DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Scott.Kennedy@doj.oregon.gov

*Counsel for the State of Oregon*

[Additional counsel to appear on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON and the CITY OF PORTLAND, | |
| Plaintiffs, | Case No. 3:25-cv-01756 |
| v. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

Page 1 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.  INTRODUCTION

1.     The "traditional and strong resistance of Americans to any military intrusion into civilian affairs" has "deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Our nation's founders recognized that military rule—particularly by a remote authority indifferent to local needs—was incompatible with liberty and democracy. Foundational principles of American law therefore limit the President's authority to involve the military in domestic affairs.

2.     Those principles stem first from the U.S. Constitution, which reserves the general police power for the states while establishing civilian control over the military. It also affords Congress, not the President, the power "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." Art. I, § 8, cl. 15–16. While Congress has delegated a portion of that power to the Executive, it carefully limited the President's authority to exert control over a state's National Guard—the modern term for the militia—to specific circumstances. And for over a century and a half, Congress has expressly forbidden federal military interference in civilian law enforcement.

3.     Defendants have trampled on these principles by federalizing members of the Oregon National Guard for deployment in Portland, Oregon, to participate in civilian law enforcement. On September 28, 2025, the Secretary of Defense (now referred to as the Secretary of War) issued a memorandum calling into federal service 200 members of the Oregon National Guard. This order effectuated a social media post by President Trump on September 27, 2025, which authorized the Secretary to employ "Troops" using "Full Force" in Portland. Citing nothing more than baseless, wildly hyperbolic pretext—the President says Portland is a "War ravaged" city "under siege" from "domestic terrorists"—Defendants have thus infringed on Oregon's sovereign power to manage its own law enforcement activity and National Guard

Page 2 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

resource. Far from promoting public safety, Defendants' provocative and arbitrary actions threaten to undermine public safety by inciting a public outcry.

4.      The facts cannot justify this overreach. While Defendants' actions appear focused on ongoing protests near an Immigration and Customs Enforcement facility in Portland, those protests have been small in recent weeks—typically involving less than thirty people—and the protesters' activities have not necessitated any arrests since mid-June. But Defendants' heavy-handed deployment of troops threatens to escalate tensions and stokes new unrest, meaning more of the Plaintiffs' law enforcement resources will be spent responding to the predictable consequences of Defendants' action.

5.      Defendants' deployment of troops to Oregon is patently unlawful. Because their stated basis for federalizing members of Oregon's National Guard is patently pretextual and baseless, Defendants cannot satisfy any of the three perquisites for involuntarily federalizing a state's National Guard under 10 U.S.C. § 12406. Defendants' purpose in federalizing those troops—to integrate them into federal law enforcement activities in Portland—also violates the Posse Comitatus Act.

6.      Additionally, Defendants' actions violate the Tenth Amendment's guarantee that the police power—including the authority to promote safety at protests and deter violent crime—resides with the states, not the federal government. And by singling out a particular disfavored jurisdiction for political retribution, these actions also eviscerate the constitutional principle that the states' sovereignty should be treated equally.

7.      For these and other reasons discussed below, Defendants' actions should be declared unlawful and preliminarily and permanently enjoined.

Page 3 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## II. JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

2201(a) and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).

Defendants are agencies of the United States and officers sued in their respective official

capacities. The State of Oregon is a resident of this district, and a substantial part of the events or

omissions giving rise to this Complaint occurred and continue to occur within the District of

Oregon.

## III. PARTIES

### A.    Plaintiffs

10.      The State of Oregon is a sovereign state of the United States. Oregon is

represented by Attorney General Dan Rayfield, who is the chief legal officer of Oregon.

11.      Plaintiff City of Portland is a municipal corporation of the State of Oregon duly

organized and existing under the laws of the State of Oregon. The Portland Police Bureau (PPB)

is a bureau of the City of Portland. PPB is the largest law enforcement agency in Oregon and has

the primary responsibility for policing the City of Portland.

### B.    Defendants

12.      Donald Trump is President of the United States. As such, he is the Commander-

in-Chief of the United States' armed forces, including those portions of the National Guard

lawfully under federal control. He is sued in his official capacity for declaratory relief only.

13.      Pete Hegseth is Secretary of Defense and the head of the U.S. Department of

Defense. He is sued in his official capacity.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

14.     The U.S. Department of Defense (DOD) is a department of the Executive Branch of the United States government responsible for coordinating and supervising the United States armed forces, including those portions of the National Guard lawfully under federal control. DOD is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). On September 5, 2025, President Trump issued Executive Order 14,347, entitled "Restoring the United States Department of War," in which he stated that the Department of Defense "may be referred to as the Department of War" as a secondary title in certain contexts. 90 Fed. Reg. 43893, 43893 (Sept. 5, 2025).

15.     Kristi Noem is Secretary of Homeland Security and the head of the U.S. Department of Homeland Security. She is sued in her official capacity.

16.     The U.S. Department of Homeland Security (DHS) is a department of the Executive Branch of the United States government. DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). One component of DHS is U.S. Immigration and Customs Enforcement (ICE).

## IV. BACKGROUND

**A.     The Oregon National Guard is a State-Based Military Reserve Force**

17.     The U.S. Constitution authorizes Congress "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." U.S. Const. art. I, § 8, cl. 15–16. This state-based militia that existed at the nation's founding was the forerunner of the modern National Guard.

18.     Today, the National Guard is a state-based military reserve force that consists of two overlapping but distinct organizations: the National Guard of the various States and the National Guard of the United States. Since 1933, anyone who enlists in a state's National Guard

Page 5 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

is simultaneously enlisted into the National Guard of the United States. And when a member of a state's National Guard is ordered into federal service, that member is relieved of his or her status in the state's National Guard for the duration of that federal service.

19.    Members of the National Guard may serve in one of three capacities: State Active Duty status, Title 32 status, and Title 10 status.

20.    First, members of the National Guard may serve in "State Active Duty" status. This means they exercise state functions under the authority of their state's governor, and their actions generally are governed by state law. For example, when wildfires occur in Oregon, Governor Kotek frequently authorizes the Oregon National Guard to assist with firefighting efforts.

21.    Second, members of the National Guard may serve in a hybrid federal-state status under Title 32 of the United States Code. In particular, 32 U.S.C. § 502(f)(2)(A) provides that, "[u]nder regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may," under certain circumstances, "be ordered to perform" enumerated duties, including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." The United States has traditionally recognized that National Guard members serving federal missions in Title 32 status must have the consent not only of their home state's governor but also the consent of any other governors concerned in the mission. Here, Oregon does not consent to the deployment of Oregon National Guard members pursuant to 32 U.S.C. § 502(f)(2)(A).

22.    Third, members of the National Guard may be "federalized" and called into federal service in what is known as "Title 10" status under Title 10 of the United States Code.

Page 6 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The President's authority under Title 10 is carefully limited to specific circumstances under 10 U.S.C. § 12406.

**B.     10 U.S.C. § 12406 Limits the Circumstances When a President Can Call a State's National Guard Members into Federal Service**

23.     Congress has granted the President authority over the states' respective National Guards, but it carefully limited that authority to specific circumstances. As relevant here, 10 U.S.C. § 12406 provides that:

> Whenever-
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

24.     Thus, the President's authority over a state's National Guard pursuant to § 12406 is limited to circumstances involving a foreign nation's "invasion," an outright "rebellion," or where the President has been "unable with regular forces" to execute Federal Law through ordinary means. And if one of those circumstances is present, the President "shall" issue any orders to a state's National Guard "through" that state's governor.

Page 7 -     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

C.     **The Posse Comitatus Act Prohibits the Deployment of Federalized National Guard Troops for the Purpose of Civilian Law Enforcement**

25.     The President's authority over a state's National Guard is subject to other constraints as well. The Posse Comitatus Act, 18 U.S.C. § 1385, prohibits anyone from deploying the U.S. military—including any National Guard members in federal service—for the purpose of civilian law enforcement within the United States. That prohibition applies "except in cases . . . expressly authorized by the Constitution or Act of Congress." *Id.*

26.     Notably, 10 U.S.C. § 12406 does not confer an exception to the Posse Comitatus Act because, while it authorizes the president to "call into federal service" a state's National Guard under certain circumstances, it does not authorize the president to domestically deploy the National Guard in pursuit of any particular purpose. This stands in contrast to other statutory provisions, like 10 U.S.C. § 252, which authorizes the President to not only "call into Federal service . . . the militia of any state" but also "*use* such of the armed forces" in specified law enforcement activities under certain circumstances (emphasis added).

27.     In light of these restrictions—together with Americans' "traditional insistence on limitations on military operations in peacetime," *Laird*, 408 U.S. at 15—it is unsurprising that until the last few months, no President had invoked § 12406 since President Nixon called up the National Guard to deliver mail during a Postal Service Strike over 50 years ago. *See* Exec. Order No. 11519, 35 Fed. Reg. 5003 (1970).

28.     The legal and normative constraints on presidential authority to federalize and deploy a state's National Guard are so well established that President Trump previously acknowledged them. Questioned in September 2020 about his commitment to restore law and order, the President said, "[w]e have laws. We have to go by the laws. We can't move in the National Guard. . . . Even in a Portland [Oregon] case, we can't call in the National Guard unless

Page 8 -     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

we're requested by a governor."[1] Instead, the president emphasized that communication and

cooperation is key, because even "[i]f a governor or a mayor is a Democrat, like in Portland, we

call them constantly."

**D.    The President Has Repeatedly Expressed Intentions to Use the Military for Routine Domestic Law Enforcement**

29.    Despite his prior statements, the President has shared his plans to deploy members

of the National Guard to further his civilian law enforcement priorities.

30.    For example, asked in April 2024 whether his domestic immigration enforcement

efforts would include using the U.S. military, President Trump said "It would."[2] The president

continued that he would have "no problem using the military," which he understood to include

"the National Guard," in order to further his domestic priorities and promote "law and order in

our country."[3] Asked whether he would go so far as to override the Posse Comitatus Act, the

President opined that the Act would not apply to immigration enforcement because in his view,

"these [undocumented immigrants] aren't civilians. These are people that aren't legally in our

country."[4]

---

[1] Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News (June 10, 2025, at 5:10 PM PT), https://apnews.com/article/trump-immigration-military-los-angeles-a2611009fd40d593f07c58255911513d.

[2] *Read the Full Transcripts of Donald Trump's Interviews With TIME*, TIME Mag. (Apr. 30, 2024, at 6:27 PM ET), https://time.com/6972022/donald-trump-transcript-2024-election/.

[3] *Id.*

[4] *Id.*

Page 9 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

31.     Similarly, on November 17, 2024, when a social media post predicted that President Trump "will declare a national emergency and will use military assets" to implement "a mass deportation program," the President responded: "TRUE!!!"[5]

**E.    Defendants Have Since Used the Military for Civilian Law Enforcement in Los Angeles and Washington, D.C.**

32.     Prior to President Trump ordering troops to Portland, federalized national guard and active-duty soldiers were first deployed in Los Angeles, California, and then Washington, D.C.

33.     Trump federalized the California National Guard on June 7, 2025, following a day of aggressive immigration enforcement activity in the Los Angeles metropolitan area. The authorization memorandum cited 10 U.S.C. § 12406 as legal authority, and claimed a factual basis of violence, disorder, and damage to federal property. *Newsom v Trump*, 141 F.4th 1032, 1041, 1051 (9th Cir., 2025).

34.     California filed suit claiming, among other things, that the federal action violated the Posse Comitatus Act. On September 2, 2025, the district court found that the Trump administration had "instigated a months-long deployment of the National Guard and Marines to Los Angeles for the purpose of establishing a military presence there and enforcing federal law. Such conduct is a serious violation of the Posse Comitatus Act." *Newsom v. Trump*, No. 3:25-cv-04870-CRB, 2025 WL 2501619, at *24 (N.D. Cal. Sept. 2, 2025).

35.     On August 11, 2025, the Trump administration's focus turned to Washington, D.C. At a press conference that day, President Trump announced the planned deployment of the

---

[5] Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News(June 10, 2025, at 5:10 PM PT), https://apnews.com/article/trump-immigration-military-los-angeles-a2611009fd40d593f07c58255911513d.

Page 10 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

D.C. National Guard into the district to "to rescue our nation's capital from crime, bloodshed, bedlam and squalor and worse."[6] He called it "Liberation Day in DC," and said, "we're gonna take our capital back."[7]

36.    The same day, Defendant Hegseth also announced that National Guard troops would be deployed in D.C. to "stand with their law enforcement partners"—which, he said, was the "same thing" the National Guard did in Los Angeles. The Trump administration deployed national guard troops from D.C. and seven other states into Washington, D.C.[8]

37.    On September 4, 2025, the District of Columbia filed a lawsuit challenging that deployment on multiple grounds. D.C. alleged that, among other harms, the "encroachment of National Guard troops in the District has also already caused harm to public safety in the District." Complaint ¶¶ 129–30, *District of Columbia v. Trump*, No. 1:25-cv-03005 (D.D.C. Sept. 4, 2025), Dkt. No. 1.

**F.    Portlanders Protest Against Portland ICE Facility**

38.    On June 2, 2025, for the first time, federal authorities arrested an asylum-seeker at Immigration Court in Portland.[9]  This arrest catalyzed small public protests at Portland's ICE facility, located at 4310 S. Macadam Avenue.

---

[6] AP Archive, *Trump Says He's [sic] Wants to Rescue Washington, DC from 'Crime, Bloodshed, Bedlam, and Squalor'* (YouTube, Aug. 11, 2025), https://www.youtube.com/watch?v=O-C0NwtFKoU

[7] *Id.*

[8] Brian Krans, *California Argues Trump's Use of Troops in LA Violated Federal Law*, KQED (Aug. 12, 2025 at 11:33 AM PT) https://www.kqed.org/news/12051797/california-argues-trumps-use-of-troops-in-l-a-violated-federal-law

[9] Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland, From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT), https://www.oregonlive.com/portland/2025/09/how-ice-protests-have-unfolded-in-portland-from-june-until-now.html.

Page 11 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

39.    On June 6, 2025, protests began in Los Angeles following increased immigration enforcement activities in the city.[10] In the following days, small protests continued outside of Portland's ICE facility. At one point, protestors blocked an ICE driveway with a makeshift barricade.  Portland Police Bureau (PPB) officers cleared the barricade within minutes, citing safety concerns.[11] Protests in Portland continued, with PPB officers taking appropriate action, arresting those few ICE-facility protesters who engaged in criminal activity.[12]

40.    On June 15, 2025, Portland Mayor Keith Wilson, reacting to troop deployments in Los Angeles, stated that Portland does not need help from National Guard.[13] Subsequent events proved the Mayor correct.

41.    The small protests at the ICE facility became less energetic and required less law-enforcement involvement. Indeed, the last arrest PPB made at those protests was on June 19, 2025.[14] In the days since, PPB has monitored the near-nightly protests, none of which required

---

[10] *Id.*

[11] Zaeem Shaikh, *Portland Police Clear Blockade of ICE Office; Chief Says It Was for Safety Not Immigration Information*, The Oregonian (June 10, 2025, at 6:19 AM PT), https://www.oregonlive.com/crime/2025/06/portland-police-clear-blockade-of-ice-office-chief-says-it-was-for-safety-not-immigration-enforcement.html.

[12] Tatum Todd, *Portland Police Arrest 10 at ICE Protest as Nationwide Demonstrations Continue*, The Oregonian (June 13, 2025, at 2:53 PM PT), https://www.oregonlive.com/crime/2025/06/portland-police-arrest-10-at-ice-protest-as-nationwide-demonstrations-continue.html.

[13] Zane Sparling, *How Protests Outside Portland ICE Unfolded Before Trump's Troop Announcement*, The Oregonian (Sept. 27, 2025, at 7:36 PM PT) https://www.oregonlive.com/politics/2025/09/how-protests-outside-portland-ice-unfolded-before-trumps-troop-announcement.html.

[14] Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland, From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT), https://www.oregonlive.com/portland/2025/09/how-ice-protests-have-unfolded-in-portland-from-june-until-now.html. *But see* Sparling, *supra* note 13 (noting that federal authorities made arrests on July 4).

Page 12 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

police intervention to protect public safety or interdict criminal activity on the part of the protesters.

42.     On July 8, 2025, as small ICE-facility protests continued, Tom Homan, the President's "Border Czar," pledged that immigration enforcement officers would be "tripling down" on enforcement in Portland.[15]

43.     On July 19, 2025, protests continued with up to 60 people gathered at the ICE facility. A PPB officer described the group as "low energy and seated quietly."[16]

44.     Sporadic protests continued over the subsequent weeks. On September 1, 2025, over 100 protestors marched to the ICE building. In response, federal officers deployed chemical gas and pepperballs at the crowd.[17]

**G.     Local Law Enforcement Authorities Have Been and Remain Fully Equipped to Address the Protests**

45.     Portland Police Bureau is a sophisticated law-enforcement agency employing 812 full-time officers. Every officer receives basic crowd management training and specialized teams receive up to forty hours of annual crowd management training.

46.     PPB's Central Precinct covers downtown Portland, where most public protests occur. As a result, Central Precinct officers have significant experience in protest management. Portland's ICE facility is located within PPB's Central Precinct, which employs 80 full-time officers who are the ideal frontline force for monitoring and responding to the small ongoing ICE-facility protests.

---

[15] Zarkhin & Shaikh, *supra* note 14.

[16] *Id.*

[17] *Id.*

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

47.     PPB monitors social media and regularly communicates with protest organizers to develop internal risk assessments associated with public protests. Based on the needs associated with any protest, PPB can deploy additional personnel from other precincts, activate crowd management incident commanders, call in PPB's Rapid Reaction Team, bring in off-duty officers, or rely on an extensive network of other local, county, and state agencies.

48.     PPB has needed to activate such resources during select times in response to protests involving the ICE Facility in June and July of 2025. And in that single instance, on or around July 17, 2025, the Rapid Reaction Team was deployed in connection with ensuring public order during a planned march from a nearby park to the ICE-facility. In every case before and after July 17, 2025, baseline Central Precinct monitoring has been sufficient to maintain public safety at the ICE-facility protests.

**H.     In September 2025, the President Turned His Attention to Portland, Oregon**

49.     Aside from the incidents discussed above, the ICE-facility protests have generally been small and are frequently sedate. On any given weekend, the nightlife in Portland's entertainment district warrants greater PPB resources than have the small, nightly protests in front of the ICE facility a few blocks away.

50.     Nonetheless, on September 5, 2025, Fox News aired a report on Portland ICE protests that included misleading clips from Portland protests in 2020.[18]

51.     Shortly thereafter, President Trump appeared to reference events in the same misleading FoxNews report when speaking to the press. A reporter asked which city President Trump planned to send troops to next, and he said he was considering targeting Portland because of news coverage the night before. President Trump alleged that "paid terrorists" and "paid

---

[18] *Id.*

Page 14 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

agitators" were making the city unlivable, further stating "[a]nd when we go there, if we go to Portland, we're gonna wipe them out. They're going to be gone and they're going to be gone fast. They won't even stand the fight."[19]

52.    President Trump later designated Antifa a terrorist organization on September 19, 2025. Afterward, he described a plan to insert federal personnel in cities such as Chicago, Memphis, and Portland. He stated "Have you seen Portland at all? You take a look what's happening in Portland. It's uh I mean, this has been going on for years. It's just people out of control. Crazy. We're going to stop that very soon."[20]

53.    While answering questions from the press on September 25, 2025, the President baselessly insisted people had "just burned the place down."[21] He said Portland is "on my list of things that I want to do before, uh, we finish up with the cities because I think we're going to whip the cities into shape. . . ." The President declared his intention "to get out there" and "do a pretty big number of those people in Portland that are doing that."[22]

54.    On September 27, 2025, the President followed through on his threats, posting a message to his Truth Social account: "At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect

---

[19] The Oregonian, *"It Is Like Living in Hell": Trump Discusses Portland as He Considers Sending the National Guard* (YouTube, Sept. 5, 2025), https://www.youtube.com/watch?v=6tP9QqDmu74.

[20] The Oregonian, *Trump Mentions Portland at White House: 'Just People Out of Control and Crazy'*, at 0:10 (YouTube, Sept. 19, 2025), https://www.youtube.com/watch?v=cisl1y10YRw&t=10s.

[21] The Oregonian, *Trump Escalates Rhetoric Promising Federal Intervention in Portland, Citing "Anarchy"*, at 0:44 (YouTube, Sept. 25, 2025), https://www.youtube.com/watch?v=G0TdH2aC-Jg&t=44s.

[22] *Id.*

Page 15 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. Thank you for your attention to this matter!"[23]



> **Donald J. Trump** ✓ ●
> @realDonaldTrump
>
> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!
>
> **12.8k** ReTruths  **53.1k** Likes                    9/27/25, 7:19 AM

55.     Later that day, Major General Timothy L. Rieger, Acting Vice Chief of the National Guard Bureau, requested that Oregon Governor Tina Kotek authorize mobilization of the Oregon National Guard in a non-federalized status based on a request from DHS. *See* Ex. 1. The memorandum threatened to direct mobilization of Oregon National Guard members under Title 10 of the U.S. Code if Governor Kotek did not agree within 12 hours to activate the National Guard. *Id.*

56.     DHS spokeswoman Tricia McLaughlin stated on September 27, 2025, that "President Trump and Secretary Noem are taking action to restore law and order following weeks of violent riots at ICE facilities, assaults on law enforcement, and the terrorist attack at our

---

[23] Donald J. Trump, (@realDonaldTrump) Truth Social (Sept. 27, 2025 at 07:19 ET), https://truthsocial.com/@realDonaldTrump/posts/115276694936263266

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

ICE facility in Dallas."[24] Specifics on how these concerns are related to Portland were not outlined.

57.    In a press conference on the same day, Governor Kotek stated that Oregon does not want military troops and that public safety will be handled by local law enforcement.[25]

58.    Nonetheless, on September 28, 2025, the Secretary of Defense issued a memorandum calling 200 members of the Oregon National Guard into federal service for a period of 60 days. *See* Ex. 2 at 1. That order was styled as "further implement[ation]" of a June 7, 2025 Presidential Memorandum, which vaguely cited "[n]umerous incidents of violence and disorder . . . in response to the enforcement of Federal law" that purportedly "constitute a form of rebellion against the authority of the United States." *Id.* at 2.

## I.    Defendants' Actions Represent the Latest Political Attack Against Democrat-led Jurisdictions that Refuse to Assist with Immigration Enforcement.

59.    The federal government holds key powers and responsibilities over the subject of immigration and the status of non-citizens. Those are laid out in the Immigration and Naturalization Act.

60.    Components within DHS enforce those laws. Among them, Customs and Border Protection (CBP) is responsible for determining the admissibility of non-citizens and securing the country's borders. ICE has two primary subcomponents: Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI). ERO is tasked with civil immigration enforcement and removal, including housing detainees in facilities nationwide, for

---

[24] Luke Broadwater, Hamed Aleaziz & Anna Griffin, *Trump Says He Has Ordered Troops to Protect ICE Facilities in Portland*, N.Y. Times (Sept. 27, 2025), https://www.nytimes.com/2025/09/27/us/politics/trump-portland-troops.html.

[25] KATU News, *'We Do Not Need Help': Oregon Gov. Tina Kotek on Trump's Portland Announcement to Send Troops* (YouTube, Sept. 27, 2025), https://www.youtube.com/watch?v=aa_CImbyLW4.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

immigration proceedings or removal from the United States. HSI conducts federal criminal investigations, in coordination with federal prosecutors and other criminal investigatory agencies.

61.    States and municipalities, by contrast, do not have this responsibility. States and municipalities instead protect the general public welfare. The Constitution vests the States with traditional police powers, which include the authority to make policy judgments and regulations for increasing the safety of all residents and focusing local police officers' limited time and resources on preventing and responding to crime.

62.    Under the Tenth Amendment to the United States Constitution, the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X; *Slaughterhouse Cases*, 83 U.S. 36, 62 (1873) (describing the police power as extending "to the protection of the lives, limbs, health, comfort, and quiet of all persons . . . within the State"). Among other meanings of this amendment is this:  the states—and not the federal government—wield the general police power.

63.    Public health and safety are among the more "conspicuous examples of the traditional application of the police power." *Berman v. Parker*, 348 U.S. 25, 32 (1954). States "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quite of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996).

64.    In consideration of that responsibility, in 1987 Oregon passed the "Sanctuary Promise," the first law of its kind in the United States, which prohibits state and local government agencies from using their resources to assist with federal immigration enforcement.

Page 18 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*See* ORS 181A.820. Oregon's Sanctuary Promise has been updated several times since 1987. *See, e.g.*, H.B. 3265, 81st Legis. Assemb., Reg. Sess. (Or. 2021).

65.    The President has repeatedly attacked Democrat-led cities and states, including over immigration enforcement.[26]

66.    On June 23, 2020, he stated: "[A]ll of these problems, Seattle, Portland, Chicago, uh, you could go to Oakland, you could go to Baltimore. What do they have in common? They're run by liberal Democrats, just like Joe Biden."[27]

67.    While running for his current term, the President continued to demonize cities where Democrats had been elected as leaders. On August 20, 2024, he said that "the crime is so out of control in our country. I mean, you have cities – I will say this, the top 25, almost all are run by Democrats, and they have very similar policies. . . . But you can't walk across the street to get a loaf of bread. . . . You get shot. You get mugged. You get raped, you get whatever it may be. And you've seen it and I've seen it, and it's time for a change. We have to bring back our cities."[28]

68.    On inauguration day, 2025, President Trump signed Executive Order 14,159, "Protecting the American People Against Invasion," which once again sought to unlawfully

---

[26] *See* Brett Samuels, *Trump Steps Up Clash with DC, Democratic-Led Cities*, The Hill (Aug. 12, 2025, at 6:00 AM ET), https://thehill.com/homenews/administration/5447093-trump-dc-democratic-cities-chicago ("Trump has long picked fights with Democratic cities, attacking mayors in Chicago, New York, Los Angeles, Baltimore and other areas and using them to boost his own image as a tough-on-crime president.").

[27] David Brody, *EXCLUSIVE President Trump Ramps Up 2020 Message to Evangelicals, Says Biden Will Destroy Pro-Life Movement*, Christian Broad. Network (June 23, 2020), https://cbn.com/news/politics/exclusive-president-trump-ramps-2020-message-evangelicals-says-biden-will-destroy-pro.

[28] Phillip Bump, *Trump's Claims About Violent Crime Increasingly Diverge from Reality*, Wash. Post (Aug. 21, 2024, at 11:52 AM ET), https://www.washingtonpost.com/politics/2024/08/21/trump-crime-fear/.

Page 19 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

defund "'sanctuary' jurisdictions" and directed the U.S. Department of Justice (DOJ) and DHS

to target jurisdictions like the Plaintiffs:

> Sec. 17. Sanctuary Jurisdictions. The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

69.    On February 19, 2025, Trump signed Executive Order 14,218, "Ending Taxpayer

Subsidization of Open Borders," which sought to defund certain State programs based on new

immigration enforcement demands related to the provision of federal public benefits. 90 Fed.

Reg. 10581 (Feb. 19, 2025).

70.    A coalition of affected jurisdictions, including the City of Portland, promptly sued

to enjoin the January and February immigration-related executive orders. *City & Cnty. of San

Francisco v. Donald J. Trump*, No. 25-cv-01350-WHO (N.D. Cal. Feb. 7, 2025). About a week

and a half before the court granted a preliminary injunction against those executive orders,

Trump again posted an attack on "sanctuary cities" claiming they "protect the Criminals:"[29]

---

[29] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 10, 2025, at 06:53 ET), https://truthsocial.com/@realDonaldTrump/posts/114313927527638500.

Page 20 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



71.     On April 18, 2025, Stephen Miller, on behalf of the Trump administration, leveled

the accusation that "Sanctuary cities shield criminal [undocumented immigrants] from removal."

Miller opined that "these cities are engaged in systemic criminal violations and that they are

engaged in a scheme to nullify and obstruct the duly enacted laws of the United States of

America."[30]

72.     On April 28, 2025, President Trump signed Executive Order 14287, titled

"Protecting American Communities From Criminal Aliens." In it, he targeted "sanctuary

jurisdictions" as well as "State and local officials" who allegedly "use their authority to violate,

obstruct, and defy the enforcement of Federal immigration laws."  The order accused its targets

of undertaking a "lawless insurrection against the supremacy of Federal law and the Federal

Government's obligation to defend the territorial sovereignty of the United States." 90 Fed Reg

18761, 18761 (Apr. 28, 2025).

73.     The same executive order also expressed the administration's intention to defund

grants or programs to states or municipalities with "sanctuary" laws that leave federal civil

---

[30] Roll Call Factbase Videos, *Press Briefing: Stephen Miller Speaks to Reporters Outside the White House – April 18, 2025*, at 10:17–36 (YouTube, May 12, 2025), https://www.youtube.com/watch?v=PyKrfqG51uI.

Page 21 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

immigration enforcement entirely to the federal government, even though federal courts had held this unlawful during Trump's first term.

74.    In furtherance of his effort to coerce sanctuary jurisdictions with threats of defunding, the Trump administration, acting through various federal agencies, has asserted sweeping authority to use state law enforcement officers for federal immigration enforcement. It has done so by requiring Oregon and other states to agree to cooperate with federal immigration enforcement activities as a condition to receiving billions of dollars in federal funding.

75.    For example, beginning in March 2025, DHS and its sub-agencies, including Federal Emergency Management Agency (FEMA), sought to upend the state-federal emergency management system, holding critical emergency preparedness and response funding hostage unless certain states promised to devote their criminal enforcement and other state agency resources to the federal government's civil immigration enforcement.

76.    Forced to choose between foregoing federal funds or facing compulsory diversion of limited law enforcement resources to enforce federal immigration law beyond what Oregon law allows, Oregon, with other states, prevailed in litigation challenging those coercive conditions. *Illinois v. Fed. Emergency Mgmt. Agency*, No. 1:25-cv-00206-WES-PAS, 2025 WL 2716277, at *16 (D.R.I. Sept. 24, 2025) (granting summary judgment to the plaintiff states). Oregon and other states have similarly challenged coercive immigration-enforcement conditions by the U.S. Department of Transportation, *California v. U.S. Dep't of Transportation*, No. 1:25-cv-00208-JJM-PAS (D.R.I. May 13, 2025), and the U.S. Department of Justice, *New Jersey v. U.S. Dep't of Just.*, No. 1:25-cv-00404-JJM-AEM (D.R.I. Aug. 18, 2025).

77.    In the midst of these immigration-related federal defunding actions and responsive lawsuits, DHS published, on May 29, 2025, a list of 500 purported "sanctuary

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

jurisdictions" around the country.[31] It accused them of "shamefully obstructing" the Trump

administration's deportation plans and "shielding dangerous criminal aliens."[32]

78.    The Trump Administration later revised that list on August 5, 2025, shortening it

to just 35 jurisdictions, stating that those jurisdictions were "[c]ities, states, or counties that have

laws, ordinances, regulations, resolutions, policies, or other formalized practices that obstruct or

limit local law enforcement cooperation with U.S. Immigration and Customs Enforcement

(ICE)."[33]

79.    That list included the false accusation that the State of Oregon and the City of

Portland (along with the listed others) "impede law enforcement and put American citizens at

risk by design." It also stated the Department of Justice would "work closely with the

Department of Homeland Security to eradicate these harmful policies around the country."[34]

80.    Collectively, these efforts sought to coerce sovereign states and their subdivisions

and instrumentalities—including the Plaintiffs—to disavow their own laws and subjugate

themselves to the political proclivities of the Trump administration. The August 5 publication

---

[31] Press Release, U.S. Dep't of Homeland Sec., DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law (May 29, 2025), https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law.

[32] Campbell Robertson, Halina Bennet & Jill Cowan, *A Federal List of Immigrant 'Sanctuaries' Nets Trump Allies and Foes Alike*, N.Y. Times (May 31, 2025), https://www.nytimes.com/2025/05/31/us/politics/sanctuary-cities-trump.html

[33] U.S. Off. of Att'y Gen., Dep't of Just., *U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens* (Sept. 26, 2025), https://www.justice.gov/ag/us-sanctuary-jurisdiction-list-following-executive-order-14287-protecting-american-communities.

[34] Press Release, U.S. Dep't of Just., Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

Page 23 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

specifically bragged about the success of a "threatening" letter that coerced Louisville, Kentucky to revoke its "sanctuary policies."[35]

81.     Also, during that time, President Trump directed federal agencies to focus immigration enforcement efforts in cities led by Democrats.[36]

82.     On August 13, 2025, Attorney General Bondi sent letters to officials in 32 of the 35 jurisdictions on the August 5 list, including Oregon Governor Tina Kotek and Portland Mayor Keith Wilson. The letters contended that "sanctuary jurisdiction policies have undermined this necessary cooperation and obstructed federal immigration enforcement, giving aliens cover to perpetrate crimes in our communities and evade the immigration consequences that federal law requires."[37]

83.     Bondi's August 13 letters further stated that, to ensure full cooperation in federal immigration enforcement efforts, "the President has directed the Attorney General of the United States, in coordination with the Secretary of Homeland Security, to identify sanctuary jurisdictions and notify them of their unlawful sanctuary status and potential violations of federal law," which was the letter's purpose. The letters did not include any specifics regarding any particular laws, nor did they reflect any recognition of prior court rulings holding the laws valid. The Bondi letter also demanded a response by August 19, 2025.[38]

---

[35] *Id.*

[36] Aamer Madhani, *Trump Directs ICE to Expand Deportations in Democratic-Run Cities, Undeterred by Protests*, AP News (June 15, 2025, at 7:51 PM PT), https://apnews.com/article/trump-ice-deportations-protests-65fa8d64ea12a78a0ee0ebeea008ee4d.

[37] Letters from Pam Bondi, U.S. Att'y Gen., to Various State and City Leaders 15, 57 (Aug 13, 2025), https://www.justice.gov/ag/media/1411166/dl?inline (Letter from Pam Bondi, U.S. Att'y Gen., to Tina Kotek, Governor, State of Oregon; Letter from Pam Bondi, U.S. Att'y Gen., to Keith Wilson, Mayor, City of Portland).

[38] *Id.* at 16, 58.

Page 24 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

84.     On August 19, 2025, Governor Kotek responded to Bondi's letter. Kotek responded that "Oregon, its public officials and its law enforcement officers do not engage in conduct that thwarts federal immigration enforcement." Kotek further responded that, under Oregon's Sanctuary Promise, "Requests from federal agencies to local law enforcement agencies about immigration enforcement without a judicial order must be documented, reported and denied." Kotek further explained that "Oregon complies with federal law and it will continue to follow its own laws."[39]

85.     That same day, President Trump used the pretext of "crime" to threaten a plan to expand domestic troop deployment to other Democrat-led cities and states.[40]

**J.     Defendants' Actions Will Harm the State of Oregon by Interfering with the State's Sovereign Interest in Managing Its Own Law Enforcement Activities**

86.     Defendants' unlawful federalization and deployment of Oregon National Guard members infringes on Oregon's sovereign interest in managing law enforcement within its borders, including the authority to manage protests and unrest. This power is reserved for the states under the Tenth Amendment. It also infringes upon the State's sovereign authority—and the Governor of Oregon's authority under Section 9 of the Constitution of Oregon—to manage the Oregon National Guard's resources according to the State's needs absent lawful federalization of the Guard's members.

---

[39] Mia Maldonado, *'I Respectfully Disagree': Kotek Says Oregon Will Follow Sanctuary Law Despite Threats*, Or. Cap. Chron. (Aug. 19, 2025, at 12:22 PM PT), https://oregoncapitalchronicle.com/2025/08/19/i-respectfully-disagree-kotek-says-oregon-will-follow-sanctuary-law-despite-threats/.

[40] Mariah Welfel & Alexandra Hall, *Trump Says He'll Expand His Focus on Crimes to Other Democratic-Led Cities*, Nat'l Pub. Radio (Aug. 19, 2025, at 4:21 PM ET), https://www.npr.org/2025/08/19/nx-s1-5501329/trump-says-hell-expand-his-focus-on-crimes-to-other-democratic-led-cities.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

87.     Defendants' intended use of federalized National Guard troops to control protests in Oregon communities amounts to a usurpation of the role of domestic law enforcement. The State has neither requested nor consented to federal intervention to take over that law enforcement role, which is being carried out by local law enforcement under their lawful authority. The impending use of federalized troops to engage in domestic law enforcement, without the State's consent, threatens an irreparable injury to the State's sovereign interest in managing its own law enforcement activities.

88.     Defendants' conduct also will directly and concretely interfere with current and planned law enforcement activities of state and local authorities. State and local law enforcement agencies, including the Oregon State Police and the  Portland Police Bureau, have in place their own plans and protocols for maintaining safety and order in Oregon communities, and they are carrying out their lawful role accordingly. The unlawful deployment of federalized National Guard troops to usurp that law enforcement role will directly interfere with the ability of state and local law enforcement to deal with any given situation. The presence of military units purporting to exercise law enforcement authority creates confusion among the public and threatens to undermine the work of local law enforcement in maintaining order and combating local crime. Further, the needless presence of federalized troops will lead directly to escalated tensions and increased unrest, interfering with state and local law enforcement's ability to maintain order.

89.     Further, Defendants' deployment of troops threatens to increase civil unrest, requiring diversion of state law enforcement and state resources. Recent deployments of troops elsewhere in the country have provoked protests and escalated tensions. Those military incursions included operations that were directly calculated as shows of force, intended to

Page 26 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

demonstrate federal presence and strength in otherwise peaceful locations. *See Newsom*, 2025 WL 2501619, at *7 (describing "Operation Excalibur," where federal troops were stationed in Humvees and tactical vehicles outside MacArthur Park in Los Angeles and blocked traffic along a stretch of Wilshire Boulevard while federal law enforcement officials marched across the park as a "show of presence"). As in those instances, Defendants' deployment of troops in Oregon communities will provoke and escalate protests and unrest and will require the State to divert its law enforcement personnel and resources to deal with unrest that the federal military presence has created.

### K. Defendants' Actions Will Also Harm the State of Oregon and the City of Portland by Suppressing Business Activity

90.     Defendants' conduct threatens the economic well-being of the people of Oregon. In recent months, unlawful federal deployments and militarized raids in California and the District of Columbia have directly and rapidly chilled economic activity. The deployment of troops in California stifled economic activity in the Los Angeles area. Restaurants, festivals, and farmers' markets shut down, as individuals were afraid to leave their homes due to militarized raids. Similarly, the deployment of National Guard troops in the District of Columbia depressed key industries, including tourism, restaurants, and hospitality services. Within a week after the deployment of federal troops in D.C., foot traffic in the District dropped 7 percent on average, with restaurant reservations showing an even steeper drop.[41] Defendants' military incursion into Oregon threatens similar immediate harms by depressing business activities, travel, and tourism in Oregon communities.

---

[41] Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, Wash. Post (Aug. 29, 2025, at 5:00 AM ET), https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

Page 27 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

91.    Defendants' conduct also threatens financial harm to the government of Oregon in multiple ways. The military incursion's chilling effect on economic activity will directly decrease tax revenue collected by the State and by the City. In the District of Columbia, troop deployment has resulted in a reduction of work hours for some District workers, and a corresponding decline in income tax withholding paid to the District government. Deployment of troops in Oregon communities threatens similar harm to Oregon tax revenues.

L.    **Defendants' Actions Will Harm the State of Oregon by Diverting National Guard Personnel and Rendering Them Unable to Engage in Other Critical Work**

92.    Defendants' unlawful federalization and deployment of the Oregon National Guard will concretely harm the State's interests by rendering those members unable to engage in other critical work.

93.    Except for when it has been lawfully called into federal service, the Oregon National Guard answers to its Commander-in-Chief, the Governor of Oregon. The Governor calls members of the Guard into active duty to serve the needs of Oregon in numerous ways, including to assist with emergent and unpredictable situations the State could face at any moment. The Governor, in consultation with other state government officials and local law enforcement, is in the best position to determine the needs of the State and how the Guard could be deployed to meet those needs.

94.    The Oregon National Guard's resources are limited. While the Guard has over 6,500 total members, only a fraction of those are presently available for assignment over the next six months. Others are unavailable because, among other reasons, they are already deployed in federal service; engaged in the Guard's essential administrative functions; or in basic training. Unlawfully federalizing even a portion of these Guard members impairs the State's capacity to respond to emergencies.

Page 28 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

95.    Wildfire response is one of the most significant functions the Oregon National Guard performs in the State. In 2017, for example, roughly 1,090 members were mobilized to respond to wildfires. In 2020, roughly 998 were mobilized for fire response. On September 27, 2025—the same day that the President announced his intention to send troops into Portland—Governor Kotek invoked the Emergency Conflagration Act in response to a complex of wildfires burning on Southwest Oregon's Rogue River, which has grown to over 17,300 acres.[42] Because wildfires can begin unpredictably and spread rapidly, it is critical that all qualified personnel—including members of the Oregon National Guard—remain ready to respond to growing wildfires on short notice.

96.    The Oregon National Guard serves many other critical functions in the State. Historically, these functions have included, among other things, counter-drug-trafficking efforts; natural disaster response; and supporting the State's response to the Covid-19 pandemic.

97.    Given the Guard's limited resources, and the inherent uncertainty about what needs might arise, needlessly calling hundreds of the Guard's members into federal service for a months-long period places the State in jeopardy. All of the Guard members in federal service are unavailable to the State for emergency response efforts.

---

[42] Zach Urness, *Rogue River Moon Complex Wildfire Explodes, Doubles in Size as New Evacuation Orders Issued*, Statesman J. (Sept. 28, 2025 at 9:50 AM PT), https://www.statesmanjournal.com/story/news/2025/09/27/moon-complex-rogue-river-wildfire-explodes-new-evacuation-orders-issued/86391465007/.

Page 29 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## CAUSES OF ACTION

### COUNT I

### *Ultra Vires* Action – Violation of 10 U.S.C. § 12406

### (Against All Defendants)

98.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

99.     Under 10 U.S.C. § 12406, the President is permitted to federalize a state's National Guard only when (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States. Any such order "shall be issued through the governor[] . . . ." 10 U.S.C. § 12406.

100.     None of those factual circumstances are present in Oregon, and Defendants' assertions to the contrary are patently pretextual and lack any good-faith basis.

101.     Defendants have not identified any "invasion by a foreign nation."

102.     Nor is there any "rebellion or danger of a rebellion." The President's characterization of Portland as "war ravaged" community is pure fiction. The protests contained to a small area near Portland's ICE facility have been successfully managed by local law enforcement and do not in any way constitute a rebellion or danger of a rebellion. And the President's June 7, 2025 Memorandum, (Ex. 2 at 2–3), made no reference to the City of Portland or the protests near the City's ICE facility.

103.     Nor have Defendants cited even a *single instance* in which they were "unable . . . to execute the laws of the United States." For example, they have not identified an inability to detain or deport those who are unlawfully present in the United States due to protests in Portland.

Page 30 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

104.    All of these facts—together with the overwhelming evidence of the President's true intentions—reveal the obvious truth: that this action was motivated by his desire to normalize the use of military troops for ordinary domestic law enforcement activity while also punishing politically disfavored jurisdictions like Portland, Oregon.

105.    Because Defendants' invocation of the prerequisites for federalization in § 12406 was wholly pretextual, the Court should find Defendants' actions are ultra vires because they violate the statute's plain language.

## COUNT II

### *Ultra Vires* Action – Violation of the Posse Comitatus Act & 10 U.S.C. § 275
### (Against All Defendants)

106.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

107.    The Posse Comitatus Act forbids Defendants from employing the armed forces to engage in law enforcement "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

108.    This restriction is underscored by 10 U.S.C. § 275, which provides that "The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law."

109.    Neither the Constitution nor any Act of Congress permits Defendants to use the armed forces—which includes the National Guard—for routine law enforcement such as protest

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

management, the suppression of violent crime or property damage, and immigration enforcement.

110.    The Court need look no further than Defendants' own statements to conclude that this troop deployment is being made for purposes that are plainly incompatible with the Posse Comitatus Act. The President's statements dating back to his most recent campaign reveal his plans to incorporate military troops into civilian law enforcement activity. And Defendants' deployment of troops in Los Angeles and Washington, D.C. furthered that plan. Then on September 5, 2025, the President said he planned to deploy troops in Portland to "wipe out" what he described as "paid terrorists" and "paid agitators." And in his September 27, 2025 social media post, the President said he planned to use troops to "protect" Portland from "domestic" organization that will perpetrate crimes in the City.

111.    Defendants' actions in Los Angeles—where they were found to have violated the PCA—further support the conclusion that they plan to do the same thing in Portland.

112.    By willfully ignoring the PCA and 10 U.S.C. § 275, while also relying on a pretextual, baseless, and bad-faith invocation of 10 U.S.C. § 12406, Defendants are acting *ultra vires*.

113.    Therefore, Plaintiffs are entitled to a declaration that any action taken pursuant to the President's September 27 directive to is invalid, and an injunction prohibiting Defendants from implementing. Absent such relief, Plaintiffs will continue to be harmed by Defendants' illegal actions.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

## COUNT III

## Violation of the Tenth Amendment of the U.S. Constitution
## (Against All Defendants)

*Infringement on Oregon's Police Power*

114.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

115.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

116.    If Defendants federalize members of the Oregon National Guard under present circumstances, they would usurp the Governor of Oregon's role as Commander-in-Chief of the National Guard in Oregon and violates the State's sovereign role over local law enforcement, pursuant to its police powers.

117.    Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the states. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878).

118.    Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured

Page 33 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

119.    Deploying federalized military forces to respond to suppress violence and manage protests despite any evidence that local law enforcement was incapable of asserting control and ensuring public safety during such protests represents the exact type of intrusion on State power that is at the heart of the Tenth Amendment. State officials in conjunction with local officials, such as the officers of the PPB, are in the best position to determine what resources are necessary to preserve public safety amid protest activity, and to intervene to enforce public safety and criminal laws when warranted.

120.    Plaintiffs are entitled to a declaration that any action to federalize the Oregon National Guard is invalid, and an injunction prohibiting Defendants from implementing those directives.

***Unlawful Coercion and Retaliation***

121.    Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which "in the ordinary course of affairs, concern the lives, liberties, and properties of the people" were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Sebelius*, 567 U.S. at 536.

Page 34 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

122.    The Defendants' actions in calling up and deploying members of the Oregon National Guard are designed to punish Plaintiffs for refusing to accede to the Trump administration's political prerogatives, not least of which on Plaintiffs' so-called sanctuary laws.

123.    This violates the Tenth Amendment by seeking to coerce Oregon into abandoning its own statutory prerogatives and instead adopt the President's policy priorities.

### Violation of Equality of State Sovereignty

124.    "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among the States." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 544 (2013) (citation omitted). The Supreme Court has long recognized that our nation "was and is a union of States, equal in power, dignity and authority," and that this "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith,* 221 U.S. 559, 567, 580 (1911).

125.    This "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" by the federal government. *Shelby Cnty*, 570 U.S. at 544 (citation omitted).

126.    Defendants have trampled these principles by selecting certain politically disfavored jurisdictions—now including Portland, Oregon—for an involuntary deployment of military troops under federal control. "And despite the tradition of equal sovereignty," Defendants have applied this harsh infringement on state sovereignty "to only [two] states" and the District of Columbia. *Id.* at 544.

127.    Such an "extraordinary departure from the traditional course of relations between the States and the Federal Government" can only be justified by dire and "unique

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

circumstances," and must be limited to "area where immediate action" is truly necessary. *Id.* at 546.

128.    But Defendants' selection of Portland, Oregon for National Guard federalization and deployment was, at best, arbitrary, and at worst, a politically motivated retaliation for the Plaintiffs' adoption of policies that the President disfavors. After all, if Defendants' true aim were to protect jurisdictions that are "ravaged" and "under siege" by criminal activity, then they would have deployed the military to any of the many jurisdictions where violent crime rates are significantly higher.

**COUNT IV**

**Violation of the Administrative Procedure Act**

**Action That is in Excess of Statutory Authority, Arbitrary
and Capricious, and Contrary to Law**

**(Against Department of Defense, Secretary Hegseth,
Department of Homeland Security, and Secretary Noem)**

129.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

130.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

131.    The DOD and Secretary Hegseth's September 28, 2025, Memorandum, (Ex. 2 at 1), federalizing 200 members of the Oregon National Guard at the request of DHS and Secretary Noem constitute final agency action because they represent the "consummation" of the agency's

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

decision-making process and they represent action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

132.    For the reasons discussed above, the DOD and Secretary Hegseth have exceeded their statutory authority to federalize the Oregon National Guard under 10 U.S.C. § 12406. For the reasons also discussed above, that action is also arbitrary and capricious. And their direction in deploying the National Guard for law enforcement will violate the Posse Comitatus Act and 10 U.S.C. § 275 as well as the U.S. Constitution.

## COUNT V
### Violation of the Constitution Separation of Powers and the Militia and Take Care Clauses
### (Against All Defendants)

133.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

134.    The Constitution's separation of powers doctrine and the Take Care Clause all place limitations on the exercise of executive authority.

135.    The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637–38 (2024).

136.    The Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. Art. I, § 8, cl. 15. The Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

Page 37 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

137.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

138.    The Militia Clauses expressly provide that "Congress shall have Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions. . . ." U.S. Const. art. I, § 8, cl. 15. They further provide that Congress has authority "To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress. . . ." U.S. Const. art. I, § 8, cl. 16.

139.    In addition, the Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them") (internal quotation marks and citation omitted). The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

Page 38 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

140.    Defendants have violated each of these constitutional doctrines by asserting authority over a state Militia that the Constitution and federal law expressly assign to the States and disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275, which limit the participation of federal military forces in law enforcement.

141.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952). Plaintiffs are entitled to preliminary and permanent injunctive relief barring the actions challenged herein.

142.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are also entitled to a declaration that the actions challenged herein violate the constitutional separation of powers doctrine, the Take Care Clause, and impermissibly arrogate to the Executive power that is reserved to Congress or the states.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.    Declare that any order federalizing and deploying members of the Oregon National Guard is ultra vires and contrary to law;

b.    Hold unlawful and enjoin Defendants' federalization and deployment of members of the Oregon National Guard;

c.    Preliminarily and permanently enjoin, and stay and set-aside, Secretary Hegseth and the Department of Defense from calling Oregon National Guard members into federal service, deploying them in Oregon, or taking any other similar action in Oregon;

Page 39 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

      d.      Award Plaintiffs' costs of suit and reasonable attorneys' fees and expenses under any applicable law; and

      e.      Award such additional relief as the interests of justice may require.

DATED September 28, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel

*s/ Scott Kennedy*
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov
Ian.VanLoh@doj.oregon.gov
Rachel.Sowray@doj.oregon.gov
Alex.Jones@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*

Page 40 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ROBERT TAYLOR  #044287
Portland City Attorney

*s/ Caroline Turco*
CAROLINE TURCO  #083813
Senior Deputy City Attorney
NAOMI SHEFFIELD  #170601
Chief Deputy City Attorney
1221 SW Fourth Avenue
Fourth Floor, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Caroline.Turco@portlandoregon.gov
Naomi.Sheffield@portlandoregon.gov

*Counsel for the City of Portland*

Page 41 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF