DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Scott.Kennedy@doj.oregon.gov

*Counsel for the State of Oregon*

[Additional counsel to appear on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON and the CITY OF PORTLAND, | Case No. 3:25-cv-01756 |
| Plaintiffs, | |
| v. | MOTION FOR TEMPORARY RESTRAINING ORDER |
| DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................................i

TABLE OF AUTHORITIES ......................................................................................................iii

MOTION...................................................................................................................................... 1

MEMORANDUM OF LAW ........................................................................................................ 1

I.      INTRODUCTION  ........................................................................................................... 1

II.     BACKGROUND .............................................................................................................. 2

        A.      The Situation in Portland. ..................................................................................... 2

                1.      Protests at the ICE facility in Portland over the summer of 2025. ............ 2

                2.      President Trump's preexisting intention to militarize streets of
                        Portland and other "sanctuary cities."...................................................... 4

                3.      The President makes good on his threats.................................................. 6

                4.      Local law enforcement has the situation under control. ........................... 8

                5.      Adding federalized troops will make the situation worse......................... 9

        B.      The National Guard................................................................................................ 9

III.    LEGAL STANDARD...................................................................................................... 10

IV.     ARGUMENT .................................................................................................................. 11

        A.      The State and City are likely to succeed on the merits of their claims................. 11

                1.      Defendants' actions are *ultra vires* and exceed the President's
                        authority under 10 U.S.C. § 12406. ....................................................... 11

                        a.      The Court must review the rationale for invoking
                                § 12406 to ensure it reflects a credible assessment of the
                                facts and law. ............................................................................ 11

                        b.      The ICE facility protests have not rendered the
                                President's unable execute the laws............................................ 12

                        c.      Nor do the ICE facility protests constitute a rebellion.................. 14

                2.      The Posse Comitatus Act and 10 U.S.C. § 275 prohibit
                        Defendants' deployment of federalized National Guard troops
                        in Portland. ............................................................................................ 15

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

3.    The Tenth Amendment of the U.S. Constitution bars
Defendants from deploying federalized troops to enforce
criminal laws or punish Oregon for its sanctuary policies....................... 17

a.    The deployment of federalized National Guard troops
substantially interferes with Plaintiffs' sovereign police
powers. ......................................................................................... 17

b.    The deployment is an attempt to coerce or punish
Plaintiffs for their sovereign choice to adopt policies the
President disfavors. ...................................................................... 19

c.    The President's action violates the fundamental
principle of equal sovereignty among the States. ........................ 20

4.    Defendants' actions violate the Administrative Procedure Act
because they are not in accordance with law. ........................................... 21

5.    Defendants' actions violate the Constitution's Separation of
Powers and the Militia and Take Care Clauses. ...................................... 22

6.    Oregon and Portland have standing to challenge the
federalization and unlawful deployment of National Guard
troops........................................................................................................ 24

B.    Without the entry of a temporary restraining order, Oregon and
Portland will suffer irreparable harm. .................................................................. 28

C.    The balance of equities and the public interest weigh in favor of issuing
a temporary restraining order. ............................................................................. 30

V.    CONCLUSION ............................................................................................................ 31

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abbott v. Perez,*
    585 U.S. 579 (2018).................................................................................29

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982)........................................................................24, 25, 27

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) .............................................................11

*Arizona v. Yellen,*
    34 F.4th 841 (9th Cir. 2022) ................................................................25

*Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) .............................................................28

*Bennett v. Spear,*
    520 U.S. 154 (1997).................................................................................22

*Biden v. Nebraska,*
    600 U.S. 477 (2023)..........................................................................24, 28

*Center for Biological Diversity v. Mattis,*
    868 F.3d 803 (9th Cir. 2017) ........................................................30, 31

*City of Chicago v. Sessions,*
    888 F.3d 272 (7th Cir. 2018) ................................................................32

*City of Chicago v. Sessions,*
    No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, No. 17-
    2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018)................................32

*City of Evanston v. Sessions,*
    No. 18 C 4853, 2018 WL 10228461 (N.D. Ill. Aug. 9, 2018)................29

*City of Oakland v. Lynch,*
    798 F.3d 1159 (9th Cir. 2015) .............................................................28

*Clinton v. City of New York,*
    524 U.S. 417 (1998)..........................................................................22, 23

*Coyle v. Smith,*
    221 U.S. 559 (1911).................................................................................21

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ........................................................................................28

*Goldman v. Weinberger,*
   475 U.S. 503 (1986) ........................................................................................30

*Kansas v. United States,*
   249 F.3d 1213 (10th Cir. 2001) .......................................................................29

*Kendall v. United States,*
   37 U.S. (12 Pet.) 524 (1838) .....................................................................23, 24

*Kentucky v. Biden,*
   23 F.4th 585 (6th Cir. 2022) .....................................................................25, 29

*League of Women Voters of United States v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................30

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................................24

*Maryland v. King,*
   567 U.S. 1301 (2012) ......................................................................................29

*McHenry Cnty. v. Raoul,*
   44 F.4th 581 (7th Cir. 2022) ...........................................................................19

*Murphy v. NCAA,*
   584 U.S. 453 (2018) ........................................................................................19

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) ............................................................................18, 19, 20

*New York v. United States,*
   505 U.S. 144 (1992) ..................................................................................19, 25

*Newsom v. Trump,*
   141 F.4th 1032 (9th Cir. 2025) ...........................................................12, 13, 14, 28

*Newsom v. Trump,*
   No. 3:25-cv-04870-CRB, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025) ...................... *passim*

*Nken v. Holder,*
   556 U.S. 418 (2009) ..................................................................................11, 30

*Ohio v. Env't Prot. Agency,*
   603 U.S. 279 (2024) ..................................................................................29, 30

Page iv -   MOTION FOR TEMPORARY RESTRAINING ORDER

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir 2006) ........................................................................22

*Oregon v. Trump*,
   406 F. Supp. 3d 940, 973 (D. Or. 2019), *aff'd in part, vacated in part,*
   *remanded sub nom. City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078
   (9th Cir. 2022)............................................................................................20

*Printz v. United States*,
   521 U.S. 898 (1997)...............................................................................19, 20

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ..............................................................30

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020)....................................................................................22

*Shelby Cnty., Ala. v. Holder*,
   570 U.S. 529 (2013)................................................................................20, 21

*South Dakota v. Dole*,
   483 U.S. 203 (1987)....................................................................................20

*Sterling v. Constantin*,
   287 U.S. 378 (1932)......................................................................................9

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020) ...................................................................12

*Tennessee v. Dep't of Educ.*,
   104 F.4th 577 (6th Cir. 2024) ......................................................................29

*Trump v. United States*,
   603 U.S. 593 (2024).....................................................................................22

*In re United Mine Workers of Am. Int'l Union*,
   190 F.3d 545 (D.C. Cir. 1999) .....................................................................23

*United States v. Alvarado*,
   Cr. No. 13-4064 JCH, 2014 WL 12785138 (D.N.M. Nov. 20, 2014) ....................16

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) .......................................................................25

*United States v. Dreyer*,
   804 F.3d 1266 (9th Cir. 2015) .....................................................................15

Page v -   MOTION FOR TEMPORARY RESTRAINING ORDER

*United States v. Hutchings*,
  127 F.3d 1255 (10th Cir. 1997) ...........................................................16

*United States v. Morrison*,
  529 U.S. 598 (2000)..........................................................17, 18, 25

*United States v. Texas*,
  599 U.S. 670 (2023) ...........................................................................24

*Util. Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014)...........................................................................23

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ...........................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...............................................................11, 28, 30

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 ..................................................................................22, 24

*In re Zappos.com, Inc.*,
  888 F.3d 1020 (9th Cir. 2018) ..............................................24, 26, 27

## STATUTES, RULES, REGULATIONS

Administrative Procedures Act
  5 U.S.C. § 704.....................................................................................22
  5 U.S.C. § 706(2)(A)-(C)....................................................................21

10 U.S.C.
  §§ 271-284 ...........................................................................................16
  § 275.....................................................................................................16
  § 10106.................................................................................................16

Posse Comitatus Act, 10 U.S.C. § 12406 ...................................... *passim*

18 U.S.C. § 1385....................................................................................15, 28

32 U.S.C. § 502(f)(2)(A)...............................................................................10

ORS
  180.805...................................................................................................3
  181A.820-.829........................................................................................3
  316.037.................................................................................................28
  317A.116..............................................................................................28

Portland City Code 7.02.500.........................................................................28

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I
   § 8, cl. 15...................................................................................................9, 11, 23
   § 8, cl. 16.........................................................................................................9, 23

U.S. Const. art. II
   § 2, cl. 1..............................................................................................................23
   § 3.......................................................................................................................23

U.S. Const. amend. I ...........................................................................................12, 15

U.S. Const. amend. X.......................................................................................... *passim*

## OTHER AUTHORITIES

Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the
   National Guard Arrived*, Wash. Post (Aug. 29, 2025, at 5:00 AM ET)..................27

AP Archive, *Trump Says He's [sic] Wants to Rescue Washington, DC from
   'Crime, Bloodshed, Bedlam, and Squalor'* (YouTube, Aug. 11, 2025) ............6, 25

Brett Samuels, *Trump Steps Up Clash with DC, Democratic-Led Cities*, The Hill
   (Aug. 12, 2025, at 6:00 AM ET)................................................................................4

*District of Columbia v. Trump*,
   No. 1:25-cv-03005 (D.D.C. Sept. 4, 2025), Dkt. No. 1 ............................................6

Donald J. Trump, (@realDonaldTrump) Truth Social (Sept. 2, 2025 at 04:45),
   https://truthsocial.com/@realDonaldTrump/posts/115134530741891730...........................25

Donald J. Trump, (@realDonaldTrump) Truth Social (Sept. 27, 2025, at 07:19),
   https://truthsocial.com/@realDonaldTrump/posts/115276694936263266........................7, 17

Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025)...........................................5

Exec. Order No. 14,287, 90 Fed. Reg. 18761 (April 28, 2025)........................................5

The Federalist, No. 45 (J. Madison) .............................................................................18

Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland,
   From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT)..............13

Letters from Pam Bondi, U.S. Att'y Gen., to Various State and City Leaders (Aug
   13, 2025) ...................................................................................................................9

Luke Broadwater, Hamed Aleaziz & Anna Griffin, *Trump Says He Has Ordered
   Troops to Protect ICE Facilities in Portland*, N.Y. Times (Sept. 27, 2025)............7

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News (June 10, 2025, at 5:10 PM PT)..................................................................5, 15, 16

Mia Maldonado, *'I Respectfully Disagree': Kotek Says Oregon Will Follow Sanctuary Law Despite Threats*, Or. Cap. Chron. (Aug. 19, 2025, at 12:22 PM PT)................................5

Phillip Bump, *Trump's Claims About Violent Crime Increasingly Diverge from Reality*, Wash. Post (Aug. 21, 2024, at 11:52 AM ET) ......................................................4

Press Release, City of Portland, Portland Sees Decline in Violent Crime; Homicides Down 51% in First Half of 2025, (Aug. 8, 2025)......................................................4

Press Release, Dan Rayfield, Or. Att'y Gen., Oregon Sues Trump Administration Over Unlawful Federalization of National Guard (Sept. 28, 2025)............................................9

Press Release, Governor Tina Kotek, Governor Kotek and Attorney General Fight Back on President Trump's Abuse of Power (Sept. 28, 2025) ....................................7

*Read the Full Transcripts of Donald Trump's Interviews With TIME*, TIME Mag. (Apr. 30, 2024, at 6:27 PM ET)...................................................................5, 15, 16

*Rebellion*, Black's Law Dictionary (12th ed. 2024) ....................................................14

The Oregonian, *"It Is Like Living in Hell": Trump Discusses Portland as He Considers Sending the National Guard* (YouTube, Sept. 5, 2025) ....................................6, 17

The Oregonian, *Trump Mentions Portland at White House: 'Just People Out of Control and Crazy'* (YouTube, Sept. 19, 2025) ........................................................6

Tatum Todd, *Portland Police Arrest 10 at ICE Protest as Nationwide Demonstrations Continue*, The Oregonian (June 13, 2025, at 2:53 PM PT)..........................13

U.S. Off. of Att'y Gen., Dep't of Just., *U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens* (Sept. 26, 2025).......................................................................5

Yesenia Amaro, *Three Demonstrators Briefly Detained at ICE Office in Portland During Protest to Support Immigrants*, The Oregonian (June 6, 2025, at 9:11 AM PT) .......................................................................3

Zaeem Shaikh, *Portland Police Clear Blockade of ICE Office; Chief Says It Was for Safety Not Immigration Information*, The Oregonian (June 10, 2025, at 6:19 AM PT).......................................................................13

Zane Sparling, *How Protests Outside Portland ICE Unfolded Before Trump's Troop Announcement*, The Oregonian (Sept. 27, 2025, at 7:36 PM PT)................................13

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

## MOTION[1]

The State of Oregon and the City of Portland move under Federal Rule of Civil Procedure 65(b) for a temporary restraining order and stay of Secretary Hegseth's September 28, 2025 memorandum federalizing members of the Oregon National Guard.

## MEMORANDUM OF LAW

## I.    INTRODUCTION

Military rule is incompatible with liberty and democracy. This enduring principle has guided the United States throughout its history. In adopting the U.S. Constitution, our nation's founders reserved the general police power for the states while establishing civilian control over the military. They also afforded Congress, not the President, the power to call forth the militia. And for over a century and a half, Congress has expressly forbidden federal military interference in civilian law enforcement.

Defendants are now trampling on those foundational principles. In furtherance of a nationwide campaign to incorporate the military into civilian law enforcement—while also seeking to punish select, politically disfavored jurisdictions—they are preparing to deploy troops in Portland, Oregon. Specifically, on September 28, 2025, the Secretary of Defense (now referred to as the Secretary of War) issued a memorandum (the "Hegseth Memorandum") calling into federal service 200 members of the Oregon National Guard. This directive effectuated a September 27, 2025 social media post by President Trump that authorized the Secretary to employ "Troops" using "Full Force" in Portland. Citing nothing but a wildly hyperbolic pretext—the President says Portland is a "War ravaged" city "under siege"—Defendants have thus infringed on Oregon's sovereign power to manage its own law enforcement activity and National Guard.

---

[1] Conferral is not required under L.R. 7-1(a)(1). Plaintiffs' counsel emailed the complaint to the Civil Chief for the U.S. Attorney's Office and the United States's counsel in *Newsom v. Trump*, No. 3:25-cv-04870-CRB (N.D. Cal.), at 2:01 p.m. yesterday, will immediately email this motion to the same attorneys upon filing, will seek to notify the U.S. Attorney's office by telephone, and will hand-deliver the motion to the U.S. Attorney's office this morning.

Page 1 -    MOTION FOR TEMPORARY RESTRAINING ORDER

The facts do not remotely justify this overreach. Defendants' actions appear focused on ongoing protests near an Immigration and Customs Enforcement (ICE) facility in Portland. Those protests have been small in recent weeks—typically involving fewer than thirty people—and the protesters' activities have not necessitated any arrests for months. But Defendants' heavy-handed deployment threatens to escalate tensions and stoke new unrest. As a result, more of the Plaintiffs' law enforcement resources will be spent responding to the predictable consequences of Defendants' actions.

Defendants' actions are patently unlawful. Because their stated basis for federalizing members of Oregon's National Guard is pretextual and baseless, Defendants cannot satisfy any of the three prerequisites for involuntarily federalizing a state's National Guard under 10 U.S.C. § 12406. Defendants' purpose in federalizing those troops—to integrate them into federal law enforcement activities in Portland—also violates the Posse Comitatus Act and 10 U.S.C. § 275. Additionally, Defendants' actions violate the Tenth Amendment's guarantee that the police power, including the authority to promote safety at protests and deter violent crime, resides with the states, not the federal government. And by singling out a disfavored jurisdiction for political retribution, these actions also eviscerate the constitutional principle that the states' sovereignty should be treated equally.

For these and other reasons discussed below, Defendants' actions should be enjoined to restore the status quo that existed before the Hegseth Memorandum upset it.

## II.    BACKGROUND

### A.    The Situation in Portland

#### 1.    Protests at the ICE facility in Portland over the summer of 2025

The Portland ICE facility is located in the South Waterfront neighborhood of Portland, approximately 1.8 miles south of Portland's Federal Courthouse. The building sits at the intersection of S Macadam Avenue and S Bancroft Street, with the driveway and front entrance facing Bancroft. *See* Decl. of Brian Marshall (Marshall Decl.), Attach. 21 (map of location).

Page 2 -    MOTION FOR TEMPORARY RESTRAINING ORDER

Protests outside the facility began on June 2, 2025, after ICE officials arrested an asylum seeker in the hallway of Portland's immigration court. Protesters briefly blocked the facility's driveway with a temporary barrier, but the Portland Police Bureau (PPB) was able to clear the obstruction within minutes. Since June, small groups of protestors—generally fewer than 100 people and consistently fewer than two dozen—have been gathering outside of the ICE Facility on a nightly basis. *See* Decl. of Craig Dobson (Dobson Decl.) ¶ 20.

PPB—an organization with significant experience in crowd management—has monitored these protests since June. *See* Dobson Decl. ¶ 24. The Bureau has repeatedly adjusted its approach to fit the situation over the past several months*. See id*. ¶¶ 14, 19-23. While local law prohibits PPB from assisting ICE with immigration enforcement,[2] the Bureau is authorized to, and does, enforce Oregon's criminal laws, including when those laws have been violated by protesters outside the ICE facility. *Id*. ¶ 14. But PPB has stopped short of prohibiting the protests: after all, lawful protests are not a crime.

For the most part, the protests outside Portland's ICE facility have been peaceful. Although PPB has occasionally intervened to protect public safety or address violations of the law, the need to do so has been limited. PPB made 25 arrests at the ICE-Facility protests between June 11 and June 19, 2025. Existing federal law enforcement officials have also played a role in policing activity at the facility.[3] Dobson Decl. ¶¶ 22, 25. But despite nightly monitoring, PPB has not had cause to make any arrests at the protests since June 19, 2025. *Id*. ¶ 22. In fact, on any given weekend, the nightlife in Portland's entertainment district has required PPB to dedicate greater resources than the small protests outside the ICE facility. *Id*. ¶ 26.

---

[2] ORS 180.805, ORS 181A.820-.829.

[3] Yesenia Amaro, *Three Demonstrators Briefly Detained at ICE Office in Portland During Protest to Support Immigrants*, The Oregonian (June 6, 2025, at 9:11 AM PT), https://www.oregonlive.com/politics/2025/06/three-demonstrators-briefly-detained-at-ice-office-in-portland-during-protest-to-support-immigrants.html. All online materials are attached to the declaration of Brian Marshall.

Page 3 -    MOTION FOR TEMPORARY RESTRAINING ORDER

Nonetheless, PPB also has the structures and resources to take stronger actions when necessary. The Bureau can deploy additional personnel from other precincts; activate crowd management incident commanders; call in PPB's Rapid Reaction Team; bring in off-duty officers; or rely on an extensive network of other local, county, and state agencies. Dobson Decl. ¶¶ 10-18. But these kinds of actions have largely proven unnecessary for the protests outside the ICE facility which, with some limited exceptions, have been relatively small and sedate. *Id*. ¶ 25. And the protests bear no resemblance to the substantially larger and more turbulent protests in 2020 near the Federal Courthouse in Portland. *Id*.

### 2. President Trump's preexisting intention to militarize streets of Portland and other "sanctuary cities."

Long before the ICE protests began in June, President Trump signaled his antipathy towards Portland and other sanctuary jurisdictions, clearly telegraphing his intent to send the military into America's Democratic-led cities. Since his 2024 campaign, President Trump has claimed in hyperbolic terms that cities run by Democrats are crime-ridden.[4] These claims do not comport with the statistical reality: in Portland, for example, PPB reports that violent crime is down. Dobson Decl. ¶ 27.[5]

The President has also repeatedly attacked Democrat-led cities and states that he perceives as insufficiently cooperative with his immigration enforcement efforts. Specifically, he has expressed antipathy toward state and local "sanctuary laws," which prohibit state and local government agencies from using their resources to assist with federal immigration enforcement.[6]

---

[4] Phillip Bump, *Trump's Claims About Violent Crime Increasingly Diverge from Reality*, Wash. Post (Aug. 21, 2024, at 11:52 AM ET), https://www.washingtonpost.com/politics/2024/08/21/trump-crime-fear/.

[5] *See also* Press Release, City of Portland, Portland Sees Decline in Violent Crime; Homicides Down 51% in First Half of 2025, (Aug. 8, 2025), https://www.portland.gov/mayor/keith-wilson/news/2025/8/8/portland-sees-decline-violent-crime-homicides-down-51-first-half.

[6] *See* Brett Samuels, *Trump Steps Up Clash with DC, Democratic-Led Cities*, The Hill (Aug. 12, 2025, at 6:00 AM ET), https://thehill.com/homenews/administration/5447093-trump-dc-democratic-cities-chicago ("Trump has long picked fights with Democratic cities, attacking mayors in Chicago, New York, Los Angeles, Baltimore and other areas and using them to boost his own image as a tough-on-crime president.").

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

He signed executive orders in January and April directing the U.S. Department of Justice (DOJ) and Department of Homeland Security (DHS) to target and punish sanctuary jurisdictions like Oregon and Portland.[7] The Trump Administration went on to publish a list of jurisdictions— including Portland and Oregon—that it accuses of obstructing local law enforcement cooperation with ICE and has stated DOJ and DHS will work to eradicate these practices.[8] Attorney General Pam Bondi asserted to Governor Kotek that Oregon's sanctuary laws violate federal law,[9] and Governor Kotek responded on August 19, 2025, that Oregon "complies with federal law and will continue to follow its own laws."[10]

President Trump also announced plans to deploy members of the National Guard to further his domestic priorities and "promote law and order" in April 2024.[11] This was followed by an affirmative response to a social media post predicting that Trump would "declare a national emergency and will use military assets" to implement "a mass deportation program."[12] The country then witnessed President Trump violate historical and legal norms by federalizing the California National Guard who were then deployed, along with active-duty soldiers, in Los

---

[7] *See* Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025); Exec. Order No. 14,287, 90 Fed. Reg. 18761 (April 28, 2025).

[8] U.S. Off. of Att'y Gen., Dep't of Just., *U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens* (Sept. 26, 2025), https://www.justice.gov/ag/us-sanctuary-jurisdiction-list-following-executive-order-14287-protecting-american-communities.

[9] Letters from Pam Bondi, U.S. Att'y Gen., to Various State and City Leaders 15, 57 (Aug 13, 2025), https://www.justice.gov/ag/media/1411166/dl?inline (Letter from Pam Bondi, U.S. Att'y Gen., to Tina Kotek, Governor, State of Oregon; Letter from Pam Bondi, U.S. Att'y Gen., to Keith Wilson, Mayor, City of Portland).

[10] Mia Maldonado, *'I Respectfully Disagree': Kotek Says Oregon Will Follow Sanctuary Law Despite Threats*, Or. Cap. Chron. (Aug. 19, 2025, at 12:22 PM PT), https://oregoncapitalchronicle.com/2025/08/19/i-respectfully-disagree-kotek-says-oregon-will-follow-sanctuary-law-despite-threats/.

[11] *Read the Full Transcripts of Donald Trump's Interviews With TIME*, TIME Mag. (Apr. 30, 2024, at 6:27 PM ET), https://time.com/6972022/donald-trump-transcript-2024-election/.

[12] Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News (June 10, 2025, at 5:10 PM PT), https://apnews.com/article/trump-immigration-military-los-angeles-a2611009fd40d593f07c58255911513d.

Page 5 -   MOTION FOR TEMPORARY RESTRAINING ORDER

Angeles, California, on June 7, 2025. California sought relief, and on September 2, 2025, a district court found that the Trump Administration's deployment of the National Guard and Marines in Los Angeles had violated the Posse Comitatus Act, which forbids using the military for domestic law enforcement.[13] The President later announced a deployment of the D.C. National Guard at an August 11, 2025, press conference, saying it was intended "to rescue our nation's capital from crime, bloodshed, bedlam and squalor and worse."[14] On September 4, 2025, the District of Columbia filed a lawsuit challenging that deployment on multiple grounds. D.C. alleged that, among other harms, the "encroachment of National Guard troops in the District has also already caused harm to public safety in the District."[15]

### 3. The President makes good on his threats.

On September 4, 2025, Fox News aired a report about protests in Portland, which included clips from 2020 Portland Protests near the federal courthouse. The next day, President Trump appeared to reference this misleading news report when telling a reporter that he was considering targeting Portland for troop deployment.[16] Then on September 19, 2025, President Trump described a plan to insert federal personnel in cities such as Chicago, Memphis, and Portland.[17] And on September 25, 2025, the President included Portland on a list of cities he wanted to "save" by stopping people who are "out of control."[18]

---

[13] *Newsom v. Trump*, No. 3:25-cv-04870-CRB, 2025 WL 2501619, at *24 (N.D. Cal. Sept. 2, 2025).

[14] AP Archive, *Trump Says He's [sic] Wants to Rescue Washington, DC from 'Crime, Bloodshed, Bedlam, and Squalor'* (YouTube, Aug. 11, 2025), https://www.youtube.com/watch?v=O-C0NwtFKoU.

[15] Complaint ¶¶ 129-30, *District of Columbia v. Trump*, No. 1:25-cv-03005 (D.D.C. Sept. 4, 2025), Dkt. No. 1.

[16] The Oregonian, *"It Is Like Living in Hell": Trump Discusses Portland as He Considers Sending the National Guard* (YouTube, Sept. 5, 2025), https://www.youtube.com/watch?v=6tP9QqDmu74.

[17] The Oregonian, *Trump Mentions Portland at White House: 'Just People Out of Control and Crazy'*, at 0:10 (YouTube, Sept. 19, 2025), https://www.youtube.com/watch?v=cisl1y10YRw&t=10s.

[18] *Id.*

Page 6 -    MOTION FOR TEMPORARY RESTRAINING ORDER

President Trump soon followed through on his threats. On September 27, 2025, he declared on his Truth Social account that he was sending in troops to "protect War ravaged Portland" using "Full Force":

> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter![19]

Later that day, Oregon Governor Tina Kotek received a written request from Major General Timothy L. Rieger, Acting Vice Chief of the National Guard Bureau, asking that Kotek authorize mobilization of the Oregon National Guard in a non-federalized status based on a DHS request.[20] The memorandum threatened to direct mobilization of Oregon National Guard members under Title 10 of the U.S. Code if the Governor would not agree within 12 hours to activate the National Guard.[21] DHS spokeswoman Tricia McLaughlin stated on September 27, 2025, that "President Trump and Secretary Noem are taking action to restore law and order following weeks of violent riots at ICE facilities, assaults on law enforcement, and the terrorist attack at our ICE facility in Dallas."[22] Specifics on how those concerns are related to Portland were not outlined.

Governor Kotek spoke with President Trump and told him that there was no insurrection or threat to public safety necessitating military intervention in Portland.[23] She did not agree that there was any need to do so and did not voluntarily activate the Oregon National Guard.

---

[19] Donald J. Trump, (@realDonaldTrump) Truth Social (Sept. 27, 2025, at 07:19), https://truthsocial.com/@realDonaldTrump/posts/115276694936263266.

[20] Compl. Ex. 1 (Dkt. No. 1-1) (the "Rieger Memorandum").

[21] *Id.*

[22] Luke Broadwater, Hamed Aleaziz & Anna Griffin, *Trump Says He Has Ordered Troops to Protect ICE Facilities in Portland*, N.Y. Times (Sept. 27, 2025, at 2:56 PM ET), https://www.nytimes.com/2025/09/27/us/politics/trump-portland-troops.html.

[23] Press Release, Governor Tina Kotek, Governor Kotek and Attorney General Fight Back on President Trump's Abuse of Power (Sept. 28, 2025) (on file with author).

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Having failed to secure the consent of the Governor, and with only the ICE Building protests to point to in Oregon, the Federal Government forged ahead with its plans. On September 28, 2025, Secretary of Defense Pete Hegseth issued a memorandum directing that "200 members of the Oregon National Guard will be called into Federal service effective immediately for a period of 60 days." That order was styled as "further implement[ation]" of a June 7, 2025, Presidential Memorandum ("Trump Memorandum"), which vaguely cited "[n]umerous incidents of violence and disorder . . . in response to the enforcement of Federal law" that purportedly "constitute a form of rebellion against the authority of the United States." *See* Compl. Ex. 2 (Dkt. No. 1-2).

### 4. Local law enforcement has the situation under control.

The ICE-Facility protests have not required anything more than routine PPB monitoring in months. *See* Dobson Decl. ¶¶ 23-24. If the protests merited greater attention, or more PPB resources, PPB has been in position to provide them. *See id*. ¶¶ 10-17, 25-26. In fact, when PPB anticipated the need for additional resources, it activated an incident command and called up its fifty-officer Rapid Response Team (RRT) from June 11 through June 25. *See id*. ¶¶ 22-25. It is the nature of these nightly protests—they are generally small and sedate—that has enabled PPB to stand down its incident-command structure and the RRT. *Id*. ¶ 25. In the event that protests meaningfully grow or begin to pose a threat to public safety, PPB is prepared to meet those needs by calling on small mobile field forces, employing the larger presence of the RRT, scaling even larger forces to the area, or calling on mutual aid partners for additional personnel or specialized response teams. *Id*. ¶¶ 11-17; *see also generally* Dobson Decl. Ex. A. To date, however, regular precinct officers conducting normal neighborhood monitoring has been enough.

Nor can Defendants plausibly maintain that Portland's violent crime requires a federal troop deployment—as the President stated when deploying national guardsmen to Washington D.C. Violent crime in Portland is significantly down. Dobson Decl. ¶ 27. Murders, rapes, burglaries, and robberies are all on the decline, some by as much a fifty percent, when compared

Page 8 -   MOTION FOR TEMPORARY RESTRAINING ORDER

to the same time last year. *Id*. Many of Portland's violent crime statistics are falling to prepandemic levels. *Id*. Simply stated, there is no legitimate law-enforcement or public-order need for Defendants' federal troop deployment. *Id*.

### 5. Adding federalized troops will make the situation worse.

"Sending in 200 National Guard Troops to guard a single building is not normal."[24] It is also likely to inflame the situation and complicate local law enforcement's task of maintaining public safety near the ICE building. Dobson Decl. ¶ 28. Indeed, history shows that surging federal officials to Portland in response to protests shifts the temperature of those protests up, not down. *Id*. ¶ 29. Inserting 200 federalized National Guard troops into the area around the ICE building, particularly without extensive planning and preparation, can be expected to undermine public safety by provoking larger and possibly more unruly protests while undermining community trust, creating confusion, and impairing coordination. *See id.*; *see also* Marshall Decl., Attachs. 1-2 (Decl. of Renee Hall, Decl. of Lt. Gen. Jeffrey S. Buchanan (Ret.)). And it will fall to PPB and other state and local law enforcement partners to try and contain the predictable response to the federalized national guard deployment—requiring PPB and other local law enforcement to expend time, resources, and funds that would otherwise be unnecessary.

Alarmed about what this unlawful, abnormal, and unwarranted incursion of federalized troops into the city streets would mean for the safety and security of the people of Oregon, the Plaintiffs now seek a temporary restraining order to block the federalization of the National Guard contemplated in the Hegseth Memorandum.

### B.    The National Guard.

The U.S. Constitution authorizes Congress "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." U.S. Const. art. I, § 8, cl. 15-16. This state-based militia that existed at the nation's founding was the forerunner of the modern National Guard. Today, the National Guard is a state-based military reserve force that

---

[24] Press Release, Dan Rayfield, Or. Att'y Gen., Oregon Sues Trump Administration Over Unlawful Federalization of National Guard (Sept. 28, 2025) (on file with author).

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

consists of two overlapping but distinct organizations: the National Guard of the various States and the National Guard of the United States. Since 1933, anyone who enlists in a state's National Guard is simultaneously enlisted into the National Guard of the United States. And when a member of a state's National Guard is ordered into federal service, that member is relieved of his or her status in the state's National Guard for the duration of that federal service.

Members of the National Guard may serve in "State Active Duty" status. This means they exercise state functions under the authority of their state's governor, and their actions generally are governed by state law. For example, when wildfires occur in Oregon, Governor Kotek frequently authorizes the Oregon National Guard to assist with firefighting efforts.

Members of the National Guard may alternatively serve in a hybrid federal-state status under Title 32 of the United States Code. In particular, 32 U.S.C. § 502(f)(2)(A) provides that, "[u]nder regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may," under certain circumstances, "be ordered to perform" enumerated duties, including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." The United States has traditionally recognized that National Guard members serving federal missions in Title 32 status must have the consent not only of their home state's governor but also the consent of any other governors concerned in the mission. Here, Oregon does not consent to the deployment of Oregon National Guard members pursuant to 32 U.S.C. § 502(f)(2)(A).

Finally, members of the National Guard may be "federalized" and called into federal service under Title 10 of the United States Code. The President's authority under Title 10 is carefully limited to specific circumstances under 10 U.S.C. § 12406.

### III.    LEGAL STANDARD

A plaintiff seeking a temporary restraining order or preliminary injunction must establish four factors: (1) a likelihood of success on the merits, (2) likely irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is a party, courts consider the last two factors together, because the equities for the State consist of the public interest in a case such as this. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Ninth Circuit permits courts to balance the first and third factors, such that "serious questions going to the merits" in combination with a balance of hardships that tips *sharply* towards the plaintiff can satisfy those two factors, so long as the plaintiff also shows that there is a likelihood of irreparable injury. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## IV.     ARGUMENT

**A.     The State and City are likely to succeed on the merits of their claims.**

### 1.    Defendants' actions are *ultra vires* and exceed the President's authority under 10 U.S.C. § 12406.

Defendants' directive to federalize and deploy Oregon National Guard troops to Portland fails to meet the requirements of 10 U.S.C. § 12406. None of the prerequisites for federalization and deployment under § 12406 exist. The Secretary's deployment order therefore exceeds any authority, is *ultra vires*, and must be enjoined.

#### a.    The Court must review the rationale for invoking § 12406 to ensure it reflects a credible assessment of the facts and law.

10 U.S.C. § 12406 authorizes the federalization of the state National Guard consistent with the Constitution's first Militia Clause,[25] and imposes important limitations on this authority that must be met. The statute authorizes the President to "call into Federal service members and units of the National Guard of any State" only in three specific circumstances:

Whenever--

(1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

---

[25] The first Militia Clause provides that "The Congress shall have Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15.

Page 11 -  MOTION FOR TEMPORARY RESTRAINING ORDER

(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

(3) the President is unable with the regular forces to execute the laws of the United States

10 U.S.C. § 12406. None of those circumstances exist in Oregon.

The Ninth Circuit recently held that the President's decision to invoke § 12406 is not immune from judicial review. *Newsom v. Trump (Newsom I)*, 141 F.4th 1032, 1050-51 (9th Cir. 2025). Under that decision, the President's invocation of § 12406 is properly reviewed to ensure, at the very least, "that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)).

### b. The ICE facility protests have not rendered the President's unable execute the laws.

Defendants have pointed to no facts suggesting that troop deployment is necessary to repel a foreign invasion. Instead, they may principally rely on the third statutory prerequisite by claiming that federalization is justified by an inability "to execute the laws of the United States." 10 U.S.C. § 12406(3). The Hegseth Memorandum, for example, asserts that the President authorized federalization "to protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions . . . at locations where protests against these functions are occurring or are likely to occur." But the facts belie that rationale.

Although the statute does not require a complete prohibition on executing the laws to justify federalizing troops, there must be more than some "minimal interference." *Newsom I*, 141 F.4th at 1051. Here, the only potential interference in Portland remotely resembling the issues described in the Hegseth and Trump Memoranda are the small, largely peaceful protests near an ICE facility. But those protests in no way rendered the President "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406. Any assessment to the contrary is neither a "colorable" assessment of the facts nor one within "range of honest judgment." *Newsom I*, 141 F.4th at 1051.

As discussed in greater detail above, since June 2, 2025, a relatively small group of people have exercised their First Amendment right to protest outside an ICE facility located at

Page 12 -  MOTION FOR TEMPORARY RESTRAINING ORDER

4310 S. Macadam Avenue in Portland. At one point, protestors blocked the ICE facility's

driveway with a makeshift barricade. PPB officers cleared the barricade within minutes, citing

safety concerns.[26] In the period since, PPB monitored the protests and made targeted arrests in

June. Over time, the protests became less energetic and required less law-enforcement

involvement. The last arrest PPB made was on June 19, 2025.[27] On July 19, 2025, protests

continued with up to 60 people gathered at the ICE facility. A PPB officer described the group as

"low energy and seated quietly."[28] Sporadic protests continued over the subsequent weeks. On

September 1, 2025, over 100 protestors marched to the ICE building. In response, federal

officers deployed chemical gas and pepperballs at the crowd.[29] The protests then continued at a

lower level with PPB officers monitoring the area taking appropriate action when necessary.[30]

Aside from those sporadic incidents, the ICE-facility protests have generally been small and

sedate. Because no evidence supports the President's hyperbolic assessment of Portland was a

"War ravaged" community "under siege," that justification for invoking § 12406 does not

represent a "colorable" assessment of the facts. *Newsom I*, 141 F.4th at 1051.

    By contrast, in *Newsom I*, the Ninth Circuit stayed a temporary restraining order based on

evidence that "protesters threw objects at ICE vehicles trying to complete a law enforcement

---

[26] Zaeem Shaikh, *Portland Police Clear Blockade of ICE Office; Chief Says It Was for Safety Not Immigration Information*, The Oregonian (June 10, 2025, at 6:19 AM PT), https://www.oregonlive.com/crime/2025/06/portland-police-clear-blockade-of-ice-office-chief-says-it-was-for-safety-not-immigration-enforcement.html.

[27] Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland, From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT), https://www.oregonlive.com/portland/2025/09/how-ice-protests-have-unfolded-in-portland-from-june-until-now.html. *But see* Zane Sparling, *How Protests Outside Portland ICE Unfolded Before Trump's Troop Announcement*, The Oregonian (Sept. 27, 2025, at 7:36 PM PT) https://www.oregonlive.com/politics/2025/09/how-protests-outside-portland-ice-unfolded-before-trumps-troop-announcement.html (noting that federal authorities made arrests on July 4).

[28] Zarkhin & Shaikh, *supra* note 27.

[29] *Id.*

[30] Tatum Todd, *Portland Police Arrest 10 at ICE Protest as Nationwide Demonstrations Continue*, The Oregonian (June 13, 2025, at 2:53 PM PT), https://www.oregonlive.com/crime/2025/06/portland-police-arrest-10-at-ice-protest-as-nationwide-demonstrations-continue.html.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

operation, 'pinned down' several FPS officers defending federal property by throwing 'concrete chunks, bottles of liquid, and other objects,' and used 'large rolling commercial dumpsters as a battering ram' in an attempt to breach the parking garage of a federal building. *Newsom I*, 141 F.4th at 1052. Those facts bear no resemblance to the recent ICE facility protests in Portland. If the relatively small, contained, and largely sedated protests near Portland's ICE facility in recent weeks can justify military intervention, then the President's authority to federalize a state's National Guard under § 12406(3) would be virtually unlimited.

### c. Nor do the ICE facility protests constitute a rebellion.

The Trump Memorandum also vaguely asserts that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." But the ICE facility protests in Portland fall far short of a rebellion as that term is used in § 12406(2).

*Black's Law Dictionary* principally defines a "rebellion" as an "[o]pen, organized, and armed resistance to an established government or ruler; esp., an organized attempt to change the government or leader of a country, usu. through violence." *Rebellion, Black's Law Dictionary* (12th ed. 2024). That definition best fits the term as used in the context of § 12406(2). Of course, dictionaries sometimes also define "rebellion" in loser terms. For example, the *second* definition of the term in Black's Law Dictionary defines a rebellion as "[o]pen resistance or opposition to an authority or tradition." *Id.* But under that definition, nearly any protest—and indeed, any "opposition" whatsoever to the policies of a given presidential administration—could justify federalization of a state's National Guard. If Congress had intended to grant the President such broad authority, it would have had no need to establish factual prerequisites to federalization in § 12406 at all.

Under this or any other contextually appropriate definition of the term, no colorable assessment of the facts could lead to the conclusion that the ICE facility protests in Portland amount to a rebellion. The few instances of civil disobedience that have occurred were addressed

Page 14 -  MOTION FOR TEMPORARY RESTRAINING ORDER

quickly and decisively—indeed, PPB made targeted arrests in June for criminal activity at that time. For these reasons and all those discussed above, this is far from an "organized attempt to change the government or leader of a country" through "violence"—it is protected First Amendment activity accompanied by sporadic, isolated episodes of criminal activity that were appropriately addressed by local authorities.

### 2. The Posse Comitatus Act and 10 U.S.C. § 275 prohibit Defendants' deployment of federalized National Guard troops in Portland.

Plaintiffs' claims are also likely to succeed because the President's own statements confirm that, consistent with the administration's actions in Los Angeles, troops are being deployed to Portland to fight crime and enforce federal law in violation of the Posse Comitatus Act and 10 U.S.C. § 275.

The Posse Comitatus Act (PCA) imposes criminal liability on anyone who uses members of the military to "execute the laws" of the United States except when "expressly authorized by the Constitution or an Act of Congress." 18 U.S.C. § 1385. The Ninth Circuit has construed the PCA to prohibit three types of activities: "direct active involvement" in "civilian law enforcement activities," actions that "pervade the activities of civilian authorities," and "regulatory, proscriptive, or compulsory military power." *United States v. Dreyer*, 804 F.3d 1266, 1275 (9th Cir. 2015) (en banc) (citation omitted). If any "one of these tests is met," the Act has been violated. *Id.* In applying those tests, the Ninth Circuit has consulted guidance promulgated by the Department of Defense (DOD). *Id.* at 1274. The current version of that guidance provides that PCA-prohibited activities include "search or seizure," "arrest," "interrogations," "brandishing a weapon," "security functions," and among other things, "crowd and traffic control." Dep't of Def. Instruction No. 3025.21 ("DODI 3025.1"), encl. 3 ¶ 1.c(1) (Feb. 8, 2019).[31]

---

[31] Dep't of Def., DoDI 3025.21, Instruction Change 1 (2019), https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/302521p.pdf.

Page 15 -  MOTION FOR TEMPORARY RESTRAINING ORDER

Relatedly, 10 U.S.C. § 275 requires the Secretary of Defense to promulgate regulations to ensure that members of the armed forces do not have "direct participation" in a "search, seizure, arrest, or other similar activity" unless otherwise authorized by law. Section 275 thus reinforces the PCA's bar on law enforcement by military personnel.

None of the facts present here excuse Defendants from complying with the PCA. National Guard members in Title 10 status are subject to the PCA. 10 U.S.C. § 12405 (National Guard members "called into Federal Service" are "subject to the laws and regulations governing the Army or the Air Force"); 10 U.S.C. § 10106 ("The Army National Guard while in the service of the United States is a component of the Army."); *United States v. Hutchings*, 127 F.3d 1255, 1257-58 (10th Cir. 1997). And 10 U.S.C. § 12406 does not create an exception to the PCA. Statutes create exceptions to the PCA by "*expressly* grant[ing] authority for military assistance to civilian law enforcement." *United States v. Alvarado*, Cr. No. 13-4064 JCH, 2014 WL 12785138, at *3 (D.N.M. Nov. 20, 2014) (emphasis added); *see, e.g.*, 10 U.S.C. §§ 271-84 (ch. 15, Military Support for Civilian Law Enforcement). Section 12406 contains no such authorization. And other exceptions to the PCA "apply only in very specific circumstances," whereas if § 12406 were construed to create an exception, it would "undermine the whole act." *Newsom v. Trump (Newsom II)*, No. 3:25-cv-04870-CRB, 2025 WL 2501619, at *17 (N.D. Cal. Sept. 2, 2025) (holding that § 12406 does not create an exception to the PCA). This reading is further bolstered by the fact that "Congress does not 'hide elephants [e.g., a sweeping grant of authority to use the military for domestic law enforcement] in mouseholes [e.g., one subsection of a procedural statute].'" *Id.* (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). Indeed, the Department of Defense's own publications omit § 12406 from a "list[] of statutory exceptions to the Posse Comitatus Act." *Id.* (citing DODI 3025.1).

The President's own statements confirm that National Guard troops are being deployed to participate in civilian law enforcement in violation of the PCA and § 275. As discussed above, President Trump has repeatedly telegraphed his plans deploy the National Guard to "promote

Page 16 -  MOTION FOR TEMPORARY RESTRAINING ORDER

law and order" and implement "a mass deportation program." *Supra* n. 11-12. Defendants did so in Los Angeles by "us[ing] military troops to execute various sectors of federal law . . . across hundreds of miles and over the course of several months" while "sidelining [] state and local authorities." *Newsom II*, 2025 WL 2501619 at *24-25 (discussing examples). On September 5, 2025—referring to "paid terrorists" and "paid agitators" that have purportedly "ruined" Portland—the President declared that "when we go there . . . we're going to wipe them out." *Supra* n. 16. Then on September 19, while discussing his plans to reduce crime in multiple U.S. cities, he promised that "we're going to stop" the "people out of control" in Portland. *Supra* n. 17. These plans culminated in his September 27 Truth Social post, which authorize the use of "Full Force" by the military to "protect War ravaged Portland." *Supra* n. 19. All of this leaves little question that Defendants are deploying troops in Portland in furtherance of the President's policy and plan to incorporate the military into domestic law enforcement in violation of the PCA and § 275.

### 3.   The Tenth Amendment of the U.S. Constitution bars Defendants from deploying federalized troops to enforce criminal laws or punish Oregon for its sanctuary policies.

Plaintiffs are also likely to succeed on their claims because Defendants' conduct violates the Tenth Amendment in at least two respects. First, the deployment of federal troops in Portland over the objection of state and local officials for the ostensible purpose of fighting crime intrudes on Oregon's sovereign police power. Second, the deployment is also transparent retaliation for Oregon's adoption of laws limiting state and local participation in federal civil immigration enforcement, even though the Tenth Amendment preserves Oregon's sovereign right to make that choice.

### a.   The deployment of federalized National Guard troops substantially interferes with Plaintiffs' sovereign police powers.

The Tenth Amendment reserves to "the States" or "the people" all rights and powers "not delegated to the United States by the Constitution." U.S. Const. amend. X. Foremost among the rights and powers reserved for the States is the police power. "Indeed, we can think of no better

Page 17 -  MOTION FOR TEMPORARY RESTRAINING ORDER

example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The President's deployment of federalized National Guard troops in Oregon is a direct intrusion on its sovereign police power. Even if he disagrees with the policies and strategies Oregon's elected leaders implement to combat crime, that is constitutionally insufficient to justify a federal troop deployment in Portland. "Whether the policy thus pursued by the State is wise or unwise, it is not the province of the national authorities to determine. That belongs to each State, under its own sense of duty, and in view of the provisions of its own Constitution." *Id.* at 504.

The Supreme Court reaffirmed this reservation of state power in *National Federation of Independent Business v. Sebelius (NFIB)*, 567 U.S. 519 (2012). There, the Court invalidated portions of the Affordable Care Act because Congress had impermissibly attempted to "coerc[e] the States" into expanding Medicaid coverage by threatening to withhold federal money. *Id.* at 575. By establishing that "the police power is controlled by 50 different States instead of one national sovereign . . . [t]he Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the peoples' were held by governments more local and more accountable than a distant federal bureaucracy." *Id.* at 536 (quoting The Federalist, No. 45, at 293 (J. Madison)). In addition to ensuring greater accountability, the reservation of the police power to the States enables them to serve as "a check on the power of the Federal Government," thereby "protect[ing] the liberty of the individual from arbitrary power." *NFIB*, 567 U.S. at 536 (quoting *Bond* v. *United States*, 564 U.S. 211, 222 (2011)). Such a check on federal power is even more important where, as here, the President seeks to use the federal military to enforce criminal laws.

Even using recognized instruments of federal power—like Congress's Spending Clause authority—can violate the Tenth Amendment when the effect is like "a gun to the head." *NFIB*,

Page 18 - MOTION FOR TEMPORARY RESTRAINING ORDER

567 U.S. at 581. If the Tenth Amendment protects the States from Congress's heavy-handed use of federal dollars to expand healthcare coverage, then surely the Constitution forbids the President from commandeering the State's troops and deploying them on the streets of an American city over his disagreement with the State's exercise of its police power.

### b. The deployment is an attempt to coerce or punish Plaintiffs for their sovereign choice to adopt policies the President disfavors.

As discussed above, the President and members of his administration have also criticized Oregon's so-called "sanctuary" policies. Sanctuary policies are those that limit participation by state and local police in federal civil immigration enforcement. But the Tenth Amendment does not permit Defendants to take retaliatory action based on Oregon's exercise of its sovereign right focus its own police on enforcing state criminal law rather than federal civil immigration law.

The Tenth Amendment and the anticommandeering principle derived from it establish that the Federal government "may not conscript state or local officers directly," *Printz v. United States*, 521 U.S. 898, 935 (1997), nor may it "coerce" States through improper influence, *NFIB*, 567 U.S. at 578. This limitation on federal power applies no matter how strong the asserted federal interest may be. *New York v. United States*, 505 U.S. 144, 178 (1992). And although the federal government has an interest in enforcing its immigration laws, that interest does not give license to federal officials to conscript state and local police into federal immigration enforcement. Nor does that interest give the federal government the ability to override a State's sovereign choice to decline participation in federal immigration enforcement efforts through legislation. *See McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022); *United States v. California*, 92 F.3d 865 (9th Cir. 2019).

The Tenth Amendment is one textual embodiment of a broader constitutional commitment to States as "dual" sovereigns with the agency to choose how to exercise their respective police powers. *Murphy v. NCAA*, 584 U.S. 453, 470-72 (2018). This foundational principle is why the President's administration—now and in the prior iteration—has persistently failed to strong-arm Oregon and its municipalities into doing the administration's bidding on

Page 19 -  MOTION FOR TEMPORARY RESTRAINING ORDER

immigration enforcement. When the first Trump administration attempted to withhold funding to Oregon because of "sanctuary" policies, this Court invalidated that effort. *See Oregon v. Trump*, 406 F. Supp. 3d 940, 973 (D. Or. 2019), *aff'd in part, vacated in part, remanded sub nom. City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022). Other Courts have also affirmed that "[t]he choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities." *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018)[32] (citing, *inter alia*, *NFIB*, 567 U.S. at 580; *Printz*, 521 U.S. 898; *South Dakota v. Dole*, 483 U.S. 203 (1987)).

If the choice to enact policies limiting state and local police from engaging in federal civil immigration enforcement means that the federal government can respond by "conscripting the States' officers directly," *Printz*, 521 U.S. at 935, then it is no choice at all. *Cf. NFIB*, 567 U.S. at 580 (exercising federal power can "be so coercive as to pass the point at which pressure turns into compulsion"); *accord Chicago*, 888 F.3d at 282-83 (quoting same). The sovereign choice preserved by the Tenth Amendment cannot be so hollow. If the Tenth Amendment protects Oregon's sovereign right to choose whether its police officers engage in federal immigration enforcement, then Oregon's exercise of that right cannot be a basis for the federal government to respond with a federal troop deployment. The President's order deploying federal troops in Portland in response to valid state and local "sanctuary" laws is a violation of the Tenth Amendment, and it must be enjoined.

### c. The President's action violates the fundamental principle of equal sovereignty among the States.

In addition to a State's sovereignty under the Constitution, there is also a 'fundamental principle of equal sovereignty' among the States." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529,

---

[32] Limited *en banc* review of this decision was initially granted, but subsequently vacated, exclusively on the issue of nationwide injunctive relief. *See City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).

Page 20 -  MOTION FOR TEMPORARY RESTRAINING ORDER

544 (2013) (citation omitted). The Supreme Court has long recognized that our nation "was and is a union of States, equal in power, dignity and authority," and that this "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith*, 221 U.S. 559, 567, 580 (1911). This "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" by the federal government. *Shelby Cnty*, 570 U.S. at 544 (citation omitted).

Defendants trampled these principles by selecting certain politically disfavored jurisdictions—now including Portland, Oregon—for an involuntary deployment of military troops under federal control. Such an "extraordinary departure from the traditional course of relations between the States and the Federal Government" can only be justified by dire and "unique circumstances," and must be limited to "area where immediate action" is truly necessary. *Id*. at 546. Yet Defendants' selection of Portland, Oregon for National Guard federalization and deployment is, at best, arbitrary, and at worst, a politically motivated retaliation for the Plaintiffs' adoption of policies that the President disfavors. After all, if Defendants' true aim were to protect jurisdictions that are "ravaged" and "under siege" by criminal activity, then they would have deployed the military to any of the many jurisdictions where violent crime rates are significantly higher.

### 4. Defendants' actions violate the Administrative Procedure Act because they are not in accordance with law.

Plaintiffs are also likely to succeed because Defendants' conduct violates the Administrative Procedures Act (APA). Under the APA, courts "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

As an initial matter, the Hegseth Memorandum federalizing 200 members of the Oregon National Guard at the request of DHS constitutes final agency action because it represents the

Page 21 -  MOTION FOR TEMPORARY RESTRAINING ORDER

"consummation" of the agency's decision-making process and action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted); *see also* 5 U.S.C. § 704 (limiting APA review to "final agency actions"). The Hegseth Memorandum satisfies the first *Bennett* prong because that Memorandum demonstrates that Defendants have arrived at a "definitive position and [have] put the decision into effect." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir 2006). And the second prong is satisfied because the Memorandum carries legal consequences: among other things, it deprives Oregon of authority over a portion of its National Guard while also infringing on powers reserved to the state under the Tenth Amendment.

Defendants' order to federalize and deploy Oregon National Guard troops to Portland is also not in accordance with law under the APA. For all the reasons discussed above, the Department of Defense and Secretary Hegseth have exceeded their statutory authority by seeking to federalize the Oregon National Guard under 10 U.S.C. § 12406 without satisfying any of the statute's factual prerequisites. Their planned deployment is also barred by the Posse Comitatus Act and 10 U.S.C. § 275 as well as the Tenth Amendment. And as discussed below, Defendants' actions also violate the separation of powers doctrine and the Constitution's Take Care and Militia Clauses.

**5. Defendants' actions violate the Constitution's Separation of Powers and the Militia and Take Care Clauses.**

Defendants' order to federalize and deploy Oregon National Guard troops to Portland violates the Constitution's separation of powers doctrine as well as the Militia and Take Care Clauses. For that reason, Plaintiffs are likely to succeed on the merits of their claims.

The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637-38 (2024). Under that doctrine, the Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also*

Page 22 -  MOTION FOR TEMPORARY RESTRAINING ORDER

*Clinton v. City of New York,* 524 U.S. 417, 438 (1998) (The Executive has no power "to enact, to amend, or to repeal statutes."). In other words, the Executive violates the separation of powers doctrine when it exercises authority reserved by the Constitution or an Act of Congress for Congress, the judiciary, or the States.

Defendants have exceeded their constitutional and statutory authority in multiple respects. First, the Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Accordingly, "Congress shall have Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions . . . ." *Id.* The Militia Clauses further provide that Congress has authority "To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress . . . ." U.S. Const. art. I, § 8, cl. 16. In contrast, the Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

Second, the Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . ." U.S. Const. art. II, § 3; *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them") (internal quotation marks and citation omitted). The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the

Page 23 -  MOTION FOR TEMPORARY RESTRAINING ORDER

President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

Defendants have violated these constitutional doctrines by asserting authority over a state Militia that the Constitution and federal law expressly assign to the States, and by disregarding—as discussed above—the limitations imposed by Congress in 10 U.S.C. § 12406 as well as the Posse Comitatus Act and 10 U.S.C. § 275. Additionally, Defendants have cited no other act of Congress that provides Defendants authority to federalize the National Guard. Thus, Defendants' actions do "not direct that a congressional policy be executed in a manner prescribed by Congress"—instead, they direct "that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 US at 587. Because Defendants' federalization of Oregon's National Guard members has no Constitutional or statutory authority, Plaintiffs are likely to succeed on their claims under the separation of powers doctrine, the Take Care Clause, and the Militia Clauses.

### 6. Oregon and Portland have standing to challenge the federalization and unlawful deployment of National Guard troops.

Standing exists when a plaintiff has "suffered an injury in fact—a concrete and imminent harm to a legally protected interest . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The asserted injury must be "legally and judicially cognizable." *United States v. Texas*, 599 U.S. 670, 676 (2023). "A plaintiff threatened with future injury has standing to sue if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (internal quotation marks omitted). Here, Oregon and Portland have standing based on ongoing and impending injuries to the State and the City.

Defendants' conduct threatens to harm—and is already harming—Oregon's sovereign interests. As a sovereign State, Oregon can seek redress for federalism-related harms and federal courts have traditionally provided a forum for States to do so. *See, e.g., Alfred L. Snapp & Son,*

Page 24 -  MOTION FOR TEMPORARY RESTRAINING ORDER

*Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607-08 (1982); *New York v. United States*, 505 U.S. 144 (1992); *Arizona v. Yellen*, 34 F.4th 841, 851 (9th Cir. 2022) (concluding that "Arizona ha[d] alleged sufficiently concrete and particularized harms to its ability to exercise its sovereign prerogatives"). Like any sovereign state, Oregon has "an interest in securing observance of the terms under which it participates in the in the federal system." *Snapp*, 458 U.S. at 607-08 (1982); *Newsom II*, 2025 WL 2501619, at *13 (same). "States also have sovereign interests to sue when they believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022). The reservation of police powers to the states is "one of the few principles that has been consistent since the [Constitution] was adopted." *Morrison*, 529 U.S. at 618. "A state's ability to regulate its internal law enforcement activities is a quintessential police power." *United States v. California*, 921 F.3d at 887 n.11.

The federal government's unlawful federalization and deployment of National Guard troops violates Oregon's sovereign interests in multiple ways. First, the unlawful federalization of Oregon National Guard members—which, under the Hegseth Memorandum, has already begun—is causing actual and ongoing harm to Oregon. By calling Guard members into federal service, Defendants are usurping the State's lawful authority and management of its own National Guard personnel and rendering those Guard members unable to engage in other critical work.

Further, there is no question that the troops being federalized will engage in law enforcement, usurping Oregon's police power. The Defendants have used federal troops as law enforcement in the District of Columbia and California, and actions in Oregon are following the same pattern.[33]

---

[33] *See* AP Archive, *Trump Says He's [sic] Wants to Rescue Washington, DC from 'Crime, Bloodshed, Bedlam, and Squalor'* (YouTube, Aug. 11, 2025), https://www.youtube.com/watch?v=O-C0NwtFKoU; Donald J. Trump, (@realDonaldTrump) Truth Social (Sept. 2, 2025 at 04:45), https://truthsocial.com/@realDonaldTrump/posts/115134530741891730 ("I will solve the crime problem fast, just like I did in DC.").

Page 25 -  MOTION FOR TEMPORARY RESTRAINING ORDER

Defendants' effort to reframe law enforcement activities in which troops will engage as mere "protect[ion of] federal personnel, functions, and property" does not undermine this analysis.[34] Indeed, Defendants characterized the California deployment with similar language, arguing that this fit it within an "exception to the Posse Comitatus Act." *Newsom II*, 2025 WL 2501619, at *4; *see also id.* at *19-23 (concluding that no such exception exists). Federal officials instructed troops that they could engage in "law enforcement actions" as long as they were doing so to "protect federal property, personnel, or functions." *Id.* at *5. A U.S. Army representative "coach[ed]" federal law enforcement agencies to phrase their requests for assistance as requests for "protection." *Id.* But those troops' actions demonstrated that these terms were mere euphemisms for the use of federal troops as auxiliary law enforcement units employed to support of a variety of law enforcement operations across a wide area of Southern California. *Id.* at *5-9 (describing how federalized National Guard troops were deployed in support of federal law enforcement actions at a private residence in Long Beach, at marijuana farms up to 140 miles away from downtown Los Angeles, and at a march of DHS agents across MacArthur Park in Los Angeles).

Thus, Defendants are already violating Oregon's sovereign interests by unlawfully federalizing its National Guard members, and there is far more than a "substantial risk" that the federalized troops will engage in law enforcement, as they have when the President has unlawfully deployed them elsewhere. *See In re Zappos.com, Inc.*, 888 F.3d at 1024. Those ongoing and impending violations of Oregon's sovereignty are, in themselves, sufficient injuries for standing purposes. *See Newsom II*, 2025 WL 2501619, at *13 (federal troops' "engage[ment] in law enforcement—a domain traditionally within the state's control" constituted "an injury that gives [California] standing to challenge those [Posse Comitatus Act] violations").

Further, on a practical level, Defendants' actions will only complicate Oregon's exercise of its own police powers as well as Portland law enforcement's maintenance of public order.

---

[34] Compl. Ex. 1 (Rieger Mem.).

Page 26 -  MOTION FOR TEMPORARY RESTRAINING ORDER

Given the small nature of the protests at the Portland ICE Facility over the past few months,
Portland police have been able to maintain order by conducting standard, routine monitoring
without incident. Dobson Decl. ¶¶ 24-26. The presence of federalized troops and the use of such
troops for law enforcement threatens to provoke larger protests, requiring state and local law
enforcement to divert personnel and resources to deal with the situation that the federal military
presence has created. *Id*. ¶¶ 28-30. The administration's recent military incursions elsewhere
included ostentatious displays of strength in public areas, carried out within hours of giving
notice to local police. *See Newsom II*, 2025 WL 2501619, at *7 (describing federal troops' role
in "Operation Excalibur," a march of federal agents across MacArthur Park intended as a "show
of presence . . . of federal law enforcement within the Los Angeles Joint Operations Area").
Given that recent pattern of federal military activity, there is more than a "substantial risk" that
the deployment of armed federal troops will only stoke tensions and unrest, making law
enforcement more, not less difficult for the City and the State. *In re Zappos.com, Inc.*, 888 F.3d
at 1024.

There is also more than a substantial risk that the military deployment will cause—and
may already be causing—economic harm to the people of Oregon and of Portland, as similar
recent deployments have elsewhere. States have "a quasi-sovereign interest in the health and
well-being—both physical and economic—of [their] residents in general." *Snapp*, 458 U.S. at
607. The deployment of troops in California and the District of Columbia directly and rapidly
chilled economic activity, with foot traffic in D.C. dropping seven percent on average within the
first week.[35] The deployment of troops in Portland or other Oregon communities threatens a
similar chill on Portland's and Oregon's economy and similar harms to the economic well-being
of City and State residents.

---

[35] Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, Wash. Post (Aug. 29, 2025, at 5:00 AM ET),
https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

Page 27 -  MOTION FOR TEMPORARY RESTRAINING ORDER

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

The economic chill that the military incursion will bring will also directly entail a loss of tax revenues collected by Oregon and Portland. Decreased business activity in Portland, and potentially elsewhere in Oregon, will mean lower income and lower corporate activity subject to state and local taxes. *See* ORS 316.037 (state income tax); ORS 317A.116 (state corporate activity tax); Portland City Code 7.02.500 (Portland business tax). Those fiscal harms are yet another injury sufficient to confer standing. *See City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (an "expected loss of tax revenue can constitute a sufficient injury" to confer Article III standing); *see also Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (loss of funding sufficient to confer standing).

There can be no serious dispute that the harms inflicted by Defendants' federalization and unlawful deployment of troops are traceable to the deployment order being challenged. *See Biden*, 600 U.S. at 489. These injuries are also judicially cognizable and capable of redress through the judicial process, as an injunction against the deployment order would stop the ongoing injuries to Oregon and Portland. *See Newsom I*, 141 F.4th at 1045-64 (challenge to president's order federalizing the California National Guard under 10 U.S.C. § 12406(3) was justiciable); *Newsom II*, 2025 WL 2501619, at *13 (claim that president violated the Posse Comitatus Act, 18 U.S.C. § 1385, was cognizable and redressable). Because of the ongoing injury inflicted on Oregon and Portland by the unlawful federalization of Oregon National Guard members, and further injuries that are certain to result, the State of Oregon and the City of Portland have standing to bring this suit.

## B.    Without the entry of a temporary restraining order, Oregon and Portland will suffer irreparable harm.

Oregon and Portland are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). As discussed above, Oregon and Portland are suffering multiple ongoing and imminent injuries. Each of those injuries is irreparable.

Page 28 -  MOTION FOR TEMPORARY RESTRAINING ORDER

First, in the absence of injunctive relief, Oregon is already enduring a substantial sovereign injury from the uncalled-for deployment of federal troops to engage in domestic law enforcement, which is a usurpation of the police power the Constitution expressly grants the States. A sovereign injury "is itself sufficient to establish irreparable harm." *City of Evanston v. Sessions*, No. 18 C 4853, 2018 WL 10228461, at *4 (N.D. Ill. Aug. 9, 2018); *accord Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) ("'[I]nvasions of state sovereignty . . . likely cannot be economically quantified, and thus cannot be monetarily redressed,' and as such constitute irreparable harm." (quoting *Kentucky v. Biden*, 23 F.4th at 611 n.19)).

Second, the "ongoing and concrete harm[s]" to Oregon's and Portland's "law enforcement and public safety interests" are irreparable. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012). Those harms include the diversion of Oregon National Guard members from their state responsibilities, impairing the State's ability to call upon the Guard to protect itself and its citizens or to respond to a natural disaster or other emergency. Those harms also include the increased unrest that military deployment threatens to provoke, requiring increased expenditure and diversion of resources by state and local law enforcement agencies to maintain order. Dobson Decl. ¶¶ 28-30; *cf. Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) (finding irreparable harm because government officials "will lose the discretion . . . to allocate scarce resources among different county operations necessary to fight the pandemic"); *see also Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (the "inability [of the state] to enforce its duly enacted plans clearly inflicts irreparable harm on the State").

Third, the deployment of military troops threatens irreparable economic and financial harms to Oregon, Portland, and their residents. As discussed above, military deployment threatens to chill economic activity, harming the economic well-being of Oregon and Portland residents and decreasing State and City tax revenues. Those financial harms are irreparable because the United States has sovereign immunity. *Ohio v. Env't Prot. Agency*, 603 U.S. 279,

Page 29 -  MOTION FOR TEMPORARY RESTRAINING ORDER

292 (2024) (finding that non-recoverable costs traced to federal action are sufficient to show irreparable harm).

**C.    The balance of equities and the public interest weigh in favor of issuing a temporary restraining order.**

Finally, the balance of equities and the public interest weigh in favor of issuing a temporary restraining order. Those "factors merge" when the government is the party to be enjoined. *Nken*, 556 U.S. at 435.

The balance of the equities tips sharply in Plaintiffs' favor. Plaintiffs seek to protect their sovereignty, retain control over local law enforcement and public safety, and prevent unnecessary disruption to Oregon's largest city. Plaintiffs have filed this suit to protect the basic structure of American federalism from an alarming intrusion that was, until the events in Los Angeles just months ago, unprecedented.

In contrast, the federal government faces no harm from an injunction. The federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding that although "[t]here is generally no public interest in the perpetuation of unlawful agency action," "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operation'"). The federal government has enforced federal law in Portland for decades without the support of active-duty military forces. It may continue to enforce such laws, including immigration laws, even with Plaintiffs' requested injunction in place.

Nor does this case involve the "relative importance of a particular military interest" for which courts give some deference to the federal executive branch for the purposes of balancing the equities. *See*, *Winter*, 555 U.S. at 24 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)); *see Ctr. for Biological Diversity v. Mattis,* 868 F.3d 803, 829 (9th Cir. 2017) (concluding that "courts are able to weigh equitable considerations when security or foreign affairs interests

Page 30 -  MOTION FOR TEMPORARY RESTRAINING ORDER

are at stake" and "[t]o hold otherwise would introduce an overbroad rule in conflict with" *Winter*).

Instead, as discussed above, this case represents an unlawful overreach by Defendants based on

pretextual concerns in order to punish and control a politically disfavored jurisdiction.

<div align="center">

**V.    CONCLUSION**

</div>

For the foregoing reasons, the Court should issue a temporary restraining order.

DATED September 29, 2025.

<div style="margin-left: 40%">

Respectfully submitted,

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel

*s/ Scott Kennedy*
SCOTT KENNEDY #T25070201, D.C. Bar
#1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov
Ian.VanLoh@doj.oregon.gov
Rachel.Sowray@doj.oregon.gov
Alex.Jones@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*

</div>

Page 31 -  MOTION FOR TEMPORARY RESTRAINING ORDER

ROBERT TAYLOR  #044287
Portland City Attorney

*s/ Caroline Turco*
CAROLINE TURCO  #083813
Senior Deputy City Attorney
NAOMI SHEFFIELD  #170601
Chief Deputy City Attorney
1221 SW Fourth Avenue
Fourth Floor, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Caroline.Turco@portlandoregon.gov
Naomi.Sheffield@portlandoregon.gov

*Counsel for the City of Portland*

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

## CERTIFICATE OF SERVICE

I certify that on September __29__, 2025, I caused to be served the foregoing MOTION

FOR TEMPORARY RESTRAINING ORDER upon the parties hereto by the method indicated

below, and addressed to the following:

Susanne Luse                                         __X__ HAND DELIVERY
United States Attorney's Office                ___ MAIL DELIVERY
District of Oregon                                   ___ OVERNIGHT MAIL
1000 SW Third Avenue                          ___ TELECOPY (FAX)
Suite 600                                                _X_ E-MAIL
Portland, OR 97204                               ___ E-SERVE
Susanne.Luse@usdoj.gov
*By email only:*
  Christopher.Edelman@usdoj.gov
  Ben.Kurland@usdoj.gov
  John.Bailey@usdoj.gov
  Jean.Lin@usdoj.gov
  Garry.Hartlieb2@usdoj.gov
  Jody.D.Lowenstein@usdoj.gov
  eric.hamilton@usdoj.gov
  abigail.stout@usdoj.gov
  taylor.n.pitz@usdoj.gov
  garry.hartlieb@usdoj.gov


*s/ Scott Kennedy*
SCOTT KENNEDY
*Counsel for the State of Oregon*

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000