# EXHIBIT A



**CITY OF PORTLAND, OREGON**

**Bureau of Police**
1111 S.W. 2nd Avenue • Portland, OR 97204

Integrity • Compassion • Accountability • Respect • Excellence • Service

**Executive Summary**
**Directive 0635.10, Portland Police Bureau Response to Public Order Events**

**Introduction**
The Bureau began its review of this directive in January of 2024, posting it for First Universal Review in February and Second Universal Review in July of 2024. The Policy Development Team reviewed this policy as part of its ongoing compliance with the settlement agreement between the City of Portland and the United States Department of Justice.

The Directive had previously undergone substantial revisions in January of 2023.

The Policy Development Team met with the United States Department of Justice, as well as subject matter experts and reviewed the findings of the Independent Monitor LLC report on the Police Bureau during 2020.

After this process the Bureau made only minor changes to the directive. These changes were centered on updating definitions to reflect changes in state law and provide greater clarity to Bureau members and the community at large.

**Public Comments**
The Bureau received five comments during the First Universal Review Period and one during the Second Universal Review Period. One commenter provided extensive feedback on a variety of aspects of the policy, not all of which can be addressed here. Several major themes are addressed below.

*Tear Gas:*
One commenter identified the use of Tear Gas as a violation of the Geneva Convention. This is incorrect, while the Geneva Convention and other International Treaties do ban the use of Tear Gas in warfare, they specifically exempt its use in civil disturbances.

Another commenter expressed concern about the word "bomb" being used in the definition of Tear Gas. The term, as well as the rest of the definition comes from Oregon State Law.

The same commenter expressed support for a complete ban on the use of Tear Gas near certain sensitive facilities like hospitals. While the directive does call this out as a specific consideration in the use of Tear Gas, it does not ban it, as there may be instances where the use of Tear Gas, even in sensitive areas may reduce overall risk of injury or death to the public.



## CITY OF PORTLAND, OREGON

**Bureau of Police**

1111 S.W. 2nd Avenue • Portland, OR 97204

Integrity • Compassion • Accountability • Respect • Excellence • Service

*Transparency and Consistency*

The Bureau received several comments on this topic. One highlighted the concern about differentiating between people lawfully exercising their 1st Amendment rights and those engaged in criminal behavior. This comment was adopted in the form of a specific definition for unlawful assembly.

Another commenter expressed concern that the directive did not require the Bureau to ensure that there were safe and known avenues of escape available during dispersals. This comment was adopted.

*Additional Restrictions*

A primary theme of an extensive comment received by the Bureau was the desire to add additional and more specific restrictions on officers in Public Order settings, these included rules around use of specific weapons, as well as seizing objects, and communication with groups organizing events. The Bureau did not adopt these comments because Public Order policing is highly context specific and while bans on certain activities can provide bright lines, they also are often overly restrictive in some contexts while not preventing bad outcomes in others. As such the Bureau seeks to balance bright lines for unacceptable or inappropriate conduct with an expectation that members will act reasonably under the totality of the circumstances.

**The Bureau's Revised Policy**

The principal change to the directive was an update to the definitions of Handheld Chemical Incapacitants (formerly Chemical Incapacitants) and Tear Gas, and the addition of a definition for Unlawful Assembly. The former was made in response to changes in the state law. The Bureau also provided specific examples of Bureau issued weapons to these definitions to provide additional clarity.

The definition of Unlawful Assembly was added in response to concerns about this term and its use during 2020 and 2021. The enacted definition provides more specific criteria regarding what activity may be deemed an unlawful assembly.

Other changes were minor, including updating the directive to include the reintroduction of the Rapid Response Team.

The Bureau welcomes further feedback on this policy during its next review.

The directive goes into effect on November 15, 2024. Published on October 17, 2024.

**0635.10 Portland Police Bureau Response to Public Order Events**

**Refer:**
- ORS 131.675 Dispersal of Unlawful or Riotous Assemblies
- ORS 161.015 General Definitions (1) ("Dangerous Weapon")
- ORS 161.205 Use of Physical Force Generally
- ORS 166.015 Riot
- ORS 166.220 Unlawful Use of Weapon
- ORS 181A.250 Specific Information Not to be Collected or Maintained
- ORS 181A.708 Use of Chemical Incapacitants, Kinetic Impact Projectiles and Sound Devices
- ORS 181A.710 Use of Other Law Enforcement Agencies to Engage in Barred Conduct
- Oregon Administrative Rules 166-200-0405(5) and 166-200-0100(68)
- Portland City Code 14C.30.010, Authority to Restrict Access to Certain Areas
- Portland City Code 14C.30.020, Other Police Officers Authorized to Arrest, Cite, or Take Other Enforcement Action for Violations of City Code Provisions
- Portland City Code 14C.30.040, Seizure and Disposition of Weapons
- Portland City Code 20.12.200, Trespassing and Areas Closed to the Public
- Portland City Code 20.12.265, Park Exclusions
- DIR 0312.50, Identification
- DIR 0344.05, Bias-Based Policing/Profiling Prohibited
- DIR 0635.00, Strikes/Job Actions
- DIR 0635.20, Community Member Observation of Police
- DIR 0640.02, Photography and Digital Imaging
- DIR 0650.00, Search, Seizures, and Inventories
- DIR 0660.10, Property and Evidence Procedures
- DIR 0700.00, Bureau Response to All-Hazards Using the National Incident Management System (NIMS)
- DIR 0900.00, General Reporting Guidelines
- DIR 0905.00, Non-Force After Action Reporting
- DIR 0910.00, Use of Force Reporting, Review, and Investigation
- DIR 1010.00, Use of Force
- DIR 1015.00, Less Lethal Weapons and Tools
- Operations Branch, Standard Operating Procedure #15: Mobile Field Force
- Forensic Evidence Division, Standard Operating Procedure: Video/Photographic Evidence Collected in Response to Civil Disturbance or Crowd Management/Control Operations and the Disposition of Such Video/Photographs

**Definitions:**

- Civil Disobedience: A non-violent form of protest or resistance to obeying certain laws, demands or commands of a government.

- Civil Disturbance: An unlawful assembly that constitutes a clear and present danger of riot, disorder, interference with traffic upon the public streets or when another immediate threat to public safety, peace or order appears.

1

- Crowd Control: Law enforcement tactics and strategies used in response to an event to effect or influence a crowd to comply with a lawful order, when the event has become a civil disturbance or riot. Crowd control may include mass arrests, dispersal orders, the use of less lethal weapons, or other tactics that may be necessary to preserve life or safety.

- Crowd Intervention: Law enforcement strategies and tactics used, before riot declaration, to de-escalate or prevent or isolate disruptions or unlawful activity during an otherwise lawful event. Crowd intervention may include communication with event participants during the event, individual arrests targeting persons engaged in unlawful behavior, and other tactics that de-escalate crowd behavior and minimize disruption of those lawfully exercising their rights.

- Crowd Management: A public security practice in which crowds are managed to prevent the outbreak of crowd crushes, affrays, fights or riots, or in which an assembly, protest or demonstration is dispersed. This is a state law term that defines when certain weapons, tools, and proxy law enforcement use is restricted by state law. For this directive, crowd management encompasses crowd stewardship, crowd intervention, and crowd control.

- Crowd Management Incident Commander (CMIC): For this Directive, an incident commander who has received special training in crowd stewardship, intervention, and control. The Chief of Police will designate a command staff member to serve as the CMIC for every major public order event. When the CMIC assumes incident command responsibilities, they become the IC and possess the overall responsibility for managing the event by establishing objectives, planning strategies, and implementing tactics in accordance with this Directive and Directive 0700.00, National Incident Management System (NIMS) and Incident Command System (ICS). This position reports to the Assistant Chief of Operations or, if necessary, the Chief or Deputy Chief during events.

- Crowd Stewardship: Law enforcement review and tracking of public order events to determine what, if any, police presence is needed to facilitate the lawful expression of First Amendment Rights while preserving public safety. Crowd stewardship may include: event planning, communicating with participants before and during the event, information gathering and sharing, observing the event for criminal activity, deciding for or against visible police presence during the event, and other approaches.

- Feasible: When time and safety allow for a particular action.

- Handheld Chemical Incapacitant: The following, together or separately:
  - (i)   Handheld  munitions and devices specifically designed to cause temporary pain, temporary irritation, temporary disruption of vital processes, temporary incapacitation, temporary disability or permanent harm through the toxic properties of toxic chemicals, or their precursors, that would be released as a result of the employment of the handheld  munitions and devices; and (ii) Any equipment specifically designed for use directly in connection with the employment of handheld munitions and devices as described in subparagraph (i) of this subparagraph. **"Chemical incapacitant" does not include tear gas.**
  - o  **As used in this directive, Bureau Issued Oleoresin Capsicum spray (e.g., Sabre Red) is considered a Handheld Chemical Incapacitant.**

- Incident Action Plan (IAP): An oral or written plan containing the objectives established by the IC or Unified Command and addressing tactics and support activities for the planned operational period.

- Incident Commander (IC): The person responsible for all incident activities, including developing strategies and tactics and monitoring resources. The IC has the overall authority and responsibility for conducting incident operations and is responsible for managing all incident operations at the incident site.

- Incident Command System (ICS): A standardized approach to the command, control, and coordination of on-scene management.

- Kinetic Impact Projectile (KIP): All non-lethal, less-lethal, or semi-lethal projectiles, including, but not limited to rubber and plastic bullets, beanbag rounds, sponge rounds, and pellet rounds.

- Lawful Objective: Any reason for police action that is valid under the law, which may include, but is not limited to: arresting, detaining, or searching a person; overcoming resistance or preventing escape; preventing the commission of a crime; defending self or others; preventing a person from self-harm; restricting access to an area in an emergency; ordering dispersals.

- Mass Arrest: The tactic of simultaneously arresting, in one action, numerous people in a short amount of time during a crowd management event, with the intent of taking them into custody or issuing them criminal citations, when there is individualized probable cause.

- Mass Detention: The tactic of simultaneously detaining, in one action, numerous people during a crowd management event for a cursory investigation when there is individualized reasonable suspicion.

- Mobile Field Force (MFF): Sworn members, who are trained in basic crowd control tactics and techniques, organized into a squad and deployed to assist in crowd management.

- Operations Section Chief: A member, designated by the CMIC, who develops and implements strategy and tactics to carry out incident objectives. The designated member organizes, assigns, and supervises the tactical response resources.

- Persons-In-Charge: The person(s) designated by an event organizer or permit holder to act on behalf of, and with the authority of, the event organizer or permit holder.

- Police Action: Any circumstance, on or off duty, in which a sworn member exercises or attempts to exercise police authority. This includes, but is not limited to, stops, searches, arrests, and use of force.

- Portland Police Bureau Event Liaison: A Bureau member who has been designated by the IC as the primary contact for communication with the event's Person-In-Charge to police.

3

- Public Order Event: A lawful assembly of a large number of people. Generally, persons primarily organize to exercise their First Amendment right to express political or social views and influence public opinion; however, these events may include the assembling of people to participate in a social or community event. Events can be planned or spontaneous and may include, but are not limited to, distributing literature, displaying banners, assembling, marching, picketing, participating in festivals or concerts, or other similar activity.

- Rapid Response Team (RRT): The Bureau's all-hazard team of members who are specially trained to assist in the response to human-made/natural disasters and other emergency management situations which include, but are not limited to, the management and control of crowds through various tactics and techniques.

- Resistance: Opposition or obstruction directed towards an officer that impedes a lawful objective. Resistance may consist of the following:
  - **Passive Resistance: Non-compliance or non-cooperation with an officer's lawful order that is non-violent, and does not involve active conduct or pose an immediate threat to the officer or the public.**
  - **Active Resistance: A person's physical attempt(s) to evade a member's control or lawful order.**

- Riot: Six or more persons engaging in tumultuous and violent conduct and thereby intentionally or recklessly creating a grave risk of causing public alarm.

- Squad: A group of members tasked with accomplishing certain goals and missions.  A minimum of one supervisor shall be assigned to lead each squad. The maximum span of control is 1-7 members per supervisor. (ICS refers to this group as a "strike team").

- Tear Gas: Oleoresin capsicum or orthochlorobenzalmalononitrile, or other similar chemicals meant to accomplish the same effect, administered by any shell, cartridge, or bomb capable of being discharged or exploded, when the discharge or explosion will cause or permit the release or emission of the chemicals.
  - **As used in this directive, Bureau-issued launched and tossed munitions that disperse CS, CN, or OC over an area (e.g., Defense Technology Triple Chaser, or OC 40MM Skat Shell) or impact munitions with a chemical payload (e.g., FN303 PAVA) are considered Tear Gas and are subject to the same restrictions.**

- Unlawful Assembly: Five or more assembled persons who engage in trespass or intentionally cause, or with reckless disregard create a risk of causing, public inconvenience, annoyance, or alarm by engaging in one or more of the following activities, which may include but are not limited:

  - **Fighting or violent, tumultuous or imminently threatening behavior;**
  - **Making unreasonable noise;**
  - **Disturbing any lawful assembly of persons without lawful authority;**
  - **Obstructing vehicular or pedestrian traffic on a public way;**

4

- o **Initiating or circulating a report, knowing it to be false, concerning an alleged or impending fire, explosion, crime, catastrophe, or other emergency;**
- o **Damaging property; or**
- o **Creating a hazardous or physically offensive condition by any act which the person is not licensed or privileged to do.**

- Warning: An officer's verbal order intended to obtain compliance and convey to the recipient that failure to comply with the order may result in an officer's use of force.

**Policy:**

1. This Directive establishes procedures for the Bureau's response to public order events ("events").

2. The Portland Police Bureau recognizes both the importance of protecting First Amendment rights and the tradition of exercising free speech and assembly in the City of Portland. The Bureau is committed to respecting lawful assembly and expression of speech while also maintaining public safety, peace, and order.

3. The Bureau follows national best practices among the principles of crowd monitoring, crowd intervention, and crowd control. Absent immediate safety concerns, the Bureau begins with crowd monitoring and prioritizes event participant engagement and promoting the crowd to self-regulate.

4. While the First Amendment protects freedom of speech, it does not protect criminal acts. The Bureau has a responsibility to protect public safety and maintain peace and order. The Bureau recognizes that a police response that impedes otherwise protected speech must be narrowly tailored to serve a significant government interest. Events may simultaneously include persons lawfully assembling and expressing speech, and persons unlawfully committing crimes. The Bureau must assess the totality of the circumstances to determine whether and to what extent police action is needed.

**Procedure:**

1. Core Principles.

   1.1. Bureau members shall respect the First Amendment rights of all persons to peaceably assemble and exercise their freedom of speech.

   1.2. When event participants comply with applicable laws and City ordinances, the Bureau shall attempt to limit police involvement by encouraging and supporting participant efforts to self-regulate and manage their events.

   1.3. Nothing in this directive relieves members from following other Bureau directives, reporting or investigation requirements, or state or federal law.

   1.4. Directive 1010.00, Use of Force, governs all uses of force, including force use during events.

      1.4.1. In accordance with state law, members' force use for crowd management is further restricted by requirements in this directive (e.g., the restricted use of certain weapons and tactics for crowd management purposes).

1.5.  The Bureau shall use the standardized, on-scene, all-hazards ICS to plan and manage events. Members shall refer to Directive 0700.00, Bureau Response to All-Hazards Using the National Incident Management System (NIMS), for specific guidance regarding incident management.

1.6.  In accordance with ICS, the IC or designee shall develop an Incident Action Plan (IAP) for the event, if the IC deems a police response necessary.

2. Incident Action Plan.
2.1.  If the IC determines that a police response necessary, the IC or designee shall develop a written IAP for the event, when feasible.
2.1.1.  If it is not feasible to develop a written IAP, the IC or their designee shall ensure that they document the IAP through another available medium (e.g., radio or handheld recording, Computer Aided Dispatch, incident board, duty notebook, ICS 201 form, etc.)
2.1.1.1.  The IC or their designee shall provide justification for not issuing a written IAP in their after-action report.

2.2.  The IAP shall define the operational period, including approximate beginning and end dates and times.

2.3.  The IAP shall not circumvent the use of force requirements and guidance set forth in Directive 1010.00, Use of Force, or this policy.

2.4.  The IC or designee shall develop a new IAP for each operational period.

3. General Guidelines for Planned Events (At Least 24-hour Notice).
3.1.  The Assistant Chief of Operations and the precinct commander nearest to the event location shall determine whether a planned police response is necessary and the extent of initial staffing needs.
3.1.1.  Events that are small in crowd size, or for which credible information indicates that there is little concern of criminal activity, civil disobedience, civil disturbance, or riotous behavior, shall generally be managed at the precinct level.  The shift supervisor (Lieutenant) shall serve as the IC and determine precinct staffing needs.
3.1.1.1.  If crowd behavior escalates to a level that poses a threat to public safety, peace, or order during an event that is being managed by a shift supervisor acting as the IC, the shift supervisor must consult with a CMIC who will then determine if the CMIC should assume command and request additional resources.
3.1.2.  The Assistant Chief of Operations shall designate a CMIC for events that are anticipated to have a greater critical impact, require a significant police response, and/or have the potential to become a civil disturbance or riot.

3.2.  If the IC determines that basic Mobile Field Force (MFF) and bicycle units are not sufficient to manage the crowd, the IC may request a CMIC to assume control of the event.

3.3.  Only a CMIC may activate or request the Rapid Response Team (RRT), mass arrest teams, detention teams, or mutual aid.

4.  General Guidelines for Spontaneous Events (Less Than 24-hour Notice).
    4.1.  Many spontaneous events can be lawful and facilitated with appropriate police assistance. A spontaneous or non-permitted event is not necessarily unlawful, nor does it automatically require a significant police response.

    4.2.  A supervisor at the precinct of occurrence shall respond to the event to determine if a police response is warranted.
        4.2.1.  If a police response is warranted, the on-scene supervisor shall serve as the IC for the incident and attempt to engage the event organizer or a person of influence in an effort to protect the safety of participants and the public, and to facilitate participants' right to lawfully assemble.
            4.2.1.1.  If the Sergeant who is the first supervisor on scene of a spontaneous event determines that, within the ICS, they do not have the capacity to solely manage the event, they shall notify their Lieutenant, who may then respond to the scene and assume command after debriefing.
        4.2.2.  The IC shall consult with a CMIC to determine if a higher level of police response is necessary or if the CMIC should assume command, based on crowd behavior.

5.  Communication with the Crowd.
    5.1.  Communication is a critical function during, and when feasible, before, an event. Announcements and warnings serve an informational purpose but have certain functional distinctions. Generally, the Bureau will strive to directly communicate with event organizers and use amplified audio communications and the Public Information Officer (PIO) to issue announcements and warnings to the crowd for the purpose of decreasing the need for police action.

    5.2.  When communicating with event participants, members shall endeavor to engage participants in a positive manner, when feasible.
        5.2.1.  Members shall act in accordance with Directive 0310.00, Professional Conduct and Courtesy, and consider procedural justice principles focused on explaining their actions, in accordance with Directive 0025.00, Procedural Justice.

    5.3.  Barring emergency circumstances, the Bureau shall issue announcements and warnings by using a graduated approach that aligns with its response of crowd stewardship, intervention, or control.

    5.4.  Announcements.
        5.4.1.  Announcements are designed to:
            5.4.1.1.  Convey general information to the crowd in an effort to keep an event lawful;
            5.4.1.2.  Communicate targeted information to specific persons to provide direction; and
            5.4.1.3.  Serve as a de-escalation tool by directing and informing the crowd in an attempt to prevent the need for police action or the use of force.

5.4.2.  Throughout the event, members shall continuously monitor the crowd for behavior that presents a clear and present danger that threatens the public safety, peace, or order and issue appropriate announcements, as needed.

5.4.3.  When feasible, a designated announcer shall issue a minimum of two announcements at reasonable intervals to notify the crowd of impending police action.

5.4.4.  When issuing announcements, the announcer should cite specific offenses and violations being committed and caution the crowd that riotous acts will not be permitted and may result in arrest or necessitate the use of force.

5.5.  Warnings.

 5.5.1.  Warnings are designed to:

  5.5.1.1.  Inform person(s) of impending police action (e.g., force); and

  5.5.1.2.  Gain compliance with a lawful order.

 5.5.2.  If the crowd or persons in the crowd engage in criminal activity or behavior that presents a clear and present danger that threatens the public safety, peace or order, members may shift to employing crowd intervention and/or crowd control tactics. If this occurs, members shall, when feasible, issue warnings to the crowd.

 5.5.3.  Pursuant to Directive 1010.00, Use of Force and state law, members shall, when feasible, issue a warning before using force.

5.6.  Documenting Announcements and Warnings.

 5.6.1.  Members shall document their issuance of an announcement(s) or warning(s) in an appropriate police report (e.g., date, time, location, announcing member, messages, number of warnings provided, etc.).

  5.6.1.1.  If a member does not issue a warning before using force, the member shall document the reason in their force report.

5.7.  Amplified Audio Communications.

 5.7.1.  When feasible, members should use a sound truck or another public announcement system to ensure the crowd can hear the Bureau's announcements or supplement warning issuances.

  5.7.1.1.  Announcements and warnings to the crowd should be loud, intelligible, and consistent.

   5.7.1.1.1.  When feasible, a member should position themselves at the back of the crowd to ensure the sound truck communication is sufficiently loud, intelligible, and consistent.

 5.7.2.  The Bureau shall not use a sound device (e.g., the sound truck) for crowd management for any purpose other than announcements or warnings.

 5.7.3.  During spontaneous events, members may not have access to a sound truck or another public announcement system, and the PIO may not be present. In these circumstances, members shall act in accordance with this section when operationally possible.

5.8.  Social Media Communication.

5.8.1. When feasible, the PIO shall communicate the Bureau's announcements and warnings using social media.

6. Crowd Stewardship.
   6.1. Planning and Communication.
      6.1.1. Bureau response to an event may not be necessary; however, when a police response is requested or deemed necessary by the Bureau:
         6.1.1.1. The Bureau shall make reasonable efforts to contact and engage in dialogue with known event organizers to assist the Bureau in its planning and to develop a shared understanding of the organizers' needs and objectives. Similarly, the Bureau should communicate its expectations and inform participants on permissible and restricted actions during the event.
         6.1.1.2. The Bureau, through the PPB Event Liaison or another designee, shall attempt to maintain communication with known event organizers or the Person(s)-in-Charge before and during the event. The Liaison shall maintain communications with the IC to keep them apprised of the situation.
         6.1.1.3. The Bureau, through the PIO or another designee, shall communicate through the use of social media and other conventional outlets to keep the public, including the crowd, informed throughout the event. The Bureau shall update its means of communication based on current technology.

   6.2. During the Event.
      6.2.1. The IC shall continuously monitor the event, weighing the totality of the circumstances to inform the decision to introduce police action to maintain public safety, peace, and order.
         6.2.1.1. When deciding whether to use certain police tactics within a crowd, the IC shall consider the government interest in intervening and the potential impact on the participants' ability to exercise their First Amendment rights.
         6.2.1.2. The IC, or a designee, shall authorize the appropriate level of protective equipment based on several factors including, but not limited to:
            6.2.1.2.1. Member safety,
            6.2.1.2.2. Individual and/or group physical resistance,
            6.2.1.2.3. The presence of weapons,
            6.2.1.2.4. Actual or credible threats or indicators of violent behavior,
            6.2.1.2.5. Actual or credible threats or indicators of criminal actions, and
            6.2.1.2.6. The potential impact or perceived effect that appearing in protective gear may have on the crowd.
         6.2.1.3. When practical and in an attempt to avoid escalating the situation, the IC should strive to position members in protective gear in locations that minimize visibility until deployment is necessary for crowd intervention or control.

7. Crowd Intervention.
   7.1. In some circumstances, there is little government interest in regulating non-violent crowd participation in civil disobedience. However, if individual behavior escalates and presents a clear and present danger that threatens the public safety, peace, or order, and the event can no longer be effectively managed through a minimal police presence,

9

therefore increasing the government interest, the IC may adjust crowd tactics to adequately respond.

7.2. During intervention, the Liaison or another IC-designated member shall continue to attempt to maintain communication with the known event organizers or the Person(s)-in-Charge the event.

7.3. When crowd intervention is necessary, members shall strive to distinguish between persons engaged in criminal behavior, persons peacefully and lawfully demonstrating, legal observers and members of the media, and nonparticipants.

7.4. The Bureau shall use intervention strategies and tactics, such as individual arrests, in an attempt to de-escalate the situation and prevent further unlawful behavior without interfering with members of the crowd who are lawfully assembling.

7.5. When feasible, an IC-designated member and/or the member operating the sound truck shall convey police action to the crowd via announcements and warnings and attempt to encourage lawful activity.

7.6. The IC shall continuously evaluate the Bureau's response and return to crowd stewardship techniques, when feasible.

8. Crowd Control.
   8.1. If crowd behavior continues to escalate after employing intervention strategies and there is *increased and widespread* behavior that presents a clear and present danger that threatens the public safety, peace, or order, the IC may adjust crowd tactics to adequately respond.

   8.2. The Bureau may employ crowd control strategies in an attempt to de-escalate and/or prevent further unlawful or threatening behavior by restoring public safety, peace, and order.

   8.3. *Riot Declaration.*
      8.3.1. When the crowd (consisting of six or more persons) engages in tumultuous and violent conduct that creates a grave risk of causing public alarm, the IC may declare a riot.

   8.4. *Crowd Dispersal.*
      8.4.1. Pursuant to City Code, the IC is authorized to close an area in the event of an emergency. An emergency includes a riot.
      8.4.2. Pursuant to ORS §131.675, the IC may order a crowd to disperse when five or more persons are unlawfully assembled.
         8.4.2.1. Before giving the order to disperse, the IC shall consider:
            8.4.2.1.1. Whether dispersal unduly endangers the public, officers, or participants in the crowd;
            8.4.2.1.2. If there are other means available to protect the public, officers, and participants in the crowd from a clear and present danger that threatens the public safety, peace, or order; and

    8.4.2.1.3. Which dispersal tactics and/or type of tools are proportional and necessary based on the circumstances.

   8.4.2.2. Before taking police action to disperse the crowd, and when feasible, the announcer shall issue a minimum of two warnings at reasonable intervals to allow the crowd to comply.

    8.4.2.2.1. Members shall take reasonable action to accommodate people with disabilities when issuing or enforcing orders to disperse.

    8.4.2.2.2. When time and circumstances permit, members shall provide detailed guidance regarding the direction in which the crowd may disperse (e.g., street or intersection names, landmarks, etc.), while keeping in mind that event participants may not know cardinal direction or street names, and ensure that avenues of escape (i.e., clear path or route) are available to the crowd.

9. Use of Force.

 9.1. When authorized to use force, members should carefully consider the potential negative impact that their force use could have on the overall tenor or behavior of the crowd. Members shall only use objectively reasonable force necessary to accomplish a lawful objective, and their actions must be in accordance with the IAP objectives or the IC's direction.

 9.2. When the Bureau declares a riot and orders the crowd to disperse, and the crowd does not heed repeated warnings, and no reasonable alternative is apparent, the IC may authorize the use of force. Force must comply with Directive 1010.00, Use of force, and further restrictions found in this directive.

  9.2.1. Members shall only use authorized less lethal force for crowd management at the direction of the IC and, when applicable avenues of escape (i.e., clear path or route) are available to the crowd.

  9.2.2. The IC shall continuously evaluate the incident and adjust the Bureau's tactics, ensuring that its response is proportional to the threat posed by the crowd, and employ de-escalation and crowd stewardship tactics, when feasible.

 9.3. Members shall not use the following less lethal force options for crowd management, as defined by state law and Bureau policy, unless otherwise permitted by this policy:

  9.3.1.1. Conducted Electrical Weapon (CEW), unless on an individual where force is authorized.

  9.3.1.2. Kinetic impact projectiles, unless deadly force is authorized.

  9.3.1.3. Handheld Chemical incapacitants.

  9.3.1.4. Tear gas, unless:

   9.3.1.4.1. The use is objectively reasonable by law enforcement to:

    9.3.1.4.1.1. Defend against a threat to life or serious bodily injury to any person, including any peace officer; or

    9.3.1.4.1.2. Bring an objectively dangerous and unlawful situation safely and effectively under control;

   9.3.1.4.2. A commanding officer (the IC) authorizes the use of tear gas;

   9.3.1.4.3. De-escalation techniques or other alternatives to force have been attempted, when reasonable, and failed; and

11

9.3.1.4.4. The Bureau has done the following, in the following order:
9.3.1.4.4.1. Announced the Bureau's intent to use tear gas;
9.3.1.4.4.2. Allowed sufficient time for persons to evacuate the area; and
9.3.1.4.4.3. Announced a second time, immediately before using the tear gas, the agency's intent to use tear gas.

9.4. Members *may* use the following KIPs and handheld chemical incapacitants *on an individual person* in a crowd *if* the person is engaged in conduct otherwise justifying the use of force under state law and Bureau policy.
9.4.1. Handheld aerosol restraints, such as Bureau issued Oleoresin Capsicum spray; and
9.4.2. Non-chemical payload impact munitions.

9.5. Additional Requirements for Handheld Chemical Incapacitants and Non-Chemical Impact Munition Use:
9.5.1. Members shall attempt to minimize the incidental impact on bystanders, journalists, and unintended targets;
9.5.2. Members shall not use handheld aerosol restraints or non-chemical impact munitions on persons engaged in passive resistance that does not impede a lawful objective;
9.5.3. Members shall not deploy non-chemical impact munitions in a manner that intentionally targets the head of a person, unless the person is engaged in conduct that otherwise justifies the use of deadly physical force under state law and Bureau policy.

9.6. Cleanup Requirements.
9.6.1. Following the use of tear gas or KIPs, members shall, within a reasonable time of use of the tools and weapons, clean all visible debris caused by use.

9.7. Prohibited Crowd Control Tactics.
9.7.1. Members shall not use the following tools or tactics for crowd management purposes:
9.7.1.1. Fire hoses;
9.7.1.2. Canines;
9.7.1.3. Sound trucks for purposes other than issuing announcements and warnings.
9.7.2. Members shall not intentionally contact crowd members or bystanders with motor vehicles.

10. Medical Aid.
10.1. Members shall follow all post-force medical aid procedures set forth in Directive 0630.50, Medical Aid.

10.2. When members use handheld chemical incapacitants, tear gas, or KIPs in a crowd, the IC or a designee shall make efforts to notify emergency rooms in the vicinity of the type of aforementioned weapon or tool used.

10.3. When using handheld chemical incapacitants, tear gas, KIPs, or electronically amplified noise-producing equipment and when safe to do so, members shall:
10.3.1. Attempt to take injured persons to safety or allow injured persons to seek medical help;

10.3.2. Allow emergency medical services, including community medics, to reach injured persons; and

10.3.3. Take reasonable action to accommodate disabilities when issuing or enforcing orders to disperse.

11. Detentions and Arrests.

11.1. Failure to comply with an order to disperse is not a crime and shall not be the basis for an arrest.

11.2. Legal Observers and Members of the Media.

11.2.1. Legal observers and members of the media have a constitutional right to observe, document, and report on public order events; however, they may not interfere with police action or impede a lawful objective.

11.2.2. Members shall consider anyone identifying themselves as a member of the media, journalist, broadcaster, or legal observer, or displaying any indicia of the aforementioned, to be an authorized legal observer or member of the media.

11.2.3. Members shall not detain or arrest legal observers or members of the media solely for their role in observing, capturing, and/or reporting on events.

11.2.4. Members shall not interfere with media or legal observers performing their respective functions; however, media and legal observers are not exempt from arrest for their own criminal conduct.

11.3. Mass Detentions and Arrests.

11.3.1. Generally, the Bureau cannot practically accomplish mass detentions or arrests with standard detention and arrest procedures. Mass detentions and arrests require a specialized response and are most often associated with an unlawful assembly that constitutes a breach of the peace or presents a clear and present danger that threatens the public safety, peace, or order.

11.3.2. The IC must authorize any mass detentions or mass arrests. The IC or CMIC shall consult with the Detective Division to ensure mass arrest resources are available.

11.3.3. The IC may only authorize mass arrests when there is probable cause to believe that the subjects of mass arrests have committed a criminal offense.

11.3.4. The IC may only authorize mass detentions when there is reasonable suspicion to believe that the targets of mass detention have committed a criminal offense.

11.3.5. Before authorizing mass detention or mass arrest, the IC shall:

11.3.5.1. Consider whether other, less intrusive tactics are available to stop or investigate the criminal activity;

11.3.5.2. Consider whether sufficient officers and resources are available to expeditiously investigate persons who are detained or process persons who are arrested;

11.3.5.3. Consider whether they (the IC) reasonably believe the group is functioning as a unit; and

11.3.5.4. Ensure they have individualized reasonable suspicion (mass detention) or individualized probable cause (mass arrest) for each person in the group to be detained or arrested.

12. Video and Photographic Documentation.

12.1. The Bureau may stream events to City facilities by live video feed to provide situational awareness to the IC.

12.1.1. Pursuant to ORS 181A.250, the Bureau or IC shall not authorize recording or photographing events solely for the purposes of monitoring, collecting, or maintaining information about individuals or groups based solely on their political; religious; or social views, associations, or activities.

12.1.2. When ordered by the IC to record criminal activity, members shall act in accordance with Directives 640.02, Photography and Digital Imaging, and 660.10, Property and Evidence Procedures, when photographing persons subject to authorized mass detention or mass arrest.

12.1.2.1. The Forensic Evidence Division (FED) shall process recordings and photographs in the following manner:

12.1.2.1.1.     Provide a copy to the Detectives Division for review to determine what information the Bureau shall maintain as evidence of criminal activity. The Bureau shall retain all evidentiary material in accordance with Directives 0640.02, Photography and Digital Imaging, and 0660.10, Property and Evidence Procedures.

12.1.2.1.2.     Provide a copy to the City Attorney's Office (CAO). The CAO shall act in accordance with state records retention laws when determining the disposition of the material(s).

12.1.2.1.3.     Provide a copy to the District Attorney's Office, when there is an arrest.

12.1.2.2. The Bureau shall not retain non-evidentiary material.

12.2. When feasible and consistent with the law, members shall activate their Body Worn Cameras when engaging with the public during a public order event.

13. Member Identification During Events.

13.1. Members shall have, "POLICE" and their first initial and last name *or* a unique identifier assigned by the Bureau affixed to the front and back of their uniform and, when applicable, the back of their tactical helmet.

13.1.1. Members shall not intentionally obscure their identifying information and shall ensure that the information is clearly visible.

13.2. If practical, safe, and tactically feasible, upon request by a member of the public, members shall provide their name and identification number, or, if applicable, their assigned unique identifier to the member of the public.

13.2.1. Members may provide a Bureau-issued business card in lieu of the information in Section 13.2.

13.3. Bureau Identification of Members.

14

13.3.1. The Bureau shall manage public requests for officer identifying information as set forth in Directive 0312.50, Identification.

14. Member Responsibilities During Events.
    14.1. The IC (or Designee) shall:
        14.1.1. Oversee the development, dissemination, and implementation of the IAP for the event in accordance with this Directive and ICS;
        14.1.2. Determine the mission and objectives and consider what crowd tactics are objectively reasonable under the totality of the circumstances;
        14.1.3. When feasible, attempt to maintain communication, through the PPB Event Liaison, with the Person-in-Charge, or their designee, during event;
        14.1.4. Approve the use of authorized protective gear.
        14.1.5. Ensure announcements communicated to the crowd are clear, consistent (non-conflicting), lawful, and appropriate for the circumstances. The content and timing of the announcement shall be documented and, if feasible, shall be audio recorded;
        14.1.6. Consider and ensure the performance of the following before authorizing the use of handheld chemical incapacitants for crowd management purposes:
            14.1.6.1. A riot must be declared, when authorized;
            14.1.6.2. Other force options are not likely to change behavior in a timely fashion;
            14.1.6.3. Proximity of deployed handheld chemical incapacitants to:
                14.1.6.3.1.    Hospitals, schools, and convalescent facilities;
                14.1.6.3.2.    Uninvolved community members;
                14.1.6.3.3.    Residential areas;
                 14.1.6.3.4.    Freeways or areas with high density traffic; and
                14.1.6.3.5.    Flammable materials.
            14.1.6.4. Weather, environmental, and topographical conditions; and
            14.1.6.5. Timing and coordination with other law enforcement agencies.
        14.1.7. Request additional resources, if there is a need for additional police resources to manage the event.
        14.1.8. Activate RRT, when they determine that there is a need for the specialized unit to assist with the management of the event; and
        14.1.9. Authorize the deployment of authorized less lethal weapons, when objectively reasonable.
        14.1.10.       Write a daily summary of the event that assesses the Bureau's response and squad actions in relation to the IAP objectives and IC direction, and considers lessons learned (e.g., effective vs. ineffective action). The summary should inform future IC decision-making for the event.

    14.2. The Operations Section Chief shall (when assigned to an event):
        14.2.1. Propose the strategies, tactics, and assigned resources to meet the IC's objectives. The IC shall approve the strategic, tactical, and resource-related proposal.

    14.3. The Detective Division Commander or Supervisor shall:
        14.3.1. Coordinate with the IC to determine the scale of a mass arrest team response;
        14.3.2. Assign detectives to assist with any mass arrests;
        14.3.3. Manage the processing of all arrests pursuant to the Detective Division SOP; and
        14.3.4. Ensure that all required documentation for arrests is collected.

14.4. Sergeants shall:

    14.4.1. Verify that all assigned squad members have the proper equipment;

    14.4.2. Ensure that squad members are briefed before the start of the event;

    14.4.3. Communicate orders from the IC or the Operations Section Chief to their squad;

    14.4.4. Only issue direction that conforms with the IAP and event objectives; and

    14.4.5. Ensure that squad members act in accordance with the IAP.

    14.4.6. By the end of shift, account for the number of munitions deployed by each less lethal operator and grenadier.

        14.4.6.1. If members need additional munitions during an event, the supervisor is responsible for tracking the issuance of those munitions.

    14.4.7. At the end of shift, notify the IC, through email or other written format, of any force use and report on munition deployment (types and number), and any injuries to Bureau members or event participants (when known).

14.5. Officers shall:

    14.5.1. Follow the directions of the sergeant;

    14.5.2. Act in accordance with the IAP;

    14.5.3. Not take independent police action, unless exigent circumstances require immediate action for protecting themselves or others from physical harm. Such independent action must comply with all applicable Bureau directives; and

    14.5.4. When acting as a less lethal operator, account for and document all issued munitions in an appropriate police report at the end of shift.

15. Coordination with Other Agencies.

    15.1. The Bureau may request assistance from other law enforcement agencies to sufficiently staff and respond to an event.

        15.1.1. The Bureau IC, or their designee, shall appropriately brief outside agency personnel before their deployment.

        15.1.2. The Bureau IC shall maintain the authority to determine tactical objectives; direct the overall police response (all agencies); and determine, when objectively reasonable, how and when to use force to address civil disturbances or riotous behavior and/or disperse the crowd.

        15.1.3. The Bureau expects assisting agencies to act in accordance with the lawful orders of the Bureau IC; however, their members' conduct is subject to the outside agency's policies and procedures.

    15.2. The Bureau shall not:

        15.2.1. Use a proxy law enforcement agency to use crowd management or control measures that are prohibited by Bureau directive or that a court or statute has barred the law enforcement agency from using;

        15.2.2. Act in concert with another law enforcement agency to engage in misconduct barred by court order, statute, or Bureau directive.

16. Post-Event Reporting and Coordination Requirements.

    16.1. The IC (or their designee) shall:

        16.1.1. When applicable, write an overall police report that describes major decision-making during the event.

16.1.2. For non-extended events, complete an After Action in accordance with Directive(s) 0905.00, Non-Force After-Action Reporting. Generally, extended events are events that last two weeks or more.

    16.1.2.1. If the IC authorizes mass detention or mass arrest during the event, they shall document:

        16.1.2.1.1.    The criminal activity that gave rise to the authorization, including a brief description of the information relied on to conclude there was reasonable suspicion or probable cause to issue the authorization;

        16.1.2.1.2.    Any alternatives they considered before determining that a mass detention or mass arrest was appropriate;

        16.1.2.1.3.    How the mass detention or mass arrest affected public safety and the safety of the group detained or arrested;

        16.1.2.1.4.    Any announcements made to the group detained or arrested, either before or after the detention/arrest, including the manner in which the announcements were communicated to the group; and

        16.1.2.1.5.    What resources the Bureau deployed to assist in expediting the investigation or processing of the persons who were detained or arrested.

16.1.3. For extended events, complete the After-Action within 60 days of the conclusion of the event. To ensure contemporaneous documentation, the IC shall initiate the After-Action Review before the conclusion of the event.

    16.1.3.1. Generally, extended events are public order events that last two weeks or more. The Chief has the discretion to extend the After-Action timeline, not to exceed 60 days, for non-extended events that warrant further review.

16.1.4. Obtain and review approved force After-Action reports from the Force Inspector and include the number and types of force used during the event, and any other significant evidence from these reports, in the event After-Action.

16.1.5. When possible, review any uses of force by other agencies' personnel as part of the overall event After-Action report;

16.1.6. Complete the overall police report within at the conclusion the shift of each day of the event and, if necessary, supplement the report as additional evidence becomes available.

16.1.7. Ensure all other applicable pertinent reports are timely submitted as required by Directive 0900.00, General Reporting Guidelines, and 1010.00, Use of Force; and

16.1.8. Hold a formal debrief of the event to discuss the overall plan, tactics, staffing and areas of improvement. The debrief should include key supervisory member participants in the event.

16.2. The Detective Division Commander or Supervisor shall:

    16.2.1. Ensure coordination with the District Attorney's Office or relevant prosecutor when arrests are made.

16.3. Squad Supervisor Reporting and Incident Review Responsibilities.

    16.3.1. At the end of the event, the lead supervisor of each squad that took police action shall conduct a debriefing of the incident with their personnel and document it in their police report. Regarding uses of force, a designated supervisor shall write an After-Action for any force used by the squad in accordance with Directive 0910.00, Use of Force Reporting, Review, and Investigation, during the incident.

16.3.2. Supervisors shall evaluate uses of force for compliance with this directive; Directive 1010.00, Use of Force; and any other applicable directives, operative IAPs, or other orders.

**Effective:**     **11/15/2024**
**Next Review:**  **11/15/2026**