# ATTACHMENT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No.: 1:25-cv-03005 (JMC) |

## DECLARATION OF RENEÉ HALL

I, U. Reneé Hall, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct to the best of my knowledge, based on my experience described herein:

1. My name is U. Reneé Hall. I am over the age of 18 and able to provide true and accurate testimony under oath.

2. This declaration is based on my own personal knowledge and experience. If I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

3. I earned a Bachelor of Science degree in Criminal Justice from Grambling State University, as well as two Masters of Science degrees from the University of Detroit Mercy in Security Administration and Intelligence Analysis, respectively. I am also a graduate of the FBI National Academy (Session 262) and the Major Cities Chiefs Association's Police Executive Leadership Institute. I was a 2022 Harvard Advanced Leadership Initiative Fellow and former Senior Editor of the Harvard Social Impact Review.

1

4. In my more than twenty-year law enforcement career, I held positions at every level, culminating as the Deputy Chief of Police in Detroit, Michigan from 2014-2017, and as the Chief of Police in Dallas, Texas from 2017-2020.

**(1) Service in Detroit**

5. I enrolled in the Police Academy in Detroit, Michigan in 1999. I served at the rank of police officer in the Detroit Police Department culminating as the Deputy Chief of Police.

6. From 1999 through 2017, I advanced through a series of increasingly complex leadership assignments within the Detroit Police Department, acquiring the operational expertise, administrative skill, and community-focused vision that ultimately positioned me to serve as Chief of Police in Dallas. My career began with foundational service as a patrol officer, where I engaged directly with Detroit's neighborhoods, conducted dignitary protection for the mayor and international visitors, and cultivated trust through community affairs initiatives.

7. Promoted to sergeant in 2006, I assumed supervisory responsibilities across internal affairs, patrol, and tactical operations. My work in internal affairs exemplified my dedication to accountability and integrity, as I investigated allegations of misconduct while ensuring compliance with federal consent decree mandates. Concurrently, I coordinated covert operations targeting violent offenders and narcotics activity, sharpening my command of investigative and tactical protocols. This supervisory stage marked a critical turning point in my development as a leader capable of balancing enforcement with reform and accountability.

8. My promotion to lieutenant in 2010 expanded my responsibilities to tactical operations at a citywide scale. In this role, I directed incident command for large-scale civil disturbances, special events, and dignitary visits, overseeing logistics for major sporting events and international gatherings. My leadership during the World Series, the Detroit Grand Prix, and

presidential visits showcased the capacity to coordinate multi-agency operations under high-pressure conditions. The scope of these assignments required both operational precision and strategic foresight, qualities that became hallmarks of my executive leadership style.

9. By 2013, I had advanced to the rank of inspector and then commander, taking charge of patrol operations in some of Detroit's most complex precincts, including downtown and entertainment districts. Managing multimillion-dollar budgets and supervising critical infrastructure security, I fostered intergovernmental collaborations with local, state, and federal agencies.

10. In 2014, I was appointed Deputy Chief of Police, a role in which I oversaw more than one-third of the department, including 12 precincts, specialized divisions, and citywide initiatives. Managing a $137 million budget, I implemented crime reduction strategies that yielded year-end decreases of 20–30 percent in violent crime. I directed Operation Ceasefire, which mobilized law enforcement, clergy, and community leaders to address gang violence, and provided oversight of the department's compliance with use-of-force requirements under federal monitoring. I also spearheaded the pilot implementation of body-worn cameras, establishing policy frameworks that would later serve as national models. My collaborative initiatives, such as Community COMPSTAT and the Spirit of Service program, strengthened police-community relations by engaging residents as partners in crime reduction and cultural understanding.

11. My experience managing budgets, overseeing specialized units, implementing federal consent decree requirements, and directing large-scale operations established me as a leader uniquely equipped to navigate the complex challenges of urban policing. By the time of my retirement from the Detroit Police Department in 2017, I had amassed nearly two decades of executive-level and operational experience, laying a robust foundation for appointment as Chief

of Police in Dallas, where I would continue to advance a vision of accountability, transparency, and community partnership.

**(2) Service in Dallas**

12. In 2017, I was hired as the Chief of Police in Dallas, Texas. I was the first woman to serve in that role in Dallas.

13. As Chief, I was the chief executive officer of the Department. In that role, I had full power and authority over the Dallas Police Department, and all functions, resources, officials, and other personnel assigned thereto. I was also responsible for the proper and efficient conduct, control, and discipline of all officers in the Department. I led 4,000 personnel and managed a $500 million budget.

14. While I was Chief, the Dallas Police Department coordinated extensively with federal partners.

15. As a Dallas Chief I had operational oversight, MOU authority and executive coordination with several task forces that brought together FBI, ATF, DEA, U.S. Marshals, and Homeland Security resources. These included, for example:

a. FBI Joint Terrorism Task Force (JTTF) — Oversight of departmental participation in counterterrorism operations, intelligence sharing, and prevention strategies;

b. FBI Violent Crimes Task Force — Coordination on serial robberies, kidnappings, and multijurisdictional violent offenders;

c. FBI/DOJ Project Safe Neighborhoods (PSN) — Executive oversight and strategy alignment to reduce gun crime and gang violence;

d. DEA Task Force — Coordination on large-scale narcotics investigations, including opioids, heroin, and synthetic drugs (like K2 in Dallas);

4

e. ATF Violent Crime and Firearms Trafficking Task Force — Collaboration on illegal firearms possession, straw purchasing, and trafficking cases;

f. U.S. Marshals North Texas Fugitive Task Force — Oversight of DPD officers assigned to high-risk fugitive apprehension operations;

g. Homeland Security Investigations (HSI) Task Force — Coordination on human trafficking, cybercrimes, and transnational organized crime; and

h. Secret Service Financial Crimes Task Force (where applicable) — Participation in investigations of large-scale fraud, identity theft, and counterfeiting.

16. I had executive oversight of all departmental participation in these task forces, ensuring that DPD's resources were aligned with federal partners while safeguarding community priorities and constitutional policing.

17. In my years as Chief, Dallas saw a 5.7 percent reduction in overall crime in 2017, and a 5.97 percent reduction in violent crime in 2018.

18. As Chief, I prioritized community engagement and outreach. I regularly connected with officers in the field and met often with Dallas community groups, professional leaders, and local organizations. I spearheaded the City of Dallas' restructuring of the Community Police Oversight Board, as well as the police department's first Youth Summer Jobs program, which allowed business leaders and community stakeholders to mentor at-risk youth through workforce development.

19. In moments of crisis, I also coordinated directly with the Texas National Guard to support local efforts while ensuring that community rights and constitutional freedoms remained protected. These collaborations allowed the Dallas Police Department to leverage federal resources while keeping community trust at the center of every operation.

20. The test of leadership came most visibly in 2020 following the murder of George Floyd, when Dallas, like the rest of the nation, was gripped by civil unrest. I worked tirelessly to strike the balance between ensuring public safety and protecting the right to peaceful protest. My leadership approach focused on engagement, transparency, and restraint. We implemented command protocols that limited the use of force to only when absolutely necessary, and I personally met with community leaders, clergy, and activists to listen to concerns and to create space for dialogue. These actions helped Dallas avoid some of the more destructive outcomes seen in other major cities and positioned the Police Department as one willing to face its challenges directly while leaning into reform.

21. My efforts in Dallas were always rooted in building trust—bridging the gap between police and community through dialogue, visibility, and accountability. From federal coordination to protest management, my experiences reinforced a principle that guided my leadership: true public safety is only possible when the community believes that their police department exists to serve them with fairness, equity, and respect.

**(3) Current Service**

22. Currently, I serve as President of the National Organization of Black Law Enforcement Executives (NOBLE), an organization of more than 4,800 members with 60 chapters in the United States, Canada, the Caribbean, and Africa. NOBLE's mission is to ensure equity in the administration of justice in the provision of public service to all communities, and to serve as the conscience of law enforcement by being committed to justice by action.

23. I am also currently the Executive Director of the Community Solidarity and Safety Coalition, where I work with nonpartisan leaders and government partners to address public safety challenges.

24. Since retiring from the Dallas Police Department in December 2020, I have continued to advance the profession of policing through training, consultation, and leadership development. I have been invited to conduct executive-level trainings for law enforcement agencies across the country, with a focus on 21st Century Policing, organizational change management, crisis leadership, and building community trust. I have consulted with major city police departments, smaller municipal agencies, and community-based organizations seeking to strengthen their partnerships with law enforcement.

25. In addition to direct consultation, I have participated in national conferences, panel discussions, and academic forums where I share insights on modern policing strategies, cultural competency, and police-community relations. I have also partnered with universities, leadership institutes, and professional organizations to design and deliver curriculum for current and aspiring police leaders. These engagements have allowed me to leverage my experiences in Detroit and Dallas while contributing to the next generation of law enforcement leadership.

26. My post-retirement work has been guided by the same principles that shaped my career: a commitment to fairness, accountability, and service. Whether through training, consultation, or public speaking, I continue to advocate for reforms that build trust and ensure that public safety evolves in a way that reflects both community needs and professional standards.

## OPINIONS

### A. Community Trust is Essential to Public Safety.

27. My two-decade-long career in policing has taught me that public safety is built on trust, consistent enforcement, and community-based strategies.

28. Community trust is critical to effective policing. Building trust between law enforcement and the community is a major component of the work of local law enforcement.

29. Trust is built in a number of different ways: a transparent command structure, being able to identify individual officers and the law enforcement agencies they work for, systems of accountability, and carefully building community relationships.

30. Policing is not simply about responding to crime; it is about creating an environment where residents feel both safe and respected. That foundation cannot exist without authentic trust between law enforcement and the communities we serve.

31. Community trust is critical to effective policing. Building trust between law enforcement and the community is a major component of the work of local law enforcement, and it requires intentionality. Trust determines whether residents call the police when they need help, whether witnesses are willing to come forward, and whether neighborhoods see officers as guardians or as outsiders.

32. Trust is built in a number of different ways. One way is through a transparent command structure. Communities need to know how decisions are made, who is accountable, and how information flows. By ensuring that our chain of command is clear and that our actions are communicated openly, we reinforce that policing is done with—not to—the community.

33. A second way trust is built is by ensuring that residents can identify individual officers and the agencies they represent. This level of visibility is a safeguard against anonymity, which can erode accountability. When officers wear clearly marked uniforms and nameplates, and when agencies ensure consistent identification, it strengthens both responsibility and professionalism.

34. A third method for ensuring community trust is creating systems of accountability. Oversight mechanisms, internal affairs processes, body-worn cameras, and civilian review boards all serve to ensure that misconduct is addressed transparently and fairly. Accountability is not a

punitive measure alone—it is also a way to build credibility by showing the community that law enforcement holds itself to the same standards of justice it enforces.

35. Another essential way trust is built is through carefully cultivated community relationships. These are not achieved through occasional outreach but through sustained engagement. Whether by creating advisory boards, hosting neighborhood dialogues, or involving youth in summer jobs programs, community relationships signal that law enforcement is invested in the success and well-being of residents beyond the moment of crisis.

36. In my experience as Chief in Dallas, one salient example came during the protests of 2020. In the midst of national tension, I met directly with clergy, activists, and community leaders. By listening before acting, by explaining command decisions in real time, and by maintaining open channels of communication, we were able to reduce the temperature of the moment and preserve space for peaceful demonstration. That experience reinforced what I had learned throughout my career: when law enforcement embraces transparency, accountability, and genuine relationship-building, it not only strengthens trust but also enhances public safety in ways enforcement alone never could.

### B. Law Enforcement Officers, Including in the District of Columbia, Receive Extensive Policing Training.

37. In my experience in Detroit and Dallas, along with what I have observed in other police departments nationwide, typical training for new recruit police officers, such as those entering service with MPD, includes training on the law relevant to policing. This would typically include law interpreting the Fourth Amendment and standards for lawful stops and arrests; the proper use of force; and the chain of custody and preservation of evidence.

38. I have reviewed MPD training materials that are publicly available.

39. According to these materials, prior to being assigned to police the District, new MPD recruit officers receive approximately 37 weeks of police academy training to prepare them for policing in the District, which includes a full program of classroom, scenario, physical, and tactical training.

40. This is consistent with the training that officers receive in both the Detroit and Dallas police departments, and it is consistent with my knowledge of other police departments' training procedures across the country.

41. Based on my review of publicly available training materials, MPD police academy training includes training on District case law interpreting the Fourth Amendment and the standards for lawful stops and arrests. A true and correct copy of the MPD Academy Curriculum Block 4.1 on the Introduction to Criminal Law is attached hereto as Exhibit A.

42. MPD's police academy training also includes training on the appropriate use of force. A true and correct copy of the MPD Academy Curriculum Block 5.1 on the Use of Force is attached hereto as Exhibit B. MPD's use of force training emphasizes that officers should attempt to defuse any situation by using de-escalation techniques whenever possible and that any use of force should be proportionate to the circumstances. See Ex. B at 6. This training also includes training on MPD's General Order on the Use of Force, which emphasizes that MPD officers must exercise "the utmost restraint" in using force and that "Members shall minimize the force that is used while protecting the lives of members and other persons, and continuously reassess the perceived threat in order to select the reasonable use of force response that is proportional to the threat faced by him, her, or others." A true and correct copy of MPD's General Order on the Use of Force is attached hereto as Exhibit C.

43. Finally, MPD's police academy training also includes training on basic investigative techniques, report writing, chain of custody, and the preservation of evidence. A true and correct copy of the MPD Academy Curriculum Blocks 3.2 through 3.4, which cover Basic Investigative Incident Reports, Crime Scene Awareness and Management, and Property, is attached hereto as Exhibit D.

**C.   National Guard Troops Deployed to the District of Columbia Will Undermine Basic Principles of Effective Local Law Enforcement and Risk Public Safety.**

44. Based on public reporting, and my own personal observations as a resident of the greater Metro-Washington area, I understand that the President declared a "crime emergency" in the District of Columbia on or about August 11, 2025.

45. As part of that "emergency," it is my understanding that the President ordered the activation of the D.C. National Guard and deployment of National Guard units from other states to the District. Based on public reporting and public statements I have reviewed from various federal and military officials, it is my understanding that more than 2,300 National Guard troops have been deployed in the District, and been authorized to carry service weapons and engage in law enforcement activities.

46. In my experience, the presence of armed military personnel in an American city is highly unusual. Never in my 20 years as a law enforcement professional have I encountered a deployment of National Guard troops like the one in the District of Columbia right now.

47. In the context of my role as Chief of Police in Dallas, I had the responsibility of working closely with the Texas Department of Public Safety (DPS) in conjunction with the National Guard when their support was requested by the Governor and Mayor during periods of heightened civil unrest (for example, the 2020 George Floyd protests). The National Guard's

11

presence was not initiated unilaterally, but rather came as part of a coordinated, lawful invitation to assist local law enforcement in maintaining order and ensuring community safety.

48. From the outset, we established a collaborative working relationship that respected both DPS, the Guard's military command structure, and the operational authority of the Dallas Police Department. The National Guard did not act independently; they served in a support capacity under civil authority, reinforcing perimeters, protecting infrastructure, and allowing sworn officers to focus on direct engagement with the public. Importantly, in Dallas their deployment was designed to be non-confrontational and many were unarmed or assigned strictly to static posts, ensuring that their presence communicated stability without escalating tension.

49. This deliberate approach stands in contrast to what has unfolded in Washington, D.C., where the deployment of federal troops and militarized responses at times blurred the lines between civil law enforcement and military intervention. In Dallas, we were intentional about preserving the distinction, maintaining civilian control, and keeping community trust at the forefront. By doing so, we were able to benefit from the Guard's resources and manpower while ensuring that our policing efforts remained grounded in the principles of accountability, proportionality, and constitutional policing.

50. In my opinion, based on years of expertise in community-law enforcement relations, the presence of armed National Guard patrols in the District of Columbia poses significant, immediate risks to public safety for three primary reasons: it undermines community trust; it creates confusion and lack of coordination; and it introduces new risks associated with lack of law enforcement training.

### (1) Undermining Community Trust

51. The deployment of uniformed and heavily armed military, as well as armored military vehicles, risks destroying carefully-constructed community relationships that, in my experience, local police departments spend decades fostering.

52. Even when federal law enforcement assists local law enforcement, which in my experience is much more common than a military deployment but still relatively rare, federal law enforcement is not immediately introduced into communities without extensive preparation and coordination at every level. And those federal agents typically come from field offices in or near those communities and are trained law enforcement officers.

53. The deployment of National Guard troops in the District carries significantly greater risks to public safety.

54. Deploying uniformed, armed National Guard troops, including more than 1,000 from outside the District who are not familiar with the District's communities, to police the District's neighborhoods risks undermining trust and confidence in law enforcement, generally.

55. In my experience, if the community does not trust law enforcement, crimes go unreported. If crimes are unreported, communities are less safe.

56. Additionally, the sight of armed military troops on District streets is intimidating and creates an atmosphere of fear. Americans are not accustomed to armed soldiers in full uniform and armored trucks on city streets. It indicates that residents live in a police state patrolled by an occupying force; it replicates war.

57. In my extensive law enforcement experience—especially in senior leadership positions in major metropolitan police departments—an atmosphere of fear does not enhance public safety – it undermines it.

### (2) Lack of Coordination

58. In addition, effective local policing requires all officers conducting law enforcement activities to have a clear understanding of the command-and-control structures under which they are operating. To the extent that multiple entities or agencies are engaged in law enforcement activities in a single jurisdiction, there must be an infrastructure in place to coordinate the command and control of all law enforcement officers.

59. Based on my experience leading the police departments in two large, urban cities, it is not possible for thousands of National Guard troops to be integrated or become familiarized with the command structure, deployments, or directives of local law enforcement in a mere matter of days or weeks. Attempting to do so on a short timeframe in the District is highly likely to pose problems for local police officers and other law enforcement entities operating in the District.

60. The lack of a coordinated command-and-control structure also poses problems for the residents of the District. When a proper command-and-control structure is in place, there is a structure for accountability for officers' conduct. Based on my understanding of the command-and-control structure governing the National Guard troops deployed in the District of Columbia, there does not appear to be a proper framework for accountability for troops' law enforcement activity.

61. For example, if National Guard troops participate in searches, seizures, arrests, or detentions for crimes in the District, District residents are unlikely to know where to seek accountability for potentially unlawful activity. Moreover, any uncertainty about the lawfulness of troops' involvement in those activities would complicate the prosecution of those crimes, which undermines public safety.

### (3) Lack of Training

62. Finally, it is my understanding that National Guard troops largely do not have experience in policing but instead have other "day jobs" that are unrelated to law enforcement.

63. Law enforcement training is different than military training. When people act as law enforcement officers without proper training, including untrained National Guard troops, it can create several risks to the public and local governments, including potential violations of the law governing important areas of policing, such as stops, seizures, and arrests; the proper use of force; and the chain of custody and preservation of evidence. Violations of these rules can endanger the public, including by subjecting them to unlawful detentions and excessive or deadly uses of force. And it can lead to negative consequences for local governments, including by exposing them to civil liability and undermining prosecution efforts.

64. Additionally, it is unclear whether the National Guard units conducting armed patrols have been trained on the safe handling of firearms in a densely populated, domestic urban setting, or on de-escalation techniques required to operate safely in an urban environment within the United States, creating a possibility of accidental discharge or other incident involving harm to the public.

\* \* \*

65. As a long-time law enforcement officer and retired Chief and Deputy Chief of Police in Dallas and Detroit, respectively, it is my professional opinion that the current deployment of National Guard troops in the District of Columbia risks significantly damaging the District's public safety efforts. Without effective coordination and training, the use of National Guard troops in law enforcement activities poses a danger to the community, as it erodes community trust in law enforcement, sows confusion, and places armed military personnel in positions for which they are ill-trained.

15

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of September 2025, in Oxon Hill, MD.

_____
U. Reneé Hall