# The Handling of the 2020 Protests and Riots in Portland, Oregon: An Independent Review

**INDEPENDENT MONITOR LLC**

Submitted By:

Nicholas E. Mitchell, Principal

THIS PAGE INTENTIONALLY LEFT BLANK

August 9, 2023

To the City of Portland, the United States Department of Justice, Members of the Portland community, and the Portland Police Bureau:

Independent Monitor LLC was retained in May 2022 to perform an independent review of the City of Portland's handling of the protests and riots that erupted in that city in 2020. After months of exhaustive investigation by our team, which includes Philip K. Eure, Dr. Matthew Buttice, and Peter Davidov, we are pleased to present this report reflecting our independent factual findings, analysis, and recommendations.

We are very grateful to the many members of the Portland community who shared their experiences, personal stories, and insights as we conducted this review. Officers, too, were open and transparent. Personnel from the United States Department of Justice, the Compliance Officer/Community Liaison, and many members of the larger federal, state, and local law enforcement communities graciously shared their time with us. We are thankful for their collaboration and partnership.

Sincerely,

Nicholas E. Mitchell
Independent Monitor LLC

THIS PAGE INTENTIONALLY LEFT BLANK

# Table of Contents

INTRODUCTION AND FACTUAL SUMMARY ....................................................................1

    METHODOLOGY.......................................................................................................... 5

    HISTORICAL AND FACTUAL BACKGROUND.................................................................. 7

        *A History of Portland Protests and PPB's Approach to Public Order Policing*.............................................. 8

        *Escalating Conflict and the Onset of the COVID-19 Pandemic*................................................................. 10

        *The Raising of the Justice Center Fence, and PPB's Growing Reliance upon CS Gas* .................................... 12

        *Presidential Executive Order 13933, Operation Diligent Valor, and Conflicts at the Federal Courthouse in*
        *July* ..................................................................................................................................................... 14

        *August and September 2020: A New Wave of Conflicts, and Wildfires That Bring Temporary Calm* ......... 16

        *The Ransack of the Oregon Historical Society and a Change in Public Perceptions* ...................................... 17

        *The November Election, the End of the Civil Disturbance, and the Resignation of the RRT* ........................ 17

    INTERNAL AND EXTERNAL CONSTRAINTS ON PPB DURING THE REVIEW PERIOD ........................ 19

INTRODUCTION CITY LEADERSHIP, PPB COMMAND, & THE INCIDENT COMMAND SYSTEM......23

    CITY LEADERSHIP AND PPB COMMAND...................................................................... 23

        *The City Was Not Transparent with the Public About its Strategies, Tactics, and Munitions for Public Order*
        *Policing, Which Set the Stage for a Loss of Public Trust* ........................................................................... 24

        *There Was Insufficient Internal Oversight of RRT by PPB Executives* ........................................................ 26

        *PPB Executives Did Not Visit the Field or Debrief with Officers Often Enough in 2020* .......................... 27

        *PPB Leaders Did Not Consistently Prime Officers with the Rules of Engagement Before Deployments*.......... 28

        *PPB Leaders Did Not Enforce Consistent Rules of Engagement with Protest Crowds*.................................. 28

        *The City Did Not Do Enough to Preserve Its Network of Mutual Aid Partners, Despite Warnings That the*
        *Network Was in Danger of Failing* ........................................................................................................ 30

    PPB'S USE OF THE INCIDENT COMMAND SYSTEM........................................................ 32

        *The Incident Command System* ............................................................................................................ 32

        *The Command Post* ............................................................................................................................ 33

        *PPB Did Not Prepare a Sufficient Number of Command Personnel to Handle a Long-Lasting Civil*
        *Disturbance*......................................................................................................................................... 34

        *The Incident Management Team Was Not Consistently Effective as a Learning Organization Throughout the*
        *Review Period*...................................................................................................................................... 35

THE FIRST AMENDMENT AND USE OF FORCE ..........................................................39

    THE GOALS OF PUBLIC ORDER POLICING .................................................................. 39

    PPB RELIED TOO OFTEN UPON CIVIL DISTURBANCE DECLARATIONS AND RIOT CONTROL
    AGENTS.................................................................................................................... 40

PPB Would Have Been Better Able to Reduce its Use of RCAs with Crowd Observation Tools and Methods That Were Not Available in 2020 ................................ 43

    *Portland's Downtown Video Blackout* ................................................................ 44

    *Lack of Plainclothes Officers Making Crowd Observations* ............................... 46

PPB's Dispersal Order Warnings Were Often Insufficient and Not Properly Documented ................................................................................................................ 48

PPB Failed to Implement Key Internal Controls on the Force Used by Officers ...... 49

    *PPB's Tracking of Less-Lethal Munitions Was Insufficient* ............................... 49

    *PPB's Force Reporting and Review Practices During the Review Period Were Inconsistent with Its Policies* .... 51

Key Policy Guidance Authorizing Certain Types of Force Was Inappropriate or Imprecise ................................................................................................................ 52

    *PPB Policy Did Not Address Dynamics, Bull Rushes, and Baton Pushes* ................ 53

    *PPB's Threshold for Use of Area Impact Munitions Was Too Low* ...................... 53

    *Other Deficiencies in PPB's Standards for Use of Less-Lethal Force* ..................... 55

**THE EFFECTIVENESS OF PPB'S PUBLIC ORDER TRAINING** ................................... 57

National Standards and PPB Training ........................................................................ 57

The City Did Not Provide Sufficient Oversight of PPB's Public Order Training ...... 58

PPB Provided Insufficient Guidance in RRT Training About When Force Was Authorized and Prohibited ........................................................................................ 61

PPB Did Not Adequately Train Mobile Field Forces ................................................ 64

PPB Did Not Sufficiently Address De-escalation and Procedural Justice in Its Training ................................................................................................................ 65

**CONCLUSIONS AND RECOMMENDATIONS** ................................................................ 67

# Glossary

| | |
|---|---|
| 2-Chlorobenzylidene Malononitrile ("CS") | Otherwise known as "tear gas," CS gas is a riot control agent that causes eye tearing and burning sensations in the nose, eyes, mouth and throat, resulting in profuse coughing, nasal mucus discharge, difficulty breathing, and partial incapacitation, among other effects.[1] |
| 40mm Launcher | A less-lethal tool that deploys 40mm projectiles that are either intended to be fired directly at individuals or to saturate an area with OC or CS gas. The direct-impact projectiles generally consist of a plastic body and crushable foam nose that can cause bruising, swelling, lacerations, eye injuries, and fractures. |
| After-Action Reports | Forms completed by PPB supervisors to document the findings associated with their investigation into uses of force. Once completed, the forms are forwarded through the chain of command for review. |
| Civil Disturbance and Riot Declarations ("Unlawful Assembly Declarations") | Determinations by PPB that certain gatherings are unlawful and either 1) present dangers of riot, disorder, interference with traffic upon the public streets; 2) produce another immediate threat to public safety, peace or order; or 3) involve six or more persons engaging in tumultuous and violent conduct that creates a grave risk of causing public alarm. |
| Command Post | The location of command personnel who are managing public order incidents, the command post is the "nerve center" of the police response in which significant strategic decisions are made. |
| De-Escalation | Police strategies to reduce the likelihood of uses of force at public order events, including enhanced dialogue, empathetic listening, and employing time and distance to minimize opportunities for conflict. |
| Dispersal Order | Police commands, usually delivered by loudspeaker, ordering crowds to leave an area after a civil disturbance or riot has been declared. |
| Dynamic or "Bull Rush" Tactic | A tactic involving a line of officers running at a group of protesters to encourage them to flee after a civil disturbance or riot has been declared. Sometimes force, such as open hand or baton pushes, is used at the conclusion of a dynamic. |

| | |
|---|---|
| FN303 Launcher | A less-lethal tool that deploys finned projectiles containing either inert powder, paint, or pelargonic acid vanillylamide powder. The projectiles can cause bruises, welts, and bleeding, and the pelargonic acid vanillylamide powder can cause reactions similar to pepper spray. |
| Force Data Collection Reports | Form that PPB officers complete to document incidents during which they used force. Once completed, the forms are forwarded to their supervisors for review. |
| Incident Command System ("ICS") | A scalable, standardized organizational structure used for managing large emergencies, including mass protest events, that creates a unified command in which all agencies are accountable to one overall incident commander. |
| Incident Commander | A police executive who is responsible for the overall control of a public order incident, including determining goals, objectives, and strategies. |
| Incident Management Team | A staff of police command and other personnel who are responsible for the management of public order incidents in a command post, including an incident commander, operations section chief, and other staff. |
| Independent Police Review | The police oversight agency in Portland that was responsible for receiving and investigating certain misconduct complaints against Portland police officers. In 2020, Portlanders voted to replace Independent Police Review with a new police oversight entity, which has not yet been created. |
| Less-Lethal Equipment and Munitions | The tools and munitions used by police officers during public order events, including, but not limited to, FN303, 40mm, CS gas, OC spray, OC vapor, and rubber ball grenades. While these tools and munitions may cause serious injury, they are less likely to be fatal than firearms. |
| Mobile Field Force ("MFF") | Portland police officers who received a limited amount of public order training and supported RRT in responding to protest events.[2] They were, in essence, regular police officers with just enough training to respond to public order incidents but not enough to count themselves as specialists. |
| Multnomah County Justice Center ("Justice Center") | Location of the Multnomah County Detention Center, a Portland jail, as well as PPB's Central Precinct and offices of the Multnomah County Sheriff. |

| | |
|---|---|
| Mutual Aid | Arrangements among neighboring jurisdictions that establish commitments of reciprocal support during times of emergency. When one jurisdiction needs help with additional police officers or other resources, the others pledge to provide it. |
| National Tactical Officers Association | A non-profit organization that develops standards and training for police specialty assignments, including SWAT, crisis negotiations, and canine. Also, the publisher of standards for public order policing that establish best practices for developing police public order units. |
| Oleoresin Capsicum ("OC") | Otherwise known as "pepper spray," an inflammatory agent used in policing and crowd control. Its inflammatory effects irritate the eyes and other mucous membranes and cause a burning sensation, pain, and temporary blindness. |
| Operation Diligent Valor | An operation under which federal personnel were dispatched to American cities, including Portland, to protect federal facilities and other assets. |
| Operations Section Chief | Head of the Operations Section in the command post who determines the tactics that will be used to achieve the objectives set by the incident commander. |
| Personal Protective Equipment | Defensive equipment used by police officers during public order incidents that includes helmets, eye protection, turtle suits or "riot gear," and other gear designed to prevent officer injuries. |
| Presidential Executive Order 13933 | An Executive Order issued by President Donald J. Trump that resulted in the dispatch of federal law enforcement to American cities in the summer of 2020, including Portland. |
| Public Order Unit or Public Order Policing Squad | A police unit with enhanced training, equipment, and frequent drilling on public order techniques and approaches, including de-escalation, to enable them to safely manage public order incidents. |
| Rapid Response Team ("RRT") | PPB's in-house public order squad until June 2021 when all members resigned en masse after one RRT member was criminally charged with Fourth Degree Assault. |
| Review Period | May 28 through November 15, 2020, or the period that is the subject of this report. |
| Riot Control Agents ("RCAs") | Hand-thrown grenades or 40mm projectiles containing OC or CS powder used to disperse crowds. RCAs create clouds of gas that impact everyone within their area of effect, including uninvolved bystanders. |

| | |
|---|---|
| Rubber-Ball Grenades or Area-Impact Munitions | Hand-thrown rubber explosive devices.  The devices can be empty or contain rubber balls that project across a 50-foot radius in 360 degrees.  The rubber balls and shrapnel from the devices cause physical pain, and the light and sound from the blast may disorient persons nearby. |
| Rules of Engagement | The principles established by a police agency that govern its responses to public order events, including what kinds of conduct are likely to result in arrest, crowd dispersal, and use of force. |
| Settlement Agreement | A legally binding agreement between the United States Department of Justice and the City or Portland requiring the reform of the PPB. |

# Introduction and Factual Summary

This report arises amidst an ongoing legitimacy crisis for the Portland Police Bureau ("PPB"). On May 25, 2020, a police officer in Minneapolis, Minnesota murdered George Floyd, a Black man being arrested for passing a counterfeit twenty-dollar bill. The reverberations of that killing, and the excruciating nearly nine-minute video that documented it, were felt throughout the United States, but particularly in Portland, Oregon ("City"). Over almost six months, the City was in a state of upheaval, with well-attended and peaceful daily protests turning into violent clashes between police and community members at night. The unrest became a national flashpoint and a frequent topic on nightly political talk shows, with television commentators attempting to diagnose what was going wrong in Portland and prescribe solutions. Many of their ideas were inflammatory and inconsistent with best practices for modern public order policing.

The harms from those six months of chaos on Portland's streets were manifold. Scores of people who sought to protest peacefully were exposed to airborne 2-chlorobenzylidene malononitrile ("CS") gas and, in some cases, targeted with less-lethal impact projectiles, resulting in a range of injuries from bruises to broken bones. The clouds of CS gas generated during nighttime crowd dispersals became so large that they penetrated the homes of uninvolved community members blocks away, forcing them to flee. To this day, many Portlanders feel alienated from and furious with PPB for using force to disperse crowds that were perceived to be peaceful, or they have lingering injuries that they attribute to police use of force.

Officers, too, felt betrayed. They were targeted with thrown projectiles, including rocks, bricks, and in some cases, Molotov cocktails, and ultimately reported more than 450 injuries, ranging from minor tissue damage to concussions and fractures. They felt judged and castigated by the very community that they intended to protect. Moreover, they believed that certain elected leaders did not sufficiently and publicly distinguish protesters from those who took to Portland's streets with violent

intentions, instead labeling all events as "protests" when some, in fact, became dangerous riots.

Many businesses in downtown Portland were damaged and remain shuttered to this day. Public buildings were ransacked, and, in some cases, set aflame. Reports conservatively estimated the cost of damage to City property at more than $10 million, private businesses at nearly $5 million, and to the Hatfield U.S. Courthouse at $1.6 million. In just a little over the first month, the Portland Bureau of Emergency Communication dispatch center received calls of nearly 150 related fires.

Notwithstanding this laundry list of harms to the City and its residents, we believe that today, there are reasons for optimism. During this review, we spoke with many Portlanders who want to work collaboratively with law enforcement to enhance public safety. We encountered a police bureau that is very interested in employing a modern approach to public order policing. And we discovered a city that is in desperate need of assistance in rebuilding the trust that was lost between the police and the community. In that spirit, we share this report, which is presented in five sections: **Introduction and Factual Summary**; **City Leadership, PPB Command, & the Incident Command System**; the **First Amendment and Use of Force**; the **Effectiveness of PPB's Public Order Training**; and **Conclusions and Recommendations**. At the end of the report, we provide 12 actionable recommendations to the City and the PPB to enable them to avoid repeating the errors of 2020. In summary:

**First**, the City must rebuild its fractured mutual aid network. Many police departments rely on mutual aid agreements that allow them to call on nearby agencies for supplemental personnel and equipment during emergencies, and the City must establish new, durable mutual aid agreements with its neighboring jurisdictions.

**Second**, PPB must dramatically reduce its reliance on riot control agents, like CS gas, for crowd dispersals at public order events. This includes determining whether the City can establish video coverage downtown consistent with state law and

community expectations, and formalizing PPB procedures—and safeguards—for the use of plainclothes officers during any future civil disturbances.

**Third**, PPB must strengthen and clarify its public order and use of force directives.

**Fourth**, the City must ensure that PPB directives related to internal controls during public order events are followed.

**Fifth**, the city must create a new specialized public order team consistent with recent standards for advanced public order units.

**Sixth**, this new public order team must be rigorously scrutinized by PPB executives, overseen by Portland's new oversight agency, and transparently introduced to the public.

**Seventh**, the City must continue to improve its public order training program consistent with recent National Tactical Officers Association standards.

**Eighth**, PPB policy should require chiefs to be engaged with and visible to officers in the field during public order deployments, when possible.

**Ninth**, PPB must prepare a deep bench of leaders to serve as incident commanders and operations section chiefs who are skilled in the management of public order events.

**Tenth**, PPB should develop a pre-operational briefing checklist and hold supervisors accountable for providing comprehensive briefings on the rules of engagement and de-escalation to officers before public order deployments.

**Eleventh**, PPB must formalize the debriefing process for public order deployments.

**Twelfth**, the City should produce a detailed self-assessment in 180 days reflecting the steps it took to implement these recommendations.

One administrative note: the City has committed to responding to this report and implementing the necessary changes that it conveys. In 180 days, Independent Monitor LLC will begin preparing a follow-up report assessing the sufficiency of the City's response to the findings and recommendations discussed herein. To enhance

transparency, that report will also be shared with the City, the United States Department of Justice, PPB, the Compliance Officer/Community Liaison, and the residents of Portland.

# Methodology

Between May 2022 and February 2023, Independent Monitor LLC gathered and reviewed information from many sources, including the City, Portland community members, and law enforcement agencies in neighboring jurisdictions. Members of the team reviewed PPB directives and standard operating procedures related to public order policing and the use of force. To analyze how PPB officers and command staff applied these directives and procedures between May 28 and November 15, 2020 ("Review Period"), Independent Monitor LLC requested and reviewed documents that included operational plans, activity logs, force reports, arrests records, and after-action reports, from a sample of 43 operational periods.[3] Team members also reviewed materials associated with the administrative investigations into complaints filed about PPB officer actions during the Review Period, including the initial complaints, evidence gathered, investigation summaries, and investigation outcomes.

To learn how PPB specifically prepared its officers to respond to public order events, Independent Monitor LLC requested and reviewed public order and less-lethal equipment training materials used by PPB between 2016 and 2020. This included lesson plans and presentations slides for trainings provided to new recruits and the now-disbanded Rapid Response Team ("RRT"). In February 2023, members of the team attended a two-day in-service training to assess how PPB's public order training evolved after 2020.

The City produced to Independent Monitor LLC over 500 videos from the sampled operational periods. The team reviewed all of these videos and supplemented them with others available online, included in court documents, or collected as part of the administrative investigations into complaints about PPB officer actions during the Review Period.

During the review, Independent Monitor LLC visited Portland multiple times, participated in a Portland Committee on Community-Engaged Policing ("PCCEP") public forum, and conducted interviews of protest participants, spectators, and representatives of groups such as the Citizen Review Committee, Coalition of Advisory Groups, Albina Ministerial Alliance, Portland Interfaith Clergy Resistance,

Mental Health Alliance, Portland Copwatch, and League of Women Voters of Portland. An email address was established to receive information from community members, PortlandReview@independentmonitor.com, and various submissions were received and reviewed.

The team also interviewed elected officials and appointees, including Mayor Ted Wheeler, Multnomah County District Attorney Mike Schmidt, City Attorney Robert Taylor, former Commissioner Jo Ann Hardesty, and Independent Police Review Director Ross Caldwell. It also interviewed Chief Charles Lovell and other current and former PPB personnel who worked in the Chief's office, command post, or in the field, including incident commanders, operations section chiefs, and RRT supervisors and officers. Leaders of other law enforcement agencies that have historically partnered with PPB also shared valuable information with the team, including the Oregon State Police ("OSP"), Multnomah County Sheriff's Office, Washougal Police Department, Clackamas County Sheriff's Office, Federal Bureau of Investigation, and United States Marshals Service.

## Historical and Factual Background

PPB is a large municipal police agency with over 800 sworn officers. In 2012, the DOJ and PPB entered into a settlement agreement ("Agreement") to address the DOJ's findings that PPB demonstrated a pattern of excessive force regarding persons with mental illness. In the years between 2012 and 2020, PPB moved to comply with the Agreement by, among other things, implementing approved use of force policies, employing specialized units, such as the Enhanced Crisis Intervention Team and Behavior Health Response Team, and improving the use of its Employee Information System.[4] On January 10, 2020, the DOJ determined that the City had achieved substantial compliance with all sections of the Agreement, and the City would be required to maintain this compliance for one year in order for the Agreement to be terminated.[5] It was during this one-year compliance period that Mr. Floyd was murdered.

In February 2021, the DOJ determined that PPB's response to the 2020 protests and riots caused it to fall out of compliance with several provisions of the Agreement, most notably those related to the investigation and review of all uses of force.[6] In February 2022, the DOJ and the City agreed on several negotiated remedies for this non-compliance. This included hiring a civilian employee to manage educational aspects of the PPB Training Division, equipping PPB officers with body-worn cameras, and investigating the actions of PPB personnel with ranks of lieutenant or above related to public order training and the PPB's response in 2020.[7] It also required the City to hire outside experts to conduct a critical assessment of the City's handling of the 2020 protests and riots, hence this report.

## A History of Portland Protests and PPB's Approach to Public Order Policing

Portland has a rich history of robust protest activity about many subjects, including large demonstrations related to the labor movement and union organizing, civil rights marches, immigration, the Occupy Movement, and, in some cases, protests about the PPB itself. By some estimates, there were over 250 assemblies or protests in the City each year before the onset of the COVID-19 pandemic. Yet none of these prior events approached the size, scale, volatility, or duration of the 2020 protests and riots.

In the early 2000s, the PPB adapted to Portland's robust protest culture by recognizing that it needed a dedicated crowd management and control (which we will call "public order policing") squad. In some ways, this put Portland ahead of the curve. The modern trend in policing is to recognize that public order policing is a specialization that requires intensive, iterative training, stress inoculation, and routine practice—in some ways akin to SWAT, Narcotics, and other specialized disciplines. Under the leadership of former Chief Mark Kroeker, in 2001, PPB developed the RRT. RRT was initially envisioned as a large unit, with over one hundred officers, but it was pared down over the years to approximately 60 or 70 officers.

RRT was not a standalone, voluntary assignment. That is, its members all had other police duties to which their work with RRT was auxiliary. Former RRT members with whom we spoke told us that the demands of those dual assignments were often challenging, and being assigned to RRT was sometimes cause for concern about one's career. For example, while officers in other specialty assignments, like the Special Emergency Reaction Team or Narcotics, received assignment-based pay increases, officers in RRT did not get a pay bump. Moreover, there was a sense that being in the RRT was high-profile, risky, and could result in significant damage to one's prospects in PPB, including the risk of being named in lawsuits, which might hinder future promotion.

RRT members received 30 hours of initial training, plus in-service training each year. The initial training had classroom and field components addressing relevant state laws, use of force, tactical formations and movements, arrest procedures, and report

writing.  In addition to its 60–70 officers, RRT was staffed by several sergeants and a lieutenant.  Portland Fire Bureau medics were also embedded within RRT to provide medical aid to officers and community members at public order events.  RRT was broken into squads, each of which was generally composed of a squad leader, approximately 12 officers, a video operator, and a medic.  During deployments, RRT officers generally wore personal protective equipment underneath their uniforms to maintain a low profile and avoid the over-militarized appearance of traditional riot gear.

PPB also relied upon what it calls "Mobile Field Forces" ("MFF") to respond to public order events.  MFF officers received limited exposure to public order concepts during their initial training and in-service classes that were generally delivered to them once every four years.  This was far less than RRT members.  MFF officers were, in essence, regular police officers with just enough training to respond to public order incidents but not enough to count themselves as specialists.

PPB's articulated philosophy for handling public order events emphasized a negotiated management model, rather than the escalated-force approach. Escalated-force involves using increasing amounts of force until crowd dispersal or compliance is achieved.  The negotiated management model focuses on communication between the police and demonstrators, tolerance of a certain amount of disruption, and avoidance of the use of force—at least in theory.  A commitment to the negotiated management approach was most clearly demonstrated by PPB's use of demonstration liaison officers.  These officers were generally members of the PPB Crisis Negotiations Team and would be used to establish communication with demonstration organizers, collect information about the organizers' needs and objectives, and share PPB expectations about permissible and restricted conduct during protests.[8]

## Escalating Conflict and the Onset of the COVID-19 Pandemic

Though Portland had a lengthy history of demonstrations, most usually resolved peacefully. The 2016 presidential election, however, marked an escalation of the tension and conflict at protests. In November 2016, there were three days of demonstrations and riots after the election. Thousands of people protested peacefully while others threw projectiles, smashed business and residential windows, and caused other property damage. PPB used CS gas to disperse crowds. PPB has said that 2016 was first time it deployed CS gas into crowds in over forty years.

Our interviews suggest that the 2016 presidential election was also perceived as an invitation by far-right organizations to assume a more visible presence on Portland's streets. Over the next several years, there were an increasing number of clashes between right- and left-leaning organizations at protests and counterprotests. This included a June 2017 "Trump Free Speech Rally" during which there was brawling between the right and left and further use of less-lethal munitions by PPB to disperse crowds. Some people expressed a belief that PPB was biased towards—and actively assisting—protesters on the far right. Similar claims were made about clashes at an August 2018 event during which protesters from the far right and left held dueling events, some of which were also dispersed by the police with less-lethal munitions.[9]

In March 2020, the COVID pandemic began to rage, which prompted lockdowns in states across America, including Oregon. All social gatherings were ordered ceased, and people were forced to remain at home. Downtown Portland was largely shuttered, and many businesses closed. Social scientists will debate the impacts of these shutdowns on human psychology and behavior—a topic far beyond the scope of this report. However, our interviews suggest that by May 2020, pent up energy and frustration were growing in the populace. And with nowhere else to go, those forces exploded onto Portland's streets when Mr. Floyd was brutally murdered in late May 2020.

## The Beginning of the Protests and Riots, Including the May 29 Attack on the Justice Center

In the days after Mr. Floyd's death, PPB was monitoring protests around the United States. While it expected there to be limited demonstrations in Portland, not until the burning of the Third Police Precinct in Minneapolis, Minnesota, on May 28, did PPB leaders began to seriously consider the possibility of civil unrest in Portland. PPB issued an intelligence bulletin to officers regarding the risks of potential "acts of violence." This bulletin, however, largely focused on potential violence towards police officers rather than the possibility of civil unrest.

On May 29, PPB mobilized an incident management team for the handling of any public order incidents. PPB has indicated that it anticipated protests similar to those that occurred after other high-profile, controversial incidents involving police, such as the 2014 shooting death of Michael Brown in Ferguson, Missouri. In the wake of Mr. Brown's death and the decision not to criminally charge the involved officer, there were days of mostly peaceful marches in Portland and moments of silence, with only a small number of arrests or uses of force. With the benefit of hindsight, we see that using 2014 as a comparator for potential George Floyd–related protests was an early miscalculation by PPB, as it did not account for the rising levels of volatility in Portland after the presidential election in 2016, nor the pent-up energy engendered by the COVID-19 pandemic and related lockdowns. But we cannot say that it was an unreasonable determination given the information available to PPB at the time.

On May 29, the first significant protests began in Portland, with people massing in Peninsula Park in North Portland and then marching through the City, eventually crossing the Burnside Bridge. In accordance with its negotiated management philosophy, PPB staged officers in parallel to the march with a goal of being close by but not highly visible and taking police action only if necessary. The march arrived at the Multnomah County Justice Center ("Justice Center"), which contains the Multnomah County Jail and PPB's Central Precinct. The gathering at the Justice Center eventually became hostile, and some individuals penetrated the building and

began breaking windows, smashing computers in administrative offices, and setting small fires.

At the time, there were several hundred inmates in the County Jail, as well as civilian and sworn employees. Working together, PPB officials and leaders from the Multnomah County Sheriff's Office, began to repel the intruders with CS gas. They were eventually able to secure the Justice Center, however, the confrontation set off a night of destruction downtown. Throughout that first night, individuals ranged through the downtown area, breaking windows, setting fires, and destroying other property, resulting in 13 arrests. This became the template for much of what the next several weeks would look like in downtown Portland, with large peaceful protests during the day and much smaller riotous confrontations with police at night.

## The Raising of the Justice Center Fence, and PPB's Growing Reliance upon CS Gas

Estimates suggest that daytime protests in early June 2020 included sometimes as many as 18,000 people. During this review, we analyzed video footage of these daytime events. We saw people chanting, holding silent vigils, marching, and sometimes dancing and participating in drum circles. We saw non-violent chants reflecting outrage about Mr. Floyd's murder, the killing of other Black, Indigenous, and people of color ("BIPOC") persons by law enforcement, and about PPB in general. There were confrontations with officers during the day, to be sure, but they were limited in size and scope, and often resolved without violence.

The Justice Center was the focus of most protest activity in June and PPB thus determined to erect a chain-link fence encircling it.[10] PPB has described its goals for the fence as protecting the Justice Center, the inmates detained therein, and critically, separating community members and police in order to reduce the likelihood of violence, use of force, and other conflict. PPB has said that officers could be stationed near the fence as a show of force or to engage in discussions with the crowd, if possible. Officers could also be stationed away from the fence where they would be able to defend the Justice Center, if necessary, but be out of the range of thrown projectiles.

Though well intentioned, the fence became a symbol of injustice for protest participants in its own right. Some residents believed that the fence had been raised not to protect City buildings from attack, but to shield PPB officers from hearing community outrage about police conduct. The fence thus became emblematic of the very problems people were in the streets to protest, and the seemingly unbridgeable divide between police and community.

At night throughout June, a much smaller number of people participated in looting, burning, and violent behavior, and PPB officers sometimes responded with force. PPB's Office of Inspector General evaluated officer reports to estimate the number of uses of force by PPB officers. While its estimates may not capture all uses of force, they provide a general sense of the ebbs and flows in the frequency of force used throughout the Review Period. In June, PPB officers used force an estimated 1,744 times and Portland's Independent Police Review received 113 complaints related to officer actions, representing approximately 69% of all the complaints received for the entire Review Period.

Amidst this growing chaos, on June 8, Jami Resch stepped down as Chief of PPB and Chuck Lovell was appointed to replace her. It is difficult to identify the precise impacts of such a significant leadership change in the midst of the unfolding crisis. Although changing leaders at such a volatile time is not preferable, we were impressed by newly-appointed Chief Lovell's immediate efforts to meet with community members and de-escalate some of the building tensions. Indeed, after the first week or two of June, the protests began to diminish in size for the remainder of the month. By June 23, PPB decided to demobilize the incident management team because Portland's streets had again become peaceful. Daily protests were reduced in size, with sometimes only dozens of people in attendance, and there were far fewer nightly conflicts. Many residents and officers hoped that this marked the end of the chaos in Portland.

**Presidential Executive Order 13933, Operation Diligent Valor, and Conflicts at the Federal Courthouse in July**

On June 26, President Donald J. Trump issued Executive Order 13933, "Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence," in response to what he characterized as left-wing violence in the United States throughout the month of June. The purpose of the Executive Order was to address "a sustained assault on the life and property of civilians, law enforcement officers, government property, and revered American monuments . . . ."[11] The President began to deploy federal law enforcement officers from the Federal Protective Service, Customs and Border Protection, and Immigration and Customs Enforcement to American cities, including more than 700 federal officers who were sent to Portland. Almost overnight, the protests and riots, which had largely self-extinguished, reignited, and their focus shifted to federal buildings, including Portland's Mark O. Hatfield United States Courthouse.

During much of July, there were notable clashes with federal law enforcement officers at the Hatfield Courthouse that included attempts by persons to penetrate it, set fires, and in some cases, assault federal officers. Significant amounts of force were used by federal authorities, including large volumes of CS gas and other less-lethal munitions, including, in well-publicized cases, less-lethal munitions that caused grievous injury to persons who were not engaged in any violence. Accusations were made that federal officers dressed in camouflage acted unconstitutionally by seizing people from Portland's streets in unmarked vans.

Because much of the conflict in July focused on the Hatfield Courthouse and federal law enforcement officers, conflicts between community members and the PPB declined in July. Estimates indicate that PPB officers used force 1,026 times in July, a 41% decrease from June. Protest-related cases referred to the Multnomah County District Attorney ("MCDA") decreased as well, from 306 in June to 130 in July, a 58% decrease.

Given the level of chaos surrounding the Hatfield Courthouse, on July 29, Oregon Governor Kate Brown announced that her administration had negotiated an agreement with the federal government to allow for a "phased withdrawal" of federal

officers.  She also announced that the OSP would assume responsibility for protecting the courthouse for several weeks.

Once the OSP assumed command, it publicly articulated a very different vision from the one espoused by the federal government, noting in a press release, for example, that "it is obvious the current strategy is not sustainable and has the high probability of serious injury or death, as officers and community members clash.  OSP hopes to de-escalate the tensions around the Mark O. Hatfield Courthouse, facilitating peaceful free speech and proportional response if criminal activity is observed."[12] According to both officers and community members, OSP troopers did, in fact, work diligently to de-escalate tensions around the courthouse.  The effect was immediate and palpable, as use of force incidents and arrests declined as soon as the OSP assumed control.

The conduct of federal officers, and the strategies and philosophies they adhered to during Operation Diligent Valor pursuant to Executive Order 13933, are beyond the scope of this report and, indeed, have been investigated by the Offices of the Inspectors General of the DOJ and the Department of Homeland Security.  We therefore make only one limited observation here—the surge of federal officers to Portland, and the President's very public statements about the City's handling of the 2020 protests and riots were damaging to the public's perception of the PPB.  Many people have little experience with or reason to distinguish between local, state, or federal officers.  Some Portlanders thus held responsible all officers, including members of PPB, for the actions of federal personnel in Portland.  Indeed, while the protests and riots had largely quelled by the end of June, in August, after the President's actions, the level of conflict between community members and PPB grew significantly.

## August and September 2020: A New Wave of Conflicts, and Wildfires That Bring Temporary Calm

In August, protests and, in some cases riots, were largely concentrated in parts of the City outside the downtown area. There were significant demonstrations and conflicts at PPB's North, East, and Penumbra Kelly Buildings, as well as major disturbances at federal facilities, and the headquarters of the Portland Police Association. In August, PPB officers were involved in an estimated 2,199 uses of force, the most of any month during the Review Period, and 266 protest-related cases were referred to MCDA for potential prosecution. In addition, there were increased tensions between right and left activists on Portland's streets. This includes, for example, the August 29 fatal shooting of pro-Trump activist Aaron "Jay" Danielson by an alleged member of Antifa.

On September 5—the 100th night of protests—hundreds of people gathered at Ventura Park in Southeast Portland. When they attempted to march to the East Portland Community Policing Center, they were confronted by officers. Explosive fireworks and at least one homemade incendiary device were thrown into the street and a community member was set on fire.

Just two days later, on September 7, wildfires erupted in Oregon amidst unusually dry weather and fierce Easterly winds, which spread the blazes across the state. During the wildfires, over one million acres burned, at least seven people were killed, and more than 40,000 were forced to evacuate their homes. Amidst that statewide human tragedy, in Portland, clouds of smoke and ash descended upon the City, causing air quality to precipitously decline. Public health authorities were unanimous: residents were to shelter indoors and avoid breathing the outside air as much as possible.

Portlanders generally heeded that advice, and protests largely ceased for over a week. When they resumed in the second half of September, they were more sporadic, less sustained, and more likely to be resolved peacefully. There were several limited conflagrations, particularly during right/left protests and counterprotests. For example, on September 25, Governor Brown declared a state of emergency when the Proud Boys, a right-wing organization, declared its intent to hold a weekend rally in

Portland, and left-leaning activists organized a counterprotest in response. The OSP and Multnomah County Sheriff's Office were in charge and no riot was declared. Other conflicts occurred intermittently throughout early October until the ransack of the Oregon Historical Society.

## The Ransack of the Oregon Historical Society and a Change in Public Perceptions

On October 11, several hundred people gathered downtown for what was dubbed an "Indigenous Peoples Day of Rage" on the eve of Indigenous Peoples' Day. Participants marched to the Oregon Historical Society where they smashed out several large plate-glass windows, threw flares into the building, and toppled statues of Abraham Lincoln and Theodore Roosevelt. The intruders were successfully repelled from the building, but some engaged in other destruction that night in Downtown Portland, including property damage at several local businesses. Most exhibits were undamaged, though a historical quilt stitched by 15 Black women in Portland in the 1970s, with each square depicting an important moment in African American history, was stolen and later recovered from a puddle on a street nearby.

Some community members and officers with whom we spoke described this as a watershed moment in public perception of the protests and riots. Many agreed with the underlying rage concerning colonial oppression and the treatment of BIPOC Americans by law enforcement. But all expressed disagreement, and even revulsion, at the damage to a public institution like the Oregon Historical Society. After that incident, attendance at the nightly protests decreased. While there continued to be sporadic protests and disturbances throughout the balance of October and the beginning of November, there was only one more significant eruption of riotous behavior.

## The November Election, the End of the Civil Disturbance, and the Resignation of the RRT

The last significant protest or riot activity during the Review Period occurred around the November presidential election. On November 3, Election Day, there was a march that began at Revolution Hall that was largely peaceful and resulted in no arrests. On November 4, there were marches downtown during which a small

number of people smashed windows and threw projectiles at officers, including explosive fireworks. Governor Brown activated the Oregon National Guard, and 12 arrests were made. On November 5 and 8, there were additional protests, some of which involved property destruction to a Portland Commissioner's home. This marked the end of the most significant conflict during the Review Period.

Seven months later, in June 2021, a grand jury sitting in Multnomah County indicted a RRT officer with Fourth Degree Assault in connection with his use of a baton against a non-violent protester. The following day, all members of the RRT resigned from that unit en masse, returning to their normal assignments. As discussed further below, since that time, PPB has not reconstituted RRT or created any other unit of public order policing specialists.

# Internal and External Constraints on PPB During the Review Period

PPB was forced to grapple with various operational, legal, and political constraints during the Review Period. Some of these constraints were imposed as a result of PPB's own practices, including its uses of force, while others either pre-dated George Floyd's murder or may have arisen independent of PPB's handling of the protests and riots. We briefly highlight some of the most significant constraints here, and we will discuss them more fully in the report's analytical sections below.

PPB used significant amounts of force during the Review Period, with more than 6,000 estimated uses of force. Of that total, 438 were riot control agents, such as CS gas grenades, 207 were area-impact munitions or rubber-ball grenades, and 1,380 were direct-impact munitions from FN303 and 40mm launchers.

*Figure 1: Estimates of PPB Use of Force, by Month*



These uses of force created significant controversy, particularly regarding the amount of CS gas and other less-lethal munitions deployed, and the frequency with which PPB made Civil Disturbance declarations. On June 6, Portland Mayor Ted Wheeler, who also served as Police Commissioner, limited, but did not ban PPB from using CS gas. He ordered that PPB could only use CS gas in the event of a "serious and immediate threat to life safety, and there is no other viable alternative for dispersal."[13] Just three days later, on June 9, a similar restriction was enshrined in

law, as a federal judge granted a temporary restraining order against PPB that limited its use of CS gas to only situations "in which the lives or safety of the public or the police are at risk."[14] The City later stipulated to a new order that placed restrictions on other less-lethal weapons. State-level politicians were also closely watching events in Portland. On June 30, Governor Brown signed House Bill 4208, which prohibited law enforcement agencies from using tear gas for purposes of crowd control except in circumstances constituting riot.

Several months later, on September 10, Mayor Wheeler fully banned the use of CS gas by PPB. He ordered that "effective immediately and until further notice, I am directing the Portland Police to end the use of CS gas for crowd control."[15] On September 25, Mayor Wheeler clarified that CS could be used but only with Mayoral approval and in circumstances with "an immediate risk of death or serious physical injury which cannot otherwise be safely addressed without a greater application of force."[16]

Other legal rulings were obtained against PPB that bound the agency or compelled it to adhere to existing law or policy. For example, on July 2, a federal judge granted a temporary restraining order that barred PPB from arresting or using physical force against anyone officers "know or reasonably should know" was a journalist or legal observer unless officers had probable cause that the person had committed a crime.

Some restrictions on PPB arose from the legislative branch of City government. At the time of these events, Portland was one of the last major cities in the United States organized under a commissioner form of government (otherwise known as a "city commission" government).[17] In a commissioner government, the executive power to run and administer city bureaus is allocated to elected members of the legislative branch, the City Council. On July 19, the City Council member who was serving as the Commissioner of Portland Fire & Rescue prohibited all law enforcement agencies, including PPB, from staging at any of the City's 31 fire stations. This included prohibiting PPB from parking law enforcement vehicles in Portland Fire & Rescue parking lots. Three days later, on July 22, the Portland City Council voted to prohibit PPB from cooperating with federal government employees deployed under Operation Diligent Valor (specifically barring PPB from providing

or receiving operational support and information "from any agent or employee representing or constituting part of deployment under executive order from the president").[18]

Various features of Oregon law also impacted the approaches available to PPB. This included Oregon Revised Statute 181A.250, which prohibits law enforcement agencies from "collect[ing] or maintain[ing] information about the political, religious or social views, associations or activities of any individual, group, association, organization, corporation, business or partnership unless such information directly relates to an investigation of criminal activities, and there are reasonable grounds to suspect the subject of the information is or may be involved in criminal conduct."[19] This was interpreted as a bar on PPB making any video recordings of crowd activities unless they were clearly and obviously criminal in nature. In reliance upon this statue, on July 30, another TRO was issued, this time, barring PPB from "collecting or maintaining audio or video of protesters" engaged in protected First Amendment activities in public spaces. In effect, this shut down a livestream video feed that PPB had been broadcasting of nighttime conduct at protests or riots.

Decisions by other local government actors also impacted PPB's handling of the protests and riots. For example, the Justice Center was occupied by both PPB and Multnomah County Sheriff's Office personnel. While both agencies shared a similar commitment to resolving the protests and riots outside the building and protecting the lives of those inside of it, they were not always philosophically aligned about tactics and approaches, including when to use force. Protesters had little ability to distinguish between the force used by PPB officers and Multnomah County Sheriff's Office deputies.

In addition, on August 11, MCDA Mike Schmidt released a memo captioned "Policy Regarding Protest Related Cases."[20] In it, he set forth the presumptions that would be applied to all referred protest and riot cases. He noted that his office would "presumptively decline to charge cases where the most serious offenses are city ordinance violations and crimes that do not involve deliberate property damage, theft, or the use or threat of force against another person."[21] This included cases involving potential charges of Interference with a Police Officer, Criminal Trespass,

Escape III, and Riot. Further, he articulated several classes of cases that would be subject to "higher level[s] of scrutiny" by his office before they would be charged. This included charges of Resisting Arrest and Assaulting a Public Safety Officer.

The arrest and charge data from the MCDA's office do not make the effects of its new charging policy obvious. They reflect that arrests did decline after August when the memo was issued. But the protests and riots were already waning in the fall, so the declines could have been organic rather than a result of the MCDA's new policy. Most of the cases that were referred for potential prosecution during the Review Period were public order crimes (941 total counts), such as Curfew Violations, Interfering with a Peace Officer, Resisting Arrest, and Riot. There were a smaller number of more serious counts referred, including 166 counts considered by the DA to be "person crimes," 29 counts of "weapons crimes," and 13 counts of "arson/burning" crimes.

*Figure 2: Protest-Related Cases Referred to the MCDA, by Month*



The data are clear, however, that most of the arrests referred for potential prosecution by PPB were not charged. As of April 2023, charges had been rejected in 85% of cases referred to the MCDA during the Review Period. The MCDA charged and prosecuted just 15% of the cases.[22]

# City Leadership, PPB Command, & the Incident Command System

Public order policing is a crucible that tests law enforcement agencies and their relationships with the community. Many people have little regular interaction with the police. But during protest and riot, public scrutiny of police behavior is at its highest, and the way a police department responds has an enduring impact on public opinion about its legitimacy.

The seeds of that response are planted long before crowds ever take to the street and police leaders assemble in a command post. They are sowed by the department's transparency to the community about its approaches to public order policing and the equipment and tactics it will use, the strength of its mutual aid relationships, the tightness of its internal controls on officer use of force, and the depth, quality, and frequency of its public order training. These are components of the framework that shape the police handling of protests and riots, including PPB's response in 2020, and which we will be evaluating here.

## City Leadership and PPB Command

The events that garnered greatest attention during the 2020 protests and riots were generally ones that unfolded on the streets of Portland, like uses of force that became controversial. But decisions made in City Hall, PPB headquarters, and the command post were equally consequential. We begin our analysis by focusing on PPB and City leadership, including the effectiveness of PPB's use of the Incident Command System, in shaping the City's response during 2020.

The 2020 George Floyd Protests were extremely challenging for many cities around the United States. Indeed, the litany of published after action reviews from around the country, some of which members of this team authored or were involved in, reflect common problems among many large police departments.[23] In Portland, these common issues were magnified by three factors that most American cities did not have to contend with: the role of the President in escalating street conflict, the organized factions that used violence and property destruction to express political

differences, and the nearly complete withdrawal of mutual aid support. Given these unique circumstances, no city or police department could have escaped unscathed. While we are mindful of these external factors, City and PPB leaders made a number of key errors in 2020 that we discuss in detail below.

## The City Was Not Transparent with the Public About its Strategies, Tactics, and Munitions for Public Order Policing, Which Set the Stage for a Loss of Public Trust

In interviews during this review, community members expressed a range of emotions. Some voiced anger or rage at PPB. Others expressed sympathy for officers given the verbal and physical abuse they experienced. But one of the most common emotions was, unexpectedly, surprise. Many Portlanders were astonished by what they perceived as an overly militarized response by PPB. They did not know about the RRT, had no sense of the kinds of equipment and munitions it would use for crowd control, nor the tactics it would employ, and they were shocked when they saw them deployed on the street.

Sir Robert Peel is a founder of modern policing philosophies, and in the 1820s, he established nine policing principles that have continued to significantly influence policing today. One of his principles was a recognition that:

> the power of the police to fulfill their functions and duties is dependent on public approval of their existence, actions and behavior, and on their ability to secure and maintain public respect.

This notion—that cooperation of the public is premised upon public acceptance of the approaches and tools to be used by law enforcement—has been echoed by more modern thinkers in policing, including President Obama's Task Force on Twenty First Century Policing.[24]

In the years leading up to 2020, RRT had a growing national profile as a unit of public order specialists. Its leaders were speaking at national policing conferences and joining boards of directors of standard-setting bodies, like the National Tactical Officers Association. They were traveling around the world to consult with or

provide training to other police departments. And PPB's executives were expressing pride in this home-grown unit of nationally recognized experts.

Yet, with all this fanfare around the country, at home, there was little public discussion about RRT or its strategies, tactics, or munitions. There were no crowd control citizen police academies, no efforts to collaborate with the public on use of force policies related to crowd control, and little in the way of public introduction to RRT, its members, equipment, or approaches. Portland has a dizzying variety of committees with sometimes overlapping mandates regarding public safety: the Coalition of Advisory Groups ("CAG"), the Citizen Review Committee ("CRC"), the Police Equity Advisory Council ("PEAC"), the Training Advisory Council ("TAC"), the Police Bureauwide Advisory Committee ("PBAC"), the Behavioral Health Unit Advisory Committee ("BHUAC"), and the Portland Committee on Community-Engaged Policing ("PCCEP"), among others. Each of these groups has responsibilities for helping to bridge the gap between the police and the community.

Yet, in this alphabet soup of community engagement, there was no systematic process for involving the public in thinking through PPB's standards for public order policing. What level of threats to life or safety should result in the forced dispersal of crowds with CS gas? What kinds of munitions should be available to the RRT? Should it have access to rubber-ball grenades? What policies should guide officer decision-making for uses of force during public order incidents? What kinds of personal protective equipment should officers use and why? These questions were not systematically addressed or reviewed in partnership between PPB and these community entities.

Thus, RRT was celebrated inside PPB but largely unknown by Portland residents. While it frequently handled public order incidents, they were often short in duration, uncontroversial, and did not attract much scrutiny. There were few lengthy deployments during which the public had a sustained look at RRT and its tactics and approaches, at least until the presidential election riots of 2016 during which RRT used CS gas for the first time. But even after 2016, there was no meaningful attempt by PPB to showcase RRT to the broader community.[25] We believe that this helped

to set the stage for the shock that we heard during our interviews and the loss of public confidence in the legitimacy of RRT in 2020.

## There Was Insufficient Internal Oversight of RRT by PPB Executives

In addition to the lack of buy-in from Portlanders, we believe that there was also insufficient oversight of RRT by PPB executives. Our interviews with PPB leaders reflect that they perceived RRT as being made up of experts with a greater degree of mastery of public order policing techniques than anyone else in the Bureau. As a result, they largely deferred to RRT regarding its training, policies, practices, and deployments.

It is often said about paramilitary organizations that leaders can delegate authority to their subordinates. But they cannot delegate responsibility. That is, they can allocate powers, but they remain accountable for ensuring that those powers are executed appropriately and in accordance with the agency's vision, mission, and policies.

Our interviews revealed that in the years leading up to 2020, PPB executives provided little direct oversight of the RRT. For example, after RRT's deployments, it would prepare an after action report reflecting the circumstances of the deployment and any issues that arose. Pursuant to PPB directives, the Assistant Chief of Operations was responsible for evaluating the performance of incident commanders and reviewing reports regarding "crowd management events."[26] With such reports in hand, the A/C of Operations or other PPB executives could theoretically debrief, ask questions of RRT, and flag potential issues. In our interviews, we were told that it was extremely rare for PPB executives to raise any issues regarding RRT's reports—or provide any feedback about them at all. Only when a deployment became high-profile did RRT leaders indicate hearing any questions, concerns, or feedback from the chain-of-command.

Moreover, RRT was allowed to develop its own trainings for RRT members that were not scrutinized by the chain-of-command, Training Academy staff, or even lawyers for the City. When asked why RRT was given this power, we were told,

essentially, that because RRT was made up of experts, no one else was in a position to review or critique the content of its training.

We believe that this lack of scrutiny of RRT was problematic. Scrutiny, oversight, and review are all essential to ensuring that specialized units do not develop problematic subcultures, policies, or training. And while the members of RRT undoubtedly had significantly more expertise in public order policing than did others in the PPB, that was not a sufficient reason to allow them to operate in the shadows, with only minimal oversight from above.

## PPB Executives Did Not Visit the Field or Debrief with Officers Often Enough in 2020

Police leaders must be visible and accessible to officers during times of civil disturbance. Their involvement is an important mechanism for providing oversight and signaling accountability. Leaders need to observe and debrief with officers in order to assess their actions in the field and the extent to which extended operations have diminished their capacity to effectively police public order events. Officers need to be reminded that they are not operating in a vacuum and that the Incident Management Team's strategic and tactical decisions are being evaluated with a perspective larger than the nightly conflict.

Moreover, routine police work can be stressful and traumatic. The National Police Foundation has noted that at any given time, "roughly 30% of law enforcement officers are suffering from symptoms or meet the full criteria for a diagnosis of post-traumatic stress disorder."[27] The stressors are particularly acute during protests and riots, especially ones about police conduct. At such events, officers may be insulted, taunted, or targeted with thrown projectiles, as happened in 2020, which only enhances the levels of potential stress and trauma.

In 2020, PPB cancelled days off and many officers were working night after night, often on little sleep. Our interviews with officers reflect that many of them felt stressed, unhappy, and, in some ways, not well cared for by their executive leaders. They noted that they did not see their leaders in the field very often, nor did PPB executives frequently participate in debriefs held in the field each night. This left

PPB leaders without relevant information from the field, and officers feeling alone and unsupported by upper command. In our interviews with PPB leaders, it is clear that they have recognized this issue on their own and already committed to being more visible during future public order deployments. We commend them for identifying the issue and committing to address it.

## PPB Leaders Did Not Consistently Prime Officers with the Rules of Engagement Before Deployments

Before any public order deployment, supervisors should assemble officers to remind them of the rules of engagement, assess their readiness, and discuss the need for de-escalation when possible. This operational briefing, or "priming," is an important part of the National Incident Management System and can help to reduce the use of unnecessary force. This is particularly true when crowds are assembling to protest *against the police*. Protests about police misconduct usually involve anger, hostility, profanity—and even possible violence—directed at officers. Policing such events is inherently provocative, which makes "priming" officers with the resources they need to help remain calm under those circumstances all the more essential.

Our interviews revealed that there were inconsistencies in the priming provided by supervisors. Some personnel reported that their supervisors provided detailed pre-deployment briefings while others indicated that briefings were often cursory and became an opportunity to commiserate without discussing the standards for use of force or the need for de-escalation.

We believe that such priming was particularly crucial in 2020 given that the standards for use of force repeatedly changed due to the various TROs and Mayoral orders that were issued. While PPB did provide some information to officers about these changing standards, there was a need for more consistent effort by supervisors to discuss the rules of engagement before the start of each operational period.

## PPB Leaders Did Not Enforce Consistent Rules of Engagement with Protest Crowds

Part of successful crowd management is establishing explicit ground rules for what conduct is acceptable or may result in arrest. These rules must be consistently

enforced across operational periods. Having a clear understanding of what conduct could lead to potential arrest enables protesters to calibrate their own behavior, know the legal limits, and know how to stay safe. It also enhances belief in the legitimacy of the police response. On the other hand, when the rules of engagement fluctuate night to night without explanation, they seem arbitrary and cause the public to doubt the logic and legitimacy of the department's response.

In our interviews, PPB supervisors, community members—and even partner agencies—identified fluctuating rules of engagement as a problem. One night, officers would be stationed outside police buildings to prevent persons from approaching, while on the next, they would be inside, and people would be free to approach at will. One night, officers would be slow to react to incoming projectiles, and on the next, thrown objects would quickly prompt the deployment of CS gas. These fluctuating standards caused confusion for crowds and anger among PPB's partners. Significantly, they also eroded the legitimacy of command decisions in the eyes of front-line officers. Officers must believe that the objectives they are placed into harm's way to achieve are necessary and important. When those objectives fluctuate day-to-day, it may cause officers to doubt that command is taking their safety as seriously as it should.

One example was the lack of consistent tactical or strategic approaches for the fence encircling the Justice Center. On some shifts, officers described being left to stand at the fence line where they would be hit with thrown objects, which neither improved relationships with the crowd nor left officers feeling that their safety was being appropriately protected by PPB leadership. On other shifts, throwing projectiles at officers over the fence would result in a prompt use of CS gas or other less-lethal munitions.

While PPB is largely responsible for these fluctuating rules of engagement, we would be remiss if we did not note that the context that PPB was operating within was also changing frequently, which sometimes forced PPB to adapt. This includes the various Temporary Restraining Orders and Mayoral Executive Orders, the new charging policies adopted by the MCDA, and the lack of resources provided by other City bureaus (discussed further below). PPB leaders rightly note that the fluctuating

standards complicated PPB's ability to adhere to and enforce consistent rules of engagement. We agree—to a point—but believe that more efforts to create consistent rules of engagement should have been made.

## The City Did Not Do Enough to Preserve Its Network of Mutual Aid Partners, Despite Warnings That the Network Was in Danger of Failing

Given the volatility and size of protests in Portland, and PPB's authorized strength, the City has historically relied upon a network of local law enforcement partners to provide mutual aid during times of civil disturbance. This group of police and sheriff departments from neighboring jurisdictions has sent officers and deputies to guard public and private property, serve on skirmish lines with PPB officers, and sometimes handle 911 calls while PPB officers were engaged in crowd management. This is not unusual for law enforcement agencies, as best practices note the importance of mutual aid to effective public order policing in many communities.[28] These networks must be preserved and sustained through the development of comprehensive mutual aid agreements that address the concerns of each member participant, and frequent training and drilling together.[29]

In early summer of 2020, several of PPB's partner agencies sent intermittent assistance, most of which trailed off as the summer progressed. Few agencies were willing to commit to the sustained support that the City hoped for or needed. Thus, PPB was forced to handle the protests and riots without help from many of its traditional partners. This meant that some of PPB's other functions, such as timely responding to 911 calls, interviewing victims of crime, and conducting follow up investigation were forced to wait while all PPB resources were directed to the crisis unfolding on Portland's streets.

In the years immediately preceding 2020, there were warnings that Portland's mutual aid network was in danger of fraying or failing. For example, the Washington County Sheriff's Office is a long-time partner of PPB that has often aided the City. In February 2018, a federal jury awarded $7 million in damages against Washington County related to conduct by some of its deputies who were assisting PPB officers in the execution of a search warrant.[30] The City did not indemnify Washington County,

and Washington County publicly informed the City that it would no longer provide mutual aid absent the most extreme risks to life or safety. Other jurisdictions openly echoed this position.

The City took limited steps to attempt to address these concerns about indemnification, but they were not sufficient. We interviewed executives from a number of PPB's partner agencies who were unanimous that their concerns were never resolved to their satisfaction. There were no coordinated regional meetings of partner agencies to bolster the mutual aid network, nor definitive attempts to hammer out new mutual aid agreements. Hence, when 2020 arrived, these agencies were unwilling to send prolonged support.[31] The failure to preserve this mutual aid network before 2020 had repercussions on the City's ability to successfully manage the protests and riots with such limited resources.

We must also comment on another factor that was often repeated in our discussions with the City's partner agencies. A number of them perceived that there was a fracture within Portland's municipal government—between the police and elected officials—and a willingness to criticize the police for work that they were being asked to do in protecting the City. "Why should we send our people into harm's way in Portland if they will just be attacked or criticized by government officials *from* Portland?" one of them asked. This theme was echoed in some of our interviews with PPB officials, who felt undermined by decisions to withhold resources, like access to Portland Fire & Rescue parking lots or concrete jersey barriers to secure fencing to protect buildings, that were being made by elected officials.

Indeed, during the protests and riots, some City council members made public statements that were perceived by regional law enforcement agencies as inflammatory and damaging to public trust in law enforcement. Moreover, they made decisions that the bureaus that they led, such as Portland Fire & Rescue and the Portland Bureau of Transportation, would not provide certain kinds of requested assistance to the PPB. We do not evaluate the merits of their specific critiques of PPB here, nor their decisions to withhold certain kinds of support. We note, however, that when crisis arose on the streets of Portland, these decisions

contributed to the withholding of the mutual aid support that the City desperately needed.

# PPB's Use of the Incident Command System

From our high-level examination of decisions by PPB and City executives, we turn to PPB's use of the Incident Command System ("ICS"), including in its command post. The command post served as the nerve center of the City's response; it took in vast amounts of information in various forms from the field, and was the source of most of the significant strategic and tactical decisions that were executed on the street. While we believe the command post was largely effective given the unprecedented challenges of 2020, we have several specific critiques.

### The Incident Command System

The National Incident Management System provides a unified approach for government organizations at the state, local, and federal levels to collaborate in responding to domestic incidents. It articulates a core set of concepts and principles, which includes the ICS. The ICS was initially developed to enable multi-agency coordination in the fight against wildfires in the American West. In the 2000s, it was adopted by police departments throughout the United States, including PPB.

The ICS is a scalable, standardized organizational structure that creates a unified command in which all agencies are accountable to one overall incident commander. The command post is a designated facility that houses the tactical-level management team that is handling the incident. It typically comprises the incident commander and other responders from state, federal, and local agencies. Personnel are organized in the command post into five sections: Command, Operations, Planning, Logistics, and Administration/Finance.



The Command and Operations Sections represent the strategic and tactical leadership. The Command Section is led by the incident commander (known by PPB as the crowd management incident commander for public order incidents). The incident commander sets goals and objectives and is responsible for the overall control of the incident. The Operations Section is headed by an operations section chief, who determines the tactics that will be used to achieve the objectives set by the incident commander.

The Planning Section is responsible for the collection and distribution of information regarding the event, and determining the availability of the resources that will be necessary for the response. The Logistics Section ensures that those resources are obtained and made available to field personnel. The Finance/Administration Section monitors and documents all costs and ensures that necessary funds are available for managing the event. Given the centrality of the Command and Operations Sections to the issues discussed in this report, our analysis will largely focus on those two sections.

### The Command Post

On May 29, PPB determined to establish an incident management team to unify the management of any George Floyd–related events under one command. A command post was initially established in the Justice Center. Given the level of activity in and around the Justice Center, however, it was later moved to PPB's Training Academy, where it remained until November 15, 2020, when it was decommissioned.

PPB benefited from significant in-house ICS expertise in running its command post, and the incident management team was structured according to ICS guidance and broken into five sections. Various agencies were present in the command post, including Portland Fire & Rescue, other local enforcement partners, and sometimes representatives of federal agencies, though the specific agencies represented would

shift from day to day. While other agencies participated in PPB's command post, they did not create a true unified command, as each agency retained its own incident commander. PPB divided its duties into operational periods and initially had different incident commanders responsible for the day and night shifts. Shortly after the protests and riots began, however, PPB began using a single incident commander each day, with a deputy incident commander primarily responsible for managing the relatively quiet daytime hours.

## PPB Did Not Prepare a Sufficient Number of Command Personnel to Handle a Long-Lasting Civil Disturbance

Incident commanders and operations section chiefs have tremendous authority and responsibility for shaping the police response to public order incidents. Thus, serving in those positions requires specialized training, fluency with ICS principles and, ideally, significant public order policing experience. In 2018, PPB demonstrated foresight by recognizing that it needed to develop new leaders to help it manage large-scale public order incidents. It began identifying PPB supervisors with the potential to serve in those roles and training them. PPB offered them a 40-hour in-house Incident Command class and provided a period of required mentorship. It also specified in policy that these new leaders would train alongside RRT, though it did not always enforce this requirement in practice.[32]

Although these efforts were useful, when the protests and riots began, PPB did not have enough command personnel with significant public order policing experience who had also received the forty-hour command class. It was therefore forced to make compromises in putting together incident management teams. For example, some incident commanders had received the forty-hour course—but they had little hands-on experience applying the concepts they had learned in training, and in some cases, had not actually trained with RRT at all. PPB made oblique reference to the problems that this caused in a lessons learned document it prepared after the Review Period:

> Although the new personnel understood the overall concepts and theories
> and could make sound decisions, they lacked the social connections from

experience and there was sometimes a lack of trust from the field command and squads working in the field.[33]

Our interviews validated this observation. We heard from both field and command post personnel that there was sometimes a lack of trust in orders being given by every incident management team. This caused RRT lieutenants to sometimes push back on orders if they did not trust that the issuer understood the impacts they would have on the streets. Moreover, it was difficult for us in interviews to nail down how authority was shared between the command post and field supervisors, and who made which kinds of tactical decisions, nor did the Bureau's records make this clear. We believe that this decision-making ambiguity may have also resulted from the experience imbalance that existed between some field and command post personnel.

In addition, the lack of enough qualified incident commanders and operations section chiefs meant that those with sufficient experience were forced to work exceptionally long hours without days off. For one person, this meant 54 days working without a single day off. As fatigue set in over time, these long stretches without a break meant that their performance may have eventually and inevitably degraded.

## The Incident Management Team Was Not Consistently Effective as a Learning Organization Throughout the Review Period

Effective incident management teams learn from each operational period and incorporate those lessons into strategic and tactical plans for upcoming shifts. Today's lessons may prevent injuries and disruption tomorrow—if the lessons are effectively processed, integrated into future plans, and disseminated. There were various problems with the way that PPB learned from the protests and riots and communicated those lessons to other Bureau personnel.

Debriefing is essential to improving performance during and after major incidents. Debriefing can be formal or informal. It can range from "hot washes," which occur before staff end their shifts, to large, multi-agency "cold" debriefs after major incidents. Cold debriefs tend to occur after all relevant facts have been gathered and

may result in a formal report that identifies specific issues and necessary corrective actions to address them.

Debriefs should be used to evaluate team performance against relevant policies, mission objectives, and operational goals. Debriefing offers the opportunity for personal reflection about one's own performance, as well as team dynamics, strategies and tactics. The goal is not to blame any one person for failures; debriefs are not personnel investigations. The goal is learning to prevent repeat errors. Generally, the person who leads a debrief should facilitate a discussion of whether or not each mission objective was achieved and if not, why not. The lessons learned from the debrief should feed back into future operational plans and potentially policy and training. PPB policy requires some amount of debriefing by incident commanders and supervisors during and after public order incidents.[34]

PPB leaders informed us that debriefing occurred between the command post and the field each night or, at the latest, on the morning of the next day. It was difficult for us to evaluate the quality of these debriefs because no reports were prepared reflecting any lessons learned. Indeed, such lessons did not feed into the daily incident action plans, where we would expect to see them incorporated. Instead, those reports were often boilerplate that remained static from day-to-day. Given the number of personnel rotating into command positions, there was a need to formalize the lessons learned from these debriefs so that all leaders could benefit from the insights obtained after each operational period. Further, the lack of formal documentation prevented PPB's executive leaders, who were not regularly in the command post, from ensuring that each nightly response was consistent with PPB's overall mission and policies.

We have two other observations about the content of the debriefs. First, we were told that the debriefs were unstructured; they did not focus on the specific mission objectives for each day and were instead conversational in nature. That is, they were an opportunity for some of the key players to discuss the night's events but not to evaluate each objective, PPB's success at achieving it, and the root cause of any

failures. While a conversation between key decision-makers can undoubtedly be productive, PPB needed a more structured debriefing process.

Second, we were told that the debriefs largely focused on crowd behavior and the effectiveness of the tactics used each night. But that they did not generally evaluate compliance with policy with respect to use of force matters. But compliance with policy is a key element of successful public order debriefing in that it encourages the agency to be reflective about the kinds of force it is using. The failure to routinely incorporate it into nightly debriefs risked creating a permissive atmosphere with respect to use of force matters.

THIS PAGE INTENTIONALLY LEFT BLANK

# The First Amendment and Use of Force

The greatest source of controversy associated with PPB's response to the 2020 protests and riots was the force used by its officers to disperse crowds. During our review, some elected officials, community members, and external observers communicated a belief that PPB relied too heavily on civil disturbance and riot declarations ("Unlawful Assembly Declarations") and that the force used to disperse crowds was often indiscriminate and disproportionate to crowd member behavior. Others pointed to the violent and dangerous conduct of some individuals within the crowds, the large number of officer injuries, and significant property damage as evidence that the decisions to disperse crowds were largely necessary and the force used appropriate.

While we found that the size and volatility of certain crowds sometimes left PPB with few alternatives other than crowd dispersal, our review also revealed that it also relied on Unlawful Assembly Declarations when other, less disruptive tactics could have been successfully employed. Moreover, there were deficiencies in some of PPB's directives that may have contributed to negative use of force outcomes, including an overreliance on Unlawful Assembly Declarations and overuse of riot control agents ("RCAs"), such as CS gas.

## The Goals of Public Order Policing

Law enforcement agencies have a responsibility to police protests in ways that preserve community members' First Amendment rights of free speech and assembly. These rights include the ability to march and protest on certain public property, to give speeches and carry signs that are critical of law enforcement, and even to yell at officers and use profanity. They do not include inciting violence, damaging property, throwing projectiles at officers, or setting buildings aflame. When crowd members begin to engage in such behavior, placing the safety of community members and officers at risk, law enforcement agencies can declare the event a civil disturbance or

riot and attempt to disperse those in attendance. But when should they do so? This is a thorny question that does not often have an easy answer.

Our approach to answering it involves first stepping back to reflect on the goals of public order policing. Those that are obvious and most frequently discussed are facilitating peaceful protest, preserving life, and preventing property destruction, which are important objectives to be sure. But police leaders increasingly recognize that a fundamental goal of public order policing is also building trust and faith with the community. As one of our interviewees noted during this review, if Portland's buildings and businesses are saved during a public order event but the public trust is badly damaged, the City "loses no matter what."

This person was correct for several reasons. Most practically, public participation in protest is dynamic. When the community comes to believe that police are responding to protest in ways that are unfair or heavy-handed, it is radicalizing and draws more people into the crowds, which only makes them exponentially harder to police. It also cements a sense of collective identity among crowd members as *adversaries* of the police, rather than partners, making them more oppositional and less likely to adhere to ground rules for lawful and safe demonstration. Thus, ironically, a law enforcement agency can accomplish its stated goals for each night by preventing loss of life and property destruction. But if the public loses faith in its strategies and tactics, each victory will only bring it closer to eventual failure as crowds grow and become more confrontational with each passing night.

## PPB Relied Too Often upon Civil Disturbance Declarations and Riot Control Agents

Oregon's Revised Statues allow law enforcement agencies to issue dispersal orders "when any five or more persons, whether armed or not, are unlawfully or riotously assembled."[35] A person commits the crime of riot when they "engage in tumultuous and violent conduct and thereby intentionally or recklessly create a grave risk of causing public alarm" with five or more persons.[36] The PPB directives in place during the Review Period were largely consistent with these legal standards. For example, they defined a civil disturbance as an "unlawful assembly that constitutes a

clear and present danger of riot, disorder, interference with traffic upon the public streets or when another immediate threat to public safety, peace or order appears" and a riot as "[s]ix or more persons engaging in tumultuous and violent conduct and thereby intentionally or recklessly creating a grave risk of causing public alarm, excluding persons who are engaged in passive resistance."[37]

There is no centralized record that aggregates all of PPB's Unlawful Assembly Declarations for the Review Period, or the reasons why they were issued, the tactics used, and the relevant outcomes. Some of that information is contained in various nightly reports that include information about PPB's use of RCAs. As defined by PPB at the time, an RCA was a hand-thrown grenade or 40mm projectile containing oleoresin capsicum ("OC") or CS powder. RCAs create clouds of gas, the size of which varies depending on the specific munition, the terrain where it is deployed, and the weather conditions. RCAs cannot, by definition, be used on only individual members of a crowd; they are a type of non-specific force that impacts everyone within their area of effect, including uninvolved bystanders.

The manufacturer of some of the RCAs used by PPB warns that they can cause serious injury or death and may contain chemicals that can cause cancer, birth defects, and other reproductive harm.[38] While these potential effects are noted, the most common impacts are irritation, burning sensations, coughing, and chest tightness, which can be addressed by decontamination with water and the passage of time.[39]

As discussed above, PPB did not consistently track officers' use of force, including the deployment of less-lethal munitions, during the Review Period. According to estimates created by PPB Office of Inspector General staff, PPB officers deployed RCAs more than 400 times during the Review Period, nearly half of which occurred during the first few days. The use of RCAs declined over time as Temporary Restraining Orders and Mayoral Executive Orders limited the circumstances under

which they could be used. However, RCAs continued to be used intermittently during the Review Period.

*Figure 3: Estimates of PPB Riot Control Agent Use, by Month[40]*



There is no numerical threshold for an appropriate number of crowd dispersals with RCAs during a civil disturbance. In interviews, PPB personnel generally described daytime protests as peaceful and requiring very little intervention. As evening set in, many peaceful protesters would leave and be replaced by persons engaged in violence or property destruction. Some interviewees expressed the view that PPB should have specifically targeted these individuals for arrest rather than relying on crowd dispersals. Our review provides support for that perspective, and we believe that PPB's heavy reliance on crowd dispersal with CS gas was often a mistake for several reasons.

First, it was likely legally problematic, as every police use of force must be constitutionally defensible, including applications of CS gas, to which scores of Portlanders were exposed while engaging in only lawful, constitutionally protected behavior. Second, the effectiveness of CS gas was quickly compromised by the tactics of some of its subjects. By early June, certain people, particularly those intending to engage in conflict with police, were coming to demonstrations with gas masks and other gear that rendered CS gas ineffective. Thus, when PPB used CS gas to disperse crowds, its most serious impacts were felt by those who were not

outfitted in such gear and intended only peaceful democratic expression. This only worsened PPB's burgeoning legitimacy crisis.

Third, and most important for our analysis, the heavy use of RCAs was counterproductive. Public order policing involves not only protecting and controlling physical space, it also requires exerting some influence over narrative space. Once a police department has lost the ability to clearly and persuasively communicate with the public about its strategies and tactics for crowd management, it is destined to fail. Our interviews reflected that many community members became angry and disillusioned at the number of peaceful protesters who were exposed to CS gas. That only cemented their view that the police were opponents, drove more people to join street demonstrations, and caused them to become more oppositional towards PPB. Thus, each successful crowd dispersal with CS gas cemented a growing perception that officers were in Portland's streets to suppress rather than serve the community.

## PPB Would Have Been Better Able to Reduce its Use of RCAs with Crowd Observation Tools and Methods That Were Not Available in 2020

We believe that there were several contributors to PPB's heavy reliance on CS gas to disperse crowds. Some were operational and related to the lack of available mutual aid support, which hampered PPB's tactical capability to isolate individuals in large crowds. Others related to deficiencies in PPB policy, which did not require incident commanders to attempt precision arrest of violent individuals instead of crowd dispersal, when possible. Instead, PPB directives gave nearly limitless discretion to incident commanders to authorize the deployment of RCAs "when objectively reasonable, to address civil disturbance and crowd dispersal."[41] This overbroad and permissive standard has since been remedied by PPB in its revised Use of Force Directive.[42] However, PPB was also operating without customary tools and methods

that would have helped it to focus on arresting violent individuals instead of dispersing whole crowds.

There are two ideas that we want to make explicit for this discussion regarding intervention in a crowd. The first concerns crowd observation. When a small number of people in a gathering are engaged in felonious, violent conduct, such as assault of other community members, throwing projectiles or incendiary devices at officers, or attempting to set private or public buildings aflame, the police have a duty to identify them and arrest them. Police can either make observations of a crowd up close or from a distance. Up close, incident commanders may stage uniformed officers near the gathering or they may embed plainclothes officers inside it. From a distance, they may observe the crowd from video cameras on fixed points or drones above it. Making observations of a volatile crowd from a distance is often safer, less provocative, and less likely to lead to conflict than when officers are staged nearby.

The second idea concerns precision arrest tactics versus non-specific force. When police have the tools to identify persons in a crowd who are engaging in felonious, violent conduct, they can use tactics to arrest them with minimal disturbance to others in the gathering. This either involves using a team to enter the crowd to make the arrest or simply flagging the person(s) for later apprehension once the crowd has dispersed. If police are unable to closely observe the crowd to identify the person(s) engaging in violence, they often choose to disperse it with non-specific force like CS gas.

## Portland's Downtown Video Blackout

Under state statute, Oregon law enforcement agencies are prohibited from collecting:

> information about the political, religious or social views, associations or
> activities of any individual, group, association, organization, corporation,
> business or partnership unless such information directly relates to an
> investigation of criminal activities, and there are reasonable grounds to

suspect the subject of the information is or may be involved in criminal conduct.[43]

We were told that the City interpreted a state court decision on this this law to mean that the City was largely prevented from making video observations of crowds since doing so would involve collecting "information" about protest events, which are "political activities," and that such collection would not be directly related to ongoing criminal investigations. We believe that this limitation on PPB's access to video was problematic for several reasons.

First, the lack of video shrouded conduct by police officers and rioters behind a veil of anonymity. Our discussions with Independent Police Review personnel reflect that the lack of video has been a significant impediment to holding officers accountable for misconduct from 2020, including serious uses of inappropriate force. In addition, throughout the summer of 2020, PPB struggled to identify and apprehend perpetrators of felony crime. While PPB made many arrests, the majority were for low-level charges, such as disorderly conduct and trespassing. In fact, during the Review Period, less than 27% of protest-related cases referred to the MCDA included felony charges.[44] Thus, persons who committed serious offenses often escaped being held accountable, while most of PPB's arrests were for less serious violations, such as refusing to follow police commands.

Second, video is an essential source of information for making tactical decisions. We have worked in cities across the United States and were shocked by the lack of video available in PPB's command post. Incident commanders in other cities generally rely upon stationary video feeds, as well as reports from the field and other resources, to assess crowd behavior and make tactical decisions. Yet in Portland, there is no meaningful network of stationary or mobile video cameras downtown to provide those feeds into the command post, which necessarily compromised tactical decision-making by incident commanders and operations section chiefs. This video blackout also prevented command personnel from observing the effectiveness of

tactics that had been ordered and degraded the quality of information available for use in nightly debriefing.

Third, the lack of video forced PPB officers to be closer to the crowds than was necessary. Uniformed officers were sometimes stationed near crowds, in cars or on foot, serving as "eyes" that could provide information to the command post. But proximity to volatile crowds is often provocative and creates opportunities for escalation.

## Lack of Plainclothes Officers Making Crowd Observations

In addition to the lack of video, PPB also did not use plainclothes officers to make crowd observations until very late in the Review Period. While PPB involved its Criminal Intelligence Unit in crowd threat assessments and other matters, PPB did not meaningfully deploy plainclothes officers into crowds until November 2020, nearly six months after the arson in the Justice Center. PPB finally established "Echo Squad" in November, which was composed of plainclothes observation teams with support from uniformed arrest officers. Echo Squad's mandate was embedding within crowds in order to identify persons who were engaging in serious felony crime and flagging them for arrest.

Before the establishment of Echo Squad, a relatively large percentage of PPB's arrests that were referred for prosecution, 73%, included only misdemeanor charges. Those numbers decreased dramatically, to only 48% in November 2020, after PPB committed to using plainclothes officers in crowds. During First Amendment events, arresting a small number of persons engaged in felonious conduct is less likely to chill free speech, assembly, and protest activity than arresting many people for low level public order violations.

Figure 4: *Percentage of Protest-Related Cases Referred to the MCDA with Only Misdemeanor Charges, by Month*



In addition, identifying and arresting perpetrators of serious crime, rather than dispersing whole crowds, would have made protest safer, and mitigated the chilling effects of violence on speech and assembly. We interviewed people who reported withdrawing from the protests due to the violent behavior of some participants. Some also reported withdrawing due to use of force by officers, particularly CS gas. Arresting those engaging in serious crime, instead of dispersing whole crowds, would have been protective of the rights of Portlanders to assemble and protest.

We want to be very clear that we are not suggesting that PPB should have used plainclothes officers to surveil political activists. It unequivocally should not have. There is a significant difference between short-term monitoring of crowds during a civil disturbance to identify people who are engaging in violence, and carrying out the kinds of surveillance that some law enforcement agencies have used to suppress protest and chill protected speech. The use of law enforcement resources to target persons based upon their political activities is unconstitutional, anti-democratic, and repugnant. Short-term, close observation of crowds during civil disturbance, however, can help to ensure that law enforcement is not over-reliant on RCAs and

crowd dispersal when other more targeted and less-disruptive tactics could be successfully employed.

## PPB's Dispersal Order Warnings Were Often Insufficient and Not Properly Documented

After law enforcement agencies decide to issue Unlawful Assembly Declarations and before they order crowd dispersal, they should issue warnings to allow community members the opportunity to leave the area.[45] The warnings should consist of "an announcement citing the offenses or violations being committed, an order to disperse, and designated dispersal routes."[46] To allow for compliance, law enforcement agencies should issue multiple warnings at reasonable time intervals.[47] To ensure compliance, the "time and the names of the issuing officers should be noted in the [incident commander's] event log," when practical, and "warnings should be audio recorded at a location in the rear of the crowd."[48]

PPB directives during the Review Period were generally consistent with this guidance. They required that when tactically feasible, members "shall issue a minimum of two warnings at reasonable intervals to notify the crowd of an impending order."[49] The warnings "should cite specific offenses and violations being committed and caution the crowd that these acts of civil disturbance will not be permitted and can result in arrest or necessitate the use of force."[50] They also required PPB to "document the warnings in an appropriate police report" and, if feasible, save audio recordings of the warnings and place officers on the other side of crowds to ensure they can be heard by all present.[51]

The directives, however, did not explicitly require that the warnings include a preferred dispersal route. In our review of video, we heard sound truck warnings that ordered community members to disperse and warned of arrests or the use of force if they remained but lacked instructions about safe dispersal routes. In interviews, community members reported hearing warnings that either lacked dispersal instructions or gave instructions that were inconsistent with officer actions

in the field, such as orders to disperse towards officers deploying less-lethal munitions.

PPB also failed to thoroughly and consistently document the reasons for and the timing of its Unlawful Assembly Declarations and dispersal warnings. We requested such documentation and while we were able to piece together a fairly clear picture using activity logs, internal emails, and press releases, we found no single, consistent source across the Review Period. Moreover, PPB did not consistently audio or video record its Unlawful Assembly Declarations or dispersal orders. In some of the videos provided, we could hear dispersal orders issued from a sound truck, but the recordings were often at a distance and appeared to only capture the orders by chance.

# PPB Failed to Implement Key Internal Controls on the Force Used by Officers

Command post personnel are responsible for setting objectives and determining the types of force authorized to accomplish them, but individual officers in the field are often left considerable discretion about how they use force. Law enforcement agencies have developed a variety of internal controls to ensure that such discretion is used in a manner that is consistent with legal requirements and agency policy. These controls are particularly important for law enforcement agencies that do not equip their officers with body-worn cameras, such as PPB during the Review Period. Our review identified gaps in PPB's tracking of less-lethal munitions and in its use of force reporting, investigation, and review practices during the Review Period.

## PPB's Tracking of Less-Lethal Munitions Was Insufficient

Law enforcement agencies should "develop a tracking system for all equipment as it is procured, assigned to officers, used in the field, and collected during demobilization" to allow command personnel to "maintain accountability of where equipment is, who is using it, and how it should be allocated."[52] The specific

tracking systems employed vary, but all must document the less-lethal munitions maintained by an agency and expended by its officers.

PPB directives and standard operating procedures in place during the Review Period provided general guidance about the storage and auditing of less-lethal equipment and munitions, but they did not provide any specific guidance about tracking during public order events.[53]  RRT standard operating procedures required the RRT Commander to designate a Logistics Officer responsible for overseeing RRT's less-lethal munitions inventory, but only required that inventory to be taken on an annual basis.[54]  These standard operating procedures further stated that "RRT members certified as grenadiers and less lethal will maintain an independent accounting of all rounds fired or deployed," but did not provide any detail about how relevant information would be collected from officers, aggregated across squads, and reviewed by the RRT Commander or other PPB command personnel.[55]

As part of our review, we requested PPB equipment and munition inventories. While we received records of some incident commander emails from later in the Review Period listing the numbers of munitions used, we did not receive any logs documenting the count of less-lethal munitions available prior to the Review Period or the daily use of munitions during it.  During interviews, we learned that these records did not exist, in part, because of the overwhelming nature of the continued protests and riots and because of turnover in the RRT Logistics Officer position. These factors help explain the lack of tracking early in the Review Period but were insufficient to explain why PPB did not develop and implement a tracking system during its later stages.

## PPB's Force Reporting and Review Practices During the Review Period Were Inconsistent with Its Policies

To ensure accountability, law enforcement agencies must document, investigate, and review the force used during public order events. While such events differ significantly from typical patrol-related activities, best practices do not generally recommend reduced reporting and review requirements during them. For example, the International Association of Chiefs of Police model crowd management policy states that all "uses of force shall be reported and investigated in accordance with agency policy," and cites to its model force reporting policy, which generally requires all officers who used or witnessed force to submit reports before the end of their shifts and supervisors to ensure that statements are taken, witnesses are interviewed, and that reports are completed.[56]

PPB directives during the Review Period were consistent with this guidance. They required officers who used or witnessed force to submit force data collection reports prior to the conclusion of the shift, unless incapacitated.[57] PPB directives also required supervisors to respond to the scene of uses of force, take officer statements, identify and speak with witnesses, and complete after-action reports.[58]

Yet, in the reports from the Review Period, we found that PPB did not adhere to these internal requirements associated with documenting and reviewing force.[59] Officers did not always complete force data collection reports promptly and many included vague or repetitive descriptions of the circumstances surrounding their uses of force. Supervisors failed to complete their after-action reports within the required 72 hours and generally did not critically analyze the appropriateness of the force being used. Some PPB personnel assigned to support the reporting and review processes lacked knowledge of and experience with the less-lethal equipment and munitions commonly used in public order events and tended to have different understandings than those in the field with more expertise. Further, to our knowledge, PPB command personnel did not conduct any routine review of after-

action reports during the Review Period to assess the effectiveness and appropriateness of the tactics and force being used.

In interviews, PPB personnel expressed frustration with the expectation that the normal use of force reporting and review process could have been followed during the Review Period. They explained that, particularly in the early days, RRT officers were in the field for more than twelve hours a day for weeks at a time. Requiring them to complete force data collection reports at the end of their shifts would have added an additional two hours of work and taken away from sleep and preparation for the next day. We are sympathetic to these concerns. Officers were working long, consecutive days in an incredibly stressful environment, and the force reporting tasks placed an additional administrative burden on them at the end of each shift. However, this does not explain other issues related to the investigation and review processes, such as the lack of critical analysis of individual uses of force.

## Key Policy Guidance Authorizing Certain Types of Force Was Inappropriate or Imprecise

A law enforcement agency's use of force policy is a key determinant of how its officers will use force in the field. In such policies, "the various levels of force must by defined and the guidelines for their use must be clearly outlined."[60] These guidelines often tie particular less-lethal equipment and munitions to certain defined resistance levels to help ensure that officers use only the level of force that is proportionate to the resistance they encounter. Our review of PPB directives identified several significant issues that affected the force used by officers during the Review Period.

## PPB Policy Did Not Address Dynamics, Bull Rushes, and Baton Pushes

When dispersing crowds during the Review Period, PPB officers often relied on a tactic in which a line of officers would run at a group of protesters to encourage them to flee. If they did not run away, officers would sometimes push those who remained to force them to leave. PPB referred to this tactic as a "dynamic."

Community members called it a "bull rush" and described it as dangerous. From our review of video, we generally agree. When the dynamic accomplished its goal, it often led to a stampede of protesters and caused some to be knocked to the ground. When protesters did not move away or did so more slowly than the running officers, officers sometimes used physical force, including baton shoves, causing those protesters to fall to the ground. Community members described a range of injuries, from minor bruises to serious bodily injury, related to the dynamic.

Despite its risks, PPB directives during the Review Period included no reference to the dynamic tactic. In other words, we are aware of no formal guidance given to incident commanders, operations section chiefs, RRT supervisors, or individual RRT members about the circumstances under which the dynamic tactic was authorized or prohibited. Further, PPB directives in place at the time focused on baton jabs and strikes but did not clearly address the two-handed baton push that officers sometimes used on protesters who refused to leave after a dynamic.

To be clear, we recognize that dynamics can be useful under very limited circumstances. For example, there are times when a path must be immediately cleared for emergency vehicles to respond to fires or life-threatening injuries, and a dynamic may be necessary. However, given its risks of injury, law enforcement agencies should provide clear guidance about the limited circumstances in which the dynamic is authorized, which PPB did not do.

## PPB's Threshold for Use of Area Impact Munitions Was Too Low

Rubber-ball grenades, or area-impact munitions, are hand-thrown explosive devices that project rubber balls across a 50-foot radius in 360 degrees. The rubber balls cause physical pain, and the light and sound from the blast disorients those nearby.

Estimates indicate that PPB officers used area impact munitions more than 200 times during the Review Period, mostly in June.

*Figure 5: Estimates of PPB Rubber-Ball Grenade Use, by Month*



In an evaluation of rubber-ball grenades, researchers found that they bounce unpredictably in a "similar fashion to a child's 'crazy ball'" and that:

> [U]nlike other less lethal weapons that target "safe" zones of the body, the trajectory of the [rubber-ball grenade] fragments cannot be controlled by the user and could potentially strike unintended portions of the target's body.  This creates a concern for eye safety and soft tissue damage, and the potential that the projectiles may become lethal.[61]

Consequently, the manufacturer of the rubber-ball grenades employed by PPB warns that their use can result in serious bodily injury and recommends that, in crowd management situations, they be "generally reserved as a last selection when chemical agents and less-lethal impact munitions have not resolved the disorder or routed the crowd."[62]

PPB directives authorized officers to use rubber-ball grenades "[u]nder the direction of the [incident commander], to disperse a crowd, when a demonstration or event becomes a civil disturbance."[63]  This vague standard was overly permissive and may have authorized the use of rubber-ball grenades on protesters displaying only passive

resistance by refusing to leave an area after a dispersal order had been given. Given the risk that rubber-ball grenades posed to those in the vicinity of their use, including bystanders, this threshold was insufficient.

## Other Deficiencies in PPB's Standards for Use of Less-Lethal Force

Some other types of less-lethal force also had inappropriate thresholds in PPB policy. For example, PPB directives authorized the use of FN303 and 40mm projectiles in "response to active aggression," which was defined as a "threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is about to happen, unless intervention occurs."[64] This relatively high threshold was appropriate given the injury risks associated with these projectiles. FN303 rounds can deliver more than 20 foot-pounds of kinetic energy and cause bruises, welts, and bleeding. Similarly, 40mm projectiles can travel at a velocity of more than 250 feet per second and can cause bruising, swelling, lacerations, eye injuries, and skull fractures. The manufacturer warns that the projectiles can cause serious injury and death.[65]

PPB directives, however, also authorized officers to use FN303 and 40mm projectiles to "avoid the use of a higher level of force."[66] This vague standard could be interpreted as empowering officers to speculate about the resistance they may face in the future and to use such projectiles on individuals who were not engaged in active aggression.

Similarly, PPB directives authorized officers to use OC spray in response to "physical resistance," which was defined as physical attempts "evade a member's control that does not rise to the level of active aggression"[67] OC spray is an aerosol that can cause burning sensations on the skin and in the eyes, inflammation of mucous membranes, and temporarily restrict breathing. Here too, officers were authorized to use OC spray when a person "indicate[d] the intent to engage in physical resistance."[68] Similar catch-all language was included for RCAs and rubber-ball grenades.[69] As with the FN303 and 40MM projectiles, this language could have been

interpreted as allowing officers to use OC spray on peaceful protesters based on speculation that they may later "engage in physical resistance."

These policy concerns might appear abstract, but our review indicates that they impacted the kinds and amount of force used by PPB officers. Officer statements justified the use of OC spray on individuals not engaged in physical resistance because they were yelling at officers and refusing to comply with dispersal orders. We saw similar issues with FN303 and 40mm projectiles. In force reports and court testimony, officers indicated that they understood PPB policy to authorize the use of FN303 and 40mm projectiles on protesters if they were holding signs that could later be used as weapons against officers.[70] Officers appeared to believe that such an approach was consistent with PPB directives because it would allow them to "avoid the use of a higher level of force" at a later time. While we believe that some of this officer confusion resulted from the policy deficiencies discussed above, problems with PPB's public order training also played a role.

# The Effectiveness of PPB's Public Order Training

Public order incidents require police supervisors and officers to make quick decisions in rapidly evolving and potentially volatile circumstances. Without a well-developed public order training program, mistakes are inevitable. Training allows officers to coordinate their movements in the field. It provides them with a background in crowd psychology and the tools necessary to facilitate First Amendment rights while maintaining public safety. Most importantly, training helps ensure that officers only use force, including less-lethal munitions, when necessary and in a manner consistent with constitutional standards and agency policy.

As part of our assessment, we reviewed materials from 2016 to 2020 related to the training provided to all new officers and RRT members. We also spoke with national experts on public order training and interviewed mutual aid partners about their experiences with PPB's public order training. Much of what we read and heard supports PPB's reputation as a law enforcement agency that has historically provided its officers with strong public order policing training that adhered to national standards, with some notable exceptions.

## National Standards and PPB Training

There is an emerging body of national standards on police public order training. Standard setting bodies agree that law enforcement agencies should "[t]rain all agency personnel on the policies, procedures, and legal issues that govern the department's response to demonstrations to ensure public and officer safety."[71] PPB's initial recruit training was consistent with this standard. PPB recruits began with a 16-week "Basic Academy" with the State of Oregon Department of Public Safety Standards and Training. Basic Academy was largely focused on introducing foundational elements related to state laws, patrol procedures, and firearm use, but also included several hours of classroom instruction about public order policing.

After Basic Academy, PPB recruits attended a 12-week training that was specific to the PPB, known as "Advanced Academy." In the years prior to the Review Period,

the Advanced Academy provided two days of training on public order policing that included classroom sessions on crowd behavior, use of force, and the First Amendment, and field exercises on gas masks, formations, and arrest techniques. This introductory training was a useful primer on these key concepts and consistent with best practices.

Standard setting bodies are also clear that law enforcement agencies should conduct "[j]oint training exercises with other agencies that will likely work together during major events."[72] Consistent with this guidance, new RRT members participated in a 30-hour regional Mobile Response Team Basic Training that had classroom and field components addressing applicable state laws, use of force, tactical formations and movements, arrest procedures, and report writing. The training was provided to officers and deputies from all over Oregon, including many of PPB's most frequent mutual aid partners, such as the OSP and Multnomah County Sheriff's Office.

Our review revealed that in many areas, the content of PPB's training was consistent with best practice. The trainings balanced direct instruction on classroom topics related to policy and introductions to the personal protective equipment and less-lethal equipment officers would be using during public order events. The materials we reviewed routinely addressed protesters' constitutional rights, what they meant in a mass demonstration context, and how protected activities differed from criminal acts. They provided important information about crowd psychology and the value of negotiated management approaches to public order policing. Our review also revealed several necessary areas for improvement in PPB's public order training, and the structures in which it was developed and delivered, which we turn to in the rest of this section.

## The City Did Not Provide Sufficient Oversight of PPB's Public Order Training

Law enforcement training on any topic should be consistent with current best practices, legal standards, and community expectations. Public order training is no different. Agencies should review public order training to "ensure it has contemporary application; is evidence-based; and incorporates updated theories of

crowd psychology and dynamics, de-escalation, social structures, and community organizing."[73] Training should be provided or informed by legal experts to "ensure that the material is consistent with current law" and officers are given an "opportunity to ask questions of those who will be responsible for charging and trial decisions."[74] The development of training curricula should also "incorporate diverse perspectives, including input from protesters, organizers, police officers, community members, business owners, and others with a stake in protest behavior and response."[75]

PPB directives and standard operating procedures during the Review Period, as well as the Agreement with the United States, established certain requirements about the development of training curricula. PPB directives required the Training Division to "regularly review lesson plans and training to ensure they conform to PPB's policies at the time of training."[76] Specific to public order training, RRT maintained a training staff that worked with the RRT Commander to develop annual training plans, and RRT standard operating procedures required the RRT Commander to provide this plan to the Training Division.[77] In addition, the Agreement required the PPB Training Division to track and provide to the DOJ all training curricula and lesson plans.[78]

In interviews with PPB personnel, however, we were told that RRT training materials generally received only minimal review, if they received any at all, before they were used. Lesson plans and presentation slides used for public order in-service training for all PPB officers and specific training for RRT members were not regularly provided to or reviewed by the Training Division. The City Attorney's Office, which provides various legal services to Portland's municipal government, was not given the opportunity to review such training materials to ensure they were consistent with current legal standards. The City also failed to provide some of these training materials to the DOJ, leaving it unable to review, provide edits, or approve of training before it was implemented. Further, nothing we reviewed or heard

during our assessment suggested that Portland community members reviewed or provided recommendations about PPB's public order training efforts.

To be clear, the RRT members who created the lesson plans and conducted the trainings were experts in public order policing. However, they were generally not certified trainers or experts in educating adult learners. RRT membership was an auxiliary assignment, meaning its training personnel had other full-time responsibilities within PPB. It is hard to imagine how they would have had the time and resources to develop and conduct training without support from others within PPB and the City. While certain deference to RRT members as subject-matter experts was appropriate, the lack of general oversight of PPB's public order training program was a failure that led to significant issues in the training provided.

The most well-known example was the slide at the end of the Mobile Response Team Basic Training, required of all new RRT members, that shared the "Prayer of the Alt-Knight." The slide described injuring left-leaning protesters with batons to teach them that officers were "tired of your shit." Clearly, such behavior would be inconsistent with PPB directives that require "upholding the civil rights all individuals" and only using force to "affect a lawful purpose."[79] Even the most limited review process would have caught and removed such inappropriate and vile content and caused PPB command staff to question those responsible for the public order training program.

*Figure 6: PPB Training Slide with the Prayer of the Alt-Knight*



The training slides contained other material that would have been addressed through a legal review by the City Attorney's Office. For example, sections of slides addressing legal standards appear to have been copied directly from an online resource center's newsletters. The content was out of date; some of the newsletters were from 2012. In fact, one case included in the RRT grenadier training describing the reasonable use of OC spray had been overturned by the time the training was actually delivered. Again, even a limited review process would have caught issues like this and ensured that the training provided to PPB officers was consistent with current legal standards.

## PPB Provided Insufficient Guidance in RRT Training About When Force Was Authorized and Prohibited

A crucial element of any public order training program is how it addresses the use of force. The training should include "how to use less-lethal munitions effectively as well as agency policies that determine when, how, and by whom their use can be

authorized."[80]  RRT training addressed how to use force, that is, the mechanics of its use, but lacked material focused on the circumstances under which particular types of force were authorized and prohibited.

The PPB Use of Force Directive provided guidance to officers about when they were authorized to use different types of force by defining certain levels of resistance.  For example, physical resistance was a person's "physical attempt to evade a member's control that does not rise to the level of active aggression," and officers were authorized to use aerosol restraints, or OC spray, when a person engaged in it.[81]  Officers were authorized to use impact weapons and munitions in the face of active aggression, defined as a "threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is about to happen, unless intervention occurs."[82]

While the training slides for new recruits defined when officers were authorized to use certain types of force in a public order context, the materials used for RRT-specific training did not.  For example, the presentation slides associated with a 2018 Mobile Response Team Basic Training, required of new RRT members, did not include basic definitions of key resistance levels or descriptions of when particular types of force were authorized.  Indeed, the slides referenced resistance levels that did not appear in the PPB Use of Force Directive in force at the time and, when describing the use of batons and OC spray, cited PPB directives that had been rescinded the prior year.  Further, one of the pictures included in the slides seemed to suggest that a protester simply holding a sign and yelling was somehow actively resistant, which would authorize officers to use force on them.  PPB directives

would likely have instead categorized such behavior as passive resistance, at most, and would not have authorized the use of force.[83]

*Figure 7: PPB Training Slide Providing an Example of Active Resistance*



Our review identified similar issues with RRT's grenadier training. This training was an additional 30-hour course addressing the less-lethal equipment and munitions only grenadiers were authorized to deploy, including aerosol and gas grenades, rubber-ball grenades, FN303 launchers, and 40mm launchers. The introductory slides to the 2019 version of this training included text from the PPB Crowd Management and Control Directive, but not its Use of Force Directive. The training specific to the FN303 launcher described resistance levels and authorized force, but used a table dated to March 2004. In the written materials we reviewed, we found only minimal explicit guidance for grenadiers about when they would be authorized to use the less-lethal equipment and munitions on which they were being trained. Nor did we find materials suggesting the officers participated in realistic, scenario-based training requiring them to make decisions about using force in a manner that was consistent with PPB directives.

This lack of guidance in RRT training about when particular types of force were authorized and prohibited had consequences for officers and community members during the Review Period. For example, a Contempt Opinion and Order issued by a

U.S. District Court Judge identified several examples of officers using force that was disproportionate to the resistance they faced.[84] The explanations given by officers to justify the force revealed a misunderstanding of PPB's definitions of certain resistance levels and, in particular, what kinds of behavior constituted active aggression.

A similar misunderstanding is apparent in the force data collection reports that were completed by officers. After the Review Period, the City Attorney's Office conducted a training with PPB officers that addressed some of these topics. That training described force data collection reports that included justifications for the use of impact munitions, rubber-ball grenades, OC spray, and batons that were inconsistent with PPB directives. For example, reports justified using batons on protesters because they were walking slowly away from an area in response to dispersal orders, even though baton strikes would only been authorized in response to active aggression. Other reports justified the use of impact munitions, such as FN303 and 40mm projectiles, on individual protesters because the larger group had thrown items at officers. These examples were not consistent with PPB's directives, but nothing we reviewed in the RRT training materials would have made that clear to those being trained.[85]

## PPB Did Not Adequately Train Mobile Field Forces

Law enforcement agencies should provide officers with "both initial and ongoing training related to crowd control and management."[86] Recommendations about the frequency of refresher training vary but many best practice resources suggest that it be done at least annually.[87] Standards propounded by the National Tactical Officers Association, for example, recommend that a basic public order unit capable of general crowd management receive a minimum of 8 hours of refresher training a year.[88] RRT members received regular, routine refresher training but MFF members, who complemented RRT during public order events, only received in-service or roll-call training once every four years, to align with preparations for national presidential elections. Given this approach, PPB was preparing to provide this in-service training in 2020 but could not do so because of the COVID-19 pandemic and associated

public health orders.  For a City that experiences as many as 250 public order events a year, public order refresher training every four years is simply insufficient.

The sergeants and lieutenants leading Mobile Field Forces teams during public order events also need training specific to their roles.  This should include initial and refresher training in topics such as the use of less-lethal munitions, crowd psychology, and incident management.  It should also include practice in managing crowds and directing officer movements during simulated public order events.  As others have noted, prior to the Review Period, PPB did not generally provide MFF sergeants and lieutenants initial or regular in-service training specific to their roles as supervisors.   Nor were they given the chance to train with the MFF officers they might end up supervising in the field.  Given PPB's current approach to public order events, which relies on MFF without the support of a dedicated, specialized group such as RRT, additional training for MFF supervisors is particularly important.

Further, law enforcement agencies should ensure that "any units that will be deployed together during a mass demonstration train together as well."[89]  Without joint training, it can be difficult for different units to coordinate in the already chaotic environment of many public order events.  The PPB training program included opportunities for different RRT squads to train together and for RRT to train with PPB's mutual aid partners.  It did not, however, generally create opportunities for MFF officers and supervisors to train and practice with RRT.  MFF played an important role in policing the protests and riots during the Review Period, and training that maximized its ability to coordinate with RRT was necessary.

## PPB Did Not Sufficiently Address De-escalation and Procedural Justice in Its Training

Finally, public order training should "[e]mphasize the importance of de-escalation and communications tactics in the context of a mass demonstration" because the "quality of interpersonal interactions between individual officers and protesters can change outcomes."[90]  Similarly, law enforcement agencies should train officers in how they can practice procedural justice in the context of public order events.[91]  Procedural justice is "about demonstrating respect to community members, treating

them with dignity and fairness, and allowing community members to express their views and tell their side of the story," and research indicates that "when the public believes the police exercise their authority in these procedurally just ways, they are more likely to accept the legitimacy of the police and defer to police authority."[92]

The Advanced Academy training material addressing public order policing and the RRT training for new members and grenadiers did not dedicate enough attention to integrating these important topics. In fact, most of the presentation slides we reviewed failed to even mention de-escalation or procedural justice. While PPB addresses these topics in other officer training, their application in the context of public order events is unique and should have been highlighted whenever possible in public order training sessions.[93]

# Conclusions and Recommendations

The protests and riots of 2020, and the City's response thereto, cast a pall on Portland that has lingered for the last several years. To this day, many downtown storefronts remain boarded up, and the anger at those who caused this destruction is palpable. Some Portlanders still talk with shock and rage about the force used by PPB, while officers have continued to feel disheartened by the perceived lack of community support.

But there are signs of renewal in Portland today. As we walked through the City on various visits during this review, we saw some businesses reopening, the plywood boards finally coming down. When Tyre Nichols was brutally and horrifically killed by five Memphis police officers in January 2023, there were demonstrations in the City. But PPB officers stayed distant while people expressed their outrage, and there was neither significant conflict with nor use of force against demonstrators.

In addition, the City and the DOJ have negotiated several remedies to enable the City to again attain compliance with the 2012 Agreement. This includes hiring a civilian employee to direct educational efforts at PPB's Training Division, equipping PPB officers with body-worn cameras, and initiating investigations into the actions of PPB personnel during the Review Period with a rank of lieutenant or above.[94] We applaud these steps and below provide 12 additional actionable recommendations that, if diligently and expeditiously implemented, will enable the City, its residents, and its police to work together to ensure that the errors of 2020 are never again repeated in Portland.

## 1) The City Must Rebuild its Mutual Aid Network

The unique conditions that gave rise to the 2020 protests and riots—pandemic lockdowns, a brutal police murder, violence from the political right and left, and an inflammatory federal response—were unprecedented. But their singularity should provide no comfort that civil disorder will never again arise in Portland. Someday, it will.

The City's capabilities in 2020 were seriously compromised by the nearly complete fracture of its mutual aid network, and it must make purposeful efforts to rebuild that network before any future disorder. This will likely involve coordinating meetings of regional law enforcement, municipal, and county executives to listen to and address their concerns, and to develop new, more durable intergovernmental mutual aid agreements. Such agreements should provide for joint trainings, resolve outstanding issues regarding indemnification, and include commitments to supporting all signatories when they are in need. State agencies, such as the OSP, should be approached about a possible role in coordinating these discussions (after all, when Portland's mutual aid system failed in 2020, OSP was required to help fill the gap. It is thus undoubtedly in OSP's interests that the mutual aid network be rebuilt).

We note that a functioning mutual aid system will benefit multiple communities, not just Portland. The City's training facilities, including its VirTra simulator and "Situation Village" are both state-of-the-art and could be a significant resource for regional mutual aid partners. The City's SERT team could also provide significant assistance to neighboring jurisdictions in times of tactical emergency. While Portland cannot force its regional partners to join a new mutual aid network, negotiating new, reciprocally beneficial mutual aid agreements would assist multiple communities in the greater metro area, and all should be aligned on the importance of achieving this objective.

## 2) PPB Must Dramatically Reduce its Reliance on Crowd Dispersals with RCAs, like CS Gas, at Public Order Events

PPB relied too heavily on crowd dispersals with CS gas during the protests and riots of 2020 instead of targeted crowd interventions. It must strengthen its policies, command training, and resources to ensure that this never happens again.

PPB has already made a number of notable improvements here, including useful updates to its directives on use of force and public order events. These revised directives now require PPB to "use intervention strategies and tactics, such as individual arrests, in an attempt to de-escalate the situation and prevent further unlawful behavior without interfering with members of the crowd who are lawfully assembling."[95] Before authorizing CS gas, incident commanders must now consider their likely effects on nearby hospitals, schools, and uninvolved community members.[96] Specific to tear gas, which includes hand-thrown CS gas grenades, officers are now prohibited from using it without incident commander authorization and only after other reasonable alternatives have been attempted.[97] These are considerable improvements, but other changes are still necessary.

First, the City must attempt to fix the video blackout that hindered investigations into allegations of police use of force and protester riotous behavior, and blinded the command post in 2020. As noted above, we have worked in various cities in the United States and were shocked by the near total lack of video downtown in 2020 (other than cell phone video, which proliferated). The paucity of sustained police use of force complaints and the difficulty of successfully prosecuting violent, riotous behavior from 2020 are reason enough to explore fixing this issue. The operational value of video to incident commanders is another reason. The City must evaluate whether state law can be amended to allow for the use of temporary video cameras, such as pole mounted equipment, to be deployed during any future civil disorder.

Second, PPB must formalize its procedures—and safeguards—for the use of plainclothes officers for crowd observation during future civil disturbance. PPB established Echo Squad in November 2020 but it created no standard operating procedures for the squad. It must now develop such standards, including guardrails to ensure that this power is never abused. The standards should include a threshold

for use—PPB should not be permitted to use such officers absent a specific, articulable threat of violence or serious disorder, or evidence that such conduct is manifesting.  Consistent with state law, the rules must also prohibit observing individuals on the basis of their political affiliations or activities and any such observation should be short-term only until the end of the immediate emergency.  And the City must ensure that there is no abuse by implementing routine auditing of the program in anonymized reports that are available for public review.

## 3) PPB Must Strengthen and Clarify its Public Order and Use of Force Directives

Following 2020, PPB updated its directives and addressed several of the issues raised in this report.  For example, the directives now require that when time and circumstances permit, dispersal orders will include detailed instructions.[98]  Permissive authorizations to use force to "avoid the use of a higher level of force" or when an individual "indicates the intent to engage in physical resistance" have been eliminated.[99]  These are noteworthy improvements.  However, additional changes are still necessary.

First, while PPB directives prohibit the use of indiscriminate force, they do not explicitly address the use of rubber-ball grenades during public order events.  We understand that Oregon Revised Statutes prohibit the use of these munitions, but we recommend that this also be reflected in policy.  Second, while PPB directives require that public order announcements be recorded, if feasible, they do not include accountability mechanisms to ensure compliance.  PPB should revise these directives to require that if the officers making the announcements determine that audio recordings are not feasible, they document the reasons in a report.  The updated directives should also require that a supervisor review these reports and spot check a number of recorded announcements to ensure conformity with PPB policy.

Third, current PPB directives do not address the dynamic tactic or the baton pushes that were sometimes used in 2020 at its conclusion.  If PPB expects to continue to use the dynamic tactic, it should substantially restrict its use through clear policy that states the very limited circumstances under which it is authorized.  The directives

should also resolve any lingering officer confusion by clearly and explicitly instructing that slowly walking away from an area after a dispersal order does not, on its own, justify the use of force.[100]

## 4) The City Must Ensure That PPB Directives Related to Internal Controls During Public Order Events Are Followed

PPB did not employ certain important internal controls on officer use of force in 2020 and must ensure that they are used in the future. PPB has already made improvements to certain related policies, including by now requiring officers who use less-lethal weapons during public order events to document all munitions deployed.[101] Supervisors are now responsible for tracking munitions resupplies to officers and reporting information about the munitions deployed to the incident commander.[102] Further, the Portland City Council passed a resolution directing PPB to regularly report on its inventory of public order tools and munitions.[103] These are key improvements, but they do not clearly identify the systems that will be used to actually track munitions inventories and how they are expended.

In response to our initial request for equipment and munition inventories, we received logs that document less-lethal munition inventories after the Review Period. For some munitions, such as rubber-ball grenades, the logs list the unique serial numbers associated with each munition and have fields for recording information about to whom they were issued and when and where they were deployed. For others, the logs provide an overall count of certain munitions but no fields for information related to their deployment. PPB should update and standardize tracking logs to clearly document not only the overall counts of munitions in inventory but also names of the officers and the times and locations they were expended. It should also build into its directives and standard operating procedures a command-level responsibility to carefully review these logs in the aftermath of public order events.

PPB also updated its directives related to the reporting, investigation, and review of uses of force. The directives establish an audit process to evaluate force reports and investigations, and, if supervisors fail to meet these requirements, they will face

disciplinary action.[104]  The review process also builds in an opportunity for non-disciplinary evaluation that could lead to additional training for an officer or a more general review of policy and practice concerns.[105]  PPB command staff must actively engage in this review process to ensure that officers and supervisors are held accountable for implementing these internal controls.

We also take seriously the concerns expressed to us by officers about the onerous burdens of the force reporting process during multi-day public order deployments. We disagree, however, with the suggested conclusion that PPB must therefore relax those requirements.  Instead, we recommend that PPB take steps to provide officers and supervisors with the resources necessary to ensure that the force reporting requirements can be met.  This includes training officers to narrate their decision-making process regarding force used during public order events into body-worn cameras after the conclusion of the force event.  It might also include providing small notebooks with pre-printed forms that allow officers to capture relevant information about uses of force at the first available opportunity rather than making them wait for the end of the shifts when they can get to a computer and their memories may have already blurred.

Most importantly, PPB must allow those working public order events enough time to complete force reporting without cutting into the opportunity to recuperate before the next shift.  This can be accomplished by training enough officers in public order policing to permit for shorter shifts or fewer consecutive days of work.  We also recommend that PPB consider assigning a group of officers and supervisors to gather evidence and begin investigations as quickly as possible during public order events.  While members of this group should be trained and have practical

experience in public order policing, their primary responsibility should be force investigation and review rather than public order operations.

## 5) The City Must Create a New Specialized Public Order Team Consistent with Emerging Standards for Advanced Public Order Units

The RRT is disbanded and defunct, but Portland's need for specialized public order policing is as acute now as ever. Policing has various disciplines that are recognized as specialties because they involve extensive, recurring training and mastery of unique tools, equipment, and tactics. These include SWAT, K-9, Explosives/Bomb Squad, and others. In recent decades, progressive police leaders have come to also recognize public order policing as a unique specialization for several reasons.

First, it can be extremely difficult to balance facilitating protest activity with the simultaneous protection of life and property. There are complicated legal and strategic considerations involved, and heightened training and recurring drills and deployments help officers master and retain those perishable skills. Second, public order policing requires specialized equipment that not all officers have the time to certify (and recertify) on, nor do municipal police budgets generally support acquisition for all officers in a department. Third, public order policing involves coordinated movements in squads that require frequent drilling to perfect.

Finally—and most importantly—after years of collective experience in the field, it is our view that extensive public order training, including iterative stress inoculation, can help officers to de-escalate and keep cool in volatile environments, including protests and riots that descend into serious disorder. That is, we believe that public order specialization with a specific focus on constitutional rights and force avoidance, can help to reduce negative force outcomes, officer and community injuries, and municipal litigation risk.

With the resignation of the RRT, the City will now rely exclusively upon MFF officers to respond to protest and riot. But MFF officers will have only two days of initial training, complemented by infrequent refreshers, and limited opportunities to drill together. We believe that this public order policing architecture—a reliance on

officers with minimal public order training in one of the most active protest cities in the nation—is simply insufficient to protect Portland and its residents.

The National Tactical Officers Association Public Order Section, whose members are experts from across the U.S., has developed a set of standards associated with police public order units. These emerging best practices create three tiers of public order units based upon the depth and frequency of their training, their operational capabilities, and the level of disorder they will be capable of managing. Basic units receive two days of initial training and 8 hours of refresher training. They are capable of standing on skirmish lines or protecting buildings in the face of relatively minor disorder or hostility. Intermediate units receive 30 hours of initial training and 32 hours of annual refresher training. They have greater capability than do basic units and can manage a higher level of disturbance, though not serious disorder.

Advanced units are the most highly trained and experienced. They receive a full 40-hour initial training complement, and have frequent, recurring training (96 annual hours) on crowd management procedures, incident assessment, constitutional and human/civil rights, de-escalation, and force avoidance. Their training also focuses on de-escalation, response levels, incident assessment, and the use of operations and equipment logs. They are able to coordinate with other specialized units such as SWAT, Mounted, K-9, Traffic, and Aviation, and they deploy with specialized personal protective equipment that helps enable them to stay calm during high-stress events.

The RRT's errors in 2020, discussed at length above, do not invalidate Portland's need for an advanced public order unit to help safely manage future protest or riot in the City. As set forth below, the new unit must be shaped by tighter policies, better

training, and more rigorous oversight than was the RRT, which will enable it to handle protest or riot with greater accountability and less reliance on force.

## 6) The New Public Order Team Must be Rigorously Scrutinized by PPB Executives, Overseen by Portland's New Oversight Agency, and Transparently Introduced to the Public

Regular internal scrutiny of police specialty units is key to accountability and ensuring that the unit's subculture and practices remain consistent with the agency's overall mission and values. Such scrutiny also helps to ensure that any force used complies with constitutional mandates. City and PPB leaders must provide regular scrutiny of PPB's new public order team in several ways. First, they must adopt policies that ensure rigorous internal review of the new unit's standard operating procedures, tools, and munitions before they are implemented or deployed. Second, all uses of force at its deployments should be closely evaluated through PPB's chain-of-command and internal force review processes.

While PPB command staff should manage and supervise the new public order team, external oversight is essential. During this review, we learned that Independent Police Review investigations into RRT officers were hindered by a lack of direct access to PPB's reports and other documents. In November 2020, Portlanders voted overwhelmingly to replace Independent Police Review with a new police oversight entity. Once the new community oversight body has begun its operations, it should review all complaints of misconduct regarding the new public order team to determine if it will conduct or oversee the investigation. Further, that entity should, subject to existing law, have unfettered access to PPB documents, reports, and materials, including all such records generated by the new team.

In addition, the public must not again be surprised by a PPB public order team's policies, tactics, practices, and munitions. Instead, the City should plan to introduce the new unit to the community using various approaches. Given the proliferation of existing police/community committees in Portland, we hesitate to suggest the creation of a public order policing committee, though one might be useful. Instead, the City might utilize its existing committees to educate the public about the training, policies, practices, and munitions of the new unit and receive community

feedback.[106]  The City might also create a Public Order Citizens' Academy for the same purpose, and regularly invite members of the public and the press to attend PPB's public order training in its Situation Village in PPB's Training Academy.  We are not being proscriptive with these ideas, which are not a mandatory list.  Instead, when we return in 180 days, we will expect to see a meaningful and creative effort, which could take a variety of forms, to be transparent with the community about the new public order team.

## 7) The City Must Continue to Improve Its Public Order Training Program Consistent with Recent National Tactical Officers Association Standards

Recent PPB public order training addressed many of the concerns identified in our review of pre-2020 training.  The City should build on this success by ensuring that future training benefits from robust oversight, is consistent with recent National Tactical Officers Association standards, and addresses important topics, such as when force is authorized.  In February 2023, we attended a two-day public order in-service training that PPB is providing to all sworn staff, regardless of rank and current assignment.  The training covered, among other topics, crowd theory, field formations, the use of force, and mass arrest procedures.  It combined classroom-based lectures, field exercises, and several interactive scenarios.  A two-day training can only accomplish so much, but our overall assessment was positive.

PPB developed its 2023 training in partnership with representatives from the City Attorney's Office and reportedly sought feedback from the Portland Training Advisory Council, a group of community members responsible for evaluating PPB training and providing recommendations.  This is a notable improvement, and PPB should revise its directives to require that the City Attorney's Office and the Training Advisory Council review all public order training before it is delivered to officers.

The 2023 in-service training addressed the importance of de-escalation and procedural justice, and provided clear guidance about when the use of certain types of force were authorized and prohibited.  The interactive scenarios offered opportunities for officers to apply these concepts in situations that ranged from relatively calm and not requiring the use of force to the more chaotic, with protesters

blocking emergency vehicles or throwing projectiles at officers. PBB should ensure that all future training also addresses these topics in a similar manner.

As PPB continues training MFF officers and builds a new, specialized team, it should use the National Tactical Officers Association standards to determine the volume and content of the training. For MFF officers, this means 16 hours of initial training and 8 hours of refresher training a year that address, among other things, when force is authorized and prohibited, how force is reported, and a basic understanding of dispersal orders and arrest procedures. We understand that immediately meeting these standards given current staffing and budgetary constraints may be difficult. Rather than try to continually train all sworn staff to serve as MFF officers, an alternative option may be to identify a smaller group of MFF officers and provide them the 8 hours of annual refresher training.

For the new public order team, PPB should aim to fulfill the training standards associated with an advanced unit, including 40 hours of initial training and 8 hours of monthly refresher training. Again, immediately meeting these standards may be difficult. At a minimum, however, we recommend that PPB begin by meeting the training standards associated with intermediate public order teams, which is 30 hours of initial training and 32 hours of refresher training annually. We also recommend PPB create training specific to field supervisors and officers responsible for specialized functions, such as grenadiers and arrest teams, and over time, identify opportunities for MFF officers and officers from the new team to train together and with mutual aid partners.

## 8) PPB Policy Should Require Chiefs to Be Engaged with and Visible to Officers in the Field During Public Order Deployments, When Possible

PPB's executives have already recognized that their relative lack of visibility in the field was not ideal in 2020 and have committed to change. PPB policy should also reflect this expectation. Current PPB Directive 0635.10, *Portland Police Bureau Response to Public Order Events*, includes the Bureau's overall policies for the handling of public order events. It includes discussions of the responsibilities of key leaders in

the incident management team, including the incident commander and operations section chief. Yet its only substantive discussions of the roles of the Chief, Deputy Chief, and Assistant Chiefs of Police relate to delegations of authority or timelines for after-action reporting.[107] While it would be impractical and foolish to attempt to entirely summarize their duties in this directive, it should include some discussion of the role that they will play during public order events, particularly their duties to engage with and be visible to officers in the field. This should include but not be limited to attending pre-operational briefings, visiting with deployed officers, and debriefing after significant incidents that result in officer or community member injuries, when possible.

## 9) PPB Should Prepare a Deep Bench of Leaders to Serve as Incident Commanders and Operations Section Chiefs

PPB did not have enough trained leaders to serve as incident commanders and operations section chiefs in 2020. To ensure operational readiness, it must prepare a deep bench with the requisite ICS training, command-level public order training, and actual experience to ably serve in those roles now and in the future. PPB is in the best position to determine the specific size of that bench. However, given the need to staff at least two, and possibly three, shifts per day for seven days per week, and the possibility of retirements or other separations, we believe that it would be prudent to have no less than 6, and possibly more, trained and experienced incident commanders and operations section chiefs at all times. Regardless of the size of that bench, all members must be required to train and drill with the new public order team to ensure familiarity with its strategies, tactics, and tools, and to create the trust between the command post and the field that was sometimes lacking in 2020.

## 10) PPB Should Develop a Pre-Operational Briefing Checklist and Hold Supervisors Accountable for Providing Comprehensive Briefings to Officers Before Public Order Deployments

To ensure that all supervisors are providing clear, consistent information about the rules of engagement before public order deployments, PPB should develop a pre-operational briefing checklist that all supervisors are required to use. It should include discussion of the relevant rules of engagement, policy standards for particular

types of force, and reminders of the requirements to de-escalate, among other matters. Supervisors must be required to sign the checklists affirming that they have provided such briefings and the checklists should be collected at the end of every operational period.

## 11) PPB Should Formalize the Debriefing Process for Public Order Deployments

Debriefing is essential during public order deployments. PPB directives require the incident commander and individual supervisors to conduct debriefs after public order deployments but they provide little specificity about what that actually means.[108] The process and expected topics must be formalized to ensure that PPB maximizes the value of debriefing for its organizational learning. Policy should require debriefs to focus on whether or not each mission objective was achieved and if not, why not. They must require discussion of not only operational effectiveness; they must also address compliance with the use of force policy and related directives. The lessons learned from the debriefs should be encapsulated in a written document that feeds into future operational plans.

## 12) The City Should Produce a Detailed Self-Assessment in 180 Days Reflecting the Steps It Took to Implement These Recommendations

Finally, as indicated at the beginning of this report, the City has committed to implementing these recommendations, and we will return in 180 days to review its progress. To enhance transparency and to facilitate that follow up review, we recommend that in 180 days, the City produce a self-assessment reflecting the specific steps it took to implement these recommendations, its successes and challenges, any quantitative data reflecting its efforts and outcomes, and any other context that will be necessary for our use in evaluating the City's progress.

## <u>INDEPENDENT MONITOR LLC RECOMMENDATIONS:</u>

1) The City must rebuild its mutual aid network.

2) PPB must dramatically reduce its reliance on crowd dispersals with RCAs, like CS gas, at public order events.

3) PPB must strengthen and clarify its public order and use of force directives.

4) The City must ensure that PPB directives related to internal controls during public order events are followed.

5) The City must create a new specialized public order team consistent with emerging standards for advanced public order units.

6) The new public order team must be rigorously scrutinized by PPB executives, overseen by Portland's new oversight agency, and transparently introduced to the public.

7) The City must continue to improve its public order training program consistent with recent National Tactical Officers Association standards.

8) PPB policy should require chiefs to be engaged with and visible to officers in the field during public order deployments, when possible.

9) PPB must prepare a deep bench of leaders to serve as incident commanders and operations section chiefs.

10) PPB should develop a pre-operational briefing checklist and hold supervisors accountable for providing comprehensive briefings to officers before public order deployments.

11) PPB must formalize the debriefing process for public order deployments.

12) The City should produce a detailed self-assessment in 180 days reflecting the steps it took to implement these recommendations.

[1] The term "tear gas" can also be used to refer to Oleoresin Capsicum aerosol that is dispersed in vapor or mist form.

[2] PPB defined Mobile Field Force as "[s]worn members, who are trained in basic crowd control tactics and techniques, organized into a squad and deployed to assist in the management of a crowd." PPB Directive 0635.10 (effective Aug. 2017)

[3] The dates for the Review Period were set by the City's statement of work. The 43 operational periods represent 25% of the 172 operational periods during the Review Period. To create the sample, Independent Monitor LLC randomly sampled 26 days from the entire Review Period and then supplemented this by sampling 17 of the remaining operational periods during which use of force was reported.

[4] *United States v. City of Portland*, 12-cv-02265, Fourth Periodic Compliance Assessment Report (D. Or., May 4, 2019).

[5] *United States v. City of Portland*, 12-cv-02265, Plaintiff's Notice of Interim Compliance Assessment Report (D. Or., Jan. 24, 2020).

[6] *United States v. City of Portland*, 12-cv-02265, Fifth Periodic Compliance Assessment Report (D. Or., Feb. 2, 2021).

[7] *United States v. City of Portland*, 12-cv-02265, Plaintiff's Unopposed Motion to Amend the Amended Settlement agreement (D. Or., Feb. 25, 2022).

[8] PPB Tactical Operation Division Standard Operating Procedure 52 § 2 (effective Aug. 2019).

[9] The OIR Group was commissioned to do a study of PPB's agency culture, including allegations of political bias in PPB. That report, A*n Independent Review of the Portland Police Bureau: Agency Culture, Community Perception, and Public Safety in a Time of Change*, is available at: https://www.oirgroup.com/_files/ugd/c0d762_16aaa9fa1dfa4b0b87a74352fe5d520c.pdf.

[10] PPB eventually determined that the fence was a flashpoint for conflict and took it down. However, the Multnomah County Sheriff's Office continued to maintain a fence on its part of the building.

[11] Administration of Donald J. Trump, *Executive Order 13933 - Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence* (June 26, 2020).

[12] Statement by Oregon State Police Superintendent Travis Hampton, available at https://www.facebook.com/OSPsocial/photos/a.263576720688320/1162073667505283/?type=3 (July 29, 2020).

[13] Statement by Mayor Ted Wheeler (June 6, 2020) (on file with author).

[14] The temporary restraining order also limited the use of OC aerosol when dispersed in a vapor or mist form. *Don't Shoot Portland, Nicholas Roberts, Michelle "Misha" Belden, and Alexandra Johnson v. City of Portland and Multnomah County*, 20-cv-00917, Order (D. Or., June 9, 2020).

[15] Statement by Mayor Ted Wheeler (Sept. 10, 2020) (on file with author).

[16] E-mail from Mayor Ted Wheeler to PPB Chief Charles Lovell (Sept. 25, 2020) (on file with author).

[17] Since that time, in 2022, Portlanders voted to do away with the city commission structure and instead adopt a city manager form of government.

[18] Portland City Council, Resolution 37496 – Immediately Cease Cooperation Between PPB and Militarized Federal Forces (filed July 22, 2020).

[19] Oregon Revised Statutes §§ 181A.250.

[20] Multnomah County District Attorney Mike Schmidt, *Policy Regarding Protest Related Cases* (Aug. 11, 2020).

[21] *Id.*

[22] According to the MCDA, 5 cases were still pending review by a Deputy District Attorney before a final charging decision was made the last time the data were updated.

[23] *See, e.g.*, Kim Barker, *In City After City, Police Mishandled Black Lives Matter Protests*, N.Y. Times, Mar. 20, 2021.

[24] *See Final Report of the President's Task Force on Twenty First Century Policing* at pp. 15 ("In order to achieve external legitimacy, law enforcement agencies should involve the community in the process of developing and evaluating policies and procedures") available at: https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

[25] The City did provide us several limited examples of attempts to inform community members about RRT and public order practices more generally, including educational events, media releases, and podcasts.

[26] *See* PPB Crowd Management Incident Commander Standard Operating Procedure, dated May 8, 2019.

[27] *See* National Police Foundation, *Staying Healthy in the Fray, the Impact of Crowd Management on Officers in the Context of Civil Unrest* at pp. 7, available at: https://www.policinginstitute.org/wp-content/uploads/2022/02/Staying-Healthy-in-the-Fray-Guidebook_FINAL.pdf.

[28] *See, e.g.*, Police Executive Research Forum, *The Police Response to mass Demonstrations: Promising Practices and Lessons Learned*, at 46 (2018); IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 10-16 (revised May 2007).

[29] *Id.*

[30] This amount was later reduced on appeal.

[31] During the Review Period, the City attempted to address the indemnification issue by requesting mutual aid outside of the existing agreement and through a state law that would indemnify other jurisdictions. However, these efforts were not effective.

[32] *See* PPB Crowd Management Incident Commander Standard Operating Procedure, dated May 8, 2019.

[33] *See* Commander Craig Dobson, *2020 Portland Civil Unrest After Action and Recommendations*, at 5 (on file with the author).

[34] *See, e.g.*, PPB Directive 0635.10, Portland Police Bureau Response to Public Order Events § 16.1.18. (requiring that for extended crowd control events, the incident commander must complete an after-action review within 60 days of the conclusion of the event. Moreover, the incident commander should "hold a formal debrief of the event to discuss the overall plan, tactics, staffing and areas of improvement. The debrief should include key supervisory member participants in the event"). *See also* PPB Directive 0635.10, Portland Police Bureau Response to Public Order Events § 16.3.1 (requiring "the lead supervisor of each squad that took police action [to] conduct a debriefing of the incident with their personnel and document it in their police report.").

[35] Oregon Revised Statutes §§ 131.675, 166.015.

[36] *Id.*

[37] PPB Directive 0635.10, Definitions (effective Aug. 2017).

[38] *See, e.g.*, Defense Technology, Triple-Chaser Grenade Continuous Discharge OC, CN, CS and SAF-Smoke Specification Sheet (revised June 2020); Defense Technology, 40MM Skat Shell OC, CN, CS and SAF-Smoke Specification Sheet (revised June 2020); Defense Technology, Pyrotechnic OC Options for Crowd Control, Sell Sheet, available at https://www.defense-technology.com/wp-content/uploads/2020/06/DT_Pyrotechnic_OC_Options_For_Crowd_Control_Sell_Sheet.pdf.

[39] *See, e.g.*, Defense Technology, Muzzle Blast 40mm Round, OC First Aid and Decontamination, available at https://www.defense-technology.com/product/muzzle-blast-40-mm-round-oc/; Defense Technology, Triple-Chaser Separating Canister, CS First Aid and Decontamination, available at https://www.defense-technology.com/product/triple-chaser-separating-canister-cs/.

[40] The City indicated that the October uses of RCAs listed in the estimates provided to us and included in Figure 3 were the result of data entry and coding errors in Force Data Collection Reports and that the involved officers used OC spray rather than RCAs.

[41] PPB Directive 0635.10 § 6.2.2 (effective Aug. 2017).

[42] The directives now require PPB to "use intervention strategies and tactics, such as individual arrests, in an attempt to de-escalate the situation and prevent further unlawful behavior without interfering with members of the crowd who are lawfully assembling." Before authorizing the use of chemical incapacitants, such as CS gas deployed from a 40mm launcher, incident commanders must consider the effect on nearby hospitals, schools, and uninvolved community members. Specific to tear gas, which includes hand-thrown CS gas grenades, officers are prohibited from using it without incident commander authorization and only after other reasonable alternatives have been attempted. PPB, Directive 0635.10 §§ 7.4; 9.3.4; 14.1.6 (effective Jan. 2023).

[43] *See* O.R.S 181A.250

[44] Multnomah County District Attorney, Protest Cases, available at https://www.mcda.us/index.php/protest-cases.

[45] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(F)(3) (Apr. 2019).

[46] *Id.* at § (IV)(F)(3)(a) (Apr. 2019).

[47] *Id.* at § (IV)(F)(3)(b) (Apr. 2019).

[48] IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper*, at 8 (Apr. 2019).

[49] PPB Directive 0635.10 § 8.3.1 (effective Aug. 2017).

[50] *Id.* at § 8.3.2 (effective Aug. 2017).

[51] *Id.* at §§ 8.3.3, 6.1.5 (effective Aug. 2017).

[52] Police Foundation, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, at 30 (2018).

[53] PPB Directive 1020.00 §§ 5, 10.3 (effective Jan. 2020)

[54] PPB RRT Standard Operating Procedure 11 – Inventory § B (effective Feb. 2019).

[55] PPB RRT Standard Operating Procedure 4 – RRT Member Deployment Responsibilities § C (effective Feb. 2019).

[56] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(E)(3)(j) (Apr. 2019); IACP Law Enforcement Policy Center, *Reporting of Use of Force Model Policy* § (IV) (Mar. 2017).

[57] PPB Directive 1010.00 §§ 11.1.4, 11.1.6 (effective Aug. 2017).

[58] PPB Directive 1010.00 § 12 (effective Aug. 2017).

[59] *See, e.g.,* Compliance Officer and Community Liaison, *Quarterly Report: Quarter 4 Updates and Analysis*, 16-21 (2021); *United States v. City of Portland*, 12-cv-02265, Fifth Periodic Compliance Assessment Report § III (D. Or., Feb. 2, 2021).

[60] National Consensus Documents on Use of Force, *Discussion Paper* § (III)(C) (July 2020).

[61] Charlie Mesloh, Jo Ann Webalis, Lindsey Medley, and Ross Wolf, *An Exploratory Study of Stingball Grenades*, at 8-9 (2011).

[62] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[63] PPB Directive 1010.00 § 6.4.6.1(effective Jan. 2020).

[64] *Id.* at § 6.4.2.1.1, Definitions (effective Jan. 2020).

[65] *See, e.g.,* FN America, LLC, Less Lethal Projectiles, available at https://fnamerica.com/products/less-lethal/projectiles/; Defense Technology, 40MM Direct Impact Round, OC, CS, Inert and Marking Specification Sheet (revised June 2021).

[66] PPB Directive 1010.00 § 6.4.2.1.3 (effective Jan. 2020).

67 *Id.* at § 6.4.3.1.1, Definitions (effective Jan. 2020).

68 *Id.* at § 6.4.3.1.1 (effective Jan. 2020).

69 *Id.* at § 6.4.6.1.3 (effective Jan. 2020).

70 *Don't Shoot Portland, Nicholas Roberts, Michelle "Misha" Belden, and Alexandra Johnson v. City of Portland and Multnomah County,* 20-cv-00917, Opinion and Order § II (D. Or., Nov. 27, 2020).

71 National Policing Institute and U.S. Department of Justice Community Oriented Policing Services Office, *21st Century Protest Response: Promoting Democracy and Advancing Community and Officer Safety,* at 24 (2022).

72 IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper,* at 9 (Apr. 2019).

73 National Policing Institute and U.S. Department of Justice Community Oriented Policing Services Office, *21st Century Protest Response: Promoting Democracy and Advancing Community and Officer Safety,* at 24 (2022).

74 *Id.*

75 National Policing Institute and U.S. Department of Justice Community Oriented Policing Services Office, *21st Century Protest Response: Promoting Democracy and Advancing Community and Officer Safety,* at 24 (2022).

76 PPB Directive 1500.00 § 11.1 (effective Dec. 2018).

77 PPB RRT Standard Operating Procedure 9 – Training § B(1) (effective Feb. 2019).

78 *United States v. City of Portland,* 12-cv-02265, Settlement Agreement §§ 81-82 (D. Or., Dec. 17, 2012).

79 PPB Directive 1010 § Definitions, 1 (effective Jan. 2020).

80 Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned,* at 37 (2018).

81 PPB Directive 1010 § Definitions, 6.4.3.1.1 (effective Jan. 2020).

82 *Id.* at Definitions, 6.4.1.1.1 (effective Jan. 2020).

83 *Id.* at § Definitions (effective Jan. 2020).

84 *Don't Shoot Portland, Nicholas Roberts, Michelle "Misha" Belden, and Alexandra Johnson v. City of Portland and Multnomah County,* 20-cv-00917, Opinion and Order § II (D. Or., Nov. 27, 2020).

85 In its report about the PPB response to the 2020 protests and riots, the Citizen Review Committee ("CRC") presented a similar finding, identifying a lack of training in proportional response to resistance. Citizen Review Committee, *Portland Protests 2020: Citizen Review Committee Summary and Recommendations,* at 8 (2021).

86 IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper,* at 9 (Apr. 2019).

87 IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper,* at 9 (Apr. 2019). National Policing Institute and U.S. Department of Justice Community Oriented Policing Services Office, *21st Century Protest Response: Promoting Democracy and Advancing Community and Officer Safety,* at 25 (2022).

88 National Tactical Officers Association, *Public Order Response and Operations Standards,* at 37 (June 2023).

89 Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned,* at 37 (2018).

90 *Id.*

91 *Id.* at 38.

92 *Id.*

93 Similarly, the CRC report identified a need for increased de-escalation and anti-bias training. Citizen Review Committee, *Portland Protests 2020: Citizen Review Committee Summary and Recommendations,* at 8, 16-21 (2021).

[94] *United States v. City of Portland*, 12-cv-02265, Plaintiff's Unopposed Motion to Amend the Amended Settlement agreement (D. Or., Feb. 25, 2022).

[95] PPB Directive 0635.10 § 7.4 (effective Jan. 2023).

[96] *Id.* at § 14.1.6 (effective Jan. 2023).

[97] *Id.* at § 9.3.4 (effective Jan. 2023).

[98] *Id.* at § 8.4.2.2.2 (effective Jan. 2023).

[99] PPB directives use the "avoid the use of a higher level of force" phrase when discussing Conducted Electrical Weapons, or tasers, but officers are generally prohibited from using these for crowd management. PPB, Directive 1015.00 § 7.2.4 (effective Nov. 2022); PPB, Directive 0635.10 § 9.3.1 (effective Jan. 2023).

[100] This addition does not need to be included in the PPB Use of Force Directive, which has recently been revised to focus on the Graham Standard rather than more detailed discussions about when specific types of force can be used. It could appear in the Public Order Directive near sections that provide additional, specific guidance about the use of tear gas, OC spray, and impact munitions. PPB Directive 0635.10 §§ 9.3.4, 9.5 (effective Jan. 2023).

[101] PPB Directive 0635.10 § 14.5.4 (effective Jan. 2023).

[102] *Id.* at §§ 14.4.6, 14.4.6.1, 14.4.7 (effective Jan. 2023).

[103] Portland City Council, Resolution 37520 – Direct the Portland Police Bureau to Inventory its Crowd Control Tools (filed Dec. 1, 2020).

[104] PPB Directive 0910.00 §§ 5.11, 5.7 (effective Nov. 2022).

[105] PPB Directive 0910.00 §§ 5.5, 5.9 (effective Nov. 2022).

[106] The City has already received certain feedback from the Citizen Review Committee's Crowd Control and Use of Force Workgroup, which the City should make attempts to integrate to the extent possible. *See Portland Protests 2020: Citizen Review Committee Summary and Recommendations*, CRC Crowd Control and Use of Force Workgroup, dated September 2021.

[107] *See* PPB Directive 0635.10 (effective Aug. 2017).

[108] *See* PPB Directive 0635.10, Portland Police Bureau Response to Public Order Events § 16.1.18. (requiring that for extended crowd control events, the incident commander must complete an after-action review within 60 days of the conclusion of the event. Moreover, the incident commander should "hold a formal debrief of the event to discuss the overall plan, tactics, staffing and areas of improvement. The debrief should include key supervisory member participants in the event"). *See also Id.* § 16.3.1 (requiring "the lead supervisor of each squad that took police action [to] conduct a debriefing of the incident with their personnel and document it in their police report.").