Pilar C. French, OSB No. 962880
frenchp@ballardspahr.com
**BALLARD SPAHR LLP**
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204-3158
Telephone: 503.778.2100
Facsimile: 503.778.2200

Donald K. Sherman, *Pro Hac Vice Forthcoming*
dsherman@citizensforethics.org
Nikhel S. Sus, *Pro Hac Vice Forthcoming*
nsus@citizensforethics.org
Alex M. Goldstein, *Pro Hac Vice Forthcoming*
agoldstein@citizensforethics.org
**CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON**
1331 F Street, NW, Suite 900
Washington, D.C. 20004
Telephone: 202.408.5565

Attorneys for Amicus Curiae Mark A. Graber

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON and the CITY OF PORTLAND,<br><br>                    Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>                    Defendants. | Case No. 3:25-cv-01756-SI<br><br>**BRIEF OF AMICUS CURIAE PROFESSOR MARK A. GRABER** |

BRIEF OF AMICUS CURIAE PROFESSOR MARK A. GRABER

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

STATEMENT OF INTEREST ....................................................................................................... 1

SUMMARY OF ARGUMENT ....................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.      The Historical Lineage of 10 U.S.C. § 12406. ............................................................. 2

II.     History and Precedent Confirm That Domestic Use of Federal Troops Is a Last Resort, Reserved for Emergency Situations Where the Civil Power Is Inoperative. ... 4

        A.      Early American history and the Constitution's Militia Clauses reflect an aversion to domestic deployment of federal troops absent extreme, warlike conditions. ............................................................................................... 4

        B.      The text and history of the Militia Act of 1903, shows that its purpose was to prepare servicemembers for military combat, not domestic law enforcement.. 6

III.    The Predicate Conditions for Federalizing the National Guard—Invasion, Rebellion, or Presidential Inability to Execute the Laws With the Regular Forces—Were Historically Understood to Require Warlike Circumstances Where the Civil Power Was Inoperative. ........................................................................................................... 9

        A.      Invasion. ............................................................................................................. 9

        B.      Rebellion. ......................................................................................................... 10

        C.      Presidential inability to execute the laws of the United States with regular forces. ............................................................................................................... 12

                1.      The Militia Clause and early American history. ................................... 13

                2.      Common law and judicial precedents. .................................................. 14

IV.     History and Precedent Confirm That Courts Have Authority to Determine Whether the Predicate Conditions Exist for the President to Call the National Guard Into Federal Service. ........................................................................................................................ 16

        A.      The text and history of the Militia Act of 1903, show that Congress did not vest in the president unreviewable discretion to determine whether the conditions for federalizing state militias exist. ................................................. 16

        B.      Nineteenth century Supreme Court precedents required courts to determine when the federal army or state militia could be used for law enforcement. ..... 17

        C.      *Martin v. Mott* is readily distinguishable and limited to its facts. ................... 19

Conclusion ................................................................................................................................... 20

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

# TABLE OF AUTHORITIES

## Cases

*Aetna Ins. Co. v. Boon*,
  95 U.S. 117 (1877)................................................................................11

*The Amy Warwick*,
  67 U.S. 635 (1862) .....................................................................11, 12, 15

*Bean v. Beckwith*,
  85 U.S. 510 (1873).....................................................................12, 16, 18

*In Re Debs*,
  158 U.S. 564 (1895).........................................................................18, 19

*Duncan v. Kahanamoku*,
  327 U.S. 304 (1946)...............................................................................16

*G.F.F. v. Trump*,
  781 F. Supp.3d 195 (S.D.N.Y. 2025)......................................................10

*Laird v. Tatum*,
  408 U.S. 1 (1972)...............................................................................5, 16

*Loving v. United States*,
  517 U.S. 748 (1996)............................................................................5, 6

*Martin v. Hortin*,
  64 Ky. 629 (1865).................................................................................11

*Martin v. Mott*,
  25 U.S. 19 (1827).....................................................................16, 19, 20

*Ex parte Milligan*,
  71 U.S. 2 (1866)........................................................................... *passim*

*Newsom v. Trump*,
  141 F.4th 1032 (9th Cir. 2025) ...............................................................3

*Padavan v. U.S.*,
  82 F.3d 23 (2d Cir. 1996).......................................................................10

*Perpich v. Dep't of Def.*,
  496 U.S. 334 (1990).................................................................................6

*State of California v. U.S.*,
  104 F.3d 1086 (9th Cir. 1997) ................................................................10

*State of New Jersey v. U.S.*,
  91 F.3d 463 (3d Cir. 1996)......................................................................10

*Sterling v. Constantin*,
  287 U.S. 378 (1932)...............................................................................19

*United States v. Irwin*,
  127 U.S. 125 (1888)...............................................................................11

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

*United States v. Rahimi*,
    602 U.S. 680 (2024)..................................................................6

*United States v. Texas*,
    719 F. Supp.3d 640 (W.D. Tex. 2024).....................................10

*W.M.M. v. Trump*,
    No. 25-10534, 2025 WL 2508869 (5th Cir. Sept. 2, 2025) ...................10

**Statutes**

10 U.S.C.
    § 12406......................................................................*passim*
    § 12406(2)..........................................................................3
    § 12406(3)..........................................................................3

Dick Act, ch. 196
    § 12..............................................................................8, 14
    § 13..................................................................................8
    § 25, 32 Stat. 775 (1903).....................................................3, 8

Insurrection Act of 1807, ch. 39, 2 Stat. 443 .......................................3

Militia Act of 1792, ch. 28, § 1, 1 Stat. 264..................................2, 3, 6

Militia Act of 1795, ch. 36 § 1-2, 1 Stat. 424 ......................................3

Suppression of the Rebellion Act of 1861, ch. 25, § 1, 12 Stat. 281 ..........3, 17

**Constitutional Provisions**

U.S. CONST. amend. III .............................................................5

U.S. CONST. art. I, § 8 ...............................................................2

U.S. CONST. art. I, § 8, cl. 12 .......................................................5

U.S. CONST. art. I, § 8, cl. 15 ...............................................2, 5, 6, 13

U.S. CONST. art. I, § 8, cl. 16 .......................................................2

U.S. CONST. art. II, § 2 ..............................................................5

U.S. CONST. art. IV, § 4 .............................................................5

**Other Authorities**

Brutus 4 (November 29, 1787)........................................................13

*Citizen Soldiers Pleased*, PLAIN DEALER (Jan. 16, 1903).............................7

THE DECLARATION OF INDEPENDENCE ¶ 14 (U.S. 1776) ...............................4

*"Dick Militia Bill,"* THE MONTGOMERY ADVERTISER (May 15, 1903)....................9

EDWARD COKE, THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND, OR, A
    COMMENTARY UPON LITTLETON, 249 (William Rawlins and Samuel Roycroft ed.,
    London 1703, 10th ed. ......................................................14

*For 'A Well-Regulated Militia,'* N.Y. TIMES (Jan. 30, 1902) ........................7

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Frank O. Bowman III, *Immigration Is Not an "Invasion" under the Constitution*, JustSecurity (Jan. 29, 2024), https://www.justsecurity.org/91543/immigration-is-not-an-invasion-under-the-constitution ...................................................................................10

FREDERICK T. WILSON, FEDERAL AID IN DOMESTIC DISTURBANCES, 1903-22, S. Doc. No. 67-263 (1922) .......................................................................................................6

G. David Crocker, et al., *South Carolina Judge Advocates of the United States Reserve, South Carolina National Guard and South Carolina State Guard*, SOUTH CAROLINA LAWYER (Jan. 2019) ............................................................................................7

General Henry Halleck, *Elements of International Law and Laws of War* (1866)......................10

George Washington, "Proclamation-Cessation of Violence and Obstruction of Justice in Protest of Liquor Laws in Pennsylvania," August 7, 1794, https://www.presidency. ucsb.edu/documents/proclamation-cessation-violence-andobstruction-justice-protest-liquor-laws-pennsylvania ..........................................................................................13

H.W. HALLECK, ELEMENTS OF INTERNATIONAL LAW AND LAWS OF WAR, 151 (J.S. Lippincott & Co.: Philadelphia, PA, 1866 ...........................................................11

The Federalist No. 29 (Alexander Hamilton) (1788) ..................................................................13

John Adams, "Third Annual Address to Congress," Dec. 3, 1799, https://www.presidency.ucsb.edu/documents/third-annual-addresscongress ..........................13

Insurrection, DR. WEBSTER'S UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE (London, Bell & Daldy 1865) ............................................................................12

James Buchanan, "Proclamation-Rebellion in the Territory of Utah," April 6, 1858, https://www.presidency.ucsb.edu/documents /proclamation-rebellion-the-territoryutah ........11

JAMES KENDALL HOSMER, SAMUEL ADAMS, 324 (Boston New York, Houghton Mifflin 1913) ...................................................................................................................4

James Parker, *The Militia Act of 1903*, 177 N. AM. REV. 278 (1903) ...........................................7

James Stuhltrager, *Send in the Guard: The National Guard Respond to Natural Disasters*, 20 NATIONAL RESOURCES & ENVIRONMENT 21 (2006) ...............................................7

Jonathan Elliot, *Debate Before the Convention of the Commonwealth of Virginia*, 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FED. CONST. 378 (statement of James Madison) ..............................................................5

Library of Congress, The War of 1812 https://www.loc.gov/item/today-in-history/june-18/ ......................................................................................................................20

MICHAEL J. KLARMAN, THE FRAMERS' COUP: THE MAKING OF THE UNITED STATES CONSTITUTION (Oxford University Press 2016) .....................................................11

*National Guard Officers to Be Kept in Touch With War Ways*, TRENTON TIMES (Apr. 15, 1903) ...................................................................................................................7

*National Guard Reform*, SALT LAKE TELEGRAM (Feb. 1, 1902) ...................................................7

*National Guard*, WILKES-BARRES TIMES (Jan. 18, 1902) ..............................................................7

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*Newsom v. Trump*, 3:25-cv-04870, Mot. Temp. Rest. Order, Ex. O (N.D. Cal. 2025) ...................4

The Report of 1800, (January 7, 1800) (Madison) .........................................................................10

ROBERT W. COAKLEY, THE ROLE OF THE FEDERAL MILITARY FORCES IN DOMESTIC DISORDERS, 1789-1878 (David F. Trask, et al.,1988) ...................................................5

*Root Favors the Canteen*, THE CLEVELAND LEADER, at 8 (Dec. 1, 1902) ......................................7

Stephen I. Vladeck, *Emergency Power and the Militia Acts*, 114 YALE L.J. 149 (2004) .............17

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

Exhibit A
Page 6

## STATEMENT OF INTEREST[1]

Mark A. Graber is the Regents Professor in the University System of Maryland, a Distinguished University Professor, University of Maryland, Baltimore, and a Professor of Law at the University of Maryland Francis King Carey School of Law. Professor Graber is the seventh person to hold the Regents Professorship, which is the highest honor in the University of Maryland System. Professor Graber has taught constitutional law for over 30 years, with a specialty in American Constitutional Development. He has researched and written about the historical understanding of "rebellion," "insurrection," and related concepts, both in the pre- and post-Civil War eras. He has published 15 books and anthologies, and over 100 articles, including in peer-reviewed history journals. His most recent book is *Punish Treason, Reward Loyalty: The Forgotten Goals of Constitutional Reform After the Civil War* (University Press of Kansas, 2023).

Professor Graber has a strong interest in ensuring the Court has accurate historical information about the Militia Acts and the predicate conditions allowing a president to federalize state militias. This brief provides details, not relayed in the parties' briefing, about the origins of the Militia Acts; the historical understandings of what constituted an invasion, a rebellion, and an uprising that renders the president unable to execute the laws; and federal courts' authority to determine whether the conditions allowing federalization of a state militia exist.

## SUMMARY OF ARGUMENT

The Militia Act of 1903—the statutory predecessor of 10 U.S.C. § 12406—was historically understood to authorize the president to federalize state militias only in response to a war or warlike conditions. The law permits the president to call state militias into federal service only when a large armed force is engaged in an invasion, a rebellion, or a substantial uprising that cannot be contained by ordinary forces under the president's command and that prevents federal courts from

---

[1] *Amicus* states no counsel for a party authored the brief in whole or in part. No party, party's counsel, person or entity other than amicus made any monetary contribution to the preparation or submission of this brief. Counsel for parties in this proceeding have provided consent to filing of an amicus brief.

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

operating. The Militia Act of 1903, was designed to respond to that level of crisis. Nothing in the Act's text or history allows the president to federalize a state national guard in response to sporadic violence during otherwise peaceful protests that do not incapacitate the courts or the execution of federal laws as a whole.

Historical and judicial precedents make clear that courts are empowered—and indeed obligated—to review whether the predicate conditions for the president to federalize state militias exist. Supreme Court decisions from the 19th century emphatically rejected the notion of unreviewable presidential discretion to deploy the military on American soil, dismissing the argument as repugnant to our founding principles. As the Court explained, accepting that the military could be used for regular law enforcement would mean "republican government is a failure" and would mark the "end of liberty regulated by law."[2] Those words ring just as true today as they did in 1866.

The court should grant Plaintiff's Motion for a Temporary Restraining Order.

## ARGUMENT

### I.     The Historical Lineage of 10 U.S.C. § 12406.

Our Constitution vests in Congress, not the president, the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions."[3] In the Militia Act of 1792, Congress delegated this "calling forth" authority to the president in limited circumstances that mirrored the Militia Clause.[4] Section 1 of that Act allowed the president to call forth the militia in cases of insurrection and invasion.[5] Section 2 dealt with situations when "the laws of the United States shall be opposed, or the execution thereof obstructed, in any state,

---

[2] *Ex parte Milligan*, 71 U.S. 2, 124-25 (1866).

[3] U.S. CONST. art. I, § 8, cl. 15 (hereinafter "the Militia Clause"). The Constitution includes a second militia clause that is not directly implicated here. *See id.* cl. 16 (empowering Congress "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States").

[4] Militia Act of 1792, ch. 28, § 1, 1 Stat. 264, 264.

[5] *Id.*

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

by combinations too powerful to be suppressed by the ordinary course of judicial proceedings" and required a federal judge to notify the president before he could call forth the state militia.[6]

Congress renewed this delegation in the Militia Act of 1795,[7] and supplemented it in the Insurrection Act of 1807.[8] Congress further amended the law in 1861, in the leadup to the Civil War, including by explicitly including "rebellion" in the list of warlike conditions for which the president could call forth the militia.[9]

The Militia Act of 1903 (also known as the Dick Act), overhauled the federal statutory scheme for state militias.[10] Section 4 of that Act formalized the president's authority to call forth the state militias "whenever the United States is invaded, or in danger of invasion from any foreign nation, or of rebellion against the authority of the Government of the United States, or the President is unable, with the other forces at his command, to execute the laws of the Union in any part thereof."[11] The Militia Act of 1903, was the "precursor" to the statute at issue here, 10 U.S.C. § 12406.[12]

On September 27, 2025, President Trump posted on Truth Social, directing Secretary of Defense Pete Hegseth to "provide all necessary Troops" to Portland.[13] The next day, Secretary Hegseth issued a memorandum calling the Oregon National Guard into federal service as a "further implement[ation]" of President Trump's June 7, 2025 memorandum invoking § 12406, on the grounds that protests in Portland constitute a "rebellion" and because Trump is purportedly "unable with the regular forces to execute the laws of the United States."[14] This is the second time that

---

[6] *Id.* § 2.
[7] Militia Act of 1795, ch. 36 § 1-2, 1 Stat. 424, 424.
[8] Insurrection Act of 1807, ch. 39, 2 Stat. 443, 443.
[9] Suppression of the Rebellion Act of 1861, ch. 25, § 1, 12 Stat. 281, 281.
[10] *See* Dick Act, ch. 196, § 25, 32 Stat. 775, (1903).
[11] *Id.* at 776.
[12] *See Newsom v. Trump*, 141 F.4th 1032, 1047 (9th Cir. 2025).
[13] *See* Decl. of Brian Marshall, Ex. 12 (Dkt. No. 9-12).
[14] *See* Compl. Ex. 2 (Dkt. No. 1-2); 10 U.S.C. § 12406(2), (3).

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

President Trump has invoked § 12406 to call a state's national guard troops into federal service, having previously done so in response to protests in Los Angeles.[15]

As detailed below, the President's extraordinary actions find no support in American history or judicial precedent. Our legal tradition reflects a deep-rooted understanding that the president can federalize a state militia only in response to a truly grave threat creating warlike conditions that ordinary forces under the president's command cannot contain, and that causes federal courts to close. The sporadic violence during otherwise peaceful protests in Portland comes nowhere close to meeting that high bar.[16]

## II. History and Precedent Confirm That Domestic Use of Federal Troops Is a Last Resort, Reserved for Emergency Situations Where the Civil Power Is Inoperative.

### A. Early American history and the Constitution's Militia Clauses reflect an aversion to domestic deployment of federal troops absent extreme, warlike conditions.

America's founders widely shared the belief that the military, including the state militias, should not engage in domestic law enforcement, except under extreme conditions that rendered civil law inoperative. To the founding generation, the military was an instrument of war, whose purpose was to confront or deter rival armed forces. On the Fifth Anniversary of the Boston Massacre, founding-era leaders spoke of "the ruinous tendency of standing armies being placed in free and populous cities in times of peace."[17] The Second Continental Congress condemned King George III's practice of using the military to enforce civil matters, writing in the Declaration of Independence, "[h]e has affected to render the Military independent of and superior to the Civil power."[18]

Critical provisions of the Constitution were inspired by the Crown's overzealous use of the

---

[15] *See Newsom v. Trump*, 3:25-cv-04870, Mot. Temp. Rest. Order, Ex. O (N.D. Cal. 2025) ("Memorandum for Adjutant General of the California National Guard Through: The Governor of California").

[16] *See generally* Decl. of Craig Dobson (Dkt. No. 7).

[17] JAMES KENDALL HOSMER, SAMUEL ADAMS, 324 (Boston New York, Houghton Mifflin 1913).

[18] THE DECLARATION OF INDEPENDENCE ¶ 14 (U.S. 1776).

PAGE 4 – BRIEF OF AMICUS CURIAE PROFESSOR MARK A. GRABER

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Exhibit A
Page 10

British standing army in colonial America and are designed to restrict use of the military for domestic law enforcement.[19] Most notably, under the Guarantee Clause, unless a state is invaded, the president may deploy the military to a state only "on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."[20] The Militia Clause was not understood as enabling the federal government to circumvent the Guarantee Clause's sharp restriction on the use of troops to quell violence on U.S. soil.[21]

The framing debates around the Militia Clause reflect the common understanding that the militia could be federalized only in extreme circumstances. Historians agree that "no power to use regular forces in domestic disorders was explicitly granted to either the president or Congress," which was "testimony to the fear of standing armies that pervaded" debates over the Militia Clause.[22] The records of state ratifying conventions show that the Militia Clause was intended to apply only when the civil law was inoperative and the courts were not functioning. Those who framed and ratified the Constitution recognized that the Militia Clause did not grant broad authority to deploy the militia when the civil power was operational.

James Madison, in response to concerns that the Militia Clause's reference to "execut[ing] the Laws of the Union" might sweep too broadly, explained it would apply only in "cases in which the execution of the laws may require the operation of militia, which cannot be said to be an invasion or insurrection," but which "the civil power might not be sufficient to quell."[23] During

---

[19] *See, e.g.*, U.S. CONST. amend. III (barring quartering of soldiers); *id.* art. I, § 8, cl. 12 (limiting standing armies and military funding); *id.* art. II, § 2 (ensuring civilian control of the military); *see also Laird v. Tatum*, 408 U.S. 1, 15 (1972) (describing the "Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and [. . .] the constitutional provisions for civilian control of the military" as examples of the "traditional and strong resistance of Americans to any military intrusion into civilian affairs"); *Loving v. United States*, 517 U.S. 748, 760 (1996) ("[H]aving experienced the military excesses of the Crown in colonial America, the Framers harbored a deep distrust of executive military power and military tribunals.").

[20] U.S. CONST. art. IV, § 4.

[21] *Id.* art. I, § 8, cl. 15.

[22] ROBERT W. COAKLEY, THE ROLE OF THE FEDERAL MILITARY FORCES IN DOMESTIC DISORDERS, 1789-1878, 14 (David F. Trask, et al.,1988).

[23] Jonathan Elliot, *Debate Before the Convention of the Commonwealth of Virginia*, 3 THE

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Virginia's Ratifying Convention, one individual explained that "the military power ought not to interpose till the civil power refuse."[24] Another individual rejected the notion that the Militia Clause "implies that, instead of using civil force in the first instance, the militia are to be called forth to arrest petty offenders against the laws," explaining: "Does [the clause] provide that the laws are to be enforced by military coercion in all cases? No, sir. All that we are to infer is that when the civil power is not sufficient, the militia must be drawn out."[25] The first federal statute implementing the Militia Clause, the Militia Act of 1792, codified this understanding.[26]

Founding-era evidence concerning the meaning of the Militia Clause bears directly on this case. "It is undisputed that Congress was acting pursuant to the Militia Clauses of the Constitution in passing the Dick Act"[27] and its successor statute, 10 U.S.C. § 12406. And Congress, of course, may only delegate to the president that "authority that it could exercise itself" and such delegations set "boundaries the President may not exceed."[28] President Trump's exercise of his delegated "calling forth" power under § 12406 must therefore be understood and limited based on the history of the Militia Clause.[29]

### B. The text and history of the Militia Act of 1903, shows that its purpose was to prepare servicemembers for military combat, not domestic law enforcement.

Government officials and newspaper commentary in the period around the Militia Act of 1903, described the Act's purpose as preparing state forces for military combat in war. Domestic

---

DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FED. CONST. 378, 410-412 (statement of James Madison).

[24] FREDERICK T. WILSON, FEDERAL AID IN DOMESTIC DISTURBANCES, 1903-22, S. Doc. No. 67-263, 19 (1922) (citing the Virginia Ratifying Convention, 1788, statement of Mr. Henry).

[25] *Id.* at 20 (statement of Governor Randolph) (emphasis added).

[26] *See* Militia Act of 1792, ch. 28, § 1, 1 Stat. 264, 264.

[27] *Perpich v. Dep't of Def.*, 496 U.S. 334, 342 (1990).

[28] *Loving*, 517 U.S. at 772.

[29] *See United States v. Rahimi*, 602 U.S. 680, 719, 724 (2024) (Kavanaugh, J., concurring) (recognizing that the "pre-ratification … stated intentions and understandings of the Framers and Ratifiers of the Constitution" can provide "strong evidence of [the] meaning" of "constitutional text," and that "[p]ost- ratification interpretations and applications by government actors" can likewise "be probative of … meaning").

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

law enforcement was not a stated purpose.

Secretary of War Elihu Root in his annual report to the president in 1902, described the law as ensuring "preparation in advance for the organization of volunteers in time of war."[30] Newspaper commentary emphasized the National Guard as a potential military force. As the *Salt Lake Telegram* reported, "[g]uns and equipment will be given them which can be used against the trained armies of foreign nations in the event of such use becoming necessary."[31] *The New York Times* reported that one objective of the Militia Act was to "bring about a harmonious co-operation between [the organized militia] and the regular army in preparation for war."[32]

The Militia Act of 1903, was primarily a response to the failures of the state militias during the Spanish-American War. James Parker writing in the *North American Review*, a prominent journal of the time, in 1903, explained that the law's "paramount value" is "to evolve a competent system of defense."[33] James Stuhltrager noted that "Congress passed the Militia Act of 1903," after the "long mobilization period to prepare for the Spanish-American War demonstrated that states' militias . . . were unprepared for modern warfare."[34] Contemporary commentary does not support the notion that the Militia Act was meant to improve domestic law enforcement or authorize deployment on U.S. soil absent warlike conditions.

---

[30] *Root Favors the Canteen*, THE CLEVELAND LEADER, at 8 (Dec. 1, 1902) (quoting the annual report of the Secretary of War).

[31] *National Guard Reform*, SALT LAKE TELEGRAM, at 4 (Feb. 1, 1902).

[32] *For 'A Well-Regulated Militia,'* N.Y. TIMES, at 8 (Jan. 30, 1902).

[33] James Parker, *The Militia Act of 1903*, 177 N. AM. REV. 278, 286 (1903); *see also National Guard*, WILKES-BARRES TIMES, at 4 (Jan. 18, 1902) ("the militia should be capable of addition and harmonious adjustment in time of war"); *Citizen Soldiers Pleased*, PLAIN DEALER, at 10 (Jan. 16, 1903) (bill makes the National Guard "a branch of the country's defensive force"). A headline in the *Trenton Times* also captured the purpose of the Militia Act. *National Guard Officers to Be Kept in Touch With War Ways*, TRENTON TIMES, at 10 (Apr. 15, 1903).

[34] James Stuhltrager, *Send in the Guard: The National Guard Respond to Natural Disasters*, 20 NATIONAL RESOURCES & ENVIRONMENT 21, 21 (2006); *see also* G. David Crocker, et al., *South Carolina Judge Advocates of the United States Reserve, South Carolina National Guard and South Carolina State Guard*, SOUTH CAROLINA LAWYER, at 48 (Jan. 2019) ("the Spanish-American War of 1898 demonstrated the difficulties of integrating militia and federal military units in an age of mechanized warfare. The Militia Act of 1903 addressed these problems. . .").

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

The various sections of the Militia Act of 1903, affirm that its overarching purpose was to prepare members of the state national guards for military combat, not domestic law enforcement. Section 2 exempts from militia service "any member of any well-recognized religious sect . . . whose creed forbids its members to participate in war in any form."[35] Section 3 declares that "the organization, armament, and discipline of the organized militia in the several States . . . shall be the same as that which is now or may hereafter be prescribed for the Regular and Volunteer Armies of the United States."[36] Section 13 mandates arming the militia with the same equipment "required for the Army of the United States."[37] Members of the state militia are subject to court-martial and subject to the "Rules and Articles of War"[38] and must be "fit for military service."[39] Section 18 mandates that all state militias "furnished with material of war, . . . participate in practice marches or go into camp of instruction at least five consecutive days, and to assemble for drill and instruction."[40] Various provisions of the Militia Act prescribe important roles for the Secretary of War and War Department.[41] None provide for training on domestic law enforcement or speak of the Attorney General, the Justice Department, or any other federal officer or agency charged with law enforcement.

Section 4 of the Militia Act allows the president to federalize a militia only when "the United States is invaded, or in danger of invasion from any foreign nation, or of rebellion against the authority of the Government of the United States, or the President is unable, with the other forces at his command, to execute the laws of the Union in any part thereof."[42] That provision—

---

[35] *See* Dick Act, ch. 196, § 25, 32 Stat. 775, 775 (1903).

[36] *Id.*

[37] *Id.* at 777.

[38] *Id.* at 776.

[39] *Id*.

[40] *Id*. at 778.

[41] *See also* Dick Act, ch. 196, § 12 (requiring the appointment of Adjunct-Generals who will report to the Secretary of War on the strength of the organized militia); *id.* at § 13 (detailing how the Secretary of War shall arm the National Guard).

[42] Dick Act, ch. 196, § 25, 32 Stat. 775, 776 (1903).

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

which mirrors the modern-day 10 U.S.C. § 12406—was likewise understood as furthering the Act's purpose to better prepare the United States for war.

Section 4's predicate conditions for federalizing state militias all mirror warlike conditions and were understood as such. Secretary of War Root allayed concerns that the national guard might be federalized for law enforcement when the United States was not facing a military threat. When asked by a major in the Georgia National Guard whether the Act authorized the president to use state national guard in "the suppression of insurrections and strikes," Secretary Root answered that the duty of the state militia continued to be "defined by the constitution" and that "regular" forces, not the state militia, "would be employed" for "the suppression of insurrections and disturbances."[43] Root's words reflect the contemporary understanding that the Militia Acts were not designed to allow the militia to assist in "regular" law enforcement.

III. **The Predicate Conditions for Federalizing the National Guard—Invasion, Rebellion, or Presidential Inability to Execute the Laws With the Regular Forces—Were Historically Understood to Require Warlike Circumstances Where the Civil Power Was Inoperative.**

The three predicate conditions under which the president could call members of a state national guard into federal service under the Militia Act of 1903, comport with the historical understanding that federalization required extreme, warlike conditions. Each predicate condition—invasion, rebellion, and presidential inability to execute the laws with regular forces— reflects a serious incapacity of the civil power, far exceeding mere interference with law enforcement. History and precedent provide ample guidance on the meaning of these terms, so there are judicially manageable standards for determining whether the predicate conditions

A. **Invasion.**

When Congress passed the Militia Act of 1903, "invasion" was widely understood to refer to a large-scale military incursion into the territory of the United States by a foreign army. A survey of the usage of "invasion" in the early republic concluded that "the word invariably refers to a

---

[43] *"Dick Militia Bill,"* THE MONTGOMERY ADVERTISER, at 7 (May 15, 1903).

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

hostile armed incursion into or against the territory of the states or the nation, an incursion that must be met with a military response."[44] James Madison, when discussing the Alien Enemies Act of 1798, declared "invasion is an operation of war."[45] Importantly, an invasion justifies federalization of the militia because a hostile foreign army is not expected to be compliant with the civil law of the United States.

Federal courts understand an invasion to be an "armed hostility from another political entity."[46] These decisions often survey eighteenth and nineteenth century sources. For example, the Fifth Circuit recently held that the historical meaning of "invasion" under the Alien Enemies Act of 1798, refers to "an act of war involving the entry into this country by a military force of or at least directed by another country or nation, with a hostile intent."[47] Another court observed, "[t]he Constitution itself uses the term 'invasion' on three occasions, all of which occur within the context of military action by a foreign state against the territorial integrity of the United States."[48]

Although the question whether Oregon has been invaded is not at issue here, historical and legal authorities on that question shed light on the types of extreme events that justify federalizing a state's national guard.

## B. Rebellion.

Historically, a "rebellion" was understood as a massive uprising aimed at overthrowing the existing government. General Henry Halleck's 1866 *Elements of International Law and Laws of War*, for example, declares that "the term *rebellion* is applied to an insurrection of large extent or long duration, and is usually a war between the legitimate government of a State, and portions or

---

[44] Frank O. Bowman III, *Immigration Is Not an "Invasion" under the Constitution*, JustSecurity (Jan. 29, 2024), https://www.justsecurity.org/91543/immigration-is- not-an-invasion-under-the-constitution/ (summarizing decisions).

[45] The Report of 1800, (January 7, 1800) (Madison).

[46] *See State of California v. U.S.*, 104 F.3d 1086, 1091 (9th Cir. 1997); *Padavan v. U.S.*, 82 F.3d 23, 28 (2d Cir. 1996); *State of New Jersey v. U.S.*, 91 F.3d 463, 468 (3d Cir. 1996).

[47] *W.M.M. v. Trump*, No. 25-10534, 2025 WL 2508869, at *11 (5th Cir. Sept. 2, 2025); *see also United States v. Texas*, 719 F. Supp.3d 640, 680 (W.D. Tex. 2024).

[48] *G.F.F. v. Trump*, 781 F. Supp.3d 195, 211 (S.D.N.Y. 2025).

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

parts of the same, who seek to overthrow the government."[49] Broad agreement existed in 1903, that a "rebellion" was conducted by military forces composed of American citizens while an invading army was composed of foreigners.

Courts in the nineteenth century classified as a "rebellion" only massive uprisings aimed at overthrowing the existing government. The Supreme Court in 1877, defining "usurped military power," spoke of "an internal armed force in rebellion, sufficient to supplant the laws of the land and displace the constituted authorities."[50] Courts in the 1860s, and afterwards, routinely identified the Civil War as a rebellion. In *The Amy Warwick* (aka *The Prize Cases*) (1862), the Supreme Court described the Civil War as a rebellion and the Confederacy as "insurgents who have risen in rebellion against their sovereign, expelled her Courts, established a revolutionary government, organized armies, and commenced hostilities."[51] The Court also spoke of Shay's Rebellion, where Massachusetts farmers prevented the implementation of law by closing the local courts.[52] In *Ex parte Milligan*, the Court spoke of Dorr's Rebellion,[53] where Dorr assembled a military force committed to overthrowing the government of Rhode Island. In *United States v. Irwin* (1888), the Court spoke of the Mormon rebellion of 1857-58, during which Mormon militia attempted to drive all federal authorities out of Utah.[54] These cases demonstrate the high bar for what constituted a "rebellion" when the 1903 Militia Act was adopted.

"Rebellion" was commonly understood as something greater than an insurrection. Insurrections were understood as a radical act of force requiring a serious act of violence or

---

[49] H.W. HALLECK, ELEMENTS OF INTERNATIONAL LAW AND LAWS OF WAR, 151 (J.S. Lippincott & Co.: Philadelphia, PA, 1866); *see also Martin v. Hortin,* 64 Ky. 629, 633 (1865) (adopting definition).

[50] *Aetna Ins. Co. v. Boon*, 95 U.S. 117, 127 (1877).

[51] *The Amy Warwick*, 67 U.S. 635, 670 (1862).

[52] *Id.* at 690-91; *see* MICHAEL J. KLARMAN, THE FRAMERS' COUP: THE MAKING OF THE UNITED STATES CONSTITUTION, 88-101 (Oxford University Press 2016).

[53] *See Milligan*, 71 U.S. at 129.

[54] *United States v. Irwin*, 127 U.S. 125, 128 (1888); *see* James Buchanan, "Proclamation—Rebellion in the Territory of Utah," April 6, 1858, https://www.presidency.ucsb.edu/documents/proclamation-rebellion-the-territoryutah.

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

intimidation against the existing government. Rebellions were more sustained, more widespread, and required a far greater probability of success. As the Supreme Court explained in *The Prize Cases*, "[i]nsurrection against a government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the Government."[55] Webster's Dictionary in 1865, defined "insurrection" as "a rising up of individuals to prevent the execution of law by force of arms," "revolt," as "a casting off the authority of a government with a view to put it down by force," and "rebellion" as "an extended insurrection."[56]

Nineteenth century disorders that were not "insurrections of large extent or long duration" were not rebellions. The Supreme Court limited rebellions to the places in which the rebellion was actually occurring or where there was a genuine threat that the government might be overthrown.[57] The Court held that there was no rebellion in Vermont during the Civil War that would justify military authority to arrest and detain civilians where no "military operations were being carried on within its limits" the "courts of justice were . . . open there, and in the full and undisturbed exercise of their regular jurisdiction."[58]

In sum, rebellion was historically understood as an organized and substantial use of force against the authority of the government, with the intention and capability of overthrowing that authority. It required a significant scope and duration, akin to war against the government by its own citizens.

## C. Presidential inability to execute the laws of the United States with regular forces.

Whether the president is "unable, with the other forces at his command, to execute the laws of the Union in any part thereof" within the meaning of the 1903 Militia Act (or, in § 12406's

---

[55] *The Amy* Warwick, 67 U.S. at 666.

[56] Insurrection, DR. WEBSTER'S UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE, 702 (London, Bell & Daldy 1865).

[57] *Ex parte Milligan*, 71 U.S. at 124–25 (holding there was no rebellion in Indiana during the Civil War).

[58] *Bean v. Beckwith*, 85 U.S. 510, 514 (1873).

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

equivalent terms, "unable with the regular forces to execute the laws of the United States") depends on whether courts are open and judicial orders obeyed. Where civil law is operative and courts are functioning—as they are in Portland—this predicate condition does not exist and cannot justify federalizing state national guards.

### 1. The Militia Clause and early American history.

As noted above, founding-era evidence on the meaning of the Constitution's Militia Clause bears directly on the meaning of the Militia Acts and successor statutes. *See supra* Part II.A (explaining that Militia Acts and 10 U.S.C. § 12406 are limited delegations of Congress's "calling forth" power under the Militia Clause). The Constitution's framers believed the purpose of Congress's "calling forth" power was to provide military assistance to federal courts confronting violent uprisings that significantly interfered with their judicial duties. Alexander Hamilton declared that the provision was meant to ensure the "federal government can command the aid of the militia in those emergencies which call the military arm in support of the civil magistrate."[59] Brutus, the pen-name of an anti-Federalist who wrote in opposition to the Constitution, believed the provision unnecessary because he could not imagine that "the people would refuse to aid the civil magistrate in executing those laws they themselves had made."[60] No person during the debates over the framing or ratification of the Constitution appears to have stated a belief that the president could call forth the militia to engage in law enforcement when courts are open and judicial decrees obeyed. The nonfunctioning of the judiciary was similarly an important factor for early American presidents who invoked the Militia Acts in response to rebellions and similar activity.[61]

---

[59] The Federalist No. 29 (Alexander Hamilton) (1788).

[60] Brutus 4 (November 29, 1787).

[61] *See, e.g.*, George Washington, "Proclamation—Cessation of Violence and Obstruction of Justice in Protest of Liquor Laws in Pennsylvania," August 7, 1794, https://www.presidency. ucsb.edu/documents/proclamation-cessation-violence-andobstruction-justice-protest-liquor-laws-pennsylvania (finding during the Whiskey Rebellion that the "laws of the United States are opposed and the execution thereof obstructed by combinations too powerful to be suppressed by the ordinary course of judicial proceedings"); John Adams, "Third Annual Address to Congress,"

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

The historical emphasis on the availability of judicial process also explains Congress's consistent use of the plural when describing presidential inability to execute "the laws" (rather than "a law") in the Militia Acts and § 12406. When courts are closed, judicial process is unavailable for *any* claim of legal right. When courts are open and functioning, by contrast, judicial processes are available for determining whether those thought to be rebels or criminals have valid legal and constitutional claims.

### 2.      Common law and judicial precedents.

The common law and early American jurisprudence confirm that the functioning of the courts and availability of judicial process are key considerations in the use of emergency powers. The common law regarded the unavailability of legal process as the lynchpin for permitting the military to substitute or assist civil authorities. Edward Coke declared, "when by invasion, insurrection, rebellions, or such like, the peaceable course of justice is disturbed and stopped, so as the courts of justice be as it were shut up, *et silent leges inter arma*, then it is said to be time of warre."[62] Congress adopted this common law understanding when empowering the president to federalize state militia. Secretary of War Root informed the Georgia delegation that the Militia Act "did not change the status of the militiamen in respect to any service they might be called on to perform," that the "duties and control of the militiamen . . . remain as they have been for more than 100 years."[63] When extreme crises prevented the proper functioning of the courts, political actors, including the president, possessed broader leeway to invoke emergency powers.

American jurisprudence continued the common law focus on the availability of judicial process. In *The Prize Cases*, the Supreme Court adopted the following test from "the writings of

---

Dec. 3, 1799, https://www.presidency.ucsb.edu/documents/third-annual-addresscongress (justifying calling out the militia because "attempts by judicial process to enforce the execution of the law" were "hopeless").

[62] EDWARD COKE, THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND, OR, A COMMENTARY UPON LITTLETON, 249 (William Rawlins and Samuel Roycroft ed., London 1703, 10th ed.).

[63] *"Dick Militia Bill," supra* n. 41.

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

the sages of the common law" for determining whether a civil war exists: "When the regular course of justice is interrupted by revolt, rebellion, or insurrection, *so that the Courts of Justice cannot be kept open*, civil war exists, and hostilities may be prosecuted on the same footing as if those opposing the Government were foreign enemies invading the land."[64]

Similarly, in Ex *Parte Milligan*, a case concerning the constitutionality of trying civilians who resided beyond the boundary of the rebellion by military tribunal after the Civil War, the Supreme Court rejected presidential use of the military to engage in law enforcement when civil courts were open. It explained that military forces may not substitute for "civil authority" when those authorities are functioning.[65] The unanimous majority opinion in *Milligan* famously declared that if "the courts are actually closed, and it is impossible to administer criminal justice according to law … it is allowed to govern by martial rule until the laws can have their free course."[66] But, the Court added, "martial rule can never exist where *the courts are open, and in the proper and unobstructed exercise of their jurisdiction.*"[67]

The *Milligan* Court recognized that giving presidents unchecked discretion over when military forces could engage in domestic law enforcement functions threatened the rule of law and constitutional government in the United States. If the contrary position "is sound to the extent claimed," the Court wrote, then political actors could "substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules."[68] Justice Murphy echoed this sentiment in a later case concerning the invocation of martial law in Hawaii following the foreign attack on Pearl Harbor, writing that "[o]nly when a foreign invasion or civil war actually closes the courts and renders it impossible for them to administer

---

[64] *The Amy* Warwick, 67 U.S. at 667 (emphasis added).
[65] *Ex parte Milligan*, 71 U.S. at 127.
[66] *Id.*
[67] *Id.* (emphasis added).
[68] *Id.* at 124.

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

criminal justice can martial law validly be invoked."[69]

These principles govern all uses of military forces engaged in law enforcement. Justice Stephen Field in 1873, declared for a unanimous court that the military could not engage in law enforcement in the absence of proof that "any rebellion existed . . . or that any military operations were being carried on within [the jurisdiction] or that the courts of justice were not open . . . and in the full and undisturbed exercise of their regular jurisdiction."[70] These cases and others reflect the "traditional and strong resistance of Americans to any military intrusion into civilian affairs."[71]

The upshot is this: history, judicial precedent, and our founding principles teach that a president cannot demonstrate an inability to execute the laws, unless federal courts and the civil power are inoperative.

## IV. History and Precedent Confirm That Courts Have Authority to Determine Whether the Predicate Conditions Exist for the President to Call the National Guard Into Federal Service.

History and precedent confirm that courts have the authority and duty to decide whether the predicate conditions for federalizing a militia are met, and that this review requires no deference to the president. Federal courts have historically imposed limits on presidential power to use the military domestically for reasons inconsistent with common and constitutional law. Neither the text nor history of the Militia Act of 1903, support unreviewable or broad deference to the president on these questions. Furthermore, the presidential discretion recognized in *Martin v. Mott* is limited to its facts and was later narrowed by the Militia Act of 1903, and subsequent Supreme Court precedent.

### A. The text and history of the Militia Act of 1903, show that Congress did not vest in the president unreviewable discretion to determine whether the conditions for federalizing state militias exist.

The Militia Act of 1903, gives the president discretion to federalize state militia only when

---

[69] *Duncan v. Kahanamoku*, 327 U.S. 304, 326 (1946) (Murphy, J. concurring).

[70] *Bean*, 85 U.S. at 514.

[71] *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972).

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

at least one of three objective conditions exist. Nothing in the statute's text gives the president unreviewable discretion to determine whether the predicate conditions are met. The 1903 law sharply differed in this respect from its 1861 predecessor, which *did* confer some discretion to determine whether the triggering conditions for federalizing the state militia exist.[72] The 1861 statute empowered the president to federalize state militia:

> Whenever by reason of unlawful obstructions, combinations, or assemblages of persons, or rebellion against the authority of the Government of the United States, *it shall become impracticable, in the judgment of the President of the United States*, to enforce, by the ordinary course of judicial proceedings, the laws of the United States within any State or Territory.[73]

The 1903 Act removed "in the judgment of the President of the United States" from the statutory text, indicating Congress meant to *curtail* presidential discretion. That language remains absent in the current text of § 12406.

**B.      Nineteenth century Supreme Court precedents required courts to determine when the federal army or state militia could be used for law enforcement.**

The Supreme Court in the nineteenth century imposed clear constitutional limits on presidential power in cases involving use of the military for law enforcement. In *Ex parte Milligan*, the Court determined without any deference to the president that a presidential decision to impose martial law in parts of Indiana at the end of the Civil War was unconstitutional.[74] The unanimous opinion concluded that the conditions under which martial law might constitutionally be imposed were absent: Indiana was not being invaded, was not a site for rebellion, and its civil courts were open.[75] The majority opinion squarely rejected that the president had discretionary authority to determine that the military was needed for law enforcement when federal courts were functioning

---

[72] *See* Stephen I. Vladeck, *Emergency Power and the Militia Acts*, 114 YALE L.J. 149, 165 (2004).
[73] 12 Stat. 281, 281 (1861).
[74] *Ex parte Milligan*, 71 U.S. at 127.
[75] *Id.* at 121-22.

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

and federal judicial orders were being obeyed.[76] As the Court bluntly concluded, "[m]artial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction."[77] The justices during Reconstruction insisted this principle covered all uses of the military for law enforcement and not just martial law.[78]

*Milligan* explained how granting the president absolute discretionary power could easily be used to subvert constitutional democracy in the United States. If an executive's "exercise of his lawful authority cannot be restrained," the Court wrote, then he could "substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules."[79] The Court emphatically rejected such an expansive view of unchecked executive power, comparing it to the monarchical British rule that spurred the American Revolution. As it explained, if the government's position were accepted,

> republican government is a failure, and there is an end of liberty
> regulated by law. Martial law, established on such a basis, destroys
> every guarantee of the Constitution, and effectually renders the 'military
> independent of and superior to the civil power'—the attempt to do
> which by the King of Great Britain was deemed by our fathers such an
> offence, that they assigned it to the world as one of the causes which
> impelled them to declare their independence. Civil liberty and this kind
> of martial law cannot endure together; the antagonism is irreconcilable;
> and, in the conflict, one or the other must perish.[80]

The Supreme Court and individual justices in various post-Civil War cases decided after *Milligan*, determined without any deference to other governing officials that no rebellion or any other condition existed that augmented presidential or federal powers to use the military. Justice Field in *Bean* did not defer to any federal official when declaring no rebellion existed in Vermont in the wake of the Civil War.[81] The Court in *In re Debs* evinced no tendency to defer to the

---

[76] *Id.* at 127.

[77] *Id.*

[78] *Bean*, 85 U.S. 510.

[79] *Milligan*, 71 U.S. at 124.

[80] *Id.* at 124-25.

[81] *Bean*, 85 U.S. 510.

BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

president or Congress when rejecting counsel for the government's claim that a rebellion existed in Chicago during the 1894 Pullman strike.[82] And in *Sterling v. Constantin*, the Court again affirmed that an executive's invocation of emergency powers was reviewable because "the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, *are judicial questions*," and while it is "the emergency that gives the right, the emergency must be shown to exist before the taking can be justified."[83]

These cases amply demonstrate the late nineteenth and early twentieth century understanding that exercises of presidential emergency powers are subject to constitutional limits and ordinary principles of judicial review.

### C.     *Martin v. Mott* is readily distinguishable and limited to its facts.

*Martin v. Mott* does not provide the controlling historical or legal precedent to determine whether the existence of the predicate conditions of the Militia Act of 1903 (and its successor statutes), are subject to judicial review. That is so for several reasons.

First, as explained above, Supreme Court decisions from the Civil War to the turn of the twentieth century indicate that the broad language about presidential discretion to federalize state militias in some antebellum cases (including, but not limited to, *Martin*) was silently overruled or narrowed to the facts of those cases. The Court never cited *Martin* when, after the Civil War, the justices adjudicated lawsuits by civilians, claiming that presidential use of the military for law enforcement violated their constitutional rights. Rather, the Court granted the president no deference—let alone absolute deference—when federalizing a state militia raised constitutional concerns.

Second, there was no dispute in *Martin* that the triggering condition for federalizing the militia—the "invasion" by the British army during the War of 1812—existed. Congress had passed

---

[82] *In Re Debs*, 158 U.S. 564 (1895).
[83] *Sterling v. Constantin*, 287 U.S. 378, 401 (1932) (emphasis added).

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

a declaration of war that President Madison signed into law in June 1812.[84] Since the invasion was an undisputed matter of public record, the *Martin* Court had no occasion to address whether the president properly invoked his statutory "calling forth" power.

Third, *Martin* was a lawsuit brought by a member of the New York militia who objected to the president's decision to federalize his unit. The bulk of the opinion emphasized why the Militia Act of 1795, did not permit members of a state militia to file a lawsuit seeking to declare illegal a presidential decision to federalize the state militia.[85] Justice Story's opinion emphasized the practical problems that would result if state militiamen could object to their deployment during an invasion. While *Martin* is sometimes misleadingly quoted as declaring "the President the sole and exclusive judge whether the exigency has arisen," the full quotation is:

> Is the President the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the President are addressed, may decide for himself, and equally open to be contested by every militia-man who shall refuse to obey the orders of the President?[86]

Viewed in context, this passage stands for the unremarkable proposition that individual militia members cannot override the president's decision to activate a state militia. It has no bearing on *the courts'* authority to decide whether the conditions for federal activation exist.

## **CONCLUSION**

The Court should grant Plaintiff's Motion for a Temporary Restraining Order.

---

[84] *See Martin v. Mott*, 25 U.S. 19 (1827); Library of Congress, The War of 1812 https://www.loc.gov/item/today-in-history/june-18/.

[85] *Martin*, 25 U.S. at 28-32.

[86] *Id.* at 29-30.

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

DATED:  October 2, 2025

BALLARD SPAHR LLP

By: _s/ Pilar C. French_____
    Pilar C. French, OSB No. 962880
    Telephone: 503.778.2100

CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
    Donald K. Sherman, *pro hac vice forthcoming*
    Nikhel S. Sus, *pro hac vice forthcoming*
    Alex M. Goldstein, *pro hac vice forthcoming*
    Telephone: 202.408.5565

Attorneys for Amicus Curiae Mark A. Graber

PAGE 21 – BRIEF OF AMICUS CURIAE PROFESSOR MARK A.
    GRABER

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

Exhibit A
Page 27