BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (NE Bar No. 25886)
Deputy Assistant Attorney General
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
CHRISTOPHER D. EDELMAN (DC Bar No. 1033486)
Senior Counsel
BENJAMIN S. KURLAND (DC Bar No. 1617521)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: 202 514-3716
jean.lin@usdoj.gov
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON and the CITY OF PORTLAND,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*, in their official capacities,<br><br>*Defendants.* | Case No. 3:25-cv-01756-SI<br><br>**Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order** |

i

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

BACKGROUND ...................................................................................................................5

I.    Legal Background ......................................................................................................5

    A.    The National Guard System ..............................................................................5

    B.    The Posse Comitatus Act ..................................................................................6

II.   Factual Background ...................................................................................................7

PROCEDURAL HISTORY ....................................................................................................11

LEGAL STANDARD ...........................................................................................................11

ARGUMENT .....................................................................................................................11

I.    Plaintiffs Are Unlikely to Succeed on the Merits. ......................................................11

    A.    The President Reasonably Determined that Section 12406's Conditions Are Satisfied and that Decision Is Conclusive ..........................................................11

    B.    The President's Order is Consistent with the Tenth Amendment. ....................18

    C.    Plaintiffs Are Not Entitled to Injunctive Relief—Let Alone an Order Enjoining the Federalization and Deployment—on their PCA and 10 U.S.C. § 275 Claim ...................................................................................................20

    D.    Plaintiffs' APA Claim Fails. ..............................................................................28

    E.    Plaintiffs' Constitutional Claims Fail. ...............................................................29

II.   Plaintiffs Have Not Shown Irreparable Harm ...........................................................29

III.  The Remaining Factors Counsel Against Injunctive Relief. .......................................33

IV.   Any Injunctive Relief Should be Narrowly Tailored and Permit Lawful Agency Activity. ...................................................................................................................33

V.    If the Court Grants Any Relief, It Should Issue a Preliminary Injunction. ..................34

VI.   Any Injunctive Relief Should Be Stayed Pending Appeal and Accompany a Bond ..................35

CONCLUSION ...................................................................................................................35

# TABLE OF AUTHORITIES

## CONSTITUTION

U.S. Const. art. I, § 8, cl. 15 ..............................................................................5, 11, 24, 29

## CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) ..............................................................................................32

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...............................................................................29

*American School of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902) ................................................................................................22

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ..............................................................................................22

*Baker v. Carr*,
    369 U.S. 186 (1962) ..............................................................................................13

*Black Lives Matter D.C. v. Trump*,
    544 F. Supp. 3d 15 (D.D.C. 2021),
    *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). ......................21

*Bryan v. United States*,
    524 U.S. 184 (1998) ..............................................................................................27

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ..............................................................................................33

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..............................................................................................31

*Cunningham v. Neagle*,
    135 U.S. 1 (1890) ..................................................................................................25

*Dalton v. Specter*,
    511 U.S. 462 (1994) ..............................................................................................13

*East Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) .................................................................................34

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ...............................................................................14

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ....................................................................................28, 34

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.,*
   415 U.S. 423 (1974) .................................................................................................34

*In re Debs,*
   158 U.S. 564 (1895) .................................................................................................25

*In re Excel Innovations, Inc.,*
   502 F.3d 1086 (9th Cir. 2007) ..............................................................................33

*Index Newspapers LLC v. U.S. Marshals Serv.,*
   977 F.3d 817 (9th Cir. 2020) .................................................................................32

*Lewis v. Casey,*
   518 U.S. 343 (1996) .................................................................................................33

*Luther v. Borden,*
   48 U.S. (7 How.) 1 (1849) ...............................................................................12, 13

*Martin v. Mott,*
   25 U.S. (12 Wheat.) 19 (1827) .......................................................................12, 13

*National Federation of Independent Business v. Sebelius,* (NFIB),
   567 U.S. 519 (2012) .................................................................................................20

*New York v. United States,*
   505 U.S. 144 (1992) .................................................................................................19

*Newdow v. Roberts,*
   603 F.3d 1002 (D.C. Cir. 2010) ............................................................................34

*Newsom v. Trump,*
   141 F.4th 1032 (9th Cir. 2025) ......................................................................*passim*

*Newsom v. Trump,*
   --- F. Supp. 3d ---, 2025 WL 2501619 (N.D. Cal. 2025) .............................*passim*

*Nuclear Reg. Comm'n v. Texas,*
   605 U.S. 665 (2025) .................................................................................................14

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11,*
   393 U.S. 233 (1968) .................................................................................................14

*Perpich v. Dept. of Def.,*

496 U.S. 334 (1990) ............................................................................................5, 19

*Ratzlaf v. United States,*
510 U.S. 135 (1994) ..................................................................................................27

*Robinson v. Overseas Mil. Sales Corp.,*
21 F.3d 502 (2d Cir. 1994) ......................................................................................21

*Smith v. United States,*
293 F.3d 984 (7th Cir. 2002) ...................................................................................21

*Stuhlbarg Int'l Sales Co. Inc. v. John D. Brush & Co.,*
240 F.3d 832 (9th Cir. 2001) ...................................................................................11

*Sunshine Anthracite Coal Co. v. Adkins,*
310 U.S. 381 (1940) ..................................................................................................22

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ..................................................................................................22

*United States v. Comstock,*
560 U.S. 126 (2010) ..................................................................................................18

*United States v. Hatch,*
722 F.3d 1193 (10th Cir. 2013) ...............................................................................18

*United States v. Kahn,*
35 F.3d 426 (9th Cir. 1994) ...............................................................................6, 26

*United States v. Klimavicius–Viloria,*
144 F.3d 1249 (9th Cir. 1998) .................................................................................26

*United States v. Mousavi,*
604 F.3d 1084 (9th Cir. 2010) .................................................................................27

*United States v. Texas,*
599 U.S. 670 (2023) ..................................................................................................22

*United States v. Yunis,*
681 F. Supp. 891 (D.D.C. 1988),
*aff'd,* 924 F.2d 1086 (D.C. Cir. 1991).....................................................................25

*United States v. Yunis,*
924 F.2d 1086 (D.C. Cir. 1991).........................................................................6, 25

*Washington v. Trump,*
847 F.3d 1151 (9th Cir. 2017) .................................................................................11

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................................................11

## STATUTES

10 U.S.C. § 275 ..................................................................................................................*passim*

10 U.S.C. § 10101 ........................................................................................................................5

10 U.S.C. § 12406 ................................................................................................................*passim*

18 U.S.C. § 1385 ....................................................................................................6, 21, 23, 27

Act of Jan. 21, 1903, 32 Stat. 775 ..........................................................................................17

Act of May 2, 1792, 1 Stat. 264 ..............................................................................................17

Or. Rev. Stat. § 396.160 ............................................................................................................10

## COURT RULES

Fed. R. Civ. P. 65(c) ..................................................................................................................35

## REGULATIONS

Executive Order 11519, 35 Fed. Reg. 5003 (Mar. 24, 1970) .............................................24

## OTHER AUTHORITIES

@realDonaldTrump, Truth Social (Sept. 27, 2025 10:19 a.m.),
   https://truthsocial.com/@realDonaldTrump/posts/115276694936263266 .....................10

@realDonaldTrump, Truth Social (Oct. 1, 2025 1:36 p.m.), (Oct. 1 Truth)
   https://truthsocial.com/@realDonaldTrump/posts/115300118756896774 ............10, 11, 14

Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*,
   Washington Post (Aug. 29, 2025),
   https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trumptakeover- national-
   guard-impacts/ ..........................................................................................................................32

*Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and*
   *Consequent Impairment of Government Functions*, 1 Supp. Op. O.L.C. 343 (1971) ......................25

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the*
   *Military to Execute Civilian Law Version* 8 (updated Nov. 6 2018) ...............................6, 17, 18, 23

## INTRODUCTION AND SUMMARY OF ARGUMENT

Each federal law enforcement agency is populated by courageous men and women who accept some measure of personal risk in serving their country. But for officers within the Department of Homeland Security's Immigration and Customs Enforcement (ICE), that risk is extraordinarily severe at present. Cruel activists who disagree with Congress's and the Executive's policy judgments on immigration have resorted to vicious tactics to thwart and intimidate the public servants charged with executing Title 8. For the last 120 days, the ICE Enforcement and Removal Operations (ERO) field office in Portland has been the target of actual and threatened violence. Agitators have assaulted federal law enforcement officers with rocks, bricks, pepper spray and incendiary devices. They have damaged federal property, including by breaking office windows, security cameras, and card readers permitting entry to the building. They have spray-painted violent threats, blockaded the building's vehicle entrance, and followed vehicles leaving the facility. And they have threatened ICE officers at the facility (including by erecting a guillotine outside of the ICE office), menaced them at their homes, doxed them online, and threatened to kill them on social media.

The results have been stark. ICE was required to close its Portland office for three weeks. And because of the violence and threats by those who are opposed to enforcement of our immigration laws, the Department of Homeland Security's (DHS) Portland Special Response Team has been depleted, as it has been forced to reassign a significant portion of its personnel to protecting federal personnel and property seven days a week, to the exclusion of its many important law enforcement missions. DHS has requested assistance from the Portland Police Bureau, but those requests have gone largely unanswered. Last month, after the Portland office's windows were boarded up to prevent property damage and protect personnel, the City of Portland demanded the boards' removal with a Notice of Zoning Violation. All of this has created unacceptably dangerous conditions for the dedicated public servants who are faithfully carrying out their duties and who do not deserve the

attacks and threats they have been facing on a nearly constant basis in Portland.

President Trump campaigned on a promise to protect law enforcement, and since taking office, the Administration has made the safety of officers a priority. Thus, two days after a sniper murdered two people at another ICE facility, DHS requested protective support for the Portland ICE office where risks have been especially high for months. DHS sought "immediate and sustained assistance from the Department of War (DoW) in order to safeguard federal personnel, facilities, and operations in the State of Oregon," "including those directly supporting [ICE] and the Federal Protective Service (FPS)," which "have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement action." The President agreed to grant the request. DoW originally responded by asking Oregon Governor Tina Kotek to mobilize 200 members of the Oregon National Guard under Title 32 of the U.S. Code. In that scenario, the Guardsmen would have been federally funded but under the command and control of Governor Kotek. But Governor Kotek refused. The Secretary of War then directed the mobilization in a federalized Title 10 status.

This deployment is tailored to the threat in Portland. Whereas 4,000 Guardsmen were federalized in Los Angeles to provide safety after wide-ranging riots, only five percent of that number, 200 Guardsmen, have been federalized in Oregon. The Oregon federalization is thus on a smaller scale than that which a unanimous Ninth Circuit panel recently held was likely lawful. And the Guardsmen are limited to protection of federal personnel and property. Plaintiffs nonetheless filed this lawsuit and seek a Temporary Restraining Order (TRO) enjoining the federalization and deployment—before any Guardsmen have begun the mission. That motion is wholly without basis.

Plaintiffs have no likelihood of success. Under 10 U.S.C. § 12406, the President is authorized to call up members of the National Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)–(3). Both

conditions apply here: The violent actions and threats by large numbers of protestors, directed at those enforcing of federal immigration laws and at federal property, constitutes at least a danger of a rebellion against federal authority. And as the Ninth Circuit held when it stayed an injunction of the federalization and deployment in California, they have impeded the ability of federal officials to enforce federal law.

Plaintiffs further assert claims under the Posse Comitatus Act (PCA), which criminalizes willful use of certain military components to execute the laws without Congressional authorization. But there is no private right of action for civil injunctive relief from an asserted violation of the PCA, which is a criminal statute that the Executive Branch enforces and requires "willful" conduct. The oddity of applying this mens rea requirement to the federal government underscores that there is no civil cause of action to enforce the PCA against the federal government. Indeed, in the 147-year history of the PCA, no court had *ever* allowed a civil claim against the Government based on the PCA, until a decision last month from the U.S. District Court for the Northern District of California. And even that decision—rendered only following a trial on the merits—did not enjoin the deployment and federalization itself and, in any event, was swiftly administratively stayed by the Ninth Circuit.

But even if Plaintiffs could enforce the PCA, the Presidential and Secretarial Orders do not authorize the Guard to execute the laws—only to protect federal personnel and property, which the Supreme Court, the Ninth Circuit, and consistent Executive Branch practice recognize does not create a PCA problem. Indeed, Plaintiffs brought this suit and seek extraordinary relief before the Guardsmen have even been *deployed*, and thus necessarily have no basis for their contention that the Guard will engage in law enforcement proscribed by the PCA. Moreover, even assuming the Guard would be conducting law enforcement, there is no violation of the PCA because the PCA's prohibition on the use of the military to execute the laws is inapplicable when such law enforcement is expressly authorized by statute. And the statute the President invoked to federalize the Guard here—the

invocation of which the Ninth Circuit has already held was likely lawful as to the much larger Los Angeles area deployment—expressly authorizes the Guard to "execute those laws" of the United States that the President deemed the regular forces "unable . . . to execute." 10 U.S.C. § 12406(3).

Finally, Plaintiffs also assert an assortment of constitutional claims and an Administrative Procedure Act (APA) contrary-to-law claim. But those claims are simply derivative of their incorrect arguments that Defendants' actions violate federal statutes, and in any event fail.

But the Court need not even address the merits because Plaintiffs have failed to show irreparable harm warranting a TRO. Plaintiffs primarily insist that the deployment inflicts a sovereign injury on Oregon. But the Guard will only be protecting federal property and personnel—not engaging in law enforcement—and they will certainly not be exercising any police powers customarily performed *by the State*. And Plaintiffs' asserted "sovereign injury" based on the federalization order itself is self-inflicted. Governor Kotek could have chosen to command and control the requested 200 Guardsmen, but she declined. Plaintiffs also complain that the federalization requires "the diversion of Oregon National Guard members from their state responsibilities, impairing the State's ability to call upon the Guard to protect itself and its citizens," but this contention is entirely conclusory. It is also implausible given that, by Plaintiffs' own count, the federalization involves approximately *3 percent* of the Oregon National Guard, for a limited period. Plaintiffs also assert that the deployment "threatens irreparable economic and financial harms to Oregon, Portland, and their residents." This is also implausible given the minuscule size and purely protective function of this mission. It is not surprising then that their entire attempted showing of harm consists of a reference to a newspaper article about the alleged effects of *another deployment* (larger by an order of magnitude) in the District of Columbia (and even as to D.C., that article provides no evidence of irreparable harm). This feeble showing does not even support Plaintiffs' Article III standing, let alone demonstrate irreparable harm.

By contrast, the injunction Plaintiffs seek would improperly impinge on the Commander in

Chief's supervision of military operations, countermand a military directive to officers in the field, and put federal officers (and others) in harm's way. Indeed, even as to the much larger deployment in the Los Angeles area, the Ninth Circuit held in staying a similar injunction that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants." *Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025) (per curiam). The motion for a TRO should be denied.

## BACKGROUND

### I.    Legal Background

### A.  The National Guard System

The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15 (granting Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Dept. of Def.*, 496 U.S. 334, 338 (1990) (quotation omitted). The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command. *See* 10 U.S.C. § 10101.

"Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States." *Perpich*, 496 U.S. at 345. Guard members may have one of three statuses at any time: (1) federal active duty under Title 10; (2) state control with federal authority under Title 32; or (3) state active duty. Title 10 gives the Federal Government authority to raise and employ military forces, including National Guard units, under federal control and at federal expense. Title 32 authorizes use of the National Guard for federal purposes and at federal expense but under state control. Finally, the Governor of a state may order that state's National Guard into state active duty pursuant to state law at state expense.

Congress has granted the President several authorities under which he may call forth the National Guard, including 10 U.S.C. § 12406, the statutory authority under which the President acted here. Section 12406's historic lineage dates to the First Militia Act of 1792, which was used by George Washington to respond to the Whiskey Rebellion. *See* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* Version 8 (updated Nov. 6 2018) (CRS Report). Today, in its entirety, Section 12406 provides:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406.

## B. The Posse Comitatus Act

The PCA states in full as follows: "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385. The PCA generally forbids using the Armed Forces "to execute the laws," 18 U.S.C. 1385, such as by directly engaging in domestic law-enforcement duties normally assigned to civilian police. *See, e.g.*, *United States v. Kahn*, 35 F.3d 426, 431 (9th Cir. 1994); *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991). Further, 10 U.S.C. § 275 directs the Secretary of War to promulgate

regulations to ensure that members of the armed forces do not directly participate in "a search, seizure, arrest, or other similar activity" unless otherwise authorized by law. 10 U.S.C. § 275.

## II.    Factual Background

Throughout the summer, ICE has seen a sharp and violent increase in protests and attempts to impede its duties of enforcing the Nation's immigration laws. *See* Declaration of Robert Cantu, ¶¶ 5-14. ICE's facility located in downtown Portland, known as the Lindquist Federal Building, has experienced significant unrest targeting both the facility itself and those who work in it. *Id.* ¶ 7. Protestors have assaulted both ICE and FPS officers with rocks, bricks, pepper spray and incendiary devices, causing injury. Declaration of Cammila Wamsley, ¶ 10; Cantu Decl. ¶ 8. Those working inside the Lindquist Building have been tailed after work and followed either to their homes or to the hotels where they are staying, for purposes of intimidation. Cantu Decl. ¶ 11; Wamsley Decl. ¶ 12. ICE and FPS officers in Portland have also fallen victim to doxing. Cantu Decl. ¶ 11 & n.1. Agitators also regularly attempt to impede government vehicles as they enter or exit the facility by throwing objects or placing themselves in front of the vehicles so that the vehicles are forced to stop, after which they surround the vehicle, and shout threats at the occupants. Cantu Decl. ¶ 12; Wamsley Decl. ¶ 12.

The building itself has also been a target. Agitators have thrown rocks at the building, damaged the main gate, proximity card readers, and security cameras in an attempt to breach the facility, causing significant security risks. Wamsley Decl. ¶¶ 10, 17; Cantu Decl. ¶ 8. They have vandalized and spray painted the sides of the building. Wamsley Decl. ¶ 16. The facility is subject to nightly protests, which risks escalation at any moment. Cantu Decl. ¶ 14. They have also set up a mock guillotine to intimidate those inside. Wamsley Decl. ¶ 16. DHS was required to close the building for three weeks, from June 13 to July 7, and board up the windows to prevent further damage and incursion. Wamsley Decl. ¶ 13.

FPS, which is the regular security force charged with protecting the Linquist Building, is stretched to the point of collapse. The sustained violence and security risks have required FPS to

provide 24/7 protection for the building, a task it is simply not resourced to accomplish. Cantu Decl. ¶ 18. DHS has been forced to reassign members of Homeland Security Investigations (HSI) Portland's Special Response Team (SRT) to support FPS, significantly impeding HSI's ability to accomplish the missions with which SRT is tasked. Wamsley Decl. ¶¶ 15, 20. FPS has repeatedly attempted to contact the Portland Police Bureau (PPB) for assistance. But the PPB has been unhelpful. Cantu Decl. ¶ 15. PPB has failed to respond to calls for assistance from FPS and, even when they have responded, their response has been delayed. *Id.* ¶¶ 15-16. Thus, FPS has had to rely almost exclusively on ICE SRT for assistance in preventing the violent agitators from attacking immigration officers and the ICE facility. *Id.* ¶ 16. Instead of assisting in the protection of the Linquist Building, Plaintiff City of Portland issued a Notice of Zoning Violation on September 18, 2025, requiring DHS to remove the protective boarding over its windows, exposing the building to further risk of damage and incursion. Wamsley Decl. ¶ 26.

Violence, unfortunately, has not been limited to Portland. Earlier this summer, riots in Los Angeles targeted ICE operations. In response, the President signed a memorandum on June 7 calling into federal service members and units of the National Guard under 10 U.S.C. § 12406 to "temporarily protect ICE and other United States personnel who are performing federal functions . . . and to protect Federal property, at locations where protests against those functions are occurring or are likely to occur[.]" Ex. D to Declaration of Major General Timony Rieger. The President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other government officials' enforcement of federal law. *Id.* "In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." *Id.* Four thousand Guardsmen were federalized from the California National Guard and 700 active duty Marines were deployed to Los Angeles to protect federal property and personnel. *Newsom v. Trump*, No. 25-CV-04870, 2025 WL 2501619, at *3 (N.D. Cal. Sept. 2, 2025).

The mission has succeeded and provided critical protection to law enforcement officers under attack and facing threats. For example, in Camarillo, about 50 miles from downtown Los Angeles and weeks after the initial riots, officers enforcing immigration laws encountered 500 rioters and came under gunfire. "ICE and CBP Law Enforcement Dodge Literal Bullets from Rioters," U.S. Dep't of Homeland Sec. (July 11, 2025), https://www.dhs.gov/news/2025/07/11/ice-and-cbp-law-enforcement-dodge-literal-bullets-rioters-while-rescuing-least-10. The crowd even laid down a makeshift spike strip to counter DHS vehicles. *Newsom*, 2025 WL 25016169, at *8. Guardsmen were deployed and provided protection. *Id.* Conditions have since improved, and officials have accordingly reduced the California force. All of the Marines and almost 95 percent of the Guardsmen have departed. *See id.* at *9; *Newsom v. Trump*, No. 25-CV-04870-CRB, ECF No. 190-1, at 5 (N.D. Cal. Sept. 5, 2025). As of mid-August, only 260 federalized Guardsmen continued their service in California. *Id.*

Though conditions in Los Angeles have improved from this summer, ICE personnel and property remain subject to actual and threatened violence nationwide. Just last week, a man shot at an ICE field office in Dallas, killing two detainees and injuring one other. Dep't of Homeland Security, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025), https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility. The shooter's shell casings bore anti-ICE messages. *Id.* That same tragedy thankfully has not occurred elsewhere this year, but the risk at Portland's ICE facility has been and remains especially acute.

Based on the ongoing violence and protests targeting the ICE facility in Portland, DHS requested that the Department of War assist in securing the facility. *See* Cantu Decl. ¶ 20. Specifically, on September 26, 2025, DHS transmitted a memorandum to the Department of War requesting "immediate and sustained assistance . . . in order to safeguard federal personnel, facilities, and operations in the State of Oregon." Rieger Decl. Ex. A. As the memo explained, "Federal facilities, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal

Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order

9

Protective Service (FPS), have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *Id.* Based on the need to "ensure the continued protection of federal facilities in Oregon[,]" DHS requested 200 DoW personnel to "direct[ly] support [] federal facility protection, access control, and crowd control measures." *Id.*

On September 27, the President explicitly cited Secretary Noem's request in making a determination that it was necessary for the Secretary of War to coordinate the deployment of National Guard forces to Portland. @realDonaldTrump, Truth Social (Sept. 27, 2025 10:19 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115276694936263266.

In response, the National Guard Bureau promptly contacted the Oregon Adjutant General, who serves as Chief of Staff to the Governor of Oregon, Director of the Oregon Military Department, and Commander of the Oregon National Guard. *See* Rieger Decl. ¶ 16; Or. Rev. Stat. § 396.160. This included several calls, as well as a formal memorandum requesting that Oregon provide 200 members of its National Guard to aid DHS in Title 32, non-federalized status. *See* Rieger Decl. ¶¶ 16-20. The Oregon Adjutant General, however, informed DoW that the Oregon Governor had already informed the President that Oregon is unwilling to lend its voluntary support.

On September 28, 2025, Secretary Pete Hegseth issued a memorandum to the Adjutant General and the Governor of Oregon mobilizing 200 members of the Oregon National Guard for sixty days. Rieger Decl. Ex. C. The federalization was based on the President's judgment that conditions in Oregon satisfied Section 12406's conditions. President Trump has explained: "As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem." @realDonaldTrump, Truth Social (Oct. 1, 2025 1:36 p.m.), https://truthsocial.com/@realDonaldTrump/posts/115300118756896774 (Oct. 1 Truth). "Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon." *Id.* "ANTIFA and Radical Left Anarchists have been viciously attacking our Federal

Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law." *Id.* Guardsmen are currently readying for deployment.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on September 28, 2025, claiming the deployment violates 10 U.S.C. § 12406, the PCA, the Tenth Amendment, several other constitutional provisions and statutes including the APA. ECF No. 1 (Compl.). They moved for a TRO the next day. ECF No. 6 (TRO).

## LEGAL STANDARD

Like a preliminary injunction, a TRO is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (per curiam) (standards applicable to TROs and preliminary injunctions "substantially identical" (quoting *Stuhlbarg Int'l Sales Co. Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001))). Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20.

## ARGUMENT

I.    **Plaintiffs Are Unlikely to Succeed on the Merits.**

   A.    **The President Reasonably Determined that Section 12406's Conditions Are Satisfied and that Decision Is Conclusive.**

The Constitution grants Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. In Section 12406, Congress explicitly authorized the President to "call into Federal service" members of the National Guard "[w]henever," *inter alia*, "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces

to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). The President determined that both of those conditions were satisfied when he federalized approximately 200 members of the Oregon Guard. Plaintiffs have no likelihood of success in second-guessing that determination.

**1.** Initially, the President's determination is "conclusive upon all other persons," and is thus not reviewable. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827). Congress vested the decision whether to call up the National Guard in the President, not the courts, as the Supreme Court observed nearly 200 years ago in *Martin*. There, a member of the New York militia challenged the penalties imposed on him by a court martial after he refused to comply with orders to report for federal service as part of the War of 1812. *See id.* at 20-23. President Madison had activated the state militia into federal service pursuant to a 1795 law providing "that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion." *Id.* at 29 (quotation omitted). The Supreme Court refused to entertain the militia member's contention that the President had misjudged the danger of such an invasion, explaining that "the authority to decide whether the exigency has arisen[] belongs exclusively to the President," whose decision "is conclusive upon all other persons." *Id.* at 30. The Court emphasized that the 1795 law "confided" the power to call up the militia "to the Executive of the Union," as Commander in Chief, and thus "necessarily constituted" the President himself as "the judge of the existence of the exigency in the first instance." *Id.* at 31; *cf. Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849).

Those same principles apply here. At bottom, Plaintiffs seek to use this suit to second-guess the President's judgment that the violence, threats, and intimidation against officials enforcing federal immigration laws as well as federal property roiling Portland warranted activating approximately 200 Guardsmen—both because the violence rose to the level of rebellion or a danger of rebellion against

the federal government's authority to enforce the immigration laws and because the violence left the President sufficiently unable to ensure faithful execution of federal law. But like the 1795 law at issue in *Martin*, Section 12406 makes clear that Congress has granted "the authority to decide whether" those statutory prerequisites are satisfied "exclusively to the President," whose decision must be treated as "conclusive." *Martin*, 25 U.S. (12 Wheat.) at 30.

*Martin* cannot be distinguished on the grounds that that case involved an invasion by a foreign government. *Newsom*, 141 F.4th at 1050. Nor, as the Ninth Circuit also explained, is the President's decision binding only as to military subordinates. To the contrary, the Court in *Martin* emphasized that the President's decision was "conclusive upon all other persons." 25 U.S. (12 Wheat.) at 28. And in *Luther*, the Court explained that even courts could not second-guess President Tyler's decision to call out the militia. 48 U.S. (7 How.) at 44-45. Similarly, the Ninth Circuit recognized that *Martin*'s continuing viability is not for lower courts to decide. *Newsom*, 141 F.4th at 1050-51. And the Supreme Court has repeatedly reiterated that when a valid statute "commits [a] decision to the discretion of the President," the President's exercise of discretion is not subject to judicial review. *Dalton v. Specter*, 511 U.S. 462, 474 (1994); *cf. Baker v. Carr*, 369 U.S. 186, 213 (1962) (quoting *Martin,* 25 (Wheat.) at 30, for the proposition that an emergency demands "[a] prompt and unhesitating obedience").

**2.** The Ninth Circuit nonetheless held in *Newsom* that these precedents preserve some degree of judicial review of the President's decision to call forth the Guard. Defendants disagree with that holding but, in light of the Ninth Circuit's discussion of *Martin* and its progeny (described above), the Ninth Circuit made clear that this longstanding precedent interpreting statutory delegations of the calling-forth power requires, at a minimum, that courts "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Newsom*, 141 F.4th at 1048; *see also id.* at 1047 (observing that review of the President's decision in this context is

"especially deferential"). The judicial role is limited to determining whether the President "had a colorable basis for invoking" Section 12406. *Id.* at 1052.

That highly deferential standard is reinforced by the nature of nonstatutory ultra vires review more generally, which is one of the most demanding standards known to the law. It is "a Hail Mary pass," *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted), requiring a showing that the defendant is engaged in "blatantly lawless" action, *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 (1968), or "has plainly and openly crossed a congressionally drawn line in the sand," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022).

Plaintiffs do not come close to satisfying that extraordinarily demanding standard here. First, as the Ninth Circuit already held as to the California federalization and deployment, the President "had a colorable basis for invoking [Section] 12406(3)." *Newsom*, 141 F.4th at 1052. Section 12406(3) authorizes the President to call forth the National Guard when he is "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3).

Here, the President authorized Secretary Hegseth to deploy the Oregon National Guard following a request for assistance from DHS to DoW, in which DHS represented that ICE and FPS have "come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *See* Rieger Decl. Ex. A. DHS further described "groups actively aligned with designated domestic terrorist organizations and have sought to impede the deportation and removal of criminal noncitizens through violent protest, intimidation, and sabotage of federal operations." *Id.* On this, the President "determined . . . conditions continue to deteriorate into lawless mayhem." Oct. 1 Truth. "Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon." *Id.*

Both FPS and ICE officials have further provided detailed accounts of the violence and threats facing federal property and personnel, as well as the strain on their resources required to maintain and respond to them. *See* Cantu Decl. ¶¶ 5-18; Wamsly Decl. ¶¶ 9-26. As discussed above, FPS cannot

feasibly provide 24/7 protection for the ICE facility on its own, which has required it to seek protection from HSI Portland's Special Response Team, significantly impeding HSI's ability to perform its own law enforcement missions. *See supra* p. 8. And repeated requests for assistance from local police have either resulted in delayed or no concrete actions. *See id.* Indeed, DHS was forced to close the building entirely in response to the violence and threats for three weeks. *See supra* p. 7. Plaintiffs thus err in contending that what federal officials are facing in Portland is limited to "small, largely peaceful protests," and "ICE-facility protests [that] have generally been small and sedate." TRO at 12-13. It is readily apparent that the President had a "colorable" basis for not accepting this benign characterization, and instead determining that protection for federal officials and property was necessary so that federal officials could execute the laws Congress has required them to enforce.

The Ninth Circuit further explained in *Newsom* that Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States in order to call members of the National Guard into federal service, nor does it suggest that activation is inappropriate so long as any continued execution of the laws is feasible." 141 F.4th at 1051. To suggest otherwise, the panel reasoned, would mean that "so long as any quantum of federal law enforcement could be accomplished in the face of mob violence," "the President would be unable to call up the Guard to respond." *Id.* (internal quotation marks omitted). To be sure, and as Plaintiffs note, the Ninth Circuit held that there must be more than some "minimal interference." *Id.* But the Ninth Circuit in *Newsom* did not require the President to provide *particular examples* of federal law enforcement that was precluded. Rather, the Ninth Circuit relied upon the violence itself, and deferred to the President's judgment that "those activities significantly impeded the ability of federal officers to execute the laws." *Id.* at 1052. *Newsom* thus stands for the proposition that Section 12406(3) authorizes the President to call up the National Guard when he is unable to ensure to his satisfaction

the faithful execution of federal laws by the federal officers who regularly enforce them, without undue harm or risk to officers. The President plainly had a colorable basis for that determination here.

Plaintiffs also attempt to distinguish *Newsom* by contending that the violence and threats in Portland are not as grave as those that prompted the President to order the federalization and deployment in Southern California. TRO at 13-14. But initially, nothing in the unanimous panel opinion in *Newsom* suggests that the panel there considered that case to be a difficult one, and that case certainly does not mark the outer boundary of the deference owed to the President under the colorable basis standard. In any event, although the situation in Portland differs from Los Angeles, *so is the deployment*. Approximately 4,700 servicemembers were deployed to Los Angeles. But less than five percent of that sum has been federalized in Oregon. The 200 Oregon Guardsmen that have been federalized is smaller than the number of California Guardsmen who remain federalized in the Los Angeles area even today. This was plainly a reasonable response and well within the President's discretion under the colorable-basis standard, particularly in light of broader circumstances. The week before the federalization, two detainees were murdered near an ICE facility in Texas. And the Portland ICE facility has been an especially risky site because of repeated and recent acts of violence, the Portland Police Department's inability to provide an adequate response, and a history of mob violence dating back to 2020, which has often been tolerated or excused by local and state officials.

**3.** The President's action under Section 12406 was independently warranted under the provision authorizing him to call the Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2).

The term "rebellion" encompasses the violent resistance to lawful enforcement of federal immigration law occurring in Portland. Black's Law Dictionary defines rebellion to include "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or summons." *See Rebellion*, Black's Law Dictionary (12th ed. 2024). The same understanding prevailed

in 1903, when Congress first enacted what is now Section 12406. *See* Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776 (authorizing the President to call forth the state militias into active federal service in the case of, among other things, "rebellion against the authority of the Government of the United States"). Dictionaries from the 1890s and 1900s define "rebellion" to focus on deliberate resistance to the government's laws and authority. *See Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws or operations of the government, committed by a subject."); *Rebellion*, An American Dictionary of the English Language (1900) ("Open resistance to lawful authority."); *Rebellion*, The Cyclopedic Dictionary of Law (1901) ("[T]he forcible opposition and resistance to the laws and process lawfully installed"); *Rebellion*, Webster's International Dictionary of the English Language (1903) ("Open resistance to, or defiance of, lawful authority.").

Plaintiffs favor a narrower definition of rebellion limited to "[o]pen, organized, and armed resistance to an established government or ruler; esp., an organized attempt to change the government or leader of a country, usu. through violence." *Rebellion*, Black's Law Dictionary (12th ed. 2024). Congress, however, plainly used "rebellion" in its broader sense here. Otherwise, Section 12406 would fail to encompass numerous instances, both before and after its initial enactment in 1903, in which the President has called the militia into federal service to address open defiance of federal authority in situations that fell short of organized efforts to overthrow the government.

Most famously, President Washington called up the militia to assist in suppressing the Whiskey Rebellion—a violent protest in western Pennsylvania targeted at tax assessors attempting to collect a federal excise tax on distilled whiskey. *See* CRS Report 8. President Washington took that action under a 1792 statute that did not by its terms refer to "rebellion." *See* CRS Report 7-8; *see also* Act of May 2, 1792, ch. 28, §§ 1-2, 1 Stat. 264, 264. But when Congress later enacted statutes referring to a "rebellion," those statutes plainly extended to cover this original historical precedent of violent opposition limited to a particular federal law. The Whiskey Rebellion, moreover, is only one example

of a range of civil disorders that members of the militia and other federal military forces have long been called upon to address. Throughout the early years of the republic, Presidents routinely called out troops to suppress opposition to other federal revenue laws. *See* CRS Report 9-12. In the late 1800s and early 1900s, states frequently requested assistance from federal troops to address violence stemming from labor disputes and miners' strikes. *See id.* at 13-14, 35-37. And Presidents Eisenhower and Johnson used the federalized National Guard to ensure the enforcement of federal civil rights laws and to protect civil rights advocates in the 1950s and 1960s. *See id.* at 37-38.

The situation in Portland exhibits many of the same features as these historical precedents. At a minimum, these conditions created a "danger of a rebellion." In response to lawful immigration enforcement efforts, agitators have specifically targeted federal property and officials with violence, intimidation, and threats. Congress sensibly did not require the President to await an actual rebellion before federalizing Guard members where a significant threat of rebellion exists. Creating life-threatening dangers for federal officers enforcing federal law and targeting federal employees for their work performing federal functions surely amounts to a dangerous risk of rebellion. The President was not required to wait for tragedy to occur (as has already happened in Texas just last week) before acting to protect federal officials and property.[1]

C.    The President's Order is Consistent with the Tenth Amendment.

The President's invocation of Section 12406 is also plainly consistent with the Tenth Amendment. So long as the federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see United States v. Comstock*, 560

---

[1] Defendants also unquestionably complied with Section 12406's procedural requirements and Plaintiffs do not contend otherwise. And it is of no moment that Governor Kotek did not agree to the federalization. The requirement to issue orders "'through the governor[]'" "does not grant the governor any 'consulting' role"; "[i]t simply delineates the procedural mechanisms through which the President's orders are issued." *Newsom*, 141 F.4th, at 1053 (first alteration in original).

U.S. 126, 144 (2010) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." (quoting *New York v. United States*, 505 U.S. 144, 156 (1992)).

That principle forecloses Plaintiffs' Tenth Amendment claim. Plaintiffs do not contend that Section 12406—some variant of which has existed since virtually the Founding—is unconstitutional. So if the federalization and deployment is authorized by Section 12406—which it is—the Tenth Amendment simply has no independent role to play in this case. That is particularly so because the President mobilized the National Guard to protect undisputedly federal interests—specifically, to protect federal officials and property.

Plaintiffs' reliance on anti-commandeering principles, *see* TRO at 19, similarly makes no sense. The National Guard is composed of both the State and Federal National Guards. *Perpich*, 496 U.S. at 345. The federal government is thus not unlawfully commandeering *state* officials when it federalizes the Guard consistent with Section 12406. Again, provided that the federalization is itself statutorily proper, the Tenth Amendment is simply irrelevant.

Although Plaintiffs' Tenth Amendment claim is thus difficult to understand, Plaintiffs appear to argue that the federalization and deployment of 200 Guardsmen violates the Tenth Amendment because, according to Plaintiffs, this step was taken with the subjective intention to punish Plaintiffs for their refusal to enforce federal immigration law. *See* TRO at 19-20. But there are two obvious problems here. First, Plaintiffs' contention that the federalization decision was made to punish the State—as opposed to the stated reason, to protect federal officials and property—is entirely conclusory. And deploying 200 National Guardsmen in a purely protective capacity would be a very odd "punishment" for failing to help enforce federal immigration law; the deployed National Guard have not been authorized to conduct traditional police powers, such as the power to search or seize, arrest, or interrogate, and will not be usurping state authority in any way. *See infra* p. 30. Plaintiffs'

contention that the federalization violates principles of "equal sovereignty" because, according to Plaintiffs, the federalization is "a politically motivated retaliation for the Plaintiffs' adoption of policies that the President disfavors," TRO at 21, fails for similar reasons.

But second, none of this matters anyway. The Tenth Amendment concerns the division of authority between States and the federal government. Plaintiffs cite no authority for the proposition that a Tenth Amendment claim can be used to challenge otherwise valid federal policies on the ground that the federal decisionmaker purportedly acted with improper motives.

Finally, Plaintiffs invoke the Supreme Court's decision in *National Federation of Independent Business v. Sebelius* (*NFIB*), 567 U.S. 519 (2012), for the proposition that "[e]ven using recognized instruments of federal power . . . can violate the Tenth Amendment when the effect is like 'a gun to the head.'" TRO at 18 (quoting *NFIB*, 567 U.S. at 581). This comparison is inapt. In *NFIB*, the Supreme Court considered an Affordable Care Act provision that was *intended* to "coerc[e] the States" into expanding Medicaid coverage by threatening to withhold federal money. 567 U.S. at 575. And "[t]he threatened loss of over 10 percent of a State's overall budget" was "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." *Id.* at 582. But the challenged action here is not intended to coerce Oregon into changing its opposition to enforcement of immigration law; it is intended to protect federal officials and property. And not even Plaintiffs contend that the temporary federalization of 200 members of the National Guard for solely protective purposes leaves them with "no real option but to" change their policy on immigration enforcement. Indeed, Plaintiffs *do not intend* to change that policy. Plaintiffs' Tenth Amendment claim fails.

### D.    Plaintiffs Are Not Entitled to Injunctive Relief—Let Alone an Order Enjoining the Federalization and Deployment—on their PCA and 10 U.S.C. § 275 Claim

Plaintiffs next assert that the PCA and 10 U.S.C. § 275 bar the federalization and deployment and entitle them to injunctive relief. This claim has no merit.

1.      For one, while Plaintiffs rely extensively on the Northern District of California's decision in *Newsom v. Trump*, --- F. Supp. 3d ---, 2025 WL 2501619 (N.D. Cal. 2025), that decision—while clearly wrong—underscores that Plaintiffs are not entitled to an injunction based on the PCA here. In that case, the district court granted a temporary restraining order on other claims (an order that was swiftly administratively stayed and then stayed pending appeal by a Ninth Circuit merits panel in a unanimous decision), but did not grant any preliminary injunctive relief on the PCA claim. Rather, the district court entered a permanent injunction on the PCA claim only after authorizing discovery and holding a trial on the merits during which evidence was adduced of the work that servicemembers had actually done. Here, by contrast, Plaintiffs brought this suit and sought extraordinary relief before the Guardsmen have even been *deployed*. And even the order in *Newsom* (which has also since been administratively stayed by the Ninth Circuit) did not enjoin the federalization and deployment of National Guard troops to California. Instead, the court enjoined the deployed troops from engaging in certain *activities* that it believed qualified as execution of the laws forbidden by the PCA. 2025 WL 2501619, at *29. Nothing about the PCA—in California or in Portland—calls into question the legality of the federalization and deployment *itself*.

2.      In any event, Plaintiffs lack a cause of action to enforce the PCA. That Act imposes criminal penalties for "willfully us[ing] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except in "cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Numerous other courts have similarly found that the PCA does not create a private civil cause of action. *See, e.g.*, *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 40 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023).

Nor do Plaintiffs have any equitable cause of action to enforce compliance with the PCA. "[T]he statutory grant" empowering federal courts to issue equitable remedies "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (citation omitted). Where courts have enjoined federal or state governments in equity, it has typically been for civil violations on behalf of plaintiffs subject to a relevant regulatory scheme. *See, e.g., American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). By contrast, there is no historical basis for a court to enjoin the federal government to comply with a criminal statute that protects the public at large.

Indeed, the Executive Branch has exclusive authority over prosecuting federal crimes, including its exercise of prosecutorial discretion. *See, e.g., United States v. Texas*, 599 U.S. 670, 680 (2023). That authority cannot be transferred to private citizens, *cf. Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), and courts cannot adjudicate a private citizen's (or a State's) grievance over the Executive Branch's prosecutorial decisions, *see Texas*, 599 U.S. at 680-81. These principles operate as a "limitation[]" on "[t]he power of federal courts of equity to enjoin unlawful executive action." *Armstrong v*, 575 U.S. at 327. Allowing a plaintiff to pursue a civil PCA claim—under an ultra vires theory or otherwise—would conflict with these settled principles.

In the 147-year history of the PCA, the government is thus aware of only a single case granting injunctive relief in a civil action on PCA grounds: the Northern District of California's decision in *Newsom* last month. That decision (which again, did not enjoin the deployment itself and came only following a trial on the merits), is clearly wrong and will not withstand appellate review. The injunction has since been administratively stayed by the Ninth Circuit. *See* No. 25-5553, ECF No. 7.1 (9th Cir. Sept. 4, 2025). But even that district court did not dispute that the PCA does not itself provide for a cause of action, and instead granted an injunction based on a non-statutory *ultra vires* theory. 2025 WL

2501619, at *27 n.26. That was incorrect: *Ultra vires* review is not available to grant a type of injunction (such as an injunction against the federal government based on a criminal statute the federal government enforces) that is not available in equity at all. And the court's conclusion that California met the extremely high bar for relief on an *ultra vires* theory was plainly erroneous.

**3.**    Plaintiffs' PCA claim fails at the threshold for the additional reason that the alleged National Guard actions challenged here are expressly permitted by the PCA.

The PCA's prohibition on the use of armed forces "as a posse comitatus or otherwise to execute the laws" does not apply "in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Section 12406(3)—the statute that, as a prior Ninth Circuit stay panel already held, likely authorized the President's mobilization of the National Guard and deployment to the Los Angeles area—expressly authorizes the President to federalize the National Guard "to execute the laws of the United States" when he is unable to do so with "regular forces." 10 U.S.C. § 12406(3). A more straightforward authorization of law execution is difficult to imagine. The PCA prohibits use of the military to "execute the laws" unless authorized by, *inter alia*, an Act of Congress, 18 U.S.C. § 1385, and Section 12406(3) allows the National Guard to be federalized for precisely that purpose. Thus, the federalized National Guard may be used to execute federal law where regular forces are unable to do so, without violating the PCA.

Again, while Plaintiffs rely on the district court's analysis in *Newsom* for the contrary conclusion, that court's analysis does not withstand scrutiny. The court in that case did not actually engage with the text of Section 12406 in any way, instead focusing on the purported novelty of the interpretation. *See* 2025 WL 2501619, at *15. But novelty cannot justify disregarding the plain text of the statute. And this interpretation is not novel anyway; Congress's own research service has recognized Section 12406(3) as an exception to the PCA. *See* CRS Report 31 n.224 (2018). And the *Newsom* district court's contrary interpretation amounted to an express disagreement with the Ninth

Circuit's decision, as the court essentially admitted. *See* 2025 WL 2501619, at *18 (characterizing Ninth Circuit decision as lacking any "limiting principle" and creating an "expansive view of presidential discretion to invoke [Section] 12406(3)").

Nor is this interpretation contrary to the principle that Congress does not hide elephants in mouseholes. TRO at 16. First of all, an authorization for the military to engage in law execution is not an "elephant" under any standard. There is no independent constitutional bar on the military executing the laws. Indeed, the Constitution expressly empowers Congress "[t]o provide for calling forth the Militia to execute the Laws of the Union." U.S Const. art. I, § 8 cl. 15. And the PCA was enacted nearly a century after the Constitution's ratification, only criminalizes willful violations, contemplates statutory and constitutional authorizations for the military to engage in law enforcement, and did not even include the Navy or Marines until 2021 (and still does not include the Coast Guard). Section 12406(3) is not a "mousehole." It is a delegation to the President of the United States, some variant of which has existed since the Washington Administration (and which thus predates the PCA by nearly a century). In any event, the plain text of Section 12406(3) could not be clearer and that is dispositive.

That plain text reading is also consistent with historical practice. President Nixon invoked Section 12406(3) to federalize the National Guard during the Postal Strike of 1970. *See* Executive Order 11519, 35 Fed. Reg. 5003 (Mar. 24, 1970). It is undisputed that the troops there were used to deliver mail—*i.e.*, execute the federal mail laws—and no one suggested they violated the PCA in doing so. Section 12406(3) provides express authorization for the conduct complained of here, and that is sufficient to bring it within the PCA's express exception.

4.    Notwithstanding the Guard's clear authority to execute the law in Portland, the Guard has not been authorized to execute the laws for PCA purposes. Courts have articulated three tests to determine whether military forces are engaged in execution of the laws: "whether civilian law enforcement agents made 'direct active use' of military personnel to execute the laws," "whether 'use

of any part of the Army or Air Force pervaded the activities' of the civilian law enforcement agents," and "whether the military personnel subjected citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature." *United States v. Yunis*, 681 F. Supp. 891, 892 (D.D.C. 1988) (citations omitted), *aff'd*, 924 F.2d 1086 (D.C. Cir. 1991). However the test is articulated, the Guard is not in any meaningful sense engaged in active and direct execution of the law. Rather, as the June 7 Presidential Memorandum and September 28 DoD Memorandum both make clear, the Guard's functions are limited to protecting ICE agents and other governmental personnel, as well as federal property. Rieger Decl. Exs. C-D.

That protective function does not constitute law execution for PCA purposes. The President has an "inherent" protective and emergency power derived from the Take Care Clause. *See Cunningham v. Neagle*, 135 U.S. 1, 69 (1890). Indeed, the Court in *Neagle* viewed it as *obvious* that protection of federal officials enforcing the laws was within the President's authority:

> [W]ho can doubt the authority of the president ... to make an order for the protection of the mail, and of the persons and lives of its carriers, by ... providing a sufficient guard, whether it be by soldiers of the army or by marshals of the United States, with a posse comitatus properly armed and equipped, to secure the safe performance of the duty of carrying the mail wherever it may be intended to go?

*Id.* at 65; *see In re Debs*, 158 U.S. 564, 582 (1895) ("If [an] emergency arises, the army of the Nation, and all its militia, are at the service of the Nation to compel obedience to its laws."). Similarly, as then-Assistant Attorney General Rehnquist explained more than half a century ago, the President has inherent Article II authority "to use troops for the protection of federal property and federal functions." *Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, 1 Supp. Op. O.L.C. 343, 343 (1971); *see id.* at 344 (discussing decisions in *Neagle*, 135 U.S. 1 (1890) *and In re Debs*, 158 U.S. 564 (1895)). More recently, the Ninth Circuit has twice rejected the argument that providing security for law enforcement operations violates the PCA (even where, unlike here, that security was combined with additional

support). *See United States v. Klimavicius–Viloria*, 144 F.3d 1249, 1259 (9th Cir. 1998) (no violation where "the Navy supplied equipment, logistical support and backup security"); *Khan*, 35 F.3d at 432 ("logistical support and backup security").

Against all of this, Plaintiffs' cursory argument is woefully insufficient. Plaintiffs do not engage with this precedent, and do not appear to dispute the point that protection of federal employees and property is not direct or active law execution for PCA purposes. Instead, Plaintiffs again primarily rely on the *Newsom* district court's purported factual findings. TRO at 17. That court's analysis of this issue was clearly wrong. That court primarily reasoned that protecting federal officials who are executing the laws and forming perimeters around their operations itself constitutes law enforcement prohibited by the PCA. 2025 WL 2501619, at *24-25. But when Guard members protect federal law enforcement agents who are engaged in immigration enforcement actions, it is the federal law enforcement agents—not any Guard personnel—who are executing federal immigration laws. By analogy, when the Secret Service protects the President, they are not executing the President's authorities; and when the U.S. Marshals protect the judiciary, they are not exercising the judicial power of the United States.

In any event, again, the district court in that case issued its findings and permanent injunction following a trial on the merits and the injunction enjoins specific activities the Court found the military had previously taken. Plaintiffs cannot use a district court's since-stayed injunction, issued following a trial on the merits concerning activities in a different state and involving an operation more than 20 times as large, to support a temporary restraining order here—and certainly cannot do so in order to seek relief (enjoining the federalization and deployment) that the district court in that case *did not even grant in the final judgment* on the PCA claim there.

**5.**    Finally, Plaintiffs fail to demonstrate willfulness. Again, the PCA provides that, absent express authorization, anyone who "*willfully* uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined

under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385 (emphasis added). Notably, lack of willfulness is not merely an affirmative defense; rather, as the plain language of the statute makes clear, absent willfulness there is no violation of the PCA in the first place. In the context of a criminal statute, "the word 'willful' generally indicates a requirement of specific intent." *United States v. Mousavi*, 604 F.3d 1084, 1092 (9th Cir. 2010). Although the specific "construction is often dependent on the context in which it appears," *Bryan v. United States*, 524 U.S. 184, 191 (1998), willfulness at least requires proof "that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).

Of course, the very presence of this issue underscores that there cannot be a civil PCA claim here, let alone an equitable cause of action against the federal government. To state the obvious, when Congress intends to provide for judicial review of Presidential and federal agency action, it very rarely (if ever) makes the outcome of that review depend on questions of governmental scienter.

But in any event, the Complaint does not plausibly plead willfulness. The sole mention of willfulness is a single reference utterly bereft of support. Compl. ¶ 112 ("By willfully ignoring the PCA and 10 U.S.C. § 275…"). Plaintiffs' TRO brief contains no mention of willfulness at all. Plaintiffs have thus not even attempted to show that they are likely to succeed in demonstrating willfulness. Nor could they, when Defendants' actions are consistent with Supreme Court precedent going back to the nineteenth century holding that the President has inherent authority to use the military to protect federal employees and property, with OLC precedent going back more than half a century to the same effect, and with multiple Ninth Circuit decisions holding that providing security for law enforcement operations does not violate the PCA. Plaintiff's PCA claim plainly fails.

**6.**     Plaintiffs' invocation of 10 U.S.C. § 275 likewise fails. That provision directs the Secretary of War to "prescribe such regulations as may be necessary to ensure that any activity" under Chapter 15 ("Military Support for Civilian Law Enforcement Agencies") "does not include or permit

direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law." 10 U.S.C. § 275. For starters, Plaintiffs never allege that the planned Guard actions violate that statute, which relates only to promulgating regulations, or any regulation that follows from the statute. In any event, the mere directive to the Secretary to promulgate regulations does not create a civil cause of action or create any judicially enforceable rights. And even if it did, Plaintiffs' remedy (if any) would be to attempt to challenge the failure to promulgate regulations or to challenge specific regulations as contrary to the PCA. But Section 275 does not expand the scope of the PCA itself. And all of the arguments set forth above—e.g., that the Guard is expressly authorized to execute the laws but in any event that the federalization and deployment directive do not amount to law execution for PCA purposes—likewise apply to Plaintiffs' attempted invocation of Section 275.

### E.    Plaintiffs' APA Claim Fails.

Plaintiffs also assert an APA claim, contending that the Secretary's September 28 Memorandum is contrary to law because it purportedly violates 10 U.S.C. § 12406, is barred by the PCA and 10 U.S.C. § 275, the Tenth Amendment, the separation of powers doctrine, and the Constitution's Take Care and Militia Clauses. TRO at 22. But an initial matter, the APA does not provide for judicial review of the government's decision to federalize and deploy the Guard. The President (not the Secretary) made that determination. The President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (holding that the Presidents' "actions are not subject to [the APA's] requirements" and are thus not reviewable under the APA). And Plaintiffs do not identify any assertedly unlawful features of the September 28 Memorandum that are independent of the federalization and deployment decision itself. But even assuming that the September 28 memorandum were final agency action subject to the APA, Plaintiffs' contrary-to-law claim fails for the same reasons their underlying claims based on these provisions fail.

### F.    Plaintiffs' Constitutional Claims Fail.

Plaintiffs also purport to assert constitutional claims based on separation of powers principles and the Militia and Take Care Clauses. But like Plaintiffs' APA claim, these claims are not freestanding theories but instead are entirely derivative of Plaintiffs' contention that the Guard's federalization and deployment violate federal statutes. Plaintiffs assert that "Defendants have violated these constitutional doctrines by asserting authority over a state Militia that the Constitution and federal law expressly assign to the States, and by disregarding—as discussed above—the limitations imposed by Congress in 10 U.S.C. § 12406 as well as the Posse Comitatus Act and 10 U.S.C. § 275." *Id.* at 24. Repackaging these statutory claims as constitutional claims again adds nothing to the analysis, and these claims fail for the same reasons Plaintiffs' underlying legal arguments fail.

Even if the Complaint could be read to assert constitutional theories independent of federal statutes, any such theories would fail. As to the PCA, there is no constitutional bar on the military executing the laws. The Constitution expressly empowers Congress "[t]o provide for calling forth the Militia to execute the Laws of the Union," U.S. Const. art. I, § 8 cl. 15, and the PCA was not even enacted until nearly a century after the Constitution's ratification. Nor is there a colorable argument that Section 12406's authorization to the President—some variant of which has existed since the Washington Administration—violates the Constitution.

## II.    Plaintiffs Have Not Shown Irreparable Harm.

The TRO motion fails for the independent reason that Plaintiffs have not demonstrated irreparable harm. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("*Winter* tells us that plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction.").

Initially, Plaintiffs' claim of irreparable harm is implausible given the limited size and scope of the federalization. Only 200 members of the National Guard will be called into federal service. Again.

that is approximately *five percent* of the number of Guardsmen federalized by the President and Secretary's June 7 and June 9 memoranda, which federalized approximately 4,000 members of the California National Guard—in addition to deploying approximately 700 Marines. And even as to that much larger federalization and deployment, the Ninth Circuit held that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants," *Newsom*, 141 F.4th at 1054. Plaintiffs nonetheless make three specific allegations of irreparable harm, none of which is even colorable.

*First*, Plaintiffs contend that the federalization of the Guard inflicts a sovereign injury. TRO at 29. But Plaintiffs do not identify any such injury. Plaintiffs reference "the uncalled-for deployment of federal troops to engage in domestic law enforcement," *id.*, but the Guard will not be engaging in domestic law enforcement. *See supra* p. 24-26; Cantu Decl. ¶ 22. Instead, the Guardsmen will merely be protecting federal personnel and property, which is within the Executive's constitutional authority.

At the very least, Plaintiffs provide no support for their argument that the Guard will be performing law enforcement activities reserved *to the State*. To the extent Plaintiffs argue that the Guard's activities will involve enforcement of *federal law* (such as immigration enforcement), that is incorrect; but in any event, whether enforcement of federal law is conducted by ICE officials on the one hand or the federalized Guard on the other does not implicate any *State* sovereign interest.

To the extent Plaintiff's "sovereign injury" argument is premised on the federalization of the Guard by itself, that too does not constitute irreparable injury. For one, only a tiny portion (about 3 percent) of the Guard has been federalized. And the Guard itself is composed of *both* the State National Guard, and the National Guard of the United States, so Plaintiffs cannot claim any cognizable interest in the Guard remaining under solely State control. And any alleged "injury" to Plaintiffs resulting from the temporary loss of control of a minuscule portion of the National Guard in Oregon is entirely self-inflicted. DoW requested that Governor Kotek approve use of the Guard in a Title 32 status, under which she would have been in command and control of the small portion

of the Guard designated for service in support of the federal protective mission. She refused. *See supra* p. 10. Such self-inflicted injury is not even a cognizable injury for purposes of Article III standing, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013), let alone a basis for asserting irreparable harm.

*Second*, Plaintiffs reference the supposed "diversion of Oregon National Guard members from their state responsibilities, impairing the State's ability to call upon the Guard to protect itself and its citizens or to respond to a natural disaster or other emergency." TRO at 29. But again, the federalization affects only about 200 of the approximately 6,500 members of the Oregon National Guard. And Plaintiffs' diversion-of-resources argument is utterly conclusory. Plaintiffs do not provide a single example of present or reasonably likely future needs that this small federalization will supposedly prevent the state government from addressing.

Plaintiffs and one of their declarants (Craig Dobson) also appear to invoke a somewhat different diversion of resources argument, contending that the deployment will force them to divert resources to deal with those protesting the federalized Guard. But here too, the relevant language of that declaration is so conclusory and devoid of detail that it is utterly meaningless. *See* Decl. of Craig Dobson, ¶ 30, ECF No. 7 ("Scaling resources to address protests based on the federal deployment may mean that PPB is less able to respond to regular public safety calls for service. In this way, the deployment will require PPB to use resources, and funds, that were unnecessary before the deployment was announced."); *id.* ("the deployment will unnecessarily draw upon PPB resources and potentially the resources of our mutual aid partners, depending on the size and nature of subsequent protests"). In any event, reliance on any such "harm" is improper because the argument is not based on anything the Guard will do, but on the theory that people the Guard does not control will protest their presence. A heckler's veto is unacceptable even when directed to constrain private activity; it certainly is not a valid basis for enjoining the President's acts in protection of federal officials and property

*Third*, Plaintiffs reference supposed "economic harm to the people of Oregon and of

Portland." TRO at 27. But Plaintiffs cannot assert an action against the Federal Government purely on behalf of its citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). And in any event, Plaintiffs provide no support of this contention, except a newspaper article suggesting that deployment of the Guard in the *District of Columbia* resulted in a seven percent drop in foot traffic the week after the Guard was deployed there. *See* Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, Washington Post (Aug. 29, 2025).[2] That is not valid evidence of irreparable harm here. The deployment in the District is again much larger— roughly 1,400 National Guardsmen from six states in addition to the D.C. National Guard—and the mission there is quite different than the mission in Portland. And in any event, the article does not remotely support the contention that the Guard's deployment caused or is causing any meaningful ongoing economic harm to the District of Columbia.[3] Plaintiffs have utterly failed to make even a colorable showing of irreparable harm justifying injunctive relief.[4]

---

[2] https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trumptakeover- national-guard-impacts/.

[3] The article notes that, *before the Guard showed up*, "[b]y several key indicators—marketing forecasts, street-level foot traffic, hotel occupancy—Washington's tourism economy is sliding." Similarly, weeks before the federal deployment, the District's marketing organization partner "had forecast a roughly 5 percent dip in international visitors this year." And the alleged economic harm that the article was discussing was a potential diminution in tourism during the last weeks of tourist season before school starts, a period that has now passed. In any event, a single-digit drop in foot traffic, over one week, that could be attributable to any number of causes, is hardly evidence of irreparable economic harm.

[4] Approximately two hours before Defendants' response to the TRO motion was due, Plaintiffs filed four declarations pertaining to economic activity, from a vending machine company, a company that "celebrates art, music, and handmade goods by local creators," a coalition of small businesses, and a baby goods store. ECF Nos. 29-32. The Court should not consider these declarations in deciding the motion but they in any event add nothing to the analysis. All of them are entirely conclusory and simply assume that the Guard's presence will lead to a significant decrease in foot traffic and economic activity in Portland, a premise that is both entirely unsupported and which makes no sense in light of the small number of Guardsmen and their protective function.

### III.    The Remaining Factors Counsel Against Injunctive Relief.

In stark contrast to the nonexistent harms to Plaintiffs, the injunction Plaintiffs seek would impose significant harms on the federal government and the public at large. The federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law." *Newsom*, 141 F.4th at 1054 (citing *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020)). Enjoining the deployment and federalization would threaten that interest by preventing the President from protecting federal employees and property from violence at the hands of violent mobs in Portland and interfering with those employees' ability to enforce federal law. As noted, National Guard members have been called up to protect federal personnel and property following a nearly constant spate of violence, threats and intimidation of federal officials.

 Enjoining the National Guard deployment, and pulling National Guard members from the area, would pose a substantial risk to federal personnel and property, as well as to federal officials' ability to enforce federal law. ICE agents (and other federal personnel) would be essentially left on their own in the performance of their duties. As a result, federal officers would have either have to face the very real risk of ongoing violence that the President found to be unacceptable, or they would be compelled to curtail their enforcement of federal law in some instances to avoid the threat of violence. Contrary to Plaintiffs, reliance on the Portland Police is not sufficient. *See* TRO at 13. As explained above, the local police's responses to DHS's requests for assistance have not been satisfactory. The President is not required to cede his constitutional and statutory authority to protect federal officials and property to local officials who, although not supportive of the violence itself, unquestionably sympathize with the political aims of the protestors.

As was the case in Los Angeles, the federal government's "significant" interest in preventing these extraordinary acts of violence and threats to federal personnel outweigh the "speculative" harms that Plaintiffs put forward here. *See Newsom*, 141 F.4th at 1055. The speculative nature of Plaintiffs'

harms likewise makes clear that they did not establish irreparable injury warranting extraordinary relief. *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm.").

## IV.    Any Injunctive Relief Should Be Narrowly Tailored And Permit Lawful Agency Activity.

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). Plaintiffs did not file a proposed order for the Court to consider alongside its kitchen-sink motion. To the extent the Court intends to grant Plaintiffs' request for a temporary restraining order, such relief should be narrowly tailored to apply only to Plaintiffs, and to enjoin only specific activities the Court finds are unlawful. For example, as discussed above, even if the Court finds PCA violations, that would plainly not be a basis to enjoin the deployment and federalization itself, as Plaintiffs request. In addition, no relief should run against Defendants DHS and Secretary Noem. None of Plaintiffs' arguments provide a basis from which to enjoin those parties, which were not made defendants in *Newsom* or the District of Columbia's National Guard suit. The Court also lacks jurisdiction to enjoin the President. "[C]ourts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-803 (1992) ("Federal courts have 'no jurisdiction of a bill to enjoin the President in the performance of his official duties.'").

## V.    If The Court Grants Any Relief, It Should Issue a Preliminary Injunction.

The motion should be denied. But if the Court grants relief, it should issue a preliminary injunction and should not style its order as a TRO. TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck*

Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order

*Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). Here, where Plaintiffs have filed a 31-page brief along with multiple declarations and dozens of exhibits, Defendants have responded with their own comprehensive brief and multiple supporting declarations, the Court is holding a hearing, and the Court's basis for issuing any injunctive order would be strongly challenged, such an order would effectively be a preliminary injunction and would thus be appealable. *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018). But to avoid any doubt, the Court should simply grant a preliminary injunction if it believes that interim relief is warranted at all (which it is not).

## VI.    Any Injunctive Relief Should Be Stayed Pending Appeal and Accompany a Bond.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum, administratively stayed to allow the United States to seek an emergency, expedited stay from the Court of Appeals or Supreme Court if an appeal is authorized. Notably, in *Newsom*, Judge Breyer administratively stayed both of the injunctions he issued—he administratively stayed the more recent injunction issued on September 2 for a period of 10 days. 2025 WL 2501619, at *29. And the Ninth Circuit has already made clear—by administratively staying and then staying the first injunction, and then almost immediately administratively staying the second injunction in that case—that it will likely not allow such an injunction into effect at least until a panel of that Court decides a motion for a stay pending appeal. At least a modest stay is warranted to allow for orderly briefing in the court of appeals.

Any injunctive relief should also be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

### CONCLUSION

The Court should deny Plaintiffs' motion.

Dated:     October 2, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

/s/  *Jean Lin*
JEAN LIN
(NY Bar No. 4074530)
Special Litigation Counsel
CHRISTOPHER D. EDELMAN
(DC Bar No. 1033486)
Senior Counsel
BENJAMIN S. KURLAND
(DC Bar No. 1617521)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: (202) 514-3716
Email: jean.lin@usdoj.gov


*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 35 pages, excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ *Jean Lin*
JEAN LIN
(NY Bar No. 4074530)
Special Litigation Counsel
Federal Programs Branch