IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON and THE CITY OF PORTLAND<br><br>Plaintiffs<br><br>v.<br><br>DONALD TRUMP, *et al.*<br><br>Defendants. | Case No.: 3:25-cv-01756<br><br>**DECLARATION OF ROBERT CANTU** |

I, Robert Cantu, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. This declaration is submitted in support of Defendants' opposition to Plaintiffs' Motion for Temporary Restraining Order (TRO).

3. I am the Deputy Director of the Federal Protective Service (FPS), Region 10, which encompasses Alaska, Washington State, Idaho, and Oregon. I have served in that position since September 9th, 2023. FPS is the law enforcement agency within the U.S. Department of Homeland Security (DHS) that protects the federal government facilities and persons therein in accordance with 40 U.S.C. § 1315.

4. FPS is a small agency with a total of 776 law enforcement officers. Of that number, only 497 are Inspectors, whose primary mission is to patrol and respond to law enforcement incidents at the federal buildings in their area of responsibility.

While FPS can surge its Inspectors to respond to emergency situations, it is not resourced to provide a large-scale response to ongoing civil unrest or sustained attacks on federal facilities or federal employees working in those facilities.

5. Since June 2025, there have been ongoing protests of the Administration's immigration policies with many occurring at federal facilities in major urban centers, such as Los Angeles, San Francisco, Chicago, Dallas, Seattle, Denver, New York, Boston, Portland and Washington DC. Many of these protests, at times, have turned violent, requiring FPS to use crowd control tactics to prevent the destruction of federal facilities or serious injury to federal employees and the public.

6. FPS has had to deploy many of its officers to those cities to increase its presence at the facilities where the protests are occurring. Even when the protests are peaceful, FPS needs to have an increased presence so that it can adequately respond to outbreaks of violence if they occur. This has resulted in a reduction in the number of FPS Inspectors available in other areas of the country where FPS services are needed. Indeed, all federal buildings continue to experience incidents requiring an FPS law enforcement response, and the continued deployment of FPS officers in response to the immigration protests stretches an already thin force beyond what is safe and effective. While FPS officers are expected to respond to emergencies after hours and on weekends and holidays, they are not expected to work 12-hour shifts, seven days a week, which has become the norm.

7. In Portland, Oregon, there have been regular protests since June 2025 at the Immigration and Customs Enforcement (ICE) building, also known as the Lindquist Federal Building, located at 4310 South Macadam Avenue. While many of the protests have been peaceful, there have been numerous occasions where groups of protestors have become extremely violent, threatening the building and federal law enforcement officers.

8. One of the most significant incidents occurred on June 14, 2025, when at approximately 4:30 p.m., protesters (including one who was carrying a firearm) began to advance up the driveway towards the main gate of the facility. They were throwing rocks and sticks at the guard shack and launching M80 fireworks at FPS officers. A mortar was thrown at the front entrance of the building, causing minor injuries to an officer. Two separate fires broke out in front of the building which had to be extinguished by FPS officers. FPS officers had to barricade themselves inside the building and protesters placed chains on the exterior doors. At

approximately 5:59 p.m., protesters attempted to breach the front door and broke the front door glass. FPS officers were forced to deploy their long guns but did not use them. The protestors continued to throw mortars at the building. At approximately 6:12 p.m., the Border Patrol Tactical Unit (BORTAC) responded to the facility with an up-armored tactical vehicle. By approximately 6:24 p.m., FPS officers were able to leave the building and, along with ICE Special Response Team (SRT) and BORTAC, were able to push the protesters past the driveway and sidewalk, into the middle of the street. A number of FPS officers suffered minor injuries from rocks and fireworks. Three individuals were arrested and charged with Assault on a Federal Officer (18 U.S.C. § 111).

9. Since the June 14th incident, protesters have continued to accost both the building and federal officials as the officers execute their duties. For example, on June 29, 2025, at approximately 3:27 a.m., a protester tampered with an access card reader providing entry to the Lindquist Building. When FPS officers took the individual into custody after a foot pursuit, he resisted arrest by biting and kicking the officers.

10. Even more concerning is when protesters threaten officers with dangerous weapons. For example, on June 24, 2025, at approximately 11:09 p.m., after officers gave a warning to clear the driveway of the facility, one protestor shot officers with a paintball gun and another shined a laser in an officer's eyes, after the officers warned the individuals to clear the facility's driveway. That same night, a third protester was detained for assaulting an officer with a machete and knife. The officer deployed his taser and was able to recover the machete and knife before he was injured. All three protesters were arrested and charged with Assault on a Federal Officer (18 U.S.C. § 111).

11. FPS and ICE officers have also been the targets of doxing[1], and at the end of each shift, it is not uncommon for officers, who have been deployed to Portland from other locations to fill operational needs, to be tailed and followed back to their hotels. Those officers have reported that groups have protested at the hotels where they were staying, both on the Oregon and Washington State sides of the Portland metropolitan area.

---

[1] Doxing occurs when an individual's personally identifiable information is gathered and publicly released for malicious purposes, such as public humiliation, stalking, identity theft, or targeting for harassment or physical violence.

Declaration of Robert Cantu

3

12. It is extremely common for protesters to attempt to impede government vehicles as they enter or exit the facility.  Once the vehicles stop, the protesters surround the vehicle, shouting threats at the occupants.  For example, on August 9, 2025, at approximately 1:00 a.m., a group of protesters became aggressive when an ICE vehicle was departing the facility and began striking the vehicle with their fists.  FPS had to deploy pepperballs to push the protesters back away from the vehicle.

13. In addition, on September 29, 2025, at approximately 6:52 p.m., an FPS officer had to deploy his pepper spray fogger against a protester who refused to comply with multiple orders to depart federal property.  The protester was part of a larger group standing in front of and to the right of the driveway.  At approximately 10:26 p.m., FPS issued a warning for protesters to clear the driveway.  At approximately 10:31 p.m., two FPS officers deployed their pepper spray foggers at protesters who were shining high-powered strobe lights in the faces of the FPS officers attempting to push the crowd back from the driveway.  One of the FPS officers who had the strobe light directed at him experienced pain in his eyes and head and spotting of his vision.

14. The above examples are part of a larger coordinated effort to obstruct lawful federal enforcement actions based at the Lindquist Building.  The facility is subject to nightly protests, which risk escalation at any moment.  In addition, there are concerns that the protesters may be protecting domestic terrorist organizations that are seeking to prevent the deportation of criminal aliens within the State of Oregon. Because of these concerns and the volatility of the situation in Portland, FPS has been forced to drastically alter its operations in a manner which is currently unsustainable.

15. Normally, FPS would be able to rely on the Portland Police Bureau (PPB) to assist with large scale law enforcement operations related to federal facilities in Portland.  FPS has been informed by PPB, however, that they will only respond to "life/safety" situations, but not anything immigration related.  For example, on September 9, 2025, at approximately 12:21 a.m., a female counter-protester was surrounded by a group of twelve to thirteen individuals.  The began to physically harasser her by taking her water bottles and shining a high-powered flashlight in her eyes. At approximately 1:08 a.m., FPS requested assistance from PPB.  PPB dispatch responded that two units would respond but an estimated time of arrival (ETA) could not be provided.   At approximately, 1:15 a.m., FPS called PPB

dispatch back to request an ETA. At approximately 1:27 a.m., a PPB Sergeant called in requesting a description of the situation and the counter-protester being harassed. At approximately 1:33 a.m., a PPB patrol car drove by the area but did not leave their vehicle or engage with the situation. At approximately 1:44 a.m., FPS called PPB dispatch again, emphasizing that the situation was not an immigration issue or related to federal property but rather a civilian in distress and that the counter-protester was surrounded and in danger. At approximately 1:46 a.m., FPS contacted PPB once again and PPB stated that they did not perceive the counter-protester to be in distress or at risk of bodily harm and would not intervene. The counter-protester continued to be harassed, spit on and threatened with physical harm. The counter-protester was permitted to come onto federal property for her safety. At approximately 2:27 a.m., FPS officers pushed the protestors off of federal property back away from the counter-protestor so that she could leave the federal property safely. The counter-protester fled the area southbound on Macadam Street with a group of protesters attempting to follow her. FPS believed that the counter-protester had enough of a head start to escape the area safely. At no point did PPB respond or assist FPS with the incident.

16. This situation has resulted in FPS having to rely almost exclusively on ICE SRT for assistance in preventing the violent protesters from attacking immigration officers and the ICE facility where they work. While having ICE SRT as an available resource is invaluable to FPS, their primary mission is to handle high-risk immigration enforcement operations. As such, their continued assistance to FPS will become a drain on those resources and is not a practical ongoing solution.

17. FPS officers have a broad range of responsibilities within their respective areas of responsibility. Not only do they respond to law enforcement calls, but they also conduct routine security inspections of the facilities and contract security guards working in the buildings. They are also responsible for conducting facility security assessments (FSAs), during which they identify security vulnerabilities for a building and make recommendations to the building's Facility Security Committee (FSC) how best to mitigate those risks. FPS is resourced to patrol and respond to law enforcement calls during the workday when the facilities it protects are open to employees and/or the public. While FPS officers will occasionally respond to emergencies after hours and on weekends and holidays, they do not typically have to do that repeatedly over an extended period.

18. The sustained violence associated with the protests in Portland has required FPS Region 10 to deploy officers from the other FPS Regions. To date, 115 FPS officers have had to deploy to Portland to maintain a 24/7 operational tempo. Removing these officers from their normal duty stations means that the buildings they are assigned to must rely on other FPS officers or the local police force to respond to law enforcement incidents. Moreover, the security related functions that the assigned officers normally perform end up being delayed.

19. FPS's efforts to contain the violence associated with the protests in Portland have placed an unreasonable strain on the FPS law enforcement community as well as on FPS's limited resources. To date, FPS has expended over two million dollars in overtime pay and expenses in response to the violent protests in Portland since June 5, 2025. Because those expenses were not anticipated, they were not factored into FPS's FY25 budget. FPS expects the costs to continue at the same rate or higher in FY26.

20. I understand that for these reasons DHS has requested, and the Department of War has agreed, to deploy members of the National Guard to assist FPS in the State of Oregon. Given FPS's urgent need for additional support in Portland, that assistance is vital. Because the National Guard has the personnel, resources and training to provide non-law enforcement support in an effective and efficient manner, they are the ideal partner for FPS to work with in protecting federal facilities, and FPS welcomes their assistance.

21. Having National Guard support will enable FPS to reduce the number of FPS Inspectors deployed to Portland and return them to their primary mission at their normal duty locations. The presence of the National Guard in Portland will also enable FPS to surge its forces to other cities as necessary to deal with ongoing and anticipated threats. Most importantly, it will enable FPS to perform its mission without having to request support from PPB.

22. It is my understanding that the National Guard members working with FPS will not engage in any law enforcement operations but will only provide FPS with direct support related to federal facility protection, access control and crowd control measures. The National Guard members supporting FPS will be instructed to call an FPS officer anytime a law enforcement response at a federal facility is necessary and to wait for the FPS officer to respond, to the extent practicable. FPS is very familiar with this type of arrangement, as it is similar to the relationship that FPS has with the contract security guards who do not have any law

enforcement authority but provide facility protection, access control and crowd control measures at the approximately 8,000 federal facilities that FPS protects daily.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on October 2, 2025, at Seattle, Washington

ROBERTO R CANTU
Digitally signed by ROBERTO R CANTU
Date: 2025.10.02 10:57:19 -07'00'

ROBERT CANTU