# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**STATE OF OREGON** and the
**CITY OF PORTLAND**,

        Plaintiffs,

    v.

**DONALD TRUMP**, in his official capacity as
President of the United States; **PETE
HEGSETH**, in his official capacity as
Secretary of Defense; **U.S. DEPARTMENT
OF DEFENSE**; **KRISTI NOEM**, in her
official capacity as Secretary of Homeland
Security; and **U.S. DEPARTMENT OF
HOMELAND SECURITY**,

        Defendants.

Case No. 3:25-cv-1756-IM

**OPINION AND ORDER GRANTING
MOTION FOR TEMPORARY
RESTRAINING ORDER**

Dan Rayfield, Oregon Attorney General; Benjamin Gutman, Oregon Solicitor General;
Dustin Buehler, Special Counsel; Scott Kennedy, Brian Simmonds Marshall, Thomas Castelli,
Ian Van Loh, and Rachel Sowray, Senior Assistant Attorneys General; and Alexander C. Jones
and Derek Olson, Assistant Attorneys General, OREGON DEPARTMENT OF JUSTICE, 100 SW
Market Street, Portland, OR 97201. Attorneys for Plaintiff State of Oregon.

Robert Taylor, Portland City Attorney; Caroline Turco, Senior Deputy City Attorney; and
Naomi Sheffield, Chief Deputy City Attorney, OFFICE OF THE PORTLAND CITY ATTORNEY,
1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Attorneys for Plaintiff City of
Portland.

Brett A. Shumate, Assistant Attorney General; Eric J. Hamilton, Deputy Assistant Attorney
General; Alexander K. Haas, Branch Director, Federal Programs Branch; Jean Lin, Special
Litigation Counsel, Federal Programs Branch; Christopher D. Edelman, Senior Counsel; and
Benjamin S. Kurland, Trial Attorney, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, FEDERAL
PROGRAMS BRANCH, 1100 L Street, NW, Washington, DC 20005. Attorneys for Defendants.

**IMMERGUT, District Judge.**

This case involves the intersection of three of the most fundamental principles in our constitutional democracy. The first concerns the relationship between the federal government and the states. The second concerns the relationship between the United States armed forces and domestic law enforcement. The third concerns the proper role of the judicial branch in ensuring that the executive branch complies with the laws and limitations imposed by the legislative branch. Whether we choose to follow what the Constitution mandates with respect to these three relationships goes to the heart of what it means to live under the rule of law in the United States.

On June 7, 2025, President Donald J. Trump issued a Memorandum broadly authorizing the federalization of National Guard service members under 10 U.S.C. § 12406, without specifying a designated location or duration. This Memorandum authorized federalized troops to temporarily protect U.S. Immigration and Customs Enforcement ("ICE") and other federal employees "who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations." Declaration of Major General Timothy L. Rieger ("Rieger Decl."), Ex. D, ECF 37 at 20.

In the wake of this June 7, 2025 Memorandum, protests ensued at the ICE facility in Portland. From June 11th to June 25th, these protests included violent behavior and required an increased law enforcement presence by both the Portland Police Bureau ("PPB") and federal law enforcement agencies. After June 25, 2025, however, the protests were generally peaceful in nature with only sporadic incidents of violence and disruptive behavior. By late September, these protests typically involved twenty or fewer people.

On September 27, 2025, President Trump posted a message on his Truth Social account stating that he was directing Pete Hegseth, the Secretary of War, to provide troops to protect "War ravaged Portland" from "Antifa, and other domestic terrorists" and authorizing "Full Force, if necessary." Declaration of Assistant Attorney General Brian Marshall ("Marshall Decl."), Ex. 12, ECF 9-12 at 2. In response, on September 28th, Secretary Hegseth issued a memorandum authorizing the deployment and federalization of 200 of Oregon National Guard service members, over the objection of Oregon's Governor, Tina Kotek.

That same day, the State of Oregon and the City of Portland (collectively, "Plaintiffs") brought this lawsuit against President Trump, Secretary Hegseth, the Secretary of Homeland Security Kristi Noem, and the U.S. Departments of Defense and Homeland Security (collectively, "Defendants"). Plaintiffs allege that Defendants' actions are *ultra vires*[1] and therefore unlawful because they violate 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 175 by federalizing Oregon's National Guard. Plaintiffs also allege that Defendants' conduct violates the Tenth Amendment and the separation of powers doctrine by infringing on Oregon's state sovereignty and police powers. Finally, Plaintiffs assert that Secretary Hegseth's Memorandum violates the Administrative Procedure Act ("APA") because it is not in accordance with the law, is in excess of statutory jurisdiction, authority, or limitations, and is arbitrary and capricious.

Plaintiffs move for a temporary restraining order ("TRO") and stay of Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon

---

[1] *Ultra vires* actions allow courts to adjudicate "constitutional challenges to presidential acts" and "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority." *Murphy Co. v. Biden*, 65 F.4th 1122, 1128–29 (9th Cir. 2023) (first citing *Franklin v. Massachusetts*, 505 U.S. 788, 790–91 (1992); then citing *Larson v. Domestic & Foreign Com. Corp.* 337 U.S. 682, 689–90 (1949)).

National Guard service members to Portland. Defendants respond that this Court may not second guess the President's determination that conditions in Portland warranted a federal military response. Defendants also contend that their conduct did not violate the U.S. Constitution or any statutory provision or exceed their statutory authority.

This Court has considered the briefing and declarations submitted in this case, the submission of *amici*, and the presentation of the parties at the hearing on Plaintiffs' TRO on October 3, 2025. For the foregoing reasons, this Court finds that Plaintiffs have met their burden at this stage of the litigation and GRANTS Plaintiffs' motion for a temporary restraining order.

## STANDARDS

In deciding whether to grant a motion for a TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1122–23 (9th Cir. 2024) (brackets omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The first factor— likelihood of success on the merits—is 'the most important.'" *Apache Stronghold v. United States*, 101 F.4th 1036, 1049 (9th Cir. 2024) (quoting *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). In addition, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary

injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entmt. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## BACKGROUND

### A. The National Guard

Members of the National Guard must be "activated" to serve on a mission. Declaration of Lieutenant General Jeffrey S. Buchanan, (Retired) ("Buchanan Decl.") ECF 9-1 ¶ 11. First, they may serve in "State Active Duty" in the state where they are commissioned when the governor of the state or commonwealth activates their unit, and they are under the command of the governor. *Id.* ¶ 12. Second, they may be activated under Title 32 of the United States Code, where the governor asks the federal government to bring troops into active duty for a particular mission, and they are under the command of the governor, but the costs are borne by the federal government. *Id.* ¶ 13; *see also* 32 U.S.C. § 502(f)(2)(A). Finally, they may be activated under Title 10 of the United States Code, where they are considered federal military and under the command of the U.S. President, *i.e.*, the "federalized" National Guard. Buchanan Decl. ¶ 14; *see also* 10 U.S.C. § 12406. This is the activation that occurred here.

State Active Duty National Guard troops and those activated under Title 32 may engage in domestic law enforcement functions, subject to restrictions under state law. Buchanan Decl. ¶ 25. Federalized National Guard troops activated under Title 10 may not engage in domestic law enforcement activities, with some exceptions. *Id.* Members of the National Guard generally do not receive training to perform local law enforcement tasks, such as learning de-escalation techniques, the use of non-lethal force, or how to properly conduct criminal investigations. *Id.* ¶¶ 34–46.

**B. Law Enforcement Resources in Portland**

Plaintiffs present several witness declarations from local law enforcement officials detailing local and state law enforcement resources that stand ready to address unlawful conduct at protests in Portland. The primary local law enforcement agency in Portland is the Portland Police Bureau. PPB employs approximately 812 officers. Declaration of PPB Assistant Chief of Operations Craig Dobson ("Dobson Decl."), ECF 7 ¶ 7. All PPB officers are trained in crowd management and First Amendment law. *Id.* ¶ 8. Crowd Management Incident Commanders receive an additional 40 hours of crowd management training. *Id.* ¶ 11. PPB also has a Rapid Response Team of 50 officers that is specially trained in crowd management, intervention (removing someone from a protest), and "direct crowd control through approved maneuvers and tactics." *Id.* ¶ 13. The Rapid Response Team receives an initial 40 hours of crowd control training and then 10 hours of crowd control training per month, meeting the standards of the National Tactical Officers Association. *Id.* The Rapid Response Team works under a Crowd Management Incident Commander. *Id.* PPB also has specially trained Dialogue Officers who work with protest organizers, *id.* ¶ 12, and Mobile Field Forces, who can move from one precinct to another as the situation demands, *id.* ¶ 15.

Crowd Management Incident Commanders work outside of their everyday PPB roles and are activated in that role based on PPB's risk assessment of an event. *Id.* ¶ 11. These commanders are activated for large events, such as the April 2025 "No Kings" protest that drew approximately 40,000–50,000 participants. *Id.* ¶ 14. PPB also uses traffic control officers and can coordinate with other local and state resources and existing federal partners as needed. *Id.* ¶¶ 14, 17. PPB has mutual aid agreements with the Multnomah County Sheriff, the City of Gresham, the Port of Portland, Clark County, Washington, and the Oregon State Police. *Id.* ¶ 17. PPB also can call in off-duty officers if PPB anticipates risks will stretch the capacity of PPB's on-duty

workforce. *Id.* ¶ 16. If additional resources beyond all of these are critically needed, PPB may request that Oregon's Governor provide National Guard resources for a locally declared emergency. *Id.* ¶ 18.

The Multnomah County District Attorney took office in January 2025 with a strong commitment to prosecuting political violence and public criminal activity. Declaration of Multnomah County District Attorney Nathan Vasquez ("Vasquez Decl."), ECF 42 ¶ 5. The District Attorney's Office has a Strategic Prosecution Unit that works closely with the Crowd Management Incident Commander. *Id.* ¶ 6. Strategic Prosecution Unit District Attorneys are on call 24 hours per day. *Id.* ¶ 6. They meet weekly with PPB to assess public safety needs. *Id.* ¶ 8. When there is a demonstration that is anticipated to require a law enforcement presence, a DDA is assigned and a supervisory DDA participates in pre-event planning to try to prevent violent gatherings. *Id.* ¶¶ 6–7.

The Oregon State Police is a partner with PPB. It responds to requests from local law enforcement for assistance. Declaration of Oregon State Police Criminal Investigations Captain Cameron Bailey ("Bailey Decl."), ECF 8 ¶ 11. Although Portland has not requested the Oregon State Police's help with the current protests, the State Police stands ready to assist PPB should it so request. *Id.* ¶ 13. The Oregon State Police has approximately 700–800 sworn officers at any given time. *Id.* ¶ 5. The State Police trains every trooper on use of force, de-escalation, and crowd management. *Id.* ¶¶ 7, 9.

Existing federal law enforcement resources also protect federal facilities in Portland. *See, e.g.*, Dobson Decl. ¶ 25; Declaration of Deputy Director of the Federal Protective Service Robert Cantu ("Cantu Decl."), ECF 40 ¶¶ 17, 37 (describing federal law enforcement activities in Portland); Declaration of Seattle Enforcement and Removal Operations Field Officer Director

Cammilla Wamsley ("Wamsley Decl."), ECF 38 ¶ 15 (describing federal law enforcement resources assisting in Portland). The federal government also has deployed additional federal law enforcement officers to Portland from around the country in response to protests when necessary. Cantu Decl., ECF 40 ¶ 18; Wamsley Decl., ECF 38 ¶ 20.

## C. Protests in Portland

ICE has a facility located at 4310 S. Macadam Avenue in Southwest Portland. Dobson Decl., ECF 7 ¶ 19. This facility encompasses approximately one block of the City of Portland. *See* Marshall Decl., Ex. 21, ECF 9-21 at 2. Following federal officials' arrests of asylum seekers in Portland's Immigration Court in June 2025, protests broke out around the ICE facility. These protests were small, generally involving fewer than 100 people, *see* Dobson Decl., ECF 7 ¶ 20, but were concentrated at the ICE facility and disruptive to the facility. The ICE facility is within PPB's Central Precinct. *Id.* ¶ 21. Unless a Crowd Management Incident Commander is activated, protests at the ICE facility are monitored by Central Precinct. *Id.*

Assistant Chief Dobson activated a Crowd Management Incident Commander for the ICE facility protests from June 11–25, 2025, who in turn activated a PPB Rapid Response Team, mostly in a monitoring capacity. *Id.* ¶ 22. The protests were mostly peaceful, but there were some individuals who engaged in unlawful conduct requiring PPB intervention. *Id.* PPB made 25 arrests from June 11–19, 2025. *Id.* After June 25, PPB transitioned monitoring over to Central Precinct because PPB determined that the protests were low risk. *Id.* ¶ 23. Since July 18, 2025, PPB has "carried out routine monitoring of the ICE-Facility protests without serious incident," and "the risks posed by nightly ICE-Facility protests have not merited anything more than standard, periodic monitoring like any other neighborhood in the City." *Id.* ¶ 24.

Defendants proffer three declarations in support of their opposition to the TRO from individuals who do not appear to be based in Oregon. These declarations detail some specific

instances of violence and other unlawful conduct involving the ICE facility and protests from this same period. On June 8, 2025, protestors attempted to block the vehicle entrance. Wamsley Decl., ECF 38 ¶ 17. On June 11, protestors lit fires to barricade a vehicle gate. *Id.* ¶ 11. Four offenders were arrested and are being prosecuted for arson, assaulting a federal officer, and depredation of federal property. *Id.* On June 14, protestors threw rocks and sticks and M80 fireworks at Federal Protective Services ("FPS") officers. Cantu Decl., ECF 40 ¶ 8. The Border Patrol Tactical Unit and the ICE Special Response Team responded, and the violent protest was under control within approximately two hours of its start. *Id.* A few FPS officers suffered minor injuries, and three protestors were arrested by federal officers and charged with assault on a federal officer. *Id.*

On June 24, 2025, one protestor was detained for assaulting a federal officer with a machete and knife—the officer deployed his taser and recovered the protestor's weapons without getting injured. *Id.* ¶ 10. Another protester shot officers with a paintball gun, and a third shined a laser in an officer's eyes. *Id.* All three were arrested by federal law enforcement and charged with assault on a federal officer. *Id.* Another protester attempted to set a U.S. flag on fire in the driveway. Wamsley Decl., ECF 38 ¶ 11. On June 29, a protestor tampered with the card reader at the ICE facility and resisted arrest. Cantu Decl., ECF 40 ¶ 9. Ultimately, three card readers were damaged in June 2025, as well as damage to gates and windows. Wamsley Decl., ECF 38 ¶ 12. With the card readers broken, personnel must call someone ahead of time to let them in, causing delays and inconvenience. *Id.* The ICE facility in Portland shut down from June 13, 2025, until July 7, 2025, due to the property damage from protesters. *Id.* ¶ 13. As a result of the closure, most Portland ICE officers had to work out of separate temporary space. *Id.*

On August 20, 2025, PPB activated a Crowd Management Incident Commander from 4:00 p.m. to 7:30 p.m., having assessed potential risk of increased protest activity that did not end up occurring. Supplemental Declaration of Craig Dobson ("Dobson Supp. Decl."), ECF 21 ¶ 3. Otherwise, from July 18th to September 27th, Central Precinct police officers handled the ICE protests with routine monitoring. Dobson Decl., ECF 7 ¶¶ 24, 25. The protests generally were limited to fewer than 30 people and were "largely sedate." *Id.* ¶ 25. If the protests were to increase or threaten public safety, PPB could call on additional available resources. *Id.* ¶ 26. But the protests have been such a minor issue, that the normal nightlife in downtown Portland has required more police resources than the ICE facility. *Id.*

Federal law enforcement encountered some instances of unlawful conduct in the two months leading up to the federal deployment. On August 9, 2025, protesters attempted to block an ICE vehicle and federal officers had to use pepper spray so the vehicle could depart. Cantu Decl., ECF 40 ¶ 12. On September 1, protestors assembled a "guillotine," and two protestors had riot shields. Wamsley Decl., ECF 38 ¶ 16. That night, PPB checked in twice with FPS Supervisor Will Turner and was told despite FPS being "down ten tactical officers" who were sent to other parts of the country, he was "not concerned" about the protestors. Declaration of Central Precinct Commander Brian Hughes ("Hughes Decl."), Ex. 1, ECF 46-1 at 2. At one point, however, federal officers had to come out and deploy tear gas to clear the area for a vehicle to exit. *Id.* According to PPB dispatch logs, on that occasion Federal officers arrested "a few" people. Hughes Decl., Ex. 2, ECF 46-2 at 2.

On September 9, 2025, four protestors shined high-powered flashlights in the eyes of drivers leaving the ICE facility. Wamsley Decl., ECF 38 ¶ 18. ICE received additional reports of drivers leaving the building that week having flashlights shone in their eyes. *Id.* PPB, however,

did not receive any requests for assistance from federal officers during the next 17 days of September. Additionally, PPB's independent monitoring of the protests and regular communications with FPS during this time show protests generally averaging less than 20 persons, with a few nights having around 50 persons. *See generally* Hughes Decl., Ex. 3, ECF 46-3 to Ex. 16, ECF 46-16. Sometimes the protests had "higher energy," and sometimes they had skirmishes between protestors, but they rarely had any issues with federal officers or federal property. *Id.*

On September 18, 2025, the protests increased in size to around 150 people, but there were no issues with federal property or personnel and FPS did not request assistance. *Id.*, Ex. 17, ECF 46-17 at 2. On September 19, federal law enforcement employed munitions to break up a crowd and reported to PPB assaults on protestors and one journalist by a known "agitator." *Id.*, Ex. 18, ECF 46-18 at 2 to Ex. 19, ECF 46-19 at 2. There was no reported activity, however, against federal property or personnel.

From Monday, September 22, 2025, through Friday, September 26, 2025, in the days immediately preceding the President's federalization directive, the protests involved around 20 or fewer people. *Id.*, Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26. PPB reported no incidents of disruptions outside the ICE facility except for a few individuals shining flashlights into drivers' eyes. *Id.*, Ex. 25, ECF 46-25 at 2.

In support of their opposition to the TRO, Defendants include in their supporting declarations that federal law enforcement officers are concerned that protests "risk escalation at any moment," Cantu Decl., ECF 40 ¶ 14, and that ICE employees are being "doxed" and having their personal information posted online. Wamsley Decl., ECF 38 ¶ 12. Several Portland ICE officers have had flyers with their names, photographs, and home addresses posted publicly. *Id.*

¶ 18. And on September 12, 2025, a photograph of an unmarked ICE vehicle in Portland was posted online with its make, model, license plate, and location after it left the ICE facility. *Id.* ¶ 18.

Defendants also express concern about danger in Portland because of incidents that have occurred elsewhere in the country. *Id.* ¶ 21. Most concerning is the sniper shooting in Dallas, Texas, targeting an ICE van, and the protest that followed in Chicago when a protestor was found with a firearm. *Id.* ¶¶ 21–22.

**D. Defendants' Actions Relating to Federalization of National Guard**

On June 6 and 7, 2025, violent protests broke out in Los Angeles at ICE facilities and elsewhere. *See Newsom v. Trump* (*Newsom I*), 786 F. Supp. 3d 1235, 1242–43 (N.D. Cal. 2025), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025). On June 7, 2025, President Trump issued a Memorandum to the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, broadly authorizing the federalization of National Guard service members under 10 U.S.C. § 12406. Rieger Decl., Ex. D, ECF 37 at 20–21. The June 7, 2025 Presidential Memo recited that "incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by [ICE] and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws." Rieger Decl., Ex. D, ECF 37 at 20. The June 7, 2025 Presidential Memo also stated that the protests "threaten the security" of ICE detention centers and other federal property. *Id.* The June 7, 2025 Presidential Memo concluded that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." *Id.*

The June 7, 2025 Presidential Memo authorized the federalized troops to "temporarily protect ICE and other United States Government personnel who are performing Federal

functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on *current threat assessments* and planned operations." *Id.* (emphasis added). The number of National Guard troops was to be no fewer than 2,000 and the duration of the deployment under the June 7, 2025 Presidential Memo was 60 days or at the discretion of the Defense Secretary. The June 7, 2025 Presidential Memo did not refer to any specific location.

In response to the June 7, 2025 Presidential Memorandum, that same night Secretary Hegseth issued his own memorandum federalizing 2,000 California National Guard members. *Newsom I*, 786 F. Supp. 3d at 1244. Two days later he federalized another 2,000 California National Guard members and deployed the National Guard along with approximately 700 active duty Marines. *Id.* at 1244–45. The first of these troops arrived to Los Angeles on June 8, 2025. *Id.* at 1245. Governor Gavin Newsom and the State of California sued President Trump and other defendants, obtaining a TRO under § 12406, which was stayed by the Ninth Circuit. *See Newsom v. Trump* (*Newsom II*), 141 F.4th 1032 (9th Cir. 2025).

On September 19, 2025, President Trump explained that the administration was going to "get rid of" the "problems" in cities, including Chicago, Memphis, and Portland. Marshall Decl., ECF 9 ¶ 25. He described that in Portland people were "out of control" and "crazy." *Id.*

On September 25, 2025, the President again described Portland, exclaiming that "nobody's ever seen anything like it" with activity happening "every night," with people that "just burn the place down." Marshall Decl., ECF 9 ¶ 26. President Trump commented on "professional agitators" in Portland who are "paid a lot of money by rich people," "anarchists," and "crazy people" who try to "burn down buildings, including federal buildings," with Portland

having activity "every night . . . for years." *Id.* He promised to do a "pretty big number" on the "people in Portland that are doing that." *Id.*

On September 27, 2025, President Trump posted a message on Truth Social, stating:

> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!

*See* Marshall Decl., Ex. 12, ECF 9-12 at 2. Later that day, Major General Timothy L. Rieger, Acting Vice Chief of the National Guard Bureau, asked Governor Kotek, via Oregon National Guard Adjutant General Alan R. Gronewald, to immediately mobilize 200 National Guard members "to protect federal personnel, functions, and property in Oregon." Rieger Decl., Ex. B, ECF 37 at 14. Major General Rieger threatened federalization of the Oregon National Guard if Governor Kotek refused. Rieger Decl., Ex. B, ECF 37 at 14.

Governor Kotek spoke with President Trump and explained that there was no insurrection or threat to public safety in Oregon. *See* Marshall Decl., Ex. 14, ECF 9-14 at 2–3. She declined to voluntarily activate Oregon's National Guard. *Id.* Oregon's Attorney General emphasized that local law enforcement has "the capacity to manage public safety without federal interference" and that sending "200 National Guard troops to guard a single building is not normal." *Id.*; *see also id.*, Ex. 15, ECF 9-15 at 2–3.

On September 28, 2025, Secretary Hegseth issued his memorandum, authorizing the federalization of 200 Oregon National guard members. Rieger Decl., Ex. C, ECF 37 at 16. He cited and attached the June 7, 2025 Presidential Memo. *Id.* at 17–18. He explained that his memorandum "further implements the President's direction" from the June 7, 2025 Presidential Memo. *Id.* He then directed the federalization and deployment of 200 Oregon National Guard

service members for 60 days. *Id.* Those members will be "under the command and control of the Commander, U.S. Northern Command." *Id.* Plaintiffs filed this lawsuit later that day, and their motion for a TRO on September 29, 2025.

On October 1, 2025, President Trump posted on Truth Social:

> As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem. Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon. ANTIFA and the Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law. We will never allow MOBS to take over our streets, burn our Cities, or destroy America. The National Guard is now in place, and has been dedicated to restoring LAW AND ORDER, and ending the Chaos, Death, and Destruction! We are a Nation of LAW, and we will PREVAIL. Thank you for your attention to this matter!

Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 1, 2025 at 10:36 AM), https://truthsocial.com/@realDonaldTrump/posts/115300118756896774 (emphasis in original); *see also* Rieger Decl., ECF 37 ¶ 12 (stating that the President "further explained" his September 27, 2025, decision to federalize troops in his October 1 Truth Social post). According to Defendants, "National Guard personnel activated would be limited in their functions to protecting federal property, personnel, and functions." Rieger Decl., ECF 37 ¶ 24.; *see also* Cantu Decl., ECF 40 ¶ 22 (same).

## DISCUSSION

Plaintiffs bring claims alleging that Defendants' actions violate (1) the statutory authority granted the President in 10 U.S.C. § 12406, (2) Oregon's sovereign rights as protected in the Tenth Amendment, (3) the Posse Comitatus Act, (4) the Administrative Procedures Act, and (5) the separation of powers, as well as the Militia and Take Care Clauses of the U.S.

Constitution. Plaintiffs argue that they are likely to succeed on all of their claims, that they will suffer irreparable harm absent injunctive relief, and that the balance of equities and public interest tip in their favor. Defendants respond that President Trump determined that the situation in Portland met the statutory criteria under Section 12406, and under the deference this Court must give that determination, Plaintiffs' fail to show a likelihood of success on that claim. And absent a showing that Defendants' conduct violated Section 12406, Defendants argue that Plaintiffs cannot show that they are likely to succeed on their remaining claims.

For the reasons discussed below, this Court finds that Plaintiffs are likely to succeed on their claim that the President's federalization of the Oregon National Guard exceeded his statutory authority under 10 U.S.C. § 12406 and was *ultra vires*. In addition, because Section 12406 defines the scope of Congress's constitutional delegation to the President to federalize the National Guard, Plaintiffs are likely to succeed on their claim that the President exceeded his constitutional authority and violated the Tenth Amendment. Because this Court finds that Plaintiffs are likely to succeed on these two claims, this Court declines to reach Plaintiffs' arguments regarding their likelihood of success on their remaining claims. Plaintiffs also have adequately shown irreparable harm and that the balance of equities and public interest weigh in their favor. This Court therefore grants Plaintiffs' motion for a temporary restraining order.

## A. Likelihood of Success on the Merits

### 1. Section 12406 Claim

#### a. Statutory Framework

Under the Militia Clause of U.S. Constitution, Congress has the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Congress first delegated authority to the President to call forth the militia in extraordinary, limited circumstances in the Militia Act of 1792. *See* Ch.

28, § 1, 1 Stat. 264–65. Congress affirmed this power in the Militia Act of 1795, which "was a precursor to the Militia Act of 1903." *Newsom II*, 141 F.4th at 1047. The Militia Act of 1903 created the modern framework of the National Guard, *see* Ch. 196, § 25, 32 Stat. 775 (1903), and this statute was the "precursor to [10 U.S.C.] § 12406." *Newsom II*, 141 F.4th at 1047.

Under 10 U.S.C. § 12406, the President may federalize National Guard service members if:

> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States.

After making this determination, the President may federalize National Guard troops "in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia." *Id.*

In *Newsom II*, the Ninth Circuit held that 10 U.S.C. § 12406 does not "preclude[] judicial review of the President's determination that a statutory precondition exists." 141 F.4th at 1047.[2] However, a reviewing court must give "a great level of deference to the President's determination that a predicate condition exists." *Id.* at 1048. A court "review[s] the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range

---

[2] Defendants argue that the President's determination under 10 U.S.C. § 12406 is unreviewable, but they acknowledge that the Ninth Circuit has held that this determination is reviewable. Resp., ECF 35 at 18–19.

of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 278 U.S. 378, 399 (1932)). At the same time, the Executive's "exercise of his authority to maintain peace" must be "*conceived in good faith*, in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance." *Id.* (emphasis in original) (quoting *Sterling*, 278 U.S. at 399–400).

### b. Whether the President is Unable with the Regular Forces to Execute the Laws of the United States

Defendants first argue that the President "had a colorable basis for invoking § 12406(3)," *id.* at 1052, because he was "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3); *see* Resp., ECF 35 at 20–22. Although Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States," "minimal interference with the execution of laws is, by itself," insufficient "to justify invoking § 12406(3)." *Newsom* II, 141 F.4th at 1051.

As a threshold matter, this Court must determine to what extent the President can rely on violence that occurred months prior to his September 27, 2025 federalization directive and that had subsided by September. Under *Newsom II*, and as a matter of logic, this Court assesses whether the President invoked Section 12406(3) based on "a colorable assessment of the facts" as they existed *at the time* he federalized the National Guard. *Newsom II*, 141 F.4th at 1051. In *Newsom II*, the Ninth Circuit evaluated the "protesters' interference with the ability of federal officers to execute the laws, *leading up to* the President's federalization of the National Guard on June 7." *Id.* at 1052 (emphasis added). And the Ninth Circuit specifically cited events from "the day before" the June 7, 2025 federalization order to conclude that "the President had a colorable basis for invoking § 12406(3)." *Id.* Likewise, this Court will focus on "the ability of federal

officers to execute the laws[] leading up to the President's federalization of the National Guard" on September 28, 2025. *Id.*

In this case, and unlike in *Newsom II*, Plaintiffs provide substantial evidence that the protests at the Portland ICE facility were not significantly violent or disruptive in the days—or even weeks—leading up to the President's directive on September 27, 2025. The record evidence establishes that while disruption outside the Portland ICE facility peaked in June of 2025, federal and local law enforcement officers were able to "quell[] . . . the disorder." *Newsom II*, 141 F.4th at 1051 (quoting *Sterling*, 278 U.S. at 399–400). As of September 27, 2025, it had been months since there was any sustained level of violent or disruptive protest activity in Portland. During this time frame, there were sporadic events requiring either PPB monitoring or federal law enforcement intervention, but overall, the protests were small and uneventful.

Defendants' declarants describe only four incidents of protesters clashing with federal officers in the month of September preceding the federalization order—on September 1st, 9th, 12th, and without further specification, the second week of September. Wamsley Decl., ECF 38 ¶¶ 16, 18; Cantu Decl., ECF 40 ¶ 15. The first involved protesters setting up a makeshift guillotine to intimidate federal officials; the second involved four people shining overpowered flashlights in the eyes of drivers; the third involved someone posting a photograph of an unmarked ICE vehicle online; and the last involved additional drivers having flashlights shone in their eyes. Cantu Decl., ECF 40 ¶ 15; Wamsley Decl., ECF 38 ¶¶ 16–18. These incidents are inexcusable, but they are nowhere near the type of incidents that cannot be handled by regular law enforcement forces. They also occurred at least two weeks before President Trump issued his directive. More broadly, these incidents are categorically different from the violent incidents as described in *Newsom II* that took place in Los Angeles when the President federalized the

California National Guard on June 7, 2025. *See* 141 F.4th at 1052 ("[P]rotesters threw objects at ICE vehicles trying to complete a law enforcement operation, 'pinned down' several FPS officers defending federal property by throwing 'concrete chunks, bottles of liquid, and other objects,' and used 'large rolling commercial dumpsters as a battering ram' in an attempt to breach the parking garage of a federal building.").

Plaintiffs provide all the PPB call logs in the month of September, which show that PPB worked in close coordination with FPS supervisors and regularly checked the status of the ICE facility. As detailed above, they also show that the protest activity in September generally did not involve violence against federal property or personnel. At the hearing, Defendants highlighted a September 19 entry relating to FPS reporting an assault by a known agitator against other protestors and a journalist. Hughes Decl., Ex. 19, ECF 46-19. This isolated assault, which did not target federal personnel, and which occurred a week before the federalization order, along with the other isolated September incidents, do not approach the level of disruption to federal functions in Los Angeles that *Newsom II* described as occurring "the day before" President Trump's June 7, 2025 federalization of the California National Guard. 141 F.4th at 1052. Neither outside the Portland ICE facility nor elsewhere in the City of Portland was there unlawful activity akin to what was occurring in Los Angeles leading up to June 7, 2025. *See id.* at 1041 (describing the riotous activity).

Defendants also argue that strained FPS resources suffice to show that the President had a colorable basis to invoke Section 12406(3). Resp., ECF 35 at 20–21. But they demonstrate just the opposite, that federal law enforcement officers, unaided by any military forces, were capable of not only "quelling" the violence in June but also "preventi[ng]" it through September. *Newsom II*, 141 F.4th at 1051 (quoting *Sterling*, 287 at 399–400). The Deputy Director of the

Federal Protective Service Region that encompasses Oregon noted that to date, FPS has deployed 115 officers from other FPS Regions to Portland. Cantu Decl., ECF 40 ¶ 18. This deployment of additional federal law enforcement officers reduced the level of disorder between June and September to the point that in the immediate days leading up to the federalization order, around twenty or fewer protesters gathered outside the ICE Facility and "FPS indicated no issues or criminal reports." Hughes Decl., Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26. On September 26, the eve of the President's directive, law enforcement "observed approximately 8–15 people at any given time out front of ICE. Mostly sitting in lawn chairs and walking around. Energy was low, minimal activity." Hughes Decl., Ex. 26, ECF 46-26. It is clear that "the regular forces," i.e. FPS and additional federal law enforcement, *were able* to execute the laws of the United States.

Defendants' argument that this diversion of federal law enforcement officers from out-of-state demonstrates that "the regular forces" were unable to execute the laws is not persuasive. Defendants' proposed test for Section 12406(3) would allow the President to call in the National Guard whenever one law enforcement office receives support from another office, which is a routine aspect of law enforcement activity. If the President could equate diversion of federal resources with his inability to execute federal law, then the President could send military troops virtually anywhere at any time.

In support of their opposition, Defendants also rely on occurrences of violence elsewhere in the country and the risk that peaceful protests in Portland might escalate into violence "at any moment." Resp., ECF 35 at 13. But violence in a different state and the mere potential for future escalation do not provide a colorable basis to invoke Section 12406(3). To accept Defendants' arguments would be to render meaningless the extraordinary requirements of 10 U.S.C. § 12406 by allowing the President to federalize one state's National Guard based on events in a different

state or mere speculation about future events. In other words, violence *elsewhere* cannot support troop deployments *here*, and concern about hypothetical *future* conduct does not demonstrate a *present* inability to execute the laws using nonmilitary federal law enforcement.

Finally, the President's own statements regarding the deployment of federalized National Guardsmen further support that his determination was not "*conceived in good faith*" or "in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance." *Newsom II*, 141 F.4th at 1051 (emphasis in original) (quoting *Sterling*, 287 U.S. at 399–400). Despite the "minimal activity" outside the Portland ICE facility in the days preceding September 27, 2025, Hughes Decl., Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26, President Trump directed Secretary Hegseth "to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists." Marshall Decl., Ex. 12, ECF 9-12. Two days before that directive, the President claimed that Portland has "professional agitators" who are "paid a lot of money by rich people," "anarchists," and "crazy people" who try to "burn down buildings, including federal buildings." *See* Marshall Decl., ECF 9 ¶ 26. Whatever the factual basis the President may have for these allegations, nothing in the record suggests that anything of this sort was occurring "every night" outside the Portland ICE building or in the City of Portland in the days or weeks leading up to his September 27 directive. *Id.*

In sum, the President is certainly entitled "a great level of deference," *Newsom II*, 141 F.4th at 1048, in his determination that he "is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). But "a great level of deference" is not equivalent to ignoring the facts on the ground. As the Ninth Circuit articulated, courts must "review the President's determination to ensure that it reflects a colorable assessment of the facts and law

within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling*, 278 U.S. at 399). Here, this Court concludes that the President did not have a "colorable basis" to invoke § 12406(3) to federalize the National Guard because the situation on the ground belied an inability of federal law enforcement officers to execute federal law. *Id.* at 1051–52. The President's determination was simply untethered to the facts.

### c. Whether there is a Rebellion or Danger of Rebellion

Defendants also argue that the September 28, 2025 federalization order is authorized under subsection two, which permits federalization of the National Guard in response to "a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). In the June 7, 2025 Presidential Memo, President Trump stated that, "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion." Rieger Decl., Ex. D, ECF 37 at 20.

The parties disagree about the meaning of the word rebellion in the statute. "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents and authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Additionally, courts must interpret words in statutes "consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

The Ninth Circuit did not reach the government's rebellion arguments in *Newsom II*. *See* 141 F.4th at 1051. In *Newsom I*, however, the district court performed a detailed statutory interpretation of § 12406(2) that this Court finds instructive. 786 F. Supp. 3d at 1251. There, the court surveyed four dictionaries from the late 1800s and early 1900s—when Congress passed the first predecessor statute to § 12406, the Militia Act of 1903. *See id.* at 1252. From that survey,

the court identified several shared characteristics of a rebellion, as Congress would have

understood the term in 1903:

> First, a rebellion must not only be violent but also be armed.
> Second, a rebellion must be organized. Third, a rebellion must be
> open and avowed. Fourth, a rebellion must be against the
> government as a whole—often with an aim of overthrowing the
> government—rather than in opposition to a single law or issue."

*Id.* at 1253 (emphasis omitted).

The court also considered three of the same definitions that the parties here proffer from

the current edition of *Black's Law Dictionary*:

> 1. Open, organized, and armed resistance to an established
> government or ruler; esp., an organized attempt to change the
> government or leader of a country, [usually] through violence.

> 2. Open resistance or opposition to an authority or tradition.

> 3. Hist. Disobedience of a legal command or summons.

*Id.* at 1252 (quoting *Rebellion*, *Black's Law Dictionary* (12th ed. 2024)).

Plaintiffs advocate for the first definition, whereas Defendants advocate for the second

and third definitions. *See* Resp., ECF 35 at 22–23. As a threshold matter, the second and third

definitions that Defendants proffer fail to meet any of the shared characteristics of early 1900s

definitions of "rebellion"—that the rebellion be (1) violent and armed; (2) organized; (3) open

and avowed; and "against the government as a whole—often with an aim of overthrowing the

government." *See Newsom I*, 786 F. Supp. 3d at 1253.

Even overlooking that problem, however, Defendants' definition of rebellion also

contravenes the greater statutory context of § 12406. *See Dolan*, 546 U.S. at 486. In *Newsom II*,

the Ninth Circuit defined the statutory phrase "unable with the regular forces to execute the laws

of the United States" in subsection (3) by reference to "[t]he statutory context." *See* 141 F.4th

at 1051. To do so, it compared the phrase to subsections (1) and (2). *Id.* "Subsections one and

two of the statute describe unusual and extreme exigencies—invasions and rebellions—that threaten the normal operations of civil government." *Id.* Defendants' broad proffered definitions of rebellion fall far short of an unusual and extreme exigency.

Therefore, this Court reaches the same conclusion as the district court in *Newsom I* that the following "key characteristics" provide the boundaries for what constitutes a "rebellion":

> First, a rebellion must not only be violent but also be armed. Second, a rebellion must be organized. Third, a rebellion must be open and avowed. Fourth, a rebellion must be against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue.

*Newsom I*, 786 F. Supp. 3d at 1253 (emphasis omitted). Here, the protests in Portland were not "a rebellion" and did not pose a "danger of a rebellion," especially in the days leading up to the federalization. As discussed above, Defendants presented evidence of sporadic violence against federal officers and property damage to a federal building. Defendants have not, however, proffered any evidence demonstrating that those episodes of violence were part of an organized attempt to overthrow the government as a whole, and therefore, Defendants have failed to show that the President had a colorable basis to conclude that Section 12406(2) was satisfied.

Defendants nevertheless argue that the President was authorized under Section 12406(2) to quell "violent resistance to lawful enforcement of federal immigration law occurring in Portland." Resp., ECF 35 at 22. Indeed, the President also stated that "protests or acts of violence [that] directly inhibit execution of the laws[] constitute a form of rebellion." Rieger Decl., Ex. D, ECF 37 at 20. These conceptions of rebellion improperly conflate the statutory preconditions in Sections 12406(2) and (3). As discussed above, subsection (3) only authorizes the President to federalize the National Guard if he is "unable with the regular forces to execute the laws of the United States." If subsection (2) ("rebellion") was satisfied whenever "protests or acts of violence directly inhibit execution of the laws," subsection (3) (requiring inability to enforce

federal law) would be superfluous. "If we were to adopt the federal government's reading of subsection [two], it would swallow subsection[ ] [three]." *See Newsom II*, 141 F.4th at 1051; *see also Fischer v. United States*, 603 U.S. 480, 490 (2024) ("Congress would not go to the trouble of spelling out [a list of terms] if a neighboring term swallowed it up . . . .").

### 1. Tenth Amendment

Defendants' *ultra vires* federalization of Oregon's National Guard troops also violates the Tenth Amendment. "No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The Tenth Amendment reserves to the States all rights and powers "not delegated to the United States by the Constitution." U.S. Const. amend. X. In turn, action that "exceeds the National Government's enumerated powers undermines the sovereign interests of the States." *Bond v. United States*, 564 U.S. 211, 225 (2011).

The Constitution grants Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. "Congress has delegated portions of that power to the President" in 10 U.S.C. § 12406. *Newsom II*, 141 F.4th at 1055; *see Youngstown*, 343 U.S. at 636–38 (Jackson, J., concurring). Here, because the President is acting outside that delegation, he is "'tak[ing] measures incompatible with the expressed . . . will of Congress' reflected in that statute." *Newsom II*, 141 F.4th at 1045–46 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). "But the Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States." *Newsom II*, 141 F.4th at 1045. Therefore, the President lacks constitutional authority to federalize the National

Guard once he exceeds the constitutional authority that Congress granted him, such as in Section 12406.[3]

Because the President is federalizing the Oregon National Guard absent constitutional authority, his actions undermine the sovereign interest of Oregon as protected by the Tenth Amendment. Oregon has a Tenth Amendment power to control its National Guard to the extent it is not cabined by the Militia Clause. And as discussed above, Defendants have acted outside the scope of this constitutional authority conferred by Congress. Put another way, Defendants "interfere[d] with the constitutional balance of power between the federal and state governments" by federalizing state National Guardsmen for federal service when no statutory or constitutional authority permitted their federalization. Brief for the State of California and Governor Newsom as Amici Curiae, ECF 41-1 at 9.

## B. Irreparable Harm

Having demonstrated a likelihood of success on the merits, Plaintiffs must also show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). Irreparable harm is that "for which there is no adequate legal remedy." *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). If a plaintiff is likely to succeed on a constitutional claim, "that showing will almost always demonstrate [the plaintiff] is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).

---

[3] In arguing that Defendants did not violate the Posse Comitatus Act, Defendants assert that under the Take Care Clause, "the President has inherent Article II authority to use troops for the protection of federal property and federal function." Resp., ECF 35 at 25. But the President's inherent authority under the Take Care Clause does not support the conclusion that he has inherent authority to federalize the state National Guard to accomplish this purpose. *See Newsom II*, 141 F.4th at 1045 ("[T]he Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States.").

First, Oregon has demonstrated a likelihood that it will suffer a constitutional injury due to Defendants' violation of the state's Tenth Amendment right to control its National Guard. This encroachment on Oregon's police power leaves an indelible mark on Oregon's "sovereignty under the Constitution," *see Shelby County v. Holder*, 570 U.S. 529, 544 (2013), which cannot be remedied by a "legal remedy, such as an award of damages." *Ariz. Dream Act Coal.*, 757 F.3d at 1068. Because Oregon is likely to succeed on its Tenth Amendment claim, it will also likely suffer irreparable harm in the absence of a temporary restraining order.

Second, Plaintiffs claim "ongoing and concrete" harms to their "law enforcement and public safety interests" due to the diversion of state resources. Motion, ECF 6 at 38 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). Federalizing Oregon National Guard members diverts them from their state responsibilities, which impairs the State's ability to call on the Guard to respond to emergencies. *See id.* Further, state and local law enforcement will need to expend additional resources to quell increased civil unrest that is likely to result from the Guard's mobilization. Dobson Decl., ECF 7 ¶ 30 ("Scaling resources to address protests based on the federal deployment may mean that PPB is less able to respond to regular public safety calls for service.").

Defendants respond that the deployment, federalizing only 200 of a total 6,500 Oregon National Guard members, does not substantially impair Oregon's use of the overall force. Resp., ECF 35 at 35–37. However, the 200 members constitute 60% of Oregon National Guardsmen "who are trained to quickly respond to emergencies, including national disasters." Declaration of Brigadier General Alan R. Gronewold, ECF 34 ¶ 3.

Defendants also argue that these harms from diversion are "so conclusory" as to render them "utterly meaningless." Resp., ECF at 37. But the increased need for state and local law

enforcement reflects reality. On the night the September 28, 2025, National Guard federalization order was announced, the size of the protests increased substantially, ballooning to around 200 people, with a second protest at a different location including "a few hundred." Schoening Decl., Ex. B, ECF 12-1 at 1. Moreover, this Court notes that in Los Angeles, the National Guard mobilizations inflamed protests, spawned unrest at new locations, and required additional resources from the California Highway Patrol. Brief for the State of California and Governor Newsom as Amici Curiae, ECF 41-1 at 11. Likewise, the deployment of federal law enforcement officers to Portland in 2020 "reignited" protests and riots that had "largely self-extinguished." Declaration of Caroline Turco, ECF 13 ¶ 3.

## C.  Balancing the Equities and Public Interest

Lastly, the balance of the equities and the public interest, *see E. Bay Sanctuary Covenant*, 993 F.3d at 668, also weigh in favor of granting Plaintiffs' TRO. The public has a profound interest in "prevent[ing] irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (quoting *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008)). Put simply, the issues at stake in this case are important, and the consequences of this Court's decision are far-reaching. As soon as the federalized National Guard deploys to Portland, the state of Oregon will suffer an injury to its sovereignty. Conversely, if the TRO issues, federal law enforcement may continue "to protect federal personnel, functions, and property in Oregon." ECF 1-1 at 2. In addition, both state and federal law enforcement officers may continue to arrest protestors who violate the law. The impact on Defendants, if any, is therefore *de minimis*.[4]

_____

[4] Defendants claim that they have a "significant" and "uncontested interest in the protection of federal agents and property and the faithful execution of the law." *Newsom II*, 141

Furthermore, this country has a longstanding and foundational tradition of resistance to government overreach, especially in the form of military intrusion into civil affairs. "That tradition has deep roots in our history and found early expression, for example, in . . . the constitutional provisions for civilian control of the military." *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also* James Madison, Address to the Constitutional Convention (1787), reprinted in 1 Records of the Federal Convention of 1787, at 465 (Max Farrand ed., 1911) ("A standing military force, with an overgrown Executive will not long be safe companions to liberty. The means of defence [against] foreign danger, have been always the instruments of tyranny at home."). This historical tradition boils down to a simple proposition: this is a nation of Constitutional law, not martial law. Defendants have made a range of arguments that, if accepted, risk blurring the line between civil and military federal power—to the detriment of this nation.

---

F.4th at 1054–55. But the record demonstrates that the threats to that interest in Portland do not warrant the extraordinary measure of bringing in the military. Rather, based on the current record, it is clear that any threats to federal agents and property are readily remedied—as they have been—by federal civilian law enforcement, with the support of State and local law enforcement. Therefore, this interest cannot overcome the countervailing balance of equities and public interest that weigh in favor of Plaintiffs.

**CONCLUSION**

For the above reasons, this Court GRANTS Plaintiffs' Motion for Temporary Restraining Order, ECF 6, and temporarily enjoins Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland. The TRO expires in fourteen days on October 18, 2025, and the parties are ORDERED to comply with the attached TRO. The Defendants' request to stay or administratively stay the Temporary Restraining Order, *see* Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, ECF 35 at 41, is DENIED.

**IT IS SO ORDERED**

DATED this 4th day of October, 2025 at 3:40 p.m. pacific daylight time.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge