DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
LEANNE HARTMANN #T25070201, Mass. BBO #667852
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Scott.Kennedy@doj.oregon.gov

*Counsel for the State of Oregon*

[Additional counsel to appear on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON; the CITY OF PORTLAND; and the STATE OF CALIFORNIA, | Case No. 3:25-cv-01756 |
| Plaintiffs, | PLAINTIFFS' TRIAL BRIEF |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................I

TABLE OF AUTHORITIES ........................................................................................ III

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 4

        A.      Factual Background ................................................................................. 4

                1.      Summer and Early Fall at the Portland ICE Facility. ................................. 4

                2.      The Situation at the ICE Facility in 2025 Stands in Marked
                        Contrast to the Large-Scale Portland Protests that Occurred in
                        2020............................................................................................ 8

                3.      Federal Law Enforcement Personnel Were Also Available to
                        Manage the Situation at the ICE Facility.................................... 9

                4.      Enforcement of Immigration Laws Has Continued in Portland
                        Throughout the Summer and Fall of 2025. ................................. 13

        B.      Procedural Background......................................................................... 15

III.    LEGAL STANDARD ........................................................................................ 16

IV.     ARGUMENT .................................................................................................... 16

        A.      Plaintiffs' Claims Will Succeed on the Merits. .................................. 16

                1.      Defendants' Federalization of Oregon's National Guard is *Ultra
                        Vires* Because it was Not Authorized by § 12406 .................... 16

                        a.      The *Newsom* Standard for Reviewing Federalization, as
                                Previously Interpreted by This Court, Governs in This
                                Case........................................................................ 17

                        b.      Section 12406 Permits Federalization Only Under
                                Exigent Circumstances Existing at the Time of the
                                President's Determination.......................................... 18

                        c.      The Court Should Use These Standards to Review the
                                President's Justification for Invoking § 12406. ............ 20

                        d.      Circumstances at the Portland ICE Facility Do Not
                                Constitute a "Rebellion." .......................................... 21

                        e.      Defendants Have Offered No Colorable Basis to
                                Conclude That the President is Unable to Execute the
                                Laws of the United States in Portland........................... 24

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

2.  Defendants' Cross-State Deployment of the California and Texas National Guard Were Also Unlawful...........................................27

3.  Defendants' Actions Also Violate the 10th Amendment to the U.S. Constitution........................................................................28

C.  Plaintiffs Have Standing and Will Be Irreparably Harmed Absent an Injunction..................................................................................29

D.  The Balance of Equities and Public Interest Favor an Injunction. .......................33

V.  CONCLUSION............................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Booksellers Found. for Free Expression v. Dean*,
    202 F. Supp. 2d 300 (D. Vt. 2002) ................................................................................ 16

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ..................................................................................... 30

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ............................................................................................... 32, 33

*Bond v. United States*,
    564 U.S. 211 (2011) ..................................................................................................... 28

*Ctr. for Biological Diversity v. Mattis*,
    868 F.3d 803 (9th Cir. 2017) ....................................................................................... 34

*Continental Airlines, Inc. v. Intra Brokers, Inc.*,
    24 F.3d 1099 (9th Cir. 1994) ................................................................................. 16, 29

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ..................................................................................................... 19

*Gathright v. City of Portland*,
    482 F. Supp. 2d 1210 (D. Or. 2007) ...................................................................... 29, 30

*Goldman v. Weinberger*,
    475 U.S. 503 (1986) ..................................................................................................... 34

*Illinois v. Trump*,
    No. 25-2798, 2025 WL 2937065 (7th Cir. Oct. 16, 2025) ............................. 22, 24, 25, 31

*Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*,
    730 F.3d 1024 (9th Cir. 2013) ..................................................................................... 16,

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ........................................................................................ 30

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ......................................................................................... 33

*Martin v. Mott*,
    25 U.S. 19 (1827) ..................................................................................................... 1, 18

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

*Maryland v. King*,
    567 U.S. 1301 (2012) ................................................................................................ 30

*Musacchio v. United States*,
    577 U.S. 237 (2016) ............................................................................................ 18, 22

*Newsom v. Trump*,
    786 F. Supp. 3d 1235 (N.D. Cal. 2025) ................................................................... 22

*Newsom v. Trump*,
    141 F.4th 1032 (9th Cir. 2025) ....................................................................... *passim*

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................................. 33

*Orantes-Hernandez v. Thornburgh*,
    919 F.2d 549 (9th Cir. 1990) .................................................................................. 30

*Oregon v. Trump*,
    No. 25-6268, 2025 WL 2951371 (9th Cir. Oct. 20, 2025) ................................. 22, 23

*Pepper v. United States*,
    562 U.S. 47 (2011) ................................................................................................... 18

*R.I.L.-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .......................................................................... 33

*Shelby County v. Holder*,
    570 U.S. 529 (2013) ............................................................................................ 30, 31

*Sterling v. Constantin*,
    287 U.S. 378 (1932) ............................................................................................ 18, 19

*Swain v. Junior*,
    958 F.3d 1081 (11th Cir. 2020) .............................................................................. 31

*Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ................................................................................. 30

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................................................................. 20

*Trump v. United States*,
    603 U.S. 693 (2024) ................................................................................................. 28

*United States v. Morrison*,
    529 U.S. 598 (2000) ................................................................................................. 31

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

*United States v. N.Y. Fish, Inc.*,
   10 F. Supp. 3d 355 (E.D.N.Y. 2014) ........................................................16

*Valley View Health Care, Inc. v. Chapman*,
   992 F. Supp. 2d 1016 (E.D. Cal. 2014)..............................................16, 29

*Washington v. Reno*,
   35 F.3d 1093 (6th Cir. 1994) ........................................................34

*W. Sys., Inc. v. Ulloa*,
   958 F.2d 864 (9th Cir. 1992) ........................................................16, 29

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).........................................................34

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952).........................................................28

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 15.........................................................28

U.S. Const. art. I, § 8, cl. 16.........................................................28

U.S. Const. amend. X.........................................................28

## STATUTES

10 U.S.C. § 10103.........................................................25

12 U.S.C. § 12406 ......................................................... *passim*

Militia Act of 1903.........................................................21

## OTHER AUTHORITIES

The Federalist No. 29 (Alexander Hamilton) ...............................................31

*Rebellion*, Black's Law Dictionary (1st ed. 1891)........................................23

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

# I.     INTRODUCTION

By delegating a carefully limited portion of its power in 10 U.S.C. § 12406, Congress made clear that it intended for Presidents to call up a state's National Guard only as a last resort. Both the statute's text and the Ninth Circuit authority interpreting it signal that only extraordinary and "exigent circumstances" can satisfy any of the statute's three factual prerequisites. *Newsom v. Trump*, 141 F.4th 1032, 1045 (9th Cir. 2025). The statute thus codifies a longstanding principle that the President's limited power over a state's militia is "to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union." *Id.* at 1048 (quoting *Martin v. Mott*, 25 U.S. 19, 30 (1827)).

Consequently, the *ordinary* challenges of governing cannot justify the extraordinary measure Defendants employed here. For example, First-Amendment-protected assemblies—even when combined with limited, sporadic episodes of unlawful conduct—do not constitute a "rebellion" or an inability "to execute the laws of the United States." 10 U.S.C. § 12406. Put another way: unlawful conduct, while inexcusable, is properly managed by regular law enforcement; its existence does not justify federalizing and deploying military forces in an American city under 10 U.S.C. § 12406. Nor do ordinary government staffing shortages created by budgetary constraints and shifting policy priorities satisfy the statute's prerequisites.

Those core principles, which guard against both the Presidential overreach and domestic militarization that our nation's Founders rightly feared, are dispositive in this case. The evidence at trial will show that, regardless of any deference due to the President's invocation of § 12406, there was no colorable basis to find the existence of a rebellion or inability to execute the law in Portland during the weeks—or even months—leading up to September 27, 2025. Yet that did not deter the President from taking one of the most drastic actions available to him. Based on little more than a hyperbolic characterization of Portland as a "War ravaged" community "under siege" by "domestic terrorists," the President infringed on Oregon's sovereign power to

Page 1 -     PLAINTIFFS' TRIAL BRIEF

command its own National Guard and manage law enforcement within its borders. The evidence will show that this assessment was "obviously absurd," that it was outside the "range of honest judgment," that its timing was wholly "arbitrary," and most importantly, that it was *not* made "in the face of an emergency." *Newsom*, 141 F.4th at 1050–51. This brash decision therefore did not "fall within the discretion of the Executive." *Id.*

To be sure, the evidence will show that law enforcement officers have faced challenges at the Immigration and Customs Enforcement (ICE) facility in Portland. There were, for example, incidents of unlawful conduct that occasionally punctuated otherwise lawful protests near the ICE facility, especially in the first two weeks of June 2025. Defendants may also offer evidence that their agencies faced suboptimal staffing levels based on budgetary and other constraints—challenges compounded by the fact that, around the same time, the President instructed DHS to prioritize a dramatic increase in immigration enforcement. Against this backdrop, Defendants will likely argue that any diversion of their personnel to Portland's ICE Facility—even if limited to a relatively small number of officers—was undesirable.

Nonetheless, the evidence will also show that no events near the Portland ICE facility in 2025 colorably rose to the level of a "rebellion" or an inability "to execute the laws." 10 U.S.C. § 12406. To the contrary, while the Portland Police Bureau (PPB) and federal law enforcement faced challenges that culminated PPB's declaration of a riot at the facility on June 14, 2025, PPB then nimbly adapted and the protests dwindled. After June 15, the situation at the ICE facility began to calm. From the end of June through September, despite sporadic episodes that warranted (and received) targeted responses from law enforcement, protests at the facility were generally sedate and small. This downward trend continued through the week leading up to the President's September 27 declaration of a "War ravaged" community, when the protests consisted of less than a few dozen people and little or no activity. In fact, in the days leading up to the President's assessment, both PPB and federal law enforcement described the situation as notably quiet. There was every indication that the challenges of early June had subsided.

Page 2 -     PLAINTIFFS' TRIAL BRIEF

Then came the President's incendiary rhetoric on September 27, which was paired with a dramatic and unprovoked increase in federal law enforcement activity. The evidence will show that these actions predictably exacerbated the situation by triggering larger protests and increased tensions between some protesters and law enforcement. They also made it harder for PPB—and the Oregon State Police (OSP), which periodically provided additional support—to respond to unlawful activity. Witnesses will testify at trial that in the period following the President's September 27 decision, federal law enforcement caused the situation to deteriorate by employing indiscriminate, excessive force against small crowds. Even PPB's officers were caught up in this overreaction: they have been gassed by federal law enforcement, and on at least one occasion, an officer was hit by a federal law enforcement projectile. The federal government's needless use of munitions at the facility also created the appearance of smoke, flashes of fire, and explosions, all of which were broadcast on national television. It is no wonder, then, that after his September 27 decision, the President sought to bolster his initial assessment with more hyperbolic descriptions of "explosions" and "fires all over the place" in Portland.

Defendants cannot, in good faith, satisfy the prerequisites of § 12406 by creating the very emergency they propose to resolve with the National Guard. And under the statute's text, they cannot backfill a rationale for the President's determination by relying on events that *post-date* his decision—particularly not when their actions contributed to those events. Even so, the events from September 27 to the present still could not satisfy any of § 12406's prerequisites because they were readily and effectively addressed by law enforcement. And even if local law enforcement had not managed the protests, Defendants cannot show that the "regular forces"—whether defined as civilian law enforcement or the military—would have been unable to execute federal law.

Nor can Defendants point to anything else that could support a colorable assessment of a rebellion or an inability to execute the laws. For example, Defendants have not identified any significant impediment to their execution of federal immigration law *despite* the fact that the

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

President has increased immigration arrest quotas while nonetheless failing to provide the resources requested by local ICE officials.

For all of these reasons—as bolstered by the evidence and arguments that will be offered at trial—the Court should find that Secretary Hegseth's memorandum federalizing members of the Oregon National Guard under 10 USC § 12406 is *ultra vires* and violated the 10th Amendment. Plaintiffs therefore ask this Court to permanently enjoin implementation of the September 28 memorandum and any related orders federalizing and deploying Oregon National Guard members to Portland. For the same reasons, all cross-state deployment orders pertaining to Portland—including the October 5 memorandum and orders deploying California and Texas National Guard members; the October 16, 2025 memorandum extending and/or deploying California and Texas National Guard members; and any related federalization and orders—should also be permanently enjoined.

## II.    BACKGROUND

### A.    Factual Background

The facts in this case are familiar to this Court. Therefore, rather than offer an exhaustive discussion of them, Plaintiffs provide a brief review of key facts they expect to prove at trial, with particular emphasis on information Plaintiffs obtained after this Court made factual findings in issuing its first Temporary Restraining Order on October 4, 2025. ECF 56.

### 1.    Summer and Early Fall at the Portland ICE Facility.

The Portland ICE facility is located in the South Waterfront neighborhood of Portland, approximately 1.8 miles south of Portland's Federal Courthouse. The facility sits at the intersection of S Macadam Avenue and S Bancroft Street, with the driveway and front entrance facing Bancroft.

Protests outside the facility began on June 2, 2025, after ICE officials arrested an asylum seeker in the hallway of Portland's immigration court. From there, events at the Portland ICE facility have evolved significantly. In general terms, the activity has unfolded in three phases: (1)

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

the two-week period up to June 14, 2025, where local law enforcement faced the most significant challenges; (2) after June 15, when PPB adapted its approach and incidents began to decline, followed by a general downward trend through the end of September; and (3) after September 27, 2025—after the President issued a social media post stating his intention to deploy the military in Portland—when tensions and crowd sizes again increased. Through each of those phases, PPB responded to sporadic unlawful activity with targeted enforcement while simultaneously respecting the right to peaceful assembly and speech protected by the First Amendment.

More specifically, during the first phase—which unfolded in the first two weeks of June—the ICE facility began to see protests accompanied by some disruptive and unlawful behavior warranting intervention from PPB. Law enforcement documented various incidents including minor fires, use of fireworks, harassment, assault on a public safety officer, use of paint balls, and use of lasers. The ICE facility was also damaged, including broken windows and doors, a broken entry gate, and graffiti. Unacceptable as these incidents were, they were not extraordinary; PPB responded and made arrests as appropriate. This period culminated on June 14, when PPB declared a riot because many members within the roughly 300-person gathering engaged in disorderly, unlawful conduct, which included instances of violence. This was the first time—and to date, the only time—that PPB declared a riot at the ICE Facility in 2025.

After June 14, PPB immediately adapted its approach, which marked the beginning of a new phase. Specifically, starting on June 15, PPB re-emphasized enforcement of not just felony person and property crimes, but also criminal conduct including misdemeanor offenses. Whether due to this re-emphasis on criminal enforcement or simply a change in protester energy and activity, after June 19, 2025, incidents of unlawful activity and general protest levels declined, and PPB did not encounter any events necessitating an arrest for months. In fact, although groups ranging from a couple of individuals to 50 continued to congregate outside the ICE facility, these

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

congregations were never significant and were characterized by PPB as "low energy" on June 16, 19, 20, 24, and 26.

This downward trend continued in July. For example, the most significant incident was reported as follows: "[S]everal individual lit non-aerial fireworks but kept them in street. Alpha contacted the group and advised the group of the fireworks ban. Some were receptive, but hostility began to grow." "[P]rotesters occupied the eastbound lanes of Bancroft, but vehicular traffic continued to flow in both directions." A "verbal altercation occurred between the driver [of a vehicle] and a handful of members of the crowd." As the vehicle departed, "waterbottles and unknown items were thrown at the truck." "The victim did not want to file a report or provide information." "We later learned protesters had hurled mortars at the ICE facility." Ex. 410 at 1. All other entries for July were even less remarkable. *See generally id.* And as before, PPB was able to address the issues that did arise.

August was even more subdued. The number and intensity of the protests remained relatively minimal with groups typically ranging from 10 to 30 people. Ex. 303 at 5–8. A couple of nights in August were characterized as "high energy," but no arrests were made. *Id.* On one night, August 9, 2025, there was an attempt to block a departing vehicle, but that effort was subdued. Most of the remaining incidents in August were again labelled as "low energy." *Id.* And, as in July, all of the incidents and protests were handled effectively, primarily by PPB.

This general downward trend continued in September. Although there were larger groups on isolated nights, the protests were generally uneventful. The most of the disruptive behavior that occurred in the early part of September was between protestors and counter-protesters; it was not directed at the ICE facility or those federal officers. And again, there was largely no need for PPB to solicit outside aid from the other law enforcement entities. These small disputes were handled by PPB in coordination with their federal counterparts. A sampling of PPB's Central Monitoring reports in early September provides:

> September 15: "No significant activity observed today."
> September 17: "Nothing to report tonight . . ."

Page 6 -    PLAINTIFFS' TRIAL BRIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

> September 20: "[N]othing popped off"
> September 22: "It was a very uneventful [sic] night at the facility."
> September 24: "No assaults, no calls for service."
> September 26: "Energy was low, minimal activity."

Ex. 303 at 10–11.

In summary, PPB made no arrests in July, August, and early September. To be sure, there were isolated incidents during this period. But the lack of any significant activity in late September capped a summer of protests that were, at most, modest—both in their scope and the disruption they caused.

Then, on September 27, 2025, the President declared on his Truth Social account that he was sending in troops to "protect War ravaged Portland" using "Full Force":

> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!

Ex. 001 at 2. On September 28, 2025, Secretary Pete Hegseth issued a memorandum directing that "200 members of the Oregon National Guard will be called into Federal service effective immediately for a period of 60 days." Ex. 192.

The President's September 27 post caught the city by surprise and marked a third phase in the protests by inflaming the situation. Larger groups quickly started to form, and the overall number of protestors increased.[1] On September 28, PPB made two arrests—the first PPB arrests at the ICE building since June. Ex 527 at 2. Sporadic arrests by PPB continued into October, with multiple arrests on some nights. *See, e.g.*, Ex 302 at 7–8 (two arrests on October 3; two arrests on October 5). PPB's personnel resource commitments increased as well, peaking in mid-October. However, most of the problematic interactions involved altercations between protesters

---

[1] Plaintiffs' exhibit 304 is a chart that shows the estimated daily number of people outside the ICE facility. Ex. 304. The exhibit demonstrates the spike in activity in early June and relatively minimal to modest numbers throughout the summer and early fall until the President's social media post on September 27, when activity became more significant.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

and counter-protestors rather than altercations with local or federal law enforcement. Communication between PPB and federal officers also worsened as the federal law enforcement deployment surged without a clear command and control structure. To list just one illustrative example, at one point pepper balls were shot in the direction of a PPB officer. When confronted, federal officials responded, "help or get out of the way." Ex. 302 at 10.

> **2.     The Situation at the ICE Facility in 2025 Stands in Marked Contrast to the Large-Scale Portland Protests that Occurred in 2020.**

In 2020, Portland experienced significant, sustained, and large-scale protests that provide important context for the 2025 protests at Portland's ICE facility. The 2020 protests continued for over 100 nights. From late May through October, thousands of people marched, at times blocking City streets and freeways. Although most participants engaged in a peaceful exercise of their First Amendment rights, some individuals unfortunately engaged in widespread property damage and violence. This included incidents in which individuals broke into and lit a fire within the Justice Center, lit hundreds of additional fires (including other fires in or outside buildings), broke windows of storefronts and government buildings (including the Federal Courthouse), stole property, and engaged in the graffitiing and destruction of property. The actions of some during the 2020 protests also involved a nightly barrage of projectiles thrown or launched at officers, including bricks, rocks, mortars, and Molotov cocktails. An individual was shot and killed. The 2020 protests were widespread throughout the City—they involved the Justice Center, the Federal Courthouse, North Precinct, East Precinct, the Portland Police Association Building, the ICE facility, and numerous parks and other sites.

In contrast to the 2025 ICE facility protests, unlawful activity accompanying the 2020 protests required a significant PPB response. And PPB learned and improved from that experience. Following the events of summer 2020, PPB reviewed its directives, its training, and its approach for responding to public order events. It also implemented many changes. For example, PPB increased its reliance on dialogue and communication between PPB officers and protesters. It also implemented a tactical shift to better enable officers to identify and address

Page 8 -     PLAINTIFFS' TRIAL BRIEF

unlawful activity and specific unlawful actors within a protest (rather than addressing the entire group) whenever possible.

These changes have proven successful. PPB has been able to manage both large and small protests addressing controversial issues with a significantly reduced footprint, fewer uses of force, and prosecutable arrests. PPB and other local law enforcement, including Oregon State Police (OSP), now have some of the most efficient and capable public-order teams in the nation. Partly for these reasons—and partly because the more recent protests at Portland's ICE facility have been objectively smaller and less disruptive—the protests at Portland's ICE facility in 2025 are markedly different in character from those in 2020.

> ### 3. Federal Law Enforcement Personnel Were Also Available to Manage the Situation at the ICE Facility.

The Federal Protective Service (FPS) is the component of the Department of Homeland Security (DHS) with principal responsibility for protecting federal facilities. *See generally* 40 U.S.C. § 1315; Exs. 029, 172. Accordingly, FPS is the primary federal entity responsible for providing building security at the ICE facility, and at other federal buildings around the country.

Notwithstanding the President's hyperbolic statements about the situation in Portland, FPS—the entity with security expertise and responsibility for building protection—deployed relatively few resources to this effort. For context, FPS has more than 1,300 employees. Ex. 029 at 1; Ex. 030 at 5. Of those, at least 776 are inspectors, higher-ranking officers, or specialists who protect federal facilities. Ex. 160 at 65:6–67:8; Ex. 161. But FPS moved only a small fraction of those to Portland to supplement the four officers assigned to the Portland ICE facility, and never more than 31 at a time:

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

| Dates | FPS deployed to Portland[2] | % of FPS law enforcement[3] |
|---|---|---|
| 6/16/2025 - 7/15/2025 | 27 | 3.5% |
| 7/15/2025 - 8/12/2025 | 31 | 4.0% |
| 8/12/2025 - 9/10/2025 | 29 | 3.7% |
| 9/10/2025 - 10/5/2025 | 20 | 2.5% |
| 10/5/2025 – 10/22/2025 | 25 | 3.2% |

Consistent with those figures, FPS Region 10 Deputy Director Cantu and Commander Turner both acknowledged in their depositions that FPS has untapped capacity that it has not deployed. It is unclear why Defendants decided against deploying additional FPS resources and instead chose to rely to some extent on ICE and Customs and Border Protection (CBP) staff.

While FPS has the primary responsibility for federal building security, they are not the only available source of federal law enforcement officers. DHS can also rely on federal law enforcement resources from a variety of other federal agencies for building protection and other assistance. (Ex. 030 at 3.) For example, as described in Defendants' interrogatory responses (Ex. 008 at 3–4) and immediately below, additional federal officers from several agencies were deployed to the ICE building in Portland from June to October 2025. Notably, however, it is unclear from Defendants' responses whether these additional non-FPS personnel were primarily deployed to secure the ICE facility from protests or whether they were instead deployed, at least in part, to engage in immigration-enforcement-related activities:

- From ICE Enforcement and Removal Operations: Enforcement and Removal Operations (ERO) and Special Response Team (SRT) officers. (Defendants' estimate that 10-50 officers per day were in Portland between June and October 2025, with 10-25 per day in September 2025. They do not distinguish between regular ERO staff and SRT staff)

- From ICE Homeland Security Investigations: Special Response Team Officers (Defendants' interrogatory responses do not include numbers for these officers.)

---

[2] Ex. 008 at 4–5.

[3] This column is calculated as the number in the "FPS deployed to Portland" column divided by 776.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

- <u>From CBP United States Border Patrol</u>: Law enforcement officers or agents (In mid-to-late June of 2025, 6–22 per day; <u>none</u> in July or August and most of September, surge of officers on September 27 and 28, with 40 and 66 deployed on those days, respectively)

- <u>From CBP Office of Field Operations</u>: Law enforcement officers or agents (In mid-to-late June of 2025, 13–29 per day; <u>none</u> in July or August or most of September, surge of officers on September 27 and 28, with 40 and 41 deployed on those days, respectively)

Ms. Cammilla Wamsley, the Seattle Field Office Director for the ICE's enforcement and removal operations in Oregon, Washington, and Alaska, provided some clarification. She indicated in her deposition that only Special Response Team members from ICE were deployed to participate in protecting the facility, whereas the surge of regular (i.e., non-SRT) Enforcement and Removal Officers were deployed for regular immigration enforcement. (Ex. 162 Wamsley Dep 139: 10–16). And even the Special Response Team personnel brought in to protect the ICE facility were at least occasionally pulled from building security to assist in immigration enforcement. (Ex. 162 Wamsley Dep. 139:10–149:4).

Regardless, even setting aside FPS and the other categories of law enforcement officers described above—and even assuming the ICE facility *requires* additional security—it is clear that Defendants have not exhausted their non-military options. Overall, DHS has more than 80,000 law enforcement officers. Ex. 027. More than 4,500 other DHS employees are trained and thus eligible for cross-designation to fulfill FPS duties. Ex. 030 at 12. *See* 40 U.S.C. § 1315(b)(1). Similarly, DHS has not tapped federal law enforcement from the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), or the U.S. Marshal's service, each of which could support additional security at the ICE facility. Ex. 162 at 241–43. It is not clear whether Defendants failed to tap these resources because they are not needed or because of a discretionary policy choice. What *is* clear is that DHS's deployment of non-military resources to the ICE Facility in 2025 pales in comparison to their non-military deployments in the past. During the 2020 protests, for example, the federal government deployed 755 law enforcement personnel from DHS to address protests at the Federal Courthouse in Portland.

Page 11 -  PLAINTIFFS' TRIAL BRIEF

Plaintiffs' Exhibit 773 shows federal evening security at the ICE facility over time:



Notably, the spikes in federal officers in June track closely with the spikes in PPB's efforts—and the dips in federal staffing in July, August, and September track with PPB's description of the protest activities subsiding. That is, federal law enforcement staffing decisions over time appear to track Plaintiffs' description of facts. This was true until September 27 and 28—the days of the President's social media post and Secretary Hegseth's federalization memorandum, respectively—when Defendants suddenly surged 80-100 officers from customs and border protection to the ICE Facility.

The various federal officers deployed to the ICE facility have responded to the situation with a level of force that appears, at times, to be needless and arbitrary, and that response has inflamed the situation. They have deployed tear gas and pepper balls on small numbers of non-violent protesters outside of the ICE building repeatedly, in some cases without apparent need or provocation, and without first exhausting de-escalation or other less-aggressive options. *See*, *e.g.*, Ex. 022 (Oregon Public Broadcasting (OPB) video documenting federal officers' use of less-lethal munitions without clear provocation). This has escalated tensions with protesters while also complicating the efforts of local law enforcement to manage the situation. In fact, PPB officers have been gassed by federal officers, and on at least one occasion, one was struck with a projectile. Moreover, this indiscriminate use of gas and projectiles has created an appearance of violence and disorder that does not align with the threat level posed by the protests.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Despite these issues, federal law enforcement officers deployed to the facility have apparently succeeded in maintaining security there. They have secured the movement of vehicles in and out of the ICE facility, and any impediments to vehicle access from protesters were quickly resolved. And even at those times when protests were accompanied by unlawful activity, contemporaneous records reflect that FPS and other federal law enforcement personnel perceived that the available teams had the situation under control. *See* Ex. 063 (June 15, 2025, Email from Alfred Garcia at FPS, "FPS and partner agencies anticipate having sufficient law enforcement personnel to respond to criminal activity from this point forward. We are establishing LE coverage plans to provide onsite and offsite response elements to meet the current threats.").

### 4. Enforcement of Immigration Laws Has Continued in Portland Throughout the Summer and Fall of 2025.

Plaintiffs expect Defendants to focus their trial presentation, in part, on a period of time after the electronic entry mechanisms for the ICE facility were damaged in June of 2025. The Portland ICE Enforcement and Removal Operation officers (staff who work on immigration enforcement) worked out of separate federal building in Portland for some or all of the period when the card readers were being repaired. Certain appointments with members of the public had to be rescheduled or moved to alternate locations during that time, meaning that ICE temporarily could not use scheduled appointments at the ICE facility to effectuate arrests. However, enforcement and Removal Operation officers continued to make arrests in the community during the temporary relocation.

Since then, employees at the ICE facility have successfully adapted their operations to the protests. For example, they prioritized moving personnel in and out during the morning when there are fewer protesters, and vehicles sometimes come and go in groups if and when there are more protesters later in the day or at night. Sometimes, they choose to take arrestees straight to the Northwest Immigration Processing Center rather than processing them at the ICE facility. There have occasionally been delays in moving in and out of the building where protesters were in front of the driveway, but those were resolved by FPS with or without PPB support. In short,

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

when necessary, ICE has generally been able to adopt workarounds that have allowed the agency's work of enforcing federal immigration laws to go forward.[4] *See* Turner Dep. 121:4–11 (expressing unawareness of any ICE operation between July 20 and September 20 that was prevented because of the protests).

In her deposition, Ms. Wamsley expressed a generalized concern that the use of her Seattle ERO Field Office staff to bolster security at the building deprived her of their fulltime availability for immigration enforcement activities. Ex. 162 at 101. But that reallocation appears minor compared to the agency's broader staffing concerns that are unrelated to the Portland protests: the Seattle ERO Field Office, which covers Oregon, is currently experiencing significant numbers of vacancies in its Enforcement and Removal Operations staff, and the Seattle field office's Special Response Team is understaffed as well. Despite these limitations, Ms. Wamsley testified that her field office had received support for immigration enforcement activity from the FBI, U.S. Marshals, and DEA.

Ms. Wamsley also stated she did not to know how many immigration related arrests Portland Enforcement and Removal Operations made in any month from June to October of 2025. She specifically testified that she did not know if the number of arrests went down during the period when Enforcement and Removal Operations were moved to a different building. Ex. 162 Wamsley Dep. 123:21–23. However, she explained that in the spring of 2025, she set a goal for the Seattle Field Office to roughly double their arrests per day (from 15 to 30, region-wide). This was in response to directives from headquarters. And Ms. Wamsley testified in her deposition that between March and October of 2025, those arrest numbers generally *did* go up. Therefore, while she denied having knowledge of precise arrest numbers, she expressed a belief that her teams were meeting expectations.

---

[4] As noted above, the Seattle Field Office is currently experiencing staffing shortages. These staffing challenges at ICE may also be a separate factor that is affecting that agency's ability to carry out their immigration enforcement functions, or to meet the increased enforcement expectations being imposed on ICE under the present administration.

Page 14 -  PLAINTIFFS' TRIAL BRIEF

B.     **Procedural Background.**

On September 28, 2025, the State of Oregon and City of Portland filed suit against President Donald Trump; Secretary of Defense Pete Hegseth; the United States Department of Defense; Secretary of Homeland Security Kristi Noem; and the United States Department of Homeland Security ("Defendants"). ECF 1. On September 29, Plaintiffs moved for a temporary restraining order, ECF 6, which this Court granted on October 4, 2025 ("First TRO"). ECF 56. The First TRO temporarily enjoined the implementation of the September 28, 2025 Memorandum. ECF 56-1.

Nonetheless, after midnight on October 5, 2025, Defendants transported 200 federalized California National Guard troops to Oregon ("the October 5 California Deployment"). Later that day, Plaintiffs Oregon and Portland, joined by the State of California, filed an amended complaint and second motion for temporary restraining order. ECF 58, 59. That evening, while the motion was still pending, Secretary Hegseth issued an order federalizing "up to 400" members of the Texas National Guard pursuant to 10 U.S.C. § 12406 "to perform federal protection missions where needed, including in the cities of Portland and Chicago" ("the October 5 Texas Federalization"). Ex. 006. The Court granted the second temporary restraining order ("Second TRO") later that night, and temporarily enjoined Defendants from deploying any federalized members of the National Guard in Oregon. ECF 68.

On October 16, 2025, Department of Defense Executive Secretary Anthony C. Fuscellaro issued a memorandum ("the October 16 Memorandum") purporting to respond to a September 26, 2025 request from the Department of Homeland Security for assistance related to "protests and threats of violence" in Oregon. Ex. 197. This memorandum indicated that Secretary Hegseth had (1) extended the federalization of all California National Guard members from November 4, 2025 to February 2, 2026; (2) federalized 200 Texas National Guard members through December 4, 2025; and (3) deployed 200 California National Guard members and 200 Texas National Guard members to Oregon "effective immediately." *Id.*

Page 15 -  PLAINTIFFS' TRIAL BRIEF

## III.    LEGAL STANDARD

When a preliminary injunction hearing is consolidated into a final merits determination under Federal Rule of Civil Procedure 65(a)(2), the request for a preliminary injunction is evaluated as a request for a permanent injunction. *See Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013) (evaluating district court's final judgment under Rule 65(a)(2) as a denial of a permanent injunction). As in a trial, the court reviews the evidence to determine whether plaintiffs have shown that they are entitled to relief by a "preponderance of the evidence." *E.g.*, *Am. Booksellers Found. for Free Expression v. Dean*, 202 F. Supp. 2d 300, 307 & n.5 (D. Vt. 2002); *United States v. N.Y. Fish, Inc.*, 10 F. Supp. 3d 355, 362 (E.D.N.Y. 2014).

"To be entitled to a permanent injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction . . . ." *Indep. Training*, 730 F.3d at 1032. "[I]rreparable injury is not an independent requirement for obtaining a permanent injunction [as opposed to a preliminary injunction or temporary restraining order]; it is only one basis for showing the inadequacy of the legal remedy." *Valley View Health Care, Inc. v. Chapman*, 992 F. Supp. 2d 1016, 1042 (E.D. Cal. 2014) (quoting *Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1102 (9th Cir. 1994)) (alterations in original). "[O]nce actual success on the merits has been established, 'a party is entitled to relief as a matter of law irrespective of the amount of irreparable injury which may be shown.'" *Id.* (quoting *W. Sys., Inc. v. Ulloa*, 958 F.2d 864, 872 (9th Cir. 1992)).

## IV.    ARGUMENT

### A.    Plaintiffs' Claims Will Succeed on the Merits.

#### 1.    Defendants' Federalization of Oregon's National Guard is *Ultra Vires* Because it was Not Authorized by § 12406

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

a.    The *Newsom* Standard for Reviewing Federalization, as Previously Interpreted by This Court, Governs in This Case.

In 10 U.S.C. § 12406, Congress delegated to the President only a limited portion of its Article I authority to call forth the militia. It provided three specific preconditions under which a President may call up a state's national guard into federal service:

Whenever—

(1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

(3) the President is unable with the regular forces to execute the laws of the United States.

10 U.S.C. § 12406. Only when one of those factual prerequisites is actually present may the President federalize National Guard troops "in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws." *Id.*

As this Court is aware, a motions panel of the Ninth Circuit recently analyzed § 12406 in *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025). It determined that the President's invocation of § 12406 is reviewable because the President's authority is statutory, so courts may determine whether the President has attempted to exceed the bounds of authority delegated by Congress. *Id.* at 1046. However, courts "must give a great level of deference to the President's determination that a predicate condition exists." *Id.* at 1048.

Nonetheless, in reviewing such a determination, courts in the Ninth Circuit must "at least ensure that it reflects a colorable assessment of the facts and law within a range of honest judgment." *Id.* at 1051 (citation modified). Courts plainly need not accept a determination "that was obviously absurd or made in bad faith," or "based on no evidence whatsoever." *Id.* at 1050. Nor must they accept "an arbitrary fiat that overleaps the bounds of judgment." *Id.* at 1051. Thus, while "the nature of the power" delegated by Congress "implies that there is a permitted range of honest judgment" the President may exercise when federalizing a state's National Guard, that power extends only to measures that were "conceived in good faith." *Id.* 1050–51.

Page 17 -  PLAINTIFFS' TRIAL BRIEF

The above legal standard, as further interpreted by this Court in granting Plaintiffs' first Motion for Temporary Restraining order (ECF 56), presently governs as law of the case. Under that doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)). Although a motions panel of the Ninth Circuit granted a stay of this Court's first temporary restraining order, that grant of a stay has itself been administratively stayed by the Ninth Circuit to allow for the completion of pending en banc proceedings on the panel majority's stay order. ECF 111. Therefore, at present, there is no subsequent governing authority revising or calling into question the standards previously ruled on by this Court.[5]

### b.  Section 12406 Permits Federalization Only Under Exigent Circumstances Existing at the Time of the President's Determination.

The Ninth Circuit in *Newsom* did not exhaustively "specify the precise standard that governs" review of Presidential action under § 12406. 141 F.4th at 1050. Nonetheless, several additional principles are readily apparent from that opinion, the Supreme Court authorities on which it relied, and the statute's text.

First and foremost, only exigent circumstances can satisfy § 12406. Historically, the power to call forth the militia has always been one "to be exercised *upon sudden emergencies*, upon great occasions of state, and under circumstances which may be vital to the existence of the Union." *Id.* at 1048 (quoting *Martin*, 25 U.S. at 30) (emphasis added). This principle was preserved in the modern text of § 12406 because, as the Ninth Circuit recognized, each of the statute's prerequisites "specifie[s] *exigent* circumstances"—not mere challenges the President faces in the ordinary course. *Id.* at 1045. Indeed, the President's invocation of § 12406 is due deference because such decisions are generally made "in the face of an emergency" to take

---

[5] Even if the motions panel decision that stayed this Court's first TRO is not vacated prior to trial—and even assuming this Court therefore views the panel's decision as authoritative— Plaintiffs still expect to succeed on their claims at trial because the factual record from that proceeding will be more complete than the limited record on which the panel's stay decision was based.

Page 18 -  PLAINTIFFS' TRIAL BRIEF

decisive action "directly related" to that emergency. *Id.* at 1051 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399–400 (1932)). Therefore, even assuming the President may properly take past circumstances into account in reaching that determination, the absence of exigent circumstances at or around the time of federalization—or, in the case of § 12406(2), the absence of a credible, present "danger of a rebellion"—bears heavily on whether the President's choice reflects a "colorable assessment of the facts." *Id.* at 1051.

For these reasons, the President's decision to federalize a state's National Guard also may not be justified with events that post-date that determination. Congress authorized the President to call up the national guard only if he "*had* a colorable basis for invoking" one of § 12406's prerequisites at the time he invoked them. *Id.* at 1052 (emphasis added). This commonsense observation flows from the statute's text which states, in the present tense, that the President may federalize a state's National Guard only at a time "[w]hen[]" the United States "*is* invaded," there "*is* a rebellion," or the President "*is* unable" to execute the law. 10 U.S.C. § 12406 (emphasis added). The corollary is that, if none of those circumstances precedes a federalization order, that order is *ultra vires. See id.* In other words, cause (here, the basis for federalization) must precede effect (the decision to federalize).

This principle precludes Defendants from backfilling a rationale for the President's determination by citing circumstances that post-date it. For example, Defendants have invoked circumstances from after the September 27 social media post as justification for the directive itself. Those arguments are particularly troubling because Plaintiffs sued, in part, to *prevent* the "escalation of tension[]" and "new unrest" that Plaintiffs' expected to come as "predictable consequences of Defendants' action." Compl. (ECF 1) ¶ 4. Defendants' circular reasoning therefore fails. Just as a Plaintiff "cannot spend its way into standing," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024), the President cannot justify his decision to federalize the National Guard by creating the very emergency he proposes to solve.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

### c.    The Court Should Use These Standards to Review the President's Justification for Invoking § 12406.

As a threshold matter, this is not a case where the Court must confine its analysis to an "official" Presidential justification without "look[ing] behind" it to other "statements by the President . . . casting doubt on" his sincerity. *Trump v. Hawaii*, 585 U.S. 667, 699, 703 (2018). That is because here, Defendants have not principally relied on any "official" justification. *Id.* [6] Instead, Defendants have affirmatively invited the Court to review the President's informal public statements—including his social media posts—as his rationale for invoking § 12406. *E.g.,* Defs.' Opp'n (ECF 35) at 10–11, 14 (citing the President's September 27 and October 1, 2025, Truth Social posts); First TRO Hr'g Tr. 11:12–15 ("So the most . . . important presidential determination relative to the federalization in Oregon is the President's determination last weekend reflected in posts that he made on Truth Social."). Nor may Defendants rely on any justifications offered by subordinate officials in the Executive branch to justify the president's choice. After all, § 12406 delegates power to the President alone, so it is naturally "the *President's* determination" that courts in the Ninth Circuit review "to ensure that it reflects a colorable assessment." *Newsom*, 141 F.4th at 1051.

Part of the Court's task, then, is to consider whether the "determination" articulated in the President's public statements about the need for National Guard troops in Portland "reflect[] a colorable assessment of the facts and law within a range of honest judgment." *Newsom*, 141 F.4th at 1051. The public statements closest in time to the President's determination include a September 27 Truth Social post in which the President authorized the use of "Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists." Ex 1. Then, in an October 1 Truth Social post the President added that he has "not been able to enforce the Laws in Oregon" because "ANTIFA and the Radical Left

---

[6] The President's the June 7, 2025 Memorandum, which Secretary Hegseth cited as the source of authority for his September 28, 2025 Memorandum, was issued "[i]n response to" incidents in Los Angeles in early June 2025, *Newsom*, 141 F.4th at 1039, 1041, and it pre-dated the federalization of Oregon's National Guard by 4 months. It therefore could not—and did not purport to—identify any exigent circumstance in Portland justifying federalization in September 2025.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Anarchists have been viciously attacking our Federal Law Enforcement Officers" who are "enforcing Federal Immigration Laws and the Rule of Law." Ex 194. He therefore determined the National Guard was needed to prevent "MOBS" from "tak[ing] over our streets" and "burn[ing] our Cities" while also "restoring LAW AND ORDER, and ending the Chaos, Death, and Destruction!" *Id.* The President further elaborated at a White House Roundtable on October 8, where he said "you look at Portland and you see fires all over the place;" that in Portland, "[y]ou don't even have sewers anymore," and that there were "explosions in the background" visible on a video of the Governor of Oregon speaking in Portland. Ex. 246.

In this litigation, Defendants construe the President's statements as invocations of § 12406(2) and (3), but they do not contend that he has invoked §12406(1). Defs.' TRO Opp'n at 11–12. The facts offered at trial, discussed more fully below, will demonstrate that the President's assessment did not reflect a "colorable assessment of the facts," and was, instead, "obviously absurd," outside "the range of honest judgment," issued at an "arbitrary" time, and not made "in the face of an emergency." *Newsom*, 141 F.4th at 1050–51.

### d.     Circumstances at the Portland ICE Facility Do Not Constitute a "Rebellion."

Defendants contend that the President properly called up Oregon's National Guard under § 12406(2), which authorizes federalization when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." While the Ninth Circuit did not comprehensively analyze this provision in *Newsom*, it nonetheless characterized the statutory term "rebellion" as "an unusual and extreme exigenc[y] . . . that threaten[s] the normal operations of civil government." 141 F.4th at 1051.

This Court already construed the term "rebellion" consistently with both that guidance and with the underlying district court opinion in *Newsom*, which had conducted a survey of dictionary definitions from the first predecessor statute to § 12406, the Militia Act of 1903. ECF 56 at 23–24. Specifically, this Court identified four "key characteristics" for what constitutes a "rebellion" under § 12406(2):

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

> First, a rebellion must not only be violent but also be armed. Second, a rebellion must be organized. Third, a rebellion must be open and avowed. Fourth, a rebellion must be against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue.

*Id.* at 25 (quoting *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1253 (N.D. Cal. 2025)). As discussed above, this construction of § 12406(2) is now the law of the case, so it "should continue to govern the same issues in subsequent stages in the same case." *Musacchio*, 577 U.S. at 244–45.

Yet even if it were not the law of the case, this Court's construction has since been bolstered by the Seventh Circuit's analysis of the same term in *Illinois v. Trump*, No. 25-2798, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025). The underlying district court opinion in Illinois adopted a similar definition to this Court's, and the Seventh Circuit then "substantially agree[d]" with that construction in explaining why protest incidents in the Chicagoland area did not constitute a "rebellion":

> Political opposition is not rebellion. A protest does not become a rebellion merely because the protestors advocate for myriad legal or policy changes, are well organized, call for significant changes to the structure of the U.S. government, use civil disobedience as a form of protest, or exercise their Second Amendment right to carry firearms as the law currently allows. Nor does a protest become a rebellion merely because of sporadic and isolated incidents of unlawful activity or even violence committed by rogue participants in the protest. Such conduct exceeds the scope of the First Amendment, of course, and law enforcement has apprehended the perpetrators accordingly. But because rebellions at least use deliberate, organized violence to resist governmental authority, the problematic incidents in this record clearly fall within the considerable daylight between protected speech and rebellion.

*Illinois*, 2025 WL 2937065, at *6. Consequently, the Seventh Circuit held that "spirited, sustained, and occasionally violent actions of demonstrators in protest of the federal government's immigration policies and actions, without more, does not give rise to a danger of rebellion against the government's authority." *Id.*

Similarly, in dissenting from the initial stay order in this case (before that stay order was stayed pending an en banc vote), Judge Graber persuasively explained why the Portland protests

Page 22 -  PLAINTIFFS' TRIAL BRIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

here did not constitute an "unusual and extreme exigency" akin to rebellions of the Founding era. *Oregon v. Trump*, No. 25-6268, 2025 WL 2951371, *1, *24 (9th Cir. Oct. 20, 2025) (Graber, J., dissenting) (quoting *Newsom*, 141 F.4th at 1051). Defendants thus fail even under their own proffered definition,[7] *see id.* (concluding as much), and the Court need not examine the precise definition further.

At trial, Plaintiffs will present testimony from multiple PPB officers who have experience with the protests at the ICE facility since June 2025, and also extensive additional experience managing other protests and violent crime in Portland. They will testify that, even going back to June 2025, the protests at the ICE facility were not "organized" as that term is used in either party's propose definition of "rebellion"—they were largely unstructured demonstrations without a clear organizational structure. And those demonstrations generally decreased in terms of volume, intensity, and unlawful conduct from June 15 onward, to the point where they became small and sedate through most of September 2025. The testimony will show that, far from representing a "rebellion" or "danger of a rebellion," the events around the ICE facility near the end of September 2025 rarely presented a "danger" of any kind.

The testimony from PPB officers will also show that other elements of this Court's definition of "rebellion" were unsatisfied. There was no "open and avowed" rebellion at the ICE facility at any time from June through present, nor did the protests suggest "an aim of overthrowing the government." ECF 56 at 25. To the contrary, to the extent the protesters exhibited any cohesive purpose, it was mere "opposition to a single law or issue"—specifically, the protesters' opposition to the federal government's current approach to immigration enforcement. For all of these reasons—and those discussed above and below concerning the scope and character of the protests as well as law enforcement's successful management of

---

[7] In argument before the Ninth Circuit motions panel, counsel for the federal government proposed a broader definition that the one previously adopted by this Court: "Deliberate, organized resistance, by force and arms, to the laws or operations of the government." 2025 WL 2951371 at *30 (Graber, J., dissenting) (citing *Rebellion*, Black's Law Dictionary (1st ed. 1891)).

Page 23 -  PLAINTIFFS' TRIAL BRIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

them—the situation at the ICE facility since June exhibited no evidence of a "rebellion" or "danger of a rebellion." 10 U.S.C. § 12406(2).

> **e.    Defendants Have Offered No Colorable Basis to Conclude That the President is Unable to Execute the Laws of the United States in Portland.**

Defendants also contend that the President lawfully invoked § 12406(3), which permits federalization when "the President is unable with the regular forces to execute the laws of the United States." In *Newsom*, the Ninth Circuit rejected the federal government's argument "that any minimal interference with the execution of laws is, by itself, enough to justify invoking § 12406(3)." 141 F.4th at 1051. The Court reasoned that the other two preconditions in the statute "discuss unusual and extreme exigencies—invasions and rebellions—that threaten the normal operations of civil government." *Id.* Thus, the federal government's sweeping interpretation "would swallow subsections one and two, because any invasion or rebellion renders the President unable to exercise *some* federal laws." *Id.* Instead, the Court concluded that the federal government must at least demonstrate that, at the time of federalization and in the days leading up to it, "activities significantly impeded the ability of federal officers to execute the laws." *Id.* at 1052. This Court has applied the same definition here, rendering it the law of the case. ECF 56 at 18–19.

Courts continue to grapple with the meaning of the "is unable" clause in § 12406(3). While *Newsom* construed the term to mean "significantly impede[]," 141 F.4th at 1052, the Seventh Circuit recently noted that a federal district court in Illinois had adopted the plain meaning of the term "unable," to wit, as "not having sufficient power or ability; being incapable." *Illinois*, 2025 WL 2937065, at *7. However, the Seventh Circuit declined to resolve this "thorny and complex issues of statutory interpretation" because, there, the federal government had failed to satisfy either definition. As discussed below, the same would be true here even if the law of the case did not control. This Court therefore need not resolve this percolating statutory debate, either.

Page 24 -  PLAINTIFFS' TRIAL BRIEF

Moreover, Courts also continue to grapple with the meaning of the statutory phrase "regular forces." *Newsom* examined "the ability of federal officers to execute the laws," taking into account the extant range of federal law enforcement resources available absent federalization. 141 F.4th at 1052. By contrast, the underlying district court decision in *Illinois* interpreted the clause more narrowly, to examine only "the soldiers and officers serving in the regular armed forces." *Illinois*, 2025 WL 2937065, at *7. The latter definition may have merit considering how the U.S. Code describes "regular" military forces. *E.g.*, 10 U.S.C. § 10103. But as above, the federal government fails either inquiry. So even absent the law of the case, the Court need not examine this question further.

Here, the testimony at trial will establish that there was no significant impediment to Defendants' execution of federal law at or around the Portland ICE facility. Instead, it will establish that, while Defendants and local law enforcement faced *challenges* at the ICE facility, especially in early June of 2025, these consisted of the ordinary challenges faced by government: the suppression of sporadic crime and the management of First Amendment protected assemblies. Indeed, Plaintiffs expect that, in presenting their case, Defendants will falsely *equate* protests and crime with an inability to execute the law, ignoring the critical distinctions between these concepts. Just as importantly, even if the Court considers the totality of events dating back to early June, the evidence will also show a clear *downward trend* in these challenges starting around June 15. Indeed, by the week leading up to September 27, 2025, protests were notably small, quiet, and uneventful.

More specifically, Plaintiffs will present testimony of three PPB officers who have firsthand experience with the protests at the ICE Facility since June 2025. These include Assistant Chief Craig Dobson, Commander Franz Schoening, and Commander Brian Hughes. Craig Dobson is the Assistant Chief with the Operations Division and will testify to direction given to the Portland Police Bureau, the Bureau's approach to public order policing, and his own personal experiences of the ICE Facility. Franz Schoening is the Commander of the Specialized

Page 25 -  PLAINTIFFS' TRIAL BRIEF

Resources Division. He will also testify to the Bureau's approach to public order policing, as well as his observations at the ICE Facility. Additionally, he will testify regarding the Incident Command System that the Bureau has at times utilized during the protests including the daily reports generated by Incident Commanders and Watch Commanders. Finally, Brian Hughes is the Commander of the Bureau's Central Precinct and will testify regarding the precinct's response to the protests, including the daily reports generated by assigned patrol Sergeants. All three officers may testify to details of police response to specific incidents, arrests, and communication with federal officers.

Collectively, these officers will testify that Portland police have been diligent in their effort to address unlawful activity that has occurred at the protests by the ICE Facility. And while there was some level of increased criminality and disorder in early June, that level of criminality reduced dramatically toward the end of June and remained relatively low through July, August and September. These officers will also testify that the level of police response necessary to address unlawful activity at the ICE Facility is well within the capabilities of the Portland Police Bureau, and that the bureau has mutual aid agreements under which they can call upon other law enforcement agencies for additional help. They will further testify that the federal officers' uses of force in response to the protests has at times not been proportionate to the behavior of the protestors. This dynamic has led to indiscriminate uses of force in which nonviolent protestors are unnecessarily exposed to munitions, including tear gas, which has exacerbated the situation.

Testimony from other witnesses will further demonstrate that events at Portland's ICE Facility did not significantly impede the execution of federal law. As discussed above, Ms. Wamsley testified at her deposition that, while she was unaware of specific immigration arrest statistics in the Portland area from June 2025 to present, she felt that her office had generally succeeded in pushing arrests up *despite* significant staffing shortages unrelated to the protests. Other testimony will establish that any protest-related impediments to vehicular traffic in and out

Page 26 -  PLAINTIFFS' TRIAL BRIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

of the ICE facility in recent months were quickly addressed such that any slowing of traffic was temporary. And personnel at the facility have developed other methods, such as grouping vehicles together or prioritizing departures and arrivals in the morning hours, to minimize any inconvenience posed by protesters. In short, any impediment to the execution of federal immigration law posed by the protests was, at most, "minimal interference" which is not "enough to justify invoking § 12406(3)." *Newsom*, 141 F.4th at 1051.

### 2.    Defendants' Cross-State Deployment of the California and Texas National Guard Were Also Unlawful.

Because Defendants cannot satisfy § 12406 as to Oregon troops, the California and Texas deployments were also necessarily unlawful. Defendants ordered these cross-state deployments on October 4 and 5—just days after the unlawful September 28 memorandum—and Defendants have not claimed, nor could they, that events between September 28 and October 5 justified separate or additional deployments. Accordingly, the failure to satisfy § 12406 as to Oregon troops is dispositive as to California and Texas troops.

Even if the Court were to conclude that the Oregon deployment was lawful—which it should not, for the reasons explained in this brief and as will be shown at trial—the cross-state deployments would still be unlawful. As the Court recognized in granting the Second TRO, the cross-state deployments were in "direct contravention" of the First TRO.[8] Indeed, Defendants' counsel admitted as much at the October 24, 2025 hearing regarding dissolution of the Second TRO. There, counsel stated that the California and Texas deployments were meant as a "replacement" for and "'instead of'" the Oregon deployment that had been enjoined by the First TRO, and further indicated that the intention had been to deploy only the 200 Oregon National Guard members. Mot. to Dissolve Second TRO Hr'g Tr. 10:24–11:22.

---

[8] *See* Second TRO Hr'g Tr. 19:14–20 ("THE COURT: . . . [O]riginally, I was viewing this just as a TRO to enjoin defendants from deploying members of the California National Guard to Oregon, but it seems to me that, based on the conduct of the defendants and the now seeking National Guard from Texas to go to Oregon - - again, I see those as direct contravention of this - - the order that this Court issued yesterday . . . .").

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Setting aside whether Defendants' conduct was contemptuous, their sole justification for cross-state deployment—a desire to bypass an injunction regarding Oregon's troops—plainly fails to satisfy § 12406. Accordingly, the October 5 cross-state deployments and the October 16 Memorandum should be permanently enjoined even if the Court declines to enjoin the September 28 Memorandum. Indeed, since the legality of the cross-state deployments do not turn on disputed facts, Plaintiffs are entitled to judgment as a matter of law as to those deployments.

### 3.    Defendants' Actions Also Violate the 10th Amendment to the U.S. Constitution.

The President's unlawful federalization and deployment of National Guard troops to Oregon also violates the Tenth Amendment. "No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 693, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (alteration in original)). The Tenth Amendment reserves to "the States" or "the people" all rights and powers "not delegated to the United States by the Constitution." U.S. Const. amend. X. "[A]ction that exceeds the National Government's enumerated powers undermines the sovereign interests of the States." *Bond v. United States*, 564 U.S. 211, 225 (2011).

The Constitution grants Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. "Congress has delegated portions of that power to the President" in 10 U.S.C. § 12406. *Newsom*, 141 F.4th at 1055. "But the Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States." *Id.* at 1045. Further, while Congress has power to "[t]o provide for . . . governing such Part of [the Militia] as may be employed in the Service of the United States," U.S. Const. art. I, § 8, cl. 16, the states retain command over their own non-federalized militia as one of the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States," U.S. Const. amend. X.

Page 28 -  PLAINTIFFS' TRIAL BRIEF

Thus, when the President federalizes and deploys a States' National Guard outside of the constitutional authority that Congress has delegated to him, he intrudes upon the powers reserved to the States. Here, by federalizing Oregon National Guard members when the statutory requirements of § 12406 are not met, the President has violated Oregon's sovereign interests protected by the Tenth Amendment. And by deploying federalized California National Guard members to Oregon for that same unlawful purpose—and extending their prior federalization for that purpose—the President violates the sovereign interests of California as well. Further, regardless of where the federalized National Guard troops are sent from, the unlawful federalization and deployment of those troops to Oregon violates Oregon's sovereign interest in determining whether National Guard intervention is necessary. As this Court has recognized, "the people of Oregon have a sovereign interest in making the determination of what the needs of the state are[,] . . .including whether they can handle their own law enforcement issues." TRO Hr'g Tr. 55:20–56:2. By overriding Oregon's determination on those issues, in the absence of any constitutionally delegated authority to do so, Defendants are interfering with the constitutional balance of power between the federal and state governments.

**C.     Plaintiffs Have Standing and Will Be Irreparably Harmed Absent an Injunction.**

"Irreparable injury is required for preliminary injunctions, but once actual success on the merits has been established, 'a party is entitled to relief as a matter of law irrespective of the amount of irreparable injury which may be shown.'" *Valley View Health Care*, 992 F. Supp. 2d at 1042 (quoting *W. Sys., Inc.*, 958 F.2d at 872). While a party seeking a permanent injunction must show that "there is no adequate remedy at law," "'[i]rreparable injury is not an independent requirement.'" *Id.* (quoting *Gathright v. City of Portland*, 482 F. Supp. 2d 1210, 1214 (D. Or. 2007); *Continental Airlines*, 24 F.3d at 1104). Rather, irreparable injury is "'only one basis for showing the inadequacy of the legal remedy.'" *Id.* (quoting *Gathright*, 482 F. Supp. 2d at 1214. "If there is the possibility of future wrongful conduct, a legal remedy is inadequate." *Gathright*,

Page 29 -  PLAINTIFFS' TRIAL BRIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

482 F. Supp. 2d at 1214 (citing *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990)).

Here, Plaintiffs will establish actual success on the merits at trial, and there is no adequate remedy at law. Plaintiffs are already suffering multiple forms of irreparable harm and are threatened with future unlawful conduct and further harm in the absence of an injunction.

First, Oregon will suffer a constitutional injury due to Defendants' violation of the state's sovereign interests. As explained above, the unlawful federalization and deployment, without Congressional authorization, encroaches on Oregon's Tenth Amendment right to control its National Guard. As this Court has recognized, "[t]his encroachment on Oregon's police power leaves an indelible mark on Oregon's 'sovereignty under the Constitution,' . . . which cannot be remedied by a 'legal remedy, such as an award of damages.'" ECF 56 at 28 (quoting *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)); *see also Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) ("'Invasions of state sovereignty . . . likely cannot be economically quantified, and thus cannot be monetarily redressed,' and as such constitute irreparable harm." (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022) (alteration in original)).

Second, Oregon and Portland face "ongoing and concrete harm[s]" to their "law enforcement and public safety interests," due to the diversion of state and city resources. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012). The unlawful federalization of Oregon National Guard members diverts them from their state responsibilities, thereby impairing the state's ability to respond to emergencies. Furthermore, testimony at trial will show that military deployment threatens to provoke increased unrest in Portland, requiring increased expenditure and diversion of resources by state and local law enforcement agencies to maintain order. Just the *announcement* of the federalization order prompted increased numbers of protesters outside the ICE facility as well as a separate protest attended by hundreds, on the same day of the announcement. On that same day, PPB incurred over $50,000 in overtime hours associated with

Page 30 -  PLAINTIFFS' TRIAL BRIEF

responding to the increased protests, followed by over $40,000 more over the next two days. Ex. 771 at 1. The testimony at trial will establish that *actual* deployment of troops in Portland is certain to provoke further, larger protests, forcing the City and State to incur more expenses and divert more law enforcement resources. *Cf. Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) (finding irreparable harm because government officials "will lose the discretion . . . to allocate scarce resources amount different county operations necessary to fight the pandemic").

Third, deploying federalized National Guard troops from California, Texas, or any other state into Oregon erodes the "fundamental principle of equal sovereignty among the States" and harms Oregon's ability to remain "equal in power, dignity, and authority" with its fellow states. *Shelby Cnty.*, 570 U.S. at 544 (internal quotations omitted). This principle has endured since the Founding Era, when Alexander Hamilton characterized the prospect of the federal government sending one State's militia into the territories of another as an "absurd[ity]"and remarked that such overreach would invite "detestation" and "universal hatred." The Federalist No. 29 (Alexander Hamilton). And the Seventh Circuit reinforced this principle in its recent order, when it held that "the deployment of National Guard members from Texas" to Illinois was "an incursion on Illinois's sovereignty" that "makes the constitutional injury especially significant." *Illinois*, 2025 WL 2937065, at *7.

Fourth, California, like Oregon, faces Tenth Amendment harms to its sovereign interests when the number of available troops is depleted to serve an unlawful mission. Moreover, federalized troops usurping traditional law enforcement functions—no matter where those functions take place—undermines California's police powers guaranteed by the Tenth Amendment. *United States v. Morrison*, 529 U.S. 598, 618–19 (2000) (the reservation of police powers to the states is "one of the few principles that has been consistent since the [Constitution] was adopted"). Just as Oregon's state sovereignty and police powers are harmed by Defendants' attempt to federalize Oregon's National Guard, California's state sovereignty and police powers are harmed by Defendants' deploying California's federalized troops into Oregon. Defendants'

Page 31 -  PLAINTIFFS' TRIAL BRIEF

removal of California's federalized National Guard troops from the State and deployment to Oregon also irreparably harms California's ability to respond to emergencies and natural disasters. California has already been harmed because its Guard has been diverted from serving critical state functions—such as fighting wildfires. But there is a separate, unique harm when the state's federalized troops are sent hundreds of miles away, across state lines, where they are not able to quickly respond should an emergency in their own state arise which requires their support.

These harms to California would be amplified because the October 16 Memorandum extended the federalization of Californias troops from November 5, 2025 to February 2, 2026 solely for the purpose of deploying to Portland. Ex. 197. Defendants have conceded the situation in Los Angeles has improved and that they intend to send at least 200 of California's Guard to Oregon—confirming that they are not needed in California and therefore have no valid basis for continued federalization in California. *Id*.; *Pentagon pulling 2,000 National Guard deployed to LA amid ICE protests* - ABC News ("'Thanks to our troops who stepped up to answer the call, the lawlessness in Los Angeles is subsiding. As such, the Secretary has ordered the release of 2,000 California National Guardsmen (79th [Infantry Brigade Combat Team]) from the federal protection mission,' Chief Pentagon Spokesman Sean Parnell said in a statement provided to ABC News.").Thus, the practical effect of allowing the deployment of California's National Guard troops in Oregon would be to maintain those troops under federal control for an additional three months. This result would not only worsen the irreparable damage to California's and Oregon's sovereign interests but would also deprive California of members of its Guard that could otherwise carry out State functions.

Each of the harms is also sufficient to confer standing on the injured Plaintiff States and City. Each of the ongoing and threatened harms to the Plaintiffs' sovereign interests, and to their ability to allocate resources, is an "injury in fact—a concrete and imminent harm to a legally protected interest . . . that is fairly traceable to the challenge conduct and likely to be redressed

Page 32 - PLAINTIFFS' TRIAL BRIEF

by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). The harms inflicted by

Defendants' unlawful federalization and deployment of troops are traceable to the deployment

orders being challenged. These injuries are judicially cognizable and capable of redress through

the judicial process, as an injunction against those orders would stop the ongoing injuries to

Plaintiffs and prevent the further injuries that would result from actual deployment. *See Newsom*,

141 F.4th at 1045–46 (challenge to president's order federalizing the California National Guard

under 10 U.S.C. § 12406(3) was justiciable).

Plaintiffs will establish success on the merits at trial, and there is no adequate legal

remedy for any of the ongoing and threatened harms resulting from Defendants' unlawful

conduct. Plaintiffs are therefore entitled to an injunction.

**D.     The Balance of Equities and Public Interest Favor an Injunction.**

Finally, the balance of equities and the public interest weigh in favor of issuing an

injunction. Those "factors merge" when the government is the party to be enjoined. *Nken v.

Holder*, 556 U.S. 418, 435 (2009).

The balance of equities tips sharply in Plaintiffs' favor. Plaintiffs seek to protect their

sovereignty, retain control over their own National Guard, law enforcement, and public safety,

and prevent unnecessary disruption to Oregon's largest city. Plaintiffs have filed this suit to

protect the basic structure of American federalism from an alarming intrusion that was, until the

events in Los Angeles just months ago, unprecedented.

In contrast, the federal government faces no harm from an injunction. The federal

government "cannot suffer harm from an injunction that merely ends an unlawful practice or

reads a statute as required to avoid constitutional concerns." *R.I.L.-R v. Johnson*, 80 F. Supp. 3d

164, 191 (D.D.C. 2015); *see also League of Women Voters of United States v. Newby*, 838 F.3d

1, 12 (D.C. Cir. 2016) (holding that although "[t]here is generally no public interest in the

perpetuation of unlawful agency action," "there is a substantial public interest 'in having

governmental agencies abide by the federal laws that govern their existence and operation.'"

Page 33 -  PLAINTIFFS' TRIAL BRIEF

(quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). The federal government has enforced federal law in Portland for decades without the support of active-duty military forces. It may continue to enforce such laws, including immigration laws, even with Plaintiffs' requested injunction in place.

Nor does this case involve the "relative importance of a particular military interest," which courts give some deference to the federal executive branch for the purposes of balancing the equities. See *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)); *see Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 829 (9th Cir. 2017) (concluding that "courts are able to weigh equitable considerations when security or foreign affairs interests are at stake" and that "[t]o hold otherwise would introduce an overbroad rule in conflict with" *Winter*). Instead, this case represents an unlawful overreach by Defendants, that "risk[s] blurring the line between civil and military federal power—to the detriment of this nation." ECF 56 at 30.

## V. CONCLUSION

For the foregoing reasons, the Court should declare Defendants' actions unlawful and issue a permanent injunction.

DATED October 27, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel

*s/ Scott Kennedy*
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
LEANNE HARTMANN #T25070201, Mass. BBO #667852

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov
Ian.VanLoh@doj.oregon.gov
Rachel.Sowray@doj.oregon.gov
Alex.Jones@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*


ROBERT TAYLOR #044287
Portland City Attorney

*s/ Naomi Sheffield*
CAROLINE TURCO #083813
Senior Deputy City Attorney
NAOMI SHEFFIELD #170601
Chief Deputy City Attorney
1221 SW Fourth Avenue
Fourth Floor, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Caroline.Turco@portlandoregon.gov
Naomi.Sheffield@portlandoregon.gov

*Counsel for the City of Portland*


**ROB BONTA**
Attorney General of California

*s/ Jesse Basbaum*
Michael L. Newman
Thomas S. Patterson
Senior Assistant Attorneys General
Anya M. Binsacca
Marissa Malouff
James E. Stanley
Supervising Deputy Attorneys General
Jesse Basbaum
Barbara Horne-Petersdorf
Jane Reilley
Meghan H. Strong
Deputy Attorneys General

Page 35 -  PLAINTIFFS' TRIAL BRIEF

455 Golden Gate Ave.
San Francisco, CA 94102
Telephone: (415) 510-3879
E-mail: Jane.Reilley@doj.ca.gov

*Counsel for the State of California*

Page 36 -  PLAINTIFFS' TRIAL BRIEF