BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (NE Bar No. 25886)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
TIBERIUS DAVIS (DC Bar No. 90020605)
JOHN BAILEY (Ohio Bar No. 104260)
Counsel to Assistant Attorney General
MICHAEL J. GERARDI (DC Bar No. 1017949)
Senior Trial Counsel
CHRISTOPHER D. EDELMAN (DC Bar No. 1033486)
Senior Counsel
KATHLEEN C. JACOBS (TX Bar No. 24091154)
BENJAMIN S. KURLAND (DC Bar No. 1617521)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
J. STEPHEN TAGERT (VA Bar No. 99641)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 305-8659
christopher.edelman@usdoj.gov
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# PORTLAND DIVISION

|  |  |
|---|---|
| STATE OF OREGON and the CITY OF PORTLAND,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*, in their official capacities,<br><br>*Defendants*. | Case No. 3:25-cv-01756<br><br>**Defendants' Pre-Trial Memorandum** |

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................1

BACKGROUND ...........................................................................................................................4

    I.    Legal Background .........................................................................................................4

    II.    Factual Background ......................................................................................................5

        A.    Violence and Unrest in Portland and Other Areas Targeting Federal Immigration Enforcement ...............................................................................5

        B.    The Portland Police's Inadequate Response to the Violence and Unrest .........................................................................................................................7

        C.    Federalization and Deployment of the National Guard in Portland ...............9

PROCEDURAL HISTORY .....................................................................................................10

LEGAL STANDARD ...............................................................................................................14

ARGUMENT ..............................................................................................................................15

    I.    THE PRESIDENT LAWFULLY FEDERALIZED THE GUARD. ......................15

    II.    THE PRESIDENT'S ORDER IS CONSISTENT WITH THE TENTH AMENDMENT. .......................................................................................................24

    III.    PLAINTIFFS CANNOT ESTABLISH STANDING TO CHALLENGE THE FEDERALIZATION OF THE OREGON GUARD. ....................................26

    IV.    PLAINTIFFS' CHALLENGE TO THE FEDERALIZATION AND DEPLOYMENT OF OUT-OF-STATE GUARDSMEN FAILS. ...........................27

    V.    AN INJUNCTION SHOULD NOT BE ENTERED AND ANY JUDGMENT SHOULD BE LIMITED. .................................................................31

    VI.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED OR AT LEAST ADMINISTRATIVELY STAYED. ..........................................................................34

CONCLUSION ...........................................................................................................................35

# TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 15 ........................................................................................ 4, 15, 25

U.S. Const. art. II, § 2, cl. 1 ........................................................................................... 30

**Cases**

*Air Courier Conf. of Am. v. Am. Postal Workers Union,*
    498 U.S. 517 (1991) ................................................................................................. 29

*Austin v. U. S. Navy Seals 1-26,*
    142 S. Ct. 1301 (2022) ............................................................................................. 16

*Baker v. Carr,*
    369 U.S. 186 (1962) ................................................................................................. 15

*Department of Navy v. Egan,*
    484 U.S. 518 (1988) ................................................................................................. 16

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) .................................................................................................... 17

*Diamond Alternative Energy, LLC v. Env't Prot. Agency,*
    145 S. Ct. 2121 (2025) ............................................................................................. 26

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ................................................................................................. 31

*Fed. Express Corp. v. U.S. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) .................................................................................. 15

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ............................................................................................. 16, 33

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) ................................................................................................. 24

*Illinois v. Trump,*
    2025 WL 2937065 (7th Cir. Oct. 16, 2025) ......................................................... 28, 34

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ................................................................................................. 28

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................................. 26

*Luther v. Borden,*
 48 U.S. (7 How.) 1 (1849) ........................................................................................15

*Martin v. Mott,*
 25 U.S. (12 Wheat.) 19 (1827) ...............................................................................15

*Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. District of Columbia,*
 62 F.4th 567 (D.C. Cir. 2023) ................................................................................28

*Monsanto Co. v. Geertson Seed Farms,*
 561 U.S. 139 (2010) ................................................................................................31

*Murthy v. Missouri,*
 603 U.S. 43 (2024) ..................................................................................................26

*Newdow v. Roberts,*
 603 F.3d 1002 (D.C. Cir. 2010) .............................................................................33

*Newsom v. Trump,*
 ---F. Supp. 3d---, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025) .......................7, 33

*Newsom v. Trump,*
 141 F.4th 1032 (9th Cir. 2025) *rehearing en banc denied*, 2025 WL 2977104 (9th Cir. Oct. 22, 2025)
 ................................................................................................................*passim*

*Nuclear Reg. Comm'n v. Texas,*
 605 U.S. 665 (2025) ...........................................................................................14, 16

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11,*
 393 U.S. 233 (1968) ................................................................................................15

*Oregon v. Trump,*
 --- F.4th ----, No. 25-6268, 2025 WL 2951371 (9th Cir. Oct. 20, 2025) ........*passim*

*Perpich v. Dept. of Def.,*
 496 U.S. 334 (1990) .......................................................................................4, 25, 30

*Spokeo, Inc. v. Robins,*
 578 U.S. 330 (2016) ................................................................................................26

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) ................................................................................................26

*Trump v. Hawaii,*
 585 U.S. 667 (2018) ................................................................................................16

*United States v. Comstock,*
 560 U.S. 126 (2010) ................................................................................................25

*United States v. Hatch,*
  722 F.3d 1193 (10th Cir. 2013) ...................................................................................25

*United States v. Texas,*
  599 U.S. 670 (2023)....................................................................................................27

*Warth v. Seldin,*
  422 U.S. 490 (1975)....................................................................................................29

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................................32

**Statutes**

10 U.S.C. § 10101 .......................................................................................................... 4, 29

10 U.S.C. § 12406 ........................................................................................................*passim*

Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775 ................................................................23

Act of May 2, 1792, ch. 28, §§ 1-2, Stat. 264 ..................................................................23

Or. Rev. Stat. § 396.160 ......................................................................................................9

**Legislative Material**

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* Version 8 (updated Nov. 6 2018) (CRS Report).....................4, 23, 24

**Other Authorities**

Alaska National Guard, "Alaska Army National Guardsmen to deploy to Southwest border to support Customs and Border Protection," (Oct. 3, 2024), https://perma.cc/BQ6W-WKHV ......30

Antoinette Grajeda, "Arkansas National Guardsmen mobilized to southern border," Arkansas Advocate (Oct. 6, 2025), https://perma.cc/KZS5-DG7X .................................................30

DHS, Bounties Originating from Mexico Offered to Shoot ICE and CBP Officers in Chicago (Oct. 14, 2025), https://perma.cc/CMX2-J9DC .............................................................22

DHS, DHS Issues Statement on Targeted Attack on Dallas ICE Facility (Sept. 24, 2025), https://perma.cc/SC58-XM25 ......................................................................................22

Rebellion, An American Dictionary of the English Language (1900)....................................23

Rebellion, Black's Law Dictionary (1st ed. 1891) ..............................................................23

Rebellion, Black's Law Dictionary (12th ed. 2024) ...........................................................23

## INTRODUCTION AND SUMMARY OF ARGUMENT

On September 26, the Department of Homeland Security (DHS) sought "immediate and sustained assistance from the Department of War (DoW) in order to safeguard federal personnel, facilities, and operations in the State of Oregon," "including those directly supporting" the Immigration and Custom Enforcement (ICE) and Federal Protective Service (FPS), which "have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement action." The President agreed to grant the request. DoW initially provided the State of Oregon an opportunity to manage the mission. It asked Oregon Governor Tina Kotek to mobilize 200 members of the Oregon National Guard under Title 32 of the U.S. Code. In that scenario, the Guardsmen would have been federally funded but under the command and control of Governor Kotek. But Governor Kotek refused. At the President's direction, the Secretary of War thus directed the federalization of 200 members of the Oregon National Guard for a Federal Protection Mission.

The President's determination was amply justified by the facts on the ground. In the weeks and months preceding the President's decision, agitators assaulted federal officers and damaged federal property in numerous ways, spray-painted violent threats, blockaded the vehicle entrance to the Portland ICE facility, trapped officers in their cars, followed them when they attempted to leave the facility, threatened them at the facility, menaced them at their homes, doxed them online, and threatened to kill them on social media. As a result of these circumstances, ICE was forced to close the Portland field office for three weeks this summer. Federal officials were forced to respond to the violence by reassigning FPS officers and other federal officers for round-the-clock protection. That intensive deployment cannot be sustained indefinitely and diverts law enforcement officers from enforcing immigration and other laws.

For their part, local authorities have been unhelpful and at times hostile. Discovery has only reinforced—and the evidence at trial will amply demonstrate—that federal authorities cannot rely on

the Portland Police Bureau (PPB) to protect federal officials and property. City policy as well as state law bars the PPB from assisting ICE with any immigration related enforcement. PPB has an extraordinarily capacious understanding of the scope of this prohibition. Among other things, the evidence at trial will show that PPB has refused to assist FPS in protecting the ICE facility, has not intervened when agitators attempt to access the ICE facility or block the facility's driveway, and has not assisted federal officials when agitators attempt to block detainee transport and officer movement to and from the ICE facility. Indeed, PPB believes that removing such obstructors itself constitutes impermissible assistance in immigration enforcement. The record is replete with evidence of the PPB failing to provide assistance when federal officials have requested it.

Plaintiffs' challenges to the President's deployment of Guardsmen to respond to this crisis must fail. Under 10 U.S.C. § 12406, the President may federalize the Guard when he "is unable with the regular forces to execute the laws of the United States" or "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." Both conditions apply in Portland. The extensive violence and threats of violence in Portland impede the ability of ICE and other federal officials to enforce federal law. They also constitute a rebellion or at least create a danger of a rebellion against federal authority.

In a recent similar case involving mob violence in Los Angeles, the President federalized several thousand Guardsmen as well as deployed approximately 700 Marines to provide protection in that area. A district court in the Northern District of California enjoined the Los Angeles deployment but the Ninth Circuit stayed the injunction, holding that the Executive was likely to succeed in its argument "that the President lawfully exercised his statutory authority under [10 U.S.C.] § 12406(3), which authorizes federalization of the National Guard when 'the President is unable with the regular forces to execute the laws of the United States.'" *Newsom v. Trump*, 141 F.4th 1032, 1040 (9th Cir. 2025) (per curiam), *rehearing en banc denied*, 2025 WL 2977104 (9th Cir. Oct. 22, 2025). The *Newsom* panel held

that federal courts must "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists," *id.* at 1048, and limit review of the determination to assessing whether "it reflects a colorable assessment of the facts and law," *id.* at 1051.

This Court previously entered temporary restraining orders enjoining the deployment of Guardsmen to prohibit the deployment of federalized Guardsmen. But a panel of the Ninth Circuit recently granted a stay pending appeal of one of these orders, carefully examining the record and explaining why Defendants are likely to prevail on appeal under *Newsom*'s deferential framework. *See Oregon v. Trump*, --- F.4th ----, No. 25-6268, 2025 WL 2951371 (9th Cir. Oct. 20, 2025) (per curiam). And indeed, the documents and testimony as further developed through discovery only underscore the reasonableness of the President's determination. The President had ample and certainly "colorable" grounds to determine that regular forces were "unable" to sufficiently protect federal personnel and property and that the conditions in Portland at least rose to the level of a "danger" of rebellion.

The President's decision to deploy federalized Guardsmen from Texas and California was similarly lawful. Section 12406 expressly recognizes the President's authority to federalize Guardsmen from other states, and there is no valid reason to treat federal officers—which is what federalized Guardsmen are—different based on the state they are from. In addition, Plaintiffs' Tenth Amendment claim similarly fails. As this Court appeared to recognize at the TRO stage (and as all three Ninth Circuit judges considering the motion for a stay pending appeal acknowledged), that claim is simply derivative of Plaintiffs' arguments that the federalization and deployments were not authorized by law. This Court accordingly should enter judgment in Defendants' favor on Plaintiffs' claims.

## BACKGROUND

### I.    Legal Background

The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15 (granting Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Dept. of Def.*, 496 U.S. 334, 338 (1990) (quotation omitted). The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command. *See* 10 U.S.C. § 10101.

"Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States." *Perpich*, 496 U.S. at 345. Guard members may have one of three statuses at any time: (1) federal active duty under Title 10; (2) state control with federal authority under Title 32; or (3) state active duty. Title 10 gives the Federal Government authority to raise and employ military forces, including National Guard units, under federal control and at federal expense. Title 32 authorizes use of the National Guard for federal purposes and at federal expense but under state control. Finally, the Governor of a state may order that state's National Guard into state active duty pursuant to state law at state expense.

Congress has granted the President several authorities under which he may call forth the National Guard, including 10 U.S.C. § 12406, the statutory authority under which the President acted here. Section 12406's historic lineage dates to the First Militia Act of 1792, which was used by George Washington to respond to the Whiskey Rebellion. *See* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* Version 8 (updated Nov. 6 2018) (CRS Report). Today, in its entirety, Section 12406 provides:

Whenever—

(1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

(3) the President is unable with the regular forces to execute the laws of the United States;

the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406.

## II.    Factual Background

### A.    Violence and Unrest in Portland and Other Areas Targeting Federal Immigration Enforcement

The Portland ICE facility has experienced a significant amount of violence and unrest from June through the present. We provide only a brief description of the violence and unrest here. Other significant violence and unrest are described in documents designated confidential and evidence concerning those incidents will be introduced at trial.

As a June 12 Portland Police Bureau report explained, "[t]he ICE facility in Portland has long been a focal point for protest activity," and "[r]ecent nationwide unrest related to immigration enforcement has reignited local demonstrations." Defs.' Ex. 1115. Although the circumstances of specific incidents have varied from day to day, many incidents have involved (among other types of violence and unlawful activity) protestors throwing objects to injure officers or damage the ICE facility (officially called the Lindquist Federal Building), blocking ingress or egress from the ICE facility, assaults committed against officers or other protestors, vandalism and property damage to the ICE facility, and lighting fires or throwing incendiary fireworks. Documents and testimony at trial will also

show that federal officers have been doxed and that agitators have tailed or followed officers to their homes or hotels to intimidate them.

Protest activity around the facility began on June 7 and "escalated quickly." *Id.* As just one example of the significant unrest in June, on June 12, "over 450 protesters barricaded employees inside the facility, ignited fires, and engaged in direct confrontations with officers—resulting in 10 arrests." *Id.* Documents and testimony at trial will show that due to the violence and disruption, ICE had to vacate the facility for three weeks, which hindered ICE in carrying out its mission of immigration enforcement.

Unrest and violence at the facility continued in July and August. Below are some illustrative examples. On July 20, an unruly protestor struck an officer with a long, wooden stick. Portland Ex. 810. During a July 24 protest, protestors threw titanium screws in front of the facility driveway to damage vehicles, because titanium screws cannot be picked up by magnetic rollers. Portland Ex. 814. On August 11, a crowd of protesters struck ICE vehicles with their fists and yelled threats at federal officers. Portland Ex. 827. On August 16, a crowd threw rocks and other objects over the facility's fence, lit fireworks, blocked the driveway and refused to comply with orders to leave; FPS had to deploy non-lethal force to clear the way so that vehicles could exit. Portland Ex. 833. On August 25, two FPS officers sustained injuries when they were attacked while attempting to interview protestors suspected of illegal activity. Portland Ex. 842. These examples are merely illustrative; many more similar incidents have occurred this summer. And as described herein, similar violent incidents have occurred in September and October. *See infra*, pp. 19-20.

FPS, which is the regular agency charged with protecting the Lindquist Building, is stretched. Testimony at trial will show that sustained violence and security risks have required FPS to provide protection for the building that it is simply not resourced to accomplish. Evidence will show that DHS has been forced to reassign members of ICE, which includes Enforcement and Removal Operations

(ERO) and Homeland Security Investigations (HSI) Special Response Teams (SRT), and U.S. Customs and Border Protection (CBP) personnel, including members of its Border Patrol Tactical Unit (BORTAC) and Office of Field Operations, Special Response Team (SRT) to support FPS, impeding ICE's and CBP's ability to accomplish the missions with which they are tasked.

Violence, unfortunately, has not been limited to Portland. Earlier this summer, riots in Los Angeles targeted ICE operations. In response, the President signed a memorandum on June 7 calling into federal service members and units of the National Guard under 10 U.S.C. § 12406 to "temporarily protect ICE and other United States Government personnel who are performing Federal functions . . . and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur[.]" Defs.' Ex. 1052. The President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other government officials' enforcement of federal law. *Id.* "In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." *Id.* Four thousand Guardsmen were federalized from the California National Guard and 700 active duty Marines were deployed to Los Angeles to protect federal property and personnel. *Newsom v. Trump*, ---F. Supp. 3d---, 2025 WL 2501619, at *3 (N.D. Cal. Sept. 2, 2025).

### B. The Portland Police's Inadequate Response to the Violence and Unrest

In response to the violence and unrest in Portland, the PPB has consistently failed to provide an adequate response. In addition to the PPB's lack of resources, Portland city policy, reflecting state law, prohibits the PPB from assisting ICE with immigration enforcement. PPB has provided direction for how to handle protests at the ICE facility, which includes direction to "not coordinate crowd management or control actions with FPS"; to "prioritiz[e] life safety and operational capacity"; and to "not intervene with individuals who" enter ICE property or block the ICE driveway. Defs.' Ex. 1178. Officers are limited to "respond[ing] to emergency calls for cover or assistance (e.g., code three cover,

injured officer, shots fired) sought by ICE, CBP or ERO," and "[i]n those instances, officers shall limit their involvement to providing emergency law enforcement cover." Defs.' Ex. 1177.

The PPB's policy against assisting with immigration enforcement goes far beyond any ordinary understanding of "immigration enforcement"—which would encompass, for example, investigating criminal violations, detaining suspected immigration violators, and helping facilitate removals. As relevant here, PPB prohibits its officers from intervening when protestors seek to obstruct officers moving in and out of the facility. Incredibly, that policy also amounts to an expression *of approval* for such activities by singling out these activities for favorable treatment. PPB *is* permitted to intervene to address blocking streets or "corking" (blocking intersections) near the ICE facility *unless* protestors are blocking detainee transport or federal officer movement—in which case officers are prohibited from intervening. Defs.' Ex. 1132. And in addition to the directives not to intervene when agitators enter ICE property, block the ICE driveway, or block the street adjacent to the ICE facility, the PPB prohibits even routine assistance such as removing debris from ICE property ("Do not remove any debris.") because "PPB involvement may be construed as assisting federal immigration enforcement, which is prohibited." *Id.* By contrast, debris may be removed "[o]n public roadways or adjacent areas." *Id.*

Not surprisingly then, the PPB's response to the violence and unrest has been wholly inadequate. To give an illustrative example, in one incident, the PPB delayed responding to an attempted robbery/assault because they wanted to wait for additional resources and to avoid confronting a crowd of 50 protestors. Portland Ex. 514. In its report of the incident, the PPB noted that three counter-protestors had been assaulted and pepper sprayed by the much larger group of anti-ICE protestors; PPB *blamed the counter-protestors* for the incident, characterizing them as a "chronic source of police and medical calls at ICE" because they are near the ICE facility when the protestors are. *Id.* In another incident, in response to reports of "black blockers assaulting people," PPB stated

that "even if these folks were still at ICE or nearby, we would not be able to address the call or make an arrest with the resources we have." Portland Ex. 513. In response to another incident on September 19, PPB did not respond for almost an hour and an assault occurred during the delay; when they did respond, they simply drove by the scene. Portland Ex. 512. When ICE boarded up some windows of the facility to protect the facility in the wake of PPB's abandonment, Portland even went so far as to issue a land use violation notice for violating local zoning laws. Portland's Response to Request for Admission No. 1.

### C. Federalization and Deployment of the National Guard in Portland

Based on the ongoing violence and threat to the ICE facility in Portland, DHS requested that the Department of War assist in securing the facility. Specifically, on September 26, 2025, DHS transmitted a memorandum to the Department of War requesting "immediate and sustained assistance . . . in order to safeguard federal personnel, facilities, and operations in the State of Oregon." Defs.' Ex. 1050. As the memo explained, "Federal facilities, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Service (FPS), have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *Id.* Based on the need to "ensure the continued protection of federal facilities in Oregon[,]" DHS requested 200 DoW personnel to "direct[ly] support [] federal facility protection, access control, and crowd control measures." *Id.*

On September 27, the President cited Secretary Noem's request in making a determination that it was necessary for the Secretary of War to coordinate the deployment of National Guard forces to Portland. Oregon Ex. 1.

In response, the National Guard Bureau promptly contacted the Oregon Adjutant General, who serves as Chief of Staff to the Governor of Oregon, Director of the Oregon Military Department, and Commander of the Oregon National Guard. Or. Rev. Stat. § 396.160. This included

several calls, as well as a formal memorandum requesting that Oregon provide 200 members of its National Guard to aid DHS in Title 32, non-federalized status where Guardsmen remain under the state chain of command. *See* Defs.' Ex. 1048. The Oregon Adjutant General, however, informed DoW that the Oregon Governor had already informed the President that Oregon is unwilling to lend its voluntary support. Defs.' Ex. 1050.

On September 28, 2025, Secretary Pete Hegseth issued a memorandum to the Adjutant General and the Governor of Oregon mobilizing 200 members of the Oregon National Guard for sixty days. Defs.' Ex. 1051. The federalization was based on the President's judgment that conditions in Oregon satisfied Section 12406's conditions. President Trump has explained: "As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem." California Ex. 194. "Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon." *Id.* "ANTIFA and the Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law." *Id.*

## PROCEDURAL HISTORY

Plaintiffs the State of Oregon and City of Portland filed a complaint on September 28, 2025, claiming the federalization and deployment of members of the Oregon National Guard violates 10 U.S.C. § 12406, the Posse Comitatus Act, the Tenth Amendment, several other constitutional provisions and statutes including the APA. ECF No. 1 (Compl.). They moved for a TRO the next day. ECF No. 6 (TRO). Following expedited proceedings, the Court concluded that the use of Guardsmen from Oregon likely violated Section 12406 and the Tenth Amendment and "enjoined" defendants from "implementing [their] September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland." Oregon Ex. 6.

Plaintiffs complied with the Court's order. Defendants ceased implementation of the enjoined memorandum, which is a communication between the Secretary of War and the Adjutant General of the Oregon National Guard that federalized members of the Oregon National Guard. At the same time, Defendants relocated 200 federalized Guardsmen from California to Oregon to provide protection for federal personnel and property. Defendants also federalized Guardsmen from Texas for purposes of providing protection in Illinois, Oregon, and potentially elsewhere. Defendants have not, however, relocated Guardsmen from Texas to Oregon.

On October 5, Plaintiffs filed an amended complaint with the State of California joining Oregon and Portland as plaintiffs. Plaintiffs then sought a second TRO prohibiting the deployment within Oregon of federalized Guardsmen from any state. ECF No. 59. In a hearing, defendants distinguished the deployment of out-of-state Guardsmen from the utilization of members of the Oregon National Guard. Among other things, Defendants argued that each of the plaintiffs lacked standing to challenge and could not establish an irreparable harm from the deployment of Guardsmen from outside Oregon. This Court disagreed and granted a second TRO, ordering that "Defendants are temporarily enjoined from deploying federalized members of the National Guard in Oregon." ECF No. 68 at 1. Defendants promptly complied with the second TRO. On October 15, this Court extended the effective period of both orders by 14 days, to November 1 and 2. ECF No. 85.

Defendants appealed the first TRO and sought an immediate administrative stay and stay pending appeal. A panel of the Ninth Circuit unanimously granted an administrative stay of the First TRO. Ninth Circuit Dkt. 32.1 at 3. On October 20, following briefing and oral argument, the panel granted a stay pending appeal. The per curiam opinion, joined by Judges Nelson and Bade, held that Defendants were likely to prevail on the merits. In a thorough opinion, the majority carefully reviewed the record—including violence and threats of violence at and near the Portland ICE facility from June to September, as well as the responses from federal and local officials—and concluded that, under the

deferential standard set forth in *Newsom*, Defendants are likely to prevail in their argument that the President lawfully exercised his discretion under Section 12406(3). *Oregon v. Trump*, 2025 WL 2951371, at *2-7, *10-13.

Among other things, the per curiam opinion reasoned that this Court erred in failing to appropriately apply the "highly deferential standard" set out in *Newsom* for determining whether the President's judgment "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" 2025 WL 2951371, at *8 (quotation omitted). Specifically, the Ninth Circuit held that this Court erred in "discount[ing] the violent and disruptive events that occurred in June, July, and August, including the resulting closure of the ICE facility for over three weeks in June and July," while focusing "on only a few events in September." *Id.* at *10. Contrary to that isolated focus, "the President is entitled, and indeed, duty-bound, to evaluate the entire context of events leading up a decision to invoke § 12406," which includes these recent past events. *Id.* at *11.

The majority next held that this Court "erred by placing too much weight on statements the President made on social media"; those statements did not alter the conclusion that the facts on the ground provide "a colorable basis to support the statutory requirements." 2025 WL 2951371, at *11. And the panel held that this Court wrongly concluded that the surge of officers to Portland from around the country to respond to months of violence established that the regular forces could execute the laws. *Id.* at *11-12. To the contrary, the record established that these deployments were irregular and unsustainable. *Id.*

As to the Tenth Amendment claim, the panel noted that this claim is derivative of Plaintiffs' statutory claim. "[W]hen the President federalizes the National Guard absent an authorization by Congress acting under its militia clause power, he necessarily violates the Tenth Amendment." 2025 WL 2951371, at *13. But since "Defendants are likely to establish that the President lawfully federalized the National Guard as Congress authorized in § 12406(3)[,] . . . Defendants are also likely

to succeed on Plaintiffs' Tenth Amendment claim." *Id.* The panel further noted that "the record establishes that the continued deployment of FPS officers to Portland is unsustainable, and state and local law enforcement have been unable or unwilling to assist the government's efforts to protect federal personnel and property at the ICE facility." 2025 WL 2951371, at *14 (citation omitted).

Judge Nelson issued a concurring opinion. In his view, Supreme Court precedent precludes review of the President's Section 12406 determination. 2025 WL 2951371, at *15 (Nelson, J., concurring). Judge Nelson further suggested that Plaintiffs may lack standing and that, in any event, "the President's determination under § 12406(3) and § 12406(2) are bolstered by the history and tradition of the early Militia Acts." *Id.* Judge Nelson also stressed that the President's response to the events in Portland was measured and proportionate—federalizing 200 Guardsmen (as noted above, roughly five percent of the Los Angeles deployment *Newsom* concluded was likely lawful). *Id.* at *21-22. Although the precise number of troops to deploy is left to the President's discretion, "[t]he federalization and deployment of just 200 National Guardsmen for 60 days is well within a deferential proportional response to support good faith." *Id.* at *22.

Judge Graber dissented. Like this Court, Judge Graber believed that only the incidents in the days immediately preceding the President's Section 12406 determination were relevant. 2025 WL 2951371, at *25-26 (Graber, J., dissenting). Judge Graber further contended that if events in June and July were considered—"the more serious protests in June and the resulting closure of the ICE building for more than three weeks, from June 13 to July 7"—those events at that time "likely" did not give rise to an inability to execute the laws. *Id.* at *27. Judge Graber characterized the significant surge in personnel that the Government's declarants had explained was unsustainable as "staffing difficulties" that could not support a "colorable" determination that the statutory conditions were met. *Id.* at *27-28.

Defendants did not separately appeal this Court's Second TRO. As the panel majority

recognized, "[a]t oral argument, Defendants' counsel explained that they did not appeal the second TRO, which relies on the same legal reasoning as the first TRO, because they concluded that the district court would be required to dissolve the second TRO if Defendants succeed on their motion for a stay pending appeal." *Id.* at *8 n.8. The dissent argued that Defendants could not establish irreparable harm because the Second TRO would continue to restrain the deployment. But the majority disagreed, explaining that its analysis would necessarily require dissolution of the Second TRO as well: "Defendants are thus correct that the first TRO and the second TRO rise or fall together on the merits of the issues raised in this motion for a stay pending appeal." *Id.* at *14 (per curiam opinion). Defendants moved to dissolve the second temporary restraining order on October 20. ECF No. 97. That motion remains pending. A judge has called for a vote on rehearing en banc of the panel's stay, and the Ninth Circuit has administratively stayed the panel's stay until 5 p.m. tomorrow.

## LEGAL STANDARD

Under the Ninth Circuit's decision in *Newsom*—with which Defendants disagree on this point—this Court may review the President's determination that one or more conditions for federalizing the Guard under Section 12406 were satisfied. But that review is exceedingly circumscribed. The Court must, at a minimum, "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Newsom*, 141 F.4th at 1048; *see also id.* at 1047 (observing that review of the President's decision in this context is "especially deferential"). The judicial role is limited to determining whether the President "had a colorable basis for invoking" Section 12406. *Id.* at 1052.

That highly deferential standard is reinforced by the nature of nonstatutory ultra vires review more generally, which is one of the most demanding standards known to the law. It is "a Hail Mary pass," *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted), requiring a showing that the defendant is engaged in "blatantly lawless" action, *Oestereich v. Selective Serv. Sys. Loc. Bd. No.*

*11*, 393 U.S. 233, 238 (1968), or "has plainly and openly crossed a congressionally drawn line in the sand," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022). Indeed, although APA review is also highly deferential, the standard for relief on an ultra vires theory is significantly more demanding. *Id.* 765 (stating that "challengers must show more than the type of routine error in 'statutory interpretation or challenged findings of fact' that would apply if Congress had allowed APA review").

## ARGUMENT

### I.    THE PRESIDENT LAWFULLY FEDERALIZED THE GUARD.

The Constitution grants Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. In Section 12406, Congress explicitly authorized the President to "call into Federal service" members of the National Guard "[w]henever," *inter alia*, "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). The President determined that both of those conditions were satisfied when he federalized and deployed Guardsmen for the Federal Protection Mission in Oregon. Plaintiffs have no likelihood of success in second-guessing that.

**1.** Initially, the President's determination is "conclusive upon all other persons," and is thus not reviewable. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827). Congress vested the decision whether to call up the National Guard in the President, not the courts, as the Supreme Court observed nearly 200 years ago in *Martin*. *Accord Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849) (asking rhetorically whether, "[a]fter the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right," and observing that extending the judicial power so far would be "a guarantee of anarchy"); *cf. Baker v. Carr*, 369 U.S. 186, 213 (1962) (quoting *Martin,* 25 (12 Wheat.) at 30, for the proposition that an emergency demands "[a] prompt and

unhesitating obedience"). Defendants acknowledge, however, that *Newsom* held otherwise. Whether that determination binds subsequent *Ninth Circuit* panels is perhaps an open question. *See Oregon v. Trump*, 2025 WL 2951371, at *15 (Nelson, J., concurring). But it certainly binds this Court. Defendants therefore repeat and incorporate their previous arguments that the President's federalization decision is not reviewable, ECF No. 35 at 12-13, and preserve this argument for further review.

**2.** In light of the Ninth Circuit's discussion of *Martin* and its progeny, the Ninth Circuit made clear that this longstanding precedent interpreting statutory delegations of the calling-forth power requires, at a minimum, that the President's determination must be upheld if there is a "colorable" basis for it. The standard "giv[es] a great level of deference." *Newsom*, 141 F.4th at 1048; *see also id.* at 1047, 1052 ("highly deferential" and "especially deferential."). Indeed, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988). "Under Article II of the Constitution, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces." *Austin v. U. S. Navy Seals 1-26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring).

In addition, even if the President's determination is reviewable, Plaintiffs' challenge must meet the extremely stringent standard for *ultra vires* review, which requires showing not merely that the President "has arguably reached a conclusion which does not comport with the law" but rather that the President "has taken action entirely in excess of [his] delegated powers and contrary to a specific prohibition." *NRC*, 605 U.S. at 681 (emphasis and quotation omitted). That is akin to highly deferential rational-basis review, under which the President's determinations should be upheld if there is any plausible basis for them. *Cf. Trump v. Hawaii*, 585 U.S. 667, 704 (2018). Moreover, Plaintiffs cannot obtain review of the President's decision through the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Nor is DoW's implementation of a presidential directive subject to APA review.

*See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (declining to consider claim that the Secretary of Homeland Security was "required to explain a legal conclusion that was not hers to make").

Applying the highly deferential standard, the Ninth Circuit already held as to the California federalization and deployment, the President "had a colorable basis for invoking [Section] 12406(3)," *Newsom*, 141 F.4th at 1052, and the motions panel reached the same conclusion with respect to the President's federalization of 200 Guardsmen here. Section 12406(3) authorizes the President to call forth the National Guard when he is "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). Here, the President authorized Secretary Hegseth to deploy the Oregon National Guard following a request for assistance from DHS to DoW, in which DHS represented that ICE and FPS have "come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *See* Defs.' Ex. 1050. DHS further explained "groups are actively aligned with designated domestic terrorist organizations and have sought to impede the deportation and removal of criminal noncitizens through violent protest, intimidation, and sabotage of federal operations." *Id.*

On this, the President "determined . . . conditions continue to deteriorate into lawless mayhem." California Ex. 194. "Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon." *Id.* Documents and testimony will describe the violence and threats facing federal property and personnel, as well as the strain on law enforcement resources required to respond. But many of the fundamental facts are undisputed. The responses to Defendants' requests for admissions acknowledge "that there have been near daily protests . . . outside of the ICE facility from approximately June 2, 2025, through present." Oregon Response to Request for Admission ("RFA") No. 8; *see also* Portland Response to RFA No. 8. Plaintiffs admit that "on a number of occasions, protesters have temporarily stopped or slowed federal vehicles arriving at, or leaving, the ICE facility." Oregon Response to RFA No. 10; *see also* Portland Response to RFA No. 10. They admit that "federal

assault charges" have been filed "based on . . . interactions with federal law enforcement" near the ICE facility. Oregon Response to RFA No. 12; *see also* Portland Response to RFA No. 12. And they admit that "some individuals present at the ICE facility protests have damaged the facility." Oregon Response to RFA No. 14; *see also* Portland Response to RFA No. 14. Portland also admits that "on occasion protesters have lit or attempted to light fires near the ICE Facility." Portland Response to RFA No. 13.

As discussed above, FPS cannot feasibly provide 24/7 protection for the ICE facility on its own, which has required it to seek protection from ICE's Special Response Teams and CBP's BORTAC and OFO officers, impeding its ability to perform its own law enforcement missions. And repeated requests for assistance from local police have either resulted in delayed or no concrete actions. *See supra* pp. 8-9. The PPB's inadequate responses are not isolated failures. They are the product of State law, city policy, and PPB guidance restricting or outright prohibiting PPB officers from responding when agitators attempt to block access to and from the facility or otherwise obstruct federal operations. *See supra* pp. 7-8. The results have been stark. Indeed, DHS was forced to close the building entirely in response to the violence and threats for three weeks. *See supra* p. 6.

This prevention of violence will be enhanced through the federalization of Guardsmen. In addition, the relocation of law enforcement resources to the ICE facility from elsewhere necessarily affects the President's ability to enforce the laws in the places where those officers typically service. Finally, the violence and threats of violence impact Title 8 enforcement in Oregon, as the President recognized. *See supra* p. 10. It is readily apparent that the President had a "colorable" basis for determining that protection for federal officials and property was necessary so that federal officials could execute the laws Congress has required them to enforce.

Defendants recognize that the Court reached a different conclusion at an early stage of the proceedings. But respectfully, the Court's previous analysis reflected several legal and factual errors.

First, as the Ninth Circuit concluded in granting a stay, this Court previously erred by focusing entirely on the situation in Portland in the handful of days preceding the President's federalization decision. As the stay panel noted, this Court declined to give any weight at all to the serious violence and disruption "in June, July, and August, including the resulting closure of the ICE facility for over three weeks in June and July." *Oregon v. Trump*, 2025 WL 2951371, at *10. The stay panel correctly rejected that narrow focus. Nothing in Section 12406 suggests the President must consider only events that immediately precede his federalization decision, and reading in such a requirement was improper.

In addition, incidents of violence and unrest in June, July, and August are hardly distant events—it is simply untenable to hold that these still-quite-recent occurrences are categorically irrelevant such that the President's consideration of them does not reflect even a *colorable* assessment of the facts. But more specific to Portland, violence has abated somewhat only because of an intensive and unsustainable deployment of FPS, ICE, and CBP forces for 24/7 coverage. *See supra* pp. 6-7. It was entirely reasonable for the President to consider these previous events in determining that the limited Guard deployment was necessary in light of the extraordinary measures needed to address that prior violence *and* the impracticality of maintaining those measures indefinitely. And as a practical matter, it would be perverse to effectively fault the President for *waiting* to authorize the Guard's deployment until late September when additional options had been pursued and reasonably determined to be unsustainable, rather than deploying the Guard immediately in June or July.

And even artificially confining the analysis to events in September in Portland, this Court's previous analysis was, respectfully, incorrect. Throughout September 2025, ICE officials and property were the subject of regular, often-violent protests. On Labor Day, for example, hundreds of protesters gathered outside ICE facilities and built a mock guillotine, requiring FPS officials to exert physical force to keep order and resulting in several arrests. ECF No. 46-2. Also in early September, agitators coerced "older transients" to "approach[] the gate" of the ICE facility and "caus[e] a distraction,"

including one "elderly man" who asked FPS agents "if he could just come up to the gate and rattle it so the antifa instigators would leave him and others alone." *Id.* On September 19, FPS alerted PPB to a disturbance at the ICE facility, but PPB had "few to zero officers available." ECF No. 46-18. Within an hour, FPS reported that an assault occurred; PPB officers then drove by but did not stop to assist. *Id.* On September 20, FPS repeatedly notified PPB "about black blockers assaulting people," including "a journalist who was assaulted by a black blocker with a large sword or stick," but "[d]ue to short staffing," PPB did nothing but "drive by." ECF No. 46-19; *see also* ECF No. 46-20 (events of September 20 involved protesters pepper-spraying counter-protesters). On the early morning of September 28, a large fight broke out outside the facility after a protester burned an American flag; protesters committed violent assaults and used pepper spray on crowd members, with one victim "bleeding heavily from his face." ECF No. 46-28.

Violence and disorder at the ICE facility have continued after the September 28 federalization order—which is no surprise given that the federalized Guardsmen have not been permitted to deploy and provide protection for which they were intended. As an example, on October 11, a crowd of about 150 people congregated, and "tempers flared between opposing groups," with one individual arrested for throwing a rock at another person's head; FPS officers arrested five individuals and had to repeatedly deploy CS gas to clear out protesters sitting on the brick wall of the facility. Oregon Ex. 44. And on October 18, hundreds of protesters gathered, with 100 of them blocking the driveway; three individuals were arrested for crimes including assault, and federal officers had to "deploy[] a heavy amount of CS gas and pepperballs" to clear the way to allow vehicles to leave. Oregon Ex. 46.

This Court also emphasized supposed differences between the situation in Los Angeles and Portland. But for one, the differences should not be exaggerated. As the stay panel explained, "[h]ere, like *Newsom*, the undisputed facts show that protesters damaged a federal building, leading to its closure for over three weeks, attempted to burn the building down, placed chains on the doors, attempted to

breach the front door of the building and broke the front glass door, threw objects at the building, including rocks, sticks, and a mortar, and launched M80 fireworks at federal officers, assaulted federal officers, shined lasers at officers' eyes, and doxed federal officers." *Oregon v. Trump*, 2025 WL 2951371, at *14. And in any event, although the situation in Portland differs from Los Angeles, so is the deployment. Approximately 4,700 servicemembers were deployed to Los Angeles. But less than five percent of that sum has been federalized in Oregon. The Guardsmen deployed here—from both Oregon and other states—comprise a small fraction of the number of Guardsmen initially deployed to the Los Angeles area. *See Oregon v. Trump*, 2025 WL 2951371, at *21-22 (Nelson, J., concurring) (noting proportionality of the President's response).

The Ninth Circuit further explained in *Newsom* that Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States in order to call members of the National Guard into federal service, nor does it suggest that activation is inappropriate so long as any continued execution of the laws is feasible." 141 F.4th at 1051. To suggest otherwise, the panel reasoned, would mean that "so long as any quantum of federal law enforcement could be accomplished in the face of mob violence," "the President would be unable to call up the Guard to respond." *Id.* (internal quotation marks omitted). To be sure, the Ninth Circuit held that there must be more than some "minimal interference." *Id.* But the Ninth Circuit in *Newsom* did not require the President to provide *particular examples* of federal law enforcement that was precluded. Rather, the Ninth Circuit relied upon the violence itself, and deferred to the President's judgment that "those activities significantly impeded the ability of federal officers to execute the laws." *Id.* at 1052.

The Court should follow the same course here. It is simply common sense that federal agents would be able to engage in greater enforcement of the immigration laws if they were not operating under the threat of assaults and obstruction, and that they are currently bearing unacceptable risks to

their safety while doing their jobs. The closure of the Portland ICE facility as a result of the violence and unrest disrupted immigration enforcement, while the deployment of the Guard frees up ICE staff to perform immigration enforcement. Even if the President's determination is reviewable, this is more than sufficient under any plausible standard.

Finally, the reasonableness of the President's decision is further underscored by events outside Portland. The events in Portland are not occurring in a vacuum. We have already discussed the events in Los Angeles prompting deployment of the National Guard in that area. In addition, two days before DHS requested assistance in Portland, a man shot at an ICE field office in Dallas, killing two detainees and injuring one other. DHS, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025), https://perma.cc/SC58-XM25. And just two weeks ago, DHS reported that "Mexican criminals, in coordination with domestic extremist groups[,] have placed targeted bounties" on DHS personnel in Chicago, with tiered bounties up to $50,000 for kidnapping, assaulting, and assassinating federal law enforcement officers and senior officials. DHS, Bounties Originating from Mexico Offered to Shoot ICE and CBP Officers in Chicago (Oct. 14, 2025), https://perma.cc/CMX2-J9DC. It is unnecessary to rely on these events here because local conditions in Portland amply justify the President's determination. But the President is in any event plainly entitled to consider this nationwide pattern of violent resistance to immigration enforcement in determining that National Guard assistance in other hot spots is warranted.

**3.** The President's action under Section 12406 was independently warranted under the provision authorizing him to call the Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2).

The term "rebellion" encompasses the violent resistance to lawful enforcement of federal immigration law occurring in Portland. Black's Law Dictionary defines rebellion to include "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or

summons." *See Rebellion*, Black's Law Dictionary (12th ed. 2024). The same understanding prevailed in 1903, when Congress first enacted what is now Section 12406. *See* Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776 (authorizing the President to call forth the state militias into active federal service in the case of, among other things, "rebellion against the authority of the Government of the United States"). Dictionaries from the 1890s and 1900s define "rebellion" to focus on deliberate resistance to the government's laws and authority. *See Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws or operations of the government, committed by a subject."); *Rebellion*, An American Dictionary of the English Language (1900) ("Open resistance to lawful authority."); *Rebellion*, The Cyclopedic Dictionary of Law (1901) ("[T]he forcible opposition and resistance to the laws and process lawfully installed"); *Rebellion*, Webster's International Dictionary of the English Language (1903) ("Open resistance to, or defiance of, lawful authority.").

Plaintiffs favor a narrower definition of rebellion limited to "[o]pen, organized, and armed resistance to an established government or ruler; esp., an organized attempt to change the government or leader of a country, usu. through violence." *Rebellion*, Black's Law Dictionary (12th ed. 2024). Congress, however, plainly used "rebellion" in its broader sense here. Otherwise, Section 12406 would fail to encompass numerous instances, both before and after its initial enactment in 1903, in which the President has called the militia into federal service to address open defiance of federal authority in situations that fell short of organized efforts to overthrow the government.

Most famously, President Washington called up the militia to assist in suppressing the Whiskey Rebellion—a violent protest in western Pennsylvania targeted at tax assessors attempting to collect a federal excise tax on distilled whiskey. *See* CRS Report 8. President Washington took that action under a 1792 statute that did not by its terms refer to "rebellion." *See* CRS Report 7-8; *see also* Act of May 2, 1792, ch. 28, §§ 1-2, 1 Stat. 264. But when Congress later enacted statutes referring to a "rebellion," those statutes plainly extended to cover this original historical precedent of violent opposition limited

to a particular federal law. The Whiskey Rebellion, moreover, is only one example of a range of civil disorders that members of the militia and other federal military forces have long been called upon to address. Throughout the early years of the republic, Presidents routinely called out troops to suppress opposition to other federal revenue laws. *See* CRS Report 9-12. In the late 1800s and early 1900s, states frequently requested assistance from federal troops to address violence stemming from labor disputes and miners' strikes. *See id.* at 13-14, 35-37. And Presidents Eisenhower and Johnson used the federalized National Guard to ensure the enforcement of federal civil rights laws and to protect civil rights advocates in the 1950s and 1960s. *See id.* at 37-38.

The situation in Portland exhibits many of the same features as these historical precedents. At a minimum, these conditions created a "danger of a rebellion." In response to lawful immigration enforcement efforts, agitators have specifically targeted federal property and officials with violence, intimidation, and threats. Congress sensibly did not require the President to await an actual rebellion before federalizing Guard members where a significant threat of rebellion exists. Creating life-threatening dangers for federal officers enforcing federal law (as well as bystanders) and targeting federal employees for their work performing federal functions surely amounts to a dangerous risk of rebellion. The President was not required to wait for tragedy to occur (as has already happened in Texas just last month) before acting to protect federal officials and property.

## II.    THE PRESIDENT'S ORDER IS CONSISTENT WITH THE TENTH AMENDMENT.

As the stay panel also concluded, the federalization of the Guard does not violate the Tenth Amendment. The Supreme Court "long ago rejected the suggestion" that the federal government "invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority . . . in a manner that displaces the States' exercise of their police powers." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981). If a federal action is authorized by the

Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see United States v. Comstock*, 560 U.S. 126, 144 (2010). Here, the text of the Constitution makes clear that Congress may "provide for calling forth the Militia." U.S. Const. art. I, § 8, cl. 15. And Section 12406 rests on that express grant of authority, authorizing the President to "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary." 10 U.S.C. § 12406. This Court previously treated Plaintiffs' Tenth Amendment claim as derivative of their statutory claim, ECF No. 56 at 26-27, as did the panel majority, 2025 WL 2951371, at *13, and Judge Graber "agree[d] with the parties that, for the purpose of the present motion, no meaningful difference exists between the statutory claim and the constitutional claim," *id.* at *23 n.1 (Graber, J., dissenting). So the President's lawful invocation of Section 12406 defeats any Tenth Amendment claim. *Newsom*, 141 F.4th at 1054 n.5.[1]

That principle forecloses Plaintiffs' Tenth Amendment claim. Plaintiffs do not contend that Section 12406—some variant of which has existed since virtually the Founding—is unconstitutional. So if the federalization and deployment is authorized by Section 12406—which it is—the Tenth Amendment simply has no independent role to play in this case. That is particularly so because the

---

[1] Plaintiffs previously contended that the federalization and deployment of 200 Guardsmen also violated the Tenth Amendment because, according to Plaintiffs, this step was taken with the subjective intention to punish Plaintiffs for their refusal to enforce federal immigration law. *See* TRO Mot. at 19-20. As we previously noted, Plaintiffs' contention that the federalization decision was made to punish the State—as opposed to the stated reason, to protect federal officials and property—is entirely conclusory. And deploying Guardsmen in a purely protective capacity would be a very odd "punishment" for failing to help enforce federal immigration law. In any event, Plaintiffs cited no authority for the proposition that a Tenth Amendment claim can be used to challenge otherwise valid federal policies on the ground that the federal decisionmaker purportedly acted with improper motives. Plaintiffs also contended that the federalization violated anti-commandeering principles. But the National Guard is composed of both the State and Federal National Guards. *Perpich*, 496 U.S. at 345. The federal government is thus not unlawfully commandeering state officials when it federalizes the Guard consistent with Section 12406. Again, provided that the federalization is itself statutorily proper, the Tenth Amendment is simply irrelevant.

President mobilized the National Guard to protect undisputedly federal interests—specifically, to protect federal officials and property.

## III.    PLAINTIFFS CANNOT ESTABLISH STANDING TO CHALLENGE THE FEDERALIZATION OF THE OREGON GUARD.

In any event, Plaintiffs have not demonstrated standing. Plaintiffs invoking the Court's jurisdiction must have Article III standing for "each claim that they press against each defendant," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted), and "for each form of relief that they seek*,*" *TransUnion LLC v. Ramirez,* 594 U.S. 413, 431 (2021). And to show standing, a plaintiff must demonstrate, among other things, that it has suffered an injury in fact—that is, it has suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted); *see also Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2133 (2025) (a plaintiffs must have "a personal stake in [a] dispute" and not be a "mere bystander[]") (citation omitted).

Critically, to establish standing for relief following a trial on the merits, "those facts (if controverted) must be supported adequately by the evidence adduced at trial." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotation marks omitted). Plaintiffs will not be able to demonstrate an injury sufficient to support their standing to seek relief here. As Defendants have previously noted, the federalization of the Oregon National Guard involves approximately three percent of the Guard, for a limited period. Plaintiffs provided no record evidence of concrete adverse impacts to existing state operations. Nor did they provide any example of reasonably likely future needs that the federalization will prevent the State from addressing. It is thus entirely speculative—and indeed, implausible—that this small and time-limited federalization will result in any concrete injury whatsoever to Plaintiffs. States also cannot challenge the Government's utilization of federal personnel—whether those personnel are federalized Guardsmen, law enforcement officers, or other federal workers—based on

perceived downstream injuries like inflamed tensions. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

Additionally, Defendants' conduct does not inflict a sovereign injury. The protection of federal personnel and property is a federal interest. Violence to federal personnel and property is inconsistent with federal law, and the deployment of Guardsmen vindicates federal interests. Nor can Plaintiffs show that Defendants' choice to locate federalized Guardsmen in Oregon intrudes on sovereign interests. As explained, federalized Guardsmen are fully federal personnel. State sovereignty interests are not offended when the federal government locates its personnel in a state regardless of whether those personnel are federalized Guardsmen, federal prosecutors, or USDA inspectors. Defendants thus lack standing to challenge the federalization and deployment of Oregon Guardsmen.

## IV. PLAINTIFFS' CHALLENGE TO THE FEDERALIZATION AND DEPLOYMENT OF OUT-OF-STATE GUARDSMEN FAILS.

Plaintiffs also challenge the federalization and deployment of members of the Texas National Guard to Portland as well as the deployment of approximately 200 already-federalized California Guardsmen to Portland. But that challenge fails on numerous grounds.

**1.** First, as with the deployment of in-state Guardsmen, Plaintiffs cannot demonstrate that they have suffered an injury in fact as to these federalization and deployment decisions. Plaintiffs have not suffered an invasion of a legally protected interest. Any legally cognizable interest in commanding and controlling the California and Texas National Guardsmen rests with the Governors of those respective states. Moreover, Section 12406's requirement—that the federalization order be sent "through" the State's Governor (or in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia)—plainly refers to the State Governor who is otherwise the commander-in-chief of the Guardsmen to be federalized, not the Governor of the location where the federalized troops will be deployed. *See* 10 U.S.C. § 12406. And "[o]rdinarily, a party 'must assert [its] own legal rights' and 'cannot rest [its] claim to relief on the legal rights . . . of

third parties.'" *Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 573 (D.C. Cir. 2023) (citation omitted); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) ("[W]e have not looked favorably upon third-party standing."). Portland even more obviously will not suffer invasion of any protected interest, since it never has any right to command and control the Oregon National Guard, regardless of its duty status.

Nor would Oregon (or Portland) suffer a concrete and particularized injury stemming from the deployment of the Texas and California National Guard to Portland. Even assuming a state suffers a sovereign injury from the federalization and resulting loss of ability to use *its own* Guard, there is no such sovereign injury from the federalization of Guardsmen from other states. And even if a State could demonstrate Article III injury where the Guard is usurping the state's police power or invading some traditional state prerogative, the federalized Guard's role here is only to protect federal property and federal personnel executing federal law. The federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law." *Newsom*, 141 F.4th at 1054. Deploying federalized Guardsmen from other states to protect federal personnel and property thus does not intrude on Oregon or Portland's police power or sovereignty any more than when DHS uses its personnel—such as the Federal Protective Service—to perform the same function.[2]

And although California is also a plaintiff, California also would not suffer an injury in fact from the deployment of its own Guardsmen to Portland that this Court could redress. The Guardsmen deployed to Portland have already been federalized. They are presently fully federal

---

[2] The Seventh Circuit, in declining to stay a similar injunction against deployment of the National Guard in Illinois, recently opined that "the deployment of National Guard members from Texas—an incursion on Illinois's sovereignty—makes the constitutional injury especially significant." *Illinois v. Trump*, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025). That was error. Once federalized, Guardsmen are federal officers subject to a federal chain in command—for sovereignty purposes, there is no difference between the presence of federal officers hailing from out of state and the presence of federal officers from in state.

personnel. An order barring their deployment to Portland would not result in release of those Guardsmen from federal service. Indeed, California's joinder here is particularly bizarre because, if anything, the opposite is true. Insofar as California's alleged grievances in the *Newsom* case concern the federalized Guard's presence and activities in California, the redeployments arguably *partially redress* the injury it claimed in *Newsom* by redeploying portions of the federalized Guard out of the State.

**2.** Even if Plaintiffs had Article III standing to challenge the out-of-state Guard members' federalization and deployment, their claim is still outside Section 12406's zone of interest. The zone of interest test "serve[s] to limit the role of the courts in resolving public disputes" by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Even when the Article III standing requirements have been met, a plaintiff must still "establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the 'zone of interests' sought to be protected by the statutory guarantee whose violation forms the legal basis for his complaint." *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523–24 (1991).

Section 12406 is primarily concerned with Congress's grant of power under the Militia Clause to the President to federalize the National Guard in certain circumstances. To be sure, it also provides a procedural mechanism for the federalization order to be issued through the State Governor. This does not confer any rights even to the state whose Guard would be federalized. *See Newsom*, 141 F.4th at 1053 (finding that the requirement to issue orders "through the governor[]" "does not grant the governor any 'consulting' role"; "[i]t simply delineates the procedural mechanisms through which the President's orders are issued"). But under any interpretation of Section 12406, the statute plainly does not protect the interest of the States to which the federalized troops could be deployed.

This makes sense because the *deployment* decision is firmly committed to the President's

discretion. As explained above, the National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command, *see* 10 U.S.C. § 10101. Once called into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *Perpich*, 496 U.S. at 347, and become federal soldiers, who serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1. It is in that status—*i.e.*, as federal soldiers—that the out-of-state Guardsmen are being deployed to Portland. On that issue, the statute imposes no geographic limitation.

**3.** But even if Plaintiffs could challenge the federalization and deployment of the out-of-state Guardsmen, there is no valid reason to treat out-of-state Guardsmen differently than in-state Guardsmen. Section 12406 expressly recognizes the President's authority to federalize Guardsmen from other States. He "may call into Federal service members and units of the National Guard of *any* State." 10 U.S.C. § 12406 (emphasis added). Consistent with that plain text, during both the current administration and Biden Administration, federalized Guard have worked in States other than their own. *See* Antoinette Grajeda, "Arkansas National Guardsmen mobilized to southern border," Arkansas Advocate (Oct. 6, 2025), https://perma.cc/KZS5-DG7X; Alaska National Guard, "Alaska Army National Guardsmen to deploy to Southwest border to support Customs and Border Protection," (Oct. 3, 2024), https://perma.cc/BQ6W-WKHV. And once a Guardsmen is federalized, he or she becomes a fully federal official. Oregon cannot challenge the federal government's choice to send law enforcement officers or other federal staff from outside Oregon any more than they can challenge the use of federalized Guardsmen who live in another state.

To be sure, where an exigency within a state warrants calling forth the Guard, prudential considerations will often warrant federalizing and deploying Guardsmen from within that state. But nothing in Section 12406 *requires* the President to call upon in-state Guardsmen. Even if the President's

judgment that conditions are present to trigger Section 12406 is subject to some level of judicial review, the number of Guardsmen to federalize plainly is not. The statute authorizes the President to federalize Guardsmen "in such numbers as he considers necessary." 10 U.S.C. § 12406. In any event, the appropriateness of utilizing federalized Guardsmen who have successfully performed a protection mission for several months in a neighboring state should be beyond dispute. Those Guardsmen are already federalized under a presidential memorandum that lacks a geographical limitation.

Finally on this point, restricting the President's authority to call on out-of-state Guardsmen would be particularly unwarranted here, given that Plaintiffs have also complained that the diversion of their *own* Guardsmen inflicts irreparable harm on the State by precluding them from being used to perform state functions—an assertion the Court credited at the TRO stage. It would be nonsensical to restrict the President's authority to deploy in-state Guardsmen based on Oregon's contention that the deployment of its own Guardsmen diverts those Guardsmen from their state responsibilities, while *also* prohibiting the President from using Guardsmen from other states for federal needs (including from states whose governors *do not object* to their federalization).

## V.    AN INJUNCTION SHOULD NOT BE ENTERED AND ANY JUDGMENT SHOULD BE LIMITED.

"[A] plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). The Court should not enter a permanent injunction. Plaintiffs seek an order that would interpose the Judiciary between active military servicemembers in the field who are protecting federal officials and property. The Ninth Circuit already held that these

harms outweigh Plaintiffs' harms and the Ninth Circuit previously held in *Newsom* that similar harms far outweigh California's asserted harms in that case. The Ninth Circuit's assessment of the equities precludes, or at least tilts heavily against, permanent injunctive relief here. *Cf Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 32 (2008) (noting that, considering the Supreme Court's assessment of the equities, "it would be an abuse of discretion to enter a permanent injunction, after final decision on the merits, along the same lines as the preliminary injunction").

Plaintiffs cannot establish an irreparable harm either. Even if a state or a city could litigate against the federal government based on speculation that federal action will inflame tensions, the deployment of Guard will have an overall positive effect. The Guard will provide the presence needed to counter persistent violence and threats in Portland. The Federal Protection Mission in California has succeeded in reducing violence since June when California Guardsmen were federalized. As explained, the post-federalization improvement in conditions in California has allowed DoW to de-federalize nearly all the 4,000 California Guardsmen who were initially federalized. The recent use of Guardsmen in the District of Columbia has likewise improved conditions. About three weeks after Guardsmen were deployed in D.C. to work with federal law enforcement and D.C.'s Metropolitan Police Department to improve public safety, D.C.'s Mayor signed an executive order recognizing that "due to the cooperative efforts between District and federal officials, violent crime in the District has noticeably decreased." District of Columbia Mayor's Order 2025-090 at I.E. (Sept. 2, 2025). The Mayor thus directed her government to "continue to prioritize DC National Guard for typical mission-focused activities." *Id.* at II.E. The Oregon deployment will likewise have an overall positive effect.

In addition, no relief should run against Defendants DHS and Secretary Noem. None of Plaintiffs' arguments concerning allegedly improper federalization and deployment of the National Guard provide a basis from which to enjoin those parties, which did not take those actions. The Court also lacks jurisdiction to enjoin the President, and the President should be dismissed from this action.

"[C]ourts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *see also Franklin*, 505 U.S. at 802-803 ("Federal courts have 'no jurisdiction of a bill to enjoin the President in the performance of his official duties.'"). Indeed, in granting an injunction barring mobilization of the Guard in Illinois, the district court did not enjoin the President. *Illinois v. Trump*, No. 25-cv-12174, ECF No. 67. The Northern District of California likewise excluded President Trump from the scope of its injunction following trial on Plaintiffs' Posse Comitatus Act claim in *Newsom. See* No. 25-CV-04870-CRB, 2025 WL 2501619, at *29 n.29 (N.D. Cal. Sept. 2, 2025).

At the very least, however, the Court should not issue a permanent injunction that impedes the President's authority to initiate other federal protection missions based on distinct facts or to federalize Guardsmen for separate purposes, such as maintaining air sovereignty or responding to a foreign invasion. The Court's Second TRO stated, without qualification, that "Defendants are temporarily enjoined from deploying federalized members of the National Guard in Oregon." ECF No. 68 at 1. By its literal text, a similarly drafted permanent injunction would arguably prevent the President from utilizing federalized Guardsmen based on altogether new and different facts—and might even require the President to seek to dissolve the injunction before, for example, responding to a foreign invasion. Any injunction should instead at most limit relief to federal protection missions based in substantial part on the events discussed at trial. No one disputes that the President possesses an authority to federalize Guardsmen when one of Section 12406's prerequisites exist. This dispute instead centers on whether the facts in this instance satisfy the relevant standard.

Finally, injunctive relief should not affect the *federalization* of members of the Texas National Guard. Members of the Texas National Guard were federalized for purposes of deploying to Illinois, Oregon, and potentially elsewhere. Even if Plaintiffs could establish standing to challenge the *deployment* of out-of-state federalized Guardsmen within Oregon, that judgment should not require

the de-federalization of Guardsmen hundreds of miles away in Texas.

## VI.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED OR AT LEAST ADMINISTRATIVELY STAYED.

Any injunction issued following trial should be stayed pending the disposition of any appeal that is authorized, or at a minimum, administratively stayed to allow the United States to seek an emergency, expedited stay from the Court of Appeals or Supreme Court if an appeal is authorized. Initially, a panel of the Ninth Circuit has already concluded that the President likely had a sufficient basis for the relevant determination and that conclusion at least warrants a brief administrative stay so that the Ninth Circuit can consider whether similar relief should go into effect in the form of a permanent injunction. But in addition, the Ninth Circuit in *Newsom* administratively stayed Judge Breyer's first injunction almost immediately, and then granted a full stay pending appeal. Judge Breyer's injunction following trial on Plaintiffs' PCA claim in *Newsom* was also administratively stayed almost immediately. *See* No. 25-5553, ECF No. 7.1 (9th Cir. Sept. 4, 2025). For its part, the Seventh Circuit issued a partial stay of the Illinois injunction. *Illinois v. Trump*, No. 25-2798, 2025 WL 2937065 (7th Cir. Oct. 16, 2025). And of course, the Ninth Circuit also issued an administrative stay of this Court's First TRO and then stayed it pending appeal. The courts of appeals have thus repeatedly recognized that the issues raised by this dispute are weighty and that appellate review is warranted before at least some aspects of the relief Plaintiffs seek should take effect. Similarly here, at least a modest stay of any injunctive relief issued following any adverse judgment is warranted to allow for orderly briefing in the court of appeals. Finally, in order to ensure prompt appellate review and avoid the need for duplicative motions practice, Defendants respectfully request that, if this Court issues injunctive relief and does not believe a stay is warranted, that its opinion expressly note that a stay was requested and that the court is denying that request.

## CONCLUSION

The Court should grant Judgment to Defendants on all issues and claims addressed at the upcoming trial on the merits.

Dated:    October 27, 2025                    Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General
                                             Civil Division

                                             ERIC J. HAMILTON
                                             (NE Bar No. 25886)
                                             Deputy Assistant Attorney General
                                             Federal Programs Branch

                                             ALEXANDER K. HAAS
                                             (CA Bar No. 220932)
                                             Branch Director
                                             Federal Programs Branch

                                             JEAN LIN
                                             (NY Bar No. 4074530)
                                             Special Litigation Counsel
                                             Federal Programs Branch

                                             TIBERIUS DAVIS
                                             (DC Bar No. 90020605)
                                             JOHN BAILEY
                                             (Ohio Bar No. 104260)
                                             Counsel to Assistant Attorney General

                                             /s/  *Michael J. Gerardi*
                                             MICHAEL J. GERARDI
                                             (DC Bar No. 1017949)
                                             Senior Trial Counsel
                                             CHRISTOPHER D. EDELMAN
                                             (DC Bar No. 1033486)
                                             Senior Counsel
                                             KATHLEEN C. JACOBS
                                             (TX Bar No. 24091154)
                                             BENJAMIN S. KURLAND
                                             (DC Bar No. 1617521)
                                             JODY D. LOWENSTEIN
                                             (MT Bar No. 55816869)
                                             J. STEPHEN TAGERT
                                             (VA Bar No. 99641)

Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: (202) 305-8659
christopher.edelman@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable limitation under LR 7-2(b) because it contains fewer than 35 pages, excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ *Michael J. Gerardi*
MICHAEL J. GERARDI
Senior Trial Counsel
Federal Programs Branch