DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
LEANNE HARTMANN #T25070201, Mass. BBO #667852
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Scott.Kennedy@doj.oregon.gov

*Counsel for the State of Oregon*

[Additional counsel to appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| STATE OF OREGON, et al., <br><br> Plaintiffs <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-01756-IM <br><br> PLAINTIFFS' POST-TRIAL BRIEFING |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

I.    Introduction ........................................................................................................................ 1

II.   All Possible Legal Standards Support Permanent Injunctive Relief. ................................ 1

      A.   Overview ................................................................................................................ 1

      B.   *Newsom* and this Court's prior rulings ................................................................. 2

      C.   The definition of "rebellion" under § 12406(2) .................................................... 4

      D.   The meaning of "unable with the regular forces" under § 12406(3) .................... 5

III.  Plaintiffs' Request for Injunctive Relief is Narrowly Tailored. ........................................ 8

IV.   The Request for a Stay Pending Appeal Should be Denied ............................................ 11

V.    Conclusion ....................................................................................................................... 12

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ............................................................................................................. 9

*City of L.A. v. Santa Monica Baykeeper*,
    254 F.3d 882 (9th Cir. 2001) ................................................................................................ 2

*eBay Inc. v. MercExchange*,
    547 U.S. 388 (2006) ............................................................................................................. 8

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ............................................................................................................. 8

*Illinois v. Trump*,
    No. 25-cv-12174, 2025 WL 2886645 (N.D. Ill. Oct. 10, 2025) ....................................... 6, 8

*Illinois v. Trump*,
    No. 25-2798, 2025 WL 2937065 (7th Cir. Oct. 16, 2025) ........................................... 4, 5, 8

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ............................................................................................... 3

*Musacchio v. United States*,
    577 U.S. 237 (2016) ............................................................................................................. 2

*Newsom v. Trump*,
    786 F. Supp. 3d 1235 (N.D. Cal. 2025) ............................................................................... 4

*Newsom v. Trump*,
    141 F.4th 1032 (9th Cir. 2025) ..................................................................................... *passim*

*Oregon v. Trump*,
    No. 25-6268, 2025 WL 2951371 (9th Cir. Oct. 20, 2025), *vacated by* 2025 WL
    3013134 (9th Cir. Oct. 28, 2025) ......................................................................................... 5

*Sterling v. Constantin*,
    287 U.S. 378 (1932) ............................................................................................................. 3

*The Amy Warwick*,
    67 U.S. 635 (1862) ............................................................................................................... 5

*Trump v. Illinois*,
    No. 25A443, 2025 WL 3020003 (U.S. Oct. 29, 2025) ........................................................ 6

*United States v. Anderson*,
  76 U.S. 56 (1869)...................................................................................................5

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008).....................................................................................................9

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982).............................................................................................8, 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952).................................................................................................2

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cls. 15–16 ..................................................................................2

U.S. Const. amend. X..........................................................................................1, 9, 10

## STATUTES

10 U.S.C.
  § 127d.........................................................................................................................7
  § 275...........................................................................................................................8
  § 506...........................................................................................................................7
  § 508...........................................................................................................................7
  § 10507.......................................................................................................................7
  § 12405.......................................................................................................................7
  § 12406............................................................................................................. *passim*

18 U.S.C. § 1385.............................................................................................................8

Act of Apr. 22, 1898, ch. 187, §§ 2–5, 30 Stat. 361 .....................................................6

Act of Jan. 21, 1903, ch. 196, § 4, Stat. 775 ...............................................................6, 7

Act of May 27, 1908, ch. 204, § 3, 35 Stat. 399 ............................................................7

## OTHER AUTHORITIES

Edward M. Coffman, *The Regulars: The American Army, 1898–1941* 2004) ...............6

S. Rep. No. 57-2129 (1902) ........................................................................................6, 7

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

I.  **Introduction**

As outlined in Plaintiffs' closing arguments at trial, Defendants' actions exceeded their authority under 10 U.S.C. § 12406 and violated the Tenth Amendment. Plaintiffs' legal arguments are outlined in detail in their trial memorandum. At the Court's request, Plaintiffs provide additional briefing that explains why the relevant legal standards—whether interpreted broadly or narrowly—all support the same conclusion under the facts adduced at trial: The orders federalizing and deploying the National Guard to Portland are unlawful and unconstitutional and should be enjoined. In addition, because Plaintiffs' request for relief is carefully tailored to remedy Defendants' unlawful conduct, *see* ECF 113 at 4, the Court should enter that relief.

II.  **All Possible Legal Standards Support Permanent Injunctive Relief.**

A.  **Overview**

Defendants seek to federalize and deploy National Guard troops to civilian streets in Portland under 10 U.S.C. § 12406. The statute provides three distinct preconditions under which a President may federalize a state's national guard:

> Whenever--
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
> (3) the President is unable with the regular forces to execute the laws of the United States;
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws.

10 U.S.C. § 12406.

Here, Defendants have argued that the President invoked two preconditions: the existence of a "rebellion" under § 12406(2), and an inability to execute federal law "with the regular forces" under § 12406(3). This Court previously construed each subsection in ruling on the TRO motion, informed by the Ninth Circuit's decision in *Newsom v. Trump (Newsom II)*, 141 F.4th 1032 (9th Cir. 2025). Plaintiffs believe that the Court's prior rulings govern as law of the case at this juncture. *See Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) ("[W]hen a court

Page 1 - PLAINTIFFS' POST-TRIAL BRIEFING

decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

However, the Court may wish to revisit those rulings, given the expedited basis on which the Court previously ruled. The Court "possesses the inherent procedural power to reconsider . . . an interlocutory order for cause seen by it to be sufficient." *City of L.A. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (citation omitted). As such, Plaintiffs first recite this Court's prior rulings under the *Newsom II* standard, which currently serve as the law of the case. In addition, at the Court's invitation, Plaintiffs provide additional analysis of both "rebellion" under § 12406(2) and "unable without the regular forces" under § 12406(3).

### B. *Newsom* and this Court's prior rulings

A motions panel of the Ninth Circuit recently analyzed § 12406 in *Newsom II*, 141 F.4th 1032. As a threshold matter, *Newsom II* held that the President's invocation of § 12406 was judicially reviewable, rejecting the federal government's argument to the contrary. 141 F.4th at 1046–46. The court explained that the President's authority was statutory, as "the Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States." *Id.* at 1045 (citing U.S. Const. art. I, § 8, cls. 15–16). As a result, the political question doctrine did not bar judicial review on whether the President attempted to exceed the bounds of authority delegated to the President by Congress. *Id.* at 1045–46 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)).

The Ninth Circuit then held that a court should give deference in reviewing a President's invocation of § 12406. Specifically, courts "must give a great level of deference to the President's determination that a predicate condition exists." 141 F.4th at 1048. In doing so, courts "review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment,'" as the statute provides Presidents with a "'permitted range of honest judgment'" that must be "'conceived in good faith,'" as well as "'directly related to the quelling of the disorder or the prevention of its continuance.'" *Id.* at

1050–51 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)).[1]

Finally, the Ninth Circuit declined to examine the meaning of rebellion under § 12406(2) and instead granted a stay based on its analysis of the meaning of the clause "unable with the regular forces" to execute federal law under § 12406(3). 141 F.4th at 1051. *Newsom II* rejected the federal government's argument "that any minimal interference with the execution of laws is, by itself, enough to justify invoking § 12406(3)." *Id.* The court reasoned that the other preconditions "discuss unusual and extreme exigencies—invasions and rebellions—that threaten the normal operations of civil government." *Id.* Thus, such a sweeping interpretation "would swallow subsections one and two, because any invasion or rebellion renders the President unable to exercise *some* federal laws." *Id.* As a result, the Ninth Circuit concluded that, at a minimum, the federal government had to show that, at the time of federalization and in the days leading up to it, "activities significantly impeded the ability of federal officers to execute the laws." *Id.* at 1052.

This Court then applied *Newsom II* in granting a TRO against the attempted federalization and deployment at issue here. ECF 56. At the outset, the Court ruled that the invocation of § 12406 was judicially reviewable. ECF 56 at 17 & n.2 (citing *Newsom II*, 141 F.4th at 1047). The Court reasoned that deference to the President was due and, thus, reviewed the invocation for a colorable assessment of the facts within a range of honest judgment, conceived in good faith and directly related to the quelling of disorder. ECF 56 at 17–18 (quoting *Newsom II*, 141 F.4th at 1048, 1051). Under § 12406(2), the Court adopted the definition of "rebellion" that the district court in *Newsom* adopted as comprising four key characteristics:

> First, a rebellion must not only be violent but also be armed. Second, a rebellion must be organized. Third, a rebellion must be open and avowed. Fourth, a rebellion must be against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue.

---

[1] Defendants' suggestion in their Pre-Trial Brief that *ultra vires* review further limits the reviewability of the President's determination*, see* ECF 115 at 16, is irreconcilable with these conclusions in *Newsom II* and with other Ninth Circuit authority on the availability of *ultra vires* review more generally. *See Murphy Co. v. Biden*, 65 F.4th 1122, 1129, 1131 (9th Cir. 2023).

Page 3 - PLAINTIFFS' POST-TRIAL BRIEFING

ECF 56 at 25 (quoting *Newsom v. Trump (Newsom I)*, 786 F. Supp. 3d 1235, 1253 (N.D. Cal. 2025)). And under § 12406(3), the Court adopted the Ninth Circuit's construal of the subsection, examining enforcement of the law using federal law enforcement at the time of federalization. ECF 56 at 18 (quoting *Newsom II*, 141 F.4th at 1051).

### C. The definition of "rebellion" under § 12406(2)

The text of § 12406(2) allows for federalization when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." As noted, the Court has already interpreted the term "rebellion," applying the four-part definition consistent with the trial court's decision in *Newsom I*. Defendants argue for a much broader definition of "rebellion," which would sweep in considerably more conduct,[2] Plaintiffs make two additional observations in support of this Court's previously-adopted, more common-sense definition.

First, the Seventh Circuit recently explained why protests generally—which are protected speech under the First Amendment—do not constitute a "rebellion" under § 12406(2), even when they involve isolated incidents of unlawful activity:

> Political opposition is not rebellion. A protest does not become a rebellion merely because the protestors advocate for myriad legal or policy changes, are well organized, call for significant changes to the structure of the U.S. government, use civil disobedience as a form of protest, or exercise their Second Amendment right to carry firearms as the law currently allows. Nor does a protest become a rebellion merely because of sporadic and isolated incidents of unlawful activity or even violence committed by rogue participants in the protest. Such conduct exceeds the scope of the First Amendment, of course, and law enforcement has apprehended the perpetrators accordingly. But because rebellions at least use deliberate, organized violence to resist governmental authority, the problematic incidents in this record clearly fall within the considerable daylight between protected speech and rebellion.

*Illinois v. Trump (Illinois II)*, No. 25-2798, 2025 WL 2937065, at *6 (7th Cir. Oct. 16, 2025). As such, the Seventh Circuit held that "spirited, sustained, and occasionally violent actions of demonstrators in protest of the federal government's immigration policies and actions, without

---

[2] Defendants offer multiple definitions of "rebellion," including that it consists of "[d]eliberate, organized resistance, by force and arms, to the laws or operations of the government, committed by a subject." ECF 115 at 23 (citation omitted).

Page 4 - PLAINTIFFS' POST-TRIAL BRIEFING

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

more, does not give rise to a danger of rebellion against the government's authority." *Id.* That logic and reasoning apply with equal force here.

Second, history supports the court's definition. In the late 1800s and early 1900s, the term "rebellion" generally was understood as a massive uprising aimed at overthrowing the existing government. (*See* Amicus Br. of Prof. Mark A. Graber, ECF 51 at 16–18 (so documenting)). Indeed, the Supreme Court has used the term in reference to the Civil War. *E.g.*, *United States v. Anderson*, 76 U.S. 56, 64 (1869) ("the States in rebellion"); *The Amy Warwick*, 67 U.S. 635, 671 (1862) ("States organized in rebellion"). And, in dissenting from the initial stay order in this case, Judge Graber explained how Founding-era rebellions all shared similar hallmarks of "a large number of participants relative to the population and to available law enforcement, a wide geographic scope, evident organization and leadership, widespread use of arms, intense ferocity, and the creation of extreme difficulty restoring control by means of ordinary law enforcement." *Oregon v. Trump*, No. 25-6268, 2025 WL 2951371, at *31 (9th Cir. Oct. 20, 2025) (Graber, J., dissenting), *vacated by* 2025 WL 3013134 (9th Cir. Oct. 28, 2025). In the words of Judge Graber, the protests in Portland have "differed in every dimension." *Id.*

At the same time, as explained in Plaintiffs' Trial Brief and in closing arguments, Plaintiffs prevail even under Defendants' more expansive definition. *See* ECF 113, at 22-23 & n.7. As such, the Court could, but need not, examine the precise definition further to enjoin the attempted invocation of § 12406(2). *See, e.g.*, *Oregon*, 2025 WL 2951371, at *30 (Graber, J., dissenting) (taking that approach).

### D. The meaning of "unable with the regular forces" under § 12406(3)

The text of § 12406(3) allows for federalization when the federal government "is unable with the regular forces to execute the laws of the United States." *Newsom II* appeared to assume, without providing any statutory analysis on the question, that the term regular forces refers to federal civilian personnel. On that assumption, which the court made on a highly tentative basis at a preliminary stage of proceedings, the court evaluated whether federal law enforcement resources generally were significantly impeded. 141 F.4th at 1052. For the reasons explained in

Page 5 - PLAINTIFFS' POST-TRIAL BRIEFING

Plaintiffs' Trial Brief and in closing arguments, Plaintiffs prevail under the *Newsom II* standard, and the Court thus need not examine the precise definition further.

In addition, as the Court is aware, the Supreme Court recently requested briefing in the Illinois case on the meaning of "regular forces," after the federal government moved for an emergency stay of the district court's TRO there, which the Seventh Circuit had largely declined to stay. *Trump v. Illinois (Illinois III)*, No. 25A443, 2025 WL 3020003, at *1 (U.S. Oct. 29, 2025). Notwithstanding *Newsom II*, Plaintiffs find it likely that, in the context of military matters comprised within Title 10 of the U.S. Code, including § 12406, "regular forces" refers to the standing military forces of the Armed Services, within the Department of Defense. *See Illinois v. Trump (Illinois I)*, No. 25-cv-12174, 2025 WL 2886645, at *16–20 (N.D. Ill. Oct. 10, 2025) (reaching that likely conclusion after extensive statutory analysis).

That statutory reading is counseled by the history of § 12406(3). The original version of the statute was enacted as part of the Militia Act of 1903, commonly known as the Dick Act, named after Representative Charles Dick, then-Chair of the House Militia Committee. *See* Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776. The principal purpose of the legislation was to establish a militia that could be used to supplement the standing military whose forces were commonly referred to as "Regulars." *See* Act of Apr. 22, 1898, ch. 187, §§ 2–5, 30 Stat. 361, 361 (declaring that "in time of war the Army shall consist of two branches which shall be designated, respectively, as the Regular Army and the Volunteer Army of the United States"; defining the "Regular Army" as "the permanent military establishment"); *see also* Edward M. Coffman, *The Regulars: The American Army, 1898–1941* (2004).

The term "Regular" also appears in the legislative history for the Dick Act, in reference to the legislation's purpose of supplementing the standing military. Specifically, the stated purpose of the act was "to regulate and provide for . . . various relations of the National Guard and its members to the general system; to conform the organization armament, and discipline of the guard to that of the Regular and Volunteer armies of the United States; to establish closer relations and better cooperation between the National Guard and the Regular Army; [and] to

promote the efficiency and dignity of the guard as a part of the military system of the United States." S. Rep. No. 57-2129 at 2 (1902).

Moreover, the original version of the Dick Act did not include the term "regular forces" in the pertinent subsection. Instead, it referred to situations in which "the President is unable, *with the other forces at his command* to execute the laws of the Union in any part thereof." Act of Jan. 21, 1903, § 4, 32 Stat. at 776 (emphasis added). In that context, "other forces" meant the other forces that the Act was intended to supplement—the professional, standing Regular Army. But five years later, Congress amended the statute, replacing the "other forces" with the "regular forces" phrasing that has persisted through the modern version of § 12406(3). *See* Act of May 27, 1908, ch. 204, § 3, 35 Stat. 399, 400. Viewed in light of that historical context, Congress likely intended the term "regular forces" to mean the standing professional military.

Indeed, the above understanding is further reflected in many current statutes found in Title 10 of the U.S. Code. For example, statutes discuss enlistment in the "regular components," which are enumerated to include the various branches of the active military. *See, e.g.*, 10 U.S.C. §§ 506, 508. Another statute in the same subtitle uses the word "regular" to distinguish active-duty military officers from those in the National Guard and reserve components. 10 U.S.C § 10507 ("the President may assign to duty in the National Guard Bureau as many regular or reserve officers of the Army or Air Force as he considers necessary"). Likewise, in the statutory provision immediately preceding § 12406, the phrase "Regular Army" is used to distinguish from the National Guard. 10 U.S.C. § 12405. In fact, aside from § 12406(3), the only time that Plaintiffs are aware that the phrase "regular forces" appears in all of Title 10, it is used to distinguish from "irregular forces" such as those under the United States Special Operations Command. *See* 10 U.S.C. § 127d(a), (k) (providing funding for "special operations for irregular warfare" and defining "irregular warfare" as "Department of Defense activities not involving armed conflict that support predetermined United States policy and military objectives conducted by, with, and through *regular forces*, irregular forces, groups, and individuals" (emphasis added)).

Page 7 - PLAINTIFFS' POST-TRIAL BRIEFING

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

To be sure, other statutes generally prohibit the use of military forces domestically to enforce federal law. *E.g.*, 10 U.S.C. § 275; 18 U.S.C. § 1385. That longstanding history, tradition, and precept against martial law is part of what makes America, America. But those provisions underscore that Congress did not, in § 12406(3), create a mechanism by which the President could circumvent those prohibitions by federalizing state national guards simply to supplement federal law enforcement efforts. Instead, Congress likely authorized the President to call up state national guards only when civil law had failed, and only after the military had been lawfully invoked in response. *See Illinois I*, 2025 WL 2886645, at *19–20 (so explaining). That understanding, which would generally limit § 12406(3) to extreme emergencies, would be consistent with the remainder of the statute, which applies in cases of "invasion" and "rebellion." *See generally Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (statutory terms are "known by the company [they] keep[]").

In short, the term "regular forces" likely means the regular military, given the text, context, and legislative history of the term. And because the record is clear that Defendants did not attempt to use the regular military before calling up the National Guard under § 12406, Plaintiffs' claims prevail. *See* Trial Tr. 319:3–9 (Assistant Chief Dobson has never seen or heard about military troops at the Portland ICE facility); *id.* 625:10–24 (Major General Rieger has no knowledge of the federal government attempting to deploy any full-time active duty soldiers, sailors, airmen, or Marines to the Portland ICE facility). Alternatively, Plaintiffs prevail even under *Newsom*'s alternative definition. As a result, the Court could, but need not, examine the precise definition further to enjoin the attempted invocation of § 12406(3). *See Illinois II*, 2025 WL 2937065, at *7 (taking that approach).

### III.    Plaintiffs' Request for Injunctive Relief is Narrowly Tailored.

The decision to grant permanent injunctive relief is an act of equitable discretion. *eBay Inc. v. MercExchange*, 547 U.S. 388, 391 (2006). And Congress has not cabined this Court's equitable discretion under 10 U.S.C. § 12406 to issue permanent injunctive relief. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 318 (1982) (rejecting the argument that a Presidential exemption

Page 8 - PLAINTIFFS' POST-TRIAL BRIEFING

cabined equitable discretion). The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff must show actual success on the merits. *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 32 (2008).

In their trial brief, Plaintiffs requested the following injunctive relief in addition to declaratory relief:

> [T]o permanently enjoin implementation of the September 28 memorandum and any related orders federalizing and deploying Oregon National Guard members to Portland. For the same reasons, all cross-state deployment orders pertaining to Portland—including the October 5 memorandum and orders deploying California and Texas National Guard members; the October 16, 2025 memorandum extending and/or deploying California and Texas National Guard members; and any related federalization and orders—should also be permanently enjoined.

ECF 113 at 4. This request for injunctive relief is narrowly drawn to remedy Defendants' violations of 10 U.S.C. § 12406 and the Tenth Amendment. It is "no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Plaintiffs' request for relief seeks a permanent injunction against implementing only the September 28, October 5, and October 16 memoranda. ECF 113 at 4.[3] By focusing on the memoranda and any related orders that are specific to federalizing and deploying National Guard members to Portland, from the relevant time-period determined by the Court, Plaintiffs seek to prohibit only those orders from being carried out. In that sense, Plaintiffs request might be thought of as somewhat analogous to a request for vacatur of those orders. Importantly, the request for relief does not seek prospective injunctive relief against the President, nor does it seek to prohibit the other Defendants from issuing future orders, if a true exigency exists and the statutory standards of 10 U.S.C. § 12406 have been met. The narrowly drawn request for relief seeks to remedy the harm from the President's September Truth Social post, and the subsequent

---

[3] Defendants argue that the Court should not enjoin the "federalization of members of the Texas National Guard." ECF 115 at 33. To be clear, Plaintiffs do not seek to enjoin any future federalization of the Texas National Guard, but rather to enjoin the orders that federalized and sought to deploy troops to Portland consistent with the memoranda.

orders that attempted to carry out that directive. Nothing more.

In other words, Plaintiffs' request for relief prevents federalization and deployment of any National Guard members to Portland if based on the unlawful and unconstitutional invocation of 10 U.S.C. § 12406 at issue in this trial. Many of Defendants' objections to the scope of the request for relief—allegations that it will tie the President's hands with respect to future invocations of 10 U.S.C. § 12406 or needlessly entangle certain Defendants—are either misplaced or unwarranted. This may be because the trial briefs were filed on the same day, and Defendants may not have had adequate time to review Plaintiffs' narrowly drawn request for relief. For example, contrary to Defendants' assertions in their trial brief, Plaintiffs do not seek to prospectively enjoin the President. *Cf.* ECF 115 at 33. Nor is it relevant that the scope of the Second TRO could be read broadly because that order was a time-limited emergency order issued on a Sunday night two hours after the motion was filed and was intended to prevent Defendants' attempts to circumvent the First TRO. ECF 115 at 13 (arguing that the Second TRO would "prevent the President from utilizing federalized Guardsmen based on altogether new and different facts . . . ."). The time-limited Second TRO is not the same thing as what Plaintiffs are requesting here for permanent injunctive relief.

Plaintiffs' request for relief does not preclude the President from making a new determination under 10 U.S.C. § 12406, if *different* circumstances emerged that might warrant it. Nor does Plaintiffs' request for relief prevent the other Defendants from issuing orders to carry out a future directive should new and different facts arise in the future. To be sure, a pretextual and factually deficient invocation of 10 U.S.C. § 12406 or any other proclamation, like the one here, would suffer the same fate before this Court. However, the request for permanent injunctive relief is limited to enjoining the deficient and unconstitutional orders that are at issue in this trial.[4]

---

[4] Plaintiffs further request that, in entering their requested relied, the Court should keep the case open. This would enable the Court to address whether Defendants violated the Court's October 4, 2025 Temporary Restraining Order under the circumstances discussed at trial on the mornings

Finally, Defendants argue that "no relief should run against Defendants DHS and Secretary Noem." ECF 115 at 32. But in their exercise of equitable power, courts have "the power to decide all relevant matters in dispute and to award complete relief." *Porter v. Warner Holding Co.*, 328 U.S. 395, 399 (1946). That includes when the primary wrongdoer coordinates with another to cause harm. *See F.T.C. v. Commerce Planet, Inc.*, 815 F.3d 593, 599 (9th Cir. 2016), *abrogated on other grounds in AMG Capital Mgmt., LLC v. Federal Trade Comm'n*, 593 U.S. 67 (2021) ("[A] court sitting in equity may 'go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances.'" (quoting *Porter*, 328 U.S. at 398.)).

## IV.   The Request for a Stay Pending Appeal Should be Denied.

The Court should deny Defendants' request for a stay pending appeal of any permanent injunctive relief. Because the Ninth Circuit vacated the panel stay order on the First TRO, and Defendants never appealed the Second TRO, the status quo has remained that National Guard are not deployed in Portland. The Ninth Circuit just reiterated that intended status quo in restating the administrative stay *of the First TRO*, which "preserves the status quo in which National Guard members have been federalized but not deployed" in Oregon, pending further order of the en banc court. (Order at 1, 6 (Oct. 30, 2025), ECF 90.1). A stay pending appeal, as requested by Defendants, would alter that status quo. Defendants can appeal this Court's final judgment on the full trial record and seek a stay in the Ninth Circuit if they believe a stay is appropriate. But they have not carried their burden in this Court to show that a stay pending appeal is warranted.

To be clear, Plaintiffs oppose any stay of the judgment. However, to the extent the Court is inclined to grant a stay pending appeal, any such stay should (1) stay only the aspects of the judgment that prohibit federalization; and (2) be limited in time, to no more than 7 days. That is, to the extent this Court finds a stay is appropriate, it should be limited in scope to match the

---

of October 29 and 30, 2025. Should further investigation reveal that those circumstances involved potential violations of the Posse Comitatus Act, this would also enable the Court to address supplemental pleadings on that subject. Lastly, it would permit the Court to address any remaining questions about the proper scope of sealing and redaction of the record from trial.

Page 11 - PLAINTIFFS' POST-TRIAL BRIEFING

scope of the present administrative stay of the First TRO.

## V. Conclusion

For the foregoing reasons, and for those reasons outlined in Plaintiffs' Trial Brief, Closing Argument, and the evidence presented at Trial, this court should find that Defendants' actions exceeded their authority under 10 U.S.C. § 12406 and violated the Tenth Amendment. To remedy the harms created, this court should permanently enjoin implementation of the September 28 memorandum and any related orders federalizing and deploying Oregon National Guard members to Portland. For the same reasons, all cross-state deployment orders pertaining to Portland—including the October 5 memorandum and orders deploying California and Texas National Guard members; the October 16, 2025 memorandum extending and/or deploying California and Texas National Guard members; and any related federalization and orders—should also be permanently enjoined.

DATED November 1, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel

*s/ Scott Kennedy*
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
LEANNE HARTMANN #T25070201, Mass. BBO #667852
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov

Thomas.Castelli@doj.oregon.gov
Ian.VanLoh@doj.oregon.gov
Rachel.Sowray@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Alex.Jones@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*


ROBERT TAYLOR #044287
Portland City Attorney

*s/ Naomi Sheffield*
CAROLINE TURCO #083813
Senior Deputy City Attorney
NAOMI SHEFFIELD #170601
Chief Deputy City Attorney
1221 SW Fourth Avenue
Fourth Floor, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Caroline.Turco@portlandoregon.gov
Naomi.Sheffield@portlandoregon.gov

*Counsel for the City of Portland*


**ROB BONTA**
Attorney General of California

*s/ Jane Reilley*
Michael L. Newman
Thomas S. Patterson
Senior Assistant Attorneys General
Anya M. Binsacca
Marissa Malouff
James E. Stanley
Supervising Deputy Attorneys General
Jesse Basbaum
Barbara Horne-Petersdorf
Jane Reilley
Meghan H. Strong
Deputy Attorneys General
455 Golden Gate Ave.
San Francisco, CA 94102
Telephone: (415) 510-3879
E-mail: Jane.Reilley@doj.ca.gov

*Counsel for the State of California*