BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (NE Bar No. 25886)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
TIBERIUS DAVIS (DC Bar No. 90020605)
JOHN BAILEY (Ohio Bar No. 104260)
Counsel to Assistant Attorney General
MICHAEL J. GERARDI (DC Bar No. 1017949)
Senior Trial Counsel
CHRISTOPHER D. EDELMAN (DC Bar No. 1033486)
Senior Counsel
KATHLEEN C. JACOBS (TX Bar No. 24091154)
BENJAMIN S. KURLAND (DC Bar No. 1617521)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
J. STEPHEN TAGERT (VA Bar No. 99641)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 305-5486
stephen.tagert@usdoj.gov
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# PORTLAND DIVISION

|  |  |
|---|---|
| STATE OF OREGON and the CITY OF PORTLAND, | Case No. 3:25-cv-01756-SI |
| *Plaintiffs*, | **Defendants' Post-Trial Memorandum** |
| v. | |
| DONALD J. TRUMP, *et al.*, in their official capacities, | |
| *Defendants*. | |

## INTRODUCTION

The Court should enter partial final judgment for Defendants on Plaintiffs' Section 12406 and Tenth Amendment claims because Plaintiffs failed to carry their burden of proof on those claims. Nor did Plaintiffs succeed in proving their standing to pursue those claims. Defendants respectfully submit this post-trial brief to address the Court's questions raised on October 31, 2025.

## I.    The standard articulated in *Newsom v. Trump* governs Plaintiffs' claims.

Although Defendants acknowledge that *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), binds this Court, Defendants preserve for further review their argument that the President's decision to federalize the National Guard under Section 12406 is not judicially reviewable. *See*, *e.g.*, *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29-30 (1827). But under *Newsom*, courts uphold a President's federalization of the National Guard if "it reflects a colorable assessment of the facts and law." *Newsom*, 141 F.4th at 1051. Courts "must give a great level of deference to the President's determination that a predicate condition exists" under Section 12406. *Id.* at 1048. Elsewhere, the Ninth Circuit calls the standard "significant deference," "highly deferential," and "especially deferential." *Id.* at 1047, 1050, 1052. In *Newsom*, it was sufficient that the defendants had "presented evidence . . . of protesters' interference with the ability of federal officers to execute the laws, leading up to the President's federalization of the National Guard." *Id.* at 1052. The Court described the protesters' interference as including, among other things, agitators vandalizing property, throwing objects at ICE vehicles, using violence against Federal Protective Service officers, and attempting to breach the parking garage of a federal building. *Id.* at 1052.

The Seventh Circuit purported to apply the same standard in *Illinois v. Trump*, No. 25-2798, 2025 WL 2937065 (Oct. 16, 2025), but misapplied it by failing to give the President's

decision the deference it was due. *See Trump v. Illinois*, No. 25A443, Application for Stay (2025).[1] That said, even the Seventh Circuit claimed to recognize that the President is, at the very least, entitled to "'a great level of deference' on the question of whether one of the statutory predicates exists" under section 12406. 2025 WL 2937065, at *5 (quoting *Newsom v. Trump*, 141 F.4th 1032, 1047 (9th Cir. 2025)). And, of course, even if the Seventh Circuit had not expressly "agree[d]" with the highly deferential *Newsom* standard, *id.*, that standard would still control here. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021) (published motions panels orders "may be binding as precedent for other panels deciding the same issue").

Relatedly, Plaintiffs' pre-trial brief mischaracterizes the *Newsom* standard for Section 12406(3). Plaintiffs assert that "[the Ninth Circuit] concluded that the federal government must at least demonstrate that, at the time of federalization and in the days leading up to it, 'activities significantly impeded the ability of federal officers to execute the laws.'" Pls.' Br. 24. But *Newsom* never held that Section 12406(3) confines the scope of review to "the days leading up to" federalization. *Id.* Indeed, two judges of the Ninth Circuit have already recognized that time limitation does not exist. *Oregon v. Trump*, --- F.4th ---, 2025 WL 2951371, at *10 (9th Cir. Oct. 20, 2024), *vacated by* 2025 WL 3013134 (Mem) (9th Cir. Oct. 28, 2025).

## II.    The term "rebellion" encompasses violent resistance to law enforcement.

In addition to Section 12406(3), *see infra*, Part III, the President's action was independently authorized under the provision authorizing him to federalize Guardsmen whenever "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). The term "rebellion" encompasses the violent resistance to lawful

---

[1]
https://www.supremecourt.gov/DocketPDF/25/25A443/379964/20251017155210488_Trump%20v.%20Illinois%20No.%2025A__%20-%20Stay%20Application%20-%20Final.pdf.

enforcement of federal immigration law. Black's Law Dictionary defines rebellion to include "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or summons." *See Rebellion*, Black's Law Dictionary (12th ed. 2024). The same understanding prevailed in 1903, when Congress first enacted what is now Section 12406. *See* Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776 (authorizing the President to call forth the state militias into active federal service in the case of, among other things, "rebellion against the authority of the Government of the United States"). Dictionaries from the 1890s and 1900s define "rebellion" to focus on deliberate resistance to the government's laws and authority. *See Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws or operations of the government, committed by a subject."); *Rebellion*, An American Dictionary of the English Language (1900) ("Open resistance to lawful authority."); *Rebellion*, The Cyclopedic Dictionary of Law (1901) ("[T]he forcible opposition and resistance to the laws and process lawfully issued"); *Rebellion*, Webster's International Dictionary of the English Language (1903) ("Open resistance to, or defiance of, lawful authority.").

Plaintiffs, adopting this Court's previous ruling, define rebellion narrowly to mean a violent, armed, organized, open rebellion "against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue." ECF 113, at 22. And now they wrongly argue that this is law of the case. *Id.* The grant of a TRO merely reflects a preliminary judgment that a plaintiff is likely to succeed on the merits based on accelerated briefing. That clearly does not preclude the Court from further considering legal issues when it issues a final judgment based on a full record and briefing. *See S. Oregon Barter Fair v. Jackson Cnty., Oregon*, 372 F.3d 1128, 1136 (9th Cir. 2004) ("decisions on preliminary injunctions are not binding at trial on the merits, and do not constitute the law of the case").

In any event, Plaintiffs' definition of rebellion is incorrect. Under Plaintiffs' flawed definition, anything short of civil war is likely insufficient to call out the National Guard. That cannot be the case, as historic examples of rebellions and the use of the militia in similar circumstances demonstrate. Most famously, President Washington called up the militia to assist in suppressing the Whiskey Rebellion—a violent protest in western Pennsylvania targeted at tax assessors attempting to collect a federal excise tax on distilled whiskey. *See*, *e.g.*, CRS Report 8. Although President Washington took that action under a 1792 statute that did not by its terms refer to "rebellion," *see* CRS Report 7-8; *see also* Act of May 2, 1792, ch. 28, §§ 1-2, 1 Stat. 264, 264, when Congress later enacted statutes referring to a "rebellion," those statutes plainly extended to cover this original historical precedent of violent opposition limited to a particular federal law— precisely what occurred in Portland, and what Plaintiffs' reading would not cover.

The Whiskey Rebellion, moreover, is only one example of a range of civil disorders that members of the militia and other federal military forces have long been called upon to address under various authorities. Throughout the early years of the republic, Presidents routinely called out troops to suppress opposition to other federal revenue laws. *See* CRS Report 9-12. In the late 1800s and early 1900s, states frequently requested assistance from federal troops to address violence stemming from labor disputes and miners' strikes. *See* CRS Report 13-14, 35-37. And Presidents Eisenhower and Johnson used the federalized Guardsmen to ensure the enforcement of federal civil rights laws and to protect civil rights advocates in the 1950s and 1960s. *See* CRS Report 37-38. Yet under Plaintiffs' reading, segregationists' resistance to integration would not be a rebellion or justify calling the National Guard because they were not trying to overthrow the entire government. These instances make it clear that Congress used "rebellion" in its broader sense here. Plaintiffs never explain why Congress would want to permit federalization of

Guardsmen to counter a complete overthrow of the Government but not other rebellions that also risk major harm to the authority of the Government. At a bare minimum, this "assessment of the . . . law" is "colorable" and therefore warrants deference. *Newsom*, 141 F.4th at 1051.

The situation in Portland exhibits many of the same features as these historical precedents. Portland Police Bureau Commander Schoening testified that he declared a riot on June 14 outside the ICE buildings. And in response to lawful immigration enforcement efforts, violent agitators, many of whom were organized, specifically targeted federal personnel and buildings to impede enforcement. *See, e.g.,* Exs. 318 ("Antifa presence is significant"); 319 (same); 410 ("They also posited key leaders within the crowd, came with a set intent tonight"). At a minimum, these conditions created "a danger of a rebellion." Creating life-threatening dangers for federal officers enforcing federal law (as well as bystanders) and targeting federal employees for their work performing federal functions surely amounts to a dangerous risk of rebellion.

## III.    The term "regular forces" means officials who typically execute the law at issue.

The President's invocation of Section 12406 is also proper because "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). The natural reading of "regular forces" in this statutory context is the forces that regularly execute the federal laws at issue, not all civilian law enforcement officers across the Executive Branch, much less all active military servicemembers.

While "regular forces" in other contexts can refer to the standing military, the context of § 12406(3) demonstrates that meaning does not apply here, at least not for the laws being impeded in Portland. First, there is a strong historical norm that domestic use of the full-time standing military is the last resort, and that the use of the militia is preferable. At the founding, the "sentiment of the time strongly disfavored standing armies; the common view was that adequate

defense of country and laws could be secured through the Militia—civilians primarily, soldiers on occasion." *United States v. Miller*, 307 U.S. 174, 179 (1939); *see also Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 424-425 (4th Cir.), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) ("members of the militia served various law enforcement functions"). Thus, the Founders expressly authorized the federal government's ability to call forth the militia "to execute the Laws," U.S. Const. Art. I, § 8, Cl. 15, to obviate the need for a standing army for that purpose. The power to "command the aid of the militia in those emergencies which call for the military arm in support of the civil magistrate," took "away the inducement and pretext" for a standing army "dangerous to liberty." Federalist No. 29 (Hamilton), 1788 WL 444, at *1; *see* 10 *The Documentary History of the Ratification of the Constitution* 1302-1303 (John P. Kamiski & Gaspare J. Saladino eds. 1993) (providing Madison's argument in the Virginia ratification debate making this point). And indeed, consistent with that preference the Constitution's express authorization for the militia to be called forth "to execute the laws," U.S. Const. Art. I, S. 8, Cl. 15, contrasts sharply with the absence of such authorization for the standing army.

The preference to use the militia or National Guard instead of standing military forces has generally persisted in American history even where the President could, statutorily, use the standing military. While Congress allowed for the calling forth of the militia to execute the laws in 1792, "[n]ot until 1807 was Congress willing to entrust the purely domestic problem of executing the laws to the" standing army on a permanent basis. Frederick Weiner, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 187-188 (1940). To be sure, the standing army was used to respond to domestic disturbances—often in the territories, and especially immediately after the Civil War when organized state militias "largely disappeared." Robert Leider, *Deciphering the "Armed Forces of the United States,"* 57 Wake Forest L. Rev. 1195, 1226-1227

(2022); see Weiner, *supra*, at 191-192. But even then, the use of the standing military to address domestic disturbances reflects more on the efficacy of the state militias rather than a belief that professional soldiers should be used to address domestic disturbances.

The Militia Act of 1903 and its 1908 amendment should be viewed in that light. The point of the law was to reform the moribund and obsolete militia system. *See Perpich v. Department of Def.*, 496 U.S. 334, 341-342 (1990). It would be odd to treat laws meant to ensure that the National Guard would "be uniformly trained, equipped, and prepared for service instantly upon call of the President in case of national emergency or need," S. Rep. 60-1067, at 2 (Feb. 24, 1908)—that is, ensuring the National Guard could effectively respond to crises—as flipping the historical preference for using the militia to respond to domestic disturbances instead of the standing military. The logic goes the other way. By modernizing the National Guard, the Militia Act, as amended, ensured that the Guard was available to respond to domestic disturbances in lieu of the standing military. And since then, Presidents have consistently looked first to the National Guard in responding to national emergencies. President Nixon, for example, called forth the National Guard to ensure the mail was delivered when postal workers went on strike without even referencing the standing military. *See* 35 Fed. Reg. 5003, 5003 (Mar. 24, 1970). And in instances where the President arguably could have used the standing military to ensure domestic peace, he did not where it was clear the state authorities—using the state National Guard—were sufficient to protect "life and property." S. Rep. 58-86, at 18 (Jan. 13, 1904) (quoting a report provided to President Roosevelt after the governor asked for federal troops to respond to a miners' strike).

Second, and relatedly, federal law generally criminalizes willful use of the standing military as the regular forces for the execution of laws. Specifically, the Posse Comitatus Act's criminal prohibition applies to use of the standing military "as a posse comitatus or otherwise to

execute the laws." 18 U.S.C. § 1385. This law, passed three decades earlier in 1878, provides important statutory context for Section 12406. Here, Guardsmen can execute the laws when federalized under Section 12406(3) because that provision falls within the Posse Comitatus Act's exception, *see* 18 U.S.C. § 1385 ("except in cases and under circumstances expressly authorized by the Constitution or Act of Congress"). But because the Posse Comitatus Act restricts the circumstances under which the standing military can execute the laws domestically, it would be strange if Congress had intended to include the standing military within the "regular forces" in the provision, "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3).

Third, the "unable with the regular forces" language does not apply to § 12406(1) (invasions) or § 12406(2) (rebellions). If "regular forces" includes the standing military, that distinction makes little sense. It is completely backwards to require the President to exhaust the standing military before turning to the militia when dealing with a problem with civil law-enforcement, but to allow the President to use the militia instead of the standing military when dealing with an invasion or rebellion. The contrast between subsections 1 (invasion) and 2 (rebellion) versus 3 makes perfect sense, however, if subsection 3 means the forces who regularly execute the laws at issue under § 12406(3). It is quite reasonable for the President to use the militia to enforce the laws if regular law-enforcement officials are unable to do so.

If "regular forces" included the standing military, then the President could call up the National Guard to put down an armed rebellion such as a rebellion against the collection of a tax without resorting to the standing military. But if tax collectors went on strike such that the President was unable to execute the tax laws, the President could not call up the National Guard to execute the tax laws unless the standing military was unable to collect taxes. That would make

no sense: the standing military is obviously far better suited to putting down armed rebellions than collecting taxes. At a minimum, the President's view of the law is sufficiently "colorable" to warrant deference. *Newsom*, 141 F.4th at 1051.

Regardless, under the highly deferential standard in *Newsom*, even if the "regular forces" includes the standing military, the President clearly had a colorable basis to invoke § 12406(3). The President's determination that he was unable to execute the laws with the regular forces does not specify who was included within the "regular forces," so the Court must presume the President considered the standing military if it is part of the "regular forces." *See, e.g.*, *Martin*, 25 U.S. at 32-33 (1827) ("When the President exercises an authority confided to him by law, the presumption is, that it is exercised in pursuance of law."). And while the standing military is capable of performing at least some protective functions in American cities, the President was entitled to determine that the standing military was less well-suited in the circumstances presented than the National Guard, that using the standing military rather than the National Guard would thus significantly impede the safe and effective execution of the laws, and that he therefore would be unable to execute the laws within the meaning of § 12406(3) without the National Guard. Indeed, the Court heard testimony from Major General Rieger about the calming effect that the presence of the National Guard has in deployments. Rieger Direct, Oct. 31, 597:13-20; *see also id.* at 599:4-11 (noting that the "impact [was] immediate" and "[m]uch of the criminal behavior stopped" after the National Guard was deployed to respond to civil disturbances in June 2020). He explained that is in part because of the ties Guardsmen form with the communities in which they serve. *Id.* at 597:21-598:4. And even when Guardsmen "travel to other states to work with other states," they are able to work together well because they "have the same frame of reference." *Id.* at 598:4-11.

**IV.    Plaintiffs' additional legal arguments are unavailing.**

The Court also asked the parties to address new legal arguments raised in pre-trial briefs. Defendants do not believe Plaintiffs raise new meaningful arguments, but nonetheless respond to several mistakes Plaintiffs make.

First, Plaintiffs did not prove that they have standing.  It is wholly speculative that federalizing 200 Oregon National Guardsmen will harm Oregon, and Plaintiffs have not shown otherwise.  There is also no harm to Oregon and California in using the already federalized troops to protect a federal building.  Doubly so for Portland.  The only evidence of harm that Portland or Oregon proffered was costs incurred from policing the area around the ICE Facility.  ECF 113, at 30-31.  But this is not traceable to the deployment of the National Guard.  Instead, the costs incurred were *caused* by responding to the protestors.  It is speculative that deploying the Guard will cause additional costs, and as Major General Rieger testified, the opposite should be expected. Rieger Direct, Oct. 31, 617:10-23.  Plus, those costs are voluntary, as Captain Bailey testified that local law enforcement could refuse assistance if they needed to.  *See* Bailey Cross, Oct. 29, 219:19-220:8.

Oregon has also maintained that it has standing to bring this lawsuit because calling the National Guard will encroach on its sovereign police power to maintain the area surrounding the ICE Facility.  S*ee* ECF No. 113 at 30.  This argument exposes a glaring contradiction.  At the same time Plaintiffs insist that Guardsmen would wrongfully exercise a state police power in protecting federal personnel and property, Plaintiffs have argued that the Tenth Amendment protects Plaintiffs' right to leave federal personnel and property unprotected.  Oregon has argued that it has "an absolute right not to cooperate in federal immigration enforcement" based on the Supreme Court's decision in *Printz v. United States*, 521 U.S. 898 (1997).  As a result of their sanctuary laws, local and state law enforcement cannot assist in protecting the ICE Facility in myriad of

ways, including on public streets.  *See*, *e.g.,* Ex. 2102; *See* Schoening Cross, Oct. 29, Tr. 108:14-123:3.  Oregon apparently takes the position that it has the right to choose not to protect the ICE Facility when it disagrees with the federal government's policies, and the federal government has no recourse without intruding on Oregon's sovereign power.  The Tenth Amendment permits nothing like that.

Second, Plaintiffs hypothesize that the actions of federal law enforcement to protect the building "escalat[ed] tensions with protestors while also complicating the efforts of local law enforcement to manage the situation."  ECF No. 113, at 12.  This is baseless speculation.  Nobody disagrees that force, including chemical munitions, is sometimes appropriate, at the discretion of officers, to control a crowd.  *See* Ex. 309 (PPB Policy 0635.10, Response to Public Order Events, pt. 9).  Here, where local law enforcement will not move protestors impeding law enforcement traffic around the ICE Facility, crowd control by federal officers is sometimes necessary.  Plaintiffs are free to have their own rules and standards governing the use of force in their jurisdiction.  But these rules, and after-the-fact judgments as to whether federal officers complied with their own rules, cannot narrow the President's right to federalize the National Guard.  *Cf. GEO Group, Inc. v. Newsom*, 50 F.4th 475 (9th Cir. 2024) ("[A]ny state regulation that purports to override the federal government's decisions about who will carry out federal functions runs afoul of the Supremacy Clause.").  To rule otherwise would be to subject § 12406 to a "heckler's veto" by those seeking to escalate civil unrest through defiance of law enforcement.  Plaintiffs' "unclean hands" twist on this argument is even less persuasive, as that is an "affirmative defense" against equitable relief (which Plaintiffs seek, not Defendants). *Providence Health Plan v. Charriere*, 666 F. Supp. 2d 1169, 1182 (D. Or. 2009).  And if there were merit to this argument, it errs causally because the National Guard will be deployed by the Department of War—not the Department of

Homeland Security. At bottom, as this Court already recognized, this is not a case about excessive force and Plaintiffs should not be allowed to make it so and besmirch federal agents in the process.

Third, Plaintiffs also misconstrue *Newsom*'s discussion of the need for "exigent circumstances" to call out the National Guard. ECF No. 113, at 18-19. Though it is true that *Martin*, 25 U.S. at 19, and § 12406 deal with "unusual and extreme exigencies," that standard cannot be separated from the central question of "by whom is the exigency to be judged of and decided?" *Martin*, 25 U.S. at 29-30. Courts do not review Presidential determinations of such circumstances *de novo*, but (according to *Newsom*) with "significant deference" to the Executive's decision-making. *Newsom*, 141 F.4th at 1050. This deference is inconsistent with Plaintiffs' argument that justifications for calling out the National Guard that arise after the determination is made cannot be considered. *Cf. SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 480 (9th Cir. 2014) (distinguishing the deferential rational basis review standard from heightened standards of scrutiny because rational basis review requires "consider[ing] the possible post-hoc rationalizations for the law"). The requirement also makes no practical sense: the President may call out the guard at his discretion, and he is not required to issue a new decision or update his prior decision every time new facts emerge that support an earlier decision. Subsequent events may also shed light on why the original decision was justified.

Fourth, there is no basis for Plaintiffs' attempt to parse the President's public statements. *See* ECF No. 113, at 20-21. Although Section 12406 requires a Presidential determination—which President Trump made here—nothing in that provision requires the President to commit his determination to writing in the first place, let alone to provide specific reasons. And *Newsom*'s colorable basis standard—overlaid on top of the extremely stringent standard for ultra vires review—is akin to highly deferential rational-basis review, under which the President's

determinations must be upheld if there is any plausible basis for them. *Cf. Trump v. Hawaii*, 585 U.S. 667, 704 (2018). Under rational basis review, the challenger must "negative every conceivable basis which might support" the challenged action, regardless of whether the decisionmaker articulated those bases (and indeed, regardless of whether those bases actually motivated the decisionmaker). *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quotations marks omitted). Similarly here, the relevant question is whether there is any colorable basis for the President's federalization and deployment decision. There plainly was and that should be the end of the judicial inquiry.

## V.    The Court cannot issue an injunction that impedes the President's future exercise of authority based on new facts.

The Court should not enter the drastic and extraordinary remedy of a permanent injunction. But if the Court does issue an injunction, it must be "tailored to eliminate only the specific harm alleged." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992). And the scope of the injunction must be "supported by the record." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1030 (9th Cir. 2019). Thus, any relief ordered should prevent only the federalization and deployment of the National Guard to protect the ICE Facility if that judgment is based alone on the violent activity that occurred prior to September 27. Facts on the ground can change significantly, as demonstrated by the increase in criminal activity in October. *See* Schoening Cross, Oct. 29, Tr. 139:16-20; Pls.' Ex. 304 & 304-1. The Court cannot prevent future federalizations and deployments of the National Guard were the circumstances to change, necessitating immediate action. And that includes if the situation around the Portland ICE building worsens. If the Court does enter an injunction, the injunction should not impede the President's authority to initiate other federal protection missions based on distinct facts or to federalize Guardsmen for separate purposes, such as maintaining air sovereignty or responding to a foreign

invasion. *See* Defs.' Pre-trial brief, ECF No. 115, at 33.

The limitation on enjoining activity in Portland also necessarily prevents the Court from ordering the relief requested by California to shorten the federalization of California Guardsmen based on a recent extension memorandum. That requested relief appears nowhere in the Amended Complaint, which requests only for the Court to act on the deployment of California National Guard members *in Oregon*. *See* Am. Compl. (ECF No. 58) at 43. Indeed, the extension of the federalization of the California National Guard is not even mentioned in the Amended Complaint. *Id.* In addition, ordering that relief would be improper as it is part of the ongoing *Newsom v. Trump* litigation, where, yesterday, California asked the Northern District of California to lift a stay so that court could order Defendants to end the federalization of California's National Guard. *See Newsom v. Trump*, No. 3:25-cv-4870, ECF No. 207 (N.D. Cal., Oct. 31, 2025). California even cites the same October 16 memorandum in the motion it filed with Judge Breyer yesterday, arguing there that "there was no basis for extending [the California Guardsmen's] deployment on October 16." *Id.* at 7. By asking this Court and the Northern District of California to entertain the same issue (on the same day no less), California engages in improper claim splitting, which is meant "to protect the defendant[s] from being harassed by repetitive actions based on the same claim." *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 328 (9th Cir. 1995) (quoting Restatement (Second) Judgments, § 26 comment a). In addition, as noted in Defendants' opening brief, no relief should run against Defendants DHS and Secretary Noem as they did not take the relevant actions.

Dated: November 1, 2025                     Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            ERIC J. HAMILTON
                                            (NE Bar No. 25886)
                                            Deputy Assistant Attorney General
                                            Federal Programs Branch

                                            ALEXANDER K. HAAS
                                            (CA Bar No. 220932)
                                            Branch Director
                                            Federal Programs Branch

                                            JEAN LIN
                                            (NY Bar No. 4074530)
                                            Special Litigation Counsel
                                            Federal Programs Branch

                                            TIBERIUS DAVIS
                                            (DC Bar No. 90020605)
                                            JOHN BAILEY
                                            (Ohio Bar No. 104260)
                                            Counsel to Assistant Attorney General

                                            /s/  *J. Stephen Tagert*
                                            MICHAEL J. GERARDI
                                            (DC Bar No. 1017949)
                                            Senior Trial Counsel
                                            CHRISTOPHER D. EDELMAN
                                            (DC Bar No. 1033486)
                                            Senior Counsel
                                            KATHLEEN C. JACOBS
                                            (TX Bar No. 24091154)
                                            BENJAMIN S. KURLAND
                                            (DC Bar No. 1617521)
                                            JODY D. LOWENSTEIN
                                            (MT Bar No. 55816869)
                                            J. STEPHEN TAGERT
                                            (VA Bar No. 99641)
                                            Trial Attorneys
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, N.W.
                                            Washington, DC 20005

Tel.: (202) 305-5486
stephen.tagert@usdoj.gov

*Counsel for Defendants*