# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**, and **STATE OF CALIFORNIA**,<br><br><br>Plaintiffs,<br><br>v.<br><br><br>**DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**,<br><br><br>Defendants. | Case No. 3:25-cv-1756-IM<br><br><br>**OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION UNTIL NOVEMBER 7, 2025, AT 5 P.M. PT** |

**IMMERGUT, District Judge.**

This Court consolidated the preliminary injunction hearing and trial on the merits under

Federal Rule of Civil Procedure 65(a)(2) to resolve this case of significant national importance

on the merits as expeditiously as possible. This Court heard three days of testimony and argument in a trial that ended 48 hours ago.[1] During the trial, the parties introduced over 750 exhibits, many of which are voluminous. This Court heard the trial testimony and arguments of counsel and has been in the process of diligently reviewing all the evidence. The interest of justice requires that this Court complete a thorough review of the exhibits and trial transcripts before issuing a final decision on the merits. In addition, this Court must consider the parties' post-trial briefing, which was filed only 24 hours ago. Moreover, this Court must fully analyze and explain its findings of fact and reasoning in an opinion. This Court asked the parties whether they would agree to maintain the status quo for a week from the conclusion of trial, during which the National Guard would remain federalized but not deployed, in order to allow this Court to perform these tasks and issue a final opinion on the merits. Defendants declined.

Without offering any legal support, Defendants argue that this Court may no longer first decide whether a preliminary injunction is warranted, while this Court continues to review the entire trial record to determine whether Plaintiffs have satisfied their ultimate burden of proving their two claims on the merits. Defendants' argument is without merit. Rule 65(a)(2) does not preclude this Court from ruling on a preliminary injunction. Indeed, the advisory committee's note on adding subsection (a)(2) to Rule 65 supports the contrary conclusion: "The fact that the

---

[1] On October 4, 2025, this Court issued a Temporary Restraining Order ("First TRO") that temporarily enjoined Defendants from "implementing Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland." First TRO, ECF 56-1 ¶ 1. The next day, on October 5, 2025, in response to Defendants' deployment of federalized California National Guardsmen to Oregon and federalization of Texas National Guardsmen for deployment to Oregon, this Court issued a second Temporary Restraining Order ("Second TRO") that temporarily enjoined Defendants from "deploying federalized members of the National Guard in Oregon." Second TRO, ECF 68 ¶ 1. Defendants appealed the First TRO but not the Second TRO. Notice of Appeal, ECF 57. The appeal of the First TRO remains pending before an en banc panel of the Ninth Circuit.

proceedings have been consolidated should cause no delay in the disposition of the application for the preliminary injunction, for the evidence will be directed in the first instance to that relief, and the preliminary injunction, if justified by the proof, may be issued in the course of the consolidated proceedings." Fed. R. Civ. P. 65(a)(2) advisory committee's note to 1966 amendment.

Accordingly, for the reasons stated below, this Court determines based on the trial testimony, and the exhibits it has reviewed so far, that Plaintiffs are entitled to a preliminary injunction on their claims that Defendants' federalization and deployment of the National Guard to Oregon violates 10 U.S.C. § 12406 and the Tenth Amendment. This Court therefore preliminarily enjoins Defendant Secretary of Defense Hegseth from implementing (1) the September 28, 2025 Memorandum federalizing and deploying the Oregon National Guard, Ex. 192; (2) the October 5, 2025 Memorandum federalizing and deploying the Texas National Guard, to the extent that it deploys members of the Texas National Guard in Oregon, Ex. 6; (3) the October 16, 2025 Memorandum deploying members of the California and Texas National Guards in Oregon, Ex. 2; and (4) any memoranda deploying members of any other State's National Guard to Oregon based on the same predicate conditions that were relied upon to authorize the above orders. This Court will issue its final opinion on the merits by this Friday, November 7, 2025, no later than 5 p.m. PT.

**A. Standing**

First, this Court finds that Plaintiffs have Article III standing to obtain the above injunctive relief on their *ultra vires* and Tenth Amendment claims. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ."). "Plaintiffs seek injunctive relief, not

damages, and as a general rule, in an injunctive case this court need not address standing of each

plaintiff if it concludes that one plaintiff has standing." *Townley v. Miller*, 722 F.3d 1128, 1133

(9th Cir. 2013) (brackets and internal quotations omitted). The evidence at trial establishes that

Oregon has standing. To establish standing, Oregon must demonstrate that the State "has

suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly

traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*,

603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Oregon has suffered a concrete and particularized injury based on the federalization of

200 members of Oregon's National Guard, who otherwise "serve solely as members of the State

militia under the command of a state governor." *Stirling v. Minasian*, 955 F.3d 795, 799 (9th Cir.

2020) (internal quotations omitted). Because Defendants had no lawful basis to federalize these

Oregon National Guardsmen under 10 U.S.C. § 12406, Defendants commandeered these State

officers to "enforce a federal [law enforcement] program" at the Portland ICE Facility, in

violation of the Tenth Amendment. *See Printz v. United States*, 521 U.S. 898, 935 (1997)

("[S]uch commands are fundamentally incompatible with our constitutional system of dual

sovereignty."); *see also TransUnion*, 594 U.S. at 425 (noting that cognizable injuries for

standing purposes include "traditional harms . . . specified by the Constitution itself").

Also, these ordered deployments involve the intrusion of California and Texas National

Guardsmen in their capacity as militiamen of those States, which constitutes an injury to

Oregon's "sovereignty under the Constitution," let alone to Oregon's "*equal* sovereignty among

the States." *Shelby County v. Holder*, 570 U.S. 529, 544 (2013) (internal quotations omitted)

(emphasis in original). At the Founding, "there was a widespread fear that a national standing

Army posed an intolerable threat to individual liberty and to the sovereignty of the separate

States." *Perpich v. Dep't of Def.*, 496 U.S. 334, 340 (1990); *accord Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *6–8 (N.D. Ill. Oct. 10, 2025) (detailing such sentiments among the Founders, including James Madison, Patrick Henry, and Alexander Hamilton). In light of this recognized threat to State sovereignty, an incursion of a State's militiamen into a sister State must certainly be a "traditional harm[]" recognized in "the Constitution itself." *TransUnion*, 594 U.S. at 425; *see Printz*, 521 U.S. at 918–19 (chronicling the provisions of the Constitution that enshrine the States' "residuary and inviolable sovereignty" (quoting The Federalist No. 39 (James Madison)); *accord Illinois v. Trump*, --- F.4th ----, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025) ("And the deployment of National Guard members from Texas—an incursion on Illinois's sovereignty—makes the constitutional injury especially significant.").

And there is no dispute that Oregon's sovereign injury is fairly traceable to, and therefore would be redressable by an order enjoining (1) the September 28, 2025 Memorandum federalizing and deploying the Oregon National Guard, Ex. 192; (2) the October 5, 2025 Memorandum federalizing and deploying the Texas National Guard, to the extent that it deploys members of the Texas National Guard in Oregon, Ex. 6; (3) the October 16, 2025 Memorandum deploying members of the California and Texas National Guards in Oregon, Ex. 2; and (4) any memoranda deploying members of any other State's National Guard to Oregon based on the same predicate conditions that were relied upon to authorize the above orders.

**B. Preliminary Injunction**

Next, this Court finds that Plaintiffs are entitled to a preliminary injunction on their claims that Defendants' federalization and deployment of the National Guard in Oregon was *ultra vires* under 10 U.S.C. § 12406 and violated the Tenth Amendment. "A plaintiff seeking a preliminary injunction must establish [1] that it is likely to succeed on the merits, [2] that it is

likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1122–23 (9th Cir. 2024) (brackets omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The first factor—likelihood of success on the merits—is 'the most important.'" *Apache Stronghold v. United States*, 101 F.4th 1036, 1049 (9th Cir. 2024) (quoting *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (en banc)).

### 1. Likelihood of Success

This Court finds that Defendants' federalization and deployment of the National Guard in response to protests outside a single federal building in Portland, Oregon, "extend[ed] beyond delegated statutory authority" under 10 U.S.C. § 12406 and violated the Tenth Amendment. *See Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023). Section 12406 provides that:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States.
>
> The President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406. In *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), the Ninth Circuit held that the President's decision to federalize the National Guard under 10 U.S.C. § 12406 is

judicially reviewable. *Id.* at 1047. A reviewing court must give "a great level of deference to the President's determination that a predicate condition exists." *Id.* at 1048. However, the court may "review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 278 U.S. 378, 399 (1932)). The President's "exercise of his authority to maintain peace" must be "*conceived in good faith*, in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance." *Id.* (emphasis in original) (quoting *Sterling*, 278 U.S. at 400).

Applying "a great level of deference to the President's determination that a predicate condition exists," *id.* at 1048, this Court nonetheless concludes that the President's invocation of Section 12406 was likely not made "in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance," *id.* (quoting *Sterling*, 278 U.S. at 400). Critically, the credible evidence at trial established that following a few days in June, which involved the high watermark of violence and unlawful activity outside the Immigration and Customs Enforcement ("ICE") building in Portland, Oregon, the protests outside the ICE facility between June 15 and September 27, 2025, were generally uneventful with occasional interference to federal personnel and property. Although there were sporadic instances of unlawful behavior, federal law enforcement, along with local law enforcement, were able to manage the situation and arrest and prosecute those responsible for criminal conduct. In fact, according to trial testimony, after June 14, 2025, the Portland Police Bureau ("PPB") implemented new guidance, including guidance for enhanced communications with Federal Protective Service ("FPS") to assist with the protests. Also, the evidence showed that the Deputy Regional Director of the FPS Region responsible for protecting the Portland ICE facility was

surprised to learn that the National Guard had been called out to deploy at the ICE building. The Deputy Regional Director testified that neither he, nor the regional director of the FPS Region, made that request.

More detailed findings of fact based on the trial testimony and exhibits are forthcoming following this Court's full review of the record. Based on the trial testimony, this Court finds no credible evidence that during the approximately two months before the President's federalization order, protests grew out of control or involved more than isolated and sporadic instances of violent conduct that resulted in no serious injuries to federal personnel. The violence that did occur during this time period predominately involved violence between protesters and counter-protesters, not violence against federal officers or the ICE facility. Although card readers at the ICE facility were occasionally damaged, this Court has found no evidence so far, based on the testimony at trial, that any significant damage to the ICE facility occurred in the two months preceding September 28, 2025. The credible testimony has not shown that ICE was unable to effect arrests or otherwise perform the agency's duties. Although the evidence so far showed that protesters frequently blocked the driveway of the ICE building, the evidence also showed that federal law enforcement officers were able to clear the driveway. And even when the building closed from mid-June to early July due to property damage that occurred on June 12, 2025, ICE's Enforcement and Removal Operations ("ERO") office was able to temporarily relocate to another facility in Portland for administrative purposes until the building reopened. ERO officers were still making arrests in the community.

Based on these preliminary factual findings, this Court concludes that the President likely did not have a "colorable basis" to invoke either Section 12406(3) or Section 12406(2) to federalize and deploy the National Guard to the Portland ICE facility in Oregon on September

27, 2025. As to the former, the Ninth Circuit held in *Newsom* that although Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States," "minimal interference with the execution of laws is, by itself," insufficient "to justify invoking § 12406(3)." *Newsom*, 141 F.4th at 1051. Rather, the relevant question is whether the President had a "colorable basis" to conclude that protesters' "activities significantly impeded the ability of federal officers to execute the laws." *Id.* at 1052. Here, the facts on the ground establish that since June 14, 2025, the protests outside the Portland ICE facility did not "significantly impede[] the ability of federal officers to execute the [immigration] laws." *See id.*

Defendants argue that "it would be perverse to effectively fault the President for *waiting* to authorize the Guard's deployment until late September . . . , rather than deploying the Guard immediately in June or July." Defs. Pre-Trial Mem., ECF 115 at 24 (emphasis in original). However, the Ninth Circuit's contextual reading of Section 12406(3) in *Newsom* confirms that a sustained change in the facts on the ground is relevant in assessing the President's determination. *See* 141 F.4th at 1051–52. As the Ninth Circuit explained, "[t]he statutory context confirms that" "minimal interference with the execution of laws is, by itself" not "enough to justify invoking § 12406(3)." *See id.* at 1051. "Subsections one and two of the statute discuss unusual and extreme *exigencies*—invasions and rebellions—that threaten the normal operations of civil government." *Id.* (emphasis added). If this Court were to accept Defendants' argument that any past exigency could justify a determination that the President is presently unable to execute the laws, then Section 12406(3) "would swallow subsections one and two, because any invasion or rebellion renders the President unable to exercise *some* federal laws" at *some* point in time. *Id.*

For similar reasons, Plaintiffs are likely to succeed in demonstrating that Defendants violated Section 12406(2). The President's authority under Section 12406(2) depends on the meaning of "rebellion." Words must be interpreted "consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (ellipses in original) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). As the Ninth Circuit recognized in *Newsom*, however, Section 12406 was not enacted "on a blank slate." *See Newsom*, 141 F.4th at 1047 (describing precursor statutes). "Congress first delegated its constitutional calling forth power to the President in the Militia Act of 1792." *Id.* And the first time the phrase "rebellion against the authority of the Government of the United States" appears in a delegation is in the Militia Act of 1903. *See* Pub. L. No. 57-33, §§ 1, 4, 32 Stat. 775, 775–76. Thus, the relevant time period for determining the phrase's ordinary meaning is the early 1900s.

Four features are common among the contemporaneous dictionary definitions of "rebellion": *First*, a rebellion is organized. *See* Rebellion, Webster's International Dictionary of the English Language (1903) ("an organized uprising of subjects"); Black's Law Dictionary (1st ed. 1891) ("organized resistance"). To be organized is to be "arrange[d] or constitute[d] in parts, each having a special function." Organize, Webster's Revised Unabridged Dictionary (1913). *Second*, because a single person cannot arrange herself in parts, a rebellion must be made up of multiple people. Defendants' proffered definition ("deliberate resistance to the government's laws and authority," Defs. Pre-Trial Mem., ECF 115 at 28) stretches beyond the ordinary meaning because under it, a single protestor could, by herself, constitute a "rebellion." *Third*, the group must be engaged in armed hostilities. *See* The Cyclopedic Dictionary of Law (1901) ("taking up of arms traitorously"); American Dictionary of the English Language (1900) ("taking of arms traitorously"); Black's Law Dictionary (1st ed. 1891) ("by force and arms"). *Fourth*, the

PAGE 10 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION UNTIL NOVEMBER 7, 2025, AT 5 P.M. PT

common purpose of a rebellion is to overtake an instrumentality of government by unlawful or antidemocratic means. *See* Rebellion, Webster's International Dictionary of the English Language (1903) ("an organized uprising of subjects for the purpose of coercing or overthrowing their lawful rule or government by force; revolt; insurrection"); The Cyclopedic Dictionary of Law (1901) ("taking up of arms traitorously against the government . . . the forcible opposition and resistance to the laws and process lawfully installed").

Putting those principles together, a rebellion is an organized group engaged in armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means. Historical examples of rebellion confirm this definition. Take the Whiskey Rebellion, for example. What started as democratic opposition to a vice tax in 1791 escalated to serious violence in 1794. At the height of the conflict, "several hundred armed insurgents in western Pennsylvania had besieged the home of the revenue collector, wounding some of the inhabitants." David E. Engdahl, *Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 IOWA L. REV. 1, 49 n.237 (1971). The insurgents "fired upon, and later seized the federal marshal, releasing him only on his agreement to renounce any future service of process on the west side of the Allegheny Mountains." *Id.* As a result, "[t]he federal district court in the insurgent district was unable to sit, so that afterwards it was necessary for Congress to enact special legislation reviving suits and process which had been pending but were discontinued when the court was unable to sit." *Id.* (citing Act of January 28, 1975, ch. 12, 1 Stat. 410). Therefore, the "judiciary was 'stripped of its capacity to enforce the laws.'" *Id.* (quoting Washington's Sixth Annual Address to Congress, Nov. 19, 1794, 1 J. RICHARDSON, MESSAGES AND THE PAPERS OF THE PRESIDENTS 162, 164 (1896)). Those armed,

organized insurgents engaging in hostilities for the common purpose of overtaking federal tax collection and the federal courts were engaged in a rebellion.

Shays' Rebellion also fits this definition. Fifteen thousand rebels (or "Shaysites," as they called themselves) who sought to "annihilate all debts public and private" waged Shays' Rebellion from 1786 to 1787 in Western Massachusetts. *See* AKHIL AMAR, THE WORDS THAT MADE US 298-300 (2021) (hereinafter "AMAR"). To do so, the rebels resorted to mob violence to shut down colonial courts and advance a scheme of "unfunded paper money." *Id.* 300. They "blockad[ed] courthouses and seiz[ed] a federal armory." *See* JILL LEPORE, THESE TRUTHS 116 (2018). "If the Shaysites prevailed, creditors who had lent out hard currency and bargained for repayment in the same coin would be forced to accept worthless paper" and the colonial courts would be incapable of collecting real currency. AMAR at 300–01. Just as with the perpetrators of the Whiskey Rebellion, the Shaysites were an organized group engaged in armed hostilities for the common purpose of overtaking a federal armory and the system of national currency by violent, antidemocratic means.

Based on trial testimony that this Court found credible, particularly the testimony of Portland Police Bureau command staff, who work in Portland and have first-hand knowledge of the crowds at the ICE building from June to the present, the protests in Portland at the time of the National Guard call outs are likely not a "rebellion," and likely do not pose a danger of rebellion. As noted above, the trial testimony included evidence of sporadic isolated instances of violent behavior toward federal officers and property damage to a single building. Defendants have not, however, proffered any evidence demonstrating that those episodes of violence were perpetrated by an organized group engaged in armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means. Once again, in the two

months leading up to the federalization order, the majority of violence that did occur during this time period involved violence between protesters and counter-protesters and isolated sporadic incidents of low-level unlawful conduct. The trial testimony produced no credible evidence of any significant damage to the ICE facility in the months before the President's callout and no credible evidence that ICE was unable to execute immigration laws. Protesters frequently blocked the driveway of the ICE building, but the evidence also showed that federal law enforcement officers were able to clear the driveway.

In sum, Defendants are likely to demonstrate that Defendants' federalization and deployment of the National Guard in Oregon was *ultra vires* under 10 U.S.C. § 12406. Therefore, Defendants' deployment of unlawfully federalized National Guard troops to Oregon also violated the Tenth Amendment. As discussed above with respect to standing, Defendants' federalization and deployment of the Oregon National Guard commandeered these State officers to enforce a federal law enforcement program at the Portland ICE Facility, in violation of the Tenth Amendment. *Printz*, 521 U.S. at 935. And as to the federalized California and Texas National Guards, these deployments involve the intrusion of California and Texas National Guardsmen in their capacity as militiamen of those States, in violation of Oregon's "sovereignty under the Constitution," and Oregon's "*equal* sovereignty among the States." *Shelby County*, 570 U.S. at 544 (internal quotations omitted) (emphasis in original).

**2. Irreparable Harm**

Plaintiffs have also demonstrated a likelihood of irreparable harm in the absence of preliminary injunctive relief. If a plaintiff is likely to succeed on a constitutional claim, "that showing will almost always demonstrate [the plaintiff] is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). And as already discussed, Defendants'

unlawful federalization and deployment of the Oregon National Guard and the National Guards of California and Texas result in two Tenth Amendment violations, the commandeering of Oregon's National Guardsmen and the affront to Oregon's sovereignty, respectively. For both of these constitutional harms, "there is no adequate legal remedy," and Plaintiffs are thus likely to suffer irreparable harm. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Finally, in this preliminary injunction order, to maintain the status quo, the Oregon National Guard may remain federalized, but not deployed, pending this Court's decision on Friday, November 7, 2025, by 5 p.m. PT.

### 3. Balance of Equities and Public Interest

The balance of the equities and the public interest also weigh in Plaintiffs' favor. "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). Plaintiffs' "likelihood of success on the merits of a constitutional claim," under the Tenth Amendment, "tips the merged third and fourth factors decisively in [their] favor." *Baird*, 81 F.4th at 1042; *see also id.* ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022))). "The government also 'cannot reasonably assert that it is harmed in any legal cognizable sense by being enjoined from constitutional violations.'" *Id.* (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983)).

Furthermore, "[t]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (quoting *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008)). As this Court previously observed, "[a]s soon as [unlawfully] federalized National Guard deploys to Portland, the state of Oregon

will suffer an [irreparable] injury to its sovereignty." *Oregon v. Trump*, --- F. Supp. 3d ----, 2025 WL 2817646, at *15 (D. Or. Oct. 4, 2025). Conversely, under the preliminary injunction that this Court grants today, "federal law enforcement may continue to protect federal personnel, functions, and property in Oregon." *Id.* (internal quotations omitted). "In addition, both state and federal law enforcement officers may continue to arrest protestors who violate the law." *Id.*

**C. Defendants' Request for a Stay**

Finally, Defendants requested a stay, or alternatively an administrative stay, of any injunction issued following a trial. Defs. Pre-Trial Mem., ECF 115 at 39. Pending resolution of the appeal of this Court's First TRO, ECF 56-1, the Ninth Circuit has administratively stayed that order to "best preserve the status quo." Order at 5, *Oregon v. Trump*, No. 25-6268, ECF 90 (9th Cir. Oct. 30, 2025). The administrative stay has allowed federalization of the Oregon National Guard but not the deployment of any federalized National Guardsmen in Oregon. *Id.* at 5–6. To similarly preserve the status quo, this Court STAYS IN PART the preliminary injunction to the extent that it enjoins the federalization of members of any State's National Guard until this Court issues its final opinion on the merits. This partial administrative stay "preserves the status quo in which National Guard members have been federalized but not deployed." *Id.* at 6. Again, this Court will issue its final opinion by Friday, November 7, 2025, by 5 p.m. PT at the latest.

## CONCLUSION

For the above reasons, this Court issues the following preliminary injunction: Until this Court issues its final opinion and order resolving Plaintiffs' request for a permanent injunction, Defendant Secretary Hegseth is preliminarily enjoined from implementing the following memoranda federalizing and deploying members of the National Guard in Oregon:

(1) the September 28, 2025 Memorandum federalizing and deploying the Oregon National Guard, Ex. 192;

(2) the October 5, 2025 Memorandum federalizing and deploying the Texas National Guard, to the extent that it deploys members of the Texas National Guard in Oregon, Ex. 6;

(3) the October 16, 2025 Memorandum deploying members of the California and Texas National Guards in Oregon, Ex. 2; and

(4) any memoranda deploying members of any other State's National Guard to Oregon based on the same predicate conditions that were relied upon to authorize the above orders.

This Court further STAYS IN PART this preliminary injunction to the extent that it enjoins the federalization of any State's National Guard until this Court issues its final opinion on the merits.

**IT IS SO ORDERED.**

DATED this 2nd day of November, 2025.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge