# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**, and **STATE OF CALIFORNIA**,<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**,<br><br>Defendants. | Case No. 3:25-cv-1756-IM<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**IMMERGUT, District Judge.**

## INTRODUCTION

On September 27, 2025, the President of the United States federalized 200 members of the Oregon National Guard over the objection of Oregon's governor and deployed them to a

single federal building in Portland, Oregon. In the ensuing days, the President ordered the

deployment of 400 federalized members of the Texas and California National Guards, all to the

same federal building in Oregon. The mission of these deployments of military troops was

ostensibly to quell violent protests outside the one-block Immigration and Customs Enforcement

("ICE") building in Portland. But after a three-day trial that included the testimony of federal,

state, and local law enforcement officials and hundreds of exhibits describing protest activity

outside the Portland ICE building, the evidence demonstrates that these deployments, which

were objected to by Oregon's governor and not requested by the federal officials in charge of

protection of the ICE building, exceeded the President's authority. While violent protests did

occur in June, they quickly abated due to the efforts of civil law enforcement officers. And since

that brief span of a few days in June, the protests outside the Portland ICE facility have been

predominately peaceful, with only isolated and sporadic instances of relatively low-level

violence, largely between protesters and counter-protesters. When considering these conditions

that persisted for months before the President's federalization of the National Guard, this Court

concludes that even giving great deference to the President's determination, the President did not

have a lawful basis to federalize the National Guard under 10 U.S.C. § 12406.

To be clear, today this Court does not rule that the President can never deploy the

National Guard to Oregon, or to any other location, if conditions on the ground justify the

Guard's intervention. But under the U.S. Constitution, Congress possesses the power to call up

the National Guard "to execute the Laws of the Union, suppress Insurrections, and repel

Invasions," U.S. Const. art. I, § 8, cl. 15, and Congress's delegation of its power to the President

is by statute. Unless and until the President lawfully federalizes National Guardsmen under a

statute such as 10 U.S.C. § 12406, "National Guard members serve solely as members of the

State militia under the command of a state governor." *Stirling v. Minasian*, 955 F.3d 795, 799 (9th Cir. 2020) (internal quotations omitted). Therefore, the President's unlawful federalization of the National Guard violates the Tenth Amendment, which "reserves to the States" any powers not expressly delegated to the federal government in the Constitution. U.S. Const. amend. X.

In *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), the Ninth Circuit interpreted the provision permitting the President to call up the National Guard when he "is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). This Court is bound to apply *Newsom*. However, this case presents novel issues not addressed in *Newsom*. *Newsom* did not discuss Section 12406(2), which permits the President to call up the National Guard when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States," nor did it fully delve into the meaning of "to execute the laws of the United States," contained in Section 12406(3). In resolving these issues, this Court draws on both *Newsom*'s reasoning and the constitutional scope of Congress's calling forth power, which defines the outer boundaries of the President's power under 10 U.S.C. § 12406. Indeed, this Court, "as in all cases, [must] interpret the Constitution in light of its text, purposes, and 'our whole experience' as a Nation." *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014) (quoting *Missouri v. Holland*, 252 U.S. 416, 433 (1920)).

After analyzing these statutory provisions, as applied to the facts in this case, this Court arrives at the necessary conclusion that there was neither "a rebellion or danger of a rebellion" nor was the President "unable with the regular forces to execute the laws of the United States" in Oregon when he ordered the federalization and deployment of the National Guard. 10 U.S.C. § 12406(2)–(3).

This Court acknowledges that some citizens may support these deployments as a helpful military supplement to effectuate the President's immigration agenda. But the Founders "embodied their profound fear and distrust of military power . . . in the Constitution and its Amendments," *Reid v. Covert*, 354 U.S. 1, 29 (1957) (plurality op.), which has lived on through the decades as "a traditional and strong resistance of Americans to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). In the Supreme Court's words, "[s]light encroachments create new boundaries from which legions of power can seek new territory to capture." *Reid*, 354 U.S. at 39 (1957). This principle has been foundational to the safeguarding of our fundamental liberties under the Constitution. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 271–72 (1964) (noting that under the First Amendment, "freedoms of expression are to have the breathing space that they need to survive" (ellipses and internal quotations omitted)); *Silverman v. United States*, 365 U.S. 505, 512 (1961) (noting in the Fourth Amendment context that "illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure" (internal quotations omitted)).

The "precise standard" to demarcate the line past which conditions would satisfy the statutory standard to deploy the military in the streets of American cities is ultimately a question for a higher court to decide. *Newsom*, 141 F.4th at 1051. But based on this Court's application of *Newsom* to the factual findings at trial and the meaning of 10 U.S.C. § 12406 in light of history and tradition, this Court finds that wherever this line precisely is, Defendants have failed to clear it. Therefore, for all the reasons stated below, this Court permanently enjoins Defendants' orders to deploy federalized members of the National Guard to Oregon.

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

TABLE OF CONTENTS ........................................................................................ 5

PROCEDURAL BACKGROUND ........................................................................ 7

    A.   First Temporary Restraining Order .................................................. 7

    B.   Second Temporary Restraining Order ........................................... 10

    C.   Subsequent Proceedings ................................................................ 11

    D.   Preliminary Injunction and Court Trial ........................................ 12

FINDINGS OF FACT ............................................................................................ 13

    A.   National Guard Callout to Oregon ................................................ 13

    B.   The Law Enforcement Agencies ................................................... 16

        1.   Federal Protective Service .................................................. 16

        2.   Immigration and Customs Enforcement .......................... 17

        3.   Portland Police Bureau ...................................................... 17

        4.   Oregon State Police ............................................................ 18

    C.   The National Guard ....................................................................... 18

    D.   The ICE Facility Protests .............................................................. 19

        1.   Decrease in Number of Protesters ..................................... 21

        2.   Number of Federal Officers ............................................... 23

        3.   Lack of Crowd Organization ............................................. 24

        4.   Minimal Presence of Weapons .......................................... 27

        5.   Decreased Interference with the ICE Building ................. 28

        6.   Lack of Violence Towards Federal Officers ..................... 32

        7.   Protestor-on-Protestor Confrontations .............................. 38

    E.   Portland Police Bureau's Response ............................................... 39

        1.   First Weeks of the Response: Mid-June ............................ 40

        2.   Refining the Approach: Mid-June to Late September ...... 43

        3.   Post-Callout PPB Response ............................................... 46

    F.   Federal Protection of the ICE Building ........................................ 47

    G.   ICE's Ability to Enforce Immigration Law ................................. 51

   H.   Post-Callout.................................................................................................. 53

CONCLUSIONS OF LAW ....................................................................................... 54

   A.   The National Guard....................................................................................... 54

   B.   Article III Standing ....................................................................................... 57

   C.   Permanent Injunction .................................................................................... 61

      1.   Actual Success on the Merits ..................................................................... 62

         a.   Section 12406(3)................................................................................ 64

            i.   *Newsom v. Trump*........................................................................ 64

            i.   History and Tradition ................................................................. 67

           ii.   Application ................................................................................. 73

         b.   Section 12406(2) ............................................................................... 86

            i.   Ordinary Meaning ..................................................................... 87

           ii.   History and Tradition ................................................................ 94

          iii.   Application ................................................................................. 99

         c.   Tenth Amendment ........................................................................... 103

      2.   Remaining Permanent Injunction Factors.................................................. 103

CONCLUSION........................................................................................................ 104

**PROCEDURAL BACKGROUND**

This case concerns the President's September 27, 2025 federalization order, which directed Secretary of Defense Pete Hegseth to call into federal active duty status the Oregon National Guard for deployment at the ICE facility in Portland, Oregon. Ex. 1; Ex. 1051. This ICE facility is a sub-office of the ICE Enforcement and Removal Operations ("ERO") Seattle field office, and it is housed in a one-block building located at the corner of South Bancroft Street and South Macadam Avenue ("Portland ICE building" or "Portland ICE facility"). Tr. 10/31/2025 671:6–8; Ex. 307. Secretary Hegseth swiftly implemented the President's order by issuing the September 28, 2025 Memorandum, which calls "200 members of the Oregon National Guard . . . into service effective immediately for a period of 60 days." Ex. 1051. On the same day that Secretary Hegseth issued this September 28, 2025 Memorandum, Plaintiffs the State of Oregon and the City of Portland filed this lawsuit. Their complaint raised five claims: that Defendants' federalization and deployment of the Oregon National Guard violated (1) 10 U.S.C. § 12406; (2) the Posse Comitatus Act and 10 U.S.C. § 275; (3) the Tenth Amendment of the Constitution; (4) the Administrative Procedure Act ("APA"); and (5) the Constitution's separation of powers doctrine and the Take Care Clause. Complaint, ECF 1 ¶¶ 98–142. Plaintiffs requested a permanent injunction to "enjoin Defendants' federalization and deployment of members of the Oregon National Guard." *Id.* at 39.

**A. First Temporary Restraining Order**

The next day, on September 29, 2025, Plaintiffs moved for a temporary restraining order to enjoin Secretary Hegseth's September 28, 2025 Memorandum. Motion for Temporary Restraining Order ("First TRO Motion"), ECF 6. On October 2, 2025, Defendants filed a response, and on October 3, 2025, this Court held a hearing on the First TRO Motion. ECF 54.

On October 4, 2025, this Court issued an opinion and order granting Plaintiffs' First TRO Motion and "temporarily enjoin[ing] Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland" for fourteen days until the end of the day on October 18, 2025. Opinion and Order Granting First TRO Motion ("TRO Opinion"), ECF 56 at 31; *see* Fed. R. Civ. P. 65(b)(2). This Court concluded that Plaintiffs were likely to succeed in demonstrating that Defendants' federalization of the Oregon National Guard (1) was an *ultra vires* action in violation of 10 U.S.C. § 12406(3) and (2) violated the Tenth Amendment. TRO Opinion, ECF 56 at 16–27; *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court also found that Plaintiffs showed a likelihood of irreparable harm in the absence of an injunction and that the balance of equities and the public interest weighed in Plaintiffs' favor. TRO Opinion, ECF 56 at 27–30. This Court therefore issued a Temporary Restraining Order that temporarily enjoined Defendants from implementing the September 28, 2025 Hegseth Memorandum. Temporary Restraining Order ("First TRO"), ECF 56-1.

Within hours of the issuance of the First TRO, Defendants redirected federalized California National Guard personnel to Portland. Tr. 10/31/2025 634:25–635:3. These California Guardsmen were federalized in June "[i]n response to disturbances in Los Angeles" and had remained in federal service. *See Newsom*, 141 F.4th at 1040. The next day, on October 5, 2025, the 200 California National Guard troops were transported to Oregon. Ex. 202 at 2; *see* Tr. 10/31/2025 618:5–19.

Meanwhile, at 11:35 AM PDT on October 4, 2025, a few hours prior to this Court's issuance of the First TRO at 4:27 PM PDT, and less than 24 hours after this Court's hearing on the TRO, Defendants deployed nine federalized members of the Oregon National Guard "at the

ICE Facility in downtown Portland, Oregon where they assumed their first support mission." Ex. 201 at 1. The nine National Guardsmen "completed the first shift at the ICE Facility" at 12:00 AM PDT, after this Court had enjoined their deployment. Ex. 202 at 2–3. Prior to the start of trial, when asked to address why the nine National Guardsmen remained deployed at the Portland ICE facility throughout the evening of October 4, 2025, Defendants stated that "there's, obviously, time that it took to convey the message to people on the ground." Tr. 10/29/2025 9:20–21. Defendants' counsel further explained that "[c]ompliance advice has to be fashioned, and then it has to be relayed down the chain of command." Tr. 10/30/2025 304:14–15.

Ordinarily, this Court would be inclined to accept Defendants' explanation for their violation of the First TRO given that "the first shift" at the Portland ICE facility commenced prior to this Court's issuance of the First TRO. However, in light of the following facts, this Court is deeply troubled by Defendants' continued deployment of Oregon National Guardsmen at the Portland ICE facility in violation of the First TRO. In the seven hours that Defendants took to "convey the message" of the First TRO "to people on the ground," Defendants simultaneously "convey[ed] the message" to the U.S. Army Northern Command to send 200 of the federalized California National Guard personnel in Los Angeles to Portland. Ex. 202; Tr. 10/31/2025 618:5–24; Tr. 10/31/2025 634:25–635:3. In other words, Defendants had time to order and coordinate the transport of federalized California National Guardsmen from Los Angeles to Portland but needed more time to communicate with the Oregon National Guardsmen at the Portland ICE facility.

This Court has not issued any finding of contempt based on Defendants' apparent violation of the First TRO. However, this Court expects Defendants will provide further

explanation when ordered to do so by this Court in the future, and this Court retains jurisdiction over the issue.

**B. Second Temporary Restraining Order**

On Sunday, October 5, 2025, the day after this Court issued the First TRO, Plaintiffs amended their complaint to join the State of California as a plaintiff and filed a Motion for a Second Temporary Restraining Order, seeking to "enjoin Defendants' deployment of members of the California National Guard to Oregon." Amended Complaint, ECF 58 at 43; Motion for a Second Temporary Restraining Order ("Second TRO Motion"), ECF 59. Plaintiffs asserted the same claims brought in the initial Complaint, Amended Complaint ¶¶ 113–59, and added allegations concerning the dead-of-night deployment of the California National Guard, *id.* ¶¶ 99– 112, 121, 130. That evening, this Court held an emergency hearing on Plaintiffs' Second TRO Motion. ECF 68. Minutes before the hearing, this Court learned that Defendant Secretary Hegseth issued a new Memorandum to the Adjutant General of the Texas National Guard that authorized "the mobilization of up to 400 members of the Texas National Guard under section 12406 of title 10, U.S. Code," to Oregon and other states. Ex. 6.

During the October 5, 2025 hearing, this Court noted that Defendants' deployment of federalized members of other states' National Guards to Oregon "appear[s] to be in direct contravention" of the First TRO. Tr. of October 5, 2025, Hearing at 20:1–2. After hearing argument from the parties, this Court issued the Second Temporary Restraining ("Second TRO"), temporarily enjoining the deployment of any "federalized members of the National Guard in Oregon." ECF 68. This Court based the Second TRO "on this Court's prior Opinion and Order Granting Plaintiffs' First Motion for Temporary Restraining Order." Second TRO, ECF 56. As this Court explained during the hearing, "the prerequisites in § 12406 were not satisfied . . . based on the facts in Portland, Oregon." Tr. of October 5, 2025, Hearing at 21:3–5.

On October 15, 2025, this Court extended the First and Second TROs both by fourteen days. ECF 85.

## C. Subsequent Proceedings

On October 4, 2025, Defendants appealed this Court's First TRO to the Ninth Circuit. Notice of Appeal, ECF 57. However, Defendants did not appeal the Second TRO. On October 5, 2025, Defendants filed a motion in the Ninth Circuit to stay the First TRO pending appeal. Motion to Stay, *Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 5, 2025), Dkt. No. 11. On October 20, 2025, a split panel of the Ninth Circuit granted Defendants' motion and stayed the First TRO, finding that Defendants were entitled to a stay. *Oregon v. Trump*, No. 25-6268, 2025 WL 3008050, at *3 (9th Cir. Oct. 20, 2025), *vacated upon reh'g en banc*. The two-judge majority found that Defendants were likely to succeed in showing that the federalization and deployment of 200 members of the Oregon National Guard on September 28, 2025, was lawful. *Id.* at *10– 14.

The same day, on October 20, 2025, a judge on the Ninth Circuit "requested a vote on whether this case should be reheard en banc." Order, *Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 5, 2025), Dkt. No. 63. On October 23, 2025, Plaintiffs filed a declaration attaching Defendants' interrogatory response regarding the number of federal law enforcement officers at the Portland ICE building between June and September. Second Decl. of Marshall, Ex. 1, ECF 108. Among other information, the response suggested that the number of FPS officers diverted to the Portland ICE facility ranged from 20 to 31 between June 16, 2025, and October 5, 2025, *id.* Ex. 1 at 4–5, contrary to the Ninth Circuit majority's reliance on Defendants' earlier representation that "115 FPS officers—nearly 25% of FPS officers nationwide—were diverted to Portland," *Oregon v. Trump*, 2025 WL 3008050, at *12.

On October 28, 2025, a majority of nonrecused active judges of the Ninth Circuit voted to rehear this case en banc, vacating the panel's October 20, 2025 order. Order, *Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 28, 2025), Dkt. No. 89. Therefore, as of the start of trial on October 29, 2025, this Court's Second TRO remained in force, enjoining Defendants from "deploying federalized members of the National Guard in Oregon." Second TRO, ECF 68.

## D. Preliminary Injunction and Court Trial

From October 29, 2025, to October 31, 2025, this Court held a three-day consolidated preliminary injunction hearing and merits bench trial on Plaintiffs' two claims that Defendants' federalization and deployment of National Guardsmen from Oregon, California, and Texas to the Portland ICE building violated 10 U.S.C. § 12406 and the Tenth Amendment. ECF 125.

After hearing testimony from eight live witnesses, and receiving hundreds of exhibits, this Court granted a preliminary injunction pursuant to 28 U.S.C. § 65(a)(2) to expire on November 7, 2025 at 5:00 PM PT, ECF 134, so this Court could complete its review of the voluminous exhibits and consider post-trial briefing of counsel and draft an opinion. Based on the full trial record, this Court makes the below findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, this Court adopts them as such. To the extent that any conclusions of law constitute findings of fact, this Court adopts them as such.

# FINDINGS OF FACT

## A. National Guard Callout to Oregon

On June 7, 2025, President Trump issued a Memorandum, ("June 7 Memorandum"), that cited "numerous incidents of violence and disorder" in response to the enforcement and faithful execution of federal immigration laws. In the June 7 Memorandum, President Trump declared:

> I hereby call into Federal service members and units of the National Guard under 10 U.S.C. 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of immigration law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessment and planned operations.

Ex. 1052. The memorandum broadly directed deployment of National Guardsman "for 60 days or at the discretion of the Secretary of Defense." *Id.* That same night Secretary Hegseth issued his own memorandum federalizing 2,000 California National Guard members, *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1244 (N.D. Cal. 2025), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025), some of whom are still in federal service today. Ex. 2.

Months after the President's June 7 Memorandum, on September 26, 2025, the callout of the Oregon National Guard was set in motion. On September 26, 2025, the Department of Homeland Security ("DHS") issued a memorandum to the Department of War, requesting assistance for Federal Facility Protection Support to DHS in Oregon. Ex. 1050. The memorandum requested assistance "to safeguard federal personnel, facilities, and operations" in Oregon because "[f]ederal facilities, including those directly supporting [ICE] and [FPS], have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *Id.* DHS requested "approximately 200 DoW personnel, trained and equipped for mission security in complex urban environments" and that "[t]hese personnel would

integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures." Ex. 1050.

The next day, September 27, 2025, President Trump posted a message on Truth Social, stating:

> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!

Ex. 1. After this post, Major General Timothy Rieger, the Vice Chief of the National Guard Bureau, issued a memorandum to the Adjutant General of the Oregon National Guard at the direction of the Office of the Secretary of War. Ex. 1048; Tr. 10/31/2025 612:17–18. Despite issuing this memorandum, Major General Rieger had no personal knowledge of the situation on the ground in Portland, tr. 10/31/2025 610:24–611:1; *id.* at 612:19–21, and the FPS Deputy Regional Director in charge of protecting the Portland ICE facility, R.C., did not request the National Guard's assistance. Tr. 10/30/25 466:10–467:15. Major General Rieger's memorandum, signed the same day as President Trump's Truth Social post, proposed that Governor Kotek agree to a 32 U.S.C. § 502(f) mobilization, where the activated guardsman serve under the Governor's command and control and the mobilization is paid for by the federal government. Tr. 10/31/2025 613:7–13. Governor Kotek rejected the proposal. Tr. 10/31/2025 615:13–14.

On September 28, 2025, Secretary of War Hegseth issued a memorandum authorizing the deployment and federalization of 200 members of the Oregon National Guard under 10 U.S.C. § 12406:

> On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10,

U.S. Code, to protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum to effectuate the calling forth of these Service members. This memorandum further implements the President's direction. 200 members of the Oregon National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Ex. 1051; Tr. 10/31/2025 616:5–24.

On October 1, 2025, President Trump posted a message on Truth Social stating:

As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem. Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon. ANTIFA and the Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law. We will never allow MOBS to take over our streets, burn our Cities, or destroy America. The National Guard is now in place, and has been dedicated to restoring LAW AND ORDER, and ending the Chaos, Death, and Destruction! We are a Nation of LAW, and we will PREVAIL. Thank you for your attention to this matter!

Ex. 194; Tr. 10/31/2025 626:23–627:10.

As described in the procedural history above, Defendants quickly pivoted to mobilizing the National Guards of other states to deploy in Portland. The same day as this Court's TRO, October 4, Defendants redirected members of the California National Guard to Portland despite this Court's order blocking the use of the Oregon National Guard in Portland. Tr. 10/31/2025 634:25–635:3. These members of the California National Guard were already in federal status under Section 12406 from when they were activated in June for deployment to Los Angeles. Tr. 10/31/2025 603:4–7; Tr. 10/31/2025 618:14–24. Additionally, the Secretary of War issued a

memorandum calling members of the Texas National Guard into federal service under § 12406 for deployment to Portland and other cities. Ex. 6. On October 5, 2025, this Court issued the second TRO in this case, which enjoined the deployment of any National Guard to Oregon. Almost two weeks later, on October 16, 2025, the Secretary of War issued a memorandum extending the prior federalization and deployment of 200 California National Guard to February 2, 2026, and 200 Texas National Guard to December 4, 2025. Ex. 2.

## B. The Law Enforcement Agencies

The 2025 ICE protests in Portland have largely been confined to the single city block surrounding the U.S. Immigration and Customs Enforcement (ICE) Facility, on the corner of Macadam and Bancroft Street in southwest Portland. Tr. 10/29/25 57:22–24; Tr. 10/30/25 389:10–22; Ex. 307. Numerous law enforcement agencies, described below, play a role in securing the ICE facility and the immediate city property surrounding it. The pertinent federal agencies are the Federal Protective Service and the U.S. Immigration and Customs Enforcement. The primary local agencies involved in this case are the Portland Police Bureau and the Oregon State Police.

### 1. Federal Protective Service

The Federal Protective Service (FPS) is the federal agency that "protect[s] all GSA federally leased or owned facilities," including the Portland ICE Facility. Tr. 10/30/2025 379:7–9. FPS officers are trained to "identify vulnerabilities in federal facilities, mitigate risks, present recommendations, and implement countermeasures." Tr. 10/30/2025 (R.C.) 379:14–380:10. FPS has "roughly 750 total FPS personnel and roughly about 500 inspectors" nationwide. Tr. 10/30/2025 386:5–8. Inspectors are the sworn law enforcement officers that are responsible for general patrol, investigations, and threat assessment at federal facilities. Tr. 10/30/2025 495:16–

20. There are four FPS officers permanently assigned to Oregon to cover 100 federal facilities. Tr. 10/30/2025 486:14–24.

### 2. Immigration and Customs Enforcement

Immigration and Customs Enforcement ("ICE") is the nation's primary immigration enforcement organization. Within ICE is the Enforcement and Removal Operations directorate, which is "responsible for interior enforcement of mostly administrative immigration law." Tr. 10/31/25 668:1–2. ICE operations in Oregon are managed from the organization's Seattle field office, which maintains subsidiary offices in Portland, Medford, and Eugene. *Id.* at 668:13–23. The Seattle field office manages approximately 220 full-time positions, 130 of which are currently filled, with 20 to 30 individuals currently employed in Portland. *Id.* at 668:24–669:15. The Seattle field office also employs a Special Response Team (SRT) of eight officers who perform high-risk duties like crowd control and execution of high-risk warrants. *Id.* at 684:18–685:24. Seven of those officers are currently deployed to Portland. *Id.* at 684:17–20.

### 3. Portland Police Bureau

The Portland Police Bureau (PPB) is the primary law enforcement agency with jurisdiction over the City of Portland. Tr. 10/29/2025 209:19–21. PPB is divided into three precincts: North Precinct, East Precinct, and Central Precinct. Tr. 10/29/2025 225:12–21. The ICE facility is within Central Precinct, which also covers Downtown Portland and over 200,000 people. Tr. 10/29/2025 225:12–24. Typically, an individual police precinct office responds to spontaneous protests or demonstrations within their precinct, tr. 10/29/2025 394:18–24s, but PPB also has specialized resources for crowd management like the Rapid Response Teams ("RRT") to respond to high-complexity events, including protests, that are either more complex or larger than a precinct can manage. Tr. 10/29/2025 39:25–40:4; Tr. 10/29/2025 143:19–24.

### 4. Oregon State Police

The Oregon State Police ("OSP") is the primary law enforcement agency for the State of Oregon, charged with enforcing the state's laws and regulations. Tr. 10/29/25 181:23–182:9. OSP employs roughly 700 to 800 troopers, anywhere between a quarter to a third of whom are located in the Portland area. Tr. 10/29/2025 182:10–18. The organization maintains a Mobile Response Team (MRT) of roughly 40 troopers to respond to exigencies including crowd management. Tr. 10/29/25 186:5–14.

## C. The National Guard

The National Guard is a militia and military reserve force organized primarily along state lines. Unless federalized, state National Guard organizations are under the command of their state's Governor. Nonetheless, the National Guard Bureau, a component of the Department of War, liaises between the Department and the state National Guard organizations, and provides support to state organizations. Tr. 10/31/25 588:18–589:5.

National Guardsmen may serve in three different statuses, and they serve under the command of a state governor for two of the three. Tr. 10/31/2025 594:8–14. First, members of the National Guard serve in "state active duty," when "the Governor calls out the Guard, and it's paid for by the State." Tr. 10/31/2025 594:9–10; see *Stirling*, 955 F.3d at 798 ("Such members act under state control for state purposes and . . . at state expense." (internal quotations omitted)). Second, they may be activated under Title 32 of the United States Code, where they are placed "under command and control by the Governor and paid for by the Federal Government." Tr. 10/31/2025 594:11–12; see *Stirling*, 955 F.3d at 798 ("[M]embers provide military support as state National Guard members under state control while also in the service of the federal government and funded by the federal government . . . .").

Finally, they may be activated under Title 10 of the United States Code, where they are "under the command control of the Federal Government and paid for by the Federal Government." Tr. 10/31/2025 594:13–14; *see Stirling*, 955 F.3d at 798 ("When members are called into federal active duty status, they serve pursuant to Title 10 of the United States Code ('Armed Forces'), which pertains to all active duty members of the armed services of the United States."). When federalized under Title 10, National Guardsman are considered part of the military and ultimately report to the Secretary of War, rather than the governor. Tr. 10/31/2025 636:12–21.

Major General Timothy Rieger, Vice Chief for the National Guard Bureau, testified that he had no prior experience with National Guard deployments in Title 10 status under Section 12406. Tr. 10/31/2025 632:2–25. Major General Rieger also acknowledged that, when deployed to assist with a civil disturbance or to protect law enforcement officers, National Guardsmen generally have no obligation to retreat or de-escalate and will skip "rungs of a ladder" of force escalation if need be, though rules for the use of force are ultimately determined by the commander. Tr. 10/31/2025 637:12–638:22.

**D. The ICE Facility Protests**

Five years ago, Portland faced sustained and violent civil unrest in response to the murder of George Floyd. For almost six months in 2020, the city was in a state of upheaval, with well-attended and peaceful daily protests turning violent at night. Ex. 31 at 14. The protests and riots shifted their focus to federal buildings, including Portland's Mark O. Hatfield United States Courthouse. Ex. 31 at 27. Protesters hurled rocks, bricks, and Molotov cocktails, and the protests resulted in 450 injuries to officers and over $15 million in damage. Ex. 31 at 14–15. Several witnesses at trial testified that as compared to the 2025 protests at the ICE facility, 2020 was "an

entirely different type of disorder." Tr. 10/29/2025 97:21–98:3. That level of civil unrest has not returned since.

The 2020 protest in Portland are not at issue in this case. What is at issue are the comparably small demonstrations at the Portland ICE building that began in mid-June 2025. The protests peaked on June 14 and diminished quickly thereafter, especially as law enforcement adjusted to facts on the ground. In July and August, the size and energy of the protests continued to decline, and any criminality associated with the protests became more isolated and manageable. While some protesters were intent on interfering with the ICE facility's driveway, FPS was able to disperse the crowds and much of any criminal activity at the protests pivoted away from being done at or towards the building or federal officers. Tr. 10/30/2025 364:15–365:2.

The decline in protest activity was not linear; there were occasional spikes in activity after June 14, but any crime was generally low-level. The protests would "generally bump up on the weekends," Tr. 10/30/2025 421:17–18, and protesters tended to engage in more unlawful activity on major holidays, like Independence Day or Labor Day, *see, e.g.*, Ex. 410; Ex. 792; Ex. 495; Ex. 847. The PPB witnesses, all of whom this Court found credible based on their experience on the ground in Portland, their demeanor while testifying, and the exhibits which corroborate their testimony, described generally peaceful crowds after June 14 up to September 27. By September, the energy of the protests reached its lowest point. To the extent that any minimal criminality remained, its focus shifted from federal property and personnel to conflict between protesters and counter-protesters. Tr. 10/30/2025 364:15–365:2. From September 19 to September 28, immediately before the National Guard callout, there was "[n]othing much" going on outside the ICE building. Tr. 10/29/2025 162: 9-19. Throughout the protests, PPB

Commander Schoening testified that protesters wore "inflatable costumes." *See* Tr. 10/29/2025 95:20–24. Similarly, PPB Assistant Chief Dobson described "folks in costumes" at the ICE Facility, as well as "other almost festive-type events going on down there," including "dance parties." Tr. 10/30/2025 365:4–11.

Any riotous activity affecting the Portland ICE building peaked in June and had subsided for months before the President's September 27, 2025 callout of the National Guard to Oregon. Regarding the nature of the crowd and its behavior, this Court finds the following. First, the size of the crowds decreased dramatically from June to September. Second, the number of officers briefly increased in response to the peak activity in mid-June, but it quickly subsided and remained at a low steady state until September 27, 2025. Third, the crowd was not directed by an organized group. Fourth, members of the crowd were rarely armed. Fifth and finally, the crowd's shift in focus from the ICE building and the federal personnel in June to counter-protester disputes in September demonstrates that much of the activity since mid-June had little to no effect on the ICE building and federal operations.

### 1. Decrease in Number of Protesters

The evidence and testimony that this Court received at trial show that, on average, the crowd size[1] flared up in mid-June, but decreased substantially thereafter, causing no more than minimal interference with federal law enforcement in July, August, and September. The number

---

[1] With respect to crowd size, there is occasional divergence between the federal law enforcement reporting and the local law enforcement reporting. *Compare* Ex. 657; *and* Ex. 658, *with* Ex. 775. Where this divergence occurs, the Court finds the PPB reporting more credible for two reasons. First, PPB has much more experience in managing—and therefore estimating the size of—large crowds. Second, PPB's estimates tended to be inclusive of the entire area of interest surrounding the ICE facility, whereas FPS estimates tended to be focused on the number of protesters in the immediate line of sight of the building. As a result, PPB tended to have higher crowd estimates than FPS. For days where PPB did not report crowd size, this Court cites crowd estimates from FPS's reports.

of protesters peaked on June 12, June 14, and June 18, with a maximum size of 450, 300, and 200 protesters respectively. Ex. 304-1. For the rest of June, the crowd size fluctuated significantly, but the greatest number of demonstrators on any given day generally stayed between 25 and 100 people. *See, e.g.*, Ex. 339; Ex. 350; Ex. 361; Ex. 375; Ex. 388; Ex. 396.

In July and August, the average number of protesters decreased further. The maximum crowd size typically hovered between 15 and 30 people, with limited exceptions. Tr. 10/29/25 230:15-22; Ex. 304-1; Ex. 400; Ex. 428; Ex. 459; Ex. 468; Ex. 493. Those exceptions included a 150-person crowd on Independence Day, as well as July 17 and August 23, which had maximums of 200 and 120 people, respectively, because of planned, peaceful marches. Ex. 410; Ex. 454; Ex. 840.[2]

On a regular basis in September, there were more federal law enforcement officers on duty than there were protesters outside the ICE facility. Tr. 10/30/25 558:18–21. The September 1 Labor Day holiday saw a spike in crowd size, with 125 people marching to the ICE facility from Caruthers Park. Ex. 495. The daily averages then settled back under a ceiling of 30 people for roughly two weeks, with the exception of a 60-person protest on September 6. *See, e.g.*, Ex. 496; Ex. 499; Ex. 504. Beginning on September 13, the number of protesters marginally swelled for about a week, reaching 50 on several days and 150 on a single day. *See, e.g.*, Ex. 506; Ex. 509; Ex. 510; Ex. 514. But by the week before the callout of the Oregon National Guard on September 27, the size of the protests was at its lowest point since before the protests began. There were 7–10 protesters on September 22, Ex. 516, "a few individuals" on September 23, Ex.

---

[2] While PPB reported 200 protesters on July 17, FPS reported 800-1,000. *Compare* Ex. 454 *with* Ex. 807. There is nothing in the record to explain FPS's large crowd estimate, and so the Court gives more weight to PPB's estimate.

Ex. 517; fewer than 10 on the 24th, Ex. 518; 20 on the 25th, Ex. 519; and 15 on the 26th. Ex. 520.

On September 27, following President Trump's Truth Social post regarding the deployment of the National Guard to Portland, the number increased to 60. Ex. 523. On September 28, it grew again to just under 200. Ex. 527. From then until the end of the record evidence on October 15, the maximum crowd size only dipped below 50 twice—on September 19 and October 1—and reached triple digits on six occasions. Ex. 532; Ex. 535; Ex. 542; Ex. 548; Ex. 553; Ex. 558; Ex. 562; Ex. 590. Two of those dates were the result of peaceful, organized protests that moved through the area, including a 1,000-person naked bike ride on October 12. Ex. 548; Ex. 590. With the return of larger crowds since the National Guard callout, local law enforcement has increased resources, as discussed below.

## 2. Number of Federal Officers

This Court received testimony and exhibits regarding the number of federal officers dedicated to protecting the Portland ICE facility throughout the period of interest from June to September 27. On June 11, the first day for which the record provides staffing numbers, there were five federal officers on duty. Ex. 773; Ex. 774. As the protests increased, additional personnel surged to the ICE facility. On June 16, the first FPS officers deployed from other locations around the country arrived in Portland. Ex. 773. For a week thereafter, the total number of federal officers on duty each day fluctuated around 70 to 90, split over multiple shifts. Ex. 773. But after this initial influx, the number of officers on duty hovered around 50 each day. Ex. 773. Notably, that number generally stayed constant throughout July and August even as the number of protesters dropped to an average of 15–30. Ex. 773. As protests decreased further in September, the number of federal officers on duty was reduced, averaging around 35 to 40. Ex. 773. On a regular basis in August and September, there were more federal law enforcement

officers on duty than there were protesters outside the ICE facility. Tr. 10/30/25 558:18–21. On September 28, 120 law enforcement officers were on duty, which this Court finds was in anticipation of a spike in protest activity following President Trump's National Guard deployment announcement. Ex. 866. Following that date, personnel numbers at the ICE facility continued to grow, topping 150 on October 3 and never again dipping below that threshold during the time period that the record covers. Ex. 773. On October 13 and 14, the number of federal officers reached 197, even as the number of protesters had settled at an average daily maximum between 50 and 80. Ex. 874; Ex. 875.

### 3. Lack of Crowd Organization

Based on evidence received regarding the organization and intent of the protesters, the Court finds that the protests were not, by and large, organized, with the limited exception of peaceful, planned, isolated marches that occasionally ended at or passed by the ICE facility. Additionally, the Court gives weight to PPB Commander Schoening's testimony that he has not received any intelligence that the protesters are organized or intend to overthrow the government, Tr. 10/29/2025 95:5–96:3, and therefore finds that no such organization or intent existed.

The Court received evidence about what protesters were wearing, in part to consider whether commonality in dress indicated organization within the protest. From that evidence, this Court finds as follows: Black bloc refers to all black clothing; a "black blocker" is someone dressed in black bloc. *See* Tr. (Hughes) 257:25-258:3. Sometimes, "black bloc" "includes padding [or] armor." 10/29/2025 (Bailey) Tr. 210:8–13. Although some ICE Facility protesters wore black bloc, this Court finds that there was no uniform or common garb among protesters.

On June 13 and 14, approximately one-third to one-half the protesters wore black bloc. Ex. 36. But the number of black blockers generally declined thereafter. Tr. 10/30/2025 365:4-11.[3]

This Court also received limited evidence[4] about "Antifa." From that evidence, this Court finds as follows: At least as it relates to the protesters at the Portland ICE facility, Antifa is an "ideology" and is "shorthand for 'anti-fascists.'" Tr. 10/29/2025 160:8–10. This Court finds credible Commander Schoening's testimony that, at least in Portland, Antifa is not an "organized group where you have membership." Tr. 10/29/2025 160:18–23. He also testified that "Antifa" is a "common term" with "public order professionals," but often there is "overuse of the term incorrectly" and "overgeneralization of the term." Tr. 10/29/2025 160:13–17. Commander Schoening has 23 years of policing experience in Portland and at least 8 years of experience working for PPB's Rapid Response Team. Tr. 10/29/2025 33:25–39:3. Commander Schoening has unique familiarity with organized protest groups and political activists in Portland. In fact, Commander Schoening identified by name several "organized protest groups" in charge of "large marches and demonstrations in the downtown area", including "50501," "PDX," and "Indivisible." Tr. 10/29/2025 95:13–16. Commander Schoening testified that "Antifa" is not an

---

[3] On August 5, 2025, ICE officers circulated internally a digital flyer advertising an "ICE Out of PDX Ongoing Protest" at the ICE facility, which depicted an individual in black bloc and said, "wear PPE." Ex. 1090. This Court heard no testimony about where ICE agents obtained the flyer or whether it was distributed among protesters. Because the documentary and testimonial evidence demonstrates that protesters wearing black bloc diminished after June 14, the Court does not give significant weight to this evidence.

[4] This Court also considers the documentary evidence that it received discussing "Antifa." In an intra-agency email on September 13, for example, ICE officers discuss how a reporter on X (previously Twitter) said that she "has heard ANTIFA talking that ICE agents are the Nazi gestapo who need to be killed." Ex. 1077. This post was not introduced into evidence or discussed at trial. This Court accordingly gives it little weight in its factual findings about the existence of Antifa or its connection to the issues in this case. As discussed, other documentary evidence mentioning Antifa was similarly not relied on at trial.

organized group in Portland; although the city "did have a brief period of time . . . where [it] had a specific group named 'Rose City Antifa.'" Tr. 10/29/2025 160:18–23. Commander Schoening testified that he is "not aware of" Rose City Antifa's "continued existence." *Id.*

For the same reasons, this Court also finds credible Commander Schoening's testimony that "there hasn't been any structured organization or any group in charge of the protest activity down at the ICE facility," including Antifa. Tr. 10/29/2025 95:13-16. Commander Schoening's experience serving in PPB's Rapid Response Team gives him additional expertise in identifying the extent of the organization among Portland protesters.[5] Despite that specialized knowledge, Commander Schoening still testified that there was "some level of organic organization," at the ICE facility protests, but that there was "no organized group dictating everyone's activity or behavior." Tr. 10/29/2025 95:20-24. Assistant Chief Dobson echoed that testimony, particularly in the month of September, when there were "almost festive-type events" occurring at the ICE facility, like "dance parties" and "the naked bike ride." Tr. 10/30/2025 365:4-:11. Accordingly, this Court finds that there was no credible evidence that an organization coordinated the movement or actions of ICE facility protesters.[6]

---

[5] Also relevant to Commander Schoening's ability to determine organized crowd activity is his extensive public order training, including trainings from the national Incident Command System and the Public Order Management Academy. Tr. 10/29/2025 35:23–36:15. He has also attended international conferences on public order policing best practices. Tr. 10/29/2025 36:16–18.

[6] The Court heard brief testimony about radio communication between protesters that it does not find to be reliable evidence of coordination. R.C. testified that FPS could "see [protesters'] communications with radios," and that FPS was "hoping to catch crosstalk" with a "walkie-talkie" in the "Emergency Operations Center." Tr. 10/30/2025 425:5–8. But the only documentary evidence this Court received about those communications postdate the President's federalization of the National Guard, so the Court does not find this communication or testimony relevant to the federalization. *See* Ex. 872; Ex. 873 (duplicate reports from October 2, 2025).

### 4. Minimal Presence of Weapons

The trial testimony and exhibits revealed that during the period of interest, law enforcement confirmed the presence of firearms only three times, excluding times when media personalities showed up with armed security. Ex. 792; Ex. 479; Ex. 496. At no point during the entirety of the protests did a demonstrator point a firearm at a law enforcement officer or use one against any individual. Judging from the record, the Court finds that the presence of firearms was not a material feature of the protests. Reports of firearms were sporadic and isolated, confirmation of them even more so, and use of them nonexistent.

On rare occasions, protesters were observed carrying an assortment of bladed weapons, but only once did FPS report that an individual actually drew a knife on a federal officer. *See, e.g.*, Tr. 10/30/25 526:23-24; Ex. 859; Ex. 1136. On June 24, while an officer was in the process of detaining one protester, another protester threatened the officer with a knife. Ex. 783. The knife-wielding protester was subdued using a taser. Ex. 783. More frequently, the exhibits showed that protesters were observed carrying pepper spray. *See, e.g.*, Ex. 653; Ex. 1131; Ex. 318; Ex. 673. When demonstrators used pepper spray, it was most often used against other demonstrators. *See, e.g.*, Ex. 808. Only once does it appear that a protester deliberately and successfully used pepper spray against a federal officer: on June 10. Ex. 1131. Based on this evidence, the Court finds that the vast majority of protesters did not carry these types of weapons. The Court also finds that these weapons were used so infrequently against federal officers that their impact on the federal government's ability to secure the ICE facility or interference with ICE's ability to perform its law enforcement mission was negligible.

This Court also received evidence about sticks and bats. Commander W.T., who worked on seven-day assignments at the ICE Facility from mid-July to September 21, 2025, testified that that it was "typical" to see protesters at the ICE facility carry bats, improvised weapons, shields,

or ballistic vests.[7] Tr. 10/30/2025 500:22–501:5; Tr. 10/30/2025 Tr. 521:24–522:6. In general, daily law enforcement reports and communications indicate that sticks, bats, and clubs were present at the protests from mid-June through the entire period of interest. *See, e.g.*, Ex. 810; Ex. 848. But there is only a single report of such items being used against law enforcement personnel. On July 20, while an SRT agent was arresting an unruly protester, a second protester struck him in the head with a stick. Ex. 810. Importantly, the FPS 209 form for the day does not record any injuries to law enforcement officers, suggesting that the assault, while unacceptable, did not injure the SRT agent. Ex. 810. Given the extraordinarily minimal frequency with which protesters employed bats, clubs, or sticks as weapons, the Court finds that, while these items may have been intended to intimidate law enforcement, they were generally not intended for use as weapons against federal agents.

Considering the full body of evidence described above regarding the presence and use of weapons by protesters at the ICE facility from early June through late September, this Court finds the following: The vast majority of protesters were peaceful and did not carry weapons. To the extent that weapons were present, they were so rarely used against federal personnel that they constituted no more than a minimal interference with law enforcement operations.

## 5. Decreased Interference with the ICE Building

The Court received evidence at trial concerning damage to and interference with the ICE

---

[7] For example, Commander W.T. testified that "[a]t approximately 1849 hours, a group of 200 to 250 peaceful protesters were observed in front of the building and scattered around the area. Some protesters were seen carrying bats, improvised weapons, shields, or what appeared to be ballistic vests." Tr. 10/30/2025 521:22–522:1. He also testified that he typically saw bats and sticks outside the ICE facility. Tr. 10/30/2025 526:15–17. He testified that the officers always see people that are armed. Tr. 10/30/2025 526:21. Specifically, he recalled some individuals carrying katanas or firearms. Tr. 10/30/2025 526:23–25.

facility resulting from the protests, from which the Court concludes that, following the initial flare-up of protests in June, protester interference with the ICE facility did not meaningfully disrupt the execution of federal law enforcement operations.

The most substantial instance of damage to the facility came in mid-June. Protesters broke a second-floor window at the ICE facility on June 12, and broke several first-floor windows, including the glass on the facility doors, during the period from June 11 to June 15. Tr. 10/29/25 59:13–17, 130:9–16, 216:25–217:3, 10/30/25 406:9–11; Ex. 775. During the same period, protesters threw bottles and bricks at the vehicle gate, temporarily disabling its automated open and close functions. Tr. 10/29/31 55:11–18, 10/31/25 674:1–3; Ex. 657. Similarly, protesters disabled some of the card readers that allowed employees to enter and exit the building. Tr. 10/31/25 674:3–4. On June 12, a small number of protesters lit a fire near the vehicle gate, including inside a large, rolling garbage can, which they then pushed into a large debris pile against the gate. Ex. 657; Ex. 658. They also targeted the building's doors, temporarily barricading some of them closed, even going so far as to put chains on one door on June 14. Tr. 10/29/25 55:15–16, 10/30/25 408:5–6.

To the extent that it lacks corroboration from other sources of evidence, the Court does not find reliable ICE/ERO Field Office Director Wamsley's characterization of the damage to the Portland ICE Facility, which suggested damage was more extensive than that which is reflected in the rest of the record. Director Wamsley testified that she visited the building in July to "survey the damage." Tr. 10/31/2025 672:24–673:7. She described the damage at trial as follows: "all of the windows on the first floor and some on the second and third floor were broken," "[a]ll the doors were broken, the entry doors," and "[t]he gates -- we have these large 15-, 20-foot high, like, steel gates that were broken. They were inoperable." Tr. 10/31/2025

673:20–674:3. There is no credible evidence, however, that all the doors and windows of the ICE facility were broken. No other witness described damage to this degree, including Commander W.T., who was at the Portland ICE Facility every other week the entire summer. Additionally, Director Wamsley testified that she did not know whether there would be any photos of this damage or whether there was any documentation of the repair estimates. Tr. 10/31/2025 711:24–712:4. Director Wamsley also testified that she would "defer to the FPS incident commanders that worked that facility" about the extent of the damage to the building. 10/31/2025 Tr. 712:2–7. FPS's internal records mention only one broken door and two broken windows prior to Director Wamsley's arrival at the ICE Facility. *See* Ex. 918 (summary of ICS 209 exhibits); Exs. 774–78 (ICS 209 exhibits from June 11 to June 15).

A key area of inconsistency at trial was whether protesters ever breached the ICE facility during the height of the protests on June 14. Director R.C. described an *attempted* breach of the building on that date, and Commander W.T. indicated generally that there had been *attempted* breaches at the facility during the period of interest. Tr. 10/30/25 390:22-25; 528:6-7. In contrast, Director Wamsley stated that "[p]rotesters had gotten into our lobby" on an unspecified date on or around June 14. Tr. 10/31/25 673:25. But Defendants themselves disagreed with this assertion, noting in their closing arguments that "there was an *attempted* breach of the facility." Tr. 10/31/25 817:17–18 (emphasis added). FPS reporting from June 14 confirms this conclusion, indicating that protesters broke the front door glass with a barbell and stop sign pole, but including no indication that protesters entered the building. Ex. 777. The Court has already discussed the reasons it does not find reliable Director Wamsley's testimony on damage to the ICE facility. The Court extends that finding to Director Wamsley's testimony on breach of the

facility because it is inconsistent with every other piece of evidence received on the subject. The Court therefore finds that protesters never breached the ICE facility.

In response to the damage to the building, Director Wamsley made the decision to close the facility from roughly June 11 through July 8. Tr. 10/31/25 673:5–674:7. She stated that the non-detained and Alternatives to Detention programs were disrupted, with several appointments cancelled or rescheduled. *Id*. 674:10–17. But especially after staff learned how to open and close the front gate manually, Director Wamsley acknowledged that ICE was able to "process people." *Id*. 676:12-17. Administrative functions continued at an alternate location. *Id*. 677:8–15. Most importantly, by early July, the ICE facility reopened, with its windows and doors boarded shut.

Given Director Wamsley's general lack of reliability on other issues related to the protests, the Court is hesitant to lean too heavily on her testimony here. However, the Court does conclude that partial building closures likely caused a moderate disruption to law enforcement operations during the period of the partial closure, and notes that this period ended nearly three months before the National Guard callout.

Incidents of damage to the ICE facility diminished rapidly and substantially after the flare-up in June. Those incidents were largely limited to graffiti and occasional attempts to again damage the card reader. *See, e.g.*, Ex. 785; Ex. 788; Ex. 792; Ex. 802; Ex. 825. The most notable incidents of protester interference with use of the building after June 14 was on June 24 and 25. On June 24, an individual protester attempted to chain the front gate closed but was chased away by federal officers. Ex. 783; Ex. 1011. On June 25, an individual protester tried unsuccessfully to block the gate "with a chain link fence panel but other demonstrators self-policed the subject and removed the panel." Ex. 784.

Additionally, in the period from July to September 27, protesters routinely walked, stood, and sat in the driveway, often in an attempt to prevent vehicles from passing. *See, e.g.*, Tr. 10/30/25 507:6-10; Ex. 361; Ex. 780; Ex. 789; Ex. 826; Ex. 1029. Sometimes, they would hit passing cars with their hands, feet, or other objects. *See, e.g.*, Tr. 10/30/15 511:25–512:1 Ex. 827. Less often, but still on a regular basis, they threw debris on the driveway, occasionally including sharp objects that they hoped might puncture a vehicle's tires. *See, e.g.*, Ex. 357; Ex. 807; Ex. 814; Ex. 815. Despite this conduct, federal officers were regularly able to move vehicles in and out of the facility, clearing protesters through the use of verbal warnings, physical "push-outs" and, when necessary, chemical agents. *See, e.g.*, Tr. 10/30/25 507:6–10, 510:2–511:12; Ex. 827; Ex. 847. Indeed, Commander W.T. testified that, in every instance of which he was aware, federal law enforcement was sufficient to allow vehicles to come and go from the building. Tr. 10/31/25 584:17–20.

Given the steady decline in obstructive conduct, its sporadic nature throughout the months of July through September, and the federal government's ability to continue operations, the Court concludes that Protesters' efforts to damage or obstruct access to the building caused, at most, minimal interference with the federal government's ability to carry out immigration and removal operations over the months preceding September 27, 2025.

### 6. Lack of Violence Towards Federal Officers

The level of violence directed towards federal personnel during the ICE facility protests ranged from offensive verbal attacks to occasions of physical violence involving concerning conduct, which were generally resolved quickly and without significant injury. Such violence towards federal officers began around June 11, peaking between June 12 and June 15 before beginning to gradually decline. *See, e.g.*, Ex. 775; Ex. 777. Much of that violence came in the form of thrown objects, particularly rocks. Tr. 10/29/25 133:23-134:1; Tr. 10/30/25 390:18-20;

Ex. 669; Ex. 777; Ex. 778. Some of that violence resulted in physical injury, with FPS reporting in block 15 of their daily incident summaries (form 209) that there were three injuries to federal officers on June 11, three injuries on June 12, three injuries on June 13, and one injury on June 16. Ex. 774; Ex. 775; Ex. 776; Ex. 779.

Defendants' witnesses and the contemporaneous reports of federal agencies paint an uneven picture with respect to the fact and severity of injuries to federal officers during this time. Commander W.T.'s testimony was internally inconsistent. *Compare* 10/30/2025 Tr. 553:13–16, with 10/30/2025 Tr. 553:21–554:3. He did not testify about the nature of physical injuries that required medical attention, and the defense did not provide any photos or videos depicting such injuries to officers, despite the fact that the ICE facility had working security cameras that captured the relevant protest and criminal activity in the relevant time period. 10/30/2025 Tr. 554:17–20. Additionally, Director R.C. testified that, on June 14, two officers were injured by fireworks that protesters threw at the facility, and a third officer was hit in the head with a thrown object – presumably a rock. Tr. 10/30/25 408:10-18. But the FPS 209 report from that day indicates no injuries, which suggests none of these three injuries were significant. Ex. 777.

Furthermore, PPB reporting from June 14 show additional inconsistencies in the federal government's version of events. PPB Captain Schoening's activity log documented: "ICE calling saying they are barricaded in the building and fire lit. Difficult to get accurate information from them. What they say is happening is frequently contradicted by video feeds and subsequent activity. Air 1 shows no fire." Ex. 327. Also, shortly after they reported being barricaded, PPB observed an FPS employee exit a door and noted that FPS "ha[d] been using th[at] door regularly for employee ingress/egress. Th[at] door was reported earlier to be barricaded." Ex. 327. FPS reported a fire to PPB, Ex. 376, but the "fire" turned out to be candles lit for a vigil set up by

demonstrators, Ex. 376; Ex. 377. Again, Defendants offered no photo or video evidence from the ICE Facility on June 14, despite R.C.'s testimony that the Facility has security cameras. Because of these contradictions, and because of PPB's deep experience in managing crowds and protests in the City of Portland, as well as this Court's ability to observe and evaluate the demeanor of witnesses, this Court finds PPB's version of events more credible.

After the mid-June peak, physical violence directed at federal officers declined rapidly and substantially. Indeed, by the end of June, most of this violence was rhetorical. Protesters persistently made verbal threats to FPS and ICE personnel. R.C. testified that "threats from the crowd in terms of the verbal threats" played a role in determining when federal agents used chemical agents to control the protests, while W.T. testified to ongoing threats of physical violence. Tr. 10/30/25 451:14–24, 525:15–23.

The 209 reports detail threatening comments directed at federal personnel on an isolated and sporadic basis throughout July and early August, with the frequency of such comments slowing even further in September. *See, e.g.*, Ex. 815; Ex. 817; Ex. 855. None of these threats ever matured into action. For example, on August 7, a woman who had earlier that day complained to FPS that the people running her son's assisted living facility were smuggling dynamite reapproached FPS to state that "[t]here is a Bomb in this building!" Ex. 825. Though the woman's comments suggested that she was mentally unwell, out of an abundance of caution, FPS requested PPB assistance in searching the facility for any explosives. Ex. 466. PPB performed a sweep of the facility with a bomb-sniffing canine, while FPS checked security cameras to ensure the woman had not placed anything in close proximity to the building. Ex. 825. No explosives were found in or around the building. FPS again felt the need to request assistance from the PPB's bomb squad on August 18 when a female protester abandoned her car

in the driveway, despite no indication that the vehicle contained explosives. Tr. 10/30/25 516:5–25; Ex. 835; Ex. 479. Again, out of an abundance of caution, PPB responded, searched the car, and subsequently removed it, finding no explosives. Tr. 10/29/25 161:8–18; Ex. 835.[8]

Consistent with the overall trend of increases in protester activity on holidays, on Labor Day, protesters set up a prop guillotine in front of the ICE facility, which was alarming given previous protester statements that federal officers "deserve[d] to be decapitated." Tr. 10/30/25 524:12-525:23; Ex. 827; Ex. 847. But this incident, too, never evolved into physical violence.

In mid-September, there were two tips that suggested additional threats of potential violence. On September 13, a caller contacted PPB about an email they had received with social media screenshots about a shooting that was going to happen that night. Ex. 506. On the same day, they received a call expressing concern that a known instigator was planning to pick a fight with protesters in order to shoot them. *Id*. PPB informed FPS and investigated. Ex. 859. In a little over an hour, the social media post had been taken down, and no shooting occurred at the protest. *Id*. On September 19, HSI Portland reported that they had received a tip from the HSI tipline about a potential bomb threat to the ICE facility. Tr. 10/31/25 681:17–682:8; Ex. 1072. But while ICE reports indicated that the tip was passed to FPS, the FPS reports from that day include no mention of a bomb threat. Ex. 864; Ex. 1072. Additionally, PPB was similarly not informed. Tr. 10/29/25 74:2–4. Given that neither the agency charged with protecting the facility nor the

---

[8] On one other occasion, law enforcement officials had to remove an abandoned vehicle. On June 15, during the height of the protests, a green van was abandoned in the driveway and subsequently searched for explosives. Ex. 1064. There is no reporting to indicate that there was a specific reason to believe that the van contained explosives, and the record does not reflect that explosives were found, so the Court assumes that the search was conducted out of an abundance of caution.

agency charged with policing the surrounding area took note of the tip, this Court finds that FPS determined that the tip was not credible.

Lower-level violence decreased over the period from mid-June to late September. FPS reported eleven injuries in June, four in July, six in August, and none in September. Ex. 918. The most egregious physical assaults on federal personnel after June occurred on Independence Day. On that date, a protester kicked an SRT agent, which the agent described as a "10 out of 10" on the pain scale. Ex. 1023; Ex. 1024. The physical violence discussed in law enforcement reports, including incidents that resulted in injury and those that did not, often revealed that violence to be of low intensity. For example, on July 13, an FPS officer pulled a groin muscle while taking a resisting suspect into custody. Ex. 803; Ex. 1129. On September 18, an FPS officer and a protester pushed against each other while the FPS officer was conducting a push-out to clear the driveway, causing the officer's shield to hit the officer in the face. Ex. 863. In some cases, FPS recorded an injury to a federal officer in its daily report but provided no additional detail as to its nature. *See, e.g.*, Ex. 822; Ex. 845. Additionally, protesters intermittently shined high-powered lights in the eyes of federal officers, causing disorientation and temporary blindness, but no lasting injury. *See, e.g.*, Tr. 10/30/25 532:1-12; Ex. 826; Ex. 850.

The Court also received evidence that federal officers in Portland were victims of doxing and online harassment. Commander Hughes testified that he "heard" that federal officers at the ICE Facility were doxed. 10/29/2025 Tr. 251:4–15. R.C. testified that it was "not uncommon to be filmed going in [and] going out" of the ICE Facility, and for protesters to "get[ ] license plate numbers, to the point that we see flyers coming out, saying, you know, 'Let's organize at such a hotel'—hotels where FPS or supporting agencies are staying." 10/30/2025 Tr. 425:13–17. On rare occasions, federal personnel were followed when leaving the building. For example, on July

26, a protester followed an ICE SRT officer to the Hilton Garden Inn. Ex. 816. On September 13, a "vehicle beg[an] following" an ICE Deportation Officer "at some point from leaving the Portland, OR [ICE] office and crossed state lines following him honking and swearing at him." Ex. 1073.[9] In addition to the evidence about demonstrators photographing and occasionally following federal personnel, the Court received documentary evidence referencing "doxing flyers," although importantly, no doxing flyer[10] was ever entered into evidence. *See, e.g.*, 10/30/2025 Tr. 425:13–17; Ex. 1066; Ex. 1071. The Court also received documentary evidence of doxing social media activity.[11] *See, e.g.*, Ex. 1065. In consideration of this evidence, the Court finds that, while the instances of doxing were among the only categories of threat to federal officers that continued after June, there is insufficient evidence to credibly link these instances of violence to protesters at the ICE Facility.

  In total, the above-described events illustrate isolated instances of real and threatened violence towards federal officers. The Court finds that those instances peaked in mid-June and declined rapidly, remaining at a low level throughout July, August, and September, with sporadic

---

[9] The Oregon-Washington state line is over nine miles north of the ICE Facility.

[10] The Court did receive flyers opposing ICE or immigration policies in general. *See* Ex. 1068 ("No peace for ICE!" and "From Palestine to Mexico, border walls must go."); and Ex. 1081 ("Families belong together! End the Separations!" advertising a "Latin Dance Fundraiser" for "families impacted by ICE" at a park approximately half a mile from the ICE Facility).

[11] The Court received one copy of a social media post in evidence. It is an Instagram post depicting two photos. Ex. 1074. The first is a car with a visible license plate. *Id.* at 5. Text overlaying the photo lists the car's make, model, and license plate number, and the text: "Keep an eye out for this van as it has been seen on multiple occasions. Carrying kidnapped people and outside of PDX ICE". The second photo depicts an officer driving the car. *Id.* at 4. He is wearing a face mask and plain clothes. *Id.* Text overlaying the photo says: "Hi! I 'allegedly' LIKE to detain and kidnap PEOPLE and have been seen on multiple occasions kidnapping them in this van." *Id.* Commentors are depicted identifying the officer's location ("He's in Salem") and making threats towards the officer ("Kill it"). *Id.* at 6-7. This Court heard no testimony about the post, the poster, or the commenters.

but manageable threats and incidents of non-life-threatening violence typical to public protest events.

Taken together, these events caused no more than a minimal interference with the federal government's ability to carry out immigration and removal operations over the months preceding September 27, 2025. After the callout, while the size of the protests did briefly flare, the violence directed at federal officers did not substantially increase. The 209 reports indicate only two dates after the 27th where federal officers were injured. On September 30, the block 10 narrative indicates one injury, though that is not reflected in the block 15 injury total. Ex. 869. On October 13, FPS reported that an inspector had been injured the previous day but gave no further information. Ex. 874.

### 7. Protestor-on-Protestor Confrontations

This Court finds that many reported disturbances at the ICE Facility after July 4 did not involve law enforcement at all. This Court also received evidence regarding disruptive behavior between individuals within the vicinity of the ICE building since June. Specifically, this Court received evidence regarding altercations between protesters and counter-protesters. Based on that evidence, this Court finds the following: Violence between protesters and counter-protesters occurred outside the Portland ICE building from June to September 27, 2025, but had, at most, a minimal effect on federal law enforcement's protection of the building and federal personnel.

Trial evidence reflects occasional skirmishes between protesters and counter-protesters in the vicinity of the ICE facility. These altercations were not targeted at ICE personnel or staff. FPS did not document any officer injury or building damage that occurred as a result of protester-counter-protester altercations. Defendants called attention to two incidents in September that warrant further explanation. FPS Commander W.T. testified that on September 6, 2025, "officers observed a confrontation between demonstrator and counter-demonstrator." Tr.

10/30/2025 529:19–530:4; Ex. 852 at 5. The confrontation occurred on city property. Tr. 10/30/2025 530:3–11; *see* Ex. 852 at 5. The contemporaneous FPS report does not detail if FPS attempted to intervene or about how this incident affected security of the building.

The only example Defendants highlight of an altercation between protesters and counter-protesters which even marginally affected FPS operations took place on September 9, 2025. Just after midnight, approximately ten protesters surrounded a counter-protester. Tr. 10/29/2025 262:8–10; Tr. 10/30/2025 534:14–22. One protester "physically harassed" the counter-protester, and "another used a high-powered flashlight to shine into [the counter-protester's] eyes." Tr. 10/30/2025 534:21–25; Ex. 855 at 4. FPS called PPB multiple times. Ex. 855 at 4–5; Tr. 10/30/2025 535:2–17. Within thirty minutes of the first call, PPB drove by and "did not perceive the counter-demonstrator to be in distress or at risk of bodily harm." Ex. 855 at 5. The altercation continued, and FPS called for PPB's help multiple times. *Id.* FPS eventually pushed protesters back to allow the counter-protester to exit the area. *Id.* This altercation occurred off federal property, Tr. 10/30/2025 535:18–22, and FPS reported no injuries, *see* Ex. 855. Defendants have presented no credible evidence to suggest this altercation affected federal law enforcement's ability to protect the ICE building. Taken together, these and like events caused, at most, minimal interference with federal law enforcement's ability to protect the ICE building from June to September 27, 2025 or perform their law enforcement mission.

**E. Portland Police Bureau's Response**

From June to October 2025, PPB's response to the protests has evolved in two respects. First, PPB has repeatedly dedicated increased resources to the block around the ICE facility during expected or actual spikes of activity. The timeline of how PPB implemented these models over the summer show PPB's determination of the intensity and risk of unlawful protester activity in the block around the ICE facility at a given time period. PPB's response shows that

the protest activity peaked in mid-June and was manageable with only precinct-level resources from mid-July to September. Second, PPB's response shows that PPB carried out its duties to enforce law and order on public property around the ICE Facility, even within the limitations of the Oregon's Sanctuary Promise Act. PPB has been responsive to ICE's calls for serious criminal activity. PPB has made arrests for even minor criminal violations, and PPB's refusal to clear the ICE Facility's driveway does not demonstrate that PPB is unable to manage potentially large crowds or violent conduct.

### 1. First Weeks of the Response: Mid-June

PPB began monitoring protest activity around the ICE facility no later than June 8, 2025. Ex. 310. By June 11, PPB determined that criminal activity in the block around the ICE facility required a dedicated Crowd Management Incident Commander (CMIC) and an activated Incident Management Team. Tr. 10/29/2025 49:6–21; Tr. 10/29/2025 51:20–52:10; Tr. 10/29/2025 54:6–14. The CMIC is a commander with extensive experience in public order policing and crowd management, and one of the CMIC's role is to tailor PPB's response to the evolving situation on the ground. Tr. 10/30/2025 315:7–16. The CMICs are trained to take "a layered approach" to public order by using dialogue officers, bike officers, undercover officers, and a dedicated "hard squad" as needed to de-escalate crowd tension. Tr. 10/29/2025 277:8-278:18.

PPB utilized this "Crowd Management Model" to respond to the activity at the ICE Facility from June 11, 2025 to June 25, 2025, Tr. 10/29/2025 49:24–50:5; *see* Tr. 10/29/2025 50:17–25, and when the situation called for more resources, PPB activated additional resources. On the worst day of the protests, June 14, 2025, PPB called on the Oregon State Police's Mobile Response Team for mutual aid assistance that day to bolster PPB's response to the events on the ground. Tr. 10/29/2025 190:15–191:5. By June 25, however, the "nightly events had calmed

significantly," and the facility no longer required those dedicated resources. Tr. 10/29/2025 274:18–25; Tr. 10/29/2025 50:19–25.

In the first month or so of the response, PPB and FPS communication was sporadic, resulting in clear communication on some days, and miscommunication on others. For example, on June 14, 2025, the day of the declared riot, PPB was not able to corroborate the reports from federal officers or collect enough information from them to appropriately respond. PPB Commander Schoening testified that communication with FPS that day was "challenging," because federal officers "were providing information that wasn't really actionable or specific enough for us to find a way to intervene right away." Tr. 10/29/2025 59:18–24. Additionally, the officers were giving PPB "inaccurate" information, "based on things [PPB was] able to corroborate through different sources, including [its] airplane." Tr. 10/29/2025 59:25–60:5. The federal officers communicating with PPB were officers "who were clearly operationally deployed or tactically deployed" and some "with limited situational awareness." Tr. 10/29/2025 59:18–21. Some of these officers were wearing gas masks. Tr. 10/29/2025 59:18–21. Even on the FPS side, Director R.C. explained that those masks made it difficult to hear and understand the officers. Tr. 10/30/2025 407:14–19. This Court finds that the lack of communication between the command posts hurt PPB's ability to assist FPS with identifying and intercepting criminal behavior in the crowd on June 14.

However, PPB made immediate efforts to resolve this issue. On June 15, 2025, PPB Assistant Chief Dobson instructed officers that "[i]t is imperative we maintain direct communication with the FPS at all times." Ex. 770 at 2. PPB's policy change plays out in the record evidence. On June 17, 2025, a PPB report states, "Tonight we had a much more deliberate approach to maintaining an open line of communication with [federal officers], which resulted in

no miscommunications about activity occurring inside and outside the facility." Ex. 344 at 3. The next day, June 18, 2025, PPB was in communication with FPS. The PPB commander on duty received a text from an FPS officer that someone was throwing cans at the federal officers. Ex. 347 at 1.[12] PPB investigated the matter and found that the cans "may not be full" and were landing 10-15' away from the officers. *Id.* PPB determined there was only probably cause for Offensive Littering. *Id.*

During this time period, PPB also first began navigating constraints on its response under Oregon's Sanctuary Promise Act. PPB interprets Oregon's sanctuary laws to "prohibit police activities related to immigration enforcement." Ex. 326 at 3. In the first week or so of PPB's response, it set an abnormally high threshold for police intervention. Officers were instructed to respond to "life safety" situations, as in situations where there is a means for and immediate likelihood of serious physical injury or death. Tr. 10/29/2025 44:23–45:12; Tr. 10/29/2025 256:25–257:4.

After the riotous activity on June 14, 2025, PPB revised its guidance on the appropriate arrest threshold. In an internal email on June 15, 2025, Assistant Chief Dobson provided guidance to officers that "criminal activity must be addressed appropriately and in a targeted manner." Ex. 770 at 1. Officers were instructed to address "both misdemeanor and felony-level crimes on and near the ICE facility." *Id.* at 2–3. PPB also met with FPS incident command on June 15, 2025 to make the commitment that PPB would arrest for all person and property crimes. Tr. 10/29/2025 63:1–17. PPB made several arrests from June 15 to June 18 as the protest and

---

[12] The Court finds that Exhibit 347 is a report for the events on June 18, 2025 even though it is dated June 11, 2025. The events described and the command officers named in Exhibit 347 match other reports from June 18, 2025, *see* Ex. 346, 349, and does not match other reports from June 11, 2025, *see* Ex. 313; Ex. 314. Exhibit 301-2 also dates Exhibit 347 to June 18, 2025. Ex. 301-2 at 1.

criminal activity subsided, including for arson, attempted assault, reckless driving, criminal mischief, and criminal trespass. Ex. 306 at 3–4.

### 2. Refining the Approach: Mid-June to Late September

From roughly June 26 to July 17, 2025, PPB implemented a new model (the "Watch Command Model") to demobilize some resources in response to the slowing activity. *See* Tr. 10/29/2025 68:1–4. The Watch Command Model ensured that someone of sufficient rank monitored activity around the ICE facility each day to assess whether or not PPB needed to activate additional resources. Tr. 10/29/2025 51:17–52:10; Tr. 10/29/2025 52:17–20; Tr. 10/28/2025 66:7–15; Tr. 10/29/2025 69:25–70:6. To this end, the Watch Commander on duty was expected to reach out to FPS at the beginning of the commander's shift each night. Tr. 10/29/2025 68:23–69:24.

During this period, PPB only escalated its resources to the Crowd Management Model once, on July 4, 2025. Tr. 10/29/2025 70:7–11. On July 4, PPB was in contact with FPS but reported that communication was still limited. Ex. 410 at 1. PPB reported that it did not receive specific enough information from FPS related to crimes occurring or suspect descriptions. *Id.* Therefore, PPB was less able to provide support to federal officers or arrest those committing crimes. *See id.* By July 17, PPB determined that even the Watch Command Model was not required to manage the incidents around the ICE facility. Tr. 10/29/2025 72:14–23. Responsibility for monitoring events around the ICE facility was transferred to Central Precinct, the PPB precinct that covers the ICE facility. Tr. 10/29/2025 72:14–23.

From July 17 to September 27, PPB utilized the third model (the "Precinct Model") to demobilize the watch commander and delegate nightly monitoring to Central Precinct sergeants. *See* Tr. 10/29/2025 134:18–135:6. Under the Precinct Model, PPB Commander Hughes testified that he directed the sergeants monitoring the ICE facility to contact a federal officer in charge

during the sergeants' shift every night. Tr. 10/29/2025 231:6–13. FPS Commander W.T., who was at the ICE facility roughly every other week from mid-July to September 20, corroborated this testimony. Tr. 10/30/2025 501:6–8; Tr. 10/30/2025 548:1–6. Commander W.T. testified that nightly communications were instigated by the PPB sergeants to ensure that FPS had a point of contact with PPB if anything were to arise. Tr. 10/30/2025 548:1–6. From July 17 to September 27, Central Precinct never escalated resources for the ICE facility back up to either the Watch Command or Crowd Management Model.

As related to the time period immediately before the President's callout of the National Guard, this Court heard testimony from FPS officers that PPB does not respond to their requests and that FPS stopped calling PPB altogether.[13] The Court does not find this testimony to be credible. FPS did call PPB for help, and PPB routinely responded to these calls for help. One example is PPB's response to the suspicious abandoned vehicle left near the ICE facility on August 16, 2025. FPS Commander W.T. testified that the Portland Metro Explosive Disposal unit responded "really fast." Tr. 10/30/2025 549:2–6. The FPS report from that day shows that the response included an Explosives Detection Canine Team responding on scene roughly half an hour after the vehicle was abandoned. Ex. 835 at 5. No bomb was discovered, and the vehicle was later towed. *Id.*

The Court recognizes that in regard to some minor calls for assistance, PPB did not respond as quickly, forcefully, or at all. For example, PPB officers have been instructed not to

---

[13] *See* Tr. 10/30/2025 387:25–388:17 (FPS Director R.C. suggesting that he would not get the same kind of support in Portland as he received in Spokane, Washington, where Spokane Police Department and "eight other neighboring agencies came up" when there was "a sporadic but very large protest at the ICE Facility"); Tr. 10/31/2025 586:5–18 (FPS Commander W.T. stating: "It has become common knowledge that Portland Police Bureau is not going to respond to assist us with the protest activity at the ICE facility.").

remove debris from ICE property and not to facilitate federal vehicles coming or going to the ICE facility because "PPB involvement may be construed as assisting federal immigration enforcement." Ex. 770 at 3; *see* Tr. 10/29/2025 110:5–111:4. Without PPB's direct assistance, federal law enforcement has successfully facilitated vehicles coming and going from the ICE facility.[14]

Even though PPB will not support immigration enforcement, PPB can directly assist federal officials at the ICE facility when there is a life-threatening situation, an actual physical injury, or something similar. Tr. 10/30/2025 369:1–5. There is no basis to conclude the PPB will not assist federal officers in danger just because PPB does not assist FPS in clearing the driveway for vehicles routinely entering and exiting the ICE facility.

Apart from clearing the driveway, in another example, FPS frequently called PPB about disputes between protesters and counter-protesters that were occurring on public property, and PPB could not always prioritize responding to those disputes immediately. *See, e.g.*, Ex. 809 at 5–6; Ex. 855 at 4–5; Ex. 864 at 5–6. For example, on September 9, 2025, when federal officers reported a counter-protester in distress surrounded by 10 protesters, PPB drove by within 30 minutes and "did not perceive the counter-demonstrator to be in distress or at risk of bodily harm." Ex. 855 at 4–5. FPS called PPB approximately 6 times that night for the counter-protester. *Id.* If the counter-protester was ever injured by the events occurring that night, FPS did not report it.

---

[14] FPS Commander W.T. testified that in every instance he is aware of, federal law enforcement present at the facility has been sufficient to allow vehicles to come and go. Tr. 10/31/2025 584:11–20. He testified that he is not aware of any instance of federal vehicles actually being blocked from entering and exiting the ICE facility. Tr. 10/29/2025 116:13–18.

### 3. Post-Callout PPB Response

PPB's response since the President's callout further underscores that PPB can and does fulfill its role of enforcing state and local law on public property. When crowds began to increase in the weeks immediately following the President's callout of the National Guard, PPB escalated its response. From September 28 to October 23, 2025, the last day for which PPB's police reports are in the record, s*ee* Ex. 301-2 at 3, PPB has used the Watch Command Model to respond to the ICE facility, as needed, to manage any swells in crowd size or illegal activity. Tr. 10/29/2025 75:5–13 (days following September 28); Tr. 10/29/2025 108:11–2 (October 8).

Since September 28, PPB has continued to reach out to federal officers each night to make sure that federal officers have a point of contact with a liaison officer in the command post. Tr. 10/29/2025 79:16–23; Tr. 10/29/2025 547:25–548:6. To sustain this heightened surveillance since September 29, PPB has called on the Oregon State Police's Mobile Response Team for the first time since June and requested support for anticipated large events in October or to alleviate staffing shortages within PPB. Tr. 10/20/2025 192:11–193:8; (staffing relief for October 6 to October 11, 2025); Ex. 38 (coverage for second No Kings Protest on October 18); *Id.* (staffing relief for October 23 to November 5, 2025).

PPB has made several more arrests since the protest and criminal activity has flared back up somewhat in October, including for disorderly conduct, harassment, and offensive physical contact spitting. Ex. 306 at 4, 5. Even FPS Director R.C, who was skeptical of PPB's willingness or ability to respond,[15] recognized that PPB came out "in force" to the ICE facility around

---

[15] FPS Director R.C. speculated that he would not get the same kind of support in Portland as he received in Spokane, Washington, where Spokane Police Department and "eight other [local law enforcement] agencies came up" when there was a "sporadic but very large protest at the ICE Facility." Tr. 10/30/2025 387:25-88:17. The Court finds this testimony regarding how PPB will respond to very large protests in the future speculative and inconsistent with the evidence presented at trial.

October 25 and "did a phenomenal job" clearing camps and enforcing all laws, even the minor violations like blocking the sidewalks and jaywalking. Tr. 10/30/2025 426:20–427:2. It is not clear if Director R.C. is aware that PPB has repeatedly cleared out these camps throughout the summer. Ex. 337 (June 16); Ex. 403 (shortly before July 3); Ex. 813 (July 23); *see also* Tr. 10/29/2025 228:14–19; Tr. 10/29/2025 237:3–7.

**F. Federal Protection of the ICE Building**

This Court received evidence regarding federal law enforcement's ability to protect the ICE Facility and its personnel. Specifically, this Court received evidence regarding how FPS and other relevant federal law enforcement agencies receive assistance from additional officers, how officers secured the Portland ICE building prior to the callout, and how the federal government deployed the Oregon National Guard when there were untapped federal law enforcement resources.

Trial evidence showed that FPS reassigns officers as needed and has support from other law enforcement agencies. Generally, FPS sources additional support "from within" the agency. Tr. 10/30/2025 386:24–387:4. R.C. testified that he could "source . . . from areas within [his] region that are not affected by any kind of civil unrest, and . . . bring officers in." Tr. 10/30/2025 387:5–8. If the exigency is larger than the region can handle, FPS can request inspectors from other parts of the country. Tr. 10/30/2025 387:9–16. Some federal agencies also assist with protecting federal buildings with which they have some connection—for example, ICE officers can be called on to protect an ICE facility. *See* Tr. 10/30/2025 388:18–389:9. FPS also relies "a lot on [its] partnerships" with "local law enforcement." Tr. 10/30/2025 387:17–24.

R.C. testified that staffing issues at FPS are a nationwide problem. Tr. 10/30/2025 440:22–441:2. R.C. testified that FPS has had chronic staffing issues and challenges in Oregon since 2020. Tr. 10/30/2025 487–88. Federal agents may be cross designated for FPS operations

under 40 U.S.C. § 1315. R.C. testified that this is the statutory authority used for ICE and U.S. Customs and Border Protection ("CPB") officers to participate in Operation Skipjack. Tr. 10/30/2025 474:23–475:6. The federal government has 80,000 DHS law enforcement officers. Ex. 27. Over 4,500 are already authorized to perform the duties of FPS officers as of 2020. Ex 30 at 21; *see also* Tr. 10/30/2025 477:15–19. And 576 were cross designated to deploy in Portland in 2020. Ex 30 at 10.

Additional federal officers were deployed to Portland starting in June of 2025. Ex. 773. The number of federal officers first increased from June 14 to June 15, and more than doubled between September 27 and September 29, 2025. *Id.* R.C. testified that he does not "know how the surge" of federal officers to Portland "happened, in terms of the planning process for that," because he "just receive[s] the information" about the number of officers coming to him and from which agency they will be deployed (e.g., from CBP, Bureau of Prisons, etc.). Tr. 10/30/2025 395:15–396:4. The officers used to come for 30-day rotations, but FPS "started changing the duration of the deployments down to 20 days . . . [m]ostly for the mental health of the officers." Tr. 10/30/2025 396:8–397:8. R.C. does not remember when the length of the rotations changed, however, nor does he remember the month. Tr. 10/30/2025 397:19–398:4. However, FPS changed the timeframe because officers were experiencing "fatigue and . . . stress" from being "in close proximity with participants outside of the federal facilities daily," and "working overtime." Tr. 10/30/2025 386:5–8. R.C. testified that based on officers' longer 10-hour and 12-hour shifts, as opposed to the usual 8-hour shifts, and the mental toll of protesters' using "racial slurs," he did not believe that it was "sustainable to surge this many FPS officers to Portland." Tr. 10/30/2025 397:9–398:9. "[R]ight around June 14," FPS decided that it would have a 24-hour law enforcement presence at the ICE Facility. Tr. 10/30/2025 399:4–16.

ICE decided to shift resources from the larger Seattle ICE ERO office to the Portland ICE facility. Director Wamsley testified that the ICE ERO Seattle field office diverted resources to support the protective mission at the Portland ICE Facility. Tr. 10/31/2025 684:14–16. The Seattle office sent seven out of eight of its Special Response Team ("SRT") members to "conduct FPS appended duties" at the Portland ICE Facility. Tr. 10/31/2025 684:7–20.

Trial evidence demonstrates that federal officers were able to keep the ICE building secure despite resource strain. Commander W.T. testified that, "[i]n every instance" he is aware of between mid-July and September 20, "federal law enforcement present at the facility has been sufficient to allow vehicles to come and go" from the ICE Facility. Tr. 10/31/2025 584:11–20. Additionally, "despite having [a] point of contact" at PPB, Commander W.T. "did not typically call these sergeants to request help" at the ICE Facility. Tr. 10/30/2025 548:4–9; *see also* Tr. 10/31/2025 586:5–10. Finally, Director Wamsley testified that she didn't "know of any criminal activity that federal officers couldn't manage" at the ICE Facility. Tr. 10/31/2025 712:25–713:2. To that end, Director Wamsley also testified that she didn't "know if there's any correlation between an increase in staff and a decrease in protest activity." Tr. 10/31/2025 711:1–4.

In fact, on June 15, 2025—the day after the most violent protests at the ICE Facility—the FPS District Commander for Region 10 sent an email to the Portland ICE office's Assistant Field Manager and several ICE, DHS, and FPS personnel, stating: "FPS and partner agencies anticipate having sufficient law enforcement personnel to respond to criminal activity from this point forward." Ex. 63 at 3. Both FPS Deputy Director R.C. and Director Wamsley received that email. *Id.* FPS explained that it was "establishing LE [law enforcement] coverage plans to provide onsite and offsite response elements to meet the current threats." *Id.* Notably, FPS said that it had "sufficient law enforcement personnel" while explicitly acknowledging the additional

strain on resources caused by the vehicle gate being broken. *See id.* ("In its current state, [the vehicle gate] is requiring large numbers of personnel to open and close the gate, while also providing security to complete this task").

Trial testimony revealed that federal officials who were in charge of protecting the ICE facility were not consulted about calling up the National Guard and did not request the Guard. FPS Deputy Director R.C. testified that he was "surprised" to hear that the guard had been federalized. Tr. 10/30/2025 466:14–467:9.[16] R.C. never requested National Guard to be deployed to Portland. Tr. 10/30/2025 467:13–15. R.C. testified that he did not know what he would do with 200 members of the Guard. Tr. 10/30/2025 467:–12. Commander W.T., however, testified that calling out the National Guard to assist FPS with securing the ICE facility would be helpful. Tr. 10/30/2025 545:6–17. He explained that when FPS officers are deployed at the ICE facility, they're not fulfilling the mission of their typical assignments. Tr. 10/31/2025 Tr. 545:21–25. Commander W.T. testified that to him, "it's a manpower and resource issue." Tr. 10/31/2025 546:3-4.

Other evidence presented showed that the federal government has law enforcement untapped capacity that can be directed to Portland in response to conditions. For example, DHS Secretary Kristi Noem recounted on Fox News that she met with Portland Mayor Keith Wilson

---

[16] The federal officials involved with the federalization of the National Guard had little, if any, familiarity with the situation on the ground in Portland. As explained, Major General Rieger was directed to write the memorandum requesting federalization (Ex. 1048) by the office of the Secretary of War, Tr. 10/31/2025 612:11–18, but he has never worked in Oregon, has never been to the ICE facility in Portland, Tr. 10/31/2025 620:12–14, and therefore had no personal knowledge of the situation on ground when he wrote the memorandum, Tr. 10/31/2025 610:24–611:1; Tr. 10/31/2025 612:19–21. On cross-examination, Major General Rieger testified that he was not brief on conditions at the ICE Facility before he wrote the memorandum, Tr. 10/31/2025 620:23–621:3, and that the only information he had about conditions at the ICE Facility were from news and social media, President Trump's Truth Social post, and reading this Court's TRO Opinion and Order, ECF 54. Tr. 10/31/2025 611:13–612:4; Tr. 10/31/2025 621:4–7.

on October 7, 2025 and said that "if he did not follow through on some of these security measures for our officers, we [are] going to cover him up with more federal resources and that we [are] going to send four times the amount of federal officers here so that the people of Portland could have some safety, they could have some security." Ex. 59. Secretary Noem told commentator Jesse Waters that "it is our federal CBP and ICE officers that are cleaning up this city, and every single day they're going to stay dedicated to doing that." *Id.* R.C. also testified that he was not aware of any agencies that have declined to provide help to the ICE Facility. Tr. 10/30/2025 445:8–13.

## G. ICE's Ability to Enforce Immigration Law

The Court finds that there is no credible evidence that protest activities at the ICE facility created more than a minimal interference with Defendants' ability to enforce Title 8 immigration laws in Portland. Director Wamsley testified herself that "altercations between protesters" do not "inhibit the execution of federal immigration law." Tr. 10/31/2025 702:15–18. Nor did the closure of the ICE Facility in June more than minimally impede enforcement of Title 8 immigration laws. When the ICE Facility was closed, it was not "completely inaccessible during the entire time of the closure." Tr. 10/31/2025 676:6–677:1. As described above, the minimal damage to the building allowed ingress and egress from the facility to continue.

Director Wamsley testified that Portland ERO, which carries out Title 8 immigration enforcement and removal, continued to enforce immigration law in Portland while the ICE Facility was closed to the public. In fact, Director Wamsley relocated ICE ERO operations to another building before June 14 because ICE received credible information that protest activity might escalate. Tr. 10/31/2025 672:17–23. Accordingly, there was no ERO staff in the ICE Facility during the June 14 riot—no operations interfered with, and no employees endangered. Tr. 10/31/2025 689:16–690:23. During the building closure, ERO Portland staff would either

report to the temporary location or would meet off-site to conduct operations. Tr. 10/31/2025 690:2–15. Director Wamsley did not know how many ERO immigration arrests were made in Portland while the building was closed, Tr. 10/31/2025 691:13–15, nor was there any evidence submitted of Title 8 arrest statistics in the Portland area. Instead, Director Wamsley testified that she set a field office-wide "goal of 30 arrests a day," and that there are days when the office "meet[s] or exceed[s]" that goal. Tr. 10/31/2025 670:8–13. This Court received no evidence that the closure of the ICE Facility in June more than minimally affected the enforcement of Title 8 immigration in Portland.

The trial evidence also suggests that general staffing problems are minimally impeding ICE's enforcement of Title 8 immigration law. Director Wamsley testified that there are approximately 220 full-time positions in the ICRO Seattle field office, but because ICE has "a lot of vacancies," only approximately 130 are filled. Tr. 10/31/2025 668:24–669:12. On top of that shortage, Director Wamsley has been urged to increase her goal of 30 arrests per day to 50 arrests per day. Tr. 10/31/2025 707:14–17. She was "told to double [her] numbers" in a performance work plan. Tr. 10/31/2025 719:5–14; Tr. 10/31/2025 706:22–707:7 ("My PWP called for a doubling of the fiscal year '24 arrests."). After receiving her performance work plan, Director Wamsley requested an additional 50 to 75 members of her staff "to effectuate immigration work." Tr. 10/31/2025 709:1–710:1. Director Wamsley testified that she could not remember when she made this request, and it was either in June after the office closed or in July after the "Big Beautiful Bill" passed. Tr. 10/31/2025 710:10–20 (June); 709:1–710:1 (July). Director Wamsley's new goal of 50 arrests per day came with no additional staffing or budget, however, so she is expected to double her office's output with no additional resources. Tr. 10/31/2025 707:5–20. Director Wamsley also testified that she has no idea what the numbers are

with regards to actual arrests since May due to the government shutdown. Tr. 10/31/2025 708:2–25. Director Wamsley "support[s] the decision to federalize the Guard for a protective mission in Oregon" because she will "struggle" less with "staffing locations." Tr. 10/31/2025 686:9-20.

**H. Post-Callout**

After the federalization order on September 28, 2025, protest activity outside the ICE building increased but did not become unmanageable. This Court finds credible Commander Schoening's testimony that "activity dropped off significantly" within a few nights of the order. Tr. 10/29/2025 75:10–13. As discussed above, the time period was marked by some large, mostly lawful demonstrations, and PPB increased its presence in kind. After September 28, 2025, more federal law enforcement officers were assigned to the Portland ICE building. Ex. 773. From September 28, 2025 to October 16, 2025, only one injury was reported, and there was no evidence of building damage during this time. *See* Ex. 918 at 4 (noting that there was not damage noted in FPS' ICS 209 reports from September 28 through October 16, 2025).

On the night of Saturday, October 4, 2025, activity outside the ICE building did briefly spike, but federal law enforcement's crowd control tactics limited the ability of PPB to help. This Court finds credible Commander Schoening's testimony that on October 4, 2025, "the situation on the ground" was "a little startling" because of federal law enforcement's crowd control measures. Tr. 10/29/2025 83:3–19. PPB was "deployed, prepared to intervene . . . [and to] take enforcement action for any safety risks that came up." Tr. 10/29/2025 81:23–82:1. Federal law enforcement "c[a]me out in significant numbers, and they began to push the crowd . . . quite a distance up [the street], which was again a significant departure from the established practice that we had seen where we had officers on the ground observing." Tr. 10/29/2025 83:3–19. Commander Schoening testified that he talked to the FPS incident commander to try and figure out what was going on. Tr. 10/29/2025 83:20–23. When Commander Schoening asked the

incident commander the reason for the departure in practice, the incident commander told him, "I don't know why." Tr. 10/29/2025 83:24–84:3.

## CONCLUSIONS OF LAW

First, this Court provides background on the National Guard as the modern militia. Second, this Court determines that Plaintiffs have Article III standing for injunctive relief on their *ultra vires*[17] and Tenth Amendment claims. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ."). Third, this Court concludes that Defendants' federalization and deployment of the National Guard to the Portland ICE facility in Oregon was unlawful under 10 U.S.C. § 12406 and violated the Tenth Amendment. Fourth, this Court finds that Plaintiffs have met the remaining requirements for a permanent injunction enjoining Secretary Hegseth's and Secretary's implementation of (1) the September 28, 2025 Memorandum federalizing and deploying the Oregon National Guard, Ex. 1051; (2) the October 5, 2025 Memorandum federalizing and deploying the Texas National Guard, to the extent that it authorizes the deployment of members of the Texas National Guard in Oregon, Ex. 6; and (3) the October 16, 2025 Memorandum deploying members of the California and Texas National Guards in Oregon, Ex. 2.

## A. The National Guard

The National Guard is descended from the Founding-era militia and today maintains its character as a state-based reserve military force distinct from the active duty and regular reserve branches of the U.S. military. "The Constitution vests in Congress the power 'to raise and

---

[17] This Court has jurisdiction to adjudicate "constitutional challenges to presidential acts" and "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority," i.e. *ultra vires* actions. *Murphy Co. v. Biden*, 65 F.4th 1122, 1128–29 (9th Cir. 2023).

support Armies' and 'to provide and maintain a Navy.'" *Torres v. Tx. Dep't of Pub. Safety*, 597 U.S. 580, 584 (2022) (brackets omitted) (quoting Art. I, § 8, cl. 1). But "[u]nlike armies and navies, which Congress is given the power to create . . . , the militia is assumed by Article I already to be *in existence*" at the Founding, comprised of "'all males physically capable of acting in concert for the common defense.'" *District of Columbia v. Heller*, 554 U.S. 570, 595–96 (2008) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

The Founders maintained this distinction between the militia and the army and navy in the Constitution's Militia Clauses, which empowered Congress "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions," U.S. Const. art. I, § 8, cl. 15; and "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress," U.S. Const. art. I, § 8, cl. 16.

As the Supreme Court explained over a century ago, "[t]he line which separates [the militia power] from the army power is . . . inherently plainly marked by the text of the two clauses." *Arver v. United States*, 245 U.S. 366, 382 (1918). In contrast to Congress's "'broad and sweeping power' power 'to raise and support armies,'" *Torres*, 597 U.S. at 585, the Constitution reserved to the States "the control of the militia to the extent that such control was not taken away by the exercise by Congress of its power to raise armies." *Arver*, 245 U.S. at 383. And the exercise of this power to call forth the Militia "was wisely left to depend upon the discretion of Congress as to the arising of the exigencies which would call it in part or in whole into play." *Id.* In short, the Constitution "delegat[ed] to Congress the right to call on occasions which were

specified for the militia force," *id.*, while empowering the President to "be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, *when called into the actual Service of the United States*." U.S. Const. art. II, § 2, cl. 1 (emphasis added).

In 1792, Congress exercised its powers under the Militia Clauses to enact a statute that "purported to establish 'an Uniform Militia throughout the United States.'" *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (quoting Act of May 8, 1792, ch. 33, 1 Stat. 271, 271). But it was not until 1903 that Congress enacted the Dick Act, which established "an 'organized militia' to be known as the National Guard of the several States." *Id.* at 342 (quoting Militia Act of 1903, ch. 196, § 1, 57 Stat. 775, 775); *see id.* ("It is undisputed that Congress was acting pursuant to the Militia Clauses of the Constitution in passing the Dick Act.").

In 1933, Congress created the National Guard system that persists to the present day, composed of "two overlapping but distinct organizations . . . the National Guard of the various States and the National Guard of the United States." *Id.* (internal quotations omitted). "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States." *Id.* "In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retained their status as members of a separate State Guard unit." *Id.* Under this "dual enlistment system," *id.* at 347, "[m]embers of the National Guard only serve the federal military when they are formally called into the military service of the United States." *Stirling v. Minasian*, 955 F.3d 795, 799 (9th Cir. 2020) (internal quotations omitted). "At all other times, National Guard members serve solely as members of the State militia under the command of a state governor." *Id.* (internal quotations omitted).

**B. Article III Standing**

Before addressing the legality of Defendants' federalization of the National Guard, this Court "must first ensure that the States have standing to challenge it." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). "Under Article III of the Constitution, a plaintiff needs a 'personal stake' in the case." *Id.* (quoting *TransUnion*, 594 U.S. at 431). In this case, "Plaintiffs seek injunctive relief, not damages, and '[a]s a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing.'" *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (brackets in original) (quoting *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 522 (9th Cir. 2009)). In addition, "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *TransUnion*, 594 U.S. at 431 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Therefore, "in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Lujan*, 504 U.S. at 561).

Here, the evidence adduced at trial establishes that, at the very least, the State of Oregon satisfies Article III standing for injunctive relief on Plaintiffs' *ultra vires* and Tenth Amendment claims. To establish standing, Oregon must demonstrate that the State "has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Defendants only challenge Plaintiffs' failure to demonstrate an injury in fact. *See* Defs. Pre-Trial Mem., ECF 115 at 31–32. Regardless, Oregon has demonstrated that all three requirements for standing are met.

First, Oregon has suffered a concrete and particularized injury based on the unlawful federalization of 200 members of the State's National Guard, who otherwise, by default, "serve

solely as members of the State militia under the command of a state governor." *Stirling v. Minasian*, 955 F.3d 795, 799 (9th Cir. 2020) (internal quotations omitted). Because Defendants had no lawful basis to federalize these Oregon National Guardsmen under 10 U.S.C. § 12406, Defendants commandeered these State officers to "enforce a federal [law enforcement] program" at the Portland ICE facility, in violation of the Tenth Amendment. *Printz v. United States*, 521 U.S. 898, 935 (1997); *see TransUnion*, 594 U.S. at 425 (noting that cognizable injuries for standing purposes include "traditional harms . . . specified by the Constitution itself").

Defendants argue that this injury does not suffice to establish a concrete injury because "the federalization of the Oregon National Guard involves approximately three percent of the [State] Guard, for a limited period." Defs. Pre-Trial Mem., ECF 115 at 31. Their argument overlooks that these 200 members of the Oregon National Guard constitute 60% of the State's Guardsmen "who are trained to quickly to respond to emergencies, including national disasters." Decl. of Brigadier Gen. Alan R. Gronewold, ECF 34 ¶ 3. More broadly, Defendants' argument fails because the relevant injury is not the "adverse impacts to existing state operations" resulting from the Governor's loss of control of 200 Oregon National Guardsmen. Defs. Pre-Trial Mem., ECF 115 at 31. Rather, the relevant injury is the "sovereign injury" inflicted upon the State when the federal government unlawfully commandeers State officers in violation of the Constitution. *Arizona v. Yellen*, 34 F.4th 841, 851–52 (9th Cir. 2022); *see Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *11 (N.D. Ill. Oct. 10, 2025) ("Plaintiffs' claimed injury is not loss of an ability to control or command, but the loss of its own sovereign rights.").

This clarification disposes of Defendants' additional argument that their "conduct does not inflict a sovereign injury" because "[t]he protection of federal personnel and property is a federal interest." Defs. Pre-Trial Mem., ECF 115 at 32. Defendants assert that "State sovereignty

interests are not offended when the federal government locates its personnel in a state regardless of whether those personnel are federalized Guardsmen, federal prosecutors, or USDA inspectors." *Id.* Unlike federal prosecutors and USDA inspectors, the 200 Oregon National Guardsmen were not legally federalized under 10 U.S.C. § 12406, as discussed below. Therefore, they remain in "state active duty" status "under state control for state purposes." *Stirling*, 955 F.3d at 798 (internal quotations omitted). And the sovereign injury to Oregon under the Tenth Amendment does not dissipate due to any "federal interest" that the commandeered National Guardsmen serve. Indeed, that is the essence of the anti-commandeering doctrine. *See Printz*, 521 U.S. at 935 ("The Federal Government may . . . no[t] command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").

Second, Oregon suffers—and "is under threat of suffering," *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)—an injury in fact from the unlawful deployment of members of the California and Texas National Guards. As discussed below, no factual predicate existed under 10 U.S.C. § 12406 to justify the President's federalization of *any* State's National Guard for deployment in Oregon. Defendants are thus incorrect that the deployment of 200 California National Guardsmen and the threatened deployment of up to 400 Texas National Guardsmen involve "federal soldiers," Defs. Pre-Trial Mem., ECF 115 at 35, who have "los[t] their status as members of the state militia," *Perpich v. Dep't of Def.*, 496 U.S. 334, 347 (1990).

Instead, these deployments involve the intrusion of California and Texas National Guardsmen in their capacity as militiamen of those States, which constitutes an injury to Oregon's "sovereignty under the Constitution," let alone to Oregon's "*equal* sovereignty among the States." *Shelby County v. Holder*, 570 U.S. 529, 544 (2013) (internal quotations omitted) (emphasis in original). At the Founding, "there was a widespread fear that a national standing

Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States." *Perpich*, 496 U.S. at 340; *see Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *6–8 (N.D. Ill. Oct. 10, 2025) (detailing such sentiments among the Founders, including James Madison, Patrick Henry, and Alexander Hamilton). In light of this recognized threat to State sovereignty, an incursion of a State's militiamen into a sister State is a "traditional harm[]" recognized in the Constitution. *TransUnion*, 594 U.S. at 425; *see Printz*, 521 U.S. at 918–19 (recognizing that "[a]lthough the States surrendered many of their powers to the new Federal Government, they retained a 'residuary and inviolable sovereignty,'" as "reflected throughout the Constitution's text") (quoting The Federalist No. 39 (James Madison)); *see also Illinois v. Trump*, No. 25-2798, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025) ("And the deployment of National Guard members from Texas—an incursion on Illinois's sovereignty—makes the constitutional injury especially significant."); *cf.* U.S. Const. art. IV, § 4 (providing in the Guarantee Clause that the federal government "shall protect each of [the states] against Invasion").

Next, there is no dispute that Oregon's sovereign injury is fairly traceable to, and therefore would be redressable by, an order enjoining (1) the September 28, 2025 Memorandum federalizing and deploying the Oregon National Guard, Ex. 1051; (2) the October 5, 2025 Memorandum federalizing and deploying the Texas National Guard, to the extent that it deploys members of the Texas National Guard in Oregon, Ex. 6; (3) the October 16, 2025 Memorandum deploying members of the California and Texas National Guards in Oregon, Ex. 2; and (4) any memoranda deploying members of any other State's National Guard to Oregon based on the same predicate conditions that were relied upon to authorize the above orders. *See Murthy*, 603 U.S. at 57 ("'[P]laintiffs must demonstrate standing for each claim that they press' against each

defendant, 'and for each form of relief that they seek.'" (quoting *TransUnion*, 594 U.S. at 431)).

In sum, Plaintiffs have standing to seek injunctive relief based on their *ultra vires* and Tenth

Amendment claims. Therefore, this Court proceeds to the merits of Plaintiffs' claims.[18]

## C. Permanent Injunction

The trial record demonstrates that Plaintiffs are entitled to a permanent injunction based

on both their *ultra vires* claim that Defendants violated 10 U.S.C. § 12406 and their

constitutional claim that Defendants violated the Tenth Amendment. "To be entitled to a

permanent injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that it

has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the

balance of hardships justify a remedy in equity; and (5) that the public interest would not be

disserved by a permanent injunction." *Indep. Training & Apprenticeship Program v. Cal. Dep't

of Indus. Rels.*, 730 F.3d 1024, 1032 (9th Cir. 2013). This Court concludes that Plaintiffs have

demonstrated actual success on both claims. This Court also finds that Oregon has suffered

irreparable injury from the unlawful federalization and deployment of both its own National

Guard and the National Guards of other states. Lastly, there are no adequate remedies available

at law, and the balance of hardships and the public interest favor Plaintiffs.

---

[18] Defendants also argue that "[e]ven if Plaintiffs had Article III standing to challenge the out-of-state Guard members' federalization and deployment, their claim is still outside Section 12406's zone of interest." Defs. Pre-Trial Mem., ECF 115 at 34. But "the zone-of-interests test . . . is not one of standing, but of 'whether the statute grants the plaintiff the cause of action that he asserts.'" *FDA v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 n.3 (2025) (quoting *Bank of Am. Corp. v. Miami*, 581 U.S. 189, 196–97 (2017)). Here, Plaintiffs do not claim that 10 U.S.C. § 12406 confers a private right of action. Rather, they bring a "nonstatutory *ultra vires*" claim, *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 680–81 (2025), and therefore, the zone-of-interests test is not relevant to Plaintiffs' ability to bring *ultra vires* or Tenth Amendment claims.

### 1. Actual Success on the Merits

At the heart of this case is whether the President's federalization and deployment of the

Oregon, California, and Texas National Guards, to Portland, Oregon, without the consent of the

Governor of Oregon, was unlawful under 10 U.S.C § 12406. Section 12406 provides in full:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406. In *Newsom v. Trump*, the Ninth Circuit held that the President's decision to

federalize the National Guard under Section 12406 is judicially reviewable.[19] 141 F.4th at 1046–

47. A reviewing court must give "a great level of deference to the President's determination that

---

[19] Defendants acknowledge that the President's determination is reviewable under *Newsom*, but "Defendants preserve for further review their argument that the President's decision to federalize the National Guard under Section 12406 is not judicially reviewable." Defs. Post-Trial Mem., ECF 131 at 2 (citing *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29–30 (1827)). As *Newsom* explained, the Supreme Court's decision in *Martin* does not establish that the President's invocation of Section 12406 is unreviewable. 141 F.4th at 1050–51. "After all, it remains 'emphatically the province and duty of the judicial department to say what the law is.'" *Id.* at 1046 (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). This duty "includes 'determining the limits of statutory grants of authority' and 'determining whether a government official did exceed his powers' granted by the statute." *Id.* (first quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944); and then quoting *Harmon v. Brucker*, 355 U.S. 579, 582 (1958) (per curiam)).

a predicate condition exists." *Id.* at 1048. However, the court may "review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 278 U.S. 378, 399 (1932)). The President's "exercise of his authority to maintain peace" must be "*in the face of the emergency* and directly related to the quelling of the disorder or the prevention of its continuance." *Id.* (emphasis added) (quoting *Sterling*, 278 U.S. at 399–400). The Ninth Circuit did caveat that "[a]t this preliminary stage of the litigation," it "need not further specify the precise standard that governs [judicial] review" of the President's determination. *Id.*

Defendants contend that the President federalized the National Guard pursuant to Section 12406(3) and Section 12406(2). Defs. Pre-Trial Mem., ECF 115 at 21–29. This Court concludes that even applying *Newsom*'s "highly deferential standard of review," the President did not have a "colorable basis for invoking" either subsection. *Newsom*, 141 F.4th at 1052. First, this Court finds that based on the trial evidence, in the months "leading up to the President's federalization of the National Guard" on September 27, 2025, that the credible evidence presented at trial showed at most only "minimal interference with the execution of laws" insufficient to invoke Section 12406(3). *See id.* at 1051–52. Second, this Court finds that the trial evidence established that there was neither "a rebellion [n]or a danger of a rebellion against the authority of the Government of the United States" at the Portland ICE facility when the President federalized the National Guard. 10 U.S.C. § 12406(2). Plaintiffs therefore prevail on their claim that Defendants' federalization of the National Guard was *ultra vires*. And since Defendants' deployment of the National Guard involves commandeering of the Oregon militia or intrusion on Oregon's sovereignty by the militias of California and Texas, Plaintiffs also prevail on their claim that Defendants violated the Tenth Amendment.

a.  **Section 12406(3)**

i.  *Newsom v. Trump*

This Court begins with the Ninth Circuit's published motions panel order in *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), which is "binding" with respect to its statutory interpretation of 10 U.S.C. § 12406(3), a "pure question of law." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660–61 & n.3 (9th Cir. 2021). In June 2025, the President invoked 10 U.S.C. § 12406 "to order 4,000 members of the National Guard into federal service" "[i]n response to disturbances in Los Angeles stemming from federal enforcement of immigration laws." *Newsom*, 141 F.4th at 1040. The Ninth Circuit recounted the following two days of unlawful conduct, which this Court recounts in full given its central relevance to the application of *Newsom* to the facts of this case:

> On June 6, 2025, a group of protesters tried to prevent Immigration and Customs Enforcement (ICE) officials from operating in Los Angeles by throwing objects at ICE vehicles. Later that evening, protesters gathered at ICE's Enforcement and Removal Operations (ERO) building in downtown Los Angeles. Protesters "pinned down" several Federal Protective Service (FPS) officers and threw "concrete chunks, bottles of liquid, and other objects" at the officers. The protesters used "large rolling commercial dumpsters as a battering ram to breach the parking garage gate and damage[ ] federal property." The Los Angeles Police Department arrived on the scene about an hour after being called by federal officers. The protesters eventually dispersed at law enforcement's direction, but the federal building had been heavily vandalized.
>
> The next day, on June 7, protesters continued to interfere with federal enforcement operations by a Homeland Security Investigations Office in Paramount, California, and continued to damage federal property. In a confrontation that lasted over seven hours, the protesters blocked traffic and used shopping carts to barricade the street. Some attacked ERO and Customs and Border Patrol (CBP) officers by "box[ing] in" the officers and "throwing mortar-style fireworks with multiple explosions" at them. Other

protesters "engage[d] in dangerous behavior such as throwing rocks and other objects, including a Molotov Cocktail at deputies," "burning a vehicle," and "vandalizing property." One ERO officer was trapped in her law enforcement vehicle while protesters surrounded it, violently pounded and shook it, and threw stones at it. One CBP officer suffered a shattered wrist caused by a thrown object. Protesters also damaged the perimeter fence of a federal building and three government vehicles.

. . .

Protests against federal officers continued into the following days. For example, during the night of June 8, protesters in downtown Los Angeles "set[ ] off commercial-grade fireworks toward federal officers and thr[ew] objects at passing law enforcement vehicles." They lit fires in dumpsters and "vandalized dozens of buildings with graffiti, including the Federal Courthouse." On June 9, a crowd of 1,000 protesters gathered near a federal building. One protester drove by the building and fired paintballs at FPS officers, hitting at least one in the head and neck. At another federal building, protesters attacked a federal van carrying multiple non-citizens and officers, rocking the vehicle and smashing its windows. The building had to be closed for most of the day and remained closed the next day, disrupting the operations of many federal agencies working in the building.

*Id.* at 1041–42 (brackets in original). Amidst this violence, on June 7, 2025, and on June 9, 2025, the President called up a total of 4,000 members of the National Guard under Section 12406 "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." *Id.* (internal quotations omitted).

As relevant here, the Ninth Circuit held in *Newsom* that Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States." *Id.* at 1051. Rather, as long as "activities significantly impeded the ability of federal officers to execute the laws," a court may not second guess the President's invocation of

Section 12406(3). *Id.* at 1052. However, *Newsom* also made clear that "minimal interference with the execution of laws is, by itself," insufficient "to justify invoking § 12406(3)." *Id.* at 1051. The pertinent question, therefore, is whether the President had a "colorable basis" to conclude that federal officers were "significantly impeded" in their execution of the laws. *Id.* at 1052. On the facts recited above, *Newsom* found that, "protesters' interference with the ability of federal officers to execute the laws, leading up to the President's federalization of the National Guard" qualified as a significant impediment. *Id.* Specifically, there was evidence that on the day before and the day of the National Guard callout, "protesters threw objects at ICE vehicles trying to complete a law enforcement operation, 'pinned down' several FPS officers defending federal property by throwing 'concrete chunks, bottles of liquid, and other objects,' and used 'large rolling commercial dumpsters as a battering ram' in an attempt to breach the parking garage of a federal building." *Id.* "Affording appropriate deference to the President's determination," *Newsom* "conclude[d] that he likely acted within his authority in federalizing the National Guard under 10 U.S.C. § 12406(3)." *Id.*

But what *Newsom* did not answer are two questions that complicate application of its test to the facts of this case. Principally, what if at some point in time months prior to the President's federalization of the National Guard, federal officers were "significantly impeded" by unlawful conduct that resembles some of the conduct described in *Newsom*, but in the subsequent months, federal officers no longer faced such significant impediments? Secondarily, how does the ability of federal officers to execute federal law with the aid of additional federal civilian law enforcement inform whether the President had a colorable basis to invoke Section 12406(3)?

The answers to these questions drive this Court's analysis of whether the President had a "colorable basis" to invoke 10 U.S.C. § 12406(3). *Id.* Resolving them requires consulting not

only *Newsom* but also further deciphering the meaning of "to execute the laws of the United States" in 10 U.S.C. § 12406(3).[20] Although *Newsom* relied on history and Supreme Court precedent interpreting that history to find that the President's determination is reviewable "[u]nder a highly deferential standard of review," *see id.* at 1047–52, the court did not interrogate the historical understanding of the statutory language "unable with the regular forces to execute the laws of the United States." As discussed below, this language mirrors and directly descends from the Militia Clauses themselves, specifically Congress's power "[t]o provide for calling forth the Militia to execute the Laws of the Union" U.S. Const. Art. I, § 8, cl. 15. Therefore, to the extent this clause constrains Congress's power to call forth the militia, it also constrains Congress's delegation to the President, since Congress cannot delegate power that it lacks. Applying this history and tradition, in conjunction with *Newsom*, this Court can answer the two key questions that go to whether the President had a colorable basis to invoke Section 12406(3).

### i.    History and Tradition

As the following examination of historical sources reveals, the meaning of "unable . . . to execute the laws of the United States" in 10 U.S.C. § 12406(3) carries a consistent meaning from the Founding through to the present that suggests this precondition arises when federal courts or federal law enforcement cannot function without the intervention of the militia. Again, the

---

[20] Another interpretive question is the meaning of "regular forces" in 10 U.S.C. § 12406(3). In *Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *16–18 (N.D. Ill. Oct. 10, 2025), the district court provided compelling reasons why "the phrase 'regular forces' was understood at the time of enactment to mean the soldiers and officers regularly enlisted with the Army and Navy, as opposed to militiamen." The Supreme Court awaits supplemental briefing on this issue, but Defendants have provided this Court with arguments why "regular forces" refers to federal civil officers and not the standing army. Defs. Post-Trial Br., ECF 131 at 6–10. In any event, this Court need not resolve this "thorny and complex issue[] of statutory interpretation." *Illinois v. Trump*, No. 25-2798, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025). In *Newsom*, the Ninth Circuit implicitly resolved this question by equating "regular forces" with "federal officers," i.e. federal civilian law enforcement, which is binding on this Court. 141 F.4th at 1051–52.

Constitution allows Congress "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel invasions." U.S. Const. art. I, § 8, cl. 15. However, soon after the Founding, "Congress first delegated its constitutional calling forth power to the President in the Militia Act of 1792." *Newsom*, 141 F.4th at 1047 (citing Militia Act of 1792, ch. 28, §§ 1–2, 1 Stat. 264, 264). This "early congressional enactment[] 'provide[s] contemporaneous and weighty evidence of the Constitution's meaning.'" *Haaland v. Brackeen*, 599 U.S. 255, 290 (2023) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (brackets and internal quotations omitted)). Indeed, Congress's 1792 delegation of its calling forth power mapped onto the clause's three enumerated conditions: (1) "to execute the Laws of the Union"; (2) "suppress Insurrections"; and (3) "repel Invasions." U.S. Const. art. I, § 8, cl. 15; *see* Militia Act of 1792, ch. 28, §§ 1–2, 1 Stat. 264, 264 (allowing the President to call forth the militia (1) "whenever the laws of the United States shall be opposed, or the execution thereof obstructed"; (2) "in case of an insurrection in any state"; and (3) "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe").

Corresponding to Section 12406(3), the Militia Act of 1792 provided in subsection two:

> That whenever the laws of the United States shall be opposed, or the execution thereof obstructed, in any state, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act, the same being notified to the President of the United States, by an associate justice or the district judge, it shall be lawful for the President of the United States to call forth the militia of such state to suppress each combinations, and to cause the laws to be duly executed.

Militia Act of 1792, ch. 28, § 2, 1 Stat. 264, 264. Notably, Congress specified that such an exigency arises only when the laws can no longer be executed "by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act." *Id.* The former points to an

inoperative federal court, and the latter points to overwhelmed federal law enforcement, since the statute elsewhere gave marshals "the same powers in executing the laws of the United States, as sheriffs and their deputies in the several states have by law, in executing the laws of their respective states." *Id.*, § 9, 1 Stat. 264, 265; *see also* Judiciary Act of 1789, ch. 20, § 27, 1 Stat. 73, 87 (specifying the duties of a marshal, including "to execute throughout the district, all lawful precepts directed to him, and issued under the authority of the United States").

These limitations reflect the Founders' understanding of the scope of the calling forth power "to execute the Laws of the Union," U.S. Const. art. I, § 8, cl. 15. At the Virginia Ratifying Convention in 1788, a delegate "thought the word *insurrection* included every opposition to the laws" and therefore asked whether the Militia Clauses could omit the phrase, "to execute the laws of the Union." Jonathan Elliot, *The Debates in the Convention of the Commonwealth of Virginia*, 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 407 (2d ed. 1836) ("Elliot, *Virginia Ratification Debates*") (emphasis in original). In response, James Madison clarified that "a riot did not come within the legal definition of an insurrection[,]" and "[t]here might be riots, to oppose the execution of the laws, *which the civil power might not be sufficient to quell*." *Id.* at 410 (emphasis added); *see Ex parte Milligan*, 71 U.S. 2, 37–38 (1866) (noting that the Founders "always asserted and enforced the subordination of the military to the civil arm" of government, i.e., "the civil power"). Alexander Hamilton similarly understood the clause as allowing "the federal government [to] command the aid of the militia in those emergencies which call for the military arm in support of the civil magistrate." THE FEDERALIST NO. 29 (Alexander Hamilton).

This circumscribed meaning of "to execute the Laws of the Union," U.S. Const. art. I, § 8, cl. 15, finds further support from the Founding era. George Mason cautioned at the Virginia

Ratifying Convention that "unless there be some restrictions on the power of calling forth the militia, to execute the laws of the Union, suppress insurrections, and repel invasions, we may very easily see that it will produce dreadful oppressions." Elliot, *Virginia Ratification Debates*, at 378. Madison responded that "it was obvious to him, that, *when the civil power was sufficient*, this mode would never be put in practice." *Id.* at 384 (emphasis added). And another delegate seconded Madison's sentiment that "[t]he civil officer is to execute the laws on all occasions; and, if he be resisted, this auxiliary power is given to Congress of calling forth the militia to execute them, *when it shall be found absolutely necessary*." *Id.* at 392 (emphasis added).

Perhaps most illuminating from the Virginia Ratifying Convention is Governor Edmund Randolph's response to Patrick Henry's warning of the apparent wide breadth of circumstances in which the militia could be "called forth to execute the laws." *Id.* at 387. Randolph stated:

> It is supposed . . . that the clause for calling forth the militia to suppress insurrections, repel invasions, and execute the laws of the Union, implies that, instead of using civil force in the first instance, the militia are to be called forth to arrest petty offenders against the laws. *Ought not common sense to be the rule of interpreting this Constitution?* Is there an exclusion of the civil power? Does it provide that the laws are to be enforced by military coercion in all cases? No, sir. *All that we are to infer is, that when the civil power is not sufficient, the militia must be drawn out.*

*Id.* at 400 (emphasis added). As Madison further explained, "[t]here is a great deal of difference between calling forth the militia, when a combination is formed to prevent the execution of the laws, and the sheriff or constable carrying with him a body of militia to execute them in the first instance." *Id.* at 415. To Madison, the latter was "a construction not warranted by the clause." *Id.*

All this to say, when Congress enacted the Militia Act of 1792, it codified this "common sense" understanding of the scope of the calling forth power, linking an inability to execute the laws to a failure of the "civil power," i.e. the civil government, to execute the laws of the United States.

Subsequent Congressional enactments and amendments delegating the calling forth power to the President shed additional light on the meaning of 10 U.S.C. § 12406(3). *See FAA v. Cooper*, 566 U.S. 284, 292 (2012) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." (internal quotations omitted)). Just three years later, in 1795, Congress "renewed" its 1792 delegation to the President. *Newsom*, 141 F.4th at 1047. Although the statute expunged the requirement that the President receive preclearance from a federal judge, the provisions otherwise remained the same. Militia Act of 1795, ch. 36, §§ 1–2, 1 Stat. 424, 424. An obstruction to the execution of the laws of the United States continued to require "combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals," and the same other two predicate conditions of "insurrection" and "invasion" remained unchanged. *Id.*

"The 1795 Act was a precursor to the Militia Act of 1903, which is a precursor to § 12406." *Newsom*, 141 F.4th at 1047 (internal citation omitted). The Militia Act of 1903 introduced much of the modern language contained in 10 U.S.C. § 12406(3), enabling the President to call forth the militia when "unable, with the other forces at his command, to execute the laws of the Union." Militia Act of 1903, ch. 196, § 4, 57 Stat. 775, 776. Without analyzing the language of the Militia Act of 1903 in the context of its historical precursors and the Founders' understanding of the scope of this power, one may overlook that "Congress employ[ed] a term of art obviously transplanted from another legal source," which therefore "brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (internal quotations omitted). But when properly considering the historical and constitutional context, a better reading emerges that the words "unable . . . to execute the laws of the Union" continued to

encapsulate the *degree* of "oppos[ition]" or "obstruct[ion]" contained in its statutory precursors and reflected in the Founders' understanding of the term. Militia Act of 1792, ch. 28, § 2, 1 Stat. 264, 264; Militia Act of 1795, ch. 36, §§ 1–2, 1 Stat. 424, 424. And thus, the necessary degree of opposition, obstruction, and now inability, has always been measured against the ability of the civil power, executive and judicial, to execute the laws.

The same is true of subsequent twentieth-century amendments to this statutory provision, which repeatedly imported the same language of the President being "unable . . . to execute the laws of the Union," or "the United States." *See Clark v. Martinez*, 543 U.S. 371, 378 (2005) ("To give these same words a different meaning for each [version] would be to invent a statute rather than interpret one."). In the Militia Act of 1908, Congress replaced "the other forces" with "the regular forces," and required the President to issue his federalization order "through the governor of the respective State . . . from which . . . such troops may be called." *Compare* Militia Act of 1903, ch. 196, § 4, 57 Stat. 775, 776 *with* Militia Act of 1908, ch. 204, § 3, 60 Stat. 399, 400. But otherwise, the statute kept the language "to execute the laws of the Union." Militia Act of 1908, ch. 204, § 4, 60 Stat. 399, 400. And in 1956, Congress updated this language to its present-day form contained in 10 U.S.C. § 12406: "the President is unable with the regular forces to execute the laws of the United States." *See* Act of August 10, 1956, ch. 1041, § 3500, 70A Stat. 199 (providing for federalization of the "Army National Guard"); *id.*, § 8500, 70A Stat. 525 (providing for federalization of the "Air National Guard"). In 1996, Congress repealed and consolidated these two separate provisions for the Army National Guard and the Air National Guard into 10 U.S.C. § 12406. National Defense Authorization Act for Fiscal Year 1995, Pub. L. No. 103-337, 108 Stat. 2663, 2994 (codified at 10 U.S.C. § 12406).

Historical practice further confirms that the President's power to call forth the militia "to execute the Laws of the Union," U.S. Const. art. I, § 8, cl. 15, is limited to situations when the civil power is unable to do so. Although discussed in further detail below, it is notable that when President Washington invoked the Militia Act of 1792 to respond to the Whiskey Rebellion in 1794, he did not cite the statutory provision addressing an "insurrection," but rather he invoked the statutory precursor to Section 12406(3), citing his need "to cause the Laws to be duly executed." Proclamation of Aug. 7, 1794. And likewise, when President John Adams invoked the Militia Act of 1795 to respond to the Fries's Rebellion in 1799, he again cited this provision, finding that "combinations to defeat the execution of the laws for the valuation of lands and dwelling houses within the United States have existed in the counties of Northampton, Montgomery, and Bucks, in the State of Pennsylvania." Proclamation No. 9 (Mar. 12, 1799).

### ii. Application

Based on the facts on the ground outside the Portland ICE building throughout the relevant time period between the outbreak of protests in June and the President's federalization order on September 27, 2025, this Court holds that the President did not have a colorable basis to invoke 10 U.S.C. § 12406(3) when he ordered the federalization of the Oregon National Guard. The starting point is *Newsom*, which rejected Defendants' argument that "minimal interference with the execution of laws is, by itself, enough to justify invoking § 12406(3)." 141 F.4th at 1051. *Newsom* reached this conclusion based on "[t]he statutory context." *Id.* Sections 12406(1) and 12406(2) "discuss unusual and extreme exigencies—invasions and rebellions—that threaten the normal operations of civil government." *Id.* So if "minimal interference with the execution of laws" could justify the President's callout under Section 12406(3), then this subsection "would swallow subsections one and two, because any invasion or rebellion renders the President unable to exercise *some* federal laws." *Id.* (emphasis in original). The question then is whether "leading

up to the President's federalization of the National Guard on" September 27, 2025, did federal officers face more than "minimal interference with the execution of laws"? *Id.* at 1051–52.

The answer is no. The facts on the ground show that since a high watermark of unlawful activity in mid-June, the protests outside the Portland ICE facility did not "significantly impede[] the ability of federal officers to execute the [immigration] laws." *See id.* at 1052. The evidence at trial showed that during a few days on or around June 12, 2025, the unlawful activities of protesters outside the Portland ICE building, at least on a superficial analysis of discrete acts, resembled some of the unlawful activities that *Newsom* discussed as "significantly imped[ing] the ability of federal officers to execute the laws." *Id.* For example, protesters at the Portland ICE facility threw objects, including bricks and rocks, at federal officers. *See id.* at 1041 (describing protesters in Los Angeles throwing concrete chunks and other objects at officers). On June 12, protesters in Portland vandalized the electrical components of the vehicle gate and card readers, rendering them inoperable. *See id.* (stating that in Los Angeles "the federal building had been heavily vandalized"). On June 14, protesters in Portland broke several windows with a barbell and stop sign pole in an attempt to breach the building. *See id.* (describing protesters in Los Angeles using "large rolling commercial dumpsters as a battering ram to breach the parking garage gate"). The same day, protesters put chains on one door in an attempt to barricade federal employees inside the building. *See id.* (describing a seven-hour confrontation in Los Angeles during which "protesters blocked traffic and used shopping carts to barricade the street"). And due to property damage, the Portland ICE building was closed for three weeks. *See id.* at 1042 (describing the closure of a federal building in Los Angeles on June 9 "for most of the day" and "the next day").

At the same time, this mid-June peak of violence outside the Portland ICE building did not rise anywhere close to the level of disruption that occurred in Los Angeles between June 6 and June 9 in many significant respects. Whereas the criminal activity in Los Angeles took place across at least "dozens" of locations around the city, the criminal activity in Portland, even at its peak in June, was contained to a single city block outside of a single federal building. *Id.* Unlike in Los Angeles, no evidence was presented of protesters impeding "ICE vehicles trying to complete a law enforcement operation" in Portland. *Id.* at 1052. While in Los Angeles "protesters attacked a federal van carrying multiple non-citizens and officers, rocking the vehicle and smashing its windows," *id.* at 1042, no evidence was presented that anything of this sort occurred anywhere or anytime in Portland. And the crowd of 1,000 people that gathered near just one of the dozens of federal buildings vandalized in Los Angeles dwarfs the size of the crowd of protesters outside the Portland ICE building at any point in time.

But even setting aside these and more stark differences, the bottom line is that the President did not call out the National Guard in response to the disturbances outside the Portland ICE facility in June. Rather, he federalized the Oregon National Guard on September 27, 2025, three months after any exigency that may have existed in June had long subsided. As chronicled in this Court's factual findings, the protests outside the Portland ICE facility between June 15, 2025, and September 27, 2025, involved minimal interference, if any, to the execution of federal immigration laws.

Physical violence toward federal officers declined rapidly and substantially following the few worst days in June. During those worst days, FPS reported three injuries to federal officers each day between June 11 and June 13 and one injury to a federal officer on June 16. But by the end of June, most of this violence was rhetorical. Protesters frequently made verbal threats to

FPS and ICE personnel, and in this vein, protesters set up a prop guillotine in front of the Portland ICE facility on Labor Day. However, there is slight evidence of any actual violence following those mid-June days. While FPS reported 11 total injuries in June, it reported only 4 in July; 6 in August; and *none* in September.

During this post-June time period, the low-level physical violence discussed in law enforcement reports did not "significantly impede[] the ability of federal officers to execute the laws." *Newsom*, 141 F.4th at 1052. None of the isolated instances of violence resulted in serious, let alone life-threatening, injuries. For example, on July 13, an FPS officer pulled a groin muscle while taking a resisting suspect into custody. On September 18, an FPS officer and a protester pushed against each other while the FPS officer was conducting a push-out to clear the driveway, causing the officer's shield to hit the officer in the face.

On a few occasions, federal personnel endured more serious acts of violence. But there is no indication that these acts, while unacceptable, ever resulted in serious injuries. On June 29, a suspect bit and kicked an FPS inspector while being detained, but the inspector was uninjured. Similarly, on July 20, an unruly protester struck an ICE/SRT agent on the head with a stick, but FPS did not report any injuries. The most egregious physical assaults on federal personnel after mid-June occurred on Independence Day. On that day, a protester kicked an SRT agent, which the agent described as a "10 out of 10" on the pain scale. Protesters also threw rocks and fireworks, and one attempted to trip an officer. FPS reported two injuries that day, but the incident report does not provide further details and emergency medical services were only called to transport a detained protester who was having trouble breathing. Taken together, even on the most active day since mid-June, these acts minimally interfered with federal law enforcement.

Property damage in June caused the building to close for three weeks, but ICE operations did not abate during the closure. Administrative functions continued at a different site, and there is no evidence of impeded ERO field operations. Although the closure required immigration appointments to be cancelled or rescheduled, such inconveniences "minimal[ly] interfer[ed]" with the execution of immigration laws. *Newsom*, 141 F.4th at 1051. It is true that throughout the period between June and September, protesters often attempted to interfere with federal officers' use of the Portland ICE building's driveway. But this interference was "minimal," *id.*, since federal officers were able to move vehicles in and out of the facility, clearing protesters through the use of verbal warnings, physical "push-outs" and, when necessary, chemical agents. FPS Commander W.T. testified, in every instance of which he was aware, federal law enforcement were successful in allowing vehicles to enter and exit from the building.

During the time period between June and October 2025, federal officers at the Portland ICE facility, with PPB's assistance, investigated some acts of doxing, as well as some concerning tips or perceived threats that turned out to be unfounded, but these nonphysical nuisances did not "significantly impede[] the ability of federal officers to execute the laws" in any concrete respect. *Id.* at 1052. For example, on two occasions, people apparently abandoned cars in front of the ICE building, and FPS called PPB to determine if, out of an abundance of caution, the cars contained explosive devices, which they did not. On another day, a woman who appeared to be suffering from mental illness told FPS that there was a bomb in the building. However, earlier that day, that same woman told FPS that someone had smuggled dynamite into her son's assisted living facility. FPS did not take any action in response to this woman's claim—leading to the conclusion that this "bomb threat" was not taken seriously. PPB also alerted FPS of a social media post that suggested a protester was going to shoot someone, but

soon after contacted FPS to inform the agency that the post had been taken down. This Court also received evidence of doxing of federal officers, through both physical flyers and online social media posts. As distasteful as this conduct is, there is no evidence that these threats and harms impeded federal immigration efforts in any significant way.

In sum, the trial record showed that although protests outside the Portland ICE building occurred nightly between June and October 2025, ever since a few particularly disruptive days in mid-June, protests have remained peaceful with only isolated and sporadic instances of violence. The occasional interference to federal officers has been minimal, and there is no evidence that these small-scale protests have significantly impeded the execution of any immigration laws.

Defendants raise various arguments for why, despite this minimal disruption in the preceding weeks and months before the President's September 27, 2025 federalization order, the President's determination under Section 12406(3) nevertheless "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Newsom*, 141 F.4th at 1051 (quoting *Sterling*, 287 U.S. at 399). But none of Defendants' arguments, even when considered in aggregate, demonstrate that the President had a colorable basis to deploy the National Guard to Oregon.

*First*, regarding the relevant timeframe of events, this Court agrees that the President, and likewise this Court, should "evaluate the entire context of events leading up [to] a decision to invoke § 12406." *Oregon v. Trump*, 2025 WL 3008050, at *12 (per curiam). But that does not mean all events that took place outside the Portland ICE building are equally relevant to whether the President had a colorable basis to invoke Section 12406(3). To illustrate, could the President rely solely on the civil unrest in Portland, Oregon, *in 2020*, to justify his deployment of military troops to the Portland ICE facility *in 2025*? Even under *Newsom*'s "especially deferential"

standard, such a decision would be "obviously absurd or made in bad faith." 141 F.4th 1047,

1050. If the vacated panel majority were correct that it is up to the President "to identify and

weigh the relevant facts under § 12406(3)" and courts may "not limit the facts and circumstances

that the President may consider in doing so," then the President's determination under Section

12406 is reviewable in name only and would amount to giving the President absolute deference.

*Oregon v. Trump*, 2025 WL 30008050, at *11 (per curiam). If the President's determination is in

substance reviewable, however, this Court's "judicial duty is to apply the law to the facts of the

case." *Gamble v. United States*, 587 U.S. 678, 723 (2019) (Thomas, J., concurring). To fulfill

this duty here, this Court must determine the *relative* importance of the facts that go toward

whether the President violated 10 U.S.C. § 12406(3).

     The text of 10 U.S.C. § 12406(3) suggests that the timing of the facts is central to

determining that weight.  Section 12406(3) asks whether "the President *is* unable with the regular

forces to execute the laws," not whether the President was at some point in the past unable to do

so. 10 U.S.C. § 12406 (emphasis added). The statute's "use of the present tense clearly conveys

congressional intent that the present state of affairs is the relevant time." *Oregon v. Trump*, 2025

WL 3008050, at *26 (Graber, J., dissenting). Of course, an exigency does not exist only at a

discrete point in time, but nor is it a ghost that continues to persist once it has passed. Thus, "the

present state of affairs" is not necessarily governed by how much time passed between June and

September but rather how much the *events* themselves qualitatively changed from June. *Id.*  To

the extent the concentrated bouts of criminal activity in mid-June are an anomaly—which they

were as described above—they have little relevance to the existence of any exigency at the time

of the federalization order on September 27, 2025. What they instead show is, at most, an

emergency in the past.

Further supporting this interpretation is how the text of Section 12406(3) "contrasts with the text of the other two subsections in a way that removes any doubt about the relevant time frame." *Id.* at *27. Whereas these other two subsections "permit deployment whenever there is an invasion or rebellion *or a danger of those events*," *id.* (emphasis in original) (citing 10 U.S.C. § 12406(1)–(2)), subsection three "asks only whether the President is presently unable to execute the laws; the subsection does not ask in the alternative whether the President is in danger of being unable to execute the laws." *Id.* Consequently, Defendants' attempt to rely on aberrational violence in June to establish the existence of an emergency in September "runs aground on the so-called surplusage canon—the presumption that each word Congress uses is there for a reason." *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).

Defendants argue that "it would be perverse to effectively fault the President for *waiting* to authorize the Guard's deployment until late September . . . , rather than deploying the Guard immediately in June or July." Defs. Pre-Trial Mem., ECF 115 at 24 (emphasis in original). But Defendants ignore the nature of the calling forth power. It is not simply another tool in the executive's federal law enforcement toolbox that he may pull out at any time to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. It is the wielding of an entirely different kind of power, the military power, of which the Founders "always asserted and enforced the subordination . . . to the civil arm." *Ex parte Milligan*, 71 U.S. at 37. Indeed, since the Founding, Americans have had a "traditional insistence on limitations on military operations in peacetime." *Laird*, 408 U.S. at 15. This tradition runs through 10 U.S.C. § 12406, through which Congress delegated to the President a power reserved for "unusual and extreme exigencies." *Newsom*, 141 F.4th at 1051. In the absence of such an exigency, the President lacks statutory authority.

*Second*, regarding the "surge" of federal law enforcement officers to the Portland ICE facility following the outbreak of violence in June, the success of federal law enforcement officers from FPS, ICE, and Customs and Border Patrol in "quelling . . . the disorder" and "prevent[ing] . . . its continuance" in the subsequent three months, *id.* (internal quotations omitted), further supports this Court's conclusion that the President was *able* "with the regular forces to execute the laws of the United States," 10 U.S.C. § 12406(3). The following observation that this Court made at the preliminary stage rings even truer now in light of Defendants' downward correction of the number of federal law enforcement officers actually deployed at the Portland ICE building on any given day: allowing any reallocation of federal personnel, "which is a routine aspect of law enforcement activity," to justify a callout under Section 12406(3) would permit "the President [to] send military troops virtually anywhere at any time." *Oregon v. Trump*, No. 25-cv-1756, 2025 WL 2817646, at *11 (D. Or. Oct. 4, 2025).

Certainly, there is a point at which an influx of federal law enforcement officers is no longer feasible or sustainable, but as the above discussion of the original meaning of the calling forth power reveals, reaching this point requires more than simply finding that military aid "would be helpful," which would seem to be the case always. 10/30/25 Tr. 545:13–17. Instead, as the Founders understood it, the power "[t]o provide for calling forth the Militia to execute the Laws of the Union," U.S. Const. art. I, § 8, cl. 15, did not permit domestic military deployment as long as "the civil power was sufficient." Elliot, *Virginia Ratification Debates*, at 384 (statement of James Madison); *see also id.* at 400 (statement of Edmund Randolph) ("Does [this clause] provide that the laws are to be enforced by military coercion in all cases? No, sir. All that we are to infer is, that when the civil power is not sufficient, the militia must be drawn out."). This historical understanding is bolstered by Congress's earliest delegations of this power to the

President, which required opposition to federal law "too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals." Militia Act of 1792, ch. 28, § 2, 1 Stat. 264, 264; Militia Act of 1795, ch. 36, § 2, 1 Stat. 424, 424.

And here, the temporary surge of approximately 80 federal officers in response to the violence in June, which quickly tapered off to a steady state of around 30 additional officers— and which further tapered off to generally 20 additional officers in September prior to the President's September 27, 2025 federalization order, *see* Ex. 773—does not begin to approach a situation in which "the civil power is not sufficient." Elliot, *Virginia Ratification Debates*, at 384 (statement of James Madison). FPS Deputy Regional Director R.C. testified that based on officers' longer 10-hour and 12-hour shifts, as opposed to the usual 8-hour shifts, and the mental toll of protesters' using "racial slurs," he did not believe that it was "sustainable to surge this many FPS officers to Portland." 10/30/2025 Tr. 396:5–398:9. But even accepting R.C.'s testimony that the *FPS* deployment was unsustainable, the subsequent deployment of over a hundred federal law enforcement officers from other agencies in the days after the President's September 27, 2025 federalization order show that law enforcement resources from Customs and Border Patrol, the Bureau of Prisons, and other law enforcement agencies were available between June and September 27, 2025. In short, the civil power was more than sufficient.

The one historical example of the President explicitly invoking 10 U.S.C. § 12406(3)—or technically, its predecessor statutes with identical language—provides further support for the magnitude of "staffing difficulties" required before the President may invoke Section 12406(3). *Oregon v. Trump*, 2025 WL 3008050, at *29–31 (Graber, J., dissenting); *see Noel Canning*, 573 U.S. at 525 ("[The Supreme] Court has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice

began after the founding era."). Defendants note that in this singular invocation of Section 12406(3) in the twentieth century, President Nixon "called forth the National Guard to ensure the mail was delivered when postal workers went on strike." Defs. Post-Trial Br., ECF 131 at 8. But Defendants do not mention that this strike involved "over a quarter of all national postal workers," which "caused the whole postal system to become inoperable." *Newsom v. Trump*, No. 25-3727, 2025 WL 2977104, at *13 (9th Cir. Oct. 22, 2025) (Berzon, J., regarding the denial of rehearing en banc) (internal quotations omitted); *see* Exec. Order No. 11,519, 35 Fed. Reg. 5003 (Mar. 24, 1970) ("[T]he breakdown of the postal service in the numerous areas affected by the said unlawful work stoppage is a matter of grave national concern"); *see Oregon v. Trump*, 2025 WL 3008050, at *27 (Graber, J., dissenting) ("akin to a modern-day shutdown of the internet").

*Third*, at trial, the parties hotly contested to what extent local law enforcement, namely the PPB, has responded to criminal conduct outside the Portland ICE facility. As an initial matter, Defendants do not dispute that under the Tenth Amendment, Oregon "has the right, pursuant to the anticommandeering rule, to refrain from assisting with" "the federal government's immigration enforcement efforts." *United States v. California*, 921 F.3d 865, 876, 890–91 (9th Cir. 2019) (upholding California's sanctuary law "limit[ing] law enforcement's 'discretion to cooperate with immigration authorities,'" including "'[a]ssisting immigration authorities' in certain activities" (first quoting Cal. Gov't Code § 7282.5(a); and then quoting *id.* § 7284.6(a)(1))). Rather, they contend that PPB's implementation of Oregon's sanctuary law hamstrung federal officers' ability to execute federal law. But the trial evidence demonstrated just the opposite. PPB established policies that allowed them to be a helpful partner in addressing crime that occurred at the protests. For example, from June 17 to September 27, 2025, PPB maintained an open line of communication with federal law enforcement and consistently

responded to requests for assistance when PPB resources permitted. On June 15, 2025, PPB

Assistant Chief Dobson instructed officers to address "both misdemeanor and felony-level

crimes on and near the ICE facility," and PPB officers made several such arrests in the ensuing

days. Ex. 770 at 2–3. It is true that PPB has not removed debris from the Portland ICE driveway

because it has interpreted such activity as prohibited by Oregon's sanctuary law, but such

inaction by PPB is, at most, "minimal interference with the execution of [federal] laws."

*Newsom*, 141 F.4th at 1051.[21]

 *Fourth*, Defendants rely on a generalized "prevention of violence" that "will be enhanced

through the federalization of Guardsmen," without distinguishing between violence toward

federal personnel and violence between protesters and counter-protesters. Defs. Pre-Trial Br.,

ECF 115 at 23. As discussed above, the former seldom occurred after mid-June, and after that

time, the latter constituted the majority of violent incidents outside the Portland ICE building.

Such violence between protesters and counter-protesters has little to no bearing on whether

federal officers were able to execute federal immigration laws in Portland, Oregon. Defendants

are correct that *Newsom* relied on "common sense," *id.* at 26, in finding that violence directed

toward federal officers was evidence of "protesters' interference with the ability of federal

officers to execute the laws." 141 F.4th at 1052. But the same common sense does not apply to

---

[21] The occasional friction between PPB and federal law enforcement due to Oregon's sanctuary law stands in stark contrast to Civil Rights era examples of National Guard deployments to respond to state defiance of federal Civil Rights laws. *See Newsom v. Trump*, 2025 WL 2977104, at *12 (Berzon, J., regarding the denial of rehearing en banc) (describing how "Presidents Eisenhower, Kennedy, and Johnson federalized the National Guard at various points during the civil rights era when state law enforcement made clear that it would not enforce federal orders, and, in some cases, openly tried to prevent enforcement"). Although these federalizations occurred under the Insurrection Act, "[i]n each of these cases, because regular law enforcement refused to perform their duties, federalization of the National Guard was necessary to execute federal law." *Id.* PPB's failure to clear debris does not approach this level of obstruction.

assaults between protesters that do not involve federal officers. It is unclear how such violence obstructs federal officers in any way, aside from the occasional minimal encroachment on their time and attention, especially when considering such crimes fall under the purview of "general police power of the sort retained by the States." *United States v. Lopez*, 514 U.S. 549, 567 (1995).

Such a scenario of sending the National Guard as a response to commonplace crimes was precisely what the Founders feared would be misread in the Militia Clauses' "to execute the Laws of the Union." When Patrick Henry stoked fear that if "the militia were to be called forth to execute the laws," then "[t]he sheriff will be aided by military force," Elliot, *Virginia Ratification Debates*, at 387, James Madison assured him that "[t]he civil officer is to execute the laws on all occasions; and, if he be resisted, this auxiliary power is given to Congress of calling forth the militia to execute them, when it shall be found absolutely necessary," *id.* at 392. Edmund Randolph made the point even more explicit, that as to Patrick Henry's suggestion that "the militia are to be called forth to arrest petty offenders against the laws[,] [o]ught not common sense to be the rule of interpreting this Constitution?" *Id.* at 400. Again, the statutory progenitors to Section 12406(3) mandated that the exigency overcome "the marshals." Militia Act of 1792, ch. 28, § 2, 1 Stat. 264, 264; Militia Act of 1795, ch. 36, § 2, 1 Stat. 424, 424.

*Fifth*, Defendants cite violence that occurred after the President's September 27, 2025 federalization order and events that occurred in other states, such as in Texas and Illinois, to justify the President's callout. Defs. Pre-Trial Br., ECF 115 at 27. Whatever modicum of relevance these events have to whether the President had a colorable basis to deploy the National Guard to Portland, Oregon, on September 27, 2025, they do not move the needle. *Henderson v.*

*Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) (noting that adding together "two untenable claims" does not make "a tenable one" because "in law as in mathematics zero plus zero equals zero").

In summary, this Court concludes that the President did not have a colorable basis to invoke 10 U.S.C. § 12406(3) when he federalized the National Guard on September 27, 2025.[22]

### b. Section 12406(2)

Defendants also argue that the President's federalization of the National Guard on September 27, 2025 was valid under 10 U.S.C. § 12406(2). Although this Court is bound by *Newsom* with respect to subsection three, the Ninth Circuit expressly did "not reach the other condition invoked by the President . . . concerning 'rebellion.'" 141 F.4th at 1051. This Court therefore must interpret subsection two to resolve this claim. The statute provides:

> Whenever . . . there is a rebellion or danger of a rebellion against the authority of the Government of the United States . . . the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to . . . suppress the rebellion.

10 U.S.C. § 12406(2).

"[S]tatutory interpretation must 'begi[n] with,' and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (quoting *Nat'l Assn. of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018)) (second alteration in *Groff*); *see also Eleri v. Sessions*, 852 F.3d 879, 882 (9th Cir. 2017) ("A question of statutory interpretation begins with the plain language

---

[22] The parties do not distinguish between the deployment of the already federalized California National Guardsmen from the federalization of the Oregon and Texas National Guardsmen in discussing the legality of the President's deployments to Oregon. However, the statute is clear that even if the California National Guardsmen may currently be validly federalized under 10 U.S.C. § 12406(3) for deployment *in California*, the plain text of the statute only permits them to be deployed to "execute those laws" that the President was "unable with the regular forces to execute." Therefore, these Guardsmen cannot proceed to enforce other laws in other states that have no connection to their initial federalization. And thus, the parties are correct to assume that if the President violated Section 12406(3) when he federalized the Oregon and Texas National Guards, he also violated the statute when he deployed the California National Guard to Oregon.

of the statute." (internal quotations omitted)). Rebellion is not defined in the statute, however, so this Court must "look to the language's ordinary meaning" to determine what the statute says.[23] *Tomczyk v. Garland*, 25 F.4th 638, 644 (9th Cir. 2022). However, "statutory terms can carry meanings that depart from their ordinary ones." *Feliciano v. Dep't of Transportation*, 605 U.S. 38, 45 (2025). "Congress may, for example, . . . employ a term of art with long-encrusted connotations in a given field." *Id.* As explained further below, the ordinary meaning of rebellion is an organized group engaged in sustained, armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means. That ordinary meaning is only buttressed by the term's "historical and governmental contexts" in the late 1800s and early 1900s. *Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring) (quotation omitted); *see also Waetzig v. Halliburton Energy Servs., Inc.*, 604 U.S. 305, 318 (2025) ("[O]ur reading . . . is buttressed by the historical context in which the [law] was enacted.").

### i. Ordinary Meaning

"To determine ordinary meaning," courts "consider dictionary definitions." *United States v. Cox*, 963 F.3d 915, 920 (9th Cir. 2020). However, "words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute,'" *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) (quoting *Perrin v. United*

---

[23] This Court's prior definitions of rebellion from its October 4 TRO opinion and its November 11 preliminary injunction opinion are not the law of the case. The "general rule" is that "decisions at the preliminary injunction phase do not constitute the law of the case." *Ranchers Cattlemen Action L. Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007); *see also* Wright & Miller Fed. Prac. & Proc. § 4478.5 ("Preliminary or tentative rulings do not establish law of the case."). The law of the case doctrine also "does not preclude a court from reassessing its own legal rulings in the same case." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018). The doctrine instead applies "most clearly where an issue has been decided by a higher court," *id.*, which has not occurred here. Since this Court's prior rulings, other federal courts have weighed in on what subsection two means. As such, this Court finds it both appropriate and advantageous to reexamine the definition of the term rebellion.

*States*, 444 U.S. 37, 42 (1979)). As explained above, Section 12406 was not enacted "on a blank slate." *See Newsom*, 141 F.4th at 1047 (describing precursor statutes). The first time the phrase "rebellion against the authority of the Government of the United States" appears in a delegation of Congress's constitutional calling forth power is in the Militia Act of 1903. *See* Pub. L. No. 57-33, §§ 1, 4, 32 Stat. 775, 775–76. Therefore, this Court consults dictionary definitions from the late 1800s and early 1900s to discern ordinary meaning.

Legal dictionaries from the relevant period define rebellion as:

> Deliberate, organized resistance, by force and arms, to the laws and operations of the government, committed by a subject.

> Rebellion, Black's Law Dictionary (1st ed. 1891).

> The taking up of arms traitorously against the government; the forcible opposition and resistance to the laws and process lawfully installed. If the rebellion amounts to treason, it is punished by the laws of the United States with death. If it be a mere resistance of process, it is generally punished by fine and imprisonment.

> Rebellion, The Cyclopedic Dictionary of Law (1901).

Common-use dictionaries share several attributes with these legal definitions:

> 1.      An open and avowed renunciation of the authority of the government to which one owes allegiance; or the taking of arms traitorously to resist the authority of lawful government; revolt. Rebellion differs from insurrection . . . . Insurrection may be a rising in opposition to a particular act or law, without a design to renounce wholly all subjection to the government. Insurrection may be, but is not necessarily, rebellion.

> 2.      Open resistance to lawful authority.

> Rebellion, American Dictionary of the English Language (1900).

> 1.      The act of rebelling; open and avowed renunciation of the authority of the government to which one owes obedience, and resistance to its officers and laws, either by levying war, or by aiding others to so; an organized uprising of subjects for the purpose of coercing or overthrowing their lawful rule or government by force; revolt; insurrection.

2.        Open resistance to, or defiance of, lawful authority.

Rebellion, Webster's International Dictionary of the English Language (1903).

From these definitions, Defendants add that rebellions include "open resistance or opposition to an authority or tradition" and "disobedience of a legal command or summons." *See* ECF 131 at 4 (quoting Black's Law Dictionary (12th ed. 2024) (brackets omitted)). However, "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Rebellion does not so far extend in Section 12406, because "the Government's literal sweep . . . sits uncomfortably with common usage." *See Abuelhawa v. United States*, 556 U.S. 816, 820 (2009). We do not call the 300,000 Americans who participated in the March on Washington rebels, even though they openly opposed the tradition of legal segregation. *See* Jill Lepore, These Truths 60910 (2018) (hereinafter "Lepore"). Nor do we refer to the movement in high schools to don black armbands in opposition to the Vietnam War a rebellion. *See Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 504 (1969); *see also id.* at 513 ("Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven."). And when Congress passed the Militia Act of 1903, it certainly did not have in its sights Elizabeth Cady Stanton and attendees of the 1848 Seneca Falls Convention, even though their Declaration of Sentiments, which demanded women's right to vote, "echoed the Declaration of Independence" by "declar[ing] the causes which impel[led] them to the separation." *See* Lepore at 257 (quotations omitted). In the ordinary meaning, a rebellion is something more than these mere shows of discontent with law, policy, or government. Four additional features are common among the contemporaneous dictionary definitions above:

*First*, a rebellion is organized. *See* Rebellion, Webster's International Dictionary of the English Language (1903) ("an organized uprising of subjects"); Black's Law Dictionary (1st ed. 1891) ("organized resistance"). To be organized is to be "arrange[d] or constitute[d] in parts, each having a special function." Organize, Webster's Revised Unabridged Dictionary (1913); *see also* Organize, American Dictionary of the English Language (1900) ("to form, as an organized body: to arrange").

*Second*, and relatedly, because a single person cannot be arranged or constituted in parts, a rebellion must be made up of multiple people. Defendants' definition ("open resistance or opposition") stretches beyond ordinary meaning because under it, a single protester could, by herself, constitute a rebellion. In context, "organization" refers to coordination, whether in physical movement or ideological cause.

*Third*, the group must take up arms collectively. *See* The Cyclopedic Dictionary of Law (1901) ("taking up of arms traitorously"); American Dictionary of the English Language (1900) ("taking of arms traitorously"); Black's Law Dictionary (1st ed. 1891) ("by force and arms"). As explained, a rebellion's "organization" requires collective movement. Thus, the group must be *collectively* armed. A protest therefore does not "become a rebellion merely because of sporadic and isolated incidents of unlawful activity or even violence committed by rogue participants in the protest." *Illinois v. Trump*, 2025 WL 2937065, at *6. Nor does a protest become a rebellion when individual protesters "exercise their Second Amendment right to carry firearms as the law currently allows." *Id.* Rather, a rebellion occurs when the group itself takes up arms in some sort of collective or organized fashion.

That taking up of arms must also be aggravated and not easily quelled. It must be sustained. Indeed, some definitions explicitly recognize that a rebellion is the equivalent of

"levying war." *See* Rebellion, Webster's International Dictionary of the English Language (1903). It would belie common usage to call a violence that can be immediately quelled by authorities, war. War is "to carry on hostilities; to be in a state of violence." Webster's Revised Unabridged Dictionary (1913); *see also* War, American Dictionary of the English Language ("a state of opposition or contest").

*Fourth*, the common purpose of a rebellion is to overtake an instrumentality of government by unlawful or antidemocratic means. *See* Rebellion, Webster's International Dictionary of the English Language (1903) ("an organized uprising of subjects for the purpose of coercing or overthrowing their lawful rule or government by force; revolt; insurrection"); The Cyclopedic Dictionary of Law (1901) ("taking up of arms traitorously against the government; the forcible opposition and resistance to the laws and process lawfully installed"); American Dictionary of the English Language (1900) ("open and avowed renunciation of the authority of the government to which one owes allegiance . . . ; revolt."). That specific objective separates rebellion from mere protests that resort to "civil disobedience." *See Illinois v. Trump*, 2025 WL 2937065, at *6.

This characteristic is confirmed by the "specific context in which that language is used." *See Yates v. United States*, 574 U.S. 528, 537 (2015). When it drafted Section 12406(2), Congress did not use the word rebellion in isolation. Rather, rebellion is immediately followed, and thus informed, by the phrase "against the authority of the Government of the United States." 10 U.S.C. § 12406(2). Turning again to ordinary meaning, authority is:

> 1. Legal or rightful power; a right to command or to act; power exercised [by] a person in virtue of his office or trust; dominion; jurisdiction; authorization; as, the authority of a prince over subjects, and of parents over children; the authority of a court.

2. Government; the persons or the body exercising power or command; as, the local authorities of the States; the military authorities.

Authority, Webster's Revised Unabridged Dictionary (1913).

In governmental law. Legal power; a right to command or to act; the right and power of public officers to require obedience to their orders lawfully issued in the scope of their public duties.

Authority, Rebellion, Black's Law Dictionary (1st ed. 1891).

In Governmental Law. The right and power which an officer has, in the exercise of a public function, to compel obedience to his lawful commands. A judge, for example, has authority to enforce obedience to his lawful orders.

Authority, The Cyclopedic Dictionary of Law (1901).

From these definitions, authority of the Government of the United States is the right of the government to require obedience to the law (and therefore, the lawful orders of public officers). A rebellion against the right of a governmental entity to enforce law is, put another way, a rebellion for the purpose of overtaking an instrumentality of government. *See Illinois v. Trump*, 2025 WL 2886645, at *15 (N.D. Ill. Oct. 10, 2025) ("[S]hould the dictionary definitions leave any doubt, the text of subsection (2) itself requires that the rebellion be against the authority of the Government of the United States." (quotation omitted)).

Accordingly, a rebellion is an organized group engaged in sustained, armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means. Section 12406(2) also discusses a "danger of rebellion." In 1903, a danger included

1. Exposure to injury, loss, pain, or other evil.
2. Domain; reach or power for harm.
3. Hesitation; coyness; caution.

Danger, Webster's Unabridged (1865).

1. Authority; jurisdiction; control.
2. Power to harm; subjection or liability to penalty.
3. Exposure to injury, loss, pain, or other evil; peril; risk;

insecurity.
4.      Difficulty; sparingness.
5.      Coyness; disdainful behavior.

Danger, Webster's Revised Unabridged Dictionary (1913).

A [hazard] or risk; insecurity; hence, power to hurt.

Danger, American Dictionary of the English Language (1900).

The ordinary meaning of danger is a hazard or risk. But "unquestionably the courts, in interpreting a statute, have some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results or would thwart the obvious purpose of the statute." *C.I.R. v. Brown*, 380 U.S. 563, 571 (1965) (citation modified). Danger cannot have a meaning "so broad that it [becomes] inconsistent with" the other sections of the statute. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). The *Newsom* court called subsection (1) ("invasion") an "unusual and extreme exigenc[y]." *See* 141 F.4th at 1051. Without some limiting principle to "danger," subsection (2) would embrace ordinary criminal conspiracies and mine-run political unrest. It would also render subsection three superfluous: interpreting "danger of rebellion" to mean any remote risk would permit the President to federalize the National Guard upon an inkling of discontent expressed by lawful First Amendment activity that does not at all impede the execution of federal law. Such a broad reading of danger would "swallow subsection" three. *See Newsom*, 141 F.4th at 1051; *accord id.* at 1052 ("Congress would not go to the trouble of spelling out a list of terms if a neighboring term swallowed it up." (quoting *Fischer v. United States*, 603 U.S. 480, 490 (2024) (adopting alterations)).

The contextually appropriate definition of danger, then, must include some limiting principle. Here, that limit is temporal: a hazard is a "peril," *see* Hazard, Webster's Revised Unabridged Dictionary (1913), and "falls or comes suddenly," Webster's American Dictionary

of the English Language (1828). So too is a risk "an abrupt precipice, hence danger." *See* Risk, American Dictionary of the English Language (1900). Accordingly, there is a "danger" for purposes of subsection (2) when there is an impending threat of a rebellion.

## ii. History and Tradition

History confirms this definition and the scope of Congress's delegation in Section 12406(2). Defendants argue that a rebellion for purposes of Section 12406(2) "encompasses . . . violent resistance to lawful enforcement of federal immigration law," and that any definition of rebellion must embrace this "original historical precedent of violent opposition limited to a particular federal law." Defs. Post-Trial Br., ECF 131 at 34, 5. But history does not reflect Defendants' definition. As then-Judge Barrett observed on the Seventh Circuit, "rebellion was a very specific crime" in the colonies. *See Kanter v. Barr*, 919 F.3d 437, 455 (7th Cir. 2019) (Barrett, J., dissenting). It was "a traiterous taking up arms, or a tumultuous oppos[ition to] the authority of the king . . . or supreme power in a nation" by individuals "bent on overthrowing" the government. *Id.* (first quoting Rebellion, 2 New Universal Etymological English Dictionary (4th ed. 1756)).

Rebellion remained a specific crime in the nineteenth century. Roughly forty years before the term was incorporated into the Militia Act of 1903, delegates from South Carolina sparked the largest rebellion in American history when it repealed the State's ratification of the Constitution. Lepore at 289. In February of 1861, Mississippi, Florida, Alabama, Georgia, Louisiana, and Texas joined South Carolina and formed the Confederate States of America. *Id.* The delegates of the seven seceding states adopted a new constitution "disavow[ing] the truths of the Union," and founded their "new government." *Id.* at 290 (quotations omitted). The American Civil War marked "four brutal, wretched years of misery," with casualties "on a scale never before seen." *Id.* at 293. Addressing Congress in 1862, President Lincoln remarked: "Without

slavery the *rebellion* could never have existed; without slavery it could not continue." Abraham Lincoln, Second Annual Address (Dec. 1, 1862).

In the aftermath, each branch of government referred to the Civil War as "the rebellion." President Andrew Johnson, for example, granted a full pardon and amnesty for the offense of treason "to persons who had been or were concerned in the late rebellion against the lawful authority of the Government of the United States." Proclamation No. 179, Granting Full Pardon and Amnesty for the Offense of Treason Against the United States During the Late Civil War, December 25, 1868. The Supreme Court described confederate soldiers as "insurgents who have risen in rebellion against their sovereign, expelled her Courts, established a revolutionary government, organized armies, and commenced hostilities." *The Prize Cases*, 67 U.S. 635, 670 (1862); *see also Young v. United States*, 97 U.S. 39, 58 (1877) ("Beyond all doubt, the late rebellion against the government of the United States was a sectional civil war."). Congress was certainly aware of those "pre-existing judicial interpretations" of the term rebellion when it put the word in the Militia Act of 1903. *Cf. United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) (en banc).

The next time Congress delegated its constitutional calling forth power, in the Militia Act of 1903, it introduced the phrase "rebellion against the authority of the Government of the United States." *See* Pub. L. No. 57-33, § 4, 32 Stat. 775, 775–76. Where Congress borrows a term of art that has "accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to [the] borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind." *Morissette v. United States*, 342 U.S. 246, 263 (1952); *accord Sekhar v. United States*, 570 U.S. 729, 73233 (2013).

This does not mean that rebellion is synonymous with the Civil War. Congress surely reflected other historical rebellions in the definition, too. *Contra* Defs. Post-Trial Br., ECF 131. Start with the Whiskey Rebellion. Defendants characterize the Whiskey Rebellion as a "violent opposition limited to a particular federal law," and "civil disorder[ ]." ECF 131 at 5. But the Whiskey Rebellion was the "[s]ingle largest example of armed resistance to a law of the United States between the ratification of the Constitution and the Civil War." THOMAS P. SLAUGHTER, THE WHISKEY REBELLION 5 (1986). Opposition to a federal whiskey tax imposed in the wake of the Revolutionary War caused escalating violence in western Pennsylvania until excise officers were unable to collect taxes. ROBERT W. COAKLEY, THE ROLE OF FEDERAL MILITARY FORCES IN DOMESTIC DISORDERS 17891878, 2833 (1988) (hereinafter COAKLEY). "The federal district court in the insurgent district was unable to sit, so that afterwards it was necessary for Congress to enact special legislation reviving suits and process which had been pending but were discontinued when the court was unable to sit." David E. Engdahl, *Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 IOWA L. REV. 1, 49 n.237 (1971). The "judiciary was 'stripped of its capacity to enforce the laws.'" *Id.* (quoting Washington's Sixth Annual Address to Congress, Nov. 19, 1794, 1 Richardson, Messages Papers of the Presidents 162, 164 (1896)); *see also Duncan v. Kahanamoku*, 327 U.S. 304, 321 (1946) (recounting President Washington's address to the Commanding General that "the judge can not be controlled in his functions"). The conflict reached a boiling point when a group of 7,000 to 15,000 armed men gathered to resist the law. COAKLEY at 3536. President Washington called forth the militia to put down the resistance. *Id.* In President Washington's view, the insurgents were committing "treason, . . . overt acts of levying war against the United States." Engdahl,

*Soldiers, Riots, and Revolution*, 57 Iowa L. Rev. at 49 n.237 (quoting Presidential Proclamation, Aug. 7, 1794, 4 Ann. of Cong. 1412).

Shays's Rebellion also fits this Court's definition of rebellion. In 1786, Daniel Shays organized 15,000 rebels (or "Shaysites," as they called themselves) around the common purpose of "annihilat[ing] all debts public and private." *See* Akhil Amar, The Words that Made Us 298300 (2021) (hereinafter "Amar"). The Shaysites resorted to mob violence to shut down colonial courts and advance a scheme of "unfunded paper money." *Id.* 300. They "blockad[ed] courthouses and seiz[ed] a federal armory." *See* Lepore at 116. "If the Shaysites prevailed, creditors who had lent out hard currency and bargained for repayment in the same coin would be forced to accept worthless paper" and the colonial courts would be incapable of collecting real currency. Amar at 30001. When the Governor of Massachusetts deployed the militia to quell the rebellion, the "great objects" of their mission were to "protect the judicial courts, to assist the civil magistrates in executing the laws, and to aid them in apprehending the disturbers of the public peace." *Duncan*, 327 U.S. at 320 (citation modified).

In 1799, John Fries advanced a similar scheme to seize tax collectors. *See generally* W.W.H. Davis, The Fries Rebellion 15 (1899). Fries organized regular meetings of farmers discontent with a tax levied during the Quasi-War between the United States and France. *Id.* at 1424. Fries convinced the federal-appointed tax assessor to resign while his insurgents marched towards Quakertown, Pennsylvania. *Id.* at 2937. The U.S. Marshal began issuing arrests for tax resistance. *Id.* at 4856. Then, two groups of rebels hijacked the Marshal's prisoners and freed the tax resisters. *Id.* at 5766. Calling forth the militia, President Adams called the rebellion a "combination[ ] to defeat the execution of the laws" amounting to "overt acts of levying war against the United States" of which "well-affected citizens" and "executive officers" could not

quell. John Adams, Proclamation No. 9, Law and Order in the Counties of Northampton, Montgomery, and Bucks, in the State of Pennsylvania (March 12, 1799). Just as with the perpetrators of the Whiskey Rebellion, the Shaysites and Fries's cadre were organized groups engaged in armed hostilities for the common purpose of overtaking an instrumentality of government (federal courts and the system of national currency) by violent, antidemocratic means.

Describing the three tax rebellions to Thomas Jefferson, John Adams said:

> [Y]ou never felt the Terrorism of Chaises [Shays] Rebellion in Massachusetts. I believe you never felt the Terrorism of Gallatins Insurrection [the Whiskey Rebellion] in Pensilvania: you certainly never reallized the Terrorism of Fries's, most outragious Riot and Rescue, as I call it, Treason, Rebellion as the World and great Judges and two Juries pronounced it. you certainly never felt the Terrorism, excited by Genet, in 1793. when ten thousand People in the Streets of Philadelphia, day after day, threatened to drag Washington out of his House, and effect a Revolution in the Government, or compell it to declare War in favour of the French Revolution, and against England. The coolest and the firmest Minds, even among the Quakers in Philadelphia, have given their opinions to me, that nothing but the yellow Fever . . . could have Saved the United States from a total Revolution of Government.

Letter from John Adams to Thomas Jefferson (June 30, 1813). Defendants' characterization of these historical rebellions as violent oppositions limited to a particular federal law minimizes grossly the level of coordination between the participants and ignores entirely their common purpose to seize an instrumentality of the federal government. Founding-era Presidents did not call forth the National Guard because the tax rebellions were violent protests against one federal law. They called forth the National Guard because the tax rebellions were sustained, organized, armed hostilities aimed at—and capable of—overthrowing the new Government.

For purposes of Section 12406(2), a rebellion is an organized group engaged in sustained, armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or

antidemocratic means. There is a danger of rebellion where an armed group organized for the

purpose of overtaking an instrumentality of government by unlawful or antidemocratic means

has the actual power to harm the government by waging armed warfare.

### iii. Application

Based on the facts on the ground outside the Portland ICE building throughout the

relevant time period between the outbreak of protests in June and the President's federalization

order on September 27, 2025, this Court holds that the President did not have a colorable basis to

invoke Section 12406(2) when he ordered the federalization of the Oregon National Guard.

Because the statute permits the President to federalize the Guard upon either a rebellion or a

danger of rebellion, the question here is whether the conditions predating the President's

September 27th federalization constituted at least a danger of a rebellion.

Again, the answer is no. The protesters at the ICE Facility were not organized. Further,

evidence at trial does not support that the protesters acted with the common purpose of

overtaking the Portland ICE facility by unlawful or antidemocratic means. Nor did the trial

evidence demonstrate that the protesters ever had the actual power to harm the government by

waging armed warfare—on June 14 or otherwise. Defendants point to Commander Schoening's

riot declaration on June 14, two PPB reports from June 12 and 13, and one PPB incident report

from July 4 to argue that violent agitators, many of whom were organized, specifically targeted

federal personnel and buildings to impede enforcement.

But none of these days satisfied the features of a "rebellion." Start with whether the

protesters were organized. Commander Schoening testified that, unlike the marches downtown

opposing immigration, there was no group in charge of the protest activity at the Portland ICE

facility. With thirteen years of experience policing in Portland and at least eight working for

PPB's Rapid Response Team, Commander Schoening also testified that, at least in Portland,

"Antifa" is not an organized group and is a term frequently misused. Although passing references to "Antifa" ascribe ideology to a few protesters at the ICE facility, there is no evidence corroborating that ideology, or demonstrating leadership or differentiation among protesters based on this label. Similarly, this Court does not give considerable weight to what Commander Schoening called organic organization, from which an observer could infer de minimis organization among protestors, such as protestors wearing black bloc. This Court had the opportunity to evaluate Commander Schoening's demeanor and testimony and found it to be highly credible and affords it great weight.

Further, this Court heard no testimony that protesters were collectively armed. In the three months of ICE Facility protests, law enforcement confirmed the presence of only six projectile weapons, four of which were guns. The individuals who brought these weapons to the protests never brandished or used their weapons in any way, spare one incident in October post-dating the President's federalization of the National Guard. Each of these protesters brought their weapons on different days, suggesting a lack of organization or common plan to brandish the weapons in a collective manner. Although short-range weapons, such as knives and pepper spray, were occasionally present at the protests, a very small minority of protesters carried these kinds of weapons and there is similarly no evidence that protesters brandished these weapons in a unified front. The same is true with respect to the "sticks and bats" this Court heard brief testimony about. There is only evidence of one incident involving a protester using a stick to hit a federal officer. Otherwise, no evidence was presented that they were brandished or used in any sort of menacing way. Indeed, none of the witnesses seemed to have any idea what happened to the sticks or bats.

June 14, the day PPB declared a riot, is the closest protesters got to "levying war" on the ICE Facility. Some protesters threw rocks at the facility, which struck ICE officers. There is no evidence that June 14 was anything more than a spontaneous event, and moreover it appears that a majority of protesters that day were nonetheless nonviolent. In that way, June 14 similarly lacks the organization and collective arming required to constitute a rebellion. Setting those defects aside, though, there is no evidence in the record that the chaos of June 14 ever occurred again. PPB, FPS, and other law enforcement arrested protesters who broke the law that day, and they continued to do so throughout the summer of 2025. Unlike the historical rebellions where the President federalized the National Guard, local and federal law enforcement quelled the violence of mid-June.

Even more detrimental to Defendants' argument for rebellion is that there is no evidence that the protesters outside the Portland ICE building acted with a purpose to overtake an instrumentality of government by unlawful or antidemocratic means. To be sure, the sporadic incidents of violence and crime at the Portland ICE facility are unlawful. But the Court received no evidence that there was a collective purpose animating that criminality—e.g., to supplant federal authority in any manner.

Defendants also argue that creating life-threatening dangers for federal officers enforcing federal law (as well as bystanders) and targeting federal employees for their work performing federal functions surely amounts to a dangerous risk of rebellion. The first half of that argument goes too far. If a life-threatening danger to a federal officer alone created the risk of rebellion, then it would seem the President could call up the National Guard every day. Officers in the FBI, DHS, HSI, TSA, and countless other agencies encounter life-threatening dangers by trade. In any event, Defendants overstate the degree of physical danger they faced at the ICE facility. In the

months preceding the President's federalization, there were sporadic and isolated incidents of violence that did not cause serious injuries to federal officers.

Neither does the online targeting of federal employees—doxing and harassment, although reprehensible—cannot alone create a danger of rebellion in this case. First, rebellion is an inherently physical action. Purely online action might constitute a danger of rebellion, but it ought to demonstrate clearly evidence of preparation, coordination, or other planning. The online "doxers" did some coordination by circulating a post discussing the location of federal officers. And one "doxer" also honked and jeered at an ICE officer by the Oregon and Washington border, around nine miles North of the ICE Facility. Even assuming that this real-life activity is sufficient evidence of danger, however, Defendants presented no credible evidence that this danger is connected to the demonstrators at the ICE Facility. The doxing posters Defendants mention in evidence (and did not testify about at trial) were put up in locations around the city far from the ICE Facility, and Defendants put forth no evidence connecting any single demonstrator to those posters.

Finally, it is telling that all of Defendants' evidence of danger predates July 5—more than two months prior to the President's federalization of the National Guard. To be sure, more evidence of coordination existed in June, such as protesters donning black bloc. But that evidence, nonetheless scant, dissipated after July 4. And the President did not call out the National Guard in response to the disturbances outside the Portland ICE facility in June or July. He federalized the Oregon National Guard on September 27. In short, this Court concludes that the President did not have a colorable basis to invoke 10 U.S.C. § 12406(2) when he federalized and deployed the National Guard to the Portland ICE building in Oregon.

### c. Tenth Amendment

Defendants' deployment of unlawfully federalized National Guard troops to Oregon also violated the Tenth Amendment. Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." As discussed above with respect to standing, Defendants' federalization and deployment of the Oregon National Guard commandeered these state officers to enforce a federal law enforcement program at the Portland ICE facility, in violation of the Tenth Amendment. *Printz*, 521 U.S. at 935. And as to the federalized California and Texas National Guards, these deployments involve the intrusion of California and Texas National Guardsmen in their capacity as militiamen of those States, in violation of Oregon's "sovereignty under the Constitution," and Oregon's "*equal* sovereignty among the States." *Shelby County*, 570 U.S. at 544 (internal quotations omitted) (emphasis in original). *See Alden v. Maine*, 527 U.S. 706, 748 (1999) ("Although the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation.").

### 2. Remaining Permanent Injunction Factors

In addition to actual success on the merits, to obtain a permanent injunction, Plaintiffs must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Oppenheimer & Co. Inc. v. Mitchell*, 135 F.4th 837, 850 (9th Cir. 2025) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Where the party opposing injunctive relief is the government,

"the third and fourth factors—the balance of equities and the public interest—merge." *Garcia v. County of Alameda*, 150 F.4th 1224, 1234 (9th Cir. 2025) (internal quotations omitted).

Plaintiffs have demonstrated each of these remaining requirements. Plaintiffs have shown irreparable harm because prevailing on a constitutional claim "will almost always demonstrate [the plaintiff] is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). For both constitutional harms that Oregon suffers from the deployment of its own National Guardsmen and the Guardsmen of other states, "there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *see also id.* ("Because intangible injuries generally lack an adequate legal remedy, intangible injuries may qualify as irreparable harm." (brackets and internal quotations omitted)). And Plaintiffs' "success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in [their] favor." *Baird*, 81 F.4th at 1042; *see also id.* ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022))). "The government also 'cannot reasonably assert that it is harmed in any legal cognizable sense by being enjoined from constitutional violations.'" *Id.* (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983)).

## CONCLUSION

For the above reasons, this Court concludes that Plaintiffs have demonstrated that Defendants violated 10 U.S.C. § 12406 and the Tenth Amendment and satisfy the requirements for a permanent injunction. Therefore, this Court **PERMANENTLY ENJOINS** Defendants[24] Pete Hegseth, the U.S. Department of Defense, Kristi Noem, and the U.S. Department of

---

[24] As this Court may lack jurisdiction to enjoin President Trump in the performance of his official duties, *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866), this injunction applies only against the other Defendants.

Homeland Security from implementing the following memoranda federalizing and deploying members of the National Guard in Oregon:

1. Defendant Secretary Hegseth's September 28, 2025 Memorandum federalizing and deploying the Oregon National Guard, Ex. 1051;

2. Defendant Secretary Hegseth's October 5, 2025 Memorandum federalizing and deploying the Texas National Guard, to the extent that it deploys members of the Texas National Guard in Oregon, Ex. 6;

3. Defendant Secretary Hegseth's October 16, 2025 Memorandum to the extent that it authorizes the deployment of federalized members of the California and Texas National Guards to Oregon, Ex. 2; and

4. any memoranda deploying members of any other State's National Guard to Oregon based on the same predicate conditions that were relied upon to authorize the above orders.

This Court retains jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651, to enforce the terms of this permanent injunction against any party.

This Court **STAYS IN PART** this Partial Final Judgment to the extent that it enjoins the federalization of members of any State's National Guard. With respect to the federalization of the Oregon National Guard, that **STAY** will be in effect for a period of 14 days. This partial administrative stay "preserves the status quo in which National Guard members have been federalized but not deployed." Order at 6, *Oregon v. Trump*, No. 25-6268, ECF 90 (9th Cir. Oct. 30, 2025). However, with respect to the deployment of any state's National Guard to Oregon, based on any of the above orders, **THIS PERMANENT INJUNCTION ORDER IS IN FULL FORCE AND EFFECT.**

**IT IS SO ORDERED.**


DATED this 7th day of November, 2025.


/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge
